USDC SCAN INDEX SHEET

















LMH   2/17/00   11:20

3:99-CV-00659   KANG V. U LIM AMERICA INC

*26*

*OPPM.*

1

**LAW OFFICE OF RICHARD E. GREY**
RICHARD E. GREY, Bar No. 157406

2

409 Camino Del Rio South, Suite 303
San Diego, California 92108

3

(619) 543-9300

4

**Attorney for Plaintiff SOO CHEOL KANG**

5

6

7

8

9

10

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

11

| SOO CHEOL KANG | ) | CASE NO. 99CV0659 JM(RBB) |

12

PLAINTIFF,

13

v.

14

U.LIM AMERICA, INC. a California
corporation; TAE JIN YOON,

15

and DOES 1 to 100

16

DEFENDANTS.

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS MOTION FOR
SUMMARY JUDGMENT AND MOTION
FOR SUMMARY ADJUDICATION OF
CLAIMS**

Date:    February 22, 2000
Time:    10:30 a.m.
Room:   6
Judge:   Hon. Jeffrey Miller

17

18

19

20

21

22

23

24

25

26

27

28

FILED

00 FEB 16 PM 3: 28

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

# TABLE OF CONTENTS

**BACKGROUND**

*General Introduction*
*Corporate Structure of the U.LIM Enterprises.*
*Plaintiff's Citizenship*
*Plaintiff's Employment*
  *Discrimination*
  *Termination*


**ARGUMENT**

I.  **The Standard for Summary Judgment**
II.  **Breach of Contract**
  A.  *Plaintiff had an Implied "Just Cause" Employment Contract*
    1.  *Plaintiff was Not Terminated for "Just Cause"*
  B.  *Even if Plaintiff's Employment was "At Will" his breach of contract action is viable*
III.  **Breach of the Covenant of Good Faith and Fair Dealing**
IV.  **The Statute of Limitations (Termination in Violation of Public Policy)**
  A.  *Equitable Tolling*
    1.  *Administrative Proceedings Procedural Background*
  B.  *Notices of Claims Received by Defendants*
    1.  *Defendants Benefitted by the Advance Notice Afforded them through the Administrative Proceedings*
  C.  *The Standard for Equitable Tolling*
    1.  *Pursuit of an Alternate Administrative Remedy tolls the Statute*
    2.  *Plaintiff's Cause of Action meets the Three-Pronged Test for Equitable Tolling*
V.  **Title VII - U.Lim America/Mexico is a Joint Enterprise**
VI.  **FEHA Extends to Acts committed by a California Employer in Mexico where all other indices of employment arise out of California**
VII.  **Disparate Treatment Under Title VII & FEHA**
  A.  **Defendants Clearly Treated Korean Employees, Including Plaintiff, Less Favorably than Other Non-Korean Employees Based on their Race/Nationality**
    1.  **Working Hours/Compensation**
    2.  **Plantiff Need Not Meet the McDonnell-Douglas Circumstantial Evidence Test Where Plaintiff has Introduced Direct Evidence of Discrimination.**
    3.  **Plaintiff has Established a Primia Facia Case of Discriminatory Discharge**
      a)  **Plaintiff was Performing His Job Satifactorily**
      b)  **Inference of Discrimination**
    4.  **Plaintiff has stated a Claim for a Discriminatorily Hostile Work Environment**
      a)  **Mere Verbal Harrasment is Sufficient to Establish a Hostile Work Environment**
      b)  **Where Plaintiff was Physically as Well as Verbally Abused, His Environment was Clearly Hostile**
      c)  **Plaintiff's Work Environment was both Objectively and**

Subjectively Hostile
5.  It is not a defense that Yoon may have believed that he is Helping his Victims to be Better Koreans
6.  Yoon's Favoritistic Treatment of Some of the Koreans Does Not Absolve Him of Responsibility for His Discriminatory Acts
7.  U.Lim is not exempt from Liability because Yoon mistreated all of the Korean employees

VIII.   Title VII - Statute of Limitations (Continuing Violations)

CONCLUSION

**TABLE OF AUTHORITIES**

**FEDERAL STATUTES**

42 U.S.C. §2000c(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 249-255. . . . . . . . . . . . . . . . . . . . . . 6

*Connecticut v. Teal* (1982) 457 U.S. 440 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Harris v. Forklift Systems* (1993) 510 U.S. 17, 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*International Brotherhood of Teamsters v. U.S.* (1977) 431 U.S. 324, 334 . . . . . . . . . . . . . . . . 18

*McDonnell-Douglas v. Greene* (1973) 411 U.S. 792, 802 . . . . . . . . . . . . . . . . . . . . . . 19,20

*Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cervantes v. City of San Diego* (1993 9th Cir. SD CA) 5 F3d 1273 . . . . . . . . . . . . . . . . . 12,13

*Draper v. Coeur Rochester, Inc.* (9th Cir. Cal. 1998) 147 F.3d 1104, 1108 . . . . . . . . . . . . . . . 22

*Green v. Los Angeles County Superintendent of Schools* (9th Cir. 1989) 883 F.2d 1472, 1480 . . . . . . 25

*Lowe v. City of Monrovia* (9th Cir. Cal. 1985) 775 F.2d 998, 1009.. . . . . . . . . . . . . . . . . . . 19

*Pejic v. Hughes Helicopters, Inc.* ((9th Cir. 1988) 840 F.2d 667). . . . . . . . . . . . . . . . . . . . . 19

*U. S. for Use and Benefit of Austin v. Western Elec. Co.*, 337 F.2d 568 . . . . . . . . . . . . . . . . . . 6

*Anthony v. County of Sacramento Sheriff's Department* (1994 E.D. Cal) 845 F.Supp. 1396 . . . . . . . 26

*Morelli v. Cedel* (2d Cir. 1998) 141 F.3d 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pereira v. Schlage Electronics* (1995) 902 F.Supp. 1095 . . . . . . . . . . . . . . . . . . . . . . . . . 22

**STATE CASES**

*Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410. . . . . . . . . . . . . . . . . . 6

*Campbell v. Graham-Armstrong* (1973) 9 Cal.3d 482. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Elkins v. Derby* (1974) 12 Cal.3d 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Fisher v. San Pedro Peninsula Hospital,* (1989) 214 Cal.App.3d 590 . . . . . . . . . . . . . . . . . . . 22

*Foley v. Interactive Data Corp.* 47 Cal.3d 654 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . .

Lockheed v Superior Court (1946)  28 Cal.2d 481 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727 . . . . . . . . . . . . . . . . . . . . . . 16

*Page v. Superior Court* (1995) 31 Cal.App.4th 1206 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pugh v. See's Candies, Inc.*, (1981) 116 Cal. App.3d 311. . . . . . . . . . . . . . . . . . . . . . . . . . 7

1

## BACKGROUND

2 *General Introduction*

3       This case arises out of Soo Kang's employment by the defendant, U.Lim America, Inc. ("U.Lim

4 America") and his long standing mistreatment by its Vice-President, Tae Jin Yoon. This mistreatment

5 included verbal and physical abuse, including being forced to do to jumping jacks as punishment, being

6 repeatedly kicked, dragged by the ear, struck with metal rulers and other objects and being forced to work

7 oppressive hours. This mistreatment was the result of Yoon's perverse sense of ethnic pride that Koreans

8 were superior to Americans and Mexicans, and accordingly they were expected to work harder and endure

9 harsher conditions and treatment than non-Koreans whom he considered to be lazy and irresponsible.

10 *Corporate Structure of the U.LIM Enterprises.*

11       The U.LIM family of corporations consists of three corporations. U.Lim Electronics Co. Ltd

12 ("U.Lim Korea") is the parent company and is located in Korea. (Deposition of Tae Jin Yoon at 128:11-18 -

13 EXHIBIT 1) U.LIM America is a California Corporation with its office/manufacturing facility being located

14 in Tijuana, Mexico.[1]  (Deposition of Jae Cho 11:18-12:7 - EXHIBIT 2)  U.LIM Mexico is a Mexican

15 Corporation which shares the same facility in Mexico. (Yoon 129:7)  Both corporations are wholly owned

16 by Ki Hwa Yoon ("Ki Hwa") who is also the Chief Executive Officer of both (Deposition of Ki Hwa Yoon

17 11:12-12:1 - EXHIBIT 3 )  His son, Tae Jin Yoon ("Yoon"), a named defendant, was and is the President

18 of U.Lim Mexico and the Vice-President of U.Lim America. (Yoon 26:22-27:4)

19       U.Lim America is in the business of manufacturing electronic components.  (Deposition of Kang

20 384:15 - EXHIBIT 4)   U.Lim America buys all of its components from U.LIM Korea which is its sole

21 supplier. (Yoon 142:14) U.Lim America then contracts with U.Lim Mexico to manufacture the products.

22 (Yoon 154:17)  The costs of manufacture (labor, utilities, etc) are then passed onto U.Lim America at cost

23 plus a 1% surcharge (Yoon 157:20; 159:7).  U.Lim America then sells the goods produced by U.Lim Mexico

24 for a profit to its various customers.  (Yoon 139:10) Accordingly, U.LIM America and U.LIM Mexico

25 constitute a joint enterprise whose purpose is to manufacture and sell electronic components. (Yoon 139:4-

26 17)

27

28

---

       [1]       U.Lim America at all times relevant to this action had an office located at the home of Yoon
located 605 Westview Court, Chula Vista, CA 91910.

1    Since its inception, *U.Lim America has only employed persons of Korean national origin or ethnic*

2    *background* (Yoon 143:24-144:4). U.Lim America employs the top ranking management personnel for both

3    corporations (Cho 140:12) and during the course of the plaintiff's employment it employed no more than

4    6 persons at a time. U.LIM Mexico, on the other hand, employees the bulk of the employees at the Tijuana

5    facility including all production employees and administrative staff. *All of U.Lim Mexico's employees are*

6    *of Mexican nationality or ethnic background.*[2]   U.Lim Mexico has employed anywhere from approximately

7    50 persons to 150 during the course of plaintiff's employment. (Cho 50:5-11) Accordingly, the combined

8    enterprises of U.Lim America and U.Lim Mexico have employed approximately 56 to 156 employees during

9    the course of plaintiff's employment.

10    The employees of U.Lim America during the course of plaintiff's employment are as follows:

11    | Ki Hwa Yoon: | Chief Executive Officer/President | 1992-Present |
| --- | --- | --- |
| Tae Jin Yoon: | Vice-President | 1992-Present |
| Jae Cho*: | Sales Manager/General Manager | 1993-Present |
| Soon Wan Park*: | Production/Quality Control Manager | April 1994-Present |
| Soo Kang*: | Purchasing/Warehousing Manager | April 1994-February 1998 |
| Teddy Back: | Assistant Purchasing Manager | November 1995-January 1996 |
| Bowon Cheong: | Production Manager | September 1997-July 1999 |

15    *   Department head.

16    All of U.Lim America's managers held titles with U.Lim Mexico but were paid exclusively by

17    U.Lim America. (Cho 63:2-6; 142:3) U.Lim Mexico employed line leaders and supervisors only.[3] All of

18    U.Lim Mexico's supervisors were men although the majority of the workforce consists of women. (Park

19    294:17-295:14) All of the supervisors reported directly to the department heads at U.Lim America. (Cho

20    140:12)

21    ***Plaintiff's Citizenship***

22    Plaintiff obtained his U.S. Citizenship on February 4, 1994 and accordingly he has been a U.S.

23    Citizen at all times relevant to this action. (Kang 180:14)

24    ***Plaintiff's Employment***

25

26    [2]   Park and Yoon testified that all the employees were Mexican. (Deposition of Park 122:5 -

27    EXHIBIT 5; Yoon 145:4) Jae Cho testified that all the employees were Mexican except one. (Cho 141:10)

28    [3]   Line leaders are beneath supervisors. All of the line leaders are women. (Park 294:4-295:14)

1    In April 1994, Yoon interviewed plaintiff for a possible job opening at U.Lim America. (Kang

2  185:22-186:1)  The initial interview took place at San Diego in California. (Kang 201:12-16).  The plaintiff

3  was offered a position at that time (Kang 205:1-4).  At a subsequent meeting, Yoon Informed plaintiff that

4  his job would entail purchasing duties (Kang 226:8) and that the regular work hours were 7:30 a.m.-5:30

5  p.m., Monday through Friday (Kang 224:18-20).  He was also told he would be paid $2,000.00 per month

6  to start at the first interview (Kang 205:1-4).  Then Yoon informed him at the second interview that his salary

7  was going to be $1,700.00 per month for 3 months. (Kang 223:2-10)

8    On April 15, 1994, Mr. Kang began his employment with defendant, U.Lim America, Inc. (Kang

9  205:1-4)  For approximately the first month his work hours were generally in keeping with those represented

10  to him by Yoon. (Kang 241:1-12)  However, that period was short lived (Kang 248:17-19)  With each month

11  that passed his work hours were steadily increased. (Kang 248:20-21)  By approximately April 1995, the

12  plaintiff was regularly working until 8:00 p.m. every night and frequently was working to 10:00 p.m.

13  (Cheong 12:20) and even until 1-2 in the morning. (Kang 265:7-22)  On several occasions he was even

14  required to work through the night (Kang 265:23).  On one occasion, he spent three days in a row at the

15  facility, sleeping over two nights in a row (Kang 266:12-17).  This was made even worse by the fact that all

16  the employees of U.Lim America lived in the United States including plaintiff (Kang 179:21-22).  This

17  necessitated a border crossing each and every day.  Not only did the hours increase dramatically but the

18  plaintiff was soon forced to work approximately 40 Saturdays for first year (Kang 274:24).  He was also

19  forced to work approximately 25 Sundays a year as well (Kang 274:22).

20  ***Physical and Verbal Abuse***[4]

21    Yoon would often recount his days working for U.LIM Korea and how harshly his father treated him

22  (Kang 375:2-6)  Accordingly, he believed that this was simply part of the proper training of an employee

23  (Kang 375:6-11)  In essence, he ran the office like a military boot camp where verbal and physical abuse

24  were considered part of the training and the prerogative of the employer (Deposition of Teddy Beak 68:22-

25

26    [4]    The physical and verbal abuse of plaintiff is set forth in great detail in the declaration of Raul

27  Carillo. [EXHIBIT 7] Presently, the plaintiff has an Ex Parte Application on file with Magistrate Brooks
seeking sanctions against the defendants for obstructing the deposition of Raul Carillo. [The application is

28  attached as EXHIBIT 8].

1   69:4 - EXHIBIT 6). This backdrop was designed to justify his mistreatment of the employees. Consequently,

2   as he became more comfortable with his position running U.Lim, he increasingly became more belligerent

3   with his employees and more demanding (Kang 354:15, 249:2-7). *This was particularly true with respect*

4   *to his treatment of Soon Wan Park ("Park") and the plaintiff* [5] (Kang 757:25-758:2-6).

5           As a general matter, Yoon would conduct daily meetings between him and all of his department

6   heads (Yoon 236:12-23). At these meetings, each department head would report to him orally and in writing

7   regarding the previous days activities of each of their respective departments. (Yoon 238:21-239:4) He

8   would yell at the department heads, swear at them and otherwise ridicule them. (Cho 81:23; Kang 341:23-

9   342:3, 344:4, 346:11-14) In the beginning, his conduct was limited to yelling, swearing and demonstrative

10  throwing of reports and report files (Kang 346:11-23, 359:11-21, 381:11-17). However, Yoon soon

11  graduated to physical abuse. He would frequently throw the reports and/or the report files at his department

12  heads *while ridiculing there performance in the harshest terms. He would call them* "cripples", "stupid",

13  "assholes", "sons of bitches" and "sons of vagina" and other epithets. (Kang 682:17-19, 752:1-13; Park

14  246:17, 250:1-12, 282:8). Gradually, he starting kicking Park and plaintiff (Kang 310:1-9). Then he began

15  hitting Park and plaintiff with a metal ruler. (Kang 361:4-19; Carillo par5; Baek 49:14-18) He would hit

16  them on the top of their heads with the sharp edge and he did this repeatedly throughout plaintiff's

17  employment. (Kang 361:23-362:24; Carillo par5; Baek 49:5-7). He also began to throw objects at Park and

18  plaintiff and did so repeatedly (Carillo par6; Baek 48:5-10). On one occasion he threw a crystal ashtray at

19  Park which hit him in the forehead and caused him to bleed (Carillo par6; Baek 48:21-49:6). He frequently

20  would grab plaintiff by the ear and drag him through the office (Kang 320:21-321:23; Baek 58:1-8; Carillo

21  par9). This happened numerous times. He would also force plaintiff to do a type of squatting jumping jack

22  while holding his ears as punishment. (Kang 669:21-670:7; Baek 59:17-24; Deposition of Bowon Cheong

23  29:12 - EXHIBIT 9)

24          This physical abuse was also combined with extreme verbal abuse as previously noted, but it would

25

---

26          [5]     Cho did not receive the same harsh treatment because as the sales manager he was in a better

27  position to concretely add to the profitability of U.Lim America while at the same time he had little to no

    management duties and was not responsible for any of the inevitable day to day problems which occur with

28  production. (Cho 83:8-12)

1  also include having to stand, sometimes more than an hour at a time, while he berated them. (Carillo par8;

2  Kang 404:10-17, 837:12-19; Cheong 23:17-19) They were not allowed to look him in the eye when he was

3  doing this.  In all, both plaintiff and Park and to a lesser extent Cho were treated as his serfs and accordingly

4  he felt that he was free to treat them, however, he felt.[6]

5       ***Discrimination***

6       Unlike most discrimination cases, plaintiff was discriminated against not because he was looked

7  down upon for being a certain ethnic background, but rather because he was considered superior because of

8  his shared ethnic background with his employer (Kang 693:18-21).  Fundamentally, the U.LIM enterprises

9  considered Koreans to be superior to other races and in particular Mexicans and Americans. (Kang 698:15-

10  20)  It was because of this ethnic pride that the plaintiff was forced to endure treatment which was never

11  visited upon the non-Korean employees. (Carillo par4, par13; Baek 35:24-36:1; Cheong 42:18-21)  It was

12  *expected that because he was Korean he would tolerate longer working hours and harsher treatment including*

13  *physical abuse.* (Kang 280:16, 345:12-21).  Fundamentally, Koreans were viewed as superior to Mexicans

14  and Americans(non-koreans) and accordingly plaintiff was treated differently and repeatedly told not to be

15  like lazy Americans and Mexicans [Kang 695:19-696:1, 697:14-19, 698:15-20].

16       ***Termination***

17       Eventually plaintiff began to realize that his employment situation was intolerable and that the

18  situation was not likely to improve, and that Yoon would never reward him as he promised [Kang 541:18-

19  23].  Consequently, in December of 1997 plaintiff made a conscious decision that he was not going to work

20  anymore overtime *unless* it was necessary [Kang 544:1-20].  He had previously suggested to Yoon that the

21  department heads *should be able to rotate the overtime hours because it was not necessary that all the*

22  department heads be present while the production lines were running. (Yoon 211:22-212:1)  Yoon, however,

23  refused to change the policy of having all the managers present during production regardless of whether or

24  not they had work to do. (Kang 574:4-25)

25       On February 2, 1998, Yoon confronted plaintiff with his failure to work the required overtime hours

26

27      [6]    Beak described Park, Cho and Kang as "working as if they're not exactly human beings.
The were working like robots.  (Beak 68:8-17) Cheong simply described Yoon as a "Tyrant".  (Cheong

28  39:19)

1   [Kang 573:25-574:6]. Plaintiff again suggested that the department heads rotate overtime hours but he would

2   not work when it was not necessary or he had no work to do (Kang 574:23-25). Yoon indicated that it

3   saddened him but if the plaintiff would not work the overtime hours required he had to let him go [Kang

4   574:23-25]. This was plaintiff's last day of employment.

## ARGUMENT

### I.     The Standard for Summary Judgment

7   Summary Judgment is appropriate only if "there is no genuine issue of material fact" and the

8   "moving party is entitled to a judgment as a matter of law." F.R.C.P. §56. The U.S. Supreme Court in

9   Anderson v. Liberty Lobby, Inc. (1986) 477 U.S. 242, 249-255, illustrated this standard as follows:

> "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions."

As stated by the court in Biljac Associates v. First Interstate Bank (1990) 218 Cal.App.3d 1410:

> Summary judgment is a drastic measure which should be used with caution so that it does not become a substitute for trial. Affidavits of the moving party are strictly construed and those of the opponent liberally construed, with doubts as to the propriety of granting the motion resolved in favor of the opposing party.

16  Biljac, at 1420.

17  Accordingly, on summary judgment, "the inferences to be drawn from the underlying facts ... must

18  be viewed in the light most favorable to the party opposing the motion." Id. at 1425. Any doubt as to the

19  existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477

20  U.S. 242, 255, 106 S.Ct. 2505, 2513-14)

> Although the summary judgment rule does not state any different requirement for opposing affidavits than for the movant's affidavits, the papers supporting the movant will be closely scrutinized, whereas the opponent's will be indulgently treated.

23  U. S. for Use and Benefit of Austin v. Western Elec. Co., 337 F.2d 568

### II.     Breach of Contract

### A.     Plaintiff had an Implied "Just Cause" Employment Contract

26  Plaintiff in fact had a reasonable expectation that he would only be terminated for just cause. He

27  had worked for the company for four years and was one of three department heads for a company of

28  approximately 156 employees at the time of his termination. Repeatedly through out the plaintiff's

- 6 -

1   employment, Yoon had indicated to him that he would never be fired.  Moreover, a general policy of not

2   terminating employees at U.Lim had been established by Yoon and Ki Hwa.  The non-termination policy

3   was first stated by Ki Hwa in reference to whether or not Raul Carillo had been fired by U.Lim and he stated

4   as follows: "Yes, yes. I instructed China and our company don't fire anybody, don't terminate

5   anybody."  (Ki Hwa 83:12)  Several times Ki Hwa reiterate his policy.  "I instructed including China our

6   company will not terminate anyone."  (Ki Hwa 83:21)  "I don't think there is any bad person. If you teach

7   them, if you train them, they are okay."  Then Ki Hwa confirmed that he instructed the head of each of his

8   companies not to terminate the employees.[7]  (Ki Hwa 84:3-11).

9          This general policy of non-termination was not only set forth by U.Lim America's CEO but also by

10  its president, Yoon.  On Various occasions Yoon promised plaintiff that he would never be fired. "For certain

11  kind of people, I would not fire him if things go wrong and perform that duty to make mistake, anything goes

12  wrong. But for you, I'm going to take you to the end." (Kang 303: 7).  "You and Soon Wan Park are the kind

13  of people that I will never fire or  -- even if you make a mistake, you stay with me." (Kang 305: 2-4).

14          The hours demanded of him indicated his worth to U.Lim. He was regularly assured that he was

15  being trained and developed for long-term employment. (Kang 357:8-19).  Ki-Hwa Yoon even referred to

16  Plaintiff as his "favorite" employee. (Ki Hwa 51:24).  Even Yoon said he never considered terminating the

17  plaintiff and he felt that each of his department heads performed their job well. (Yoon 294:24-295:1).

18          *Pugh v. See's Candies, Inc.*, (1981) 116 Cal. App.3d 311 set forth the factors to be weighed in

19  determining the existence of an implied promise not to terminate except for just cause. They are as follows:

20  duration of employment; commendations and promotions; apparent lack of any direct criticism of work; the

21  assurances that if one was loyal and did a good job their future was secure and defendants practice of not

22  terminating personnel except for good cause.  And as noted by the court in Pughes, "an agreement may be

23  shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the

24  surrounding circumstances." *Id.* at 455.

25  _____

26      [7]      After Ki Hwa had expressly set forth U.Lim's policy regarding termination, defense counsel
    removed him from the deposition, while a question was pending and under the pretense that Ki Hwa did not
27  understand the translation of the entire line of inquiry, and returned with him 12 minutes later to have his
    client clarify that he had only instructed his companies to "love" their employees. (Ki Hwa 86:13-16).
28

- 7 -

1    In the instant case, there was direct testimony that U.Lim had a policy of non-termination and that

2 with the exception of the duration of employment, the plaintiff has met all the other factors for determining

3 the existence of an implied promise not to terminate except for just cause.  The jury is entitled to weigh the

4 intent and conduct of the parties to determine whether or not U.Lim America impliedly or expressly promise

5 not to terminate plaintiff except for just cause.

6    ### 1.    *Plaintiff was Not Terminated for "Just Cause"*

7    Defendant's have assumed arguenda that Plaintiff was terminated, but in so doing they are unable

8 to articulate a reason for Plaintiff's termination which would constitute just cause.  Any reason articulated

9 for Plaintiff's termination is mere speculation of the part of defense counsel as Yoon has unequivocally

10 stated that Plaintiff was not terminated (Yoon 69:4-7).  Moreover, the pretextual reason offered by defense

11 counsel that he was terminated because he refused to work overtime also fails because Yoon states that

12 overtime was not an issue when plaintiff was fired and/or quit.[8] (Yoon 69:16).

13    Yoon stated that he never considered terminating plaintiff and that all of the department heads,

14 including plaintiff performed their jobs well (Yoon 294:18-295:1).  But, Yoon goes further than that to

15 discredit the idea that the plaintiff was fired for not working the necessary overtime.  He notes that the

16 overtime issue was only raised once between him and the plaintiff and that when it was raised the plaintiff

17 suggested the possibility of rotating department heads during overtime hours (Yoon 214:10-17).  Yoon noted

18 that when this idea was raised all the departments heads were working during the operation of the production

19 line hours (Yoon 211:22-212:2).  Yoon indicated that the idea was acceptable to him if the department heads

20 agreed [Yoon 211:7-9].  Accordingly, Yoon has both substantiated that the department heads were working

21 hours that were generally unnecessary in so far as he agreed that rotating was an acceptable solution and that

22 he did not have any problems with it.  *Id.*  Notably, the Mexican supervisors were already using a rotation

23 system.  Yoon himself testified that he had a lesser expectation that the plaintiff would have to work the

24 production overtime hours if he had taken care of materials or supplies for the production line during the

25 _____

26    [8]    Yoon claims that the only issue raised in this final conversation was a demand by plaintiff
that he should fire Cho.  Yoon claims that he told plaintiff to try to work out his problems with Cho and the
27 plaintiff agreed.  No other issues were discussed.  (Yoon 68:15-69:2).  Notably, Yoon claims to have no idea
about any previous problems between Cho and plaintiff and claims they worked well together.  (Yoon 71:24-
28 72:2).  Two pages later he claims that Kang asked him to fire Cho 5-6 times before.  (Yoon 74:23).

1   week [Yoon 209:21-210:10].   Notably, plaintiff suggested this very solution to Cho previously.  (Kang

2   532:18-534:2).

3       Then where does the pretext of firing plaintiff for his failure to work the necessary overtime come

4   from?  It comes solely from plaintiff's testimony that Yoon told him that if he did not work overtime, he was

5   fired.  However, plaintiff also contends that it was never an issue of whether he would work overtime hours

6   but whether he would be forced to work when it was *unnecessary*.  (Kang 540:24-541:23).  Defense counsel

7   had made an assertion that plaintiff failed to work the necessary hours during a time when U.Lim had rush

8   orders from a major customer, LG Enterprises.  However, this is conjecture based on counsel loose

9   association of the plaintiff reducing his overtime hours toward the end of his employment and the LG order.

10  Cho specifically states that the plaintiff's hours increased in December of 1998 because of a huge order of

11  P.O.s and that he, Park and the plaintiff had to stay longer to deliver these products.  *Cho* at 221-222.

12  Plaintiff also confirms this fact.  (Kang 515:10).  Notably, both plaintiff and Cho indicate that the plaintiff

13  stopped working overtime hours in the second half of January 1998.  (Cho 223; Kang 519:16-17).[9]

14      There was no "just cause" for the plaintiff's termination.  Defense counsel's attempts to articulate

15  a "just cause" reason for termination, constitute mere speculation and do not sufficiently evidence

16  termination for a "fair and honest cause or reason, regulated by good faith" (See, MSJ at Page 12, quoting

17  *Pugh v. See's Candies, Inc.* **) since such speculation is unsupported by the testimony of the defendants.

18      **B.**   ***Even if Plaintiff's Employment was "At Will" his breach of contract action is viable***

19      Assuming arguendo that Kang's employment contract was terminable "at will", the fact that a

20  contract for employment is at-will does not mean that a breach of its terms of employment is not actionable.

21  Defendants wholly fail to address the following:

22      a)    Plaintiff was physically struck on a regular basis and otherwise suffered
            a hostile, discriminatory working environment; (Kang 362:20-24).

23

24      b)    The work hours of the position were misrepresented to plaintiff; (Kang 224:18-23).

25  _____

26      [9]    Defense counsel is using Cheong's testimony that the plaintiff did not work overtime hours
    in December.  However, Cheong was not at the facility from December 19, 1999 to January 11, 1998.

27  (Cheong 20:4-18).  Notably, *Cheong did state that when Kang had to make deliveries he went and that he*
    heard from Park that the plaintiff made several deliveries during January, even on Sunday. (Cheong 33:20).

28

c)    Plaintiff was promised profit-sharing which was not paid; (Kang 250:7-14).

d)    Plaintiff was promised performance bonuses which, while motivating him to continue working under the employment contract, were illusory in that they were intentionally set at non-achievable levels.  (Park 289:20-23, 291:15-24).

Each of these acts is in itself a breach of the employment contract.

Defendants' contention that Plaintiff cannot claim that conformance with the laws and policies of California and the United States were terms of his employment contract is incorrect.  Every contract of employment incorporates these terms by operation of law.  This was found in Lockheed Aircraft Corp. v. Superior Court, wherein defendant employer was sued for breach of contract by his employees for interfering with their freedom of political activity in violation of Labor Code §1101 et seq:

> A violation of section 1101 is made a misdemeanor by section 1103, and defendant contends the statute is therefore penal in character and does not create any civil right of action.  This argument ignores section 1105 which provides that 'Nothing in this chapter shall prevent the injured employee from recovering damages from his employer for injury suffered through a violation of this chapter.'  The contract of employment must be held to have been made in the light of, and to have incorporated, the provisions of existing law.  Stockton Sav. & Loan Bank v. Massanet, [citation].  Hence, upon violation of the section, an employee has a right of action for damages for breach of his employment contract.

*Lockheed Aircraft Corp. v. Superior Court* 28 Cal.2d 481, 486 (1946)

Accordingly, every unlawful act alleged against defendants is also a breach of Plaintiff's contract of employment in conjunction with those breaches arising out of the misrepresentations made to plaintiff concerning the terms of his hours and compensation.  Additionally, it is important to note with respect to the battery and other unlawful acts that Plaintiff would not have been subjected to this treatment had he not been engaged in the performance of his duties thereunder.  His efforts to perform under the agreement subjected him to those acts.  Accordingly, these acts, which in another context would simply be torts, indeed arise out of the Plaintiff's contractual relationship and are actionable as breaches thereof.

**III.     Breach of the Covenant of Good Faith and Fair Dealing**

This cause of action is dependent on a finding by the fact finder as to whether or not an implied "just cause" employment contract existed.  If such a contract existed, then the action is viable under *Foley v. Interactive Data Corp.* 47 Cal.3d 654 (1988).  If it did not then the cause of action fails.  For the reasons set forth in the previous sections, plaintiff believes that a genuine issue of material fact exists as to whether or not the plaintiff had an implied "just cause" employment contracts with U.Lim America.

- 10 -

1  **IV.    The Statute of Limitations**

2      Defendants have argued that the plaintiff's cause of action for Termination in Violation of Public

3  Policy is barred by the applicable one year statute of limitations. They are in error and have failed to address

4  the fact that the notices provided them by EEOC and FEHA toll the wrongful termination action.

5      **A.    *Equitable Tolling***

6      Plaintiff's claim for wrongful termination in violation of public policy was equitably tolled during

7  the proceedings before the EEOC and Department of Fair Employment and Housing ("DFEH").

8              **1.    *Administrative Proceedings Procedural Background***

9      Plaintiff submitted his FEHA complaint to the DFEH on September 23, 1998. [See, FEHA

10 Complaint - EXHIBIT 10]. Plaintiff's "Right to Sue" letter regarding his FEHA Claim was issued by the

11 Department on October 20, 1998. [FEHA Right to Sue Letter - EXHIBIT 11]. Plaintiff next submitted his

12 EEOC complaint to the Commission on November 13, 1998. [EEOC Complaint - EXHIBIT 12] The

13 Commission issued his "Right to Sue" letter regarding his Title VII claim on November 20, 1998 [EEOC

14 Right to Sue Letter - EXHIBIT 13 ]. Plaintiff was required by law to have submitted his claims to these

15 administrative agencies prior to filing suit. From start to finish, 34 days transpired between the time plaintiff

16 submitted his claims to these agencies and the time he received his right to sue letters. (27 days for FEHA

17 and 7 days for the EEOC).

18     **B.    *Notices of Claims Received by Defendants***

19     Defendants were issued notices of Plaintiff having filed from DFEH on October 20, 1998 [DFEH

20 Notice - EXHIBIT 14] and the EEOC on November 13, 1998. [EEOC Notice - EXHIBIT 15] Each of these

21 notices clearly indicate the acts complained of which underlie Plaintiff's claim for wrongful termination in

22 contravention of public policy.  Specifically, the claims indicated that (1) the Plaintiff was discriminated

23 against on the basis of his race/nationality; (2) that he suffered a hostile work environment in which he was

24 verbally and physically abused and (3) that this was part of an ongoing pattern of conduct.  Furthermore, the

25 FEHA notice clearly indicates that Plaintiff has requested the right to sue.

26             **1.    *Defendants Benefitted by the Advanced Administrative Notice***

27     Defendants were given notice of Plaintiff's intent to sue them for discrimination and abusive

28 workplace practices first on October 20, 1998 by the DFEH, and once again on November 13, 1998 by the

1 │ EEOC. This was more than three months prior to the expiration of the statute of limitations on the wrongful

2 │ termination cause of action. The first (DFEH) notice included a copy of Plaintiff's FEHA complaint which

3 │ clearly states that Plaintiff was fired by Tae Jin Yoon because of Plaintiff's refusal to work more than 100

4 │ hours per week, and that Plaintiff believed the real reason he was fired was because Plaintiff, in addition to

5 │ refusing to work those onerous hours, would not tolerate being physically and verbally abused because of

6 │ their shared Korean heritage. The EEOC complaint attached to their notice letter states the same facts. The

7 │ FEHA notice, furthermore, explicitly states that Plaintiff had requested an authorization to file a lawsuit

8 │ against defendants. The complaints were mailed via certified mail to U.Lim America and were signed for

9 │ by Yoo Sik Youn (Tae Jin Yoon's brother), and the person who replaced Plaintiff at his position as

10 │ Purchasing and Warehouse Manager.

11 │      Defendants were given the opportunity to marshal their evidence and prepare a defense to this cause

12 │ of action as early as October 20, 1998, more than three months before the one-year statute would have

13 │ normally expired. Accordingly, they cannot claim in good faith that they have suffered any prejudice with

14 │ respect to their defense of this claim, particularly where the complaint was actually filed only 14 days after

15 │ the one year statute would have normally expired.

16 │     **C.**    *The Standard for Equitable Tolling*

17 │      California's standard for the application of equitable tolling was addressed by the Ninth Circuit in

18 │ the case of *Cervantes v. City of San Diego* (1993 9th Cir. SD CA) 5 F3d 1273. In that case, the Plaintiff had

19 │ been terminated from his job after being arrested. After spending some 11 months pursuing administrative

20 │ remedies for reinstatement, Plaintiff filed an action under 42 U.S.C. §1983 for violation of his civil rights

21 │ by the arresting officers. As California's one-year statute of limitations for personal injury applies to

22 │ Terminations in Violation of Public Policy, this cause would have been time-barred were it not equitably

23 │ tolled. Noting first that the Ninth Circuit borrows its rules for equitable tolling from the forum state, the

24 │ Court of Appeals found that:

25 │       California courts "have liberally applied tolling rules or their functional equivalents to
      situations in which the plaintiff has satisfied the notification purpose of a limitations

26 │       statute." [citation] Consistent with this tradition, the doctrine of equitable tolling rests upon
      the reasoning that a claim should not be barred "unless the defendant would be unfairly

27 │       prejudiced if the plaintiff were allowed to proceed." [citation] Under California law,
      equitable tolling "reliev[es] plaintiff from the bar of a limitations statute when, possessing

28 │       several legal remedies he, reasonably and in good faith, pursues one designed to lessen the

1    extent of his injuries or damage." [citation]

2    > To this end, California courts have developed a "definitive three- pronged test for invocation
      of the doctrine" of equitable tolling. [citation]  A plaintiff's pursuit of a remedy in another
3    forum equitably tolls the limitations period if the plaintiff's actions satisfy these factors:  1)
      timely notice to the defendants in filing the first claim;   2) lack of prejudice to the
4    defendants in gathering evidence for the second claim;  and 3) good faith and reasonable
      conduct in filing the second claim. [Citation]  The doctrine of equitable tolling focuses on
5    the effect of the prior claim in warning the defendants in the subsequent claim of the need
      to prepare a defense.

6
7    *Cervantes* at 1275 [emphasis added]

       This holds true even where the second action (sought to be tolled) could have been pursued separate

8    from the others, such as a personal injury case in which a worker's compensation claim may also be brought.

9    This situation was addressed in *Elkins v. Derby* (1974) 12 Cal.3d 410.  In that case, the Plaintiff was attacked

10   by a performing timber wolf on the job.  He pursued his remedies through worker's compensation then, after

11   it was found he could not recover under worker's compensation, he filed a personal injury suit after the one-

12   year statute of limitations would have expired.  Defendants therein argued that because the personal injury

13   suit could have been filed regardless of the pendency of the worker's compensation action, defendant could

14   not claim the suit was equitably tolled.  The California Supreme Court disagreed, holding that the statute of

15   limitations for the personal injury suit would be equitably tolled:

16
17       [R]egardless of whether the exhaustion of one remedy is a prerequisite to the pursuit of
         another, if the defendant is not prejudiced thereby, the running of the limitations period is
         tolled '(w)hen an injured person has several legal remedies and, reasonably and in good
18       faith, pursues one.'

19       Defendants in that case then argued that they had been prejudiced in their defense of the personal

20   injury action because the institution of worker's compensation proceedings would not have alerted them to

21   the need to collect evidence regarding fault and negligence.  The Supreme Court was found that this was not

22   sufficiently prejudicial to deny Plaintiff equitable tolling:

23       To be sure, an employer notified of a compensation claim may fail to gather evidence of
         fault, and such evidence could prove critical in a subsequent tort action. [citation] The
24       likelihood, however, that the employer will suffer prejudice if the compensation claimant
         files a tort action more than one year after the date of injury is minimal. After the filing of
25       a compensation claim, the employer can identify and locate persons with knowledge of the
         events or circumstances causing the injury. By doing so, he takes the critical steps necessary
26       to preserve evidence respecting fault. Although he may choose not to gather evidence
         bearing on fault from these parties when faced only with a compensation claim, he will be
27       able in most instances to recontact these people, particularly if they are continuing
         employees, for further evidentiary contributions should a controversy as to fault later arise
28       in a tort action.

                                                    - 13 -

1  *Elkins*, supra, at 418.

2      Based on the foregoing, the plaintiff's cause for Termination in Violation of Public Policy is clearly

3  tolled for the 14 days in question, as it meets the standard set forth below under the Three Prong Test.

4          **1.      *Pursuit of an Alternate Administrative Remedy tolls the Statute***

5      The California Supreme Court has further held that the pursuit of alternate administrative remedies

6  tolls the statute of limitations <u>even where no exhaustion of administrative remedies is necessary</u> to the

7  prosecution of the plaintiff's claims (See, *Campbell v. Graham-Armstrong* (1973) 9 Cal.3d 482 at **),

8      By contrast, Plaintiff herein was <u>absolutely required</u> to submit his claims to administrative

9  proceedings or be denied his civil rights-related remedies. The wrongful acts which underlay the civil rights

10 claims were the selfsame acts giving rise to Plaintiff's wrongful termination claim, and the gravamen of that

11 claim was that he was discriminated against.

12         **2.      *Plaintiff meets the Three-Pronged Test for Equitable Tolling***

13     Pursuant to the Three-Pronged test set forth in *Cervantes,* the plaintiff's cause of action for

14 Termination in Violation of Public Policy is tolled.

15     *Timely Notice to the Defendants in Filing the First Claim:* As stated above, Defendants first

16 received notice of the administrative claims more than three months (October 20, 1998) prior to the time on

17 which the statute of limitations for Plaintiff's wrongful termination claim would have expired. As such,

18 notice was timely.

19     *Lack of Prejudice to the Defendants in Gathering Evidence:* Both notices clearly state Plaintiff had

20 sought authorization to file suit against U.Lim for firing him because he would not tolerate their racial

21 discrimination, outrageous working hours, hostile work environment, and verbal and physical abuse. These

22 notices state the prima facie case for plaintiff's claim for wrongful termination in contravention of public

23 policy and as such provided U.Lim with sufficient notice to begin gathering evidence.

24     *Good Faith and Reasonable Conduct in Filing the Second Claim:* It clearly would have made no

25 sense for Plaintiff to have filed two separate actions when the operative facts were so intertwined. The

26 defendants were provided with notice of the claims at issue and a single complaint was filed incorporating

27 these claims. Plaintiff filed his suit only 14 days after the statute of limitations would have normally run *if*

28 his pursuit of the administrative remedies had not tolled the statute. In fact, he could have filed suit as late

1   as October 20, 1999, under FEHA which allows a claimant to file suit up to one year after the right-to-sue

2   letter is issued.  Had Plaintiff sought to inflict prejudice upon defendants, he would not have filed so

3   promptly.  Plaintiff clearly acted in good faith and the statute is equitably tolled for the 14 days at issue.

4   **V.     Title VII - U.LIM America/Mexico is a Joint Enterprise**

5            U.Lim America and U.Lim Mexico are "Integrated Enterprises" under Title VII and collectively

6   have more than the required 15 Employees.  U.Lim's attempt to avail itself of this defense is wholly

7   transparent.  Defendants are well aware that the purpose of the limitation was to spare small employers the

8   costs attendant with civil rights litigation.  [Citation - MILLER/?]  U.Lim America is hardly a "small

9   employer".

10           U.Lim America completely controls and shares the same facility with U. Lim Mexico which has

11  employed no fewer than 50-150 people over the course of Plaintiff's employment with U.Lim. (Cho 50:3-

12  11) U.Lim Mexico's only customer is U.Lim America and all of U.Lim Mexico's supervisors report directly

13  to U.Lim America's department heads. (Yoon 139:4; Cho 140:12-16)  U.Lim America's managers had the

14  authority to hire or fire U.Lim Mexico employees. (Park 217:5)  U.Lim America's managers all have an

15  identical title at U.Lim Mexico (Cho 63:2-6), save Yoon who is President of U.Lim Mexico and Vice-

16  President of U.Lim America.  U.Lim Mexico also  passes all of its production costs onto U.Lim America at

17  cost, save a 1% surcharge, and thereby transfers all of its would be profit to U.Lim America (Yoon 154:17)

18  which has posted gross sales of 2.5 to 8 million dollars during the course of plaintiff's employment.[10] (Cho

19  27:10)  Furthermore, both U.Lim companies are owned and controlled by the same person, Ki Hwa.  (Ki

20  Hwa 11:8-12:1; 90:9)  Accordingly, the employees of U.Lim Mexico, who are nothing more than the labor

21  pool for U.Lim America, must be counted against the 15 employee limit.

22           The federal courts have developed a test, derived from federal labor case law, to determine
         whether two corporations should be considered a single employer for Title VII purposes.
23       Commonly called the "integrated enterprise" test, it has four factors: (1) interrelation of
         operations, (2) common management, (3) centralized control of labor relations, and (4)
24       common ownership or financial control.  [citations] This test is designed to further
         Congress's intent that Title VII be construed liberally, including its definition of the term
25

26  _____

          [10]      The purpose of this 1% surcharge is to generate a minimal profit for U.Lim Mexico so that
27  U.Lim Mexico can comply with Mexican Law which requires that its employees be paid profit sharing.  It
    essentially allows U.Lim Mexico not to pay profit sharing and to transfer all the profits to U.Lim America
28  which is not subject to a legally mandated profit sharing program. (Yoon 169:4-170:9)

                                                        - 15 -

1    "employer." [(#) added for emphasis]

2    *Laird v. Capitol Cities ABC* 68 Cal.App. 4th 727, 739 (1998)[emphasis added]

3         While the Laird court found that Laird had failed to make this showing, Plaintiff herein has

4    demonstrated each of the factors she had failed to:

5         Laird produced no evidence that Cap Cities exercised day-to-day control over Sutton's
         employment decisions in general or that it exercised any control over Sutton's decisions with
6         respect to her.

7    *Laird*, supra, at 739

8         The employment decisions, as with all management-level decisions, of U.Lim Mexico are made by

9    U.Lim America.

10        Laird also produced no evidence that the operations of Cap Cities and Sutton were
         "interrelated"--i.e., that Cap Cities exercised greater control over Sutton's operations than
11        that which a parent corporation would normally exercise over its subsidiary. She did not
         show, for instance, that Cap Cities kept Sutton's books, issued its paychecks, or paid its bills.
12        Nor did she show that the two operations had shared employees (in the sense that any
         employee of one might be reassigned to the other), headquarters, or office space. (Ibid.)
13
     *Laird*, supra, at 739
14
         U.Lim America kept the accounts of U.Lim Mexico, issued its paychecks and paid its bills. The
15
     operations shared employees in that U.Lim America's employees managed all aspects of U.Lim's operations
16
     and they clearly shared office space.
17
         As already indicated, Laird also failed to show that the two corporations had any degree of
18        common management. Other than her bare assertion that all Sutton employees were ipso
         facto Cap Cities employees, she offered no evidence that anyone served as a manager of
19        both corporations.

20   *Laird*, supra, at 739

21        The employees of U.Lim America were the sole upper-level management of U.Lim Mexico. U.Lim

22   America's employees directed or influenced every aspect of U.Lim Mexico's day-to-day operations. The

23   managers of U.Lim America did not need to be transferred to U.Lim Mexico, as they were already there, in

24   U.Lim Mexico's facility, directing its operations.

25        As previously noted, U.Lim America and U.Lim Mexico are owned and controlled by the same

26   person, Ki Hwa. U.Lim Mexico was nothing more than the labor pool for an integrated enterprise directed

27   by U.Lim America. U.Lim Mexico effectively makes no profit and transfers all of its funds to U.Lim

28   America. Every significant decision, policy or procedure of U.Lim Mexico is controlled by U.Lim America.

- 16 -

1   It would be hard to find a more appropriate candidate for application of the "integrated enterprise" doctrine

2   than U.Lim.  Given that the combined enterprise has had no fewer than 56-156 employees during the

3   applicable period, Title VII clearly applies to them.

4       **1.    *Foreign Employees Count for Purpose of the "15 Employee" Requirement***

5       The Second Circuit Court of Appeals has found that an "integrated entity's" foreign employees

6   should be counted against the ADEA's employee limits for purposes of determining whether a corporation

7   is liable under the ADEA, given than the employee limit was implemented for the main purpose of protecting

8   truly small businesses from ruinous compliance costs.  This is equally applicable to a Title VII case [Where

9   civil rights statutes share common purposes (e.g. ADEA & Title VII - elimination of discrimination in the

10  workplace - Oscar Mayer & Co. v. Evans, 441 U.S. 750, 756], they should be construed consistently (9th Cir.

11  1986) 799 F.2d 1416, 1418]

12      In *Morelli v. Cedel* (2d Cir. 1998) 141 F.3d 39, the Second Circuit found that:

13      [W]e have previously identified several reasons for Title VII's minimum-employee
    requirement, see 42 U.S.C. § 2000e(b) (15 or more employees).  These include the burdens

14      of compliance and potential litigation costs, "the protection of intimate and personal
    relations existing in small businesses, potential effects on competition and the economy, and

15      the constitutionality of Title VII under the Commerce Clause." [citation]

16      None of these reasons suggests that whether a foreign employer is subject to the ADEA
    should turn on the size of its U.S. operations alone.  Cedel contends that because it has

17      fewer than 20 employees in the United States, it is the equivalent of a small U.S. employer.
    This is implausible with respect to compliance and litigation costs;  their impact on Cedel

18      is better gauged by its worldwide employment.  Cedel would not appear to be any more a
    boutique operation in the United States than would a business with ten employees each in

19      offices in, say, Alaska and Florida, which would be subject to the ADEA. Further, a U.S.
    corporation with many foreign employees but fewer than 20 domestic ones would certainly

20      be subject to the ADEA.

21      Accordingly, in determining whether Cedel satisfies the ADEA's 20-employee threshold,
    employees cannot be ignored merely because they work overseas.  We therefore vacate the

22      judgment on the plaintiff's ADEA count.

23  *Morelli v. Cedel* (2d Cir. 1998) 141 F.3d 39, 46

24      Accordingly, there is no dispute that U.Lim Mexico's employees count against U.Lim America's

25  Title VII employee count, particularly given that U.Lim as an integrated entity had gross sales of

26  $14,000,000 over the past two years and employs many times the minimum number of employees.

27  **VI.    FEHA Extends to Acts committed by a California Employer in Mexico where all indices of**
    **employment arise out of California**

28

                            - 17 -

1    Defendants admit that no court has addressed the issue of whether FEHA covers a California

2 resident/citizen working in Mexico for a California corporation. It has always been the policy of California

3 to extend to its citizens protections exceeding that of the Civil Rights Act, and it has always looked to federal

4 decisions for guidance. In the instant case the plaintiff was a resident of California, U.Lim America was a

5 California Corporation and plaintiff paid all taxes associated with employment in California. Thus, while

6 it has been held that where the plain language of FEHA contradicts federal law, the FEHA language controls,

7 this has been applied to extend greater protection (FEHA applicable to individuals where Title VII is not),

8 not to lessen it (*Page v. Superior Court* 1995 31 CalApp4th 1206). Title VII has been made explicitly

9 applicable to such a situation by the 1991 amendment to the Civil Rights Act. Accordingly, it would violate

10 California's stated policies to fail to likewise extend FEHA's reach, particularly where obtaining jurisdiction

11 over the defendant in question, a California corporation, is not an issue and where the plaintiff, a California

12 resident, paying California taxes and employed by a California Corporation would anticipate being afforded

13 all the protections afforded any other California employee. Additionally, as the remedies available under

14 FEHA and Title VII are essentially identical, defendants run the selfsame risks should either remedy be

15 allowed.

16 **VII.   Disparate Treatment under Title VII and FEHA**[11]

17    Plaintiff's Title VII claim rests upon his disparate treatment by U.Lim based upon his race and/or

18 national origin. Under Title VII's standards for "disparate treatment":

19    "Disparate treatment" such as is alleged in the present case is the most easily understood
      type of discrimination. The employer simply treats some people less favorably than others
20    because of their race, color, religion, sex, or national origin.

21 *International Brotherhood of Teamsters v. U.S.* (1977) 431 U.S. 324, 334

22    *A.    Defendants Clearly Treated Korean Employees, Including Plaintiff, Less*
          *Favorably than Other Non-Korean Employees Based on their Race/Nationality*
23
          *1.    Working Hours/Compensation*
24
25    The Korean managers of U.Lim, particularly Plaintiff, Park, Baek and Cheong, worked almost twice

the "typical" hours as the Mexican managers and often worked Saturdays and Sundays. [Baek, 25:2-4;
26

27 _____

28        [11]    All the standards for Title VII are equally applicable to the FEHA claims.

25:19-20; 25:25-26:2; 26:3-26:13]  All of the Korean managers were expected to work overtime hours. [Yoon, 208:15-212:9]  The Koreans were not paid for this substantial overtime. [Kang, 821:22-822:8]

By contrast, the Mexican managers of U.Lim worked hours half as long, with one of them rotating in for overtime and the rest going home at the end of the day. [Baek, 110:2-114:11]

Accordingly, it may be strongly inferred that the work hours imposed upon the Koreans by U.Lim were discriminatorily motivated as well as onerous, particularly in light of Yoon's statements in the record regarding his views on Koreans vis a vis other nationalities.

### 2. Plaintiff Need Not Meet the McDonnell-Douglas Circumstantial Evidence Test Where Plaintiff has Introduced Direct Evidence of Discrimination

Defendants contend that Plaintiff must first prove a prima facie case of discrimination to establish his Title VII claim.  However, this is only true where there is no direct evidence of discrimination.

> [A] plaintiff may establish a prima facie case of disparate treatment by satisfying the McDonnell Douglas four-part test, thereby creating a rebuttable presumption of discriminatory treatment, or by presenting actual evidence, direct or circumstantial, of the employer's discriminatory motive.

*Lowe v. City of Monrovia* (9th Cir. Cal. 1985) 775 F.2d 998, 1009.

Defendants ignore a substantial body of direct evidence in their moving papers, e.g. comments made by Yoon which admit Koreans were expected to work harder than other ethnic groups. [Kang, 693:6-696:18; 696:2-7; 887:18-888:6; Cheong at 44:16-18; 44:25-45:3].

### 3. Plaintiff Has Established a Prima-Facie Case of Discriminatory Discharge

Defendants attempt to shoehorn Plaintiff's claim into the *Pejic v. Hughes Helicopters, Inc.* ((9th Cir. 1988) 840 F.2d 667) standard for establishing a prima facie case of discrimination is inappropriate.  When it adopted the *McDonnell-Douglas v. Greene* (1973) 411 U.S. 792, 802 prima facie/burden shifting criteria, the Supreme Court expressly recognized that:

> The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.

*McDonnell-Douglas*, supra, 802 [Footnote 13]

The *Pejic* four-prong test requires that the Plaintiff prove the following: (1) he is a member of a protected class (not at issue), (2) adverse employment action was taken against him (not at issue), (3) that

1   he was performing his job satisfactorily (contested), and (4) that the adverse action took place in

2   circumstances giving rise to an inference of discrimination (contested).

3                                                      *a)*       ***Plaintiff was Performing his Job Satisfactorily***

4        First, it must be noted that defendant's contention that Cho was Kang's supervisor in the period

5   leading up to his termination is incorrect. Kang reported to Yoon throughout his tenure at U.Lim. [Kang,

6   244:12-14]. Defendants contend that Plaintiff's refusal to work overtime was the "unsatisfactory" element

7   of his performance. Yet Yoon has expressly testified that he was agreeable to the "rotating" overtime

8   proposal made by Kang [Yoon, 79:1-13; 82:16-83:20; 211:2-9]. He has also testified that Kang's presence

9   during overtime hours was not as important as that of Park with respect to overtime operations [Yoon,

10  209:13-210:10]. He testified that he didn't even know why Kang was working overtime hours if he had

11  completed all of his purchasing duties.  [Yoon, 212:18-213:3]  He also testified that it was up to the

12  department heads if they worked overtime together or rotated.  [Yoon, 79:1-13; 82:16-83:20; 211:2-9]

13       When they last spoke, in the conversation in which defendants state Plaintiff was terminated, Yoon

14  states that they did not even discuss the issue of overtime [Yoon, 61:3-20; 72:19-20; 73:20-74:24], and that

15  he had only discussed that issue once with plaintiff at a point in time he could not recollect.  [Yoon, 79:1-13;

16  82:16-83:20; 211:2-9]. Yoon states that in this final conversation, the only issue discussed was Kang's desire

17  that Cho be fired. [Yoon, ] In this conversation, Yoon told him to work out his problems with Cho and both

18  agreed that he would try to do that. (Yoon, 68:19-69:2) Yoon expessly stated that he did not fire the plaintiff

19  and the plaintiff did not quit. (Yoon, 69:4-6). Yoon also stated that he never considered terminating Kang

20  [Yoon, 294:18-20] was satisfied with Kang's job performance.  (Yoon, 294:24-295:1)  Accordingly, there

21  is a considerable question of material fact as to whether there was, in fact, any issue with respect to Kang's

22  job performance by virtue of the testimony of the only person who had the authority to terminate him.

23                                                     *b)*       ***Inference of Discrimination***

24       Defendants next claim that, even were his performance satisfactory, his termination did not occur

25  in circumstances giving rise to an inference of discrimination.  Given the aforecited statements made by

26  Yoon disparaging Mexicans and Americans in comparison to Koreans, coupled with the established disparity

27  in treatment between Koreans and non-Koreans with respect to working hours, working conditions and

28  overall treatment, this is simply not plausible.  Ample evidence of discrimination is available, and should

1   be submitted to the trier of fact to determine motive.

2         **4.    Plaintiff has Stated a Claim for a Discriminatorily Hostile Work Environment**

3        Defendants contend that Plaintiff has failed to establish that he was subjected to a hostile work

4   environment.  An amazing claim given the facts of this case.

5             *a)    Mere Verbal Harassment is Sufficient to Establish a*
               *Hostile Work Environment*

6

7        In *Harris v.Forklift Systems* (1993) 510 U.S. 17, Teresa Harris worked as a manager at Forklift

8   Systems, Inc., an equipment rental company, from April 1985 until October 1987.  Charles Hardy was

9   Forklift's president.  Throughout Harris' time at Forklift, Hardy often insulted her because of her gender and

10  often made her the target of unwanted sexual innuendos.[12]

11       Nevertheless, the District Court found that Harris did not have a Title VII claim for being subjected

12  to a discriminatorily hostile work environment because she did not suffer "serious psychological injury."

13  The United States Supreme Court found that the District Court had erred in making this ruling, holding that:

14        A discriminatorily abusive work environment, even one that does not seriously affect
      employees' psychological well-being, can and often will detract from employees' job

15        performance, discourage employees from remaining on the job, or keep them from
      advancing in their careers.  Moreover, even without regard to these tangible effects, the very

16        fact that the discriminatory conduct was so severe or pervasive that it created a work
      environment abusive to employees because of their race, gender, religion, or national origin

17        offends Title VII's broad rule of workplace equality...
                          ***

18        We therefore believe the District Court erred in relying on whether the conduct "seriously
      affect[ed] plaintiff's psychological well-being" or led her to "suffe[r] injury..."  Certainly

19        Title VII bars conduct that would seriously affect a reasonable person's psychological well-
      being, but the statute is not limited to such conduct.  So long as the environment would

20        reasonably be perceived, and is perceived, as hostile or abusive, [citation], there is no need
      for it also to be psychologically injurious.

21  *Harris*, supra, at 21.  (c.f. *Draper v. Coeur Rochester, Inc* (9th Cir. 1998) 147 F.3d 1104 - sexual innuendos

22  of defendant's supervisor coupled with discriminatory work assignments were held to have created a
sufficiently hostile work environment).

23            *b)    Where Plaintiff was Physically as Well as Verbally*
               *Abused, His Environment was Clearly Hostile*

24

25      [12]. Hardy told Harris on several occasions, in the presence of other employees, "You're a woman,

26  what do you know" and "We need a man as the rental manager"; at least once, he told her she was "a dumb
ass woman."  *Again in front of others*, he suggested that the two of them "go to the Holiday Inn to negotiate

27  [Harris'] raise."  Hardy occasionally asked Harris and other female employees to get coins from his front
pants pocket.  He threw objects on the ground in front of Harris and other women, and asked them to pick

28  the objects up.  He made sexual innuendos about Harris' and other women's clothing.

1

2       Additionally, it must be noted that Plaintiff suffered regular physical abuse at the hands of Yoon

3  (cites). Both the Ninth Circuit and the State of California have expressly recognized that physical abuse is

   more offensive than verbal abuse for purposes of establishing the legal hostility of a workplace [*Fisher v.*

4  *San Pedro Peninsula Hospital*, (1989) 214 Cal.App.3d 590; *Pereira v. Schlage Electronics* (1995) 902

5  F.Supp. 1095]

6                    c)    **Plaintiff's Work Environment was both**

7                          **Objectively and Subjectively Hostile**

8       In order to be found "hostile" a work environment must be both objectively and subjectively hostile

9  [*Harris*, supra, at 22]. The pervasive environment of physical and verbal abuse which Yoon maintained at

10 U.Lim is well-established in the record

11      From the objective standpoint, it must be noted that witnesses Baek and Cheong have expressed in

12 no uncertain terms the nature of Kang's work environment. Baek says it was a "military camp", that Kang

13 was treated like a kindergartener, and that he was insulted at the treatment Kang sustained. Cheong, who

14 was employed by U.Lim most recently, through the date of Plaintiff's termination, stated that they were

15 treated like "servants", that Kang was hit and kicked as part of a "daily ritual" and that they just "got used"

16 to being hit every day. (Cheong, 34:13-35:8; 36:7-11; 48:24-49:5)

17      Subjectively, Kang has stated that he felt hurt, afraid, "brainwashed", depressed and humiliated and

18 was afraid for his job if he complained. (Kang, 316:22-318:4; 371:15-371:21; 372:4-9; 372:14-20; 554:4-

19 10; 327: 7-12; 927:23-928-18; 326:21-327:12373:8-12; 374:19-23) Baek stated that whenever he saw Yoon

20 kick Kang, he could tell that it hurt Kang. [Baek, 161:7-21] As to being hit in the face and head with a metal

21 ruler, that is obviously distressing. Furthermore, Kang's own statements should also be considered in light

22 of the statement of Cheong with respect to just getting used to being hit all the time. There is sufficient

23 evidence to establish that Kang perceived his environment as hostile or abusive [*Harris*, supra, at 22].

24               5.   **It is not a defense that Yoon may have believed that he is helping his**

25                    **victims to be better Koreans**

26      Defendants next attempt at MSJ Page 24 to explain away Yoon's deplorable behavior by claiming

27 his racist comments and behavior show he favored, rather than discriminated against, Koreans.. While this

28 may be true, this sort of "favoritism" is not what Plaintiff needed, considering it came in the form of constant

- 22 -

physical and verbal abuse, punishing work hours and capricious termination. While the instant situation is somewhat novel in that Yoon may genuinely believe he is making his victims better Koreans,[13] no authority has ever recognized a belief in the victim's "racial superiority" to be a defense to a claim for disparate treatment. To the contrary, 42 U.S.C. 2000e2 simply states that:

> It shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

42 USCA s 2000e-2 (in pertinent part)

Defendants cannot reasonably claim that Plaintiff was not treated less favorably in terms of overtime hours, compensation and working conditions vis a vis the Mexican employees, who were not abused to the same degree [Baek, 35:19-36:1; 138:24-25; Cheong 42:20-21], were permitted to rotate overtime [**] and were compensated for their overtime [**]. Nor can they overcome the inference that Yoon inflicted these conditions upon him based upon the fact that he was Korean. Whether he did so out of malice or a twisted sense of benevolence makes no difference.

### 6.   Yoon's Favoritistic Treatment of Some of the Koreans Does Not Absolve Him of Responsibility for His Discriminatory Acts

The fact that Yoon may, by virtue of personal relations or otherwise, favor one or more of the employees to the extent that they do not suffer his attentions to the same extent the less fortunate Koreans do, is not a defense. This issue of "tokenism" was squarely addressed in *Connecticut v. Teal* (1982) 457 U.S. 440. Therein, the Supreme Court stated that:

> It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group. We recognized in Los Angeles Dept. of Water & Power v. Manhart, [citation], that fairness to the class of women employees as a whole could not justify unfairness to the individual female employee because the "statute's focus on the individual is unambiguous." [citation]

*Connecticut v. Teal*, supra, at 445.

---

[13]   Defendant's cited case [*Pacenza*] accordingly has no applicability. The point Plaintiff is making in citing Yoon's statements is not that he bears animus toward Koreans, but rather that he is explicitly admitting that he singles the Koreans out for a harsher work and discipline regimen because he believes they are superior workers to their Mexican or American counterparts. This stark admission of "favoritism" is wholly relevant to and probative of Yoon's racial motivation.

- 23 -

The evidence clearly shows that Kang was singled out for harsh treatment based upon his race, regardless of what Yoon's relationship with Cho or any other individual manager may have been.

### 7. *U.Lim is not exempt from liability because Yoon mistreated all of Koreans employees equally.*

Defendants next "defense" is that Yoon's abusive treatment was "equal opportunity". [MSJ at 24:10-11] Their problem in utilizing the well-worn "he was a bastard to everyone" employer defense is that the record does not support this. The testimony of the plaintiff and witnesses clearly shows that, while Yoon is hardly an ideal boss no matter what your ethnic background, you particularly do not want to be his Korean employee.

Kang, Baek and Carillo all clearly state that Yoon did not hit Mexican employees, did not scold them as harshly, and did not subject them to the punishing work scheduled expected of the Koreans. The standard for disparate treatment is that an employee is treated less favorably than another because of his race. This does not mean that an employer can escape fault by mistreating everyone in his employ.[14]

Sufficient testimony is in evidence to show that Plaintiff suffered discriminatory termination from a hostile work environment for refusing to work intolerable hours under unsconscionable conditions after performing his legitimate duties to the admitted satisfaction of his supervisor. Defendants' motion as to this cause of action should be overruled.

## VIII.   TITLE VII - Statute of Limitation (Continuing Violations)

Defendants' claim herein ignores the well-known "continuing violations" doctrine, whereunder acts which are related by common motive, theme, target, and function in the workplace are considered a single violation for purposes of calculating when a plaintiff's cause of action accrues vis a vis the applicable statute of limitations.

---

[14]      This is an odd sort of "mixed-motive" argument. Claims like these are the very reason why Congress explicitly and with great dispatch amended the Civil Rights Act in 1991. The Act now states that all a Plaintiff must do to prove a claim under Title VII where the employer claims he would have taken the wrongful action absent the discriminatory factor is to show that race was a "substantial factor" in motivating the decision.   Nevertheless, it must be noted that, given that Plaintiff was terminated, constructively or otherwise, for refusal to work hours which were imposed solely upon Koreans and out of general dissatisfaction with abusive treatement sustained only by Koreans, it cannot be said that he would not have been fired had he not been Korean, as he never would have suffered the adverse conditions to such a degree in the first place.

1

> "To establish a continuing violation [a plaintiff has] to show 'a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period.' " [citations]. A continuing violation may thus be established not only by demonstrating a company wide policy or practice, but also by demonstrating a series of related acts against a single individual. [citation] In the latter instance, "[the] question ... boils down to whether sufficient evidence supports a determination that the 'alleged discriminatory acts are related closely enough to constitute a continuing violation.' " [citation]

2

3

4

5

*Green v. Los Angeles County Superintendent of Schools* (9th Cir. 1989) 883 F.2d 1472, 1480

6

7    In *Draper v. Coeur Rochester, Inc.* (9th Cir. Cal. 1998) 147 F.3d 1104 worked at Coeur for a period

8    of two years in which she was subjected to regular sexual innuendoes by her supervisor and given

9    unfavorable work assignments when she failed to reciprocate his interest.  The Ninth Circuit Court of

10   Appeals ruled as follows.

11

> Here, Draper has testified that she was subject to the same sort of harassment by Anelli on a regular basis, and that she constantly felt uncomfortable and upset at work.  As in most claims of hostile work environment harassment, the discriminatory acts were not always of a nature that could be identified individually as significant events; instead, the day-to-day harassment was primarily significant, both as a legal and as a practical matter, in its cumulative effect.  Because Draper's hostile work environment claim is not based upon a series of discrete and unrelated discriminatory actions, but is instead premised upon a series of closely related similar occurrences that took place within the same general time period and stemmed from the same source, her allegations set forth a claim of a continuing violation.

12

13

14

15

16   *Draper v. Coeur Rochester, Inc.* (9th Cir. Cal. 1998) 147 F.3d 1104, 1108

17   Likewise, in the case of *Anthony v. County of Sacramento Sheriff's Department* (1994 E.D. Cal) 845

18   F.Supp. 1396, the plaintiff was similarly subjected to racist and sexist remarks, discriminatory treatment and

19   harassment.  The Court therein found that:

20

> Here, plaintiff alleges acts of harassment and discrimination which were motivated by endemic racial and sexual animus and retaliation for particular forms of speech.  As explained above, these acts are related by common motive, theme, target, and function in the workplace.  Plaintiff's allegations, if proven, would therefore establish a continuous violation sufficient to toll the statute.

21

22

23

> An ongoing campaign of related harassment, like an ongoing policy of discrimination, constitutes a civil rights violation that continues rather than concludes with any individual act.

24

25   *Anthony v. County of Sacramento Sheriff's Department* (1994 E.D. Cal) 845 F.Supp. 1396, 1402

26   In the instant case, it is abundantly clear that the Plaintiff's termination, as well as the physical and

27   verbal abuse and punishing work schedule he endured was motivated by race and was part of a continuing

28   pattern of discrimination inflicted upon all Korean employees, including Plaintiff.  Accordingly, all

1  discriminatory acts alleged in the complaint are actionable and the statute of limitations does not apply

2  thereto.

3                                    CONCLUSION

4          For the aforemention reasons, the defendants motion for Summary Judgment and/or Summary

5  Adjudication should be denied as there exist genuine issues of material fact.

6

7  Dated: __2/15/00__                          _____

8                                              Richard E. Grey, Attorney for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## UNITED STATES DISTRICT COURT - SOUTHERN DISTRICT OF CALIFORNIA

2

## DECLARATION OF SERVICE

3

### KANG v. U.LIM AMERICA, INC, et al - Civil No. 99CV0659 JM (RBBS)

4    I, Dawn M.Souder, declare, I am, a citizen of the United States, over the age of eighteen years,

5    and not a party to this action. I am employed in the County of San Diego, California. My business address

6    is 409 Camino Del Rio South, Suite 303, San Diego, California.  On February 15, 2000  I served the

7    following document(s):

8    **PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND MOTION**
     **FOR SUMMARY ADJUDICATION OF CLAIMS; DECLARATION OF RICHARD E. GREY;**
9    **PLAINTIFF'S UNDISPUTED STATEMENT OF FACTS.**

10   on all interested parties in said action, by delivering a true copy as follows:

11        [ ]    (By Mail)  I placed a true copy thereof enclosed in a sealed envelope with
                 postage thereon fully prepaid.  I deposited said envelope in the United States
12               Mail in the State of California in the County of San Diego.

13        [ ]    (By Hand)  I placed a true copy thereof enclosed in a sealed envelope and
                 caused such envelope to be delivered to the offices of each addressee.

14
          [X]    (By Facsimile) I sent a true copy thereof via telephone facsimile transmission
15               to the offices of the addressee via the facsimile number as identified by each
                 addressee, and additionally I forwarded a hard copy by mail.

16
          Each envelope (if applicable) was addressed as follows:
17
          John S. Battenfeld, Esq
18        Morgan, Lewis & Bockius LLP
          300 South Grand Avenue, 22nd Floor
19        Los Angeles, CA 90071-3132
          Attorney for U. Lim America, Inc., Tae Jin Yoon
20
          I declare under penalty of perjury that the foregoing is true and correct. Executed
21
     February 15, 2000 at San Diego, California.
22
                                                              Dawn M. Souder
23

24

25

26

27

28

Legal Tabs Co  1-800-322-3022

Recycled   Stock # DO-10-B

KANG V.
U. LIM AMERICA

TAE JIN YOON
02/01/00

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF CALIFORNIA
 3
 4  SOO CHEOL KANG,                    )
                                       )
 5          Plaintiff,                 )
                                       )
 6      vs.                            )   No. 99 CV659 JM
                                       )        (RBB)
 7  U. LIM AMERICA, INC.; TAE          )
    JIN YOON, an individual; and       )
 8  DOES 1 to 100,                     )
                                       )
 9          Defendants.                )
10  _____ )
11
12
13
14          DEPOSITION OF TAE JIN YOON
15              San Diego, California
16           Tuesday, February 1, 2000
17                   Volume I
18
19
20
21
22
    Reported by:
23  JESSICA E. MASSE
    CSR No. 9910
24  JOB No. 12376B
25
```

**Page 2**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF CALIFORNIA
 3
 4  SOO CHEOL KANG,                    )
                                       )
 5          Plaintiff,                 )
                                       )
 6      vs.                            )   No. 99 CV659 JM
                                       )        (RBB)
 7  U. LIM AMERICA, INC.; TAE          )
    JIN YOON, an individual; and       )
 8  DOES 1 to 100,                     )
                                       )
 9          Defendants.                )
10  _____ )
11
12
13
14
15          Deposition of TAE JIN YOON,
16      Volume I, taken on behalf of Plaintiff,
17      at 501 West Broadway, Suite 1300, San
18      Diego, California, beginning at 10:50
19      a.m. and ending at 5:00 p.m. on
20      Tuesday, February 1, 2000, before
21      JESSICA E. MASSE, Certified Shorthand
22      Reporter No. 9910.
23
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3          LAW OFFICE OF RICHARD E. GREY
            BY:  RICHARD E. GREY
 4          Attorney at Law
            409 Camino Del Rio South, Suite 303
 5          San Diego, California 92108
            (619) 543-9300
 6
    For the Defendants:
 7
            MORGAN, LEWIS & BOCKIUS
 8          BY:  JOHN S. BATTENFELD
            Attorney at Law
 9          300 South Grand Avenue, 22nd Floor
            Los Angeles, California 90071
10          (213) 612-2500
11  Also Present:
12          JAE HO CHO
            SOO CHEOL KANG
13
    Interpreter:
14
            ANN McCORMICK
15          12212 Old Stone Road
            Poway, California 92064
16          (619) 486-6648
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    INDEX
 2  WITNESS:                         EXAMINATION
 3  TAE JIN YOON
    Volume I
 4
 5          BY MR. GREY                   5
 6
 7
 8
 9
10
11              EXHIBITS
12               (None)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

KANG V.
U. LIM AMERICA

TAE JIN YOON
02/01/00

1  does have a cold, and my understanding is he's able to
2  testify notwithstanding the cold, but I want to make
3  sure that the witness will let us know if that becomes
4  a problem particularly as the day progresses.
5      THE WITNESS:  Yes.  If I have a problem, I will
6  let you know.
7  BY MR. GREY:
8      Q    Okay.  Have you reviewed any documents in
9  preparation for today's deposition?
10     A    No.  I have not reviewed any document.
11     Q    Have you met with anyone concerning
12  today's deposition?
13     A    Yes.  I met my attorney this morning.
14     Q    Have you met with anyone other than your
15  attorney regarding today's deposition?
16     A    No.  Besides just I had breakfast with
17  Jae.  That's all.
18     Q    Was your attorney present for that
19  breakfast?
20     A    Yes.
21     Q    Other than your attorney and Mr. Cho this
22  morning, have you spoken to anyone concerning today's
23  deposition?
24     MR. BATTENFELD:  Do you mean including any
25  meeting we may have had yesterday as well?

                                                    9

1  attended.
2  BY MR. GREY:
3      Q    You never spoke with Mr. Cho regarding
4  Mr. Park's deposition?
5      A    I received a report from Mr. Cho, Jae,
6  that Mr. Park attended the deposition.
7      Q    Did you speak about the content of the
8  deposition?
9      A    No.
10     Q    When you say "report," you are not
11  referring to a written report; correct?
12     A    No.  Just verbal report.
13     Q    Did you ever speak to anyone other than
14  your attorney regarding Mr. Cho's deposition?
15     A    I knew that he attended the deposition,
16  however, and then also I saw this morning he was here.
17     Q    Did you ever talk to him or anyone else
18  about the content of his deposition?
19     MR. BATTENFELD:  And again other than
20  discussion with counsel.
21     THE WITNESS:  No.  I don't have.
22  BY MR. GREY:
23     Q    Have you ever talked to anyone regarding
24  the content of Mr. Kang's depositions in this case?
25     MR. BATTENFELD:  And again --

                                                    11

1      MR. GREY:  Any meeting.
2      THE WITNESS:  I only had dinner with our
3  attorney.  That's all I had.
4  BY MR. GREY:
5      Q    And was Mr. Cho present for that?
6      A    Yes.  Jae was there.
7      Q    Other than these two meetings, have you
8  spoken or met with anyone concerning today's
9  deposition?
10     A    No.
11     Q    Did you speak with your father regarding
12  today's deposition?
13     A    No.  But he knows that I am coming here.
14     Q    Have you spoken with anyone concerning
15  the deposition that your father gave?
16     A    I was aware that my father attended here.
17     Q    But did you speak to anyone about that?
18     A    I knew that he attended here.  However,
19  not talked about the content of what happened.
20     Q    Did you talk to anyone concerning the
21  deposition of Mr. Park that he gave in this case?
22     MR. BATTENFELD:  Other than discussion with
23  counsel.
24     MR. GREY:  Other than discussion with counsel.
25     THE WITNESS:  No.  I don't have.  I knew he

                                                    10

1      MR. GREY:  Other than counsel.
2      THE WITNESS:  Would you repeat the question?
3  BY MR. GREY:
4      Q    Have you ever talked to anyone other than
5  your counsel regarding the content of Mr. Kang's
6  depositions in this case?
7      A    No.
8      Q    And have you ever talked to anyone
9  regarding the content of Mr. Cheong's deposition in
10  this case other than your attorney?
11     A    No.
12     Q    And finally have you ever talked to
13  anyone regarding the content of Mr. Baek's deposition
14  in this case other than your attorney?
15     A    No.
16     Q    Have you ever seen a declaration given by
17  Mr. Teddy Baek?
18     A    No.
19     Q    And you understand what a declaration is?
20     A    I do not know.
21     Q    A declaration is a written statement
22  given by -- could be given by any person and generally
23  signed under the penalty of perjury.  So I will ask it
24  this way.  Have you ever seen a written statement
25  given by Mr. Baek at any time?

                                                    12

KANG V.
U. LIM AMERICA

TAE JIN YOON
02/01/00

1  report was made?

2       A    No, there wasn't.

3       Q    Okay.  And approximately what point in

4  time, date did he inform you of Mr. Kang filing a

5  complaint?

6       MR. BATTENFELD:  If you recall.

7       THE WITNESS:  I do not remember.

8  BY MR. GREY:

9       Q    This is one of those instances where I'm

10 going to ask you for your best estimate as to time

11 because you have a recollection of it occurring, and

12 you have some estimate of when that was.  You may or

13 may not be accurate in your estimate, but give us a

14 range that you are comfortable with, your best

15 estimate in the most comfortable range when that

16 occurred.

17      A    Yes.  I will.

18      Q    And what is that?

19      A    About March of 1998.

20      MR. BATTENFELD:  '98 or '99?

21      THE WITNESS:  '99, I think.

22 BY MR. GREY:

23      Q    And what did Mr. Cho inform you as to the

24 allegations in Mr. Kang's complaint?

25      A    The content of the lawsuit, and I heard a

                                                    17

1  few items or issues, but I do not recall.

2       Q    Do you recall any of the issues that you

3  spoke about?

4       A    He did the overtime, and then I raised my

5  voice.  I think about that I remember.

6       Q    Any other specific allegations you

7  remember discussing at that time when you were

8  informed of the complaint?

9       A    No.

10      Q    So it's your testimony, then, that the

11 only thing that you recall specific issues discussing

12 is overtime and you raising your voice to Mr. Kang?

13      A    Yes.  At this moment, that's all.

14      Q    Did you discuss with Mr. Cho at that time

15 whether or not Ki Hwa Yoon needed to be informed of

16 this lawsuit?

17      A    No.

18      Q    Did you make any -- or have any

19 discussion at that time as to what you are going to do

20 next with respect to the lawsuit?

21      A    What do you mean?

22      Q    Mr. Cho informed you of the lawsuit;

23 correct?

24      A    Yes.

25      Q    And that was certainly a concern of the

                                                    18

1  business; correct?

2       A    Yes.

3       Q    Did you make any decision at that time

4  with Mr. Cho as to what action, if any, you would take

5  relative to the lawsuit?

6       A    No.  I did not.

7       Q    Well, did you discuss hiring an attorney

8  at that time?

9       THE INTERPRETER:  I didn't hear.

10      THE WITNESS:  No.  Did not talk about the

11 complaint.  However, I think I need to hire an

12 attorney for the case.  I think that's all we talked

13 about.

14 BY MR. GREY:

15      Q    And did you make the decision to hire an

16 attorney, or did you place that in Mr. Cho's hand?

17 Who did you give that responsibility to?

18      A    I gave them to Mr. Cho.

19      Q    When is the next time you spoke to anyone

20 regarding Mr. Kang's lawsuit?

21      A    No.  I did not talk about it.

22      Q    I'm not sure you understand the question.

23 Was there -- when was the next time, if any, but the

24 next time that you spoke to anyone regarding

25 Mr. Kang's lawsuit?

                                                    19

1       MR. BATTENFELD:  If you recall.

2       THE WITNESS:  I don't remember.

3  BY MR. GREY:

4       Q    Well, you spoke to your attorney

5  regarding the lawsuit at some point in time; correct?

6       A    Yes.  I think we went to his office in

7  L.A.

8       Q    And when did this meeting occur?

9       A    I do not remember the months.

10      Q    Just your best estimate.  If you want a

11 calendar to look at to help you out, feel free.

12      MR. BATTENFELD:  Again if you are able to give

13 an estimate.

14      THE WITNESS:  November or December.  I think it

15 was November.

16 BY MR. GREY:

17      Q    Of this year -- or rather 1999?

18      MR. BATTENFELD:  I want to remind the witness

19 he should not guess.

20      THE WITNESS:  Then, I don't remember.

21 BY MR. GREY:

22      Q    It was after your meeting with Cho;

23 correct?

24      A    Yes.

25      Q    And was it a couple of months after your

                                                    20

1   his attorneys, and I will instruct the witness to not
2   respond as to any information he may have been given
3   by his attorneys.
4        MR. GREY:  And I don't want you to reveal the
5   content of your communications with your attorney.
6   I'm just wondering whether or not at that time you
7   were aware that you or Mr. Park could be a potential
8   witness in the case.
9        MR. BATTENFELD:  But again if his awareness
10  came from the attorneys, then it's not an appropriate
11  question because that would reveal an attorney/client
12  communication.
13       MR. GREY:  You can answer to the extent of your
14  attorney's instruction.
15       MR. BATTENFELD:  In other words, were you aware
16  from any source other than your attorneys that you or
17  Mr. Park might be a witness in the case?
18       THE WITNESS:  No.  I didn't know.
19       MR. GREY:  Interesting legal issue.
20       Q    When you came back from the meeting, did
21  you speak to Mr. Cho regarding the meeting?
22       A    No.  I did not.
23       Q    Did he inquire of you regarding the
24  meeting?
25       A    No, he did not.

                                                    25

1        A    Vice-president.
2        Q    And you were president of the Mexican
3   operations; is that correct?
4        A    Yes.
5        Q    And at the time this meeting with your
6   attorney took place, Mr. Cho was general manager; is
7   that correct?
8        A    Yes.
9        Q    When is the next time you spoke with
10  anyone concerning this litigation?
11       THE INTERPRETER:  Let me just repeat it.
12       THE WITNESS:  As I stated earlier, that there
13  was no person that I spoke about.
14  BY MR. GREY:
15       Q    Okay.  Let me -- just so I understand,
16  you had the first meeting with Mr. Cho where he
17  informed you portions of the complaint; correct?
18       A    Yes.
19       Q    And the next meeting you had concerning
20  any aspect of this litigation was with your attorney
21  when you drove up with Mr. Park; correct?
22       A    Yes.
23       Q    And then you came back from that meeting,
24  and you reported that you went to the meeting to Ki
25  Hwa Yoon; correct?

                                                    27

1        Q    Did you speak with anyone concerning the
2   meeting?
3        A    No.  There was no one I talked about --
4   talked about.  I reported to Ki Hwa Yoon that I made
5   the trip.
6        Q    Prior to making the trip, had you spoken
7   to Ki Hwa Yoon about this litigation?
8        A    No.  I did not.
9        Q    What was the reason why you felt the need
10  to report to him at that time?
11       A    Would you repeat that?
12       Q    What was the reason why you felt the need
13  to report to him the first time after the meeting?
14       A    And I sometimes report to him my schedule
15  because he is an upper person.
16       MR. GREY:  Was that the full extent of his
17  answer?
18       THE WITNESS:  Since he was an upper person,
19  there were times that I report to him about my
20  schedule and things like that.
21  BY MR. GREY:
22       Q    And during Mr. Kang's employment, what
23  was your title at U. Lim America?
24       A    In America side?
25       Q    America side.

                                                    26

1        A    Yes.
2        Q    When is the next time you had any meeting
3   or spoke to anyone concerning this litigation from
4   that time on?
5        MR. BATTENFELD:  If you can recall.
6        THE WITNESS:  I don't think I did it with
7   anybody.  Also I don't recall.
8   BY MR. GREY:
9        Q    So is it your testimony, then, that the
10  next time you spoke with anyone regarding this
11  litigation is when you met with Mr. Cho and your
12  attorney last night before this deposition?
13       A    Yes.
14       Q    Other than reporting that you went to the
15  meeting to Ki Hwa Yoon, did you discuss the litigation
16  with Ki Hwa Yoon?
17       A    No.  I did not.
18       MR. GREY:  Let's just take a two-minute break.
19       (Recess taken.)
20  BY MR. GREY:
21       Q    Are you aware of U. Lim setting up a
22  meeting with Mr. Kang to discuss his lawsuit?
23       A    Would you repeat that?
24       Q    Are you aware of the meeting that U. Lim
25  set up with Mr. Kang to discuss his lawsuit?

                                                    28

1    A    Already they have met.  That's why.
2    Q    Do you know if they met with Mr. Kang to
3 try to settle the lawsuit or to convince him to drop
4 the lawsuit?
5    A    I understood that they just had dinner
6 together.
7    Q    Do you know whether or not Mr. Cho
8 reported this meeting to Mr. Yoon, your father?
9    A    No.  I don't know.
10    Q    As we sit here today, you are aware of
11 the fact that Mr. Kang has sued U. Lim America;
12 correct?
13    A    Yes, yes.  I know.
14    Q    And you are aware of the fact that he's
15 personally sued you; correct?
16    A    Yes, I do.
17    Q    And as we sit here today, what is your
18 understanding of his allegations against you and U.
19 Lim America?
20    MR. BATTENFELD:  And I'll object to the
21 question to the extent it calls for any testimony
22 about an understanding he obtained through discussions
23 with attorneys for Mr. Yoon and/or the company.  I
24 will instruct the witness to respond only as to any
25 understanding he has obtained through discussions with

33

1 people other than his attorneys or where his attorneys
2 were not present.
3    THE WITNESS:  I do not have anything besides
4 the source I obtained from those.
5 BY MR. GREY:
6    Q    Are you aware that Mr. Kang has alleged
7 that you verbally abused him during the course of his
8 employment?
9    A    Yes.  That, which I understand.
10    Q    Do you understand that Mr. Kang has
11 alleged that you physically struck him on occasions
12 during the course of his employment?
13    A    I remember that.  I think that
14 information was included in the complaint.
15    Q    So the answer is "yes"?
16    A    Yes.  That is the way I remember.
17    Q    Have you ever spoken with Mr. Carillo at
18 any time concerning this litigation?
19    A    Who is Carillo?
20    Q    Raul Carillo.
21    A    No.  I did not.
22    Q    Are you aware of Mr. Cho or Mr. Park
23 speaking to Raul Carillo at any time concerning this
24 litigation?
25    A    Yes.  I do remember.

34

1    Q    And who informed you of that meeting?
2    A    Jae reported.
3    Q    Okay.  And when did he report to you
4 about this meeting?
5    A    I do not remember.
6    Q    And what did he report to you about this
7 meeting?
8    A    Only he informed that they met.
9    Q    Did he tell you before the meeting that
10 he was planning to have this meeting with Mr. Carillo?
11    A    No.  It was not.  After they met.
12    Q    Did you know why he met with Mr. Carillo?
13    A    No.  I did not.
14    Q    When Mr. Cho reported that he had met
15 with Mr. Carillo, did you inquire as to what happened
16 in the meeting?
17    A    I only heard that they had dinner.  They
18 met.
19    Q    Now, you indicated that Mr. Cho reported
20 having this meeting with Mr. Carillo.  Was it
21 Mr. Cho's duty to report any meetings he had regarding
22 the litigation to you?
23    A    Just informing the -- about what happened
24 rather than reporting me with a report.
25    Q    But you are vice-president of U. Lim

35

1 America; correct?
2    A    Yes, it is.
3    Q    And he was below you; correct?
4    A    Who?
5    Q    Cho.
6    A    Yes, it is.
7    Q    And since you were his superior, was it
8 his duty to report to you all the events concerning
9 this litigation?
10    MR. BATTENFELD:  I'll object to the question as
11 being ambiguous with respect to the word "duty" and
12 the phrase all the events regarding the litigation, or
13 exactly how it was phrased, I don't recall.
14    THE WITNESS:  No.  It's not his duty.
15 BY MR. GREY:
16    Q    Did anyone have a duty at the company to
17 tell you what was happening with respect to this
18 litigation?
19    A    About the litigation?
20    Q    Yes.
21    A    You mean a person who report to me the
22 status when it happens?
23    Q    Reporting the status or the events.
24    THE INTERPRETER:  I didn't hear.
25    MR. GREY:  Reporting the status or the events.

36

1  report to you; correct?
2       A    Yes, it is.
3       Q    And each of them would report the
4  activities in their department for the day before;
5  correct?
6       A    Yes.
7       Q    Mr. Park would report what the production
8  was for the day before; correct?
9       MR. BATTENFELD:  You are asking about a typical
10 meeting?
11      MR. GREY:  A typical meeting.
12      THE WITNESS:  You mean relating to production?
13      MR. GREY:  Yes.
14      THE WITNESS:  Yes.
15 BY MR. GREY:
16      Q    And Mr. Cho would report his sales
17 activities to you; correct?
18      A    Yes, it is.
19      Q    And Mr. Kang would report his purchasing
20 activities?
21      A    Yes, it is.
22      Q    And the reason for these reports was
23 because you were vice-president and needed to know the
24 status of each department; correct?
25      A    Yes, it is.

41

1       Q    And you were responsible for the overall
2  supervision and running of U. Lim America and U. Lim
3  Mexico; correct?
4       A    Yes, it is.
5       Q    And is that still the case today?
6       A    Yes, it is.
7       Q    So during these daily meetings, it was
8  important to you to know what the production was for
9  the day before or the week before; correct?
10      A    Yes.
11      Q    You wanted to make sure that the
12 production quotas were being met; correct?
13      A    Yes.  Of course.
14      Q    You supervised things like overtime
15 expenses to meet those production quotas; correct?
16      A    Yes, it is.
17      Q    And you would also be concerned with
18 quality control; correct?
19      A    Yes.
20      Q    And in that regard, the number of units
21 that may or may not have been rejected during the
22 course of that day or prior shipments; correct?
23      A    Yes.  Of course.
24      Q    And with respect to Mr. Kang, you'd want
25 to know the details of the inventory in the warehouse;

42

1  correct?
2       A    Yes.  Of course.
3       Q    And the cost of the supplies; correct?
4       A    Yes, it is.
5       Q    Okay.  And for Mr. Cho you'd want to know
6  the details of the sales calls he had made; correct?
7       A    Yes.  Of course.
8       Q    And the number of prospective orders that
9  would be forthcoming; correct?
10      A    Yes.
11      Q    And ultimately you were responsible for
12 everything that happened at both U. Lim Mexico and U.
13 Lim America; correct?
14      MR. BATTENFELD:  I'll object to the question as
15 being ambiguous and calling for a legal conclusion
16 with respect to the phrase ultimately responsible.
17      MR. GREY:  And I'm not using it in a legal
18 sense.  I'm using it in a business sense.
19      Q    Ultimately in a business sense you were
20 responsible for those two facilities or those two
21 companies?
22      A    Yes, it is.
23      Q    Do you consider the lawsuit that has been
24 filed against U. Lim America to be a serious issue for
25 the business?

43

1       A    To some degree.
2       Q    Then why is it you were not concerned
3  about why Mr. Cho met with Mr. Carillo or what
4  happened at the meeting with Mr. Carillo?
5       MR. BATTENFELD:  I object to the question as
6  misstating the witness' testimony.  I don't believe
7  there's ever been any testimony about whether he was
8  or wasn't concerned.
9       MR. GREY:  I'll lay a foundation.
10      Q    Were you concerned about the meeting with
11 Mr. Carillo at all?
12      A    No, not really.
13      Q    So then now to my next question.  As
14 vice-president of U. Lim America and president of U.
15 Lim Mexico, why were you not concerned about the
16 meeting between Mr. Cho and Mr. Carillo?
17      A    As I stated earlier, Raul used to work
18 for our company, and then prior to that, there were
19 frequent times that employees -- they have dinner
20 together like that.
21      Q    But this wasn't just a dinner between
22 friends; correct?
23      MR. BATTENFELD:  Objection, calls for
24 speculation.
25      MR. GREY:  You can answer.

44

KANG V.
. U. LIM AMERICA

TAE JIN YOON
02/01/00

```
 1      A       Already they have met.  That's why.
 2      Q       Do you know if they met with Mr. Kang to
 3  try to settle the lawsuit or to convince him to drop
 4  the lawsuit?
 5      A       I understood that they just had dinner
 6  together.
 7      Q       Do you know whether or not Mr. Cho
 8  reported this meeting to Mr. Yoon, your father?
 9      A       No.  I don't know.
10      Q       As we sit here today, you are aware of
11  the fact that Mr. Kang has sued U. Lim America;
12  correct?
13      A       Yes, yes.  I know.
14      Q       And you are aware of the fact that he's
15  personally sued you; correct?
16      A       Yes, I do.
17      Q       And as we sit here today, what is your
18  understanding of his allegations against you and U.
19  Lim America?
20      MR. BATTENFELD:  And I'll object to the
21  question to the extent it calls for any testimony
22  about an understanding he obtained through discussions
23  with attorneys for Mr. Yoon and/or the company.  I
24  will instruct the witness to respond only as to any
25  understanding he has obtained through discussions with
                                                        33
```

```
 1  people other than his attorneys or where his attorneys
 2  were not present.
 3      THE WITNESS:  I do not have anything besides
 4  the source I obtained from those.
 5  BY MR. GREY:
 6      Q       Are you aware that Mr. Kang has alleged
 7  that you verbally abused him during the course of his
 8  employment?
 9      A       Yes.  That, which I understand.
10      Q       Do you understand that Mr. Kang has
11  alleged that you physically struck him on occasions
12  during the course of his employment?
13      A       I remember that.  I think that
14  information was included in the complaint.
15      Q       So the answer is "yes"?
16      A       Yes.  That is the way I remember.
17      Q       Have you ever spoken with Mr. Carillo at
18  any time concerning this litigation?
19      A       Who is Carillo?
20      Q       Raul Carillo.
21      A       No.  I did not.
22      Q       Are you aware of Mr. Cho or Mr. Park
23  speaking to Raul Carillo at any time concerning this
24  litigation?
25      A       Yes.  I do remember.
                                                        34
```

```
 1      Q       And who informed you of that meeting?
 2      A       Jae reported.
 3      Q       Okay.  And when did he report to you
 4  about this meeting?
 5      A       I do not remember.
 6      Q       And what did he report to you about this
 7  meeting?
 8      A       Only he informed that they met.
 9      Q       Did he tell you before the meeting that
10  he was planning to have this meeting with Mr. Carillo?
11      A       No.  It was not.  After they met.
12      Q       Did you know why he met with Mr. Carillo?
13      A       No.  I did not.
14      Q       When Mr. Cho reported that he had met
15  with Mr. Carillo, did you inquire as to what happened
16  in the meeting?
17      A       I only heard that they had dinner.  They
18  met.
19      Q       Now, you indicated that Mr. Cho reported
20  having this meeting with Mr. Carillo.  Was it
21  Mr. Cho's duty to report any meetings he had regarding
22  the litigation to you?
23      A       Just informing the -- about what happened
24  rather than reporting me with a report.
25      Q       But you are vice-president of U. Lim
                                                        35
```

```
 1  America; correct?
 2      A       Yes, it is.
 3      Q       And he was below you; correct?
 4      A       Who?
 5      Q       Cho.
 6      A       Yes, it is.
 7      Q       And since you were his superior, was it
 8  his duty to report to you all the events concerning
 9  this litigation?
10      MR. BATTENFELD:  I'll object to the question as
11  being ambiguous with respect to the word "duty" and
12  the phrase all the events regarding the litigation, or
13  exactly how it was phrased, I don't recall.
14      THE WITNESS:  No.  It's not his duty.
15  BY MR. GREY:
16      Q       Did anyone have a duty at the company to
17  tell you what was happening with respect to this
18  litigation?
19      A       About the litigation?
20      Q       Yes.
21      A       You mean a person who report to me the
22  status when it happens?
23      Q       Reporting the status or the events.
24      THE INTERPRETER:  I didn't hear.
25      MR. GREY:  Reporting the status or the events.
                                                        36
```

1  report to you; correct?
2      A    Yes, it is.
3      Q    And each of them would report the
4  activities in their department for the day before;
5  correct?
6      A    Yes.
7      Q    Mr. Park would report what the production
8  was for the day before; correct?
9      MR. BATTENFELD:  You are asking about a typical
10 meeting?
11     MR. GREY:  A typical meeting.
12     THE WITNESS:  You mean relating to production?
13     MR. GREY:  Yes.
14     THE WITNESS:  Yes.
15 BY MR. GREY:
16     Q    And Mr. Cho would report his sales
17 activities to you; correct?
18     A    Yes, it is.
19     Q    And Mr. Kang would report his purchasing
20 activities?
21     A    Yes, it is.
22     Q    And the reason for these reports was
23 because you were vice-president and needed to know the
24 status of each department; correct?
25     A    Yes, it is.

41

1      Q    And you were responsible for the overall
2  supervision and running of U. Lim America and U. Lim
3  Mexico; correct?
4      A    Yes, it is.
5      Q    And is that still the case today?
6      A    Yes, it is.
7      Q    So during these daily meetings, it was
8  important to you to know what the production was for
9  the day before or the week before; correct?
10     A    Yes.
11     Q    You wanted to make sure that the
12 production quotas were being met; correct?
13     A    Yes.  Of course.
14     Q    You supervised things like overtime
15 expenses to meet those production quotas; correct?
16     A    Yes, it is.
17     Q    And you would also be concerned with
18 quality control; correct?
19     A    Yes.
20     Q    And in that regard, the number of units
21 that may or may not have been rejected during the
22 course of that day or prior shipments; correct?
23     A    Yes.  Of course.
24     Q    And with respect to Mr. Kang, you'd want
25 to know the details of the inventory in the warehouse;

42

1  correct?
2      A    Yes.  Of course.
3      Q    And the cost of the supplies; correct?
4      A    Yes, it is.
5      Q    Okay.  And for Mr. Cho you'd want to know
6  the details of the sales calls he had made; correct?
7      A    Yes.  Of course.
8      Q    And the number of prospective orders that
9  would be forthcoming; correct?
10     A    Yes.
11     Q    And ultimately you were responsible for
12 everything that happened at both U. Lim Mexico and U.
13 Lim America; correct?
14     MR. BATTENFELD:  I'll object to the question as
15 being ambiguous and calling for a legal conclusion
16 with respect to the phrase ultimately responsible.
17     MR. GREY:  And I'm not using it in a legal
18 sense.  I'm using it in a business sense.
19     Q    Ultimately in a business sense you were
20 responsible for those two facilities or those two
21 companies?
22     A    Yes, it is.
23     Q    Do you consider the lawsuit that has been
24 filed against U. Lim America to be a serious issue for
25 the business?

43

1      A    To some degree.
2      Q    Then why is it you were not concerned
3  about why Mr. Cho met with Mr. Carillo or what
4  happened at the meeting with Mr. Carillo?
5      MR. BATTENFELD:  I object to the question as
6  misstating the witness' testimony.  I don't believe
7  there's ever been any testimony about whether he was
8  or wasn't concerned.
9      MR. GREY:  I'll lay a foundation.
10     Q    Were you concerned about the meeting with
11 Mr. Carillo at all?
12     A    No, not really.
13     Q    So then now to my next question.  As
14 vice-president of U. Lim America and president of U.
15 Lim Mexico, why were you not concerned about the
16 meeting between Mr. Cho and Mr. Carillo?
17     A    As I stated earlier, Raul used to work
18 for our company, and then prior to that, there were
19 frequent times that employees -- they have dinner
20 together like that.
21     Q    But this wasn't just a dinner between
22 friends; correct?
23     MR. BATTENFELD:  Objection, calls for
24 speculation.
25     MR. GREY:  You can answer.

44

1  is argumentative.  I also want to make sure that the
2  witness understands that he's being asked now about a
3  deposition involving Mr. Carillo as opposed to the
4  meeting that Mr. Cho had with Mr. Carillo that he's
5  already testified about.
6  BY MR. GREY:
7      Q    You understand that we are talking about
8  two separate incidents -- events; correct?
9      A    Would you repeat your question?
10     Q    There were two separate events; one being
11 the meeting where Mr. Cho had dinner with Mr. Carillo,
12 and the other being a scheduled deposition of
13 Mr. Carillo.  You understand those to be two separate
14 events; correct?
15     A    Yes.
16     Q    Okay.  And you indicated that Mr. Cho
17 reported back to you about both of those events;
18 correct?
19     A    Yes.
20     Q    And we are referring now to him reporting
21 back to you after the scheduled deposition of
22 Mr. Carillo.
23     A    Yes.
24     Q    And my question to you was why were you
25 not concerned about what happened at the deposition of

49

1  Mr. Carillo?
2      A    I was quite busy at the time.
3      Q    Were you in the United States or Mexico
4  at the time that Mr. Cho reported this deposition to
5  you?
6      A    I don't recall.
7      Q    You don't recall where you were?
8      A    I do not remember whether I was in the
9  U.S. side office or the Mexican side office.
10     Q    I'm not talking about whether or not you
11 were at your home address in San Diego or at the U.
12 Lim facility when this was reported.  I'm talking
13 whether you were outside of either of these two
14 countries when this was reported to you.
15     A    I don't remember.  The reason is I get
16 confused.  Even though I'm on this side of the
17 country, I get report from him, Jae.  Even if I am in
18 Korea, still I get report from Jae.
19     Q    Do you know whether or not the report
20 from Jae you received was in person or not?
21     A    I don't remember.  I don't remember
22 whether he reported to me on the phone or in person.
23     Q    Did you ever come to learn that
24 Mr. Carillo did not attend his deposition?
25     A    No.  I didn't know.

50

1      Q    Did you ever have a meeting with your
2  father and other employees of U. Lim concerning this
3  litigation at his house?
4      A    No.  I don't.
5      Q    Did you ever have a meeting with your
6  father and any of the other U. Lim employees
7  concerning this litigation at any time?
8      A    No.
9      Q    So is it correct to say, then, that you
10 never discussed -- let me strike that.
11          Other than reporting to your father that
12 you had the meeting with the attorney, have you ever
13 spoken to your father concerning this litigation at
14 any time?
15     A    No.  I didn't have any.  And my father
16 has quite a busy schedule as well as I had therefor.
17     Q    Did your father ever ask you whether or
18 not any of Mr. Kang's allegations were true?
19     A    No.
20     Q    Now, you indicated that you're aware of
21 the fact that Mr. Kang filed a claim for unemployment
22 benefits; correct?
23     A    Yes.
24     Q    And who informed you of that?
25     A    I heard from Jae.

51

1      Q    Did you ever indicate to Mr. Cho that you
2  would or should oppose those unemployment benefits?
3      A    No.
4      Q    Do you know whether or not U. Lim ever
5  opposed those unemployment benefits?
6      A    No.  I do not know.
7      Q    So as we sit here today, you do not know
8  whether or not U. Lim opposed Mr. Kang's application
9  for unemployment benefits; is that correct?
10     THE INTERPRETER:  Let me just repeat it.
11     THE WITNESS:  At this moment?
12     MR. GREY:  At this moment.
13     THE WITNESS:  Now I know.
14 BY MR. GREY:
15     Q    When did you first learn that U. Lim had
16 opposed his unemployment benefits?
17     A    I do not remember.  I think maybe I may
18 heard after he resigned -- Mr. Kang resigned.
19     Q    When is your best estimate of when you
20 heard?
21     A    I don't remember since I was in Korea at
22 the time.
23     Q    Did first learn that U. Lim opposed
24 his unemployment benefits after Mr. Kang had filed a
25 lawsuit?

52

1    Q    Okay. And at some point after which the
2    unemployment hearing was resolved, you found out about
3    it; correct?
4    A    Yes.
5    Q    Okay. And then I asked you whether or
6    not you found out about it before or after you found
7    out about the lawsuit.
8    A    I stated earlier that I found out after
9    he filed this litigation.
10   Q    So you found out after he filed the
11   litigation; is that correct?
12   A    Yes. Yes, it is.
13   Q    And it was Mr. Cho who informed you;
14   correct?
15   A    Yes.
16   Q    Did he inform you as to the results of
17   that unemployment hearing?
18   A    What result?
19   Q    Whether or not Mr. Kang was granted
20   unemployment benefits.
21   A    No. I did not hear anything about it.
22   Q    So as we sit here today, you do not know
23   whether or not Mr. Kang received those unemployment
24   benefits?
25   A    Even now, I do not know.

57

1    Q    What is your best estimate of when
2    Mr. Kang ceased working for U. Lim?
3    A    My recollection was when I was in Korea.
4    I think it was in 1998, maybe March or June. I think
5    about that time.
6    Q    Do you know why Mr. Kang ceased his
7    employment with U. Lim America?
8    A    Would you ask me -- I do not understand
9    the content of your question. Would you ask me that
10   again?
11   Q    Do you know why Mr. Kang's employment
12   came to an end at U. Lim?
13   MR. BATTENFELD: I'll object to the question
14   that it calls for speculation.
15   THE WITNESS: Yes, I do.
16   MR. GREY: What was his answer?
17   THE INTERPRETER: "Yes, I do."
18   BY MR. GREY:
19   Q    And why was that?
20   MR. BATTENFELD: Same objection.
21   THE WITNESS: I heard that he had problems with
22   other employees, and also he was not -- did not
23   orchestrate the work with the other managers. So if
24   there is no action taken about it, he would not work.
25   MR. CHO: Can you go over it again? It's

58

1    confusing.
2    MR. BATTENFELD: Is that a proper translation?
3    MR. GREY: We've got the first translation on
4    the record, but Mr. Cho's concerned about the
5    translation, so we'll just repeat the question and
6    give Tae Jin Yoon an opportunity to listen to it
7    carefully and give the interpreter an opportunity to
8    make sure she's absolutely precise in giving back his
9    testimony.
10   MR. BATTENFELD: And I think he's reporting a
11   conversation he had with Mr. Kang, and I don't think
12   that's been properly translated.
13   THE INTERPRETER: I translate everything what I
14   heard. So the problem we might have here compared to
15   some other deponents and compared to Mr. Yoon,
16   Mr. Yoon usually do not use subject. Whenever he
17   makes statement, he always leaves the subject out. I
18   or he or you is not there, so I just say what I hear.
19   I think subject -- I want you to know that he always
20   never say the subject. I heard or he told me or I
21   told him. There is no subject. That's the pattern.
22   MR. GREY: Why don't we instruct him to use a
23   subject whenever it's appropriate to help out the
24   interpreter.
25   THE INTERPRETER: Yeah. Let me -- he says I is

59

1    I. He never say I. He always says heard -- heard
2    like that manner. So I am asking him try to place I
3    heard him saying or I was told what he said. Subjects
4    are missing.
5    MR. GREY: Tell him to put the subjects in if
6    it's appropriate.
7    THE INTERPRETER: I told him that I am here to
8    do the best job I can. What I hear, I do the
9    verbatim. Therefore, if I don't hear any subject, I
10   am not given any choice to make up any subject.
11   Therefore, I want to say precisely what I heard. So
12   try to place subjects in any sentence which I said
13   exactly to Mr. Yoon to help me out.
14   BY MR. GREY:
15   Q    And you understand that, Mr. Yoon?
16   A    Yes.
17   Q    So we'll go back from the beginning of
18   the question I was asking you. Do you know the reason
19   why Mr. Kang stopped working for U. Lim?
20   A    Yes, I do.
21   Q    And what is your understanding of why he
22   stopped working at U. Lim?
23   MR. BATTENFELD: And that includes explaining
24   what caused you to have that understanding, what
25   source -- what was the source of your understanding.

60

KANG V.
U. LIM AMERICA

TAE JIN YOON
02/01/00

1  other issues that you discussed with Mr. Kang other
2  than his problems with Mr. Cho?
3      A    No.  There was no other issue.
4      Q    Are you sure about that?
5      MR. BATTENFELD:  You mean -- his prior
6  testimony was that he made reference to problems with
7  Cho and Park and in conjunction with that an issue
8  about overtime.  Are you asking in addition to that?
9      MR. GREY:  I'll ask the question again.
10     Q    Other than his difficulties working with
11 Mr. Cho, were there any other issues addressed in that
12 conversation?
13     MR. BATTENFELD:  If you could also translate
14 my --
15     THE WITNESS:  Overtime issue was there, and
16 rotation issue was there.  And after that, I don't
17 think so.
18 BY MR. GREY:
19     Q    Okay.  What did you discuss with respect
20 to overtime?
21     A    I informed that the overtime issue should
22 be discussed among the department head -- managers.
23 So meeting about it and then report it to me.
24     Q    When you are referring to department
25 heads, you are referring to Mr. Kang, Mr. Park, and

65

1  important for everybody in the room.
2      A    Of course.
3      Q    But only you know whether or not you
4  understand the question.  So if you have any concerns
5  about the question, you should let us know so that we
6  can clarify because at the conclusion of this
7  deposition, you are going to get a transcript, and you
8  are going to have an opportunity to review that
9  transcript and make changes to it.  But if you make
10 substantive changes to it, I can comment on that at
11 the time of trial and question your credibility.
12     A    Yes, it is.
13          Isn't it?  Is that right?
14     Q    Yes.  That's right.
15          So it's important that you give your most
16 accurate testimony here today.
17     A    Yes.  I understand that.
18     MR. GREY:  Why don't we take a two-minute
19 break.  You can collect yourself, and then we can just
20 slow it down, and we'll make sure we can get accurate
21 responses.
22     MR. BATTENFELD:  By this point is that he get
23 accurate questions.  That, we need to do.
24     MR. GREY:  I will -- I will help this witness
25 give accurate testimony.  I will do that if I know

67

1  Mr. Cho; correct?
2      A    Yes, it is.
3      Q    And was it your understanding from that
4  conversation that Mr. Kang believed that he should not
5  have to work as much overtime as he was working?
6      MR. BATTENFELD:  Would you repeat the question?
7          Could you read back the question?
8      MR. GREY:  Yeah.  Read it back.
9          (Record read.)
10     THE INTERPRETER:  I will repeat it.
11     MR. BATTENFELD:  Could you clarify that he is
12 being asked still about the phone conversation with
13 Mr. Kang?  That's what this question is relating to.
14     MR. GREY:  Right.
15     THE INTERPRETER:  You want me to ask --
16     MR. BATTENFELD:  No.  If you can clarify with
17 the witness.
18     THE WITNESS:  No, no.  Didn't have time to
19 discuss it, and I am confused right now.  I
20 don't understand whether -- what time, when, what
21 question you are asking.
22 BY MR. GREY:
23     Q    Okay.  You need -- it is important in
24 this deposition that we get your accurate testimony.
25 It's important for you.  It's important for me.  It's

66

1  what problems he's having with the question.
2          (Recess taken.)
3  BY MR. GREY:
4      Q    Mr. Yoon, are you okay to proceed?
5      A    Yeah.  I'm fine.
6      Q    We are going to try to figure out where
7  the confusion was.  Okay?  So let me know if you have
8  any questions.  We are talking now about the
9  conversation you had with Mr. Kang.  Okay?  And these
10 questions are going to relate to that conversation.
11     MR. BATTENFELD:  Telephone conversation?
12     MR. GREY:  Telephone conversation.
13     Q    Do you understand that?
14     A    Yes.
15     Q    Now, you indicated that in that telephone
16 conversation Mr. Kang told you that he was having
17 problems with Mr. Cho; correct?
18     A    Yes.
19     Q    And that you told him that he and Mr. Cho
20 should try to work out the problems; correct?
21     A    Yes.
22     Q    And that he indicated that he understood;
23 correct?
24     A    Yes.
25     Q    And it was your understanding when you

68

KANG V.
U. LIM AMERICA

TAE JIN YOON
02/01/00

1  ri, r-i -- he did not use the word of terminate.
2  However, previously the statement Mr. Yoon made --
3  this is my statement -- previously the statement
4  Mr. Yoon made, he used the word "jung ri," j-u-n-g,
5  one space, r-i.  Then he explained that that word is
6  termination.  Therefore, the word he used this time
7  was "jung ri," j-u-n-g, one space, r-i.  That is
8  taking care of.  Verbatim meaning, those two words are
9  taking care of.  So I used to do something about it
10 and then also termination because that was -- came
11 from Mr. Yoon.
12         MR. BATTENFELD:  Let me talk to Mr. Cho for a
13 minute.
14         (Recess taken.)
15         THE WITNESS:  He mentioned -- he mentioned
16 numerous times prior to that conversation.
17 BY MR. GREY:
18     Q    And what were the problems that he
19 mentioned having with Mr. Cho?
20     A    Mr. Kang stated to me that Jae does not
21 have a good personality.  He's very hard to work with,
22 and then also he is not educated.
23     Q    Did Mr. Kang ever indicate to you that he
24 was having difficulty working with Mr. Park?
25     A    I do not recall when it was.  However,

73

1     A    I do not pay attention when the issue is
2  termination.
3     Q    Did you pay attention when the issue was
4  just a problem with them working together?
5     A    Are you talking about among managers?
6     Q    Well, you indicated you did not pay
7  attention when the issue was termination; correct?
8     A    Yes.
9     Q    I'm asking you did you pay attention when
10 the issue wasn't termination, but just them working
11 together?
12     A    I do not understand.
13     Q    Well, maybe I don't understand, but it
14 was my understanding of your answer that what you are
15 saying is you didn't pay attention to the discussions
16 about termination in that you didn't give that serious
17 consideration.  Is that true?
18     A    Yes, yes.  It's correct.
19     Q    So what I'm asking you is the underlying
20 problem between Mr. Kang and Mr. Cho, did you give
21 consideration or attention to that problem?
22     A    Yes.  I do.
23     Q    And what specifically was your
24 understanding of the main problem between Mr. Kang and
25 Mr. Cho?

75

1  Mr. Kang stated to me that Mr. Park also is
2  uneducated.  So it's very hard to work with and also
3  hard to converse.
4     Q    Was this telephone conversation you had
5  with Mr. Kang -- last telephone conversation, was this
6  the first time he ever asked you to terminate Mr. Cho?
7     A    I do not recall when they were, but --
8  however, prior to that time, I heard numerous times
9  about that issue from Mr. Kang.
10     Q    Just to clarify, but he never asked you
11 to terminate Mr. Cho before; is that correct?
12         MR. BATTENFELD:  I don't think that's what he
13 said.
14         THE WITNESS:  Would you repeat it?
15         MR. BATTENFELD:  What he's trying to find out
16 is whether or not in these prior conversations
17 Mr. Kang asked Mr. Yoon to fire Mr. Cho.
18         MR. GREY:  Yes.
19         MR. BATTENFELD:  That's the question.
20         THE WITNESS:  Yes.
21 BY MR. GREY:
22     Q    And how many times did he ask that?
23     A    I cannot recall, but I think it was about
24 five or six times.
25     Q    And I assume each time you refused?

74

1     A    Not particularly.  I thought it was just
2  something work related.
3     Q    We are talking about work.  So
4  work-related issues are important.  So what was it?
5     A    For example -- for instance, the raw
6  material came too late, or --
7         THE INTERPRETER:  Now I have to ask him.
8         THE WITNESS:  We have a complete products piled
9  up in our warehouse lot, and we have less of raw
10 materials work related.  You can have some problems
11 like when those are related like that -- like such as
12 those.
13 BY MR. GREY:
14     Q    After the telephone conversation you came
15 to have an understanding that Mr. Kang stopped coming
16 to work at U. Lim; correct?
17     A    Yes, it was.
18     Q    And who told you he had stopped coming to
19 work?
20     A    I don't recall.  I think that I called
21 the company, and then I asked for him -- I asked for
22 him.
23     Q    And what?
24     A    Then I was told that he didn't come to
25 work.

76

1      Q     So that proposal was acceptable to you if
2  the other department heads agreed?
3      A     I do not -- I did not have the response
4  about it.  I do not understand your question.  Would
5  you repeat it?
6      Q     Well, he brought up the issue of rotating
7  the managers to do the overtime; correct?
8      A     Mr. Kang?
9      Q     Yes.
10     A     Yes.
11     Q     And you responded that he should have a
12 meeting with the other department heads to discuss
13 that proposal; correct?
14     A     Yes.
15     Q     Okay.  So when you suggested that he have
16 this meeting --
17     MR. BATTENFELD:  Just to complete what his
18 testimony was, his testimony was that he instructed
19 Mr. Kang to then report back to him after they had --
20     MR. GREY:  Well, that's not my question.
21     MR. BATTENFELD:  But you didn't complete what
22 his testimony was on that issue, and that is his
23 complete testimony on that issue.
24     MR. GREY:  I don't have to complete all his
25 testimony.

                                                   81

1      MR. BATTENFELD:  You do if you are trying to
2  ask a question that is related to that chronology.
3      MR. GREY:  No, I don't.
4      Q     Next question is --
5      MR. BATTENFELD:  Could you please translate my
6  comments?
7  BY MR. GREY:
8      Q     When you told Mr. Kang that he should
9  have this meeting with the other department heads, did
10 that mean to you that it was an acceptable proposition
11 if the other department heads agreed?
12     MR. BATTENFELD:  And I'll object that the
13 question is an incomplete hypothetical.
14     THE WITNESS:  Would you repeat the question?
15 BY MR. GREY:
16     Q     Mr. Kang raised the issue of rotating the
17 managers to perform overtime; correct?
18     A     Yes.
19     Q     Okay.  And you told him to have a meeting
20 with the other department heads to discuss his
21 proposal; correct?
22     A     Yes.
23     Q     My question to you is did that mean that
24 the proposal was acceptable to you if it was
25 acceptable to the department heads?

                                                   82

1      THE INTERPRETER:  I don't understand.
2  Acceptable to other department heads?
3      MR. GREY:  Just read back the question.
4      MR. BATTENFELD:  If the translator doesn't even
5  understand the question, obviously the witness isn't
6  going to.
7      MR. GREY:  Well, that's true.
8          (Record read.)
9      THE WITNESS:  The question now is different
10 than the previous question you had.
11     MR. GREY:  Well, just --
12     THE WITNESS:  So what -- would you repeat about
13 that again?
14     THE INTERPRETER:  Do you want me to repeat it?
15     MR. GREY:  Read the question.
16         All we are concerned about now is the
17 question that is being posed that we are going to read
18 it again.
19         (Record read.)
20     THE WITNESS:  Yes.  Of course.
21 BY MR. GREY:
22     Q     Now, you indicated that this was the only
23 time you talked to Mr. Kang about the overtime issue;
24 correct?
25     A     I remember hearing about it only once.

                                                   83

1      Q     When you say "hearing about it," are you
2  referring to the conversation that we were just
3  talking about between you and Mr. Kang?
4      A     Are you talking about the previous
5  conversation?
6      Q     You mentioned talking to Mr. Kang once
7  about the overtime issue; correct?
8      A     Yes.
9      MR. BATTENFELD:  And the rotation proposal so
10 that we can be clear on what we are talking about.
11     MR. GREY:  I think it was overtime, slash,
12 rotation.  Both.
13     THE WITNESS:  Overtime and then rotation.  That
14 conversation only once.
15 BY MR. GREY:
16     Q     Okay.  And then I said did you ever speak
17 to him again regarding the overtime, and the answer to
18 that is no; is that correct?
19     A     It's correct.  No.
20     Q     Do you know whether or not the department
21 heads ever had a meeting about his proposal?
22     A     No.  I don't know.
23     Q     Okay.  Do you know whether or not the
24 department heads at any point in time after this
25 conversation began to rotate overtime?

                                                   84

KANG V.                                              TAE JIN YOON
U. LIM AMERICA                                         02/01/00

```
 1        Q    Did he ask you about the lawsuit?
 2        A    No, he didn't.
 3        Q    He didn't ask you any details about the
 4   lawsuit.
 5        THE INTERPRETER:  What is that?
 6        MR. GREY:  Any details about the lawsuit.
 7        THE WITNESS:  No.  He did not ask about the
 8   details.
 9   BY MR. GREY:
10        Q    Well, you indicated that he asked whether
11   or not it was true.  Was he referring simply that
12   Mr. Kang sued U. Lim or true with respect to certain
13   allegations?
14        A    The litigation has been filed -- no.  The
15   lawsuit has been filed or not.
16        Q    Did he ever suggest to you that you
17   should speak with Mr. Kang?
18        A    Oh, Mr. Chung told me that he met
19   Mr. Kang and heard about it.
20        Q    Did Mr. Chung ever tell you that you
21   should speak directly with Mr. Kang about the lawsuit?
22        A    Yes.  He mentioned about it.
23        Q    And what was his reason that he suggested
24   you should speak to Mr. Kang?
25        MR. BATTENFELD:  And I'll object that the
```

                                                        89

```
 1   question calls for speculation.
 2        THE WITNESS:  I do not know.
 3        MR. GREY:  What was his answer?
 4        MR. BATTENFELD:  His answer was "I don't know."
 5        THE INTERPRETER:  "I don't know."
 6   BY MR. GREY:
 7        Q    And when he told you you should speak
 8   with Mr. Kang, what was your response?
 9        A    I didn't say anything.
10        Q    Remember the meeting that you testified
11   to where Mr. Park met with Mr. Kang?  Remember the
12   meeting you testified to where Mr. Park met with
13   Mr. Kang?
14        A    Yes.
15        Q    Do you know whether or not Mr. Chung
16   phoned Mr. Park or Mr. Kang during that meeting?
17        A    You are talking the Daily newspaper
18   Mr. Chung?
19        Q    Yes.
20        A    I do not know.
21        Q    You weren't present when Mr. Chung --
22   when Kwan Chung phoned Mr. Park or Mr. Kang during
23   that meeting?
24        A    No.  I was not.
25        Q    Did you talk about anything else in this
```

                                                        90

```
 1   meeting with Mr. Chung where he indicated you should
 2   speak to Mr. Kang?
 3        A    No.
 4        Q    Did you ever talk to Mr. Chung again
 5   about anything to do with this lawsuit?
 6        A    No.  I did not.
 7        Q    And when you had this meeting with
 8   Mr. Chung, was that telephonic, or was it in person?
 9        A    Which conversation?
10        Q    The conversation where Mr. Chung told you
11   you should meet with Mr. Kang.
12        A    I don't remember.  Could be at the office
13   or at home.  I do not recall.
14        Q    Do you recall if anybody was present
15   other than you and Mr. Chung?
16        A    No.
17        Q    And you mentioned which meeting.  Was
18   there more than one meeting or just this meeting with
19   Mr. Chung regarding any aspect of the lawsuit?
20        A    Only one time.
21        MR. GREY:  It's 4:20.  Let's take a five-minute
22   break.
23        (Recess taken.)
24   BY MR. GREY:
25        Q    We normally do these sorts of questions
```

                                                        91

```
 1   at the beginning, but your testimony was just so
 2   interesting that I skipped it, but I'm just going to
 3   go through some basic background information.
 4        Q    You were born in Korea; correct?
 5        A    Yes.
 6        Q    And when did you come to the United
 7   States permanently?
 8        A    In 1992.
 9        Q    And are you presently a U.S. citizen?
10        A    No.  I am a permanent resident.
11        Q    And did you graduate high school?
12        A    Yes.
13        Q    And you graduated high school in Korea;
14   correct?
15        A    Yes.
16        Q    Did you go to college?
17        A    Yes.
18        Q    And did you go to college in Korea?
19        A    Yes, yes.  Yes.
20        Q    And did you obtain a degree in college?
21        A    No.  I did not.
22        Q    How long did you attend?
23        A    Two years.
24        Q    And was your first job coming out of
25   college working for U. Lim Korea?
```

                                                        92

1    Q    As part of a business trip; correct?
2    A    Yes.
3    Q    But you didn't begin working for U. Lim
4  America directly or U. Lim Mexico at that time;
5  correct?
6    A    I did more like analyzing the facilities.
7    Q    But you need to obtain your visa first to
8  begin officially working for U. Lim America; is that
9  correct?
10   A    Yes.
11   Q    Okay.  And when did you officially begin
12 your duties at U. Lim America, U. Lim Mexico?
13   A    You can say that after -- six months
14 after that date because it took that long to obtain
15 the visa.
16   Q    So somewhere approximately in August of
17 '92 or '93?
18   A    If you look between four to five -- I
19 think if you look at five months.  You can say about
20 June.
21   Q    And when you began working for U. Lim
22 America, what was your title?
23   A    Are you talking about after I obtained
24 the visa?
25   Q    Yes.  When you officially began working

97

1  for U. Lim America.
2    A    Vice-president.
3    Q    And you officially began working for U.
4  Lim Mexico at the same time; correct?
5    A    Yes.
6    Q    And your title at U. Lim Mexico was what?
7    A    President.
8    Q    Was there any reason why you were
9  vice-president of U. Lim America and president of U.
10 Lim Mexico?
11   A    No.  There is no reason.
12   Q    Who was the president of U. Lim America
13 when you started working there?
14   A    My father.
15   Q    And he was also the CEO of U. Lim
16 America; correct?
17   A    Yes.
18   Q    And he was the CEO of U. Lim Mexico;
19 correct?
20   A    Yes, it is.
21   Q    And when you first began your employment
22 at U. Lim America, who was employed at U. Lim America
23 other than yourself?
24   A    Mr. Ko, Mr. Kim, Mr. Cheong, Mr. Chin.
25   Q    J-i-n?

98

1    A    C-h-i-n.
2    Q    Are you talking about Korean personnels
3  or managers, or what -- what kind of people are you
4  talking about?
5    Q    I'm talking about the employees of U. Lim
6  America.
7        MR. BATTENFELD:  You are asking people who were
8  actually employed by U. Lim America as opposed to --
9        MR. GREY:  U. Lim Mexico.
10       MR. BATTENFELD:  Or individuals who were over
11 visiting?
12       MR. GREY:  I'm asking about U. Lim America, who
13 was actually employed by U. Lim America.
14       MR. BATTENFELD:  So he's excluding anybody who
15 worked for the Korean company who was on a business
16 trip.
17       THE WITNESS:  So you are excluding that?
18 BY MR. GREY:
19   Q    Why don't we do this.  To save us two
20 questions, tell me who was actually working there, and
21 then tell me who was employed by U. Lim America and
22 who was on an assignment from U. Lim Korea.
23   A    Business trip from U. Lim Korea, the
24 people I mentioned and the president.  I think Jae
25 came in 1993.  Three of us first.

99

1    Q    So all the persons other than yourself at
2  U. Lim America were actually on assignment from U. Lim
3  Korea when you first started working there; correct?
4    A    Yes.
5    Q    And so they were considered temporary
6  employees for purposes of U. Lim America?
7        MR. BATTENFELD:  I'll object to the question to
8  the extent it calls for a legal conclusion.
9        THE WITNESS:  I do not know about that.
10 BY MR. GREY:
11   Q    Well, was it intended that either Mr. Ko
12 or Mr. Kim or Mr. Chin were going to become permanent
13 employees of U. Lim America?
14   A    I don't know about that.
15   Q    When you started off as vice-president
16 for U. Lim America, part of your duties was to staff
17 U. Lim America; correct?
18   A    Yes.
19   Q    And as part of those duties you hired
20 Mr. Cho; correct?
21   A    Yes.
22   Q    Okay.  Did you have the intention of
23 replacing Mr. Ko, Mr. Kim, and Mr. Chin with other
24 employees?
25   A    They were on business trips.  So instead

100

```
 1   STATE OF CALIFORNIA          )
                                  :  ss
 2   COUNTY OF SAN DIEGO          )
 3
 4           I, the undersigned, a Certified Shorthand
 5   Reporter of the State of California, do hereby
 6   certify:
 7           That the foregoing proceedings were taken
 8   before me at the time and place herein set forth; that
 9   any witnesses in the foregoing proceedings, prior to
10   testifying, were placed under oath; that a verbatim
11   record of the proceedings was made by me using machine
12   shorthand which was thereafter transcribed under my
13   direction; further, that the foregoing is an accurate
14   transcription thereof.
15           I further certify that I am neither
16   financially interested in the action nor a relative or
17   employee of any attorney of any of the parties.
18           IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20
     Dated: _____
21
22
23          _____
            JESSICA E. MASSE
24          CSR No. 9910
25
                                              105
```

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4      SOO CHEOL KANG,              )
                                     )
 5                Plaintiff,         )
                                     )
 6        vs.                        )    No. 99 CV659 JM
                                     )
 7      U. LIM AMERICA, INC.; TAE JIN )
        YOON, an individual; and DOES )
 8      1 to 100,                    )
                                     )
 9                Defendants.        )
        _____ )
10
11
12
13
14
15          DEPOSITION OF TAE JIN YOON
16              San Diego, California
17          Wednesday, February 2, 2000
18                  Volume II
19
20
21
22
23
        Reported by:
24      RENEE K. PAPIERNIAK
        CSR No. 7056
25      JOB No. 12437

                    106
```

```
 1      APPEARANCES:
 2
 3      For the Plaintiff:
 4          LAW OFFICE OF RICHARD E. GREY
            BY:  RICHARD E. GREY
 5          Attorney at Law
            409 Camino Del Rio South, Suite 903
 6          San Diego, California 92108
            (619) 543-9300
 7
        For the Defendants:
 8
            MORGAN, LEWIS & BOCKIUS
 9          BY:  JOHN S. BATTENFELD
            Attorney at Law
10          300 South Grand Avenue, 22nd Floor
            Los Angeles, California 90071
11          (213) 612-2500
12      Also Present:
13          Soo Cheol Kang
            Jae Cho
14
        Interpreter:
15
            ANN McCORMICK
16          12212 Old Stone Road
            Poway, California  92064
17          (858) 486-6648
18
19
20
21
22
23
24
25

                    108
```

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4      SOO CHEOL KANG,              )
                                     )
 5                Plaintiff,         )
                                     )
 6        vs.                        )    No. 99 CV659 JM
                                     )
 7      U. LIM AMERICA, INC.; TAE JIN )
        YOON, an individual; and DOES )
 8      1 to 100,                    )
                                     )
 9                Defendants.        )
        _____ )
10
11
12
13
14
15          Deposition of TAE JIN YOON,
16      taken on behalf of Plaintiff, at 501
17      West Broadway, Suite 1300, San Diego,
18      California, beginning at 9:43 a.m.
19      and ending at 3:26 p.m. on Wednesday,
20      February 2, 2000, before RENEE K. PAPIERNIAK,
21      Certified Shorthand Reporter No. 7056.
22
23
24
25

                    107
```

```
 1                    INDEX
 2      WITNESS                      EXAMINATION
 3      TAE JIN YOON
 4
 5          BY MR. GREY              110
 6
 7
 8
 9                  EXHIBITS
10      PLAINTIFF'S                  PAGE
11      1    Pay Stub For Martinez Vega      217
             November 17, 1995
12
13
14
15          INSTURCTION NOT TO ANSWER
16              PAGE    LINE
17              47      15
                120     2
18
19
20
21
22
23
24
25

                    109
```

1     A     He only worked about three months there
2   so I do not remember.
3     Q     What's your best estimate of when he
4   worked there?
5          MR. BATTENFELD:  If you can give one.
6          THE WITNESS:  I do not remember.
7   BY MR. GREY:
8     Q     Was it during the course of Mr. Kang's
9   employment?
10    A     I do not remember.
11    Q     Do you know if he worked while Mr. Chung
12  worked there?
13    A     No.
14    Q     No, he didn't or, no, you don't know?
15    A     No, they did not work together.
16    Q     And what was his position that he was
17  hired for?
18         THE INTERPRETER:  We are talking about two
19  different men, so can you give me the names?
20         MR. GREY:  Teddy Baek.
21         THE WITNESS:  At the time his employment was
22  temporary and then, also, he was the -- more like the
23  training.
24  BY MR. GREY:
25    Q     What was he in training to become?

114

1     A     The materials.
2     Q     Materials.  What department is the
3   materials?
4     A     Purchase.
5     Q     And was he hired for the same reason that
6   Mr. Chung was hired, due to the increased sales?
7     A     I do not remember.
8     Q     You were responsible for hiring all
9   U. Lim employees.  Correct?
10         MR. BATTENFELD:  Object to the question as
11  misstating the witness's prior testimony.
12  BY MR. GREY:
13    Q     You can answer.
14    A     I do not know.
15    Q     Well, was there anyone, other than you,
16  at U. Lim America, excepting Ki Wa Yoon, who had the
17  ability to hire new personnel at U. Lim America?
18         MR. BATTENFELD:  Just for clarification, you
19  were talking about U. Lim America as opposed to U. Lim
20  Mexico?
21         MR. GREY:  Yes.
22         MR. BATTENFELD:  Okay.  I think she made a
23  mistake.  According to Mr. Cho, she may not have
24  translated the question as I understand your question.
25         It's whether anyone other than Mr. Ki Wa

115

1   Yoon or Tae Jin Yoon had authority to hire people at
2   U. Lim America.
3          MR. GREY:  Yes.
4          THE INTERPRETER:  I didn't say U. Lim America
5   because Mr. Grey did not include the word America, so
6   I said U. Lim.  However, the question has been
7   translated correctly.
8          MR. BATTENFELD:  Mr. Cho believes that the
9   question was asked was there any one higher than
10  Mr. Yoon, precisely translated in that way.
11         THE INTERPRETER:  No, my question was -- my
12  translation was besides Tae Jin Yoon is there anybody
13  else, except I --
14         MR. GREY:  Let's not argue about it.  Let me
15  ask the question again.
16         THE INTERPRETER:  I can do it again.
17  BY MR. GREY:
18    Q     Was there anyone, other yourself and Ki
19  Wa Yoon, at U. Lim America who had the authority to
20  hire personnel for U. Lim America?
21    A     No.
22    Q     Okay.  So, ultimately, if someone was
23  going to be hired you would make the decision to hire
24  them.  Correct?
25    A     Yes, it is.

116

1     Q     So ultimately, then, at some point in
2   time you made the decision to hire Teddy Baek.
3   Correct?
4     A     Yes, it was.
5     Q     Okay.  And do you have any recollection
6   as to why you hired Teddy Baek?
7     A     That was preparation for the future.
8     Q     And what were you preparing for?
9     A     It takes more than six months to learn a
10  line of work.
11    Q     You anticipated a need to have Teddy Baek
12  or someone like him.  Correct?
13         THE INTERPRETER:  I do not understand "someone
14  like him."
15         MR. GREY:  I'll rephrase the question.
16  BY MR. GREY:
17    Q     You had a need to hire someone for the
18  purchasing department.  Correct?
19    A     Yes.
20    Q     And was that because there was an
21  increase in purchasing orders that were occurring?
22    A     Expected to have increase purchasing.
23    Q     When Mr. Kang left U. Lim's employment,
24  who took over his position?
25    A     Yoon.

117

1 worked for U. Lim America in any capacity before
2 Mr. Kang left his employment with U. Lim America?
3     A    Yes, I do.
4     Q    And what work did he do for U. Lim prior
5 to Mr. Kang leaving his employment?
6     A    An accountant or accounting.
7     Q    Did he do all of the accounting for
8 U. Lim America?
9     A    Yes, it was.
10     Q    And when was he first employed as U. Lim
11 America's accountant or for the accounting?
12     THE INTERPRETER:  Did you say accountant or
13 accounting?
14     MR. GREY:  Both.
15     MR. BATTENFELD:  I'll object to the question as
16 assuming a fact that this witness has not testified
17 to, and that is, whether Mr. Yu Sik Yoon was employed
18 by U. Lim America to perform accounting work as
19 opposed to -- as opposed to performing that work in
20 some other capacity.
21 BY MR. GREY:
22     Q    If there is a difference you can clarify.
23     A    He did accounting work.
24     Q    Was he, in fact, an employee of U. Lim
25 America when he did this accounting work?

122

1     A    Yes.
2     Q    And when was he first employed by U. Lim
3 America to do this accounting work?
4     A    I cannot remember.
5     Q    What's your best estimate?
6     A    I cannot remember.
7     Q    Well, did he start doing this work as
8 early as 1994?
9     A    I don't remember.
10     Q    Do you recall who the person was who did
11 the work before Yu Sik Yoon, if there was anyone?  And
12 I'm referring to the accounting.
13     A    I did that.
14     Q    Other than Mr. Kang, Mr. Kim, Mr. Jin,
15 Mr. Cho, Mr. Park, Mr. Kang, Mr. Chung, Mr. Baek, and
16 Yu Sik Yoon, was there any other person employed by
17 U. Lim America at any time from beginning of its
18 operations to the time that Mr. Kang left employment
19 with U. Lim?
20     THE INTERPRETER:  Before I start to translate,
21 let me check the names.  Kang, Ko, Kim, Jin, Park,
22 Chung, Baek.
23     MR. BATTENFELD:  And I'll object to the
24 question as stating facts that were not testified to
25 by this witness because some of the individuals Mr.

123

1 Grey has just identified were identified by the
2 witness as having been employed by U. Lim Korea rather
3 than U. Lim America.
4     THE WITNESS:  I do not know.
5 BY MR. GREY:
6     Q    You do not know if there was any other
7 individuals?
8     A    No, there -- it no one.
9     Q    Your native language is, obviously,
10 Korean.  Correct?
11     A    Yes, it is.
12     Q    And that's the only language that you're
13 fluent in.  Correct?
14     A    Yes, it is.
15     Q    Can you read or write English?
16     A    Very little.
17     MR. BATTENFELD:  I'm sorry, can you repeat the
18 last question.
19     (Record read.)
20 BY MR. GREY:
21     Q    And can you speak English?
22     A    Little.
23     Q    And can you speak Spanish?
24     A    No, I do not.
25     Q    Mr. Park was first employed by U. Lim

124

1 Korea.  Correct?
2     A    Yes, it is.
3     Q    And how long had you know Mr. Park prior
4 to him being employed by U. Lim America?
5     A    Since 13 years old.
6     Q    Since you were 13 years old?
7     A    Yes, it is.
8     Q    As a result of that, would you consider
9 Mr. Park to be a close friend?
10     A    Yes, it is.
11     Q    And how long did you know Mr. Bo Won
12 Chung before he was employed by U. Lim?
13     A    About the same time.
14     Q    And would you consider Mr. Chung to be a
15 close friend?
16     A    He was a school friend when I was 13
17 years old, and after then, in 1997, I saw him since
18 then again.
19     Q    Do you consider him to be a close friend?
20     A    Yes, he is.
21     Q    Did you know Teddy Baek before you hired
22 him?
23     A    No, I didn't know him.
24     Q    Did you know Mr. Kang before you hired
25 him?

125

1   America name.  Correct?
2       A       President and then the vice-president.
3   Who else?
4       Q       I'll back you up.
5               The department heads were Mr. Cho,
6   Mr. Kang, and Mr. Park during Mr. Kang's employment.
7   Correct?
8       A       Yes, it was.
9       Q       And you were the vice-president of U. Lim
10  America.  Correct?
11      A       Yes, it was.
12      Q       And all of those persons were paid by
13  U. Lim America, correct, including yourself?
14      A       Yes, it was.
15      Q       And what I'm asking you is, why were
16  these key management personnel not hired under U. Lim
17  Mexico?
18      A       Why were --
19              MR. BATTENFELD:  And I'll object to the
20  question to the extent it calls for a legal
21  conclusion.
22              THE WITNESS:  I do not know.
23  BY MR. GREY:
24      Q       You have no idea why the managers or the
25  department heads were hired under U. Lim America as

                        130

1   opposed to U. Lim Mexico?
2       A       The Mexico facility also hired key
3   managers too.
4       Q       But all of the managers at the Mexico
5   facility were underneath the managers at U. Lim
6   America.  Correct?
7       A       You cannot say that.
8       Q       What managers are you referring to at
9   U. Lim Mexico?
10      A       Such as accounting.
11      Q       Who was the accounting manager of U. Lim
12  Mexico?
13      A       Lulu.
14      Q       And who was Lulu's boss?
15      A       I.
16      Q       And what other managers were you
17  referring to at U. Lim Mexico?
18      A       I don't remember.
19      Q       Was Raul Coria a manager?
20      A       Yes, he was a manager.
21      Q       And who did he report to?
22      A       Mr. Park at the production.
23      Q       Was there another manager by the name of
24  Sergio?
25      A       Who?

                        131

1       Q       Sergio.
2       A       Yes, there was.
3       Q       And who did he report to?
4       A       Mr. Kang.
5       Q       So isn't it true that all the supervisors
6   at U. Lim Mexico ultimately reported to the managers
7   of U. Lim America?
8       A       What do you mean "report"?
9       Q       Mr. Cho reports to you because you're his
10  boss.  Correct?
11      A       Yes, it is.
12      Q       And Mr. Coria reports to Mr. Park because
13  Mr. Park was Mr. Coria's boss?
14      A       Yes, it is.
15      Q       So my question to you is, wasn't it true
16  that all of the supervisors at U. Lim Mexico
17  ultimately reported to a U. Lim America manager as
18  their boss?
19      A       Not always.
20      Q       Well, who at U. Lim Mexico did not report
21  to a U. Lim America manager?
22      A       Lulu.
23      Q       But you say she reports to you.  Correct?
24      A       And I am the president of Mexico.
25      Q       Are you paid by U. Lim Mexico or U. Lim

                        132

1   America, or both?
2       A       By U. Lim America.
3       Q       So my question to you is, when you set up
4   the two -- or aided in setting up the two different
5   companies, what was the reason for putting the key
6   managers in U. Lim America as opposed to U. Lim
7   Mexico?
8       A       There is no special reason.
9       Q       Is it easier to get a work visa for
10  Mexico or for the U.S. coming from Korea?
11      A       I do not know.
12      Q       Did U. Lim America help Mr. Park obtain a
13  work visa?
14      A       What do you mean when you say, did it
15  help him?
16      Q       Well, did you help him fill out any
17  applications, did you sponsor him, did you pay any
18  fees associated with his work visa?
19      A       Yes, it is.
20      Q       And did you help Mr. Chung obtain a work
21  visa?
22      A       Yes.
23      Q       Why did you help him obtain a U.S. work
24  visa as opposed to a Mexico work visa?
25      A       No, there is no reason.

                        133

BY MR. GREY:

Q    And what was the reason for setting up the separate U. Lim America corporation for the management?

A    I do not know.

Q    So as president of U. Lim Mexico and as vice-president of U. Lim America, you don't know why there were two separate corporations.  Is that true?

A    I do not know at the beginning the state or status, since I came to work here after initial setting up -- set up was done by Yoe Su Kim.

Q    Now, I'm not talking about the initial set up.  I'm just saying as president of U. Lim Mexico and as vice-president of U. Lim America, as you sit here today, do you know why two separate corporations were established to produce the U. Lim product at the subject location?

A    Activate the sales.

Q    Can you explain your answer?

A    The Mexican facility that -- can be active with the business entities in that area, American entity also can be active with the business entities in this area.

Q    "In this area" you mean the U.S.?

A    Yes, it is.

138

Q    You sell to both companies that are located in Mexico and the United States.  Correct?

A    Yes, it is.

Q    And U. Lim Mexico actually produces all of the products sold by U. Lim America.  Correct?

A    Yes, it is.

Q    And, in fact, U. Lim Mexico's only customer is U. Lim Mexico.  Correct?

A    Yes, it is.

Q    So all of the goods that are sold to either companies in Mexico or the United States are sold through U. Lim America.  Correct?

A    Yes, it is.

Q    So the U. Lim Mexico corporation is not, in fact, active with any other companies in Mexico other than U. Lim America.  Correct?

A    Yes, it is.

Q    Yes, it is not?

A    That means do not do any business.

Q    Is there any reason why U. Lim Mexico could not sell goods to companies other than U. Lim America?

MR. BATTENFELD:  I'll object to the question to the extent it calls for a legal conclusion.

THE WITNESS:  I do not know.

139

BY MR. GREY:

Q    Are you aware of any reason why U. Lim Mexico could not sell to other companies located in Mexico?

A    I think you can sell but do not sell now.

MR. BATTENFELD:  Don't guess.

BY MR. GREY:

Q    Why has U. Lim Mexico not sold any of its products directly to any other company other than U. Lim America?

A    I do not know.

Q    When I started this questioning I asked you why there were two separate corporations set up, that being U. Lim Mexico and U. Lim America sharing the same facility.  And you indicated that, I believe, the reason was that the Mexican facility could be active with Mexico companies and the American company could be active with companies in the U.S.  Is that correct?

MR. BATTENFELD:  And I'll object to the question, that it misstates the prior testimony.

MR. GREY:  He indicated the U.S. corporation could be active in U.S. sales.

MR. BATTENFELD:  No, you added to it.

BY MR. GREY:

140

Q    Is that a correct statement?

A    Would you repeat?

(Record read.)

MR. BATTENFELD:  Same objection, that the question misstates the witness's prior testimony.

MR. BATTENFELD:  The prior testimony had to only do with the U.S. corporation making U.S. sales.

BY MR. GREY:

Q    Is that a correct statement?

MR. BATTENFELD:  Which?

MR. GREY:  Mine.  My question.

THE WITNESS:  I do not know.

BY MR. GREY:

Q    Well, as you've indicated, the Mexican facility is not active with Mexican companies or U.S. companies, other than U. Lim America.  Correct?

A    Yes.

Q    And all the sales are conducted through U. Lim America.  Correct?

A    Yes.

Q    So do you know of any reason why two separate corporations were established to produce these goods?

MR. BATTENFELD:  And I'll object to the question as being asked and answered and as calling

141

1      Q      And do you have any employees at U. Lim
2  Mexico employed in the purchasing department?
3      A      Yes.
4      Q      And approximately how many?
5      A      About two.
6      Q      And are all the other U. Lim Mexico
7  employees employed in the capacity of production?
8      A      There are -- the employees are divided
9  into two. One is direct and another one is indirect.
10      Q      I'm just trying to get a feel for the
11  employment of U. Lim Mexico. And the majority of the
12  workers are employed in what type of area?
13      A      Of course it's in production department.
14      Q      And approximately how many do you have
15  currently in production?
16      A      You're asking only production department?
17      Q      Production.
18      A      Average about 100.
19      Q      And then you just have a few people in
20  sales and a few people doing purchasing duties.
21  Correct?
22      A      Yes, it is.
23      Q      Now, the production personnel are
24  supervised by line supervisors. Correct?
25      A      Yes, it is.

146

1      Q      And is that the lowest supervisory level
2  that you have at U. Lim Mexico?
3      A      Yes, it is.
4      Q      And what's the next supervisory level
5  that you have at U. Lim Mexico?
6      A      You're talking about from above to bottom
7  or bottom up?
8      Q      From bottom up.
9      A      Next of the supervisor you can say clerk.
10      Q      We don't usually refer to a clerk as a
11  supervisor. Is that what -- are you correct in your
12  answer?
13      A      See, there is the position who controls
14  for the supervisor and then above that person who
15  controls supervisor is assistant manager.
16      Q      Just try to go in order from the lowest
17  employees, the production employee, who is
18  manufacturing the goods. Correct?
19      MR. BATTENFELD: You're just asking about the
20  production area right now?
21      MR. GREY: Right.
22  BY MR. GREY:
23      Q      You divide them up into different
24  production lines. Correct?
25      A      Yes, it is.

147

1      Q      And each production line will have a line
2  supervisor. Correct?
3      A      Yes.
4      Q      And what's the next level above line
5  supervisor?
6      A      Assistant manager.
7      Q      And then the next level above assistant
8  manager would be one of the department heads at U. Lim
9  America. Is that correct?
10      A      No. Mexican manager in the Mexican
11  facility.
12      Q      Okay. So there is a managerial level
13  above assistant manager at U. Lim Mexico?
14      A      And then after that Mr. Park controls
15  the -- everything.
16      Q      So you have three levels of manager at
17  U. Lim Mexico, line supervisor, assistant manager, and
18  manager. Is that correct?
19      A      Yes, it is.
20      Q      And ultimately the manager in charge of
21  production would report to Mr. Park at U. Lim America?
22      A      Yes, it is.
23      Q      Okay. During Mr. Kang's employment, was
24  this the same managerial structure you had at U. Lim
25  Mexico?

148

1      A      Yes, it is.
2      Q      Okay. And do you know the names of the
3  managers at U. Lim Mexico during Mr. Kang's
4  employment?
5      A      I do not remember.
6      Q      If you don't remember their names, do you
7  still have a picture of them in your mind?
8      A      I do not.
9      Q      Do you know whether or not the managers
10  employed at U. Lim Mexico have always been male?
11      A      I do not remember.
12      Q      Do you know whether or not the assistant
13  manager employed at U. Lim Mexico has always been
14  male?
15      A      That also I don't remember.
16      Q      Finally, do you know whether or not the
17  line supervisors at U. Lim Mexico have always been
18  male?
19      A      That also I do not remember.
20      Q      Do you have a specific -- well, are you
21  the one who hires the managers at U. Lim Mexico?
22      A      No.
23      Q      Who does that?
24      A      Each department, the head of the
25  department does.

149

1        MR. BATTENFELD:  What is the question?
2    BY MR. GREY:
3        Q    What were the sales of U. Lim Mexico to
4    U. Lim America in 1993?
5        MR. BATTENFELD:  I'll object to the question as
6    ambiguous.
7            What do you mean by "what were the
8    sales"?  Do you mean what did U. Lim Mexico charge
9    U. Lim Korea?
10   BY MR. GREY:
11       Q    U. Lim Mexico sold goods to U. Lim
12   America.  Correct?
13       A    U. Lim America hires U. Lim Mexico as
14   subcontractor.
15       Q    Did U. Lim Mexico sell individually its
16   products to U. Lim America?
17       A    U. Lim America hires U. Lim Mexico as
18   subcontractor.  When U. Lim America has a production
19   request U. Lim America hires U. Lim Mexico to produce
20   those items.
21           Once U. Lim Mexico produced those items,
22   they give back to U. Lim America, then U. Lim America
23   sells those products.
24           When the sale's complete from the
25   proceeds, U. Lim America pays only 1 percent of total

154

1    gross sale to U. Lim Mexico.
2        Q    One percent of gross sales?
3        A    Gross sale profit.
4            That is the transaction that we are
5    talking about, U. Lim Mexico sells to U. Lim America.
6        Q    Let me just understand some basics.  The
7    goods that are used to produce the products sold by
8    U. Lim America, are those goods purchased by U. Lim
9    America or purchased by U. Lim Mexico?
10       THE INTERPRETER:  When you say "goods,"
11   materials?
12       MR. GREY:  Materials.
13       (Discussion held off the record.)
14       MR. GREY:  Let me rephrase the question.  We'll
15   start again.
16   BY MR. GREY:
17       Q    The goods that U. Lim America sells are
18   manufactured by U. Lim Mexico.  Correct?
19       A    Yes.
20       Q    Okay.  To produce those goods you have to
21   buy raw materials or component parts to produce the
22   goods.  Correct?
23       A    Yes, it is.
24       Q    Okay.  Is it U. Lim America or U. Lim
25   Mexico that purchases those raw materials or component

155

1    parts?
2        A    U. Lim America.
3        Q    Okay.  So U. Lim America supplies U. Lim
4    Mexico with the component parts and then U. Lim Mexico
5    manufactures those products and hands them back over
6    to U. Lim America.  Correct?
7        A    Yes, it is.
8        Q    Okay.  Now, does U. Lim America charge
9    U. Lim America just for its labor in producing those
10   goods or does it charge U. Lim America for the
11   individual items that it produces?
12       MR. BATTENFELD:  And I'll object to the
13   question as being compound and as assuming that it's
14   one or the other as opposed to neither.
15       THE WITNESS:  Would you repeat it just one by
16   one, one question by one question, because you're
17   asking too broad the question?
18       MR. GREY:  Read me back the question.
19       (Record read.)
20       MR. GREY:  Retranslate that question.
21       THE WITNESS:  They charge the whole production.
22   BY MR. GREY:
23       Q    Can you explain what you mean by that?
24       A    Labor, electricity.  It's general
25   expenses, it's general.  U. Lim America pays for, yes.

156

1        Q    Okay.  So U. Lim Mexico doesn't charge
2    U. Lim America by the piece that it produces?
3        A    No, it does not.
4        Q    So the major variably charge to U. Lim
5    America by U. Lim Mexico is the labor cost.  Is that
6    correct?
7        A    Yes, it is.
8        Q    Do you know what U. Lim Mexico charged
9    to U. Lim America in 1993?
10       A    I do not remember.
11       Q    Do you know what U. Lim Mexico charged to
12   U. Lim America in 1994?
13       A    No, I don't remember.
14       Q    How about for 1995?
15       A    Including 1998, 1999, up to now, I do not
16   remember.
17       Q    That charge from U. Lim Mexico to U. Lim
18   America is a major -- just strike the last one.  I'll
19   start over.
20           Does U. Lim Mexico charge U. Lim
21   America at cost for its labor, electricity, and other
22   expenses?
23       A    Yes, it is.
24       Q    So there is no real profit built into
25   U. Lim Mexico's charges to U. Lim America.  Correct?

157

1    percent.
2    BY MR. GREY:
3        Q    And since U. Lim Mexico, generally
4    speaking, just simply transferred its costs to U. Lim
5    America, what was the purpose of that 1 percent gross
6    sales profit item?
7        A    I believe that when they were
8    establishing companies I think that is the way they
9    set it up, to give that amount to Mexican side.
10       Q    Are you familiar with the fact that there
11   was profit sharing paid to the U. Lim Mexico
12   employees?
13           (Record read.)
14       MR. BATTENFELD:  I'll object to the question as
15   being ambiguous with respect to the phrase "profit
16   sharing." And also the phrase the "Mexican employees"
17   is also ambiguous.
18   BY MR. GREY:
19       Q    Do you understand the question?
20       A    Yes, yes.
21       Q    Are you aware of profit sharing being
22   paid to the U. Lim Mexico employees?
23       A    Yes, I do.
24       Q    And are you also aware of the fact that
25   profit sharing is mandated by Mexican law for Mexican

                        162

1    employees?
2        A    Yes, I do.
3        Q    And was this the reason why U. Lim Mexico
4    was paid 1 percent of the gross sales profit of U. Lim
5    America?
6        MR. BATTENFELD:  I'll object to the question as
7    calling for a legal conclusion.
8        THE WITNESS:  The response I give to you is
9    incorrect. The 1 percent I said was not profit, 1
10   percent of the profit. It's not the profit.
11           The 1 percent -- that is the amount
12   transferred to Mexico such as the expense for the --
13   for production and all total. One percent of all
14   total the amount to send to Mexico.
15   BY MR. GREY:
16       Q    Do you know whether or not U. Lim Mexico
17   ever generated a profit in 1993?
18       A    I do not remember.
19       Q    Okay. How about for 1994?
20       MR. BATTENFELD:  You're asking about U. Lim
21   Mexico?
22       MR. GREY:  Uh-huh.
23       THE WITNESS:  I stated earlier that 1 percent
24   of the amount of money transferred to that side.
25   BY MR. GREY:

                        163

1        Q    And you consider that to be U. Lim
2    Mexico's profit?
3        A    Yes, it is.
4        Q    What I'm asking you is, was that policy
5    of paying U. Lim Mexico 1 percent of the gross sales
6    profit of U. Lim America designed so that there would
7    be profits for the Mexican employees of U. Lim Mexico?
8        MR. BATTENFELD:  Go ahead and translate it.
9            And the objection is that the question
10   misstates the witness's testimony. He just testified
11   that the 1 percent was not a gross sales profit
12   figure.
13   BY MR. GREY:
14       Q    Do you understand the question?
15       A    I --
16       MR. BATTENFELD:  Hold on a minute. Wait.
17           Did you translate my objection?
18       THE INTERPRETER:  Yes, I did. I said it was
19   not what Mr. Yoon stated.
20   BY MR. GREY:
21       Q    We've lost track of the question at this
22   juncture.
23           You indicated that the only U. Lim Mexico
24   profit would be generated from this 1 percent gross
25   sales profit paid to U. Lim Mexico from U. Lim

                        164

1    America. Is that correct?
2        A    No.
3        Q    You remember I asked you if you were
4    aware of U. Lim Mexico making or having any profit in
5    1993 or '94?
6        A    Yes.
7        Q    And you said you didn't remember?
8        A    Yes, I do not remember the amount.
9        Q    But U. Lim Mexico simply passes on its
10   costs to U. Lim America. Correct?
11       A    Yes.
12       Q    Okay. So there is no profit in that
13   passing on of costs. Correct?
14       A    It is right.
15       Q    Okay. So the only -- the only avenue for
16   U. Lim Mexico to make a profit is via this 1 percent
17   gross sales profit revenue. Is that correct?
18       MR. BATTENFELD:  And I'm going to object to the
19   question as misstating the witness's testimony. He
20   just explained that he misspoke when he called it
21   gross sales profit.
22   BY MR. GREY:
23       Q    Didn't you call that fee a 1 percent
24   gross sales profit?
25       A    However, I told you that I misstated

                        165

1  understanding was.
2      A    When I said legal matters, Mexico has
3  that kind of laws set up but America side I don't
4  think there is, that is why.
5      Q    It's your understanding, then, that
6  U. Lim America didn't provide profit sharing because
7  there was no law requiring profit sharing for an
8  American corporation?
9      A    Yes, it is.
10     Q    Was U. Lim America created so that the
11 profits from U. Lim Mexico would actually be
12 transferred into U. Lim America?
13     A    No.
14     Q    When did you first meet Mr. Kang?
15     A    I think it was in 1994.
16     Q    And how did you first come to know
17 Mr. Kang?
18     A    I was introduced by Kwan Mock Chung.
19     Q    And did he recommend Mr. Kang?
20     A    Yes, he did.
21     Q    And were you looking to hire Mr. Kang
22 because of increasing sales?
23     A    Yes, it was.
24     Q    And where was your first meeting with
25 Mr. Kang?

                        170

1      A    Where or when?
2      MR. GREY:  I can't remember now what I said.
3      (Record read.)
4      THE WITNESS:  At the office of the central
5  daily newspaper.
6  BY MR. GREY:
7      Q    And did you interview Mr. Kang at that
8  meeting?
9      A    Yes, I -- yes.
10     Q    Was Mr. Chung present during the
11 interview?
12     A    I don't remember.
13     Q    And at this interview did you inform
14 Mr. Kang as to the position he was being interviewed
15 for?
16     A    I told him about the department rather
17 than the position.
18     Q    And that department was purchasing and
19 warehouse.  Correct?
20     A    Yes.
21     Q    And other than Mr. Chung's
22 recommendation, what was of interest to you regarding
23 Mr. Kang as far as his credentials?
24     A    He spoke English and also he can speak
25 Korean.

                        171

1      Q    Anything else about his background or
2  qualifications that was of interest to you initially?
3      A    No.
4      Q    When you discussed the department with
5  Mr. Kang, did you discuss at all what his duties in
6  that department would be?
7      MR. BATTENFELD:  And, for clarification, you're
8  asking about this interview at the newspaper office?
9      MR. GREY:  The initial interview.
10     THE WITNESS:  I didn't talk too much.
11 BY MR. GREY:
12     Q    Even if you didn't talk too much, did you
13 discuss what his job duties would be in the purchasing
14 and warehouse department?
15     A    I only told him that the person will be
16 placed in the purchasing department.
17     Q    Did you ask Mr. Kang any questions
18 concerning his potential employment?
19     A    I don't remember.
20     Q    Do you recall if Mr. Kang asked you any
21 questions concerning his potential employment?
22     A    I don't remember.
23     Q    Do you recall if you discussed anything
24 about salary with Mr. Kang?
25     A    I cannot remember.

                        172

1      Q    Do you recall if you discussed anything
2  regarding the working hours of this position with
3  Mr. Kang?
4      A    I remember telling him that start his
5  work from 7:30.
6      Q    Did you tell him when he'd have to end
7  his work?
8      A    No, I don't remember.
9      Q    Do you remember anything else you
10 discussed with Mr. Kang in this meeting?
11     A    No, I don't remember.
12     Q    When is the next time after this meeting
13 that you spoke or met with Mr. Kang?
14     A    I believe that after a while, since I
15 went to Korea for a business trip and then until I
16 came back from the business trip.
17     Q    Did you meet with him or speak with him
18 on the phone the next time you spoke with him?
19     A    I don't remember.
20     Q    Do you recall what you spoke about in
21 this conversation or meeting with Mr. Kang this second
22 time?
23     A    I don't remember.
24     Q    Do you know if you agreed to hire Mr.
25 Kang at the time of this second conversation?

                        173

1   correct?
2        A    Yes.
3        Q    And was that a sales goal?
4        A    Yes, it was.
5        Q    And would you set these sales goals every
6   year?
7        A    Yes, it is.
8        Q    Okay.  As opposed to monthly?
9        A    Yes, we do it monthly too.
10       Q    The bonus that was paid, was that based
11  upon meeting a yearly goal or a monthly goal?
12       A    Annual.
13       Q    Do you know whether or not when that
14  bonus was paid U. Lim actually met that goal or just
15  came close to that goal?
16       A    Met the goal.
17       Q    And did you set the goal?
18       A    I made decision with the information I
19  get from the business department and then -- sales
20  goals.
21       Q    When you refer to the business
22  department, are you referring to U. Lim America's
23  business department or U. Lim Korea's business
24  department?
25       MR. BATTENFELD:  And he had said sales

178

1   department, for the record.  I think the translator
2   corrected it to sales department, not business
3   department.
4        THE INTERPRETER:  I think he stated the
5   business department too and then also he added sales
6   department.  I only heard business department.  I did
7   not hear sales department so I asked him again what
8   was the second word.  He said sales department.  I
9   added sales department.  I heard the business
10  department twice here.
11  BY MR. GREY:
12       Q    Let's just clarify.  It's no big deal.
13            You said you made the decision based on
14  information you received from what department?
15       A    Sales department.
16       Q    And when you say "sales department,"
17  basically you're referring to Mr. Cho.  Correct?
18       A    Yes, it is.
19       Q    Okay.  And isn't it true that since 1993
20  through the present U. Lim America only met their
21  sales goals once?
22       A    Yes, it is.
23       Q    And do you also, as vice-president of
24  U. Lim America, compare your sales at U. Lim America
25  with other businesses selling similar products in the

179

1   area?
2        A    No.
3        Q    These sales goals that you set, were they
4   based on the year's prior sales?
5        A    You set that goal according to the
6   market, the previous year's market.
7        THE INTERPRETER:  I don't know the one word
8   here.
9        THE WITNESS:  The market forecast.
10  BY MR. GREY:
11       Q    When you're setting these sales goals,
12  are they based on, in any way, on a percentage
13  increase from the last year's sales?
14       A    No, is not necessarily.
15       Q    Well, what specific factors do you take
16  into account for setting the sales goals then?
17       A    The items that -- for the future, the
18  next year, to prepare for that.  And the items that
19  presently produced.  And then, also, you forecast the
20  amount that the buyers, the -- how much the buyers
21  would purchase.  So those are the -- the base that you
22  set the goal.
23       Q    What was the year that U. Lim America met
24  the goal?
25       A    1997.

180

1        MR. BATTENFELD:  Is that an estimate or --
2        THE WITNESS:  That was the year that it made
3   eight million dollars.
4   BY MR. GREY:
5        Q    Did you ever tell the employees of U. Lim
6   America that if they worked very hard they would share
7   in U. Lim's success?
8        THE INTERPRETER:  Mr. Grey, if I translate
9   share, keeping something, giving -- actually
10  physically sharing.  I share this with you, rather
11  than philosophical share.  So I have to be more
12  precise.  The sentence will be confused or I will not
13  be able to make the correct translation.  When you say
14  share in English you can share success of a
15  philosophy, not the material share.
16       MR. GREY:  Do the give share.
17       THE INTERPRETER:  Then the material share?
18       MR. GREY:  All right.
19       THE WITNESS:  No.
20  BY MR. GREY:
21       Q    Did you ever tell anyone at U. Lim
22  America that you would give back any of the profits of
23  U. Lim to the U. Lim employees?
24       A    No.
25       Q    Did you ever tell any of the U. Lim

181

1        Q     For instance, did it ever run from 5:30
2   to 7:30 or from 6:30 to 8:30, to your knowledge?
3        A     I think there were times that the 30
4   minutes -- there were times that the 30 minute -- no,
5   there were times that the shift began 30 minutes
6   earlier or worked 30 minutes later than the regular
7   schedule.
8        Q     Normally it was 6 to 8.  Correct?
9        A     Yes, it is.
10       Q     Did you ever have an overtime shift that
11  went beyond 9 o'clock so, for instance, maybe an 8 to
12  10 shift?
13       MR. BATTENFELD:  For clarification, you're
14  asking about during Mr. Kang's employment?
15       MR. GREY:  That's fine.
16       THE WITNESS:  I don't remember.
17  BY MR. GREY:
18       Q     Well, do you ever recall whether or not
19  the production line during Mr. Kang's employment ever
20  ran beyond 8 p.m.?
21       A     I believe, yes.
22       Q     And when they would run a shift past
23  8 o'clock, would they run a new shift or would they
24  just extend the overtime shift?
25       A     I don't know now because that is taken

                          186

1   care of by Mr. Park, who is in charge of production
2   department.
3        Q     But Mr. Park would report to you.
4   Correct?
5        A     Yes, he did.
6        Q     And he would report to you, among many
7   things, also the overtime worked the previous day or
8   the previous week.  Correct?
9        MR. BATTENFELD:  And I'll object to the
10  question as being ambiguous as to time frame.
11       THE WITNESS:  I don't remember.
12  BY MR. GREY:
13       Q     You don't remember whether or not he
14  would report to you concerning overtime worked?
15       A     Are you talking about a period?
16       Q     Well, Mr. Park, since the date he was
17  hired until the present, has been your production
18  manager.  Correct?
19       A     Yes.
20       Q     Okay.  And throughout that period he
21  reported to you.  Correct?
22       A     Yes, it is.
23       Q     And he reports to you the amount of items
24  produced.  Correct?
25       A     Yes.

                          187

1        Q     And he will report to you the amount of
2   overtime used to produce those goods.  Correct?
3        A     Yes, it is.
4        Q     And he normally would report this to you
5   on a daily or weekly basis.  Correct?
6        MR. BATTENFELD:  Did you ask daily and weekly?
7        MR. GREY:  Daily or weekly.
8        THE WITNESS:  Yes, he did.
9   BY MR. GREY:
10       Q     So Mr. Park, throughout the course of his
11  employment, made you aware of the overtime worked at
12  U. Lim Mexico.  Correct?
13       A     Yes, it is.
14       Q     So do you have any awareness of there
15  being an overtime shift beyond 8 o'clock?
16       A     Would you ask that again?
17       Q     Do you have an awareness of there being
18  any overtime shift past 8 o'clock?
19       A     I don't remember.
20       Q     Did you ever institute an actual second
21  shift at U. Lim Mexico.
22       THE INTERPRETER:  Could you use another --
23  different word than institute.  There can be so many
24  translations.
25  BY MR. GREY:

                          188

1        Q     Did you ever create a second shift at
2   U. Lim Mexico?
3        A     No.
4        I would like to have a break.
5        (Recess.)
6   BY MR. GREY:
7        Q     Okay.  Approximately how many U. Lim
8   Mexico employees did you have in 1993?
9        A     I don't remember.
10       Q     Approximately how many U. Lim Mexico
11  employees did you have in 1994?
12       A     I believe that was less than 100.
13       Q     Is your best estimate approximately 100?
14       MR. BATTENFELD:  Objection.  Misstates the
15  witness's testimony.
16       THE WITNESS:  Less than 100.
17       MR. GREY:  I know.  I'm just trying to get it
18  clarified.
19       MR. BATTENFELD:  It doesn't clarify it.
20  BY MR. GREY:
21       Q     Less than 100 can mean anywhere from 0 to
22  100 and, obviously, you had more than zero.  Correct?
23       What's your best estimate of the number
24  or the range of employees you had in 1994?
25       A     I think it was from between 50 to 70.

                          189

1    MR. GREY: I understand that.
2    MR. BATTENFELD: The problem is, your question
3 assumes there was no increase.
4    MR. GREY: No, my question didn't assume that.
5    MR. BATTENFELD: Yes, it did.
6    MR. GREY: Now, John, you know I am -- I am
7 trying to be fair with this witness. I continue to
8 try to be fair with this witness.
9    All I simply said was based on his prior
10 testimony that he had 50 to 70 employees in 1994 and
11 between 50 and 70 employees in 1995, that the number
12 of employees remained approximately the same. And
13 that's a fair statement and that's not meant to trap
14 Mr. Yoon. It's meant to fairly summarize what he
15 said.
16    MR. BATTENFELD: It's not a fair statement
17 because that could mean -- based on a range it could
18 mean 50 employees in one year and 70 employees in
19 another year.
20    MR. GREY: That's why I said approximately.
21    MR. BATTENFELD: I would not regard that as
22 being approximately.
23    MR. GREY: He gave the exact same ranges for
24 '94 and '95, John. I didn't give that range, he did.
25    MR. BATTENFELD: Listen to what I'm saying.

194

1 What I'm saying --
2    MR. GREY: I understand what you're saying.
3    MR. BATTENFELD: I don't know what he said
4 before. What I'm telling you is if you're correct, 50
5 to 70, that doesn't mean approximately the same.
6    MR. GREY: He gave a range that he was
7 comfortable with.
8    MR. BATTENFELD: Correct.
9    MR. GREY: That range remained the same from
10 '94 to '95.
11    He never said or gave any indication that
12 the number of employees increased between '94 and '95.
13    MR. BATTENFELD: Why don't you ask him that.
14    MR. GREY: If he wishes to clarify he can
15 clarify, John.
16    MR. BATTENFELD: The problem is that you asked
17 about ranges.
18    MR. GREY: No, the problem --
19    MR. BATTENFELD: You're misstating his
20 testimony.
21    MR. GREY: The problem is not that I'm
22 misstating testimony but you're trying to put words
23 into your witness's mouth.
24    Are you not letting him answer the
25 question?

195

1    MR. BATTENFELD: The problem is you continually
2 ask a question that misstates a prior answer. You've
3 been doing it throughout the deposition.
4    MR. GREY: Why don't we have it read to him,
5 his answers, going back from '93 to '98 with regard to
6 the number of employees he estimated he had for those
7 periods, and if he wishes to clarify he can do so.
8    MR. BATTENFELD: Since we're talking about '94
9 to '95, I'd like to focus on '94 and '95
10    (Record read.)
11 BY MR. GREY:
12    Q    We have just gone back over your
13 estimates for the number of employees U. Lim Mexico
14 had for 1993 through 1996 and you heard that.
15 Correct?
16    A    Yes.
17    Q    Do you wish to clarify or change any of
18 those estimates?
19    A    I do not have the recollection of how
20 many employees actually worked there.
21    In 1993 about 40 to 50. In 1994 I think
22 about 50 to 70. After that I do not have recollection
23 how many employees I added or hired.
24    It's very evident that the numbers have
25 been gradually increasing.

196

1    Q    So, do you believe that you hired or had
2 working for you more employees in 1995 than you had in
3 1994 in U. Lim Mexico?
4    A    Yes.
5    Q    And you had previously given your best
6 estimate to be 50 to 70. Would you increase that
7 slightly based on your testimony now?
8    A    What year?
9    Q    For 1995.
10    A    I don't remember.
11    Q    Because of the significant increase in
12 sales between 1994 and 1995, did you have to engage
13 more employees in overtime production?
14    A    I think a few times.
15    Q    So do you believe that the overall number
16 of overtime hours worked in 1995 increased from 1994?
17    A    I don't remember.
18    Q    The sales almost doubled from 1995 to
19 1996. Correct?
20    A    Yes, it was.
21    Q    Okay.
22    MR. BATTENFELD: What years were you asking
23 about?
24    MR. GREY: '95 to '96.
25    MR. BATTENFELD: I think he said four to six.

197

**Page 202**

1  constant. Correct?
2      A   Yes.
3      Q   So there wasn't a change in the number of
4  make-up Saturdays over the course of Mr. Kang's
5  employment. Correct?
6      A   Yes, it's correct.
7      Q   So I'm asking you, was there a point in
8  time during Mr. Kang's employment where the production
9  facilities began to work more Saturdays or Sundays,
10  that you recall?
11      MR. BATTENFELD:  Is the question more Saturdays
12  or Sundays or more Saturdays and Sundays?
13      MR. GREY:  More Saturdays and Sundays.
14      MR. BATTENFELD:  I'll object to the question as
15  assuming a fact that hasn't been testified to, the
16  Sunday work.
17      THE WITNESS:  I do not know.
18  BY MR. GREY:
19      Q   So, then, you don't recall if there was
20  ever a marked increase in the weekend operations of
21  the production facilities from 1994 through '98?
22      A   What I meant is I cannot recall.
23      Q   In 1994, other than those ten make-up
24  Saturdays, how many Saturdays do you believe that the
25  production line was running during 1994?

**Page 203**

1      A   About two or three times.
2      Q   And in 1995, how many Saturdays do you
3  think the production facilities were running, other
4  than those ten make-up Saturdays?
5      MR. BATTENFELD:  And I want to remind the
6  witness he should not guess.  If he can give an
7  estimate he's comfortable with, he should give it, but
8  he should not guess.
9      THE WITNESS:  I remember only there were three
10  times in 1994, 5, 6, 7, 8.
11  BY MR. GREY:
12      Q   Three times for 1994 through 1998?
13      A   Each year.
14      Q   Each year.
15      So it's your best estimate that each year
16  the production lines were in operation on Saturday two
17  to three times, plus the ten make-up Saturdays?
18      A   Yes, it is.
19      Q   So then from 1994 to '98 you don't recall
20  any significant increase in the number of Saturdays
21  worked. Correct?
22      A   I do not know.
23      Q   And what were the number of Sundays
24  worked in 1994 by the production line?
25      A   I do not remember.

**Page 204**

1      Q   What is your best estimate, if you have
2  one?
3      A   I don't remember about Sundays.
4      Q   So you have no estimate for 1994.
5  Correct?
6      A   I do not remember about Sundays from 1994
7  to 1998.
8      Q   Did you ever -- did you ever personally
9  work on Sundays during that period?
10      A   I don't remember.
11      Q   Do you remember ever working on Saturdays
12  during that period, 1994 to 1998?
13      A   Yes, I do.
14      Q   And how often do you remember working in
15  1994 on Saturdays?
16      A   I cannot recall.
17      Q   What's your best estimate?
18      A   About 13 times a year.
19      Q   And for 1995?
20      A   Same 1995 through 1998.
21      Q   And it's your understanding that all the
22  managers are supposed to be at work when the
23  production line was operating. Correct?
24      MR. BATTENFELD:  And I'll object to the
25  question as ambiguous as to what you mean by "all the

**Page 205**

1  managers," and the question is also ambiguous as to
2  time.
3  BY MR. GREY:
4      Q   Referring to U. Lim America managers.
5      A   When the department heads would need to
6  be there, I assume so.
7      Q   Well, during the period of Mr. Kang's
8  employment, was it your belief that Mr. Cho, Mr. Park,
9  and Mr. Kang should all be present on Saturdays when
10  the production line was in operation?
11      A   Not necessarily, though.
12      Q   Why was it not necessary.
13      MR. BATTENFELD:  He said "not necessarily."
14  BY MR. GREY:
15      Q   What would make it not necessarily so?
16      A   For instance, if they are waiting for the
17  production or what if they didn't have much work to
18  do, then it didn't matter whether they do not come.
19      Q   Well, would you believe it was important
20  that Mr. Park always be there while the production
21  line was in operation?
22      A   I assume that since he was the production
23  manager that when production lines were working I
24  assume that he was there.
25      Q   So in your estimation, then, it would

1    Q    Compared to Mr. Park.
2    A    When he takes care of all the materials,
3    supplies for the production lines, yes, it is.  Then
4    it is.
5         Q    And let me -- just so I understand your
6    testimony, what you're saying is if he has taken care
7    of arranging for the material components during the
8    week, then it would be less important that he be there
9    for the weekend operations of the plant?
10    A    Of course.
11    Q    Now, you indicated that at one point in
12    time Mr. Kang broached the subject of rotating the
13    department heads for weekend work, is that correct, or
14    overtime work?
15    A    Yes, it was.
16    Q    Okay.  And you indicated that that was
17    acceptable to you if the department heads agreed.
18    Correct?
19    A    To whom?  To indicate it to whom?
20    Q    Mr. Kang.
21    A    No, I didn't say it was okay.
22    Q    Well, when Mr. Kang broached this subject
23    with you, you said go have a meeting with the
24    department heads to see if they find that it's okay.
25    Correct?

210

1    operation.  Correct?
2    A    Yes, I understand now.
3    Q    Yes, is that correct or, yes, you just
4    simply understand the question?
5    A    I said yes because I understood now your
6    question.
7    Q    And the answer to that question is yes.
8    Correct?
9    A    Yes.
10    Q    If it was not as important to you that
11    Mr. Cho work during the overtime hours of the
12    production facility, why was he doing it?
13    MR. BATTENFELD:  I'll object to the question,
14    calls for speculation as to Mr. Cho's motiviations.
15    BY MR. GREY:
16    Q    To the extent you have any awareness.
17    A    I don't know.
18    Q    And if Mr. Kang completed all of his
19    purchasing duties so that there were material
20    components for the overtime production, why was he
21    working during the overtime production hours, if you
22    know?
23    MR. BATTENFELD:  And I'll object to the
24    question as calling for speculation as to Mr. Kang's
25    motivations.  I'll also object to the question as

212

1    A    Yes.
2    Q    And I asked you previously in the
3    deposition if that meant that you thought it was
4    acceptable to you if it was acceptable to the
5    department heads?
6    A    Yes, you did.
7    Q    And you said if the department heads
8    agreed then it would be acceptable to you?
9    A    Yes, I did.
10    Q    Okay.  But when Mr. Kang asked you about
11    this rotation issue, that was because all of the
12    department heads were working during the hours of
13    operation.  Correct?
14    (Record read.)
15    MR. BATTENFELD:  And I'll object, the question
16    calls for speculation as to what Mr. Kang was thinking
17    when he raised the subject.
18    BY MR. GREY:
19    Q    You can answer.
20    A    He didn't say anything.  Just said
21    rotation.
22    Q    I'm not asking you what he said
23    specifically.  It's just when he brought up the issue
24    of rotation, at that point in time all of the managers
25    were working during the production line hours of

211

1    being an incomplete hypothetical because Mr. Kang had
2    both purchasing and warehouse duties.
3    THE WITNESS:  I don't know.
4    MR. BATTENFELD:  Can we take a quick break
5    here?
6    MR. GREY:  Sure.
7    (Recess.)
8    BY MR. GREY:
9    Q    Do you have any estimate of how often
10    Mr. Park and Mr. Kang would work past 5:30, Monday
11    through Friday, in 1994?
12    A    I do not remember.
13    Q    So you have no estimate?
14    A    No, I don't.  I can't --
15    Q    Do you have any estimate as to how often
16    Mr. Park would work past 5:30 in 1995, Monday through
17    Friday?
18    A    I do not remember from 1995 to 1998.
19    Q    So from 1994 through 1998 you have no
20    estimate as to how often Mr. Park would work past
21    5:30, Monday through Friday.  Correct?
22    A    Is correct, I cannot recall.
23    Q    Okay.  And do you have any estimate as to
24    how often Mr. Kang would work past 5:30, Monday
25    through Friday, in 1994?

213

1   these payroll records are a year old they're
2   destroyed?
3       A   I stated to you that whether they are or
4   they are not, I do not know.
5       Q   Other than payroll records, are there any
6   records which would show the overtime worked by the
7   U. Lim Mexico employees?
8       A   There is a record that indicates total,
9   like amount paid for all overtime hours.  I don't know
10  whether that kind, the individual, the pay stub is
11  kept or not.  Usually the annual documents are kept
12  with annual numbers.
13      Q   An annual report?
14      A   Yes, it is.
15      Q   And how far back do you maintain the
16  annual reports?
17      A   I do not know about the Mexican side,
18  that accounting system.
19      Q   Does U. Lim Mexico create an annual
20  report?
21      A   Yes, it does.
22      Q   Okay.  And that report would, obviously,
23  be submitted to you.  Correct?
24      A   Yes.
25      Q   And would that annual report, in fact, be

218

1   sort of a subsection of the U. Lim America annual
2   report?
3       A   Yes, it is.
4       Q   Okay.  So the U. Lim Mexico report is
5   contained in the U. Lim America annual report.
6   Correct?
7       A   Yes, it is.
8       Q   Okay.  And how far back do you keep the
9   U. Lim America annual reports?
10      A   I do not know.
11      Q   Approximately how thick are these annual
12  reports or how many pages?
13      A   I don't know.  Like this thick.
14      Q   Well, you review them each year.
15  Correct?
16      A   Yes, it is.
17      Q   You know, are they the size of a booklet
18  or the size of a book?  Approximately how many pages
19  are we talking about?
20      A   About this thick.
21      Q   Two or three inches?
22      A   Yes.
23      Q   Okay.  And where are these annual reports
24  kept?
25      A   At the office of the CPA.

219

1       Q   And these summarize the activities of
2   U. Lim America over the course of the previous year.
3   Correct?
4       A   Yes, it is.
5       Q   Therefore, they're an important document.
6   Correct?
7       A   Yes, it is.
8       Q   And there would be no reason to destroy
9   that document.  Correct?
10      A   It is.
11      Q   So it would be your understanding those
12  documents should still exist for U. Lim America for
13  each of its years of operation?
14      MR. BATTENFELD:  Which document?
15      MR. GREY:  U. Lim America's annual reports.
16      THE WITNESS:  CPA office should have them.
17  BY MR. GREY:
18      Q   And they should still have them.
19  Correct?
20      A   I would assume so.
21      Q   But you've never instructed them to
22  destroy them.  Correct?
23      A   No, I did not.
24      Q   And these annual reports then would have,
25  as you've indicated, the total overtime hours worked

220

1   at U. Lim Mexico.  Correct?
2       MR. BATTENFELD:  Remind the witness that he
3   shouldn't speculate or guess unless he has personal
4   knowledge.
5       THE WITNESS:  I do not know.
6           The reason is the information obtained
7   from Mexico was added to the large picture, so when
8   you put that in there then the annual report is
9   produced from those information.  That's why I do not
10  know.
11  BY MR. GREY:
12      Q   The annual report, though, contains that
13  information.  Correct?
14      A   Yes, it does.
15      Q   Have you or anyone on your behalf ever
16  conducted a search for any records which would show
17  the overtime hours worked at U. Lim Mexico related to
18  this litigation?
19      A   No.
20      Q   Was or is there ever occasion where
21  Mr. Park takes direction directly from U. Lim Korea?
22      THE INTERPRETER:  When you say "direction,"
23  instruction or some --
24      MR. GREY:  Yes.
25      MR. BATTENFELD:  I'll object to the question as

221

KANG V.
U. LIM AMERICA

TAE JIN YOON, VOL 2
02/02/00

1     MR. BATTENFELD: Why?

2     MR. GREY: Because it's relevant to the risk

3 that he's placing employees in that is outside the

4 bounds of his authority as an employer.

5     MR. BATTENFELD: Why is that relevant?

6     MR. GREY: I'm not going to give you any more

7 offers of proof.

8     MR. BATTENFELD: Every time you say that it's

9 because you don't have an answer.

10    MR. GREY: Are you instructing this witness not

11 to answer?

12    MR. BATTENFELD: Yes, unless you can make a

13 better offer of proof.

14    MR. GREY: I made my argument. Are you

15 instructing him not to answer?

16    MR. BATTENFELD: I am.

17    MR. GREY: Fine.

18 BY MR. GREY:

19    Q    Were there any other items that you

20 utilized Mr. Cho's credit for to purchase company

21 assets or personal assets for you?

22    A    No.

23    Q    Did you ever utilize Mr. Kang's credit to

24 purchase any other assets and/or to lease any other

25 assets?

226

---

1    A    No.

2    MR. GREY: Well, it's 5:26, why don't we end it

3 here.

4    //

227

---

1           I, TAE JIN YOON, do hereby declare under

2 penalty of perjury that I have read the foregoing

3 transcript; that I have made any corrections as appear

4 noted, in ink, initialed by me; that my testimony as

5 contained herein, as corrected, is true and correct.

6      EXECUTED THIS____day of _____,

7 2000, at_____.

       (City)        (State)

11           _____

              TAE JIN YOON

228

---

1 STATE OF CALIFORNIA )

                 : ss

2 COUNTY OF SAN DIEGO )

3

4     I, the undersigned, a Certified Shorthand

5 Reporter of the State of California, do hereby

6 certify:

7     That the foregoing proceedings were taken

8 before me at the time and place herein set forth; that

9 any witnesses in the foregoing proceedings, prior to

10 testifying, were placed under oath; that a verbatim

11 record of the proceedings was made by me using machine

12 shorthand which was thereafter transcribed under my

13 direction; further, that the foregoing is an accurate

14 transcription thereof.

15     I further certify that I am neither financially

16 interested in the action nor a relative or employee of

17 any attorney of any of the parties.

18     IN WITNESS WHEREOF, I have this date subscribed

19 my name.

20

21 Dated: February 3, 2000

22

23           _____

            RENEE K. PAPIERNIAK

24           CSR No. 7056

25

229

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,                    )
                                        )
 5            Plaintiff,                )
                                        )
 6       vs.                            ) NO. 99-CV659 JM (RBB)
                                        )
 7   U. LIM AMERICA, INC.; TAE          )
     JIN YOON, an individual; and       )
 8   Does 1 to 100,                     )
                                        )
 9            Defendants.               )
                                        )
10   _____
11
12
13
14
15            DEPOSITION OF TAE JIN YOON
16              San Diego, California
17           Thursday, February 3, 2000
18                  Volume 3
19
20
21
22
23
     Reported by:
24   GAIL L. INGHRAM
     CSR No. 8635
25   JOB No. 12453

                        230
```

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,                    )
                                        )
 5            Plaintiff,                )
                                        )
 6       vs.                            ) NO. 99-CV659 JM (RBB)
                                        )
 7   U. LIM AMERICA, INC.; TAE          )
     JIN YOON, an individual; and       )
 8   Does 1 to 100,                     )
                                        )
 9            Defendants.               )
                                        )
10   _____
11
12
13
14
15          Deposition of TAE JIN YOON,
16    Volume 3, taken on behalf of
17    Plaintiff, at 501 West Broadway, Suite
18    1300, San Diego, California, beginning
19    at 9:40 a.m. and ending at 4:05 p.m.
20    on Thursday, February 3, 2000, before
21    GAIL L. INGHRAM, Certified Shorthand
22    Reporter No. 8635.
23
24
25

                        231
```

```
 1   APPEARANCES:
 2   For Plaintiff:
 3        LAW OFFICE OF RICHARD E. GREY
          BY:  RICHARD E. GREY
 4        Attorney at Law
          409 Camino del Rio South, Suite 303
 5        San Diego, California 92108
          619 543-9300
 6
     For Defendants:
 7
          MORGAN, LEWIS & BOCKIUS
 8        BY:  JOHN S. BATTENFELD
          Attorney at Law
 9        300 South Grand Avenue, Suite 2200
          Los Angeles, California 90071-1018
10        213 612-1018
11   Also Present:
12        JAE CHO
          SOO KANG
13
     Interpreter:
14
          ANN McCORMICK
15        12212 Old Stone Road
          Poway, California 92064
16        858-486-6648
17
18
19
20
21
22
23
24
25

                        232
```

```
 1                    INDEX
 2   WITNESS:                        EXAMINATION
 3   TAE JIN YOON
     Volume 3
 4
 5      BY MR. GREY                     235
 6
 7
 8
 9
10                  EXHIBITS
11   PLAINTIFF'S                        PAGE
12   2    Newspaper article in Spanish; 2 pages   284
13
14
15
16
17
18
19
20
21
22
23
24
25

                        233
```

1 correct?
2       MR. BATTENFELD:  Are you asking whether they
3 would ever attend the meetings or whether they
4 usually attended the meetings?
5 BY MR. GREY:
6       Q     Well, during Mr. Kang's employment, do
7 you recall them ever attending the meetings?
8       A     Yes.
9       Q     And how often would that occur?
10      A     I do not recall.
11      Q     Generally speaking, it was rarely,
12 correct?
13      A     I do not recall.
14      Q     And what was the purpose of these daily
15 meetings?
16      MR. BATTENFELD:  And I'll object that the
17 question is overbroad and ambiguous as to time frame.
18      THE WITNESS:  Just generally, the company
19 matters.
20 BY MR. GREY:
21      Q     And would each of the department heads
22 report to you at this meeting?
23      A     Yes, it was.
24      Q     Would they report to you orally or in
25 writing or both?

238

1       A     Both.
2       Q     And did they generally submit to you
3 written reports at each of these daily meetings?
4       A     Yes, it was.
5       Q     And what were the types of written
6 reports that they would be submitting to you at these
7 daily meetings?
8       A     It's more like the department report.
9       Q     What is that?
10      A     Sales, means sales report and the
11 purchasing and production departments report, the
12 present status.
13      Q     What information would be contained in
14 the sales reports that were submitted to you at these
15 meetings?
16      A     The status, the sales, the activity.
17      Q     When you say status of sales activity,
18 what would Mr. Cho be reporting to as having changed
19 on a daily basis?
20      MR. BATTENFELD:  And I'll object to the
21 question as assuming a fact that hasn't been
22 testified to, that the written reports were done on a
23 daily basis.
24      THE WITNESS:  It's more like general -- the
25 status report on sales.

239

1 BY MR. GREY:
2       Q     How many pages would these reports
3 typically be?
4       A     About two, three -- two to four.
5       Q     And Mr. Park would also provide you
6 with a report with respect to purchasing, correct?
7       MR. BATTENFELD:  Mr. Park would provide a
8 report on purchasing?
9 BY MR. GREY:
10      Q     I'm sorry.  Mr. Park would provide a
11 report on production?
12      A     Yes, it is.
13      Q     And in these reports, he would outline
14 what the number of units produced over the last day
15 was?
16      A     Yes, it is.
17      Q     And he would also outline what the
18 labor costs for producing those units was?
19      A     No.
20      Q     Would he outline what the overtime
21 hours worked to produce those units were?
22      A     No, it's not.
23      Q     Did he outline any of the costs
24 incurred in producing those units?
25      A     No, it's not.

240

1       Q     And did his reports include the number
2 of units that were rejected?
3       A     No.
4       Q     Other than the number of units
5 produced, what did his reports include?
6       A     The quantity of the production, and
7 then also each unit price of the production.
8       Q     And approximately how many pages were
9 these reports?
10      A     About two, three.
11      Q     And in the purchasing report, what
12 would be contained in that?
13      A     Total material, and then price and the
14 schedule for the material's arrival.
15      Q     And Mr. Kang would produce this report
16 to you at each of these daily meetings, correct?
17      A     Yes, it is.
18      Q     And that report was approximately three
19 pages as well?
20      A     One or two.
21      Q     Was there one person who usually
22 reported to you first?
23      THE INTERPRETER:  I don't understand the
24 question.  I don't understand.
25 BY MR. GREY:

241

1    Q    At the meeting, was there one person
2  who would normally report first at the meeting?
3        MR. BATTENFELD:  Do you mean was there some
4  order that they reported in?
5        MR. GREY:  Right.
6        THE WITNESS:  No.
7  BY MR. GREY:
8        Q    And these meetings were normally
9  conducted in your office; is that correct?
10       A    In a meeting room -- in the meeting
11 room.
12       Q    Is that separate from your office?
13       A    Next to my office.
14       Q    And how long would these meetings
15 normally last, these daily meetings?
16       A    Depends on.
17       Q    What was the average length of these
18 meetings?
19       A    About 30 minutes.
20       Q    What was the longest that you remember
21 these meetings lasting?
22       A    No, I don't remember.
23       Q    Is it possible that they could have
24 lasted as long as two hours on occasion?
25       MR. BATTENFELD:  I'll object to the question.

242

1  Anything is possible.
2        THE WITNESS:  I do not know.
3  BY MR. GREY:
4        Q    These reports, did they get placed in
5  binders of any kind?
6        A    That depends on each department.
7        Q    Well, do you remember these reports
8  being in binders or not?
9        A    No, I don't remember.
10       Q    So you don't know whether or not the
11 sales reports were placed in binders or not, correct?
12       A    Yes, it's correct.
13       Q    And you don't know whether or not the
14 purchasing reports were placed in binders; is that
15 correct?
16       A    It's correct.
17       Q    And you don't know whether the
18 production reports were placed in binders, correct?
19       A    It's correct.
20       Q    Now, two of your employees have
21 admitted that you have a temper.
22            Have you ever thrown any of these
23 reports?
24       MR. BATTENFELD:  You're referring to any of
25 the reports?

243

1        MR. GREY:  Any of these production reports,
2  purchasing reports, sales reports.
3        THE WITNESS:  I don't remember.
4  BY MR. GREY:
5        Q    You have no recollection whether you
6  threw these reports at any time?
7        A    No, I don't remember.
8        Q    Specifically, do you have any
9  recollection of having ever thrown any of these
10 reports at either Mr. Park, Mr. Cho or Mr. Kang at
11 any time?
12       A    No, I don't.
13       Q    You don't have a -- you don't remember?
14       MR. BATTENFELD:  The question is, did you ever
15 throw a report at Mr. Kang, Mr. Cho or Mr. Park.  And
16 the question is, did you do that, and the answer
17 would either be "yes," "no," or "I don't recall."
18       MR. GREY:  Wait a second.  The question was,
19 do you remember ever throwing a report at Mr. Park,
20 Mr. Kang or Mr. Cho.
21       MR. BATTENFELD:  And I'll object that the
22 question Mr. Grey has asked is ambiguous.  To ask the
23 question do you remember doing something is
24 inevitably going to result in an answer where it's
25 unclear whether the witness is saying that he

244

1  remembers doing it, he doesn't remember doing it or
2  he doesn't remember that he remembers.  So I would
3  suggest that Mr. Grey rephrase the question to simply
4  ask did he ever do it as opposed to asking does he
5  remember.
6  BY MR. GREY:
7        Q    I think the question is good.  Would
8  you please answer it.
9        A    No, I have not done that.
10       Q    So you're saying you never threw
11 reports at Mr. Park, Mr. Kang or Mr. Cho; is that
12 correct?
13       A    No, I do not.
14       Q    Do you recall ever yelling at Mr. Park
15 in any of these meetings?
16       A    Who?
17       Q    Mr. Park.
18       A    Yes, a few occasions.
19       Q    During the course of Mr. Kang's
20 employment, approximately how many times did you yell
21 at Mr. Park during these meetings?
22       MR. BATTENFELD:  And I will object that the
23 question is overbroad as to time frame.
24       THE WITNESS:  I do not recall.
25 BY MR. GREY:

245

1   San Diego, California, Thursday, February 3, 2000
2           9:40 a.m. - 4:05 p.m.
3
4               ANN, McCORMICK
5   was duly sworn to act as English/Korean interpreter.
6
7               TAE JIN YOON,
8   having been first duly sworn through the interpreter,
9   was examined and testified through the interpreter as
10  follows:
11
12      MR. BATTENFELD:  Before we begin, I just want
13  to say a couple of things.  Just to confirm, I
14  received what was served on me last night at
15  approximately 5:35 an ex parte application.  I'm not
16  sure when it was filed, but that's when it was served
17  on me.
18          We will be filing an opposition to
19  that, but what I wanted to say on the record, as I've
20  told Mr. Grey, our problem with continuing the
21  hearing date has to do with the pretrial deadlines
22  that are requiring things to be done almost
23  immediately after that continued date that Mr. Grey
24  is seeking.
25          I invite Mr. Grey to seek to have those

                    234

1   pretrial dates moved, and if he's able to do that,
2   that would alleviate the concerns we have about
3   moving the summary judgment motion.
4       MR. GREY:  Well, I appreciate that, and I'll
5   do what I can to notify the court that as long as the
6   pretrial dates are moved, that we're willing to
7   stipulate to extend the hearing date on the motion
8   for summary judgment.
9       MR. BATTENFELD:  Depending on what the court
10  is willing to do -- we'll have to find out what the
11  court is willing to do before we can determine what
12  our position would be, then, on the summary judgment
13  date.
14      MR. GREY:  I'm thinking that maybe what might
15  be best in that regard is that we take time at the
16  lunch break to call the court to notify them of that.
17      MR. BATTENFELD:  Well, we're going to need to
18  file a response.  Mr. Grey's ex parte is full of a
19  number of misrepresentations, so we will need to file
20  a response to that, but that's our fundamental
21  position.
22      MR. GREY:  Okay.
23              EXAMINATION
24  BY MR. GREY:
25      Q     Good morning, Mr. Yoon.

                    235

1       A     Good morning.
2       Q     I think what I want to do is start off
3   talking about the daily meetings that you would
4   generally have with Mr. Cho and Mr. Park and
5   Mr. Kang.
6       MR. BATTENFELD:  And I'll object to the
7   introductory statement as assuming facts that haven't
8   been testified to, that there were such daily
9   meetings.
10      MR. GREY:  Well, we'll establish what the
11  regularity of those meetings were.
12      Q     You do recall that you would meet
13  frequently with Mr. Cho and Mr. Park and Mr. Kang to
14  go over business activities of the previous day
15  and/or week, correct?
16      A     Yes.
17      Q     And did you begin basically having
18  those meetings as soon as Mr. Park and Mr. Kang were
19  hired?
20      A     Yes, it was.
21      Q     And were these meetings generally held
22  on a daily basis when you were at the actual
23  facility?
24      A     When it's necessary.
25      Q     Did you usually believe that it was

                    236

1   necessary to have those meetings on a daily basis
2   when you were present in the office?
3       A     Yes.
4       Q     And this practice of having the daily
5   meetings, that pretty much continued uninterrupted
6   throughout Mr. Kang's employment when you were
7   present at the facility, correct?
8       A     Yes.
9       Q     Were these meetings generally held in
10  the mornings?
11      A     No.  It was not -- the hours didn't --
12  was not always the same.
13      Q     There wasn't a time of day that you
14  would more often have them than not?
15      A     No, it was not.
16      Q     And when you had these meetings, it's
17  true that, generally speaking, Mr. Cho, Mr. Park and
18  Mr. Kang would be the persons present, correct?
19      A     Yes, it was.
20      Q     And during Mr. Kang's employment, was
21  there anyone else who regularly attended these
22  meetings?
23      A     No.
24      Q     The Mexican supervisors from U. Lim,
25  Mexico, they would not attend these meetings,

                    237

KANG V.                                    TAE JIN YOON, VOL3
U. LIM AMERICA                                      02/03/00

1      Q      Was it the case that you would yell at
2  Mr. Park at most of these meetings?
3      A      No.
4      Q      What was the average number of times
5  you would yell at him in a given week at these
6  meetings?
7      MR. BATTENFELD:  And I'll object that the
8  question is overbroad and ambiguous as to time frame.
9      THE WITNESS:  I do not remember.
10  BY MR. GREY:
11      Q      During the course of Mr. Kang's
12  employment, what is your best estimate of the number
13  of times that you would yell at Mr. Park at these
14  meetings on a weekly or monthly basis?
15      A      I do not remember.
16      Q      During the course of Mr. Kang's
17  employment, do you have any estimate as to the number
18  of times that you would yell at Mr. Park at these
19  meetings?
20      A      I do not remember.
21      Q      So you have no estimate; is that
22  correct?
23      A      No, I don't.  No.
24      Q      And would you ever yell at Mr. Kang at
25  these meetings?

246

1      A      I think so.
2      Q      Over the course of Mr. Kang's
3  employment, do you have any estimate as to the number
4  of times you yelled at Mr. Kang during these
5  meetings?
6      A      I do not remember.
7      Q      So you do not have an estimate,
8  correct?
9      A      I do not remember.
10      Q      I just want to clarify, is it that you
11  don't remember the number of times or you have no
12  estimate as to the number of times?
13      THE INTERPRETER:  Would you help me out --
14      MR. BATTENFELD:  I'm going to object that the
15  question is unintelligible as phrased, and I'm sure
16  that's why the interpreter is having problems.
17      THE WITNESS:  I do not remember.
18  BY MR. GREY:
19      Q      And did you ever yell at Mr. Cho at
20  these meetings?
21      A      Yes.
22      Q      And do you have an estimate as to the
23  number of times you yelled at Mr. Cho at these
24  meetings during Mr. Kang's employment?
25      A      No, I don't remember.

247

1      Q      Do you ever recall making Mr. Park
2  stand during these meetings?
3      A      I do not remember.
4      Q      Do you ever recall making Mr. Kang
5  stand at these meetings?
6      A      I do not remember.
7      Q      Do you ever recall making Mr. Cho stand
8  at these meetings?
9      A      I do not remember.
10      Q      Do you recall ever hitting Mr. Park
11  with a ruler on his hands at these meetings?
12      THE INTERPRETER:  Ruler -- hitting Mr. Park
13  with a ruler -- Mr. Park's hand?
14      MR. GREY:  Yes.
15      THE INTERPRETER:  All right.
16      THE WITNESS:  No, I have not done that.
17  BY MR. GREY:
18      Q      Did you ever hit Mr. Park on the top of
19  his head with a ruler during these meetings?
20      A      I do not remember doing that.
21      Q      Do you recall ever hitting Mr. Park
22  with a ruler at any time during Mr. -- well, stop
23  right there.
24      A      No, I did not.
25      Q      Do you ever recall grabbing Mr. Park by

248

1  the ear at any time since his employment began at
2  U. Lim?
3      A      No, I don't remember.
4      Q      No, you did not, or no, you don't
5  remember?
6      A      I do not remember.
7      Q      Do you recall grabbing Mr. Kang's ear
8  at any time during the course of his employment?
9      A      No, I did not.
10      Q      Did you ever instruct Mr. Park or
11  Mr. Kang to do jumping jacks or to do squats in front
12  of you?
13      A      No.  It's not even military.  No, I did
14  not do that.
15      Q      What do you mean by "it's not even
16  military"?
17      A      I served in the military in Korea, so I
18  don't understand what you are asking now.
19      Q      I'm just asking whether or not you ever
20  instructed Mr. Park or Mr. Kang to do jumping jacks
21  or to do squats in front of you.
22      A      No, I did not.
23      Q      Did you ever throw an ashtray at
24  Mr. Park, Mr. Yoon?
25      A      No.

249

1      Q      What's your best estimate when you told
2  Mr. Cho this?
3      A      I do not remember.
4      Q      Was it a month ago?  A year ago?
5      A      I do not remember.
6      Q      So at some point between the time you
7  learned about the lawsuit and the time you met with
8  Mr. Cho and your attorney three days ago, you told
9  Mr. Cho that you had never struck Mr. Park with a
10  ruler; is that correct?
11      A      I think so.
12      Q      Was there anyone present when you had
13  this conversation?
14      MR. BATTENFELD:  Do you mean besides Mr. Cho?
15      MR. GREY:  Yes, obviously.
16      THE WITNESS:  No.
17  BY MR. GREY:
18      Q      And when you told Mr. Cho this, were
19  you discussing the litigation?
20      A      I was told that what has been filed.
21      Q      So did you have this discussion with
22  Mr. Cho at that first meeting when he reviewed the
23  complaint with you?
24      MR. BATTENFELD:  And I want to remind the
25  witness shouldn't guess unless he has a

                          254

1  recollection.
2      THE WITNESS:  I don't know when it was.
3  BY MR. GREY:
4      Q      But you have a specific recollection of
5  that conversation, correct?
6      A      A few things I do remember.
7      Q      What else do you remember about that
8  conversation?
9      A      About yelling.
10      MR. BATTENFELD:  Just for clarification, are
11  you asking about the conversation where he told
12  Mr. Cho that he didn't hit Mr. Park --
13      MR. GREY:  That's the conversation --
14      MR. BATTENFELD:  -- or are you asking about
15  some other conversation?
16      MR. GREY:  That's the conversation we've been
17  talking about.
18      THE WITNESS:  I don't recall whether I met him
19  in person and talked about it or on the phone.
20  BY MR. GREY:
21      Q      I don't care whether it was in person
22  or on the phone right now.  I'm just talking about
23  that conversation.  And you indicated that there were
24  a few things you discussed in that conversation,
25  including the fact that you did not strike Mr. Park,

                          255

1  and I was asking you what those few things were.
2      A      Such as overtime, sort of things.
3      Q      What other sort of things?
4      A      I do not remember.
5      Q      You mentioned yelling and overtime,
6  correct?
7      A      Yes, I did.
8      Q      And did Cho first mention to you about
9  the allegation of yelling?
10      A      Yes, it was.
11      Q      Did he agree that you did that?
12      THE INTERPRETER:  "Did he agree that you did
13  that?"
14      MR. GREY:  Uh-huh.
15      MR. BATTENFELD:  And I'll object that the
16  question is ambiguous as to what you mean by "that."
17  BY MR. GREY:
18      Q      You can answer.
19      MR. BATTENFELD:  Only if you understand the
20  question.
21      THE WITNESS:  No, I did not.
22  BY MR. GREY:
23      Q      I'm not asking you what you did.  I'm
24  asking you, when Mr. Cho raised the allegation about
25  your yelling, did he agree that you had yelled at

                          256

1  Mr. Kang?
2      A      I don't understand your question.
3      Q      You indicated that Mr. Cho raised the
4  issue or allegation of you yelling at Mr. Kang; is
5  that correct?
6      A      No.
7      Q      Mr. Cho didn't raise that issue or
8  allegation?
9      A      I only heard from him that Kang said
10  like that in the complaint.
11      Q      So he told you about the allegation in
12  the complaint that you were yelling at Mr. Kang,
13  correct?
14      A      Yes, it was.
15      Q      And when Mr. Cho told you about this
16  allegation, did he indicate to you in any way that he
17  agreed that those things had happened, the yelling?
18      A      No.
19      Q      Did you deny to Mr. Cho that you had
20  ever yelled at Mr. Kang at that meeting?
21      MR. BATTENFELD:  You're asking did he deny
22  that he ever yelled at Mr. Kang?
23      MR. GREY:  At the meeting.
24      THE WITNESS:  I don't remember.
25  BY MR. GREY:

                          257

```
 1      Q      During 1994, who would usually prepare
 2 the lunch meals?
 3      A      All of them brought their own lunches.
 4      Q      Did you bring your lunch?
 5      A      Of course.
 6      Q      Do you have any recollection of either
 7 Mr. Park or Mr. Kang preparing your lunch during
 8 these lunch meals?
 9      A      Kang frequently did not bring his
10 lunch, so he prepared it for his lunch.  I think
11 there were times that he did, and there are times
12 they shared and then ate together.
13      Q      Was it the case that either Mr. Park or
14 Mr. Kang were responsible for preparing your rice for
15 your lunch?
16      A      My wife packs my lunch.
17      Q      Was it the common practice of the
18 department heads to wait for you before they had
19 lunch?
20      MR. BATTENFELD:  And I'll object to the
21 question as ambiguous with respect to the phrase
22 "common practice."
23      THE WITNESS:  At the time that we did not have
24 a lunch room; therefore, there is a space that --
25 right in front of my office.  If I open my office
```
262

```
 1 door, right there, there is tables, so we had lunch
 2 there.
 3 BY MR. GREY:
 4      Q      But would they normally wait for you
 5 before beginning lunch?
 6      A      No, it was not.  My office was located
 7 in upstairs, second floor, and the managers were in
 8 downstairs.  We always had lunch on second floor.
 9      Q      Is that because they always ate lunch
10 with you?
11      A      I don't understand your question.
12      Q      Well, you indicated that you always ate
13 lunch on the second floor, correct?
14      A      Yes.
15      Q      And that was directly outside your
16 office, correct?
17      A      Yes.
18      Q      Okay.  My question to you was, did you
19 always eat lunch together directly outside your
20 office?
21      A      Yes.
22      Q      And would you consider it rude if they
23 began lunch without you?
24      A      No, not at all.
25      Q      Do you recall them ever eating lunch
```
263

```
 1 without you when you were at the facility?
 2      A      Of course.  I'm sure they did when I
 3 had things to do outside.
 4      Q      No, I'm talking about when you were at
 5 the facility.
 6      A      I do not remember.
 7      Q      Do you recall having poker parties with
 8 you and the department heads?
 9      A      Are you saying poker party?
10      Q      Yes.
11      MR. BATTENFELD:  I'll object to the question
12 as ambiguous as to what you mean by "poker party."
13 Do you mean do they play poker or do they have a
14 party while they play poker?
15 BY MR. GREY:
16      Q      Do you understand the question?
17      A      No, I don't understand.
18      Q      Well, do you remember getting together
19 with the department heads to play poker?
20      A      Yes, I do.
21      Q      And did you do so at your house,
22 correct?
23      A      Yes, we did at my house.
24      Q      Is that the normal place that you would
25 hold these poker games?
```
264

```
 1      A      Yes, it was.
 2      Q      And how often, in 1994, would you hold
 3 these poker games?
 4      A      From 1994 to 1998, I do not recall how
 5 many times we did.
 6      Q      What's your best estimate of how many
 7 times these occurred?
 8      MR. BATTENFELD:  And here he's asking for a
 9 range you're comfortable with.  In other words, was
10 it more than once?  More than five times?  Less than
11 10 times?  Less than 20 times?
12      THE WITNESS:  I think about three or four
13 times in a year.  But however, that is not very
14 precise.
15 BY MR. GREY:
16      Q      And who generally would be at the
17 games?
18      A      I and managers.
19      Q      And you're referring now to department
20 heads?
21      A      Yes.
22      Q      Anyone else other than you and the
23 department heads?
24      A      Yes, there are a few times that company
25 people came.
```
265

1  and whether you're limiting your question to when he
2  was at the Tijuana facility as opposed to either at a
3  customer meeting or away on a business trip.
4         MR. GREY:  I'll limit it to Tijuana.
5         THE WITNESS:  I think that I stayed even
6  beyond that hour.  There were times that I stayed
7  beyond that hour.
8  BY MR. GREY:
9         Q     And when you were at the facility, the
10  department heads were generally at the facility,
11  correct?
12        A     When they worked -- are you asking that
13  when I was working there late hours, those department
14  heads were there?
15        Q     Yes.
16        A     No, people, when they need to go, they
17  left.  I stayed there, because I had things to do.
18        Q     In 1994, how often do you recall
19  staying at work at the Tijuana facility up to and
20  including 8:00 o'clock?
21        MR. BATTENFELD:  And I'll object to the
22  question as being ambiguous as to the phrase "up to
23  and including 8:00 o'clock."
24        THE WITNESS:  I do not remember.
25  BY MR. GREY:

                    270

1         Q     Just to clarify, you indicated that
2  sometimes you would stay until 8:00 o'clock, correct?
3         A     Yes.
4         Q     And in 1994, how many times do you
5  remember staying until 8:00 o'clock at work at the
6  facility?
7         A     I do not remember.
8         Q     Do you have any estimate as to how many
9  times you stayed at work until 8:00 o'clock at the
10  facility in 1995?
11        A     I do not remember from 1994 -- 1995 to
12  1998 how many times I stayed late.
13        Q     And you indicated that sometimes you
14  stayed past 8:00 p.m.  What's the latest you recall
15  staying at the facility working during the course of
16  Mr. Kang's employment?
17        A     No, I don't remember.
18        Q     And you have no estimate; is that
19  correct?
20        A     That's correct.
21        Q     Did you have any timecards at the
22  facility for the U. Lim America employees?
23        A     No.
24        Q     Did you have any timecards for the
25  U. Lim Mexico employees?

                    271

1         A     Yes.
2         Q     And where are these timecards kept?
3         A     In Mexico.
4         Q     And who's in charge of maintaining
5  these records?
6         A     Ilma, the female staff.
7         Q     And do you know how long you've
8  maintained the time records for U. Lim Mexico?
9  Timecards.
10        A     I don't know about that.  I am just
11  assuming that they're kept about a year.
12        MR. BATTENFELD:  You don't want to guess.
13  BY MR. GREY:
14        Q     You never gave anyone any instructions
15  to destroy those records, correct?
16        A     No, I did not.
17        Q     Did you frequently have arguments with
18  Mr. Park during t of course of Mr. Kang's employment?
19        MR. BATTENFELD:  And I'll object to the
20  question as being ambiguous with respect to the word
21  "frequently."
22        THE WITNESS:  I don't understand when you say
23  the word "argue."
24  BY MR. GREY:
25        Q     An angry discussion.

                    272

1         A     I conversed with him about the work
2  rather than arguing.
3         Q     So you don't recall actually having
4  arguments with Mr. Park during the course of
5  Mr. Kang's employment?
6         MR. BATTENFELD:  And by that you mean angry
7  discussions?
8         MR. GREY:  Angry discussions.
9         THE WITNESS:  I mean, you do work, but there
10  are times that you get upset, you get angry.
11  BY MR. GREY:
12        Q     And would you yell at Mr. Park when you
13  got angry?
14        A     I think I did -- there were times that
15  I did.
16        Q     And during the course of Mr. Kang's
17  employment, give me your best estimate as to how
18  frequently you would have these angry discussions or
19  arguments with Mr. Park on a weekly or monthly basis.
20        MR. BATTENFELD:  And I'll object that the
21  question is compound, ambiguous and overbroad.
22        THE WITNESS:  I do not remember.
23  BY MR. GREY:
24        Q     So you might have had these arguments
25  with Mr. Park as frequently as daily?  Weekly?

                    273

1       Q       Either.  Do you remember a gas leak
2   either at the plant or one that affected the plant?
3       A       *Yes, there was an incident.*
4       Q       Wasn't there more than one occasion
5   that this occurred?
6       A       I believe that there was once.  I think
7   about twice.
8       Q       And do you know what caused this gas
9   leak, or what the gas was?
10      A       I understood that the factory next was
11  careless -- the next factory was careless.  That's
12  why.
13      MR. BATTENFELD:  Next to U. Lim's factory?
14      THE INTERPRETER:  He didn't say "U. Lim" but
15  he -- so I couldn't say "U. Lim," but he said "next."
16      THE WITNESS:  Different company, the next,
17  different company.
18  BY MR. GREY:
19      Q       Do you know what that gas was?
20      A       Propane, I think.
21      Q       And who first informed you of the gas
22  leak affecting the U. Lim facility?
23      MR. BATTENFELD:  And I'll object to the
24  question as ambiguous as to which leak incident
25  you're referring to.

                        278

1       THE WITNESS:  I do not remember.
2   BY MR. GREY:
3       Q       You don't remember for either incident?
4       A       No, I don't remember.
5       Q       Do you remember either Mr. Park,
6   Mr. Kang or Mr. Cho recommending that you evacuate
7   the plant?
8       A       I don't know from whom I received the
9   report, but I came to the facility after they already
10  evacuated the people from the facility to outside.
11      Q       Do you know how long it took -- well,
12  strike that.
13          Do you know if anybody was injured
14  and/or fainted as a result of this gas leak?  At your
15  facility.
16      A       I think because of the smell, there
17  were headache instance.
18      Q       Do you know if anybody was hospitalized
19  as a result of this gas leak?  At your facility.
20      A       I remember that one person was taken
21  to.
22      Q       Did you ever tell Mr. Park that the gas
23  leak was not serious and that he should continue to
24  *keep the production line working?*
25      A       No, I did not.

                        279

1       Q       And did you ever stop the production as
2   a result of a gas leak?
3       MR. BATTENFELD:  *You're asking whether he*
4   personally stopped production or whether the company
5   stopped production?
6       MR. GREY:  I'll ask him personally.
7       THE WITNESS:  The company stopped.
8   BY MR. GREY:
9       Q       But you did not instruct the stopping
10  of the production?
11      A       That is correct.  Before I was aware
12  that the production line had stopped.
13      Q       By the way, did you ever tell Mr. Park,
14  Mr. Kang or anyone else at U. Lim that you had been a
15  gang member back in Korea?
16      MR. BATTENFELD:  *I think it was translated*
17  whether U. Lim was a gang member.
18      THE INTERPRETER:  That I heard.
19      MR. BATTENFELD:  *I think we --*
20      THE INTERPRETER:  I may have misheard.
21      MR. BATTENFELD:  *Why don't you read back the*
22  question.
23          (Record read.)
24      THE WITNESS:  No, I did not.
25  BY MR. GREY:

                        280

1       Q       Did you ever talk to Mr. Ko about this
2   litigation at any time?
3       A       No.
4       Q       Was there ever an occasion where you
5   found Mr. Ko sleeping at his desk?
6       A       I do not recall.
7       Q       Do you ever recall slapping Mr. Ko in
8   the head at any time?
9       A       No, I did not.
10      Q       Was Mr. Ko terminated from U. Lim's
11  employment by you?
12      A       No, I did not.
13      Q       Did Mr. Ko ever officially work for
14  U. Lim America or did he always work as an employee
15  of U. Lim Korea?
16      A       That, I do remember right now.
17      Q       Do you know why Mr. Ko stopped working
18  at U. Lim America?
19      A       I understand that he had some -- the
20  parents, some matters in Korea.  Therefore, he went
21  back to Korea.
22      MR. GREY:  Is that "parents"?
23      THE INTERPRETER:  "Parents."
24  BY MR. GREY:
25      Q       Do you know why Mr. Baek left U. Lim

                        281

KANG V.
U. LIM AMERICA

TAE JIN YOON, VOL3
02/03/00

---

1    you yelled at him?
2        A      No.
3        Q      Do you think it was appropriate for you
4    to yell at Mr. Park?
5        MR. BATTENFELD: And I'll object that the
6    question is an incomplete hypothetical and is
7    ambiguous, without context as to which particular
8    situation you're referring to.
9        THE WITNESS: I don't understand your
10   question.
11   BY MR. GREY:
12       Q      Well, do you think it's inappropriate
13   to yell at employees?
14       MR. BATTENFELD: And again, I'll object. The
15   question is an incomplete hypothetical and
16   unintelligible without any context as to what kind of
17   yelling you're referring to.
18       THE WITNESS: I do not know.
19   BY MR. GREY:
20       Q      You don't know whether it's
21   inappropriate or not?
22       THE INTERPRETER: I have a hard time -- I
23   tried my best to translate that "appropriate" to the
24   right the word in Korean. So I more translated it as
25   whether it's -- I like to translate it more like

286

---

1    okay, it's okay to have that manner or like that, to
2    that. But since there is a perfect word -- "manner"
3    was not said by Mr. Grey -- I am not translating by
4    using that word, "manner." But however in Asia,
5    they're very sensitive about selecting when it comes
6    down to mannerisms, proper, improper. So I am having
7    little problem of that word.
8    BY MR. GREY:
9        Q      Do you think it's okay --
10       THE INTERPRETER: Yes, yes. Thank you.
11   BY MR. GREY:
12       Q      -- to yell at your employees?
13       MR. BATTENFELD: And again, I'll object. The
14   question is an incomplete hypothetical and
15   unintelligible in the absence of any context of what
16   type of yelling or the context of the yelling that
17   you're referring to. And the witness should only
18   answer if he's able to answer, given the problems
19   with the question.
20       THE WITNESS: I do not know.
21   BY MR. GREY:
22       Q      Well, you indicated that you have
23   yelled at Mr. Park before, correct?
24       A      Yes, I did.
25       Q      On those occasions, do you believe it

287

---

1    was okay to yell at Mr. Park?
2        MR. BATTENFELD: And again, I'll object. The
3    question is ambiguous and unintelligible as to time
4    frame and as to the specifics of any particular
5    yelling.
6        THE WITNESS: I do not know.
7    BY MR. GREY:
8        Q      On those occasions when you yelled at
9    Mr. Park, do you think it was okay to yell at
10   Mr. Park -- strike that.
11       On those occasions when you yelled at
12   Mr. Kang, do you think it's okay to yell?
13       MR. BATTENFELD: And again, I'll object. The
14   question is ambiguous and unintelligible as to what
15   particular incident is being referred to --
16       MR. GREY: I'm referring to all incidents.
17       MR. BATTENFELD: Let me finish my objection.
18   And I'll object that the question is ambiguous and
19   unintelligible with respect to the word "okay."
20       THE WITNESS: I do not know.
21   BY MR. GREY:
22       Q      Do you think it's appropriate, in a
23   business context, to yell at Mr. Kang the way you
24   admittedly yelled at Mr. Kang?
25       MR. BATTENFELD: I'll object that the question

288

---

1    is vague and ambiguous as to the phrase "appropriate
2    in a business sense," ambiguous and unintelligible in
3    terms of the reference to the way he yelled at
4    Mr. Kang, since there has been no testimony about the
5    circumstances of any particular yelling at Mr. Kang.
6        THE WITNESS: I do not know.
7    BY MR. GREY:
8        Q      Would you describe yourself as having a
9    temper, Mr. Yoon?
10       MR. BATTENFELD: I'll object that the question
11   is ambiguous with respect to the phrase "a temper."
12       THE WITNESS: I do not know.
13   BY MR. GREY:
14       Q      Do you know what the word "temper"
15   means?
16       A      Yes, I do.
17       Q      Do you consider the fact that you have
18   a temper?
19       MR. BATTENFELD: Same objections.
20       THE WITNESS: I think I have that as much as
21   others have.
22   BY MR. GREY:
23       Q      Do you believe that you are more easily
24   angered than, say, the other employees at U. Lim?
25       MR. BATTENFELD: And I'll object that the

289

---

KANG V.
U. LIM AMERICA

TAE JIN YOON, VOL3
02/03/00

1  supposed to receive at U. Lim Korea?
2      A      For the training of purchasing
3  materials.
4      Q      And who performed his job while he was
5  gone?
6      A      I don't remember.
7      Q      Are you aware of the fact that Ki Hwa
8  Yoon considered Mr. Kang his favorite at U. Lim
9  America?
10     A      I do not know.
11     Q      Did you consider Mr. Kang to be your
12 favorite of the department heads?
13     A      I don't particularly like one person
14 above the others.  I like them equally.
15     Q      Did you ever consider terminating
16 Mr. Park?
17     A      No, I never did.
18     Q      Did you ever consider terminating
19 Mr. Kang?
20     A      No, I never did.
21     Q      And did you ever consider terminating
22 Mr. Cho?
23     A      No, I never did.
24     Q      Did you feel each of your department
25 heads performed their jobs well?

294

1  Mr. Kang quit yet?"
2      A      No.
3      Q      Did you ever tell Mr. Kang or anyone
4  else that Mr. Kang should quit?
5      A      No, I did not.
6      Q      When you hired Mr. Kang or at any time
7  thereafter, did you ever indicate to Mr. Kang what
8  his expected hours were to be?
9      A      I only told him the time he begin to
10 work.
11     Q      And what did you tell him at that time?
12     A      7:30.
13     Q      And you didn't tell him anything with
14 respect to his ending time?
15     A      No, I did not.
16     Q      And what representations did you make
17 to Mr. Kang at the time you hired him or any time
18 thereafter about what compensation he was to receive?
19         MR. BATTENFELD:  And I'll object that the
20 question is overbroad and ambiguous as to time frame
21 and as to the phrase "compensation."  I also object
22 that the question calls for a legal conclusion to the
23 extent he used the word "representations."
24         THE WITNESS:  No, I did not.
25 BY MR. GREY:

296

1      A      Yes.
2      Q      Did you ever have any problems with
3  Mr. Kang's performance?
4          MR. BATTENFELD:  And I'll object to the
5  question as being ambiguous as to the phrase
6  "problems with Mr. Kang's performance."
7          THE WITNESS:  I don't know.
8  BY MR. GREY:
9      Q      Did you ever have any problems -- that
10 means difficulties -- with Mr. Kang's performance of
11 his job duties?
12         MR. BATTENFELD:  Same objection.
13         THE WITNESS:  It's very difficult for me to
14 say, because when you say the "duties," there are
15 times that you do well; there are times that you
16 don't do well.  So it's more like cycling, so very
17 hard to say about it.
18 BY MR. GREY:
19     Q      Did you ever have any problems or
20 difficulties with Mr. Park's performance at any time?
21     A      It's also same.
22     Q      It's your understanding Mr. Kang quit,
23 correct?
24     A      Yes, it is.
25     Q      Did you ever tell anyone, "Why hasn't

295

1      Q      You didn't make any representations to
2  him regarding what he'd be paid at U. Lim at any
3  time?
4          MR. BATTENFELD:  Are you including any salary
5  increases he may have been informed of, anything like
6  that?
7          MR. GREY:  Anything to do with pay.
8          MR. BATTENFELD:  Did you have any discussions
9  about pay, where you may have told him what his
10 salary was or would be?
11         THE WITNESS:  I believe I stated to him the
12 initial -- the wage when he entered the company.
13 BY MR. GREY:
14     Q      What do you mean by "ways"?
15     A      Salary.
16         MR. BATTENFELD:  "Wage."
17         THE WITNESS:  Wage, salary.
18 BY MR. GREY:
19     Q      So you did tell him what his salary was
20 going to be when you initially hired him, correct?
21     A      Yes, at the beginning.
22     Q      And do you recall what that salary was?
23     A      No, I don't recall.
24     Q      Do you recall whether you indicated to
25 him when, if ever, he should expect raises of that

297

KANG V.
U. LIM AMERICA

TAE JIN YOON, VOL3
02/03/00

---

**302**

1    A    I felt that the company has many
2 check-writing signers.  I don't think it is good.
3 Therefore, I asked to take me out.
4    Q    Do you have check-writing authority for
5 U. Lim Mexico?
6    A    No.
7    Q    When did you stop having check-writing
8 authority for U. Lim Mexico?
9    A    I do not remember.
10   Q    Was it the same time that you stopped
11 having check-writing authority for U. Lim America?
12   A    I think so.
13   Q    And you are still president of U. Lim
14 Mexico, correct?
15   A    Yes, it is.
16   Q    Who has the check-writing authority now
17 for U. Lim Mexico?
18   A    Cho and the president, Ki Hwa Yoon.
19   Q    And who has check-writing authority now
20 for U. Lim America?
21   A    The president alone.
22   Q    And by that you mean Ki Hwa Yoon?
23   A    Yes, it is.
24   Q    Anyone else?
25   A    I don't think there is any.

---

**303**

1    Q    Ki Hwa Yoon, is he primarily engaged in
2 managing U. Lim Korea versus U. Lim America?
3    A    I don't understand your question.
4    Q    Does Ki Hwa Yoon spend more time
5 managing U. Lim Korea than he does managing U. Lim
6 America?
7    A    No, that's not the situation.  It can
8 be different according to situation.
9    Q    Isn't it true that he spends
10 approximately eight months out of twelve in Korea, on
11 average?
12   A    I don't know.
13   Q    In the course of the past year, what's
14 your best estimate?
15   A    I remember more like 50/50.
16        I like to have break.
17        (Recess.)
18 BY MR. GREY:
19   Q    Mr. Yoon, you indicated you presently
20 have no check-writing authority for either U. Lim
21 Mexico or U. Lim America, correct?
22   A    Yes, it is.
23   Q    Do you have settlement authority in
24 this case?
25        THE INTERPRETER:  I will explain that

---

**304**

1 "settlement" in Korean.
2        MR. BATTENFELD:  Let me take a break, and I'm
3 going to talk -- since this is a legal issue, I want
4 to talk with Mr. Yoon so I can explain to him the
5 meaning of the legal term.
6        (Recess.)
7 BY MR. GREY:
8    Q    You've had an opportunity to speak with
9 your attorney now, so I'm going to ask you the
10 question:  Do you have settlement authority in this
11 case?
12       THE INTERPRETER:  Since then, I will use those
13 two words, "settlement authority," in English.
14       THE WITNESS:  Yes.
15 BY MR. GREY:
16   Q    Is that settlement authority within
17 preauthorized limits or can it be anything?
18       MR. BATTENFELD:  Objection.  And I'll instruct
19 the witness not to answer that question as invading
20 any strategic privilege to decisions we may have
21 about the parameters of settlement.
22       MR. GREY:  Let me just see if I can clarify.
23   Q    Before you made a settlement decision,
24 if any, would you need to seek approval of Ki Hwa
25 Yoon?

---

**305**

1        MR. BATTENFELD:  I'll object to the question
2 as being ambiguous as to whether you mean as a legal
3 matter or whether you mean as either a familial
4 matter or a business matter.
5        MR. GREY:  As a business matter.
6        THE WITNESS:  I have to confer.
7 BY MR. GREY:
8    Q    With Mr. Yoon, correct?
9    A    Yes.
10   Q    Have you ever sworn or cursed at the
11 U. Lim America employees?
12   A    No, I do not.
13   Q    Have you ever heard the phrase "ssip
14 ssae" or "ssip ssae kki"?
15       THE INTERPRETER:  I know what you are saying.
16 I don't like to even repeat that word.
17       THE WITNESS:  No, I did not.
18 BY MR. GREY:
19   Q    I asked you if you have heard it.
20   A    In Korean, yes, I have heard.
21   Q    Now, I'm going to ask you, did you ever
22 say that to any U. Lim America employee?
23   A    No, I did not.
24   Q    Did you ever use the phrase
25 "underemployee"?  I'm referring to any U. Lim America

---

1  BY MR. GREY:
2      Q      And when you refer to "development,"
3  what are you referring to?
4      A      New item development.
5      Q      Okay.  And in the period of 1994
6  through 1998, how many new units or items did you
7  develop?
8      A      I don't remember.
9      Q      For instance, 1997, how many different
10 types of components or items did U. Lim America
11 produce or sell?
12     A      I do not recall.
13     Q      I'm just asking for the number of
14 products, for instance, in 1997 U. Lim America
15 produced and your best estimate of the number of
16 products.
17     MR. BATTENFELD:  Types of products?
18     MR. GREY:  Types of products.
19     THE WITNESS:  In detail, you could say about
20 40 kinds.
21 BY MR. GREY:
22     Q      Okay.  And do you have any estimate as
23 to how many new product lines you added in 1997?
24     A      I don't remember.
25     Q      Just what's your best estimate?

310

1  basis, correct?
2      A      No, it's not necessarily that you say,
3  every day.  Usually about the -- about couple times,
4  you get the materials from -- shipped from Korea in a
5  container when it comes down to purchasing.
6  Therefore, I think that the department heads, they
7  take care of that.
8      Q      Of the three topics, you mentioned --
9  quality issues, product development issues and
10 purchasing issues -- which of those were dealt with
11 more frequently than the others with U. Lim Korea?
12     MR. BATTENFELD:  And I'll object that the
13 question calls for speculation and lacks foundation
14 as to whether this witness would know -- have
15 personal knowledge of all the communications going on
16 with U. Lim Korea on those topics.
17     THE WITNESS:  That, I wouldn't know.
18 BY MR. GREY:
19     Q      Weren't you made aware by Mr. Park of
20 any product rejects or quality control problems with
21 the U. Lim Korea components?
22     A      Yes, we talk when it's major issue.
23     Q      Major issue?
24     A      Yes.
25     Q      But Mr. Park would report quality

312

1      A      I do not remember.
2      Q      Well, on average, did you add one or
3  two new product lines a year?  Five or six?  Whatever
4  your best estimate is.
5      A      That, I don't remember.
6      Q      The development issues, those were
7  related to adding new product lines, correct?
8      A      I don't understand your question.
9      Q      Well, you indicated that your dealings
10 with U. Lim Korea included development issues,
11 correct?
12     A      Yes, it is.
13     Q      And I assume that those development
14 issues related to the adding of new product lines,
15 correct?
16     A      Yes, it is.
17     Q      So that's why I've asked you what your
18 best estimate is as to the number of product lines
19 you would add in a given year.
20     A      That, I don't remember.
21     Q      Well, would you discuss product
22 developments with U. Lim Korea on a daily basis?
23     A      Not every day.
24     Q      But generally speaking, you would be
25 purchasing products from U. Lim Korea on a daily

311

1  issues to you on a daily basis, correct?
2      A      Yes, it is.
3      Q      And if there was a problem with the
4  quality of any of the U. Lim Korea components,
5  whether that was a small problem or a big problem,
6  you'd want to know about it, correct?
7      A      I only pay attention to the major
8  problem, because when it's a minor problem, the
9  department heads can take care of it always.
10     Q      Who, at U. Lim America, was in charge
11 of product development?
12     A      I and Cho.
13     Q      So then you would have a good
14 understanding of how frequently you would contact
15 U. Lim Korea to discuss product development issues,
16 correct?
17     A      Yes, I do, but however, I do not
18 remember how I did -- I cannot recall.
19     Q      And at the daily meetings, Mr. Kang
20 would report to you purchasing status, correct?
21     A      Yes, it is.
22     Q      So you were either directly or
23 indirectly made aware of the purchasing, quality
24 control and product development issues discussed with
25 U. Lim Korea, correct?

313

1      A    Yes, it is.
2      Q    Mr. Cho was both your sales manager
3 and, at a later point, your general manager, correct?
4      A    Yes, it is.
5      Q    Why didn't you hire a delivery person
6 to handle this portion of Mr. Cho's responsibilities?
7      MR. BATTENFELD:  And I'll object that the
8 question is argumentative and assumes facts that
9 haven't been testified to, particularly given
10 Mr. Cho's testimony that there was a delivery person.
11     THE WITNESS:  You're saying they did not hire
12 the person for that?
13 BY MR. GREY:
14     Q    Why didn't you hire a delivery person
15 so that Mr. Cho did not have to actually deliver the
16 goods?
17     MR. BATTENFELD:  And again, my objection,
18 which I'd like you to translate, is that the question
19 assumes a fact that has not been testified to.  In
20 other words, this witness has never testified that
21 they didn't hire somebody to make deliveries.
22     MR. GREY:  Let me clarify.
23     Q    Did you have a delivery person at
24 U. Lim America during the period of Mr. Kang's
25 employment?

318

1 employment, correct?
2      MR. BATTENFELD:  And again, I'll object that
3 the question is overbroad and ambiguous as to time
4 frame and with respect to the words "substantial
5 amount."
6      THE WITNESS:  The departments did a lot.
7 BY MR. GREY:
8      Q    But I'm asking you specifically about
9 Mr. Cho.
10     A    I do not remember, because it is
11 something Mr. Cho was in charge.
12     Q    Do you have any estimate, during the
13 course of Mr. Kang's employment, on average, how many
14 deliveries Mr. Cho would make in a given week?
15     A    I do not recall.
16     Q    Are you aware that a significant amount
17 of his daily schedule or his work was spent
18 delivering goods for U. Lim America during the course
19 of Mr. Kang's employment?
20     MR. BATTENFELD:  And again, I'll object that
21 the question is vague and ambiguous as to time frame
22 and as respect to the phrase "significant amount."
23     THE WITNESS:  I don't remember.
24 BY MR. GREY:
25     Q    Well, Mr. Cho was your sales manager.

320

1      A    American side?  No, I didn't have an
2 American side.
3      Q    On the Mexico side?
4      A    I think the Mexican side there are,
5 since the department head, they hired the employees
6 according to their needs.
7      Q    But it was the case that Mr. Cho still
8 carried out a substantial portion of the deliveries
9 personally, correct?
10     MR. BATTENFELD:  And I'll object that the
11 question is overbroad and ambiguous as to time frame,
12 assumes a fact that the witness hasn't testified to
13 and is ambiguous with respect to the word
14 "substantial."
15     THE WITNESS:  I do not know.
16 BY MR. GREY:
17     Q    Well, you know that Mr. Cho personally
18 delivered goods for U. Lim America during Mr. Kang's
19 employment, correct?
20     A    Yes, I do.
21     Q    And he had a truck specifically for
22 that purpose, correct?
23     A    Yes.
24     Q    And he did do a substantial amount of
25 the deliveries for U. Lim America during Mr. Kang's

319

1      A    Yes.
2      Q    What did Mr. Cho do on the average day
3 he spent at work during Mr. Kang's employment?
4      MR. BATTENFELD:  Richard, I'm going to cut you
5 off unless you can explain to me how this line of
6 inquiry has anything to do with Mr. Kang's case.
7      MR. GREY:  I'm establishing what the various
8 duties of the department heads were, and the bottom
9 line is that they were extremely overworked,
10 including Mr. Cho.  It's a very simple answer:  What
11 does Mr. Cho do?
12     MR. BATTENFELD:  It's not a simple answer.  We
13 could spend all day --
14     MR. GREY:  We're spending a lot of time all
15 day, because the bottom line is, you're in essence
16 instructing your client constantly to answer in the
17 "I don't know" phrase, which he does every single
18 time you interject.
19          I just want to know, because Mr. Cho
20 has testified --
21     MR. BATTENFELD:  I want you to point out on
22 the record where I've instructed this witness to
23 answer "I don't know."  You point it out to me.
24     MR. GREY:  No, I'm not.
25     MR. BATTENFELD:  Then withdraw that last

321

1      THE WITNESS:  No, always same.
2  BY MR. GREY:
3      Q      Is Ki Hwa Yoon, then, presently
4  involved with the day-to-day activities of U. Lim
5  America?
6      A      Who?
7      Q      Ki Hwa Yoon.
8      A      I don't know.
9      Q      Five minutes?  I'd like to take a
10  break.
11      MR. GREY:  Sure.
12      (Recess.)
13  BY MR. GREY:
14      Q      Mr. Yoon, at the end of Mr. Kang's
15  employment, have your responsibilities at U. Lim
16  America changed in any significant way?
17      A      Yes.
18      Q      And how have they changed?
19      A      I became more involved or in charge of
20  abroad business entities.
21      Q      Does U. Lim America have any abroad
22  business entities?
23      A      Yes.
24      MR. BATTENFELD:  You're asking about U. Lim
25  America as opposed to U. Lim Korea?

326

1      MR. GREY:  U. Lim America.
2      THE WITNESS:  No, not U. Lim America.
3  BY MR. GREY:
4      Q      So you've become actually more involved
5  in the business of U. Lim Korea, correct?
6      A      No, it's not.
7      Q      What business entities, then, are you
8  referring to?
9      A      To review the new business in a new
10  place, new countries, and there are also market
11  research.
12      Q      So your activities have been more
13  involved in developing new business occasions or
14  facilities; is that correct?
15      A      Including the products.
16      Q      And would those new business facilities
17  and/or products be owned and/or operated by U. Lim
18  Korea?
19      A      No, it's not.
20      Q      Who would they be owned and/or operated
21  by?
22      A      That, we are reviewing.  We are
23  reviewing about that.
24      Q      Regardless of who -- or if you set up a
25  new corporation for these facilities, are you looking

327

1  at these new facility locations and product
2  development on behalf of U. Lim Korea or on behalf of
3  U. Lim America?
4      A      U. Lim, for U. Lim.
5      Q      Which U. Lim?
6      A      Regardless whether U. Lim America,
7  U. Lim China, U. Lim Korea, it's for U. Lim.
8      Q      So basically the U. Lim family of
9  corporations, correct?
10      A      Yes, it is.
11      Q      But you're still paid by U. Lim
12  America, correct?
13      A      Yes, it is.
14      Q      Was there ever a time when Ki Hwa Yoon
15  expressed his displeasure with you about how you were
16  running U. Lim America?
17      A      No.
18      Q      The Otay Mesa office of U. Lim America,
19  that was recently established, correct?
20      A      Yes.
21      Q      And U. Lim Mexico -- U. Lim America
22  also moved its main production facilities to a new
23  location in Tijuana, correct?
24      A      Yes, it is.
25      Q      Do you have an office at the U. Lim

328

1  Mexico facility in Mexico?
2      A      Yes.
3      Q      Do you also have an office at the
4  Otay Mesa facility?
5      A      Yes.
6      Q      And does anyone else have an office at
7  the Otay Mesa facility?
8      A      Ki Hwa Yoon has his office there, and
9  just that, I and him both.
10      Q      And approximately how far from U. Lim
11  Mexico's facility is the Otay Mesa office?
12      A      You're saying between the U. Lim Mexico
13  and Otay Mesa?
14      Q      Yes.
15      A      About 20 minutes.
16      Q      With these offices being as close as
17  they are, why was a separate office established at
18  Otay Mesa?
19      MR. BATTENFELD:  And I'll object that the
20  question has no relevance to Mr. Kang's case, given
21  that his employment ended over two years ago.  And I
22  would like an offer of proof as to any relevance of
23  that inquiry as to the establishment of this new
24  office.
25      MR. GREY:  Change of Mr. Yoon's position with

329

1    day-to-day operations of U. Lim America, correct?
2         A      I don't understand your question.
3         Q      Well, you're no longer in charge of the
4    day-to-day operations -- the supervision of the
5    day-to-day operations of U. Lim America, correct?
6         A      Yes, I do.
7         Q      Do you still have daily meetings with
8    Mr. Cho and Mr. Park?
9         A      No.
10        Q      When did you stop having those daily
11   meetings?
12        A      I don't remember.
13        Q      Your best estimate.
14        A      I don't remember.
15        Q      During the course of Mr. Kang's
16   employment, what vacations were provided to Mr. Kang
17   on a yearly basis?
18        A      Summer leave and also Christmas.
19        Q      How much time was provided in summer?
20        A      I don't remember.
21        Q      Do you have an estimate?
22        A      I do not remember.
23        Q      How much time was provided at
24   Christmas?
25        A      I think more than 10 days.

                            334

1         Q      And was the summer leave a paid leave?
2         A      I believe that it was paid.
3         Q      The Christmas leave, was that paid?
4         A      It's the same.
5         Q      There's no staff at the Otay Mesa
6    facility, correct?
7         A      That's correct.
8         MR. GREY:  Well, I hate to bring our special
9    time to an end, but I think that's it.
10        (Discussion off the record.)
11        MR. GREY:  The stipulation was that the
12   original be forwarded to defense counsel's office,
13   the deponent would have 30 days to read and sign the
14   transcript, and then defense counsel will notify us
15   within five business days of any changes to the
16   transcript.  If for any reason the transcript is --
17   the original is lost, misplaced or stolen or
18   otherwise unavailable, then a certified copy can be
19   used in its stead, and we relieve the court reporter
20   of her duties under the code.
21             Pretty much covers it?
22        MR. BATTENFELD:  I think so.  If it doesn't,
23   we've covered it in prior depositions.
24   /
25   /

                            335

1
2
3
4
5
6
7
8
9             I, TAE JIN YOON, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript of my deposition; that I have made such
12   corrections as noted herein, in ink, initialed by me,
13   or attached hereto; that my testimony as contained
14   herein, as corrected, is true and correct.
15        EXECUTED this _____ day of _____,
16   20___, at _____, _____.
                      (City)              (State)
17
18
19
20             TAE JIN YOON
               Volume 3
21
22
23
24
25

                            336

1    STATE OF CALIFORNIA          )
                                  :  ss
2    COUNTY OF SAN DIEGO          )
3
4              I, the undersigned, a Certified
5    Shorthand Reporter of the State of California, do
6    hereby certify:
7              That the foregoing proceedings were
8    taken before me at the time and place herein set
9    forth; that any witnesses in the foregoing
10   proceedings, prior to testifying, were placed under
11   oath; that a verbatim record of the proceedings was
12   made by me using machine shorthand which was
13   thereafter transcribed under my direction; further,
14   that the foregoing is an accurate transcription
15   thereof.
16             I further certify that I am neither
17   financially interested in the action nor a relative
18   or employee of any attorney of any of the parties.
19             IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21
22   Dated: _____
23
24        _____
25        GAIL L. INGHRAM
          CSR No. 8635

                            337

Legal Tabs Co. 1-800-322-3022

Recycled   Stock # DO-10-B

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,              )
                                  )
 5              Plaintiff,        )
                                  )
 6        vs.                     )    No. 99 CV659 JM
                                  )       (RBB)
 7   U. LIM AMERICA, INC.; TAE    )
     JIN YOON, an individual; and )
 8   DOES 1 to 100,               )
                                  )
 9              Defendants.       )
     _____)
10
11
12
13
14              DEPOSITION OF JAE HO CHO
15                San Diego, California
16             Thursday, January 6, 2000
17                      Volume I
18
19
20
21
22
     Reported by:
23   JESSICA E. MASSE
     CSR No. 9910
24   JOB No. 11907B
25
```

1

---

**Page 3**

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3        LAW OFFICE OF RICHARD E. GREY
          BY:  RICHARD E. GREY
 4        Attorney at Law
          409 Camino Del Rio South, Suite 303
 5        San Diego, California 92108
          (619) 543-9300
 6
     For the Defendants:
 7
 8        MORGAN, LEWIS & BOCKIUS
          BY:  JOHN S. BATTENFELD
 9        Attorney at Law
          300 South Grand Avenue, 22nd Floor
10        Los Angeles, California 90071
          (213) 612-2500
11   Also Present:
12        SOO CHEOL KANG
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

---

**Page 2**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,              )
                                  )
 5              Plaintiff,        )
                                  )
 6        vs.                     )    No. 99 CV659 JM
                                  )       (RBB)
 7   U. LIM AMERICA, INC.; TAE    )
     JIN YOON, an individual; and )
 8   DOES 1 to 100,               )
                                  )
 9              Defendants.       )
     _____)
10
11
12
13
14
15        Deposition of JAE HO CHO, Volume
16   I, taken on behalf of Plaintiff, at 501
17   West Broadway, Suite 1300, San Diego,
18   California, beginning at 12:31 p.m. and
19   ending at 5:22 p.m. on Thursday,
20   January 6, 2000, before JESSICA E.
21   MASSE, Certified Shorthand Reporter No.
22   9910.
23
24
25
```

2

---

**Page 4**

```
 1                    INDEX
 2   WITNESS:                        EXAMINATION
 3   JAE HO CHO
     Volume I
 4
 5        BY MR. GREY                    5
 6
 7
 8
 9
                      EXHIBITS
10
     PLAINTIFF'S                         PAGE
11
     1         Supplemental responses     46
12
     2         Decision of the administrative
13             law judge                  46
14   3         Declaration of Raul Carillo  120
15
16
17
18         INSTRUCTION NOT TO ANSWER
19             Page  Line
20              64     2
21              66     6
22              66    12
23              66    19
24              67     2
25
```

4

---

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

1  estimate as far as dates, numbers, things of that
2  nature, and I'm entitled to your best estimate.  Do
3  you understand that?
4      A    Yes, I do.
5      Q    You can give an estimate in terms of how
6  you feel comfortable.
7      A    Okay.
8      Q    Do you have any questions before we
9  continue?
10     A    No, I don't.
11     Q    And where did you first meet Tae Jin
12  Yoon?
13     A    I believe it was his house -- apartment.
14     Q    In what city?
15     A    Englewood.  Englewood, Colorado.
16     MR. BATTENFELD:  With an "E."
17     THE WITNESS:  Yeah.
18  BY MR. GREY:
19     Q    And so you knew him approximately six
20  years before you began working at U. Lim?
21     A    No, I did not.  I knew him for about two
22  months.
23     Q    Okay.  Let me just -- I thought you said
24  you met Tae Jin Yoon through a friend in 1987.
25     A    Correct.

9

1      A    Yes, I was.
2      Q    And why was he offering you this job
3  having known you for such a short time?
4      MR. BATTENFELD:  Objection, calls for
5  speculation.
6      MR. GREY:  If you know.
7      THE WITNESS:  Just needed a friend -- needed a
8  person to work with him that could speak English.
9  BY MR. GREY:
10     Q    When you met him back in 1987 through a
11  friend, during those few months that you were still in
12  Colorado, did you develop a relationship with him, a
13  friendship?
14     A    I guess you could say that.
15     Q    And when he offered you employment with
16  U. Lim, what was your understanding of his position at
17  that time?
18     A    He was going to be the president of the
19  Tijuana factory.
20     Q    And when you say "Tijuana factory," are
21  you referring now to both entities U. Lim Mexico and
22  U. Lim America?
23     A    No.  I'm saying just the Mexican company.
24     Q    But he was going to be employing you with
25  U. Lim America?

11

1      Q    And you began working for U. Lim in March
2  of '93?
3      A    Correct.
4      Q    Wouldn't that be approximately six years?
5      A    That is six years, but I knew him for
6  about two months.  Then he went back to Korea
7  around -- shortly after I'd known him.
8      Q    So shortly after you met him in '87, he
9  went back to Korea?
10     A    Correct.
11     Q    When was the next time you met him?
12     A    In San Diego.  Well, I didn't meet him.
13  I got a phone call from him.
14     Q    And when was that?
15     A    Approximately 1992 around December.
16     Q    And was that the first time you heard
17  from Tae Jin since he left for Korea?
18     A    Correct.
19     Q    And what was the purpose of his
20  contacting you in 1992?
21     A    He wanted a person -- he wanted to work
22  with me down in San Diego, so he was offering me a
23  job.
24     Q    And at the time he offered you that job,
25  were you still in Colorado?

10

1      A    Correct.
2      Q    What was his role with U. Lim America?
3      A    I believe it was as a vice-president.
4      Q    At the time he contacted you for
5  employment, was the production facility in Mexico
6  operating?
7      A    Yes, it was.
8      Q    Do you know how long it had been
9  operating?
10     A    I believe it was from October '92.
11     Q    Okay.  And from October of '92 to when
12  you were hired, who were the managers at U. Lim
13  America, if any?
14     A    I believe it was Mr. -- Mr. Kim.  I
15  forgot his first name.  I believe it was Mr. Kim.
16     Q    Were there any other managers?
17     A    There were, but I can't recall.
18     Q    And when had Tae Jin became president or VP
19  of U. Lim America?
20     A    I believe it was in January of '93.
21     Q    So basically in anticipation of him
22  coming on board, he contacted you for offer of
23  employment?
24     A    Correct.
25     Q    Do you know who the president was before

12

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

1   questions relative to those interrogatories and to
2   provide substantive answers.  I'm just wondering did
3   he provide those substantive answers.
4       MR. BATTENFELD:  Again whatever process we came
5   up with to prepare the responses, whatever input I
6   received from Mr. Cho would all be subject to
7   attorney/client privilege.
8       MR. GREY:  Well, I think your discussions with
9   Mr. Cho are privileged.
10      MR. BATTENFELD:  Correct.
11      MR. GREY:  But not to the extent that he as a
12  representative is providing those -- the substance of
13  the response, and it's going to be verified.
14      MR. BATTENFELD:  Whether it's verified is a
15  different issue.  But in terms of process by which the
16  responses were prepared, it's privileged.
17      MR. GREY:  It's not the process I'm talking
18  about.  Let me just show you U. Lim America's
19  substantive responses received by me yesterday.
20      Q    Did you assist in the preparation of
21  those responses?
22      MR. BATTENFELD:  Again I'll object as
23  ambiguous.
24          For the record, I will represent that my
25  office prepared those responses with assistance from

17

1   my client including Mr. Cho.  Beyond that, I'm not
2   going to allow any inquiry.
3       THE WITNESS:  Yes, I did.
4       MR. GREY:  And you haven't gotten verification
5   for these yet?
6       MR. BATTENFELD:  Right.
7       MR. GREY:  Mr. Cho is the one verifying?
8       MR. BATTENFELD:  I presume he will be.
9   BY MR. GREY:
10      Q    At the time you toured the plant in
11  February of '93, did you accept the position at that
12  time?
13      A    I still hesitated at that time.
14      Q    Any particular reason?
15      A    Well, I mean it was in Mexico, and there
16  were hardly any employees at the time, and the
17  facility was very small, and thinking about moving all
18  my family down to San Diego was a very difficult
19  decision, so I had to think about it.
20      Q    And approximately how many employees were
21  employed at the time?
22      A    Around 13 people.
23      Q    You are including the production?
24      A    Just the production I'm talking about.
25      Q    Just the production on top of it?

18

1       A    Just the production employees was 13
2   people.  The management was 2 at that time.  So a
3   total of 15.
4       Q    And are you including Tae Jin Yoon in the
5   two management?
6       A    Correct.
7       Q    And then Mr. Kim?
8       A    No.  Mr. Kim wasn't there.  Tae Jin Yoon
9   took over Mr. Kim's position in January, and Mr. Ko
10  was there at that time.
11      Q    At what point did you decide to take the
12  job?
13      A    After I went back, thought about it.  It
14  was a good opportunity for me to -- maybe -- you know,
15  for myself, so I took the job after about a couple of
16  days discussing it with my wife.
17      Q    Did you voice any concerns to Tae Jin
18  Yoon about taking the position?
19      A    Excuse me?
20      Q    Did you voice any concerns to Tae Jin
21  Yoon about taking the position?
22      A    No, I didn't.
23      Q    So I assume you accepted -- well, when
24  did you accept the position?
25      A    Like about three to four days after I

19

1   visited the facility.
2       Q    And when you started the position, it was
3   just Tae Jin Yoon, Mr. Ko, and yourself that was
4   working for U. Lim America?
5       A    Yes.
6       Q    And as you indicated, Tae Jin Yoon was
7   the vice-president at that time; correct?
8       A    Correct.
9       Q    Who was the president at that time?
10      A    I believe Mr. Ki Hwa Yoon was the chief
11  executive officer and the president.
12      Q    And has that remained the case to this
13  day for Ki Hwa Yoon?
14      A    Yes.  That's correct.
15      Q    And when is the next point in time any
16  managers were hired?
17      A    Are you including assistant managers,
18  too?
19      Q    Yes.
20      A    The year of '94.
21      Q    And who is the first manager or assistant
22  manager hired?
23      A    I believe it was Mr. Park.
24      Q    And I assume it was Mr. Kang who was
25  hired next?

20

| | |
|---|---|
| 1 stay in the States. | 1 America? |
| 2    Q   Do you remember any occasion where Tae | 2    A   Correct. |
| 3 Jin Yoon indicated that he might send Mr. Park back to | 3    Q   U. Lim America sells the items? |
| 4 Korea? | 4    A   Correct. |
| 5    A   I can't recall. | 5    Q   When you are talking about sales figures, |
| 6    Q   Do you remember any occasion where | 6 you are talking really what U. Lim America sold? |
| 7 Mr. Park told you that Tae Jin Yoon had threatened to | 7    A   That's correct. |
| 8 send him back to Korea or that he was concerned that | 8    Q   And at the end of 1994, what were your |
| 9 he was going to be sent back to Korea? | 9 sales revenues? |
| 10    A   No. I can't -- I don't remember anything | 10    A   Estimate 2.5 million. |
| 11 like that. | 11    Q   And in '95? |
| 12    Q   What specific event, if anything, caused | 12    A   It's an estimate. 4.2 million. |
| 13 you to start the paperwork on Mr. Park in July of '99? | 13    Q   '96? |
| 14 And I'm referring right now to the green card. | 14    A   It's an estimate. 6 million. |
| 15    A   He had requested and told Mr. Yoon about | 15    Q   And in '97? |
| 16 it, and Mr. Yoon, the chairman, had decided to process | 16    A   8 million. |
| 17 his green card. | 17    Q   And throughout those years, you |
| 18    MR. BATTENFELD: Just for clarification, which | 18 maintained your responsibilities as sales and |
| 19 Mr. Yoon are you referring to? | 19 marketing manager; correct? |
| 20    THE WITNESS: Ki Hwa. | 20    A   Correct. |
| 21    MR. GREY: Ki Hwa? | 21    Q   So you would be the person most |
| 22    MR. BATTENFELD: I think you said the chairman. | 22 knowledgeable regarding the sales revenues of U. Lim? |
| 23    THE WITNESS: Did I say the chairman? Sorry. | 23    A   Correct. |
| 24 BY MR. GREY: | 24    Q   Who was handling quality control before |
| 25    Q   You indicated you started working for U. | 25 Mr. Park was hired? |
| 25 | 27 |

| | |
|---|---|
| 1 Lim in March of '93. What were the sales revenues for | 1    A   I believe Mr. Ko was handling that |
| 2 U. Lim at the conclusion of '93? | 2 together with production. |
| 3    A   500,000. | 3    Q   And who was handling purchasing and the |
| 4    MR. BATTENFELD: Is that a guess or an | 4 warehouse? |
| 5 estimate? | 5    A   At that time it was very small sales, so |
| 6    THE WITNESS: It's almost a guess. | 6 Mr. Ko was handling that, too. |
| 7    MR. GREY: Just give us your best estimate. | 7    Q   So other than sales and marketing, Mr. Ko |
| 8    THE WITNESS: 500,000. | 8 is basically managing all the other daily activities |
| 9 BY MR. GREY: | 9 of the business? |
| 10    Q   And when you tally up something like | 10    A   But I give a hand in the |
| 11 that, the sales revenues, are we talking about U. Lim | 11 responsibilities. I help out in production. I help |
| 12 America, or are we talking about U. Lim Mexico, or are | 12 out in QC. |
| 13 we talking about the two of them together? | 13    Q   Now, when Mr. Park and Mr. Kang came on |
| 14    A   The two of them together. | 14 board -- strike that. |
| 15    Q   And just briefly, the items are actually | 15    Did you have daily meetings with Tae Jin |
| 16 produced by U. Lim Mexico; correct? | 16 Yoon and Mr. Ko prior to Mr. Park being hired? |
| 17    A   Correct. | 17    A   No, no. Not daily meetings. Maybe two |
| 18    Q   And are they then sold to U. Lim America? | 18 to three times a week. |
| 19    A   No, it's not. | 19    Q   Did those daily morning meetings start |
| 20    Q   Okay. | 20 basically when Mr. Park and Mr. Kang were hired? |
| 21    A   We have a corporation down in San Diego, | 21    A   Well, since the revenues have been going |
| 22 U. Lim America, and we subcontract our items in | 22 up, yeah. It was -- yes. We did. |
| 23 Tijuana. So they are subcontractors. U. Lim Mexico | 23    Q   And those daily meetings were normally |
| 24 is our subcontractor. | 24 done in the morning; correct? |
| 25    Q   Okay. So they produce items for U. Lim | 25    A   Sometimes morning. Sometimes afternoon. |
| 26 | 28 |

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

---

1    of '98 he no longer became the QC department.
2         Q    Do you know if he was demoted at that
3    time?
4         A    No.
5         Q    There was no reduction in salary as a
6    result?
7         A    No.
8         Q    You are unsure whether or not you were
9    general manager prior to Mr. Kang leaving U. Lim; is
10   that correct?
11        A    Prior to Mr. Kang leaving U. Lim was I
12   general manager?  I was not.
13        MR. BATTENFELD:  Are you still thinking?
14        THE WITNESS:  At the time that Mr. Kang left, I
15   was assistant general manager.  So that's what I was.
16   BY MR. GREY:
17        Q    You were assistant general manager?
18        A    Yes.
19        Q    Is that sales and marketing manager, and
20   then there is assistant general manager and then
21   general manager?
22        A    Yes.
23        Q    When did you become assistant general
24   manager?
25        A    I believe it was in early '97.

                        33

---

1         Q    Titles aren't always accurate, but I
2    would assume by assistant general manager you were to
3    help out taking over the duties of Tae Jin Yoon when
4    he was no longer in the office, that sort of thing?
5         A    I would say that.
6         Q    How would you describe your relationship
7    with Mr. Park?
8         A    An associate.
9         Q    By that you mean work associate?
10        A    Correct.
11        Q    Do you consider yourself friends?
12        A    Friends, no.
13        Q    Whereas you would say that you do have a
14   friendship with Tae Jin Yoon; correct?
15        A    I guess you could say that.
16        Q    And how would you describe your
17   relationship with Mr. Kang at the time of his
18   employment?
19        A    Associate.
20        Q    Do you recall having any particular
21   difficulties working with Mr. Park?
22        A    Oh, we had our differences of course.
23        Q    How about Mr. Kang?
24        A    Yes.  Same with Mr. Kang.
25        Q    Do you consider the relationship with

                        34

---

1    Mr. Kang to be more negative than your relationship
2    with Mr. Park while you were working?
3         A    No.  I would say about the same.
4         Q    When you were first hired by U. Lim
5    America, were you the only person employed at U. Lim
6    America who spoke English?
7         MR. BATTENFELD:  Do you mean spoke at all?
8         MR. GREY:  Fluently.
9         THE WITNESS:  Yes.
10   BY MR. GREY:
11        Q    And you were the only American citizen at
12   U. Lim at that time; correct?
13        A    Correct.
14        Q    Did U. Lim America utilize your credit to
15   purchase any goods, items, cars, or anything else for
16   U. Lim America?
17        A    Yes, it did.
18        Q    Was that at the request of Tae Jin Yoon?
19        A    It was a request and as a friend, and I
20   accepted it.
21        Q    And what did you purchase for U. Lim on
22   your credit?
23        A    An automobile.
24        Q    And how many automobiles?
25        A    I would say two.

                        35

---

1         Q    And were both those automobiles
2    ultimately driven by Tae Jin Yoon?
3         A    One would be his personal -- well, like a
4    work -- going back and forth to work.
5         MR. BATTENFELD:  You mean a company car?
6         THE WITNESS:  Company car.  It was all company
7    cars.  I'm sorry.  They were all company cars.
8    BY MR. GREY:
9         Q    But were both these company cars
10   basically used by Tae Jin Yoon for his commuting back
11   and forth?
12        A    No.  Yeah.  One was for him, and one was
13   for the company itself.
14        Q    I assume U. Lim America paid for the
15   vehicle?
16        A    Yes.  We leased, and we financed of
17   course.
18        Q    And are you still -- are the vehicles
19   still under your name?
20        A    Yes, it is.
21        Q    Was there anything else you purchased for
22   U. Lim utilizing your credit?
23        A    No.  Other than that, no.
24        MR. BATTENFELD:  I assume excluding ordinary
25   business expenses.

                        36

---

1   running, and he was required.  I mean he was in charge
2   of the warehouse and inventories and purchases.  So
3   even on overtime.
4        Q    It's not your understanding, however,
5   that he was refusing to work any Saturday or overtime,
6   but just when he deemed he wasn't needed?
7        A    No.  Well, he specifically said that he's
8   not going to work on Saturdays.
9        Q    You don't recall him qualifying that in
10  any way?
11       A    No, I don't.  I can't remember.
12  Everything is very faint to me right now.  Like I
13  said, he had some kind of agreement with his family
14  saying that he didn't want to work Saturdays.  I don't
15  know what kind of agreement that he had with his
16  family.  That's the thing that I remember he said.
17       Q    Who received first his notice of
18  application for unemployment, you or Tae Jin Yoon?
19       A    I believe I did.
20       Q    Did you then inform Tae Jin Yoon about
21  the application?
22       A    Yes, I did.
23       Q    Had you received any instruction from Tae
24  Jin Yoon prior to receiving the application regarding
25  unemployment?

                        41

1   witness or something, so I brought him along.
2        Q    But you never brought him into the
3   hearing?
4        A    No, I did not.
5        Q    Why did you choose not to bring him into
6   the hearing?
7        A    I think I went in and asked if a witness
8   is required or something.  I can't remember why I did
9   not bring him inside to the unemployment.  I can't
10  remember.
11       Q    Did you inform Tae Jin Yoon that you were
12  going to the unemployment hearing?
13       A    Yes, I did.
14       Q    Did you inform Tae Jin Yoon after the
15  unemployment hearing as to the results of it?
16       A    There wasn't any results.  I mean nothing
17  was finalized at that time, so I just -- I explained
18  what happened.  Yes, I did.
19       Q    Was he at the office at that time?
20       A    I believe he was or on a business trip.
21  I can't remember.
22       Q    Do you know why Tae Jin Yoon didn't
23  appear for this hearing?
24       A    Well, I mean I guess as a general manager
25  I took the responsibility.

                        43

1        A    No.  We didn't even know if he was going
2   to file unemployment.  We didn't know.
3        Q    So at that time you made him aware that
4   Mr. Kang had filed for unemployment?
5        A    Correct.
6        Q    And was this a face-to-face meeting, or
7   was it telephonic?
8        A    I believe it was telephonic.
9        Q    And what did Mr. Yoon say to you when you
10  informed him of this fact?
11       A    Well, I informed him -- I think I told
12  him that he had filed unemployment, and Mr. Yoon said
13  why did he file unemployment when he resigned the
14  company.  He understood that if you get laid off or if
15  the company fires him, that he would file
16  unemployment.  So I guess he decided that -- and I
17  decided that we are not going to give him
18  unemployment.
19       Q    Now, you attended the unemployment
20  hearing; correct?
21       A    Correct.
22       Q    There was some confusion.  Did you attend
23  it and Mr. Park?
24       A    Yes.  Mr. Park attended, but he stayed in
25  the car.  I thought he might be needed for like a

                        42

1        Q    Did you ever testify at the hearing that
2   Tae Jin Yoon had never actually told you what happened
3   in the conversation with Mr. Kang?
4        A    Yes.  I did say that.  Yes.  That's
5   correct.
6        Q    Why hadn't Tae Jin Yoon to your knowledge
7   told you what happened in that conversation?
8        MR. BATTENFELD:  Objection.  The question calls
9   for speculation.
10       MR. GREY:  If you know.
11       THE WITNESS:  I don't remember.  I mean I
12  can't -- I can't remember if he did tell me or if he
13  didn't tell me.  But I just -- at that time when he --
14  when we went to the unemployment, he had not explained
15  anything to me at that time.  But after the
16  unemployment, we had discussed things about it, yes.
17  BY MR. GREY:
18       Q    When you were going to the unemployment
19  hearing, didn't you think it would be important to
20  know about the contents of the conversation between
21  Mr. Yoon and Mr. Kang?
22       A    The only thing for me to say that it was
23  important is what Mr. Kang said to me.  If you don't
24  want to work Saturdays, you could quit, and that's
25  what he had expressed that out to me.  So I didn't

                        44

1   the claimant had been told he had to work the extended
2   hours or that the claimant had been discharged by the
3   president." Now, you read that sentence; correct?
4       A   I read it, yes.
5       Q   Is that statement correct?
6       A   That I -- yes. I guess it would be.
7       MR. BATTENFELD: Again don't guess.
8       THE WITNESS: Yes. Okay.
9   BY MR. GREY:
10      Q   And then the final sentence here reads,
11  "The witness admitted that the claimant told him that
12  the president had fired him." Is that correct?
13      A   Yes. I told you guys that -- no, no.
14  No. Fired him? No.
15      Q   That's why I'm reading this sentence.
16      A   This is incorrect. See, I told the judge
17  what Mr. Kang had told me, all right, that if you
18  don't want to work Saturdays, that you could quit.
19  That's what Mr. Yoon told Mr. Kang, and I explained
20  that to the judge, and the judge said that would mean
21  you are fired. That's what he stated, and that's what
22  he put it, that's what the judge -- yeah. I remember
23  that question, yes.
24      Q   You indicated that when you started
25  working for U. Lim, there were 13 production people,

49

1   correct, and two managers?
2      A   Yes. That's correct.
3      Q   By the end of 1994, how many production
4  people were there? Best estimate.
5      A   50.
6      Q   And by the end of 1995?
7      A   70 to 100.
8      Q   And by the end of '96?
9      A   80 to 120.
10      Q   And '97?
11      A   90 to 150.
12      Q   And '98?
13      A   90 to 120.
14      Q   There was a reduction in '98?
15      A   Yes.
16      Q   I didn't ask you what were the sales
17  figures for '98 -- by the end of '98 sales revenues.
18      A   I believe 6.2.
19      Q   So there was a drop from approximately 8
20  million to 6.2?
21      A   Correct.
22      Q   And what was the cause of that drop?
23      A   We lost a client.
24      Q   When you started working -- we'll take
25  '93 -- what were your approximate working hours during

50

1   1993?
2      MR. BATTENFELD: I'll object to the question as
3  being ambiguous and overbroad.
4      MR. GREY: I'll narrow it down.
5      Q   For Monday through Friday during 1993,
6  what were your approximate regular working hours?
7      MR. BATTENFELD: Same objection. Assumes facts
8  that there were regular working hours.
9      THE WITNESS: 7:30 to 5:30.
10  BY MR. GREY:
11      Q   And did that change in 1994 at all?
12      A   In the time we changed our schedule,
13  maybe 10 to 20 minutes or 5 to 10 minutes, but it
14  changed a little, but I can't remember what year it
15  was or what date or month.
16      Q   Did your length of day increase, or did
17  it simply just shift?
18      A   The hours shifted a little.
19      Q   So approximately the same time give or
20  take 15 minutes or so?
21      A   I would say, yeah. I would say that,
22  yes.
23      Q   And did your hours increase at all from
24  Monday through Friday in '95?
25      A   We are in management -- so I mean the

51

1   Mexican employees leave at -- after the work is over
2  at 5:30. The management stays alone to take care of
3  document work or other duties that they need to take
4  care of, and then they leave. So it could vary from
5  5:30 to 7:00 or 6:30. I can't say what time I left in
6  '95.
7      Q   Would that response apply equally to '94?
8      A   I would say that.
9      Q   And '93?
10      A   Yes.
11      Q   And would it apply equally to all the
12  years of your employment?
13      A   I would say that, yes.
14      We are just talking about the U.S.
15  employees or U. Lim America and U. Lim Mexico?
16      Q   I'm talking about you specifically.
17      A   Yes.
18      Q   So I understand your testimony that the
19  Mexican employees would generally be in the plant
20  approximately from 7:30 to 5:30?
21      A   Correct.
22      Q   That you would be in the plant at the
23  same time during that period, and then that you would
24  have various other jobs or duties you perform after
25  the plant closed?

52

1  business.
2      A      Correct.
3      Q      As a result of that increase in business,
4  did U. Lim have to increase employment for people in
5  overtime capacity?
6      A      Well, there were some days we did
7  overtime. Most of the material that come have been
8  assembled from south Korea, so it doesn't take that
9  many people to assemble these parts.  So our revenues
10  might have gone up, but like I said, assembling is
11  already done in south Korea.  We just assemble -- you
12  know, it's a real -- very easy job.  So we probably
13  did hire a lot more people.  No overtime was needed,
14  but we occasionally did have overtime.
15      Q      As your sales revenues increased
16  substantially from '94 to '95, did your job duties
17  increase?
18      A      My job duties in sales and marketing,
19  yes, it did.
20      Q      And again there was a jump in revenue
21  from '95 to '96.  Did that put an increased workload
22  on you as well?
23      A      I would say, yes.
24      Q      And from '96 to '97 when you went from 6
25  to 8 million?

57

1      A      I'd say about the same.
2      Q      So is it fair to say from 1993 when you
3  were first employed to approximately the end of '96,
4  the amount of work required of you generally speaking
5  increased?
6      A      Well, I would say my rank has gone up,
7  so, yes, my responsibility has been changed a lot.
8  But I mean other employees support my section, and I
9  support other people's section.  So everybody works
10  together in that facility, other management.
11      Q      What employees did you have working
12  directly under you in sales and marketing in '93?
13      A      I was by myself, but everybody helped me
14  out.
15      Q      And did you ever get an employee who
16  worked directly underneath you in just the sales and
17  marketing department?
18      A      A year ago.
19      Q      That would be when?
20      A      '98.
21      Q      So 1998 was the first time you actually
22  got a dedicated employee for sales and marketing?
23      A      I had secretaries who did invoicing and
24  things like that, to give me a hand, yes.  I had other
25  Mexican employees, yes.

58

1      Q      Did you have any salespeople working
2  under you?
3      A      No.
4      Q      The first salesperson working under you
5  would be in 1998?
6      A      Yes.
7      Q      And when is the first time that Mr. Park
8  had anyone working directly under him in either the
9  production or the quality control department?
10      A      I guess since he was there.  I mean since
11  he was there from '94, he had a supervisor under him
12  all the time.
13      Q      You are referring now to a supervisor at
14  U. Lim Mexico; correct?
15      A      Correct.
16      Q      A Mexican supervisor?
17      A      Correct.
18      Q      When is the first time he received
19  anybody working directly under him in production or
20  quality control who was employed by U. Lim America?
21      A      Production and quality control?
22      Q      Yeah.
23      A      Both?
24      Q      In either department.
25      A      I guess from 1994.  Like I said, he had a

59

1  supervisor under him since he came to the United
2  States.
3      Q      We are talking about now that he is
4  employed at U. Lim America.
5      A      Are you talking about U. Lim America or
6  U. Lim Mexico?
7      Q      U. Lim America.
8      A      Okay.  Everybody has their own
9  departments.  Okay?  They have like maybe
10  Mr. Cheong, Mr. Kang.  Everybody might be under
11  Mr. Park if Mr. Park is a manager.  Everybody that is
12  assistant manager is under Mr. Park.  Okay?  But each
13  department has their own departments.  Okay?  So they
14  are in charge of their departments.  Okay?  So I mean
15  if something maybe traumatic happens, then they will
16  put Mr. Park regarding -- about that, but they are in
17  charge of their departments.
18      Q      But as I understand it, the two
19  departments that Mr. Park was in charge of were
20  production and quality control.  Mr. Kang was in
21  charge of purchasing and warehousing.
22      A      Correct.  Correct.
23      Q      Was there ever a point in time when
24  Mr. Park got someone directly working underneath him
25  employed by U. Lim America in either the purchasing

60

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

---

1    your objection that you don't think it's reasonably
2    calculated, but there comes a point in time when you
3    are asking me to offer to you my entire case and what
4    I think is significant, and I don't have an obligation
5    to do that.
6            I'm asking presently whether or not Tae
7    Jin Yoon, who is a defendant in this action, who is
8    the vice-president of the corporation at the time of
9    Mr. Kang's employment, at the time of the alleged
10   acts, is still presently in a position of power at U.
11   Lim, and it may or may not have any influence on U.
12   Lim's actions. I think I'm entitled to know that, and
13   I'm entitled to inquire into it, and it's reasonably
14   calculated to lead to discovery of admissible
15   evidence.
16           So I would ask again whether or not Tae
17   Jin Yoon is presently responsible for the day-to-day
18   activities of U. Lim America.
19           MR. BATTENFELD: I reserve my right to object
20   if you continue on this line, but I'll allow the
21   witness to answer that question.
22           MR. GREY: Thank you.
23           THE WITNESS: Yes.
24   BY MR. GREY:
25       Q    Was there ever a point in time when Tae

65

---

1    Jin Yoon was relieved of any of his responsibilities
2    for U. Lim America?
3        A    No, no.
4        Q    Was there ever a point in time when he
5    lost that check-writing ability?
6            MR. BATTENFELD: I'll object to the question
7    for the same reasons I objected before, and I give the
8    witness the same instruction not to answer it.
9    BY MR. GREY:
10       Q    Was Mr. Yoon ever accused by anyone in
11   the company of having embezzled corporate funds?
12           MR. BATTENFELD: I'll object to the question as
13   not being relevant to any issue in Mr. Kang's action,
14   as invading Mr. Yoon's privacy, and I will instruct
15   the witness not to answer the question.
16   BY MR. GREY:
17       Q    Has Mr. Yoon received any kickback from
18   any of the clients of U. Lim America?
19           MR. BATTENFELD: Same objection. -- same
20   objection, and I'll instruct the witness not to
21   answer.
22   BY MR. GREY:
23       Q    Has he ever received any moneys from any
24   of the clients of U. Lim America which were not
25   properly submitted to or deposited into U. Lim

66

---

1    accounts?
2            MR. BATTENFELD: Same objection, and I'll
3    instruct the witness not to answer.
4    BY MR. GREY:
5        Q    The green card that Mr. Park requested,
6    did he request that first to you or to Mr. Yoon?
7            MR. BATTENFELD: I'll object that the question
8    calls for speculation.
9            MR. GREY: If you know.
10           THE WITNESS: I don't remember who it was. I
11   do remember Mr. Yoon giving me the records, so --
12   BY MR. GREY:
13       Q    You are talking about Ki Hwa Yoon?
14       A    Yeah.
15       Q    Do you know whether or not he ever
16   requested the green card from Tae Jin Yoon?
17       A    I have no idea.
18       Q    Do you know whether or not Tae Jin Yoon
19   had ever mentioned to you if U. Lim should try to
20   obtain a green card for Mr. Park?
21       A    Mr. Yoon -- Tae Jin Yoon had told me
22   that, yeah, he was considering getting Mr. Park a
23   green card.
24       Q    When did Mr. Yoon tell you that?
25       A    I can't remember, but it's been quite a

67

---

1    while ago.
2        Q    You don't have any idea as to the year?
3        A    No, I don't.
4        Q    When did you first become aware of
5    Mr. Kang's litigation against U. Lim?
6        A    I guess sometime in '98.
7        Q    What time of year in '98?
8        A    I can't place it if it's in the middle or
9    the end of it. I can't remember.
10       Q    Was your first knowledge of the complaint
11   being filed against U. Lim when it was served on U.
12   Lim?
13       A    Excuse me. I didn't --
14       Q    Is the first knowledge you have of
15   Mr. Kang instituting legal action against U. Lim when
16   the complaint was served on U. Lim?
17       A    Yes.
18       Q    And who informed you of that litigation?
19       A    I think I received a certified mail.
20       Q    Do you know from who?
21       A    Maybe you. I can't remember. I can't
22   remember who it was, but it was a certified mail.
23       Q    Is it possible you received it from your
24   agent of service of process?
25       A    No. We first received it at 605

68

---

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

---

1  command?
2      MR. BATTENFELD: I object that the question is
3  argumentative, that the witness already answered it.
4      THE WITNESS: Well, we have a -- well, Mr. Yoon
5  treats everybody -- all the employees -- Mr. Ki Hwa
6  Yoon treats all of his employees like his sons and
7  daughters of the company, and with that respect I had
8  explained to Mr. Yoon what the situation is.  I did
9  not jump over Mr. Tae Jin Yoon because Mr. Yoon -- Ki
10 Hwa Yoon asks me of any problems or anything that's
11 happening in the company.  He asks me.  Then I
12 responded with that question.
13 BY MR. GREY:
14     Q     These allegations were very personal to
15 Tae Jin Yoon; correct?
16     A     Well, it was personal, but it was a
17 company matter.
18     Q     You didn't feel it was Tae Jin Yoon's
19 responsibility to inform Ki Hwa Yoon?
20     A     Why?  I mean -- well, okay.  Like I said,
21 Mr. Ki Hwa Yoon asked me if there was any problem with
22 the company, and I explained to him what the situation
23 is after I received the letter.
24     Q     Do you recall the content of that
25 conversation?

73

---

1      Q     How long did that meeting last?
2      A     10, 15 minutes maybe.
3      Q     Now, you said Ki Hwa Yoon didn't give you
4  any instruction in this initial telephone meeting, but
5  that apparently he did at some later point.
6      A     I'm pretty sure he did.
7      Q     When was that that he gave you the
8  instruction?
9      A     I can't remember date or the year when
10 he -- I guess it was in '98 when he came here.
11     MR. BATTENFELD: Just for the record, the
12 complaint wasn't filed until February of '99.
13     THE WITNESS: Okay.
14 BY MR. GREY:
15     Q     How soon after you received the complaint
16 do you recall Ki Hwa Yoon coming out?
17     A     Two months later or a month later.  It's
18 an estimate.  A month or two months.  I can't --
19     Q     Now, at some point in time somebody
20 contacted Mr. Battenfeld's office.
21     A     Correct.
22     Q     Were you the one who did that?
23     A     No, no.
24     Q     Who was responsible for getting the
25 complaint to an attorney?

75

---

1      A     To Mr. Ki Hwa Yoon?
2      Q     Yes.
3      MR. BATTENFELD: Other than what he's testified
4  to?
5      MR. GREY: Well, I don't recall much testimony
6  with respect to the conversation with Ki Hwa Yoon.
7      THE WITNESS: You are right.  That's it.  I
8  don't remember other than what I said.
9  BY MR. GREY:
10     Q     Did he instruct you to take any course of
11 action?
12     A     Course of action, not at that time.
13     Q     When did he first give you any
14 instruction relative to the litigation?
15     A     Maybe when he came to the United States.
16     Q     And did he come out specifically because
17 of this?
18     A     No.  He has business meetings with
19 Samsung.  I mean other clients.  So it was things that
20 he does every year.
21     Q     In your meeting with Tae Jin Yoon, did he
22 comment about the allegations with respect to him
23 striking Mr. Kang?
24     A     Like I said before, I think I said that I
25 can't recall about the striking or anything.

74

---

1      A     It was both of ours, You Sik Youn and I
2  was.
3      Q     At this point in time, what was You Sik
4  Youn's role in the company?
5      A     Accountant, I think.
6      Q     You indicated that Tae Jin Yoon was
7  vice-president at the time.  Why wasn't it his
8  responsibility for making sure that U. Lim America had
9  hired attorneys to handle the complaint?
10     A     Well, I was the corporate secretary, and
11 I had the responsibility, and I took the
12 responsibility.
13     Q     Did he ever instruct you to do that?
14     A     Yes.
15     Q     Tae Jin Yoon did that?
16     A     Yes, he did.
17     Q     Now, Ki Hwa Yoon came out approximately
18 one to two months later, and you had a meeting with
19 him?
20     A     Correct.
21     Q     One or several meetings?
22     A     Well, see, when Mr. Yoon comes to the
23 States, I'm the one who takes him around or take him
24 to the company.  I do most of my time with Mr. Ki Hwa
25 Yoon.  So meetings could happen every day in the

76

---

KANG VS.                                                                    JAE HO CHO
U. LIM AMERICA                                                               01/06/00

1  during the course of his employment?
2       A    No.
3       Q    "No," or you don't recall?
4       A    "No."  I did not see.
5       Q    Was there ever an occasion when you saw
6  Mr. Park bleeding as a result of being struck with any
7  object thrown by Mr. Yoon?
8       A    No.  I did not see anything.
9       Q    Have you ever seen an occasion when
10 Mr. Park was grabbed by the ear by Mr. Yoon during the
11 course of his employment?
12      A    I did not see anything.
13      Q    It is true, is it not, that Mr. Yoon
14 could get very upset in those daily meetings?
15 Correct?
16      A    He has temper like I have temper, too,
17 yes.
18      Q    Nobody is accusing you of striking
19 anybody.
20           And is it not true that he would
21 frequently yell at Mr. Park and Mr. Kang and
22 occasionally you in these meetings?
23      A    No.  He yells at everybody.  He has a
24 temper.  He yells at everybody even the Mexican
25 employees, too.

                            81

1  time.  So sometimes when there's an order that I need
2  to deliver, sometimes I get excused because I need to
3  deliver the material sometimes, yes.
4       Q    Would you agree with the statement that
5  between the three of you, Mr. Park, Mr. Kang, and
6  yourself, that you were probably treated the best by
7  Mr. Yoon?
8       A    Well, as the responsibility that I have
9  and the marketing and the sales that I have that I
10 achieve -- most of the sales it was done by me making
11 a couple million dollars a year extra because of me.
12 Maybe I could be in favor, yes.
13      Q    You were, in fact, yelled at
14 substantially less than, by Mr. Yoon, Mr. Park or
15 Mr. Kang?
16      A    I can't say that.  He yelled at everybody
17 equal amount.  When he gets upset, he gets upset.
18      Q    And this showing would occur usually on a
19 daily basis?
20      A    Well, when there is something wrong, when
21 there's problems that happen, if we didn't achieve
22 some goals or something happens, yes.  He would get
23 angry.
24      Q    Was there generally some problem or
25 another every day at U. Lim?

                            83

1       Q    And during these meetings, isn't it true
2  that you have seen him occasionally throw reports or
3  notebooks at Mr. Park or Mr. Kang?
4       A    Well, I think I've seen one or two
5  occasions that he did throw documents on the floor,
6  but not directly at people.
7       Q    And in these daily meetings, you never
8  saw him strike Mr. Park with a ruler at any time?
9       A    No, I did not.
10      Q    Did you ever see him strike Mr. Kang with
11 a ruler at any time?
12      A    No, I did not.
13      Q    Did you ever see him kick either Mr. Park
14 or Mr. Kang at any time during their employment?
15      A    No, I did not.
16      Q    Did you ever see him grab Mr. Kang by the
17 ear at any time during Mr. Kang's employment?
18      A    No, I did not.
19      Q    How long would these daily meetings last?
20      A    30 to an hour.  30 minutes to an hour.
21 Sometimes it could go a little longer.
22      Q    Were you frequently dismissed before
23 Mr. Park or Mr. Kang from these meetings?
24      A    No.  Like I said, I'm in sales and
25 marketing, and I'll be out in the field most of the

                            82

1       A    No, not every day.
2       MR. BATTENFELD:  Let's hope not.
3       MR. GREY:  Depends how you define problems.
4       THE WITNESS:  No.
5  BY MR. GREY:
6       Q    Did you ever have a meeting with Ki Hwa
7  Yoon and Tae Jin Yoon together regarding this
8  litigation?
9       A    I think we did, but I can't remember when
10 it was.
11      Q    Did you ever have a meeting at Ki Hwa
12 Yoon's house that in any way reflected the event of
13 the litigation?
14      A    It happens everywhere because this thing
15 was going on for, what, a year or over a year.  I
16 can't remember, but it's daily -- daily basis that we
17 talk about it, just some things like that.  So I
18 can't -- I could say that it took -- it did take place
19 at his house or in the car, everywhere.
20      Q    Do you recall Tae Jin Yoon ever telling
21 you specifically that he had not struck Mr. Kang?
22      A    I can't remember that.  I don't think he
23 did.
24      Q    Were you the one who instructed Mr. Park
25 to go to Mr. Battenfeld's office with Tae Jin Yoon?

                            84

1   anything why he left at that point.  He came back two
2   days later, and I was just trying to find out -- I
3   asked him this is not -- I told him this is not your
4   company.  You don't leave when you want to and come
5   back when you want to.  That's where the argument
6   started.
7           So I had the responsibility of, you know,
8   taking care of all the matters in the company.  I was
9   trying to find out what he was doing.  So at that time
10  we argued and had verbal comments going back and
11  forth.  And after that I guess maybe he got a little,
12  you know, angry and took a battery and threw it at me.
13      Q    You were concerned about how he left the
14  company unannounced?
15      A    Well, he had explained to us that he was
16  going to resign, but he told us, I think, at that
17  time -- okay.  I remember.
18      MR. BATTENFELD:  Take your time.
19      THE WITNESS:  I remember what he said.  He said
20  he was going to finish out the month at the time when
21  he talked to Mr. Yoon, and everything after that he
22  told me that -- he told us that he was going to finish
23  out the month, then resign.  Something like that.
24  Then he leaves and doesn't come back for two days.
25  That's why I asked him what are you doing.  This is

                          89

1   not your company.  You don't have the right to leave
2   when you want to leave and come back when you want to
3   come back.  So I thought at that time he was still
4   working for the company.
5   BY MR. GREY:
6       Q    I take it at some point in this
7   conversation he told you he was not working for U.
8   Lim?
9       A    After two days that he came back, yes.
10      Q    And so this is basically news to you at
11  that time?
12      A    Correct.  Well, like I said, he was going
13  to resign after the month -- after February, yes.
14      Q    Now, you indicated that Mr. Kang had
15  explained in some fashion that he wasn't going to work
16  overtime or Saturdays anymore because of a family
17  agreement.
18      A    Correct.
19      Q    And it's your understanding that working
20  that overtime or those Saturdays is a requirement of
21  the employment; is that correct?
22      A    Requirement of the employment?  I guess
23  it's our duty.  We have our responsibilities what we
24  need to do at the company.  If it requires for us to
25  be there for overtime, yes.  I will be there.  If it

                          90

1   requires us -- for us to be there on Saturdays, yes.
2   I will be there.  But like I said, you have your
3   responsibilities.  You need to take your
4   responsibilities.
5       Q    And you would, therefore, believe that if
6   you didn't show up on Saturday or didn't show up for
7   the overtime, you would not be fulfilling your
8   responsibilities?
9       A    For me, yes.  I would say that for
10  myself.
11      Q    And, therefore, it's a condition of the
12  employment?
13      A    Condition -- I can't say condition.  I
14  think it's my -- the way of my thinking, I guess,
15  because I have a family.  I need to support my family.
16  I have a good job that pays me well.  For me to make,
17  you know, the salary that I'm making, you know, I
18  can't complain.  I have a responsibility.
19      Q    What did you think would be the result of
20  Mr. Kang indicating that he wasn't going to work
21  Saturdays anymore unless he was needed or period?
22      A    I think I can't answer that because all
23  management is different.  People take -- the upper
24  levels think differently than employees that is under
25  them, so I can't answer that question.

                          91

1       Q    Did you ever feel that there were
2   occasions where the managers were being forced to work
3   Saturdays and overtime when they weren't really needed
4   to be present?
5       A    Like I said before, no one forces.  It's
6   our responsibility.  I have the responsibility to do.
7   If I was required there, I go there.  I work.  I don't
8   know what to tell you.
9       Q    If there were times when you were needed
10  and you didn't show up, would you believe that the
11  result --
12      A    There is a lot of times that I didn't
13  show up at work on Saturdays, and I wasn't needed.
14  But most of the time -- like I said, I am in sales and
15  marketing.  I entertain a lot of people -- customers,
16  golf engagement, dinner engagement.  So sometimes I'm
17  there.  Sometimes I'm not.
18      Q    You indicated that at some point in this
19  conversation when he comes back, he is no longer
20  working for U. Lim; correct?
21      A    Correct.
22      Q    How did the conversation continue after
23  that?
24      A    We were both upset.  I can't remember
25  what we exactly said.  The only thing that I remember

                          92

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

1  BY MR. GREY:
2      Q    You don't know?
3      A    No.
4      Q    How about in '94?
5      A    Except the ten Saturdays, no, I can't.
6      Q    Okay.  And in 1995?
7      A    In 1995?
8      Q    We'll assume each and every year there is
9  at least ten, so we are talking about the ten plus.  I
10 want to know what the plus is.
11     A    1995 you say?
12     Q    Right.
13     A    Two to three extra Saturdays.
14     Q    And 1996?
15     A    1996, three to four Saturdays.
16     Q    And 1997?
17     A    Maybe four.
18     Q    '98?
19     A    About the same.
20     Q    Four?
21     A    Yes.
22     Q    Just so we are understanding each other,
23 in 1998 it's your best estimate that you worked
24 approximately 14 Saturdays during that year?
25     A    I would say that.

97

1      A    1994 -- well, I need to change my
2  statement, then.  Yes.  I worked -- I mean, well,
3  entertain people on Saturdays maybe I think I
4  mentioned one or two in '94.
5           Is that right?
6      Q    In '94 you said you did not as I recall,
7  and then you said in '95 approximately two or three
8  beyond the ten.  So in '94 would that be approximately
9  one or two Saturdays?
10     A    Yeah.  I would say that, yes.
11     Q    Extra for entertainment?
12     A    Yeah.
13     Q    And how many additional entertainment
14 Saturdays did you work on in '95?
15     A    I love golfing, so I don't know.
16     MR. BATTENFELD:  So it's hard to call it work.
17     THE WITNESS:  Yeah.
18     MR. GREY:  Sometimes people have it better than
19 others.
20     THE WITNESS:  So three to four times more I
21 guess.
22 BY MR. GREY:
23     Q    And in '96?
24     A    Don't guess.
25     MR. BATTENFELD:  Yeah.  Don't guess.

99

1      Q    And we are going to do the same thing for
2  Sundays cause it was so much fun the first time.
3  1993?
4      A    Sundays I think none.
5      Q    Now, you did mention that many of your
6  duties also refer to entertaining customers or
7  potential customers.
8      A    Correct.
9      Q    And I assume that that entertainment can
10 occur on weekends as well?
11     A    That's true.
12     Q    And to the extent that I'm asking you
13 whether or not you worked a Saturday, even if it was
14 playing golf, but it was a business golf outing that
15 you felt obligated to attend, that would count.  Okay?
16     A    Yes.
17     MR. BATTENFELD:  Do you need to change your
18 answer in light of that understanding?
19     THE WITNESS:  In '93 there wasn't any because
20 it was starting for me.  I didn't know too much about
21 that.  So in '93 there wasn't hardly any
22 entertainments that I did with the customers.
23 BY MR. GREY:
24     Q    Would that entertainment work for
25 Saturday add any Saturdays to your response to 1994?

98

1      THE WITNESS:  Yeah.  Three times more.
2  BY MR. GREY:
3      Q    And '97?
4      A    Three times more.
5      Q    And '98?
6      A    Four times.
7      Q    And why don't we divide Sundays the same
8  way, then, and I will ask you how many Sundays
9  excluding entertainment days did you work in 1993.
10     A    None.
11     Q    And how many Sundays excluding
12 entertainment days did you work in 1994?
13     A    Maybe once.
14     Q    And in '95?
15     A    Two.
16     Q    '96?
17     A    Two.
18     Q    '97?
19     A    Maybe -- three to four maybe.
20     Q    And '98?
21     A    Two.
22     Q    And then going back now to '93, how many
23 entertainment Sundays?
24     MR. BATTENFELD:  Just to back up, can we assume
25 you are giving estimates?

100

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

| | |
|---|---|
| 1    Q    And the inspection reports -- who | 1         MR. BATTENFELD:  You mean where the managers |
| 2  maintains those reports currently? | 2  were based? |
| 3    A    Currently the QC department. | 3         MR. GREY:  Let's start this all over again. |
| 4    Q    And who is the person in charge at the QC | 4    Q    Where is the general office of the |
| 5  department for maintaining those reports? | 5  facility? |
| 6    A    I guess Mr. Park had mentioned Efe. | 6    A    In Mexico. |
| 7    MR. BATTENFELD:  Don't repeat what Mr. Park | 7    Q    In Mexico? |
| 8  said.  If you have personal knowledge, that's fine. | 8    A    Yes. |
| 9  But he's not looking for you to repeat Mr. Park's | 9    Q    And that's where the managers operate out |
| 10  testimony.  Do you personally know? | 10  of; correct? |
| 11    THE WITNESS:  No, I don't.  Sorry. | 11    A    Correct. |
| 12  BY MR. GREY: | 12    Q    And as I understand it, there was one |
| 13    Q    It's just your understanding it is the QC | 13  large area with several desks in it? |
| 14  department? | 14    A    Correct. |
| 15    A    Yeah. | 15    Q    And did Mr. Carillo have a desk in that |
| 16    Q    Have you ever been instructed by anyone | 16  office? |
| 17  to obtain those records in regard to this litigation | 17    A    Yes, he did. |
| 18  other than your attorney? | 18    Q    So you would frequently see him? |
| 19    A    No. | 19    A    Yes.  That's correct. |
| 20    Q    Have you reviewed any of the daily | 20    Q    And he worked directly under Mr. Park; |
| 21  production reports or inspection reports in connection | 21  correct? |
| 22  with this litigation? | 22    A    Excuse me? |
| 23    A    No, I have not. | 23    Q    He worked directly under Mr. Park? |
| 24    Q    Do you know if anybody else has reviewed | 24    A    Yes. |
| 25  them in connection with this litigation? | 25    Q    Have you or anyone at U. Lim spoken to |
| 105 | 107 |

| | |
|---|---|
| 1    A    I don't know. | 1  Mr. Carillo to your knowledge since he left |
| 2    Q    Do you know Raul Carillo? | 2  employment? |
| 3    A    Yes, I do. | 3    A    Yes.  I have. |
| 4    Q    What was his position at U. Lim? | 4    Q    When did you speak to Mr. Carillo? |
| 5    A    I believe he was supervisor of | 5    A    Two -- no.  Wait.  Maybe a month to a |
| 6  production. | 6  month and a half ago. |
| 7    Q    For the Mexican plant; correct? | 7    Q    Is this before or after his deposition |
| 8    A    Correct. | 8  was scheduled? |
| 9    Q    Do you know how long he worked for U. | 9    MR. BATTENFELD:  I'll object to the question as |
| 10  Lim? | 10  being compound and also assuming it was one or the |
| 11    A    Approximately a year I guess.  No | 11  other. |
| 12  guessing. | 12  BY MR. GREY: |
| 13    MR. BATTENFELD:  Don't guess. | 13    Q    Well, did you speak to him before the |
| 14  BY MR. GREY: | 14  deposition? |
| 15    Q    Did you know him well? | 15    A    Yes. |
| 16    A    Yes.  I mean not well.  We were working | 16    Q    And what caused you to speak to him |
| 17  associates. | 17  before the deposition? |
| 18    Q    But he was a frequent visitor in the | 18    A    I think I got a call from him.  He was |
| 19  actual U. Lim offices; correct? | 19  telling me about the case. |
| 20    A    What do you mean by "visitor"? | 20    Q    Why would he call you to tell you about |
| 21    Q    Well, strike that. | 21  the case? |
| 22    He actually had a desk in the U. Lim | 22    A    He called me to -- I guess he was |
| 23  America offices; correct? | 23  concerned.  I don't know.  Cause Raul and I didn't |
| 24    A    America? | 24  have any bad relations when we were working together. |
| 25    Q    A desk in that facility. | 25  Maybe he was concerned, and he called me up and told |
| 106 | 108 |

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

---

| | |
|---|---|
| 1 Q Did he tell you that he had signed a | 1 THE WITNESS: Oh, yes. I talked to him after |
| 2 declaration? | 2 the deposition. |
| 3 A No, he did not. | 3 BY MR. GREY: |
| 4 Q Did he talk to you about any specific | 4 Q You did talk to him after the deposition? |
| 5 allegation, about whether or not Tae Jin Yoon had | 5 A Yes. |
| 6 struck Mr. Kang at any time? | 6 Q When was that? |
| 7 A No. | 7 A Maybe two days after that. Something |
| 8 Q Did you ask him whether or not he had | 8 like that. |
| 9 seen any of that? | 9 Q And did you talk to him at work? Did you |
| 10 A No, I did not. | 10 talk to him at his house? |
| 11 Q You weren't curious if he testified that | 11 A I called him. |
| 12 he had seen such action? | 12 Q You called him where? |
| 13 A No. Cause I don't think that was | 13 A At his work. |
| 14 mentioned, no. I don't know what the -- what his | 14 Q And you were able to get ahold of him; |
| 15 deposition was about, you know. | 15 correct? |
| 16 Q So is it your testimony, then, the only | 16 A At first it was very hard to get ahold of |
| 17 thing that you can recall from that conversation is he | 17 him. I think I left a message, and he called me back. |
| 18 talked to you about the fact that Mr. Kang supposedly | 18 Q And in this conversation did he indicate |
| 19 was offering him money and/or a job to testify? | 19 why he had not shown up to the deposition? |
| 20 A Well, he said he was going to take care | 20 A He had indicated to me that he doesn't |
| 21 of it after the trial was over. Something like that. | 21 want to be involved, and he likes his job. I don't |
| 22 Q And no other specifics about what he was | 22 know why he would tell me that he likes his job. He |
| 23 going to testify to? | 23 doesn't want to be involved. He doesn't like to get |
| 24 A Something about why he quit the company. | 24 in problems with his manager. Things like that. He |
| 25 Things like that, yes. | 25 said that to me. |
| | |
| 113 | 115 |

---

| | |
|---|---|
| 1 Q Did you ever ask Mr. Carillo not to | 1 Q And why did you call him? |
| 2 testify? | 2 A Why did I call him? I was curious. I'm |
| 3 A Not to testify? | 3 pretty sure you guys were curious why he didn't show |
| 4 Q Not to testify. | 4 up. I was curious why he didn't show up either. |
| 5 A I think I said as a friend -- I would | 5 Q Well, you asked him not to be involved. |
| 6 like as a friend -- as a friend if you are not | 6 A Excuse me? |
| 7 involved, I would appreciate it, or something like | 7 Q You had asked him as a friend not to be |
| 8 that I said. | 8 involved. |
| 9 Q If you would not testify? | 9 A I did say that, yes. |
| 10 A I did not say "testify." I said if you | 10 Q Did you take any notes of this meeting? |
| 11 are not involved. | 11 A Did I take any notes of this meeting? |
| 12 Q So as a friend you would appreciate it if | 12 Q The meeting before the deposition. |
| 13 he would not be involved? | 13 A No, I did not. |
| 14 A Yeah. | 14 Q Did you call Mr. Raul after the |
| 15 Q And did he agree not to be involved as a | 15 deposition to thank him for not appearing at the |
| 16 result? | 16 deposition? |
| 17 A No. He didn't tell me that. | 17 A I guess you could say that. |
| 18 Q Did you ever talk to him again after this | 18 MR. BATTENFELD: No. Only adopt that if that's |
| 19 meeting? | 19 what you said. If you didn't say that, then that's |
| 20 A I think it was after -- no. | 20 not your testimony. |
| 21 Q You are sure? | 21 BY MR. GREY: |
| 22 A Yeah. | 22 Q Did you or didn't you, Mr. Cho, call him |
| 23 MR. BATTENFELD: You are asking after the | 23 to say thank you for not appearing? |
| 24 deposition? | 24 A Yes, I did. |
| 25 MR. GREY: After the deposition. | 25 MR. GREY: Well, John has been dying to see |
| | |
| 114 | 116 |

KANG VS.

U. LIM AMERICA

JAE HO CHO

01/06/00

BY MR. GREY:

1  Q    You now had an opportunity to review this
2  declaration, correct, Mr. Cho?
3  A    Yes.
4  Q    Okay. And you've had an opportunity to
5  review it with your attorney; correct?
6  A    Correct.
7  Q    And you had testified that Mr. Carillo
8  either in this telephone conversation with you for the
9  first time or in this first meeting with you indicated
10  that he was going to be testifying for Mr. Kang;
11  correct?
12  A    Correct.
13  Q    Did you ask him at either in that first
14  phone conversation or in your meeting what
15  specifically he would be testifying about for
16  Mr. Kang?
17  A    I think I did ask him this.
18  Q    And did he tell you?
19  A    Something about his termination and about
20  Mr. Yoon.
21  Q    Did he tell you that he had observed
22  Mr. Yoon --
23  A    Oh, let me clarify something. Mr. Park
24  was at the meeting with me at the restaurant. I

121

1  forgot about that.
2  Q    And did Mr. Carillo tell you that he had
3  observed Mr. Yoon on different occasions throw objects
4  at Mr. Park?
5  A    Well, he wasn't really clear if it was
6  Mr. Park or Mr. Kang, so I mean he was very vague
7  about who did what, you know. He wasn't clear about
8  that to me.
9  Q    But you do recall him talking about the
10  fact that he had seen Mr. Yoon throw something either
11  at Mr. Park or Mr. Kang?
12  A    Throwing -- we didn't discuss anything
13  about throwing.
14  Q    How about hitting?
15  A    No hitting.
16  Q    What specifically do you recall him
17  testifying about -- strike that.
18      What specifically do you recall him
19  telling you about the things that he had observed
20  Mr. Yoon do to either Mr. Park or Mr. Kang?
21  A    Mr. Kang and Mr. Park -- no. We didn't
22  discuss anything about that. We discussed about his
23  termination and why he quit. Well, I thought he quit.
24  I thought he quit, but he was saying he was
25  terminated. I think he did tell me that he quit and

122

1  was telling me why he quit, things like that.
2  Q    And you said you asked him what he was
3  going to be testifying about for Mr. Kang; correct?
4  A    Yes, I did.
5  Q    And what did he tell you he would be
6  testifying about?
7  A    Like I just told you, why he got fired or
8  why he quit and what Mr. Yoon asked him to do about --
9  something about washing cars or something like that.
10  Q    But that's not Mr. Kang's case; correct?
11  That has to do with Mr. Carillo's own termination?
12  A    Yes, it was.
13  Q    What specifically did he say he was going
14  to be testifying about relative to Mr. Kang?
15  MR. BATTENFELD: So the record is clear, that
16  allegation is contained in Mr. Carillo's declaration
17  that is now marked as an exhibit.
18  THE WITNESS: I don't think we discussed
19  anything about the declaration. We mainly talked
20  about just termination and why he was terminated or
21  why he quit or what Mr. Yoon was asking him to do,
22  things like that. I didn't go into details of what
23  declaration that he has filed cause he had told me
24  that he never filed a declaration. So that's why I
25  guess I did not go into the declaration, but I know

123

1  that he was supposed to testify, but I didn't know
2  exactly what he was testifying.
3      So I did ask him that, but he had
4  mentioned why he was terminated, what Mr. Yoon had him
5  do, things like that. Nothing about throwing things
6  or hitting or anything like that.
7  BY MR. GREY:
8  Q    Let me go into paragraph 5. In this
9  declaration Mr. Carillo states, "I observed on
10  numerous occasions Mr. Park being hit by Mr. Yoon with
11  the edge of a ruler." Did he ever mention that to you
12  in that meeting?
13  A    No, he did not.
14  Q    Did he ever mention to you at any time
15  that he was planning to testify to that fact?
16  A    No, he did not.
17  Q    Okay. Did you ever observe Mr. Park
18  being hit by Mr. Yoon with the edge of a ruler?
19  A    No, I did not.
20  MR. BATTENFELD: Objection, asked and answered.
21  BY MR. GREY:
22  Q    He also testified in his declaration, I
23  also observed Mr. Yoon strike Mr. Kang and Mr. Ko in a
24  similar fashion, that being with a ruler. Why don't
25  you read -- the declaration says, "I also observed

124

KANG VS.                                                           JAE HO CHO
U. LIM AMERICA                                                      01/06/00

---

**Page 129**

1  A   Working hours, no.  I did not.
2  Q   Did you ever discuss the lunches at U.
3  Lim with Mr. Carillo?
4  A   No, I did not.
5  Q   Would you say that it's true that Tae Jin
6  Yoon would typically yell more at Korean employees
7  than at Mexican employees?
8  A   I'd say it's equal.
9  Q   What did Mr. Park ask Mr. Carillo at this
10 meeting?
11 A   He didn't say much because he doesn't
12 speak English that well, so I did most of the talking.
13 Q   Why did Mr. Park go down with you to
14 Mexico?
15 A   Well, he is in Mexico.  We work there.
16     And why did we go to the dinner?
17 Q   Why did you go to this meeting together
18 with Mr. Park?
19 A   Mr. Park wanted to attend because like I
20 said, we are all friends -- not friends, but
21 associates.  We work together.  So Mr. Park wanted to
22 see Raul, so he tagged along.
23 Q   Had Mr. Park to your knowledge spoken to
24 Raul before this?
25 A   No.

---

**Page 130**

1  Q   How long did this meeting last?
2  A   Maybe a total of an hour.  We ate and
3  talked.
4  Q   Hadn't you been informed by anyone that
5  there was a declaration of Mr. Carillo?
6  A   No.  I don't think so.
7  Q   Did you ever promise Mr. Carillo anything
8  for not showing up at his deposition?
9  A   No, I did not.
10 Q   Did you pay Mr. Carillo -- or did U. Lim
11 pay Mr. Carillo any amount of money?
12 A   No, we did not.
13 Q   Did you or U. Lim give him any kind of
14 compensation of any type in the form of a car for
15 instance?
16 A   No.
17 Q   Did you promise him any benefits with
18 respect to his employment?
19 A   No.
20 Q   Did he ask for any of these things?
21 A   No, he did not.
22 Q   What other former employees of U. Lim
23 have you met with relative to this litigation?
24 A   Mr. Bo Won Cheong, and I had a phone
25 conversation with Suhko Ko.

---

**Page 131**

1  Q   Did you ask him not to be involved in
2  this litigation?
3  A   Excuse me?
4  Q   Did you ask him not to be involved in
5  this litigation?
6  A   Ask who?
7  Q   Mr. Ko.
8  A   No.
9  Q   And Mr. Ko is in Korea; correct?
10 A   Correct.
11 Q   And when did you meet with Mr. Cheong?
12 A   I can't remember the exact date or time.
13 Maybe a month or two months.  Two months ago.  Maybe
14 two or three months ago.
15 Q   Who initiated that meeting?
16 A   Me and Mr. Kim.
17 Q   Why did you initiate that meeting?
18 A   Mr. Kim wanted to know what the situation
19 was of Mr. Cheong.
20 Q   Were you concerned that Mr. Cheong was
21 going to be suing you, or had he already sued you?
22 I'm referring now to U. Lim.
23 A   Like I said, it wasn't me that was
24 interested.  Mr. Kim was the one that was interested
25 to see him.

---

**Page 132**

1  Q   What did Mr. Kim tell you were his
2  reasons?
3  A   He was wondering why Mr. Cheong was going
4  to sue us, I think.  Something like that.
5  Q   And when did you have this -- you said
6  you had this meeting about two months ago?
7  A   Yeah.  I can't remember exactly when it
8  was.
9  Q   Did you discuss whether or not Mr. Cheong
10 would be testifying for Mr. Kang?
11 A   Excuse me?
12 Q   Did you discuss whether or not Mr. Cheong
13 would be testifying for Mr. Kang?
14 A   No.  That wasn't discussed.
15 Q   Did you discuss in any way what did
16 Mr. Cheong observe with respect to Tae Jin Yoon's
17 conduct against Mr. Kang and Mr. Park?
18 A   I wasn't involved in the talking.  I was
19 mostly kind of away from the talking.  Mr. Kim did all
20 the initiating.
21 Q   But you were still present; correct?
22 A   Yes.
23 Q   Did you overhear any conversations with
24 respect to whether or not Mr. Cheong would be
25 testifying for Mr. Kang?

---

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

1  Mr. Tae Jin Yoon that his deposition had been noticed?
2       A    Yes.
3       Q    When was that?
4       A    About a month ago.
5       Q    And where was Tae Jin Yoon when you
6  informed him of this?
7       A    I believe he was in Korea.
8       Q    And did you discuss his availability for
9  his deposition?
10      A    Yes, I did.
11      Q    And what did he say?
12      A    He'll be coming on January the 12th.
13      Q    And have you discussed the deposition
14  notice with Ki Hwa Yoon -- with Mr. Ki Hwa Yoon?
15      A    Yes, I have.
16      Q    And did he indicate his availability?
17      A    Not exactly cause he doesn't know his
18  schedule.
19      Q    Is he presently in Korea?
20      A    No.  He's here.
21      Q    And how long has he been in the U.S. on
22  this last trip?
23      A    I guess about -- about a month now.
24      Q    And he's still here in America now?
25      A    Correct.

137

1       Q    Is he working presently out of the
2  facility in Mexico?
3       A    He goes back and forth, yes.
4       Q    Does he make a daily appearance or a
5  weekly appearance?
6       A    Daily appearance.
7       Q    Are you aware of any scheduled return
8  trips to Korea by Mr. Ki Hwa Yoon?
9       A    No, I'm not.  No.  I do know -- I'm
10  sorry.  January the 18th he's thinking about going
11  back.  Yeah.
12      Q    Over the course of the last year, how
13  much time has Ki Hwa Yoon spent in the U.S.?
14      A    A total of maybe three to four months.
15  That's in and out.
16      Q    Other than Mr. Park, Mr. Kang, and
17  Mr. Cheong, what other persons have been employed as
18  managers or assistant managers at U. Lim America
19  during the course of Mr. Kang's employment?
20      MR. BATTENFELD:  Other than who?
21      MR. GREY:  Mr. Park, Mr. Kang himself, and
22  Mr. Cheong.
23      THE WITNESS:  Would Mr. Ko be -- I mean while
24  he was there, Mr. Ko was there.
25  BY MR. GREY:

138

1       Q    Okay.  Anyone else?
2       A    As managers?
3       Q    Mr. Baek; correct?
4       A    He wasn't a manager.
5       Q    Or assistant manager.
6       A    I don't even think he was assistant
7  manager.  He was just an employee.
8       Q    Would he be at a supervisor level?
9       A    No.  It's hard to describe the word in
10  Korea to English of what that is, but a working staff
11  I guess.
12      Q    Well, he wasn't secretarial; correct?
13      A    No.  He wasn't secretarial.
14      Q    What was Mr. Baek's role at the company?
15      A    He was purchasing -- purchasing and
16  warehouse, but he didn't have any -- a rank or
17  anything.
18      Q    Why don't we broaden it, then.  Who else
19  worked at U. Lim America other than secretarial staff
20  during Mr. Kang's employment?
21      A    Other than secretarial?  So Mr. Baek --
22  other than --
23      Q    Other than secretarial.  I'm not talking
24  about the secretaries.
25      MR. BATTENFELD:  If there were any secretaries

139

1  at the time.
2       MR. GREY:  If there were.
3       Q    Why don't we just establish were all the
4  secretaries hired under U. Lim Mexico?
5       A    Yeah.
6       Q    Okay.  So then basically we can just say
7  who was an employee of U. Lim America during the
8  course of Mr. Kang's employment.
9       A    Okay.  Mr. Baek was there for a couple of
10  months.  I don't know how long.  I don't think there
11  was any other people -- U.S. employee.
12      Q    Okay.  And all the supervisors who worked
13  for U. Lim Mexico, all of them reported to one of the
14  U. Lim managers whoever that may be for that
15  department; correct?
16      A    Correct.
17      Q    And so as I understand it, then, that
18  during the course of Mr. Kang's employment all of the
19  employees at U. Lim America were, in fact, of Korean
20  ancestor; correct?
21      A    U. Lim America?
22      Q    Yeah.
23      A    Yes.  Well, no.  Yes, yes.  That's
24  correct.  Yes, yes.
25      MR. BATTENFELD:  He means by that not

140

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

---

1    U. Lim, he was not fluent in Spanish?
2         A    Correct.
3         Q    Was Mr. Ko fluent in either English or
4    Spanish?
5         A    No, he was not.
6         Q    And you were fluent in English; correct?
7         A    Correct.
8         Q    And Tae Jin Yoon was neither fluent in
9    English nor Spanish; correct?
10        A    Correct.
11        Q    And Ki Hwa Yoon is neither fluent in
12   English nor Spanish?
13        A    No.
14        Q    Did you ever hear Tae Jin Yoon refer to
15   Americans as lazy?
16        A    No.  Cause I consider myself American
17   citizen.  No.
18        Q    Did you ever hear Tae Jin Yoon refer to
19   Koreans as harder-working people?
20        A    No.
21        Q    Never?
22        A    No.
23        Q    Did you ever hear Tae Jin Yoon refer to
24   Mexicans as being lazy?
25        A    No.

145

---

1         Q    As being irresponsible?
2         A    No.  Well, he would tell us -- I mean
3    everybody comments that I'm responsible, you know.  I
4    mean occasionally he would say that to me or to all
5    the employees.
6         Q    Did Tae Jin Yoon ever refer to Koreans as
7    harder working?
8         MR. BATTENFELD:  Objection; asked and answered.
9         THE WITNESS:  No.
10   BY MR. GREY:
11        Q    Do you have any knowledge as to how many
12   Saturdays Mr. Park worked during 1994 other than I
13   assume those ten makeup days?
14        A    I can't give you an estimate on that.
15        Q    Do you have any estimate as to how many
16   Saturdays Mr. Park worked in 1995 beyond those ten
17   makeup days?
18        A    I would say about the same as I.  I mean
19   taking out the golf -- I mean the entertainments,
20   about the same.
21        Q    Do you have any estimate as to how many
22   Saturdays he worked in 1996?
23        A    In 1996, no.  No estimate.
24        Q    How about for 1997?
25        A    No.

146

---

1         Q    No estimate?
2         A    No estimate.
3         Q    And how about for 1998?
4         A    I guess it would be the same as I was.
5         Q    Do you know how many Sundays Mr. Park
6    worked in 1994?
7         A    No clue.
8         Q    No estimate?
9         A    No.
10        Q    How about 1995?
11        A    No.  No estimate.
12        Q    And 1996?
13        A    Same -- same as I would be I guess.
14        Q    If you have no estimate, that's fine.
15        A    Okay.
16        Q    But you have to say that, otherwise if
17   you say same as you, then you are making an
18   affirmative response that it is the same as you.  So
19   let me ask you again in 1996 do you have any estimate
20   as to how many Sundays Mr. Park worked?
21        A    Same as mine.
22        Q    How about 1997?
23        A    Same as mine.
24        Q    In '98?
25        A    Same as mine.

147

---

1         Q    Now, in 1996 you said you only worked two
2    Sundays and maybe one or two entertainment Sundays.
3         A    Uh-huh.
4         Q    Having worked only two Sundays in the
5    plant, how is it that you have an estimate that he
6    worked the same as you for 1996, the number of
7    Sundays?
8         A    On Sundays?  Can you repeat that again?
9         Q    Well, you testified that you worked
10   approximately two Sundays in 1996 at the plant.
11        A    Uh-huh.
12        Q    And one to two entertainment Sundays.
13        A    Correct.
14        Q    I assume the one to two entertainment
15   Sundays were not done at the plant, or they are not
16   much entertainment.
17        A    Correct.
18        Q    So you worked two Sundays at the plant.
19   How is it that you have an estimate that he worked the
20   same number of Sundays if you were only there two
21   times during the year?
22        A    I told you.  I worked two Sundays, so
23   Mr. Park worked two times in the year.
24        Q    Are you aware of Mr. Park working any
25   other time when you weren't there on a Sunday?

148

---

KANG VS.
U. LIM AMERICA

JAE HO CHO
01/06/00

```
 1   within five business days of receipt of those changes,
 2   and if for any reason the loss -- if for any reason
 3   the deposition is lost, misplaced, stolen, or
 4   otherwise unavailable, a certified copy can be used
 5   instead.
 6              What else do we need?
 7          MR. BATTENFELD:  Nothing.
 8          MR. GREY:  And we'll relieve the court reporter
 9   of her duties under the code, and you'll mail the
10   deposition transcript directly to Mr. Battenfeld's
11   office.
12   /
13   /
14
15
16
17
18
19
20
21
22
23
24
25

                      153
```

```
 1   STATE OF CALIFORNIA        )
                                : ss
 2   COUNTY OF SAN DIEGO        )
 3
 4              I, the undersigned, a Certified Shorthand
 5   Reporter of the State of California, do hereby
 6   certify:
 7              That the foregoing proceedings were taken
 8   before me at the time and place herein set forth; that
 9   any witnesses in the foregoing proceedings, prior to
10   testifying, were placed under oath; that a verbatim
11   record of the proceedings was made by me using machine
12   shorthand which was thereafter transcribed under my
13   direction; further, that the foregoing is an accurate
14   transcription thereof.
15              I further certify that I am neither
16   financially interested in the action nor a relative or
17   employee of any attorney of any of the parties.
18              IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20
     Dated:  _____
21
22
23         _____
           JESSICA E. MASSE
24         CSR No. 9910
25

                      155
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9              I, JAE HO CHO, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript of my deposition; that I have made such
12   corrections as noted herein, in ink, initialed by me,
13   or attached hereto; that my testimony as contained
14   herein, as corrected, is true and correct.
15          EXECUTED this _____ day of _____,
16   19___, at _____, _____.
                (City)              (State)
17
18
19
20         _____
           JAE HO CHO
           Volume I
21
22
23
24
25

                      154
```

KANG V.
U. LIM AMERICA

JAE HO CHO
01/11/00

---

**Page 156**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,              )
                                  )
 5              Plaintiff,        )
                                  )
 6          vs.                   )  No. 99 CV659 JM
                                  )      (RBB)
 7   U. LIM AMERICA, INC.; TAE    )
     JIN YOON, an individual; and )
 8   DOES 1 to 100,               )
                                  )
 9              Defendants.       )
     _____)
10
11
12
13
14
15          DEPOSITION OF JAE HO CHO
16             San Diego, California
17          Tuesday, January 11, 2000
18                 Volume II
19
20
21
22
23   Reported by:
     JESSICA E. MASSE
24   CSR No. 9910
     JOB No. 12065B
25
                    156
```

---

**Page 157**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,              )
                                  )
 5              Plaintiff,        )
                                  )
 6          vs.                   )  No. 99 CV659 JM
                                  )      (RBB)
 7   U. LIM AMERICA, INC.; TAE    )
     JIN YOON, an individual; and )
 8   DOES 1 to 100,               )
                                  )
 9              Defendants.       )
     _____)
10
11
12
13
14
15          Deposition of JAE HO CHO, Volume
16      II, taken on behalf of Plaintiff, at
17      501 West Broadway, Suite 1300, San
18      Diego, California, beginning at 3:56
19      p.m. and ending at 5:34 p.m. on
20      Tuesday, January 11, 2000, before
21      JESSICA E. MASSE, Certified Shorthand
22      Reporter No. 9910.
23
24
25
                    157
```

---

**Page 158**

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3       LAW OFFICE OF RICHARD E. GREY
         BY:  RICHARD E. GREY
 4       Attorney at Law
         409 Camino Del Rio South, Suite 303
 5       San Diego, California 92108
         (619) 543-9300
 6
     For the Defendants:
 7
         MORGAN, LEWIS & BOCKIUS
 8       BY:  JOHN S. BATTENFELD
         Attorney at Law
 9       300 South Grand Avenue, 22nd Floor
         Los Angeles, California 90071
10       (213) 612-2500
11   Also Present:
12       SOO CHEOL KANG
13
14
15
16
17
18
19
20
21
22
23
24
25
                    158
```

---

**Page 159**

```
 1                   INDEX
 2   WITNESS:                        EXAMINATION
 3   JAE HO CHO
     Volume II
 4
 5       BY MR. GREY                      160
 6
 7
 8
 9
10
                  EXHIBITS
11
                  (None)
12
13
14
15
16
17      INSTRUCTION NOT TO ANSWER
18           Page  Line
19           187    6
20           193   21
21
22
23
24
25
                    159
```

---

KANG V.                                                     JAE HO CHO
U. LIM AMERICA                                             01/11/00

```
 1  questioned on those limited topics.
 2  BY MR. GREY:
 3      Q    Okay.  Mr. Cho, was there ever a point in
 4  time when Tae Jin Yoon stopped regularly visiting the
 5  U. Lim facility in Mexico?
 6      A    Stopped visiting?  He does a lot of
 7  marketing, too, marketing and sales.  He does that,
 8  too.  So when you say "stopped" --
 9      Q    I'm talking about physically coming to
10  the plant.
11      MR. BATTENFELD:  I object that the question is
12  ambiguous as to whether you are referring to instances
13  where he was out of the country for one reason or
14  another, or you are referring to a situation where he
15  was physically in the area, but not coming to the
16  plant.
17      MR. GREY:  I'll try to clarify.
18      Q    Certainly back in 1994, '95, Tae Jin Yoon
19  was regularly coming to the Tijuana facility; correct?
20      A    Correct.
21      Q    And was doing so generally speaking on a
22  regular basis unless he had business trips; correct?
23      A    Correct.
24      Q    And was generally responsible for the
25  overseeing of the daily activities of the factory;
```

164

```
 1  correct?
 2      A    Correct.
 3      Q    Was there a point in time when that
 4  routine changed for Mr. Yoon where he was no longer
 5  regularly coming to the Tijuana facility?
 6      MR. BATTENFELD:  You mean other than when he
 7  was on business trips?
 8      MR. GREY:  Other than the business trips which
 9  were typical for him in '94, '95, '96.
10      THE WITNESS:  I would say it started around
11  1996 December.
12  BY MR. GREY:
13      Q    And what changed in December of 1996?
14      A    He had a lot of business trips to Korea.
15      Q    When did he resume, if he resumed, his
16  daily overseeing activities at the plant?
17      A    Say that again.
18      Q    When, if ever, did he resume his daily
19  overseeing activities at the plant?
20      MR. BATTENFELD:  Well, I'll object.  It
21  misstates the witness' prior testimony.  He simply
22  said starting in December of 1996 Mr. Yoon had a lot
23  of business trips to Korea.
24  BY MR. GREY:
25      Q    Did that period of business trips to
```

165

```
 1  Korea ever change?
 2      A    Did it change?
 3      Q    Those extended business trips to Korea.
 4      A    No.  It did not change.
 5      Q    So you are saying from December of 1996
 6  to the present, he's had substantial business trips to
 7  Korea that have taken him away from the facility?
 8      A    Correct.
 9      Q    In the last -- 1999, approximately how
10  many times did he actually physically come to the
11  plant?
12      A    In 1999?
13      Q    Right.
14      A    I'd say in a month --
15      MR. BATTENFELD:  If you can, estimate again.
16  You don't want to guess.
17      THE WITNESS:  Maybe ten times.
18  BY MR. GREY:
19      Q    And how about 1998?
20      A    I would say 50 percent of the time.
21      Q    And when you say "50 percent of the
22  time," you are referring to 50 percent of the
23  workdays?
24      A    Correct.
25      Q    Now, you changed facilities in April of
```

166

```
 1  1998; correct?
 2      A    No.  April of '99.
 3      Q    April of '99.  I'm sorry.
 4      And when you said in 1998 that he worked
 5  approximately 50 percent -- or strike that -- that he
 6  attended the Tijuana facility approximately 50 percent
 7  of the workdays, was that 50 percent more that
 8  occurred in the beginning of 1998, in the middle, or
 9  was it spread out evenly?
10      A    I would say spread out.
11      Q    Now, there was a point in time when Tae
12  Jin Yoon no longer had check-writing authority;
13  correct?
14      A    Correct.
15      Q    When was that?
16      A    I can't remember when because he went on
17  a lot of business trips, and he was hardly at the
18  facility.  So the younger son You Sik Youn took over
19  the check-writing authority.
20      Q    It's true, however, that Tae Jin Yoon
21  presently has no check-writing ability for U. Lim
22  America; correct?
23      A    No.
24      Q    No, he does not have that ability, or
25  that's not true?
```

167

KANG V.
U. LIM AMERICA

JAE HO CHO
01/11/00

1    like four months ago.
2         Q      When was it that you were made general
3    manager?
4         A      I don't know that.  I don't know exactly
5    when that was.
6         Q      What's your best estimate?
7         A      A year and a half ago.
8         Q      And you were made assistant general
9    manager how much before that time?
10        A      I can't remember.
11        Q      Best estimate?
12        A      Not even a best estimate.  I can't
13   remember.
14        MR. BATTENFELD:  You need to speak up.
15        THE WITNESS:  I can't remember.  Sorry.
16   BY MR. GREY:
17        Q      Is it your testimony that when you were
18   assistant general manager, you have no knowledge of
19   who had check-writing ability for U. Lim Mexico?
20        A      Well, I had the authority, but -- yeah.
21   Yeah.  I don't know who else.
22        Q      Okay.  You had check-writing authority
23   for U. Lim Mexico?
24        A      Correct.
25        Q      When did that start?

                        172

1         A      Maybe in -- maybe three, four years ago.
2    I can't remember when it was.
3         Q      And was that with your sole signature, or
4    was a co-signature required?
5         A      At the time it was sole.  Then after a
6    while, it went to two signatures.  Then I went solo
7    again.  Then it went to two signatures again.  So it
8    went back and forth.
9         Q      And the first time it went to two
10   signatures, who was the second signature required?
11        A      Maybe it was Ko.  I can't remember.
12        Q      And the second time it went to two
13   signatures, who was the second signature required?
14        A      Me and Park.
15        Q      And when you say two signatures, is that
16   presently what is required?
17        A      Presently, yes.
18        Q      And is Park the co-signator that is
19   required?
20        A      That's correct.
21        Q      For U. Lim Mexico?
22        A      Correct.
23        Q      Other than possibly Ko and Mr. Park, are
24   you aware of anyone else who had U. Lim Mexico
25   check-writing authority while you were employed at U.

                        173

1    Lim America?
2         MR. BATTENFELD:  During his entire employment?
3         MR. GREY:  Yeah.
4         THE WITNESS:  You Sik had signing ability.
5    BY MR. GREY:
6         Q      This is for U. Lim Mexico?
7         A      That's correct.  And Mr. Ki Hwa Yoon had
8    the authority.
9         Q      And Ki Hwa Yoon, I assume, has had
10   authority for as long as you can recall for U. Lim
11   Mexico?
12        A      No.  I think -- well --
13        MR. BATTENFELD:  Don't guess.
14        THE WITNESS:  I don't know.
15   BY MR. GREY:
16        Q      When did You Sik Youn obtain any
17   check-writing authority for U. Lim Mexico?
18        A      Maybe after Soo Kang left the company.
19   Maybe three months later.  Something like that.
20        Q      Approximately in May of '98?
21        A      Approximately.
22        Q      And then at some point in time Tae Jin
23   Yoon had U. Lim Mexico check-writing authority, but
24   lost it; correct?
25        A      He had it from the start.  When you say

                        174

1    "check-writing authority," I mean it was -- it was his
2    and Mr. Yoon's decision to take him out.  It wasn't
3    just solely Mr. Ki Hwa Yoon's decision.
4         Q      We'll get to that.
5         A      Okay.
6         Q      When did You Sik Youn actually start
7    working for either U. Lim America or U. Lim Mexico?
8         A      I can't remember.
9         Q      What is your best estimate?
10        A      No estimate.
11        Q      No estimate at all?
12        A      Well, I gave -- well, I told you that he
13   started when Mr. Kang left.
14        Q      No.  You told me his check-writing
15   authority.
16        A      That's correct.
17        Q      It's not exactly the same thing.
18               When to your best estimate did he start
19   working for either U. Lim America or U. Lim Mexico?
20        A      No estimate.
21        Q      So it could have been as early as 1994,
22   or it could have been as late as yesterday?
23        A      Well, I guess it would have been when his
24   visa started, so I can't tell you when his visa
25   started.

                        175

KANG V.
U. LIM AMERICA

JAE HO CHO
01/11/00

1   recollection prior to February of '98 while You Sik
2   Youn had been in this country, he'd been a student; is
3   that correct?
4        A     He was a student.  He came off and on, so
5   I can't -- I can't answer your question.  Without
6   looking at my documents or something, I can't answer
7   that question.
8        Q     So are you meaning to say, then, that you
9   are not sure whether he was continuously a student
10  throughout that period?
11       A     Yes.  That's correct.
12       Q     But you've never known him to be employed
13  either here or in Mexico prior to February of '98;
14  correct?
15       A     Well, see.  He was employed in south
16  Korea.  Okay?  He was employed in south Korea.  I
17  can't -- yeah.
18       Q     I'm just asking now for U.S. and Mexico.
19       A     Can I talk to my attorney for a second?
20       Q     Sure.
21            (Brief recess.)
22       MR. GREY:  Can you repeat that question once
23  more for the witness?
24            (Record read.)
25       THE WITNESS:  In 1997 You Sik, I believe, was

180

1   BY MR. GREY:
2        Q     In 1997, you didn't see any evidence
3   during the course of your duties of him performing any
4   services for U. Lim America or U. Lim Mexico; correct?
5        A     If he had done any services, he would
6   have probably done it on the U.S. side.
7        Q     In your work in 1997, you didn't come
8   across any evidence of any services performed by You
9   Sik Youn for either U. Lim America or U. Lim Mexico;
10  correct?
11       A     Yes.  I didn't see.
12       Q     So you have no knowledge, then, of You
13  Sik Youn during that period before February of 1998
14  performing any services for U. Lim America or U. Lim
15  Mexico?
16       A     He might have in the U.S., but not in
17  Mexico.
18       Q     What I'm saying is you have no knowledge
19  of it.  If he did, he did it outside the scope of your
20  knowledge; is that correct?
21       A     That would be correct.
22       Q     Now, what were the facilities in the
23  United States that you are referring to?
24       A     Mr. Yoon's house.
25       Q     And to your knowledge, what, if any,

182

1   going to school, but I was not engaged in any working
2   activities with him in '97.  So I don't know if he was
3   actually working for the company or not, but I do know
4   that Mr. -- when Mr. Soo Cheol Kang left the company,
5   You Sik Youn had started in Mexico.
6   BY MR. GREY:
7        Q     Okay.  I guess I'm confused by your
8   answer because you were at the Mexico facility in
9   1997.
10       A     That's correct.
11       Q     And you were there all year; correct?
12       A     Correct.
13       Q     And for all intents and purposes, U. Lim
14  America plant is the U. Lim plant in that they occupy
15  the same facility.
16       A     Correct.
17       Q     So you would have been in a position to
18  know whether or not You Sik Youn was working for the
19  company in 1997; correct?
20       MR. BATTENFELD:  I object.  It calls for
21  speculation.
22       THE WITNESS:  Like I said, I do not -- I did
23  not engage in any business with You Sik Youn, so I
24  don't have any knowledge if he did work or if he
25  didn't work.

181

1   corporate functions are served at Mr. Yoon's house?
2        A     It's just an office.
3        Q     Is it, in fact, a working office, or is
4   it just an office in title only?
5        A     Office in title only.
6        Q     So there's -- it's not a working office?
7        A     Well, after -- after late hours, yes.
8   Mr. Yoon does work there, so I guess you could call
9   it -- yes.  You can call it an office that you work
10  in.
11       Q     And is that the Westview Court?
12       A     That's correct.
13       Q     And is that the only U. Lim America -- or
14  U. Lim Mexico and American facility or location for
15  either company?
16       A     That's correct.
17       Q     Do you have knowledge as to whether or
18  not You Sik Youn was on either U. Lim America or U.
19  Lim Mexico's payroll prior to February 1998?
20       A     I do not know.
21       Q     Did you ever at any point in time examine
22  any accounting records which evidenced that fact?
23       A     I do not know.
24       Q     Do you know whether or not Mr. You Sik
25  Youn obtained any check-writing authority either

183

1    A    No, it was not.
2    Q    Okay.  Who was it in 1997 that came over?
3    A    I think it was Mr. Lee.
4    Q    And did Mr. Lee discover accounting
5  discrepancies?
6    A    No, he did not.
7    Q    Isn't it true that you provided Mr. Lee
8  with information as to certain accounting
9  discrepancies?
10    A    No, I did not.
11    Q    Isn't it true that, in fact, you provided
12  Mr. Lee with evidence that Mr. Tae Jin Yoon had either
13  not disclosed and/or embezzled certain funds from U.
14  Lim America?
15    A    I'm not aware of.
16    Q    You are not aware of that?
17    A    No, I'm not.
18    Q    Did it happen?
19    A    I'm not aware of it.  I don't know cause
20  I wasn't involved.
21    Q    Was there any investigation, that is, as
22  to whether or not Tae Jin Yoon ever failed to disclose
23  certain moneys received by or on behalf of U. Lim
24  America and/or embezzled any funds from U. Lim
25  America?

                        188

1    A    No.
2    Q    There was no investigation?
3    A    No investigation.  Like I said, there is
4  an audit every year.
5    Q    Isn't it true that at the U. Lim facility
6  Ki Hwa Yoon wrote on one of the boards there --
7  bulletin boards and/or blackboards -- that Tae Jin
8  Yoon had stolen and/or embezzled funds from U. Lim
9  America?
10    A    No, he did not.
11    Q    Isn't it true that you had a discussion
12  with Bo Won Cheong as to whether or not you should
13  make the information with respect to Tae Jin Yoon's
14  embezzlement known to Ki Hwa Yoon?
15    A    No, I did not.
16    Q    Was there any memorandum or other
17  instruction oral or written issued from either U. Lim
18  Korea or Ki Hwa Yoon that Tae Jin Yoon was being
19  relieved from any of his duties at U. Lim America or
20  U. Lim Mexico?
21    A    I'm not aware of that.
22    Q    Are you aware in any capacity of Ki Hwa
23  Yoon or U. Lim Korea relieving Tae Jin Yoon of any of
24  his duties at U. Lim Mexico or U. Lim America?
25    A    The only thing I'm aware of is the

                        189

1  check-writing ability itself.
2    Q    Are you aware of any employee of U. Lim
3  ever having been directed by U. Lim to smuggle any
4  cash back to Korea?
5    A    No.  I do not know anything about that.
6    MR. BATTENFELD:  Give me a chance to make an
7  objection.
8        Richard, I'm cutting you off.  I've
9  indulged you as to this line of inquiry which has no
10  relevance to Mr. Kang's case.
11    MR. GREY:  It certainly has relevance.  What
12  are you talking about?
13    MR. BATTENFELD:  How does it have relevance?
14    MR. GREY:  I will explain it.  To the extent
15  that you are telling employees of U. Lim America to
16  commit criminal acts which you know to be criminal,
17  which you know to be wrongful and to the extent that
18  those U. Lim America employees are willing to commit
19  those criminal acts either under threat of termination
20  or by other sort of influence by U. Lim America.
21        It goes to the credibility of the
22  witnesses that are going to be speaking on U. Lim's
23  behalf, that being Mr. Cho, Mr. Park, Ki Hwa Yoon, Tae
24  Jin Yoon.  If you can get them to commit criminal acts
25  with respect to smuggling, certainly the obstruction

                        190

1  of witnesses and getting them to lie with respect to
2  deposition testimony is right in line.
3    MR. BATTENFELD:  I would suggest that you watch
4  what you say about obstruction of witnesses.  What we
5  have is my witness asking a non-subpoenaed witness as
6  a friend to stay out of the case if he wanted to.
7  What we have your client doing is offering to pay
8  Mr. Carillo to testify on his behalf.  So you be
9  careful, Mr. Grey, to make that claim.
10    MR. GREY:  I am not concerned, John.  I'm not
11  concerned because I know the events and how they went
12  down.  Okay?  And certainly Raul Carillo was not
13  offered any money to testify.  He came forward and
14  said that -- Raul Carillo said he could not attend the
15  deposition because he'd be fired.  We then tried to
16  see whether or not we can get him a job so we can
17  permit him to testify providing that job did not allow
18  additional moneys.
19        So there was absolutely no betterment of
20  his position that was ever, ever intended nor was
21  going to be allowed.  So I know how that went down,
22  and that's not the case.  He was never paid to
23  testify.
24    Q    Were you ever told that you should have
25  reported Tae Jin Yoon's activities to U. Lim Korea or

                        191

KANG V.                                                    JAE HO CHO
U. LIM AMERICA                                              01/11/00

---

1   case.  That's the only reason I'm asking this.
2       MR. BATTENFELD:  It's already been established
3   by this witness according to his recollection that
4   Mr. Kang's case was not discussed in the meeting with
5   Mr. Cheong.  Based on that testimony, what you are
6   asking about goes to Mr. Cheong's case and
7   Mr. Cheong's case alone.
8       MR. GREY:  Well, why don't you let him say
9   whether or not words to that effect ever occurred at
10  that meeting that he recalls.
11      MR. BATTENFELD:  What words to what effect?
12      MR. GREY:  Anything with respect to Ki Hwa Yoon
13  saving face.
14      THE WITNESS:  Saving face?  Well, see, I was at
15  the -- I was at the -- I guess you call it a meeting
16  or gathering.
17      MR. BATTENFELD:  Hold on.  Let's take a break.
18          (Brief recess.)
19  BY MR. GREY:
20      Q    You've had a chance to meet with your
21  attorney.  Do you have an answer to the question?
22      A    No.  I did not hear any such word because
23  there is background.  There is a lot of noise, and
24  this was at a cafe.  I just stood back and let them do
25  what they have to do.  I just didn't have any

                        196

---

1   knowledge of what they were talking about.
2       Q    At all?
3       A    Well, at all.  Well, I didn't hear, so I
4   don't know what they really were talking about.
5       Q    But your testimony is you didn't have any
6   knowledge of their conversation?
7       MR. BATTENFELD:  Objection, misstates prior
8   testimony.  He heard some of what they said.
9       MR. GREY:  I believe he's changed his
10  testimony.
11      MR. BATTENFELD:  I don't believe he has.
12  BY MR. GREY:
13      Q    So you did hear some of the conversation;
14  correct?
15      A    Like I said, it was -- there was a lot of
16  music background.  I just kicked back, and they were
17  talking.  I didn't hear anything.
18      Q    You didn't hear anything?
19      A    No.
20      Q    On your return trip, did you discuss with
21  Mr. Kim how the meeting went?
22      A    Return trip?
23      Q    Well, did you leave the cafe with
24  Mr. Kim?
25      A    Yes.

                        197

---

1       Q    And where did you go with Mr. Kim from
2   the cafe?
3       A    We went back down to San Diego.
4       Q    And this cafe was in L.A.; correct?
5       A    That's right.
6       Q    And you drove together in a car?
7       A    That's correct.
8       Q    During the course of leaving the cafe and
9   returning to San Diego, did you discuss the meeting
10  with Mr. Kim?
11      A    Yes, we did.
12      Q    And what did you discuss?
13      A    I think I asked him how everything went.
14  He responded to me everything looks good.  Something
15  like that.  Other issues like Kang's issue was never
16  mentioned.  Then he got on the phone, was talking to
17  Korea about work for about 30 minutes.  That's the
18  only thing I can remember.
19      Q    Approximately what time did you leave the
20  cafe?
21      A    Let's see.  Estimate of 7:00 or 9:00.
22  Between that time.
23      Q    7:00 or 9:00 p.m.?
24      A    Yeah.
25      Q    And what did you understand him to mean

                        198

---

1   when he said everything looks good?
2       MR. BATTENFELD:  Objection, calls for
3   speculation.
4       THE WITNESS:  I mean how the meeting went.
5   BY MR. GREY:
6       Q    What did you understand that to mean?
7       MR. BATTENFELD:  Calls for speculation.
8       THE WITNESS:  Well, he's a -- I don't know.
9   He's a quiet person, so he doesn't discuss a lot of
10  things with me.  He talked with Mr. Yoon about some
11  issues, but I can't remember what they talked about.
12  BY MR. GREY:
13      Q    Tae Jin Yoon or You Sik Youn or Ki Hwa
14  Yoon?
15      A    I think it was You Sik Youn.
16      Q    Was You Sik Youn with you?
17      A    Excuse me?
18      Q    Was You Sik Youn with you in the car?
19      A    No, he was not.
20      Q    Did he phone You Sik Youn?
21      A    No.  It was after.  I don't know if they
22  met -- I mean where they met, but I think they met.
23      Q    You are talking about after you arrived
24  to San Diego?
25      A    Correct.

                        199

---

KANG V.
U. LIM AMERICA

JAE HO CHO
01/11/00

1     A     Excuse me?
2     Q     How much time did you spend in the
3  meeting with Mr. Cheong?
4     A     Like I said, we met.  We ate.  We just
5  asked each other how we were doing.  Then we went to a
6  cafe.  Maybe we ate.  Maybe 30 minutes at the
7  restaurant.  Then we went to a cafe, and we were there
8  maybe from 30 to 40 minutes, then left.
9     Q     So approximately the whole thing took
10  anywhere from six to seven hours; correct?
11     A     Six to seven hours?
12     Q     Two and a half hours up, two and a half
13  hours back.  That's five.  Another hour and 15 minutes
14  for dinner and the cafe.
15     A     That's about right.
16     Q     Did you discuss with Mr. Kim this
17  upcoming meeting with Mr. Cheong on the way up to
18  L.A.?
19     A     Yes, we did.
20     Q     What did you discuss?
21     MR. BATTENFELD:  I'm going to object to the
22  question as phrased as seeking evidence relating to
23  Mr. Cheong's case rather than Mr. Kang's case, and
24  absent a limitation to ask whether there was any
25  discussion about Mr. Kang's case or any testimony

                            204

1  to file, and we wanted to know why he was going to
2  file.
3     Q     And who did you hear this from?
4     MR. BATTENFELD:  Objection.  To the extent that
5  the question calls for attorney/client communication,
6  I instruct the witness not to answer as to any
7  attorney/client communications.
8  BY MR. GREY:
9     Q     Did you discover this from anyone other
10  than your attorney?
11     A     I can't recall who I heard it from, but I
12  heard that -- I can't remember who told me that.
13     Q     Did you ever receive any instruction from
14  Ki Hwa Yoon to meet with Mr. Cheong?
15     A     No, we did not.
16     Q     Did you ever receive any instruction from
17  Ki Hwa Yoon as to meeting with any witnesses or former
18  employees of U. Lim America concerning Mr. Kang's
19  litigation?
20     A     No.
21     Q     Other than Raul Carillo and Mr. Cheong,
22  have you met with any former employees of U. Lim
23  America or Mexico concerning Mr. Kang's litigation?
24     MR. BATTENFELD:  Objection, asked and answered.
25     THE WITNESS:  Ko contacted me, and we talked.

                            206

1  Mr. Cheong might give in Mr. Kang's case, I will
2  instruct the witness not to answer the question.
3     MR. GREY:  I will clarify.
4     Q     Did you discuss in any way that
5  Mr. Cheong might be testifying in Mr. Kang's case?
6     A     That issue was not mentioned, no.
7     Q     Never?
8     A     No.
9     Q     You were aware at the time you went up
10  that Mr. Cheong had filed a lawsuit; correct?
11     A     No, I did not.  I wasn't aware at that
12  time.  I heard that that was the case, but I did not
13  know if he filed it or not filed it because it was way
14  before I received -- what do you call it -- a summons
15  letter or a sue letter.
16     Q     What was your understanding as to whether
17  or not he had filed a case against U. Lim at the time
18  you went up to this meeting?
19     A     He did not file.
20     Q     So at the time you went, it's your
21  understanding that no case had been filed by
22  Mr. Cheong against U. Lim; correct?
23     A     Correct.
24     Q     What was your reason for going up, then?
25     A     The reason was we heard that he was going

                            205

1  Ko and I talked.
2  BY MR. GREY:
3     Q     Did you discuss whether or not he was
4  going to testify in this litigation?
5     A     When he called me, he told me about Soo
6  Cheol contacting him and said he would pay for his
7  airplane ticket.  He would compensate him, and he told
8  me why is he doing -- why is he suing the company.  Is
9  he all right?  Does he have a problem?  Things like
10  that.  Then we went on to our own business.
11     Q     And what did you say with respect to why
12  Mr. Kang was suing?
13     A     I told him all of the things that he was
14  suing, about discrimination, discharge.  That's about
15  it.
16     Q     Did you comment on Mr. Kang's lawsuit at
17  that time?
18     A     With Ko?
19     Q     Yeah.
20     A     Yes.  Briefly, yes.
21     Q     And what did you comment on?
22     A     About why he was -- why he's filing
23  lawsuit against the company.
24     Q     Did you make any comments about it?
25     A     Comments -- no comments.  Cause he called

                            207

KANG V.
U. LIM AMERICA

JAE HO CHO
01/11/00

```
 1   STATE OF CALIFORNIA        )
                               : ss
 2   COUNTY OF SAN DIEGO        )

 3

 4            I, the undersigned, a Certified Shorthand
 5   Reporter of the State of California, do hereby
 6   certify:
 7            That the foregoing proceedings were taken
 8   before me at the time and place herein set forth; that
 9   any witnesses in the foregoing proceedings, prior to
10   testifying, were placed under oath; that a verbatim
11   record of the proceedings was made by me using machine
12   shorthand which was thereafter transcribed under my
13   direction; further, that the foregoing is an accurate
14   transcription thereof.
15            I further certify that I am neither
16   financially interested in the action nor a relative or
17   employee of any attorney of any of the parties.
18            IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20
     Dated: _____
21
22
23            _____
              JESSICA E. MASSE
24            CSR No. 9910
25
```

                         212

1    THE WITNESS:  No.  There was not.
2 BY MR. GREY:
3    Q    Has he ever discussed with you -- or has
4 he ever denied to you that he's ever hit Mr. Kang?
5    MR. BATTENFELD:  Same objection and same
6 instruction.
7    MR. GREY:  You have to give a verbal response.
8    THE WITNESS:  No.
9 BY MR. GREY:
10   Q    Has he ever denied to you that he's ever
11 grabbed Mr. Kang by the ear during the course of his
12 employment?
13   MR. BATTENFELD:  Same objection and same
14 instruction.
15   THE WITNESS:  No.
16 BY MR. GREY:
17   Q    Has he ever denied to you that he's ever
18 thrown anything at Mr. Kang during the course of his
19 employment?
20   MR. BATTENFELD:  Same objection.  Same
21 instruction.
22   THE WITNESS:  No.
23 BY MR. GREY:
24   Q    What's your present pay at U. Lim?
25   A    My present pay?

245

1    A    Maybe 3500 to 4,000 monthly.  I can't --
2 I can't remember exactly.
3    MR. BATTENFELD:  Don't guess.
4    THE WITNESS:  Yeah.  I can't remember.
5 BY MR. GREY:
6    Q    Did this salary increase coincide with
7 you becoming a general manager?
8    A    Yes.
9    Q    So it's your understanding that you had
10 the salary increase approximately in January of '99?
11   A    Maybe '98.  I can't -- maybe '98.  In the
12 wintertime of '98, or -- I can't really tell you when
13 my salary increased exactly, what time.
14   MR. GREY:  Okay.  We've had all this special
15 time together.
16   THE WITNESS:  Okay.
17   MR. GREY:  She's going to make up a copy of
18 this transcript, which will be very short, and you've
19 got the other transcripts I assume by now, and we'll
20 just have the same stipulation apply.
21   MR. BATTENFELD:  Sure.  30 days from receipt?
22   MR. GREY:  Yeah.  Good enough.
23 /
24 /
25

247

1    Q    Yeah.
2    MR. BATTENFELD:  Why is that relevant?
3    MR. GREY:  As a current employee of U. Lim, it
4 goes to U. Lim's control over him, his comparison
5 between what he could make at other locations, other
6 types of jobs, other corporations.  So it's a question
7 of what control U. Lim has over him.
8    MR. BATTENFELD:  I'm going to take a break and
9 talk to the witness.  It goes to the privacy issues
10 and whether he wants to disclose that information or
11 not.  It's a privacy issue.
12        (Brief recess.)
13   MR. BATTENFELD:  I've spoken to my client.
14 There is a privacy objection here.  He has limited
15 questions, and he's willing to waive his privacy
16 rights.  So I'll allow him to answer the question.
17 BY MR. GREY:
18   Q    Okay.  What's your current salary?
19   A    60,000.
20   Q    60,000?
21   A    Yes.  That's correct.
22   Q    And when is the last salary increase you
23 had?
24   A    I think a year ago.
25   Q    And what was your previous salary?

246

1
2
3
4
5
6
7
8
9    I, JAE HO CHO, do hereby declare under
10 penalty of perjury that I have read the foregoing
11 transcript of my deposition; that I have made such
12 corrections as noted herein, initialed by me,
13 or attached hereto; that my testimony as contained
14 herein, as corrected, is true and correct.
15   EXECUTED this _____ day of _____,
16 19___, at _____, _____.
              (City)              (State)
17
18
19

20   _____
     JAE HO CHO
     Volume III
21
22
23
24
25

248

KANG V.
U. LIM AMERICA

JAE HO CHO, VOL 3
02/01/00

---

1  I think.  I can't -- I'm not sure.
2       MR. BATTENFELD:  You don't want to --
3       THE WITNESS:  I'm not sure.  I'm not sure.
4  BY MR. GREY:
5       Q    Well, you have access to that computer;
6  correct?
7       A    Yes.
8       Q    And you review those payroll records from
9  time to time; correct?
10      A    Back to '97 and '96.  That's the time,
11 yes.
12      Q    And you are currently the general manager
13 of the company?
14      A    Correct.
15      Q    Are you aware of those records ever being
16 destroyed at any time?
17      A    I don't think so.
18      Q    And isn't it true that the payroll
19 records for the U. Lim Mexico employees show the
20 amount of overtime they work?
21      A    I would say that, yes.  We only do two
22 hours of overtime, so --
23      Q    Well, there were additional shifts.
24 There was an 8:00 to 10:00 shift, and there were
25 additional shifts beyond that.

237

---

1       A    There were very few.  Maybe a month or
2  two.
3       Q    But those records would show that
4  overtime; correct?
5       A    I would say yeah, but -- yeah.
6       MR. BATTENFELD:  Again remember if you know as
7  a fact that they do, then your answer should be yes.
8  If you are assuming that they do, then you are
9  speculating.  So you need to clarify which is your
10 testimony.
11      THE WITNESS:  Well, I haven't really searched
12 to see if there were those documents, so I can't be
13 really clear to tell you if we do have it or not.
14 BY MR. GREY:
15      Q    The Mexican employees or the employees of
16 U. Lim Mexico received some profit sharing; correct?
17      A    There were times they did receive profit
18 sharing, yes.
19      Q    And that's mandated by Mexican law;
20 correct?
21      A    Yeah.  If there was a profit -- if there
22 was a profit, yes.  We are supposed to give out
23 profit, yes.
24      Q    Now, was any profit sharing done with
25 respect to U. Lim America?

238

---

1       A    No.  There was not.
2       Q    So it's your understanding that the
3  Mexican laws relating to mandating a profit sharing
4  did not apply to U. Lim America?
5       A    That's correct.
6       MR. BATTENFELD:  Calls for a legal conclusion.
7  BY MR. GREY:
8       Q    Are you aware of any reason why profit
9  sharing wasn't instituted for U. Lim America?
10      A    Never was mentioned.
11      Q    During the course of Mr. Kang's
12 employment, were bonuses ever given out by U. Lim
13 America?
14      A    I think there was, yes.  Once there was,
15 yes.
16      Q    And what was the purpose of those
17 bonuses?
18      A    We achieved a goal.  I think we -- yeah.
19 We achieved a goal, and that's why in December we got
20 a Christmas bonus.
21      Q    Are you aware of why Ki Hwa Yoon became
22 more involved in the business activities of U. Lim
23 America in approximately 1998?
24      A    Didn't he say 1999?
25      Q    Correct me if I'm wrong.

239

---

1       A    I think 1999, December or November.  I
2  think that's what he said.
3       Q    Did you notice a marked increase in his
4  involvement in U. Lim America?
5       A    No.
6       Q    Did you notice any increase in his
7  involvement with respect to U. Lim America?
8       A    No.
9       Q    So when he testified that he became more
10 involved with U. Lim America, you haven't noticed
11 that?
12      A    Increase in business because of his
13 involvement?
14      Q    No, no.  Increase in his involvement in
15 the business.
16      MR. BATTENFELD:  The question is did you notice
17 that he was more involved in the business or not.  I
18 believe that's the question.
19      MR. GREY:  Yes.
20      THE WITNESS:  Okay.  Well, it's mainly Mr. Tae
21 Jin Yoon the one who is in charge of Mexico.  And when
22 Mr. -- I think when Mr. Ki Hwa Yoon said he was more
23 involved, he wanted to know more about Mexico and how
24 the operation was.  I think that's what he was telling
25 you at that time.

240

---

1    A    I would say maybe 40 percent.
2    Q    Now, who else was responsible for making
3  deliveries other than yourself?
4    A    Everybody had responsibilities in
5  delivering materials.  All the departments do.
6    Q    And when you say "everybody," who
7  specifically is "everybody"?
8    A    The Mexican drivers, each department head
9  because sometimes if I'm not there, they would take
10  the responsibility to deliver the material or have the
11  drivers take the material.  Cause like I said, I was
12  in marketing, too.  So sometimes I'd be out in the
13  field, you know, with customers or on business trips.
14    Q    When you referred to department heads,
15  you are referring to Mr. Park and Mr. Kang
16  specifically?
17    A    Correct.
18    Q    Did you have any permanent driver for
19  delivery?
20    A    Off and on.
21    Q    Was there a vehicle for each delivery
22  other than your own?
23    A    The truck wasn't mine.  It was the
24  company's truck.
25    Q    The truck that you were driving, you

229

1  would regularly drive it to and from work?
2    A    That's correct.
3    Q    Was there another vehicle other than the
4  one you would regularly have used?
5    A    Yeah.  I think we had a van.
6    Q    And in 1995, approximately how many
7  deliveries a week would U. Lim have?
8    A    I can't -- I can't -- I can't remember.
9  It could be -- I can't remember.
10    Q    Well, it's producing goods on a daily
11  basis?
12    A    Correct.
13    Q    And then you have to prepare those for
14  shipment even if you are delivering them yourselves?
15    A    Yeah.  But it all varies because the
16  P.O.s are all different dates, and I can't
17  specifically tell you how many days we delivered a
18  week.  I mean it could be one time.  Next week could
19  be two times.  I can't tell you.
20    Q    Again we are just going to get into your
21  best estimates.  Was U. Lim delivering goods to
22  someone once a day, once a week?  Your best estimate.
23    A    Maybe three -- three to four times a
24  week.
25    Q    Was there any specific location that U.

230

1  Lim would be typically delivering to or a customer
2  that was the majority customer?
3    A    I would say Samsung was.
4    Q    And where were they located?
5    A    Maybe -- at that time maybe 20 minutes
6  away.
7    Q    And who was your second biggest customer?
8    A    In '95?
9    Q    Yeah.
10    A    I would say Sanyo would be.
11    Q    And where were they located?
12    A    About ten minutes away.
13    Q    And how long did they remain your number
14  one, number two customers?
15    A    To current.
16    Q    Now, also the name of L.G. --
17    A    L.G. -- I don't think we had their
18  account until '97 -- '97.  If you had me brought my
19  profile, I could explain to you how they stand, but I
20  don't have that profile in front of me.
21    Q    And where was L.G. located?  In Mexicali?
22    A    In Mexicali.  That's right.
23    Q    And how far away is Mexicali from U.
24  Lim's facility?
25    A    Two hours.

231

1    Q    So approximately in 1995 how many hours a
2  week would you say were devoted by you to deliver?
3    A    Majority of the time.
4         Can you repeat that question again?
5    Q    Sure.
6         In 1995, how many of the hours that you
7  worked at U. Lim were devoted to deliver?
8    A    In a week or --
9    Q    In a week.
10    A    In a week?
11         MR. BATTENFELD:  I'll remind the witness not to
12  guess.
13         THE WITNESS:  I can't give you an estimate
14  cause I'm all over.
15  BY MR. GREY:
16    Q    Well, as a percentage of the hours that
17  you worked, what's your best estimate?
18    A    It varies.  I mean I can't pinpoint out.
19    Q    I know.  I'm sure it's going to vary from
20  week to week, but again you made the deliveries.  They
21  were part of your work.  You delivered the majority of
22  goods for U. Lim.  It obviously took some time to do,
23  and you went through all of that.  So what's your best
24  estimate of either the number of hours in a week or a
25  monthly basis that you had to deliver?

232

1  in sales?
2       A       That's correct.  Yes.
3       Q       So there was some correlation between the
4  managers and specifically Mr. Kang having to work
5  longer hours as the sales increased?
6       A       Like I said before, I mean we do receive
7  a lot of materials assembled and half assembled, and
8  there is not that much production needed to increase
9  because of that.  Or maybe the purchasing department
10 had a lot of things to order from Korea.  Maybe, you
11 know.  Like I said, one to two hours.
12      Q       But there was an increase?
13      A       One to two hours, yes.
14      Q       Correlating to the sales?
15      MR. BATTENFELD:  Well, objection, misstates his
16 testimony.
17      THE WITNESS:  Like I said -- what I said.  I
18 mean the raw materials and the materials
19 that we get, it's just -- you know, our production
20 does not need to increase because of that.
21 BY MR. GREY:
22      Q       Was there ever a point in time
23 approximately around December of 1998 that Mr. Kang's
24 overtime began to -- or hours worked beyond 5:30 began
25 to increase?

221

1       MR. BATTENFELD:  You mean December '97?
2       MR. GREY:  I'm sorry.  December '97.
3       THE WITNESS:  Yeah.  Like I stated last time,
4  we had a -- I mean a huge order of P.O.s and things
5  that we had to deliver on time that we did stay longer
6  hours, yes.
7  BY MR. GREY:
8       Q       December of '97?
9       A       Correct.
10      Q       And that would have included you,
11 Mr. Park, and Mr. Kang?
12      A       Correct.  And Mr. Yoon, too, at the time.
13 Well, no.  I can't remember.  No.  Strike that.
14      Q       Were you referring to Tae Jin Yoon at
15 that moment?
16      A       Yeah.
17      Q       Tae Jin Yoon?
18      A       Yes.
19      MR. BATTENFELD:  But you said strike that.
20      THE WITNESS:  Yeah.
21 BY MR. GREY:
22      Q       But you are unsure?
23      A       Yes.
24      Q       Was there ever a point in time when
25 Mr. Kang said anything to you about how he wasn't

222

1  going to work past 5:30?
2       A       Yes, there was.
3       Q       And when was that?
4       A       I think maybe starting January of '98.
5       Q       And what did he say to you?
6       A       He had a meeting with his family.  They
7  discussed if there was no work needed to be done, he
8  would not come to work.
9       Q       Was there -- and this conversation you
10 had with Mr. Kang was in January of '98?
11      A       Approximately, yes.
12      Q       And what else do you remember about that
13 conversation?
14      A       I think I told him how could you discuss
15 working hours and, you know, business matters with
16 your family and making a decision on that.
17      Q       And did he have any response?
18      A       I can't remember.  I can't remember.
19      Q       Do you remember anything else from that
20 conversation?
21      A       No, I don't.
22      Q       Was anybody else present for that
23 conversation?
24      A       No.  It was just me and Kang, I think.
25      Q       And this was the first time that you

223

1  recall speaking to Mr. Kang about that topic; correct?
2       A       Yes.
3       Q       Did you have any other discussions with
4  him prior to his termination date regarding his
5  working of overtime?  And I'm just using overtime now
6  for time past 5:30.
7       A       I can't recall.  I can't remember.
8       Q       Did you convey the content of this
9  conversation to anyone else at U. Lim?
10      A       I can't recall.
11      Q       Well, specifically did you tell Mr. Tae
12 Jin Yoon?
13      A       I don't think I did.  I can't remember.
14      Q       Do you recall discussing with anyone at
15 U. Lim Mr. Kang's supposed position of not working
16 overtime?
17      A       I think maybe Mr. Park.  I may have
18 discussed that with Mr. Park cause Mr. Yoon was
19 frequently out of the country on business trips.
20      Q       And in this conversation you believe you
21 might have had with Mr. Park, what did you discuss?
22      A       The conversation that he told me that he
23 had with his family and things, that he didn't want to
24 work after 5:30.  I think that's it.
25      (Mr. Kang enters the deposition room.)

224

**Page 213**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,              )
                                  )
 5              Plaintiff,        )
                                  )
 6        vs.                     )   No. 99 CV659 JM
                                  )        (RBB)
 7   U. LIM AMERICA, INC.; TAE    )
     JIN YOON, an individual; and )
 8   DOES 1 to 100,               )
                                  )
 9              Defendants.       )
     _____)
10
11
12
13
14
15          DEPOSITION OF JAE HO CHO
16             San Diego, California
17           Tuesday, February 1, 2000
18                 Volume III
19
20
21
22
23   Reported by:
     JESSICA E. MASSE
24   CSR No. 9910
     JOB No. 12376A
25
```

**Page 214**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,              )
                                  )
 5              Plaintiff,        )
                                  )
 6        vs.                     )   No. 99 CV659 JM
                                  )        (RBB)
 7   U. LIM AMERICA, INC.; TAE    )
     JIN YOON, an individual; and )
 8   DOES 1 to 100,               )
                                  )
 9              Defendants.       )
     _____)
10
11
12
13
14
15          Deposition of JAE HO CHO, Volume
16   III, taken on behalf of Plaintiff, at
17   501 West Broadway, Suite 1300, San
18   Diego, California, beginning at 9:43
19   a.m. and ending at 10:37 a.m. on
20   Tuesday, February 1, 2000, before
21   JESSICA E. MASSE, Certified Shorthand
22   Reporter No. 9910.
23
24
25
```

**Page 215**

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3        LAW OFFICE OF RICHARD E. GREY
          BY:  RICHARD E. GREY
 4        Attorney at Law
          409 Camino Del Rio South, Suite 303
 5        San Diego, California 92108
          (619) 543-9300
 6
     For the Defendants:
 7
          MORGAN, LEWIS & BOCKIUS
 8        BY:  JOHN S. BATTENFELD
          Attorney at Law
 9        300 South Grand Avenue, 22nd Floor
          Los Angeles, California 90071
10        (213) 612-2500
11   Also Present:
12        SOO CHEOL KANG  (Where indicated.)
          TAE JIN YOON
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 216**

```
 1                    INDEX
 2   WITNESS:                      EXAMINATION
 3   JAE HO CHO
     Volume III
 4
 5        BY MR. GREY                   217
 6
 7
 8
 9
10
11
12               EXHIBITS
13
              (None)
14
15
16
17
18
19
20
21
22
23
24
25
```

Legal Tabs Co. 1-800-322-3022

Recycled   Stock #90-10-B

KANG V.                                                              KI HWA YOON
U. LIM AMERICA                                                        01/12/00

---

1         Q    Are you aware of the existence of a
2    second or a third shift at the U. Lim Mexico plant?
3         A    I don't think so.  I don't know.
4         Q    Final question.  Just one.  Who is the
5    person, or if there is more than one person, with
6    settlement authority in this case, Mr. Kang's
7    litigation?
8         THE INTERPRETER:  I need to explain settlement
9    with a few more words than just the one word.
10        MR. BATTENFELD:  I want to make an objection
11   that the question calls for a legal conclusion.
12   Settlement is a legal term.
13        THE INTERPRETER:  The settlement word.
14        MR. BATTENFELD:  You need to translate.
15        THE INTERPRETER:  I will translate for you.
16   The word of settlement is not -- there is no
17   equivalent word in Korean.  I need more than a word to
18   explain what settlement means in this country.
19        THE WITNESS:  President.
20   BY MR. GREY:
21        Q    Who is the president?
22        A    Tae Jin Yoon.
23        Q    You mean the vice-president?
24        A    Yes.
25        MR. GREY:  Okay.  That's it.

                          129

---

1         I assume you have no questions?
2         MR. BATTENFELD:  No.
3         MR. GREY:  Same stipulation.  Forward the
4    original deposition transcript to Mr. Battenfeld's
5    office; he'll have 30 days for his client to read and
6    sign the transcript and to make any changes he deems
7    necessary, and then Mr. Battenfeld will notify me
8    within five business days of those changes; if for any
9    reason the original is lost, misplaced, or stolen,
10   then a certified copy can be used instead.
11        Anything else?
12        MR. BATTENFELD:  So stipulated.
13        MR. GREY:  So stipulated.
14   /
15   /
16
17
18
19
20
21
22
23
24
25

                          130

---

1
2
3
4
5
6
7
8
9         I, KI HWA YOON, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript of my deposition; that I have made such
12   corrections as noted herein, in ink, initialed by me,
13   or attached hereto; that my testimony as contained
14   herein, as corrected, is true and correct.
15        EXECUTED this _____ day of _____,
16   19___, at _____, _____, _____.
            (City)              (State)
17
18
19
20        _____
          KI HWA YOON
21
22
23
24
25

                          131

---

1    STATE OF CALIFORNIA        )
                                : ss
2    COUNTY OF SAN DIEGO        )
3
4         I, the undersigned, a Certified Shorthand
5    Reporter of the State of California, do hereby
6    certify:
7         That the foregoing proceedings were taken
8    before me at the time and place herein set forth; that
9    any witnesses in the foregoing proceedings, prior to
10   testifying, were placed under oath; that a verbatim
11   record of the proceedings was made by me using machine
12   shorthand which was thereafter transcribed under my
13   direction; further, that the foregoing is an accurate
14   transcription thereof.
15        I further certify that I am neither
16   financially interested in the action nor a relative or
17   employee of any attorney of any of the parties.
18        IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20
21   Dated: _____
22
23        _____
          JESSICA E. MASSE
24        CSR No. 9910
25

                          132

---

Page 121:

```
 1   employees to work ten Saturdays to make up for the
 2   days lost?
 3        THE INTERPRETER:  I don't understand.  Let me
 4   understand before I --
 5   BY MR. GREY:
 6        Q    Isn't it true that U. Lim America
 7   requires the employees to work ten Saturdays to make
 8   up for the ten business days lost because of vacation?
 9        A    I don't know anything about it.  I do not
10   know anything about it.
11        Q    Are you aware of U. Lim America sending
12   its managers to workshops regularly during the
13   Christmas break?
14        A    No.
15        MR. BATTENFELD:  I think there was a
16   mistranslation of the last --
17        MR. GREY:  It was just workshops.
18        THE WITNESS:  To where?
19        MR. GREY:  To anywhere.  If U. Lim America
20   employees were sent to a workshop at any location
21   during the Christmas break.
22        THE WITNESS:  Did you say they were sent to
23   workshops for two weeks?
24   BY MR. GREY:
25        Q    During the Christmas break, were they
```

121

Page 122:

```
 1   sent to workshops?
 2        A    I think after Christmas they go.  I don't
 3   know.
 4        Q    Do you know where those workshops are
 5   held?
 6        A    In Korea.
 7        Q    Do you know how long those workshops last
 8   for?
 9        A    Like one night and two days.
10        Q    How long have you been in the United
11   States on this last trip?
12        THE INTERPRETER:  This trip or last trip?
13        MR. GREY:  This trip right now.
14        THE WITNESS:  I think more than one month and a
15   half.
16   BY MR. GREY:
17        Q    And you share the same house as Tae Jin
18   Yoon; correct?
19        A    Yes.  When he goes to Korea -- I mean we
20   always on and off live together.
21        Q    The Westview Court address, does Tae Jin
22   Yoon also live at that address?
23        A    Yes.
24        Q    Okay.  And that's where you've been for
25   the last month and a half; correct?
```

122

Page 123:

```
 1        A    Yes.  And I travel to here and there,
 2   too.
 3        Q    Okay.  And before that, where were you?
 4        A    Korea.
 5        Q    And how long were you in Korea?
 6        A    Mainly usually most time I stay in Korea.
 7        Q    I'm just wondering how long you were in
 8   Korea before you came back to the U.S. on this trip.
 9        MR. BATTENFELD:  Richard, what's the relevance
10   of this question?
11        MR. GREY:  I will get to the relevance.
12        MR. BATTENFELD:  Well, I'd like to know because
13   this is all post Kang's employment.
14        MR. GREY:  I will get to the relevance of this.
15        Q    How long were you in Korea?
16        A    About two months and a half.
17        Q    And before that, were you back in the
18   U.S.?
19        A    Yes.
20        Q    Okay.  And on that trip, how long were
21   you in the U.S.?
22        A    About two months.
23        Q    Now, this last trip that you've been here
24   for a month and a half, has Tae Jin Yoon also been in
25   the house the last month and a half?
```

123

Page 124:

```
 1        A    No.  He is in Korea.
 2        Q    During the last six months, how long has
 3   Tae Jin Yoon been in the United States?
 4        A    For six months?
 5        Q    During the last six months.
 6        A    I don't know exactly.  I think he stayed
 7   quite long.
 8        Q    Has there ever been occasion while you've
 9   been at the Westview address on this trip or the last
10   trip that Tae Jin Yoon has been at the last address as
11   well?
12        A    Just off and on.  When he comes, he stays
13   only a few days.  Mainly he is in Korea.
14        Q    But he has been at that Westview address
15   for some of the time while you've been at it on the
16   last two trips; correct?
17        A    Yes.
18        Q    Okay.  And during the last two times that
19   you've been out to the U.S., have you ever talked to
20   Tae Jin Yoon about Mr. Kang's litigation?
21        A    No.
22        Q    In the last six months, have you ever
23   talked to Tae Jin Yoon at all about Mr. Kang's
24   litigation?
25        A    No.
```

124

KANG V.
U. LIM AMERICA

KJ HWA YOON
01/12/00

1     Q    Okay.  I'm not asking whether other
2  people can sign checks.  I'm just asking whether or
3  not if you sign a check and only your signature is
4  present, is that check good?
5     A    Yes, it is.
6     Q    Okay.  And at some point in time, Mr. Cho
7  and You Sik Yoon could write checks for U. Lim
8  America; correct?
9     A    Yes.
10    Q    Okay.  But both of their signatures were
11  required?
12    A    Yes.  Together.
13    Q    And at one point in time just like you,
14  Tae Jin Yoon could write checks with just his
15  signature, correct, for U. Lim America?
16    A    Yes.
17    Q    Okay.  And as you indicated, at some
18  point he no longer had that check-writing ability;
19  correct?
20    A    Yes.  Because he was frequently absent
21  for other business activities.
22    Q    Why did you take his name off completely
23  from the check-writing ability?
24    A    He's absent because he travels frequently
25  due to the business.

113

1  who could sign checks; correct?
2    A    Yes, it is.
3    Q    Okay.  But just like Tae Jin Yoon, you
4  were frequently away from U. Lim America either in
5  Korea or on business trips; correct?
6    A    Yes, yes.
7    Q    Okay.  And you still have check-writing
8  ability; correct?
9    A    Yes.
10    Q    Why didn't you keep check-writing ability
11  for Tae Jin Yoon just like you?
12    A    Europe or Hungary -- we are constructing
13  a factory.  That's why we took him out.  That has been
14  transferred to there or this side.
15    Q    Did you ever bring over a Mr. Lee to
16  conduct an audit of U. Lim's records -- financial
17  records?
18    A    I don't think so.
19    Q    Do you know Mr. Lee?
20    A    You mean main -- the company in Chinese?
21    Q    Mr. Lee that works for you.
22    A    I don't know which one you are talking
23  about.
24    Q    Is there a Mr. Lee who works in
25  accounting or financial services for your company?

115

1     Q    Okay.  But he's the president of the
2  company still; correct?
3    MR. BATTENFELD:  Of U. Lim America?
4    MR. GREY:  I'm sorry.  Vice-president.
5    THE WITNESS:  Vice-president.
6  BY MR. GREY:
7    Q    And he is president of U. Lim Mexico?
8    A    Yes.
9    Q    And he has check-writing authority for
10  neither U. Lim Mexico nor U. Lim America; is that
11  correct?
12    A    Yes.
13    Q    Okay.  And he still is conducting
14  business for both U. Lim Mexico and U. Lim America;
15  correct?
16    A    Yes.
17    Q    Okay.  Then why did you take his name off
18  the checks even if you had a need for Mr. Cho or
19  Mr. Yoon to be able to sign checks?
20    A    Cannot work because he is absent due to
21  the business.
22    Q    Okay.  I understand that Mr. Cho and
23  Mr. You Sik Yoon are present at the facility; correct?
24    A    Mr. Park also can sign.
25    Q    Okay.  And you wanted people at the plant

114

1    A    What is his name?
2    Q    Mr. Lee, L-e-e.
3    A    The name?
4    THE INTERPRETER:  This is my comment.  Mr. Lee,
5  Johnson, Smith.  Everybody is Mr. Lee in Korea.
6  BY MR. GREY:
7    Q    I believe Mr. Cho testified that a
8  Mr. Lee came over from Korea to conduct an audit.  Are
9  you familiar with that?
10    MR. BATTENFELD:  That misstates Mr. Cho's
11  testimony.  I will state for the record that Mr. Cho
12  did not give that testimony.
13  BY MR. GREY:
14    Q    Are you aware of Mr. Lee coming to audit
15  any of the records?
16    A    Mr. Lee didn't come here to do audit.
17  Mr. Lee came to tour the facilities with me.  He came
18  with me.
19    (Recess taken from 5:03 p.m. to 5:07
20  p.m.)
21  BY MR. GREY:
22    Q    Did you ever conduct any investigation
23  into whether or not U. Lim America was missing any
24  funds?
25    MR. BATTENFELD:  And I'm going to object to the

116

KANG V.                                                                    KI HWA YOON
U. LIM AMERICA                                                              01/12/00

1  responding. If you don't trust what I say, you don't
2  even have to waste our time here.
3      MR. BATTENFELD: Let's take a break. Let's
4  take a break.
5      MR. GREY: Let me just know one thing. I am
6  not saying that you are lying. I am trying to
7  understand you, and you appear to be trying to
8  understand me, and I just want to get your accurate
9  testimony, and that's all we are trying to do. Do you
10  understand?
11      THE WITNESS: The American talking the way,
12  very hard to understand.
13      MR. BATTENFELD: There is no question pending.
14  Let's take a break so we can talk to the witness, and
15  we'll try to get back on this straight path here.
16      MR. GREY: We'll try again in a couple of
17  minutes.
18      (Recess taken from 4:31 p.m. to 4:40
19  p.m.)
20  BY MR. GREY:
21      Q    You've had an opportunity to meet with
22  counsel and your general manager Mr. Cho; correct?
23      A    Yes.
24      Q    And what we are going to try is to get
25  through this and make sure that both of us are

                          105

1  understanding what we are saying.
2      A    Yes.
3      Q    And you are giving your testimony here
4  today, and you understand what testifying means;
5  correct?
6      A    Yes.
7      Q    Okay. But you have not filed a lawsuit;
8  correct?
9      A    Yes.
10      Q    But yet you are still a witness and
11  testifying?
12      A    Yes.
13      Q    Okay. In Mr. Cheong's case, he has filed
14  a lawsuit and is a witness.
15      A    Yes.
16      Q    Do you understand that?
17      A    Yes.
18      Q    And in his case, he has some allegations
19  similar to Mr. Kang and some different. And as I
20  understand, at some point in time Mr. Cho informed you
21  that Mr. Cheong would either be testifying for
22  Mr. Kang or had filed his own lawsuit.
23      A    I was told that he filed a lawsuit. I
24  understood -- I heard and understood as that. Whether
25  I was aware he had filed lawsuit or not, I didn't

                          106

1  think about Kang testifying.
2      Q    Did you think about Mr. Cheong
3  testifying?
4      THE INTERPRETER: Would you repeat that?
5  BY MR. GREY:
6      Q    Did you think about Mr. Cheong
7  testifying?
8      A    Now I understand. Now I understand what
9  it is.
10      Q    Did you have any concern over the fact
11  that Mr. Cheong may testify on behalf of Mr. Kang?
12      A    No.
13      Q    Did Mr. Cho ever use the term "witness"
14  for Mr. Kang, that he might be a witness for Mr. Kang?
15      A    Yes, yes. Yes.
16      Q    Okay. And to the extent that he was
17  going to be a witness, did Mr. Cho tell you what he
18  was going to be a witness about?
19      A    No. I didn't hear the detail.
20      Q    Now, before the break you mentioned the
21  fact that you were disgusted. Were you disgusted by
22  Mr. Kang filing a lawsuit?
23      A    What are you asking?
24      Q    Were you disgusted by the fact that
25  Mr. Kang filed a lawsuit against U. Lim?

                          107

1      A    With whom?
2      Q    Were you disgusted by the fact that
3  Mr. Kang filed a lawsuit against U. Lim?
4      A    I didn't feel good about it.
5      MR. BATTENFELD: Mr. Cho believes that the
6  initial testimony he gave was I didn't feel good
7  rather than he was disgusted. He believes that was
8  the original word used by the witness.
9  BY MR. GREY:
10      Q    Why didn't you feel good about Mr. Kang's
11  lawsuit?
12      THE INTERPRETER: Mr. Kang's lawsuit?
13      MR. GREY: Yes.
14      THE WITNESS: I think just the human nature.
15  When you like somebody, it happens. I think it's not
16  just I alone. Other people would feel the same way.
17  BY MR. GREY:
18      Q    Did U. Lim America have any policy with
19  respect to Korean employees working at U. Lim who did
20  not have U.S. citizenship specifically with respect to
21  visas?
22      THE INTERPRETER: Would you repeat that? I
23  don't want to mistranslate.
24      MR. GREY: Oh, I wish I wouldn't have to. Let
25  me try to rephrase.

                          108

**Page 97**

1     A    I don't understand your question.
2     Q    Did you ever talk to Mr. Cho or anyone
3 else at U. Lim on whether or not Mr. Carillo was going
4 to testify in this case?
5         THE INTERPRETER:  Let me have the spelling of
6 Carillo cause he understands as Raul.  So if I don't
7 have correct spelling, I don't want to create any
8 confusion here.  Would you let me have spelling of
9 Mr. Carillo?
10        MR. GREY:  C-a-r-i-, double, l-o.
11        THE INTERPRETER:  C-a-r-i --
12        MR. GREY:  Double l-o.
13        THE INTERPRETER:  Double "O"?
14        MR. GREY:  C-a-r-i-l-l-o.
15        THE INTERPRETER:  Can I just say Raul, then?
16        MR. GREY:  We can refer to him as Raul.
17        Q    You know Raul Carillo; correct?  You
18 testified to that.
19        A    I only know Raul.
20        Q    Okay.  We'll refer to him as Raul, then.
21 Do you remember the question?
22        THE INTERPRETER:  Yeah.
23        THE WITNESS:  I don't remember.
24 BY MR. GREY:
25        Q    You don't remember whether or not you

                          97

**Page 98**

1 ever spoke to Mr. Cho or anyone at U. Lim with respect
2 to whether or not Raul was going to testify in this
3 case?
4     A    I don't know.
5     Q    Do you know who Bo Won Cheong is?
6     A    Yes.
7     Q    And who is Bo Won Cheong or what position
8 did he hold at U. Lim?
9     A    Supervisor.  The position was supervisor.
10        MR. BATTENFELD:  Mr. Cho believes he used the
11 word assistant manager, but --
12        MR. GREY:  We'll have you clarify.
13        THE WITNESS:  Assistant manager.
14 BY MR. GREY:
15        Q    Did you know Mr. Cheong personally?
16        A    Yes.
17        Q    Have you ever had occasion to meet with
18 Mr. Cheong at your house?
19        A    At my house?
20        Q    At your house in the U.S.
21        A    My house?  When I come, they usually come
22 to greet me.
23        Q    At your house?
24        A    Yes.
25        Q    Did you ever become aware that Mr. Cheong

                          98

**Page 99**

1 was going to testify in Mr. Kang's case on his behalf?
2         THE INTERPRETER:  On whose behalf?
3         MR. GREY:  Mr. Kang's.
4         THE WITNESS:  Yes.  I heard from Jae when he
5 was driving.
6 BY MR. GREY:
7     Q    When was that?
8     A    I can't recall.  I think it's been a
9 while ago.
10    Q    Okay.  Your best estimate.
11    A    I don't know.  I cannot think right now.
12 I may have heard.
13    Q    And what did Mr. Cho tell you about
14 Mr. Cheong?
15    A    *I think I heard that Soo Cheol Kang filed*
16 *lawsuit.*
17    Q    Did you hear that Mr. Cheong was going to
18 testify for Mr. Kang?
19    A    Yes, yes.
20        (Telephonic interruption.)
21 BY MR. GREY:
22    Q    Now, you testified that Mr. Cho told you
23 that Mr. Cheong was going to testify for Mr. Kang;
24 correct?
25    A    Yes.

                          99

**Page 100**

1     Q    And what did he tell you Mr. Cheong was
2 going to testify about?
3         MR. BATTENFELD:  And I'll object to the
4 question.  That assumes that Mr. Cho told him anything
5 at that time.
6 BY MR. GREY:
7     Q    Do you understand the question?
8     A    I don't.
9     Q    Mr. Cho told you Mr. Cheong was going to
10 testify; correct?
11    A    I think I heard that lawsuit has been
12 filed.
13    Q    We were just talking about the fact that
14 Mr. Cho informed you that Mr. Cheong was going to
15 testify on Mr. Kang's behalf.  Remember?
16    A    No.  It's not on behalf of Mr. Kang.  I
17 think together they filed lawsuit.
18    Q    Did Mr. Cho ever tell you what Mr. Cheong
19 was going to testify to?
20    A    *I think -- I think when I heard from him,*
21 *I didn't make any comment because it was so*
22 *disgusting.*
23    Q    Why was it so disgusting?
24    A    *Because the people we had filing*
25 *lawsuits.*

                          100

KANG V.                                                          KI HWA YOON
U. LIM AMERICA                                                     01/12/00

---

1       A       Yes.
2       Q       So ultimately, then, Mr. Kang was your
3  employee; correct?
4       A       Yes.
5       Q       And you said it was your personal belief
6  that you should always have love towards your
7  employees; correct?
8       A       Would you repeat it?
9       Q       You said it was your personal belief that
10 you should always have love towards your employees;
11 correct?
12      A       Yes, I do.
13      Q       With that in mind, are you upset that
14 Mr. Kang left his employment with your company?
15      A       What do you mean?
16      Q       Well, with that in mind that you have
17 love for your employees, are you upset that Mr. Kang
18 left employment with your company?
19      A       I feel more like sad about it.
20      Q       Have you done anything to figure out the
21 reason why Mr. Kang left employment with your company?
22      A       No.
23      Q       Why not?
24      A       There is -- the president is there.
25      Q       Are you concerned that there may have

                        89

---

1  been difficulties between Mr. Kang and the president?
2       A       I don't understand your question.
3       Q       Well, are you bothered or worried that
4  there may have been problems between Mr. Kang and Tae
5  Jin Yoon?
6       A       No.
7       Q       Why not?
8       A       Cause I didn't know what happened.
9       Q       Well, you are the owner of the company;
10 correct?
11      A       Yes.
12      Q       And ultimately everything that happens at
13 the company is your responsibility; correct?
14      MR. BATTENFELD:  Go ahead and ask the question,
15 and I'll make an objection -- translate the question.
16 And I'll object that the question is argumentative and
17 calls for a legal conclusion.
18      MR. GREY:  You can answer.
19      THE WITNESS:  Would you repeat what you said?
20 I don't understand that at all.
21 BY MR. GREY:
22      Q       Ultimately as the head of the company and
23 nobody else is above you, you are responsible for what
24 happens in your company; correct?
25      MR. BATTENFELD:  Same objection.

                        90

---

1       THE WITNESS:  I don't think I can answer for
2  that since I don't understand the question.
3  BY MR. GREY:
4       Q       Well, you are the head of the business;
5  correct?
6       A       Yes, it is.
7       Q       And one of those businesses is U. Lim
8  America; correct?
9       A       Yes.
10      Q       And there is nobody above you; correct?
11      A       Yes.
12      Q       And ultimately everybody reports to you
13 either directly or through their superiors like
14 Mr. Cho or Tae Jin Yoon; correct?
15      MR. BATTENFELD:  And I'll object that the
16 question is ambiguous.
17      MR. GREY:  You can answer.
18      THE WITNESS:  Why do they report to me?  They
19 have their own president.
20 BY MR. GREY:
21      Q       Well, they report to the president;
22 correct?
23      A       Who?
24      Q       The employees.
25      A       I don't understand that question.  What

                        91

---

1  are you asking about the company?
2       Q       You are the head of U. Lim America;
3  correct?
4       A       Yes.
5       Q       And there is nobody above you?
6       A       Yes.
7       Q       Okay.  And ultimately everybody at U. Lim
8  America is below you; correct?
9       A       Yes.
10      Q       And they report to you either directly or
11 indirectly; correct?
12      MR. BATTENFELD:  And I'll object that the
13 question is ambiguous and misstates prior testimony.
14      THE WITNESS:  There are things that they report
15 to me.  There are things that they don't report to me.
16 BY MR. GREY:
17      Q       Okay.  But if Mr. Cho has an assistant
18 manager, that assistant manager reports to Mr. Cho;
19 correct?
20      A       Should be.
21      Q       And Mr. Cho reports to Tae Jin Yoon;
22 correct?
23      A       Yes.  Should be.
24      Q       And Tae Jin Yoon reports to you; correct?
25      A       There are things to report or there are

                        92

---

KANG V.
U. LIM AMERICA

KI HWA YOON
01/12/00

---

**Page 81**

1  BY MR. GREY:
2      Q    Do you know whether or not Raul Carillo
3  was terminated?
4      THE INTERPRETER:  I don't want to make any
5  mistake.  Can you use terminate in a different way?
6      MR. GREY:  Sure.  Fired or cut off.
7      THE WITNESS:  Should I talk about Raul here?
8      MR. GREY:  Yes.
9      THE WITNESS:  Raul -- he left the position.  He
10  was not terminated or fired, but he was -- he
11  misunderstood that somebody was talking to him, didn't
12  understand Spanish very well, so he misunderstood, so
13  he thought he was terminated.
14  BY MR. GREY:
15      Q    And you are saying he was not terminated?
16      A    It's correct.
17      Q    Who was it that he misunderstood?
18      A    The assistant manager.  Park misspoke.
19      Q    What is it that Mr. Park said that gave
20  Raul Carillo the impression he was fired?
21      A    It was regarding the automobile.
22      Q    What specifically was it?
23      A    I think when I was asking Mr. Park to
24  wash the car in Mexico, and he misunderstood, so he
25  thought -- he said -- thought I told him that he

---

**Page 82**

1  should get Mexican to go with.  He thought I was
2  asking to call Mexican to wash the car there.  So I
3  think he misunderstood that he was asked to wash the
4  car.
5      Q    Who was asked to wash the car can't be
6  misinterpreted as firing Raul Carillo.  What was it
7  specifically that Mr. Park said that you believe was
8  misinterpreted by Raul Carillo to mean that he was
9  fired?
10      A    He said he was quitting because he didn't
11  like that he was told to wash the car.  That was
12  misunderstanding.
13      Q    Were there any specific words Mr. Park
14  used -- I'm talking about Mr. Park now -- that caused
15  Mr. Carillo to believe that he was being terminated?
16      A    He was not fired.  No, not at all.
17      Q    I believe your earlier testimony was that
18  Raul thought he had been fired, and that Mr. Park had
19  misspoken; is that correct?
20      MR. BATTENFELD:  And I'll object that that
21  misstates the witness' testimony.
22      THE WITNESS:  What are you saying?  I never
23  said terminated or fired.  He was not fired.
24  BY MR. GREY:
25      Q    I thought you said at one point earlier

---

**Page 83**

1  in the testimony that Raul Carillo thought -- thought
2  he was fired because Mr. Park misspoke.
3      MR. BATTENFELD:  And for the record, I believe
4  there may have been a problem with translation.
5      THE WITNESS:  No, it was not.  I didn't say
6  that.  He misspoke, so he misunderstood, so he didn't
7  like what he heard which was the misunderstanding.
8  That's why he left.
9  BY MR. GREY:
10      Q    Was the only misunderstanding whether or
11  not Raul Carillo was supposed to wash the car?
12      A    Yes, yes.  I instructed China and our
13  company don't fire anybody, don't terminate anybody.
14      MR. BATTENFELD:  I'm going to remind the
15  witness to answer the question that he's been asked.
16  Could you please translate answer the question that's
17  pending.  That's what you are here to do.  Nothing
18  more.
19      MR. GREY:  Complete the translation of Mr. Ki
20  Hwa Yoon.
21      THE WITNESS:  I instructed including China our
22  company will not terminate anyone.
23  BY MR. GREY:
24      Q    When you say it was your instruction to
25  the company not to terminate anyone, what did you do

---

**Page 84**

1  with employees that you thought were not good
2  employees?
3      A    And I tell them that it's not -- with no
4  condition I tell them that first you don't hire
5  somebody like that and do not even terminate.  From
6  beginning I always tell them to identify good one and
7  hire.
8      Q    But no one is perfect, and you are not
9  going to identify all the good ones; correct?
10      A    I don't think there is any bad person.
11  If you teach them, if you train them, they are okay.
12      Q    Well, is it your testimony, then, that
13  you never had an occasion either personally or through
14  one of your subordinates to fire or cut off one of
15  your employees?
16      MR. BATTENFELD:  And I'm going to object to the
17  question as calling for speculation, asking for
18  situations beyond this witness' knowledge.
19      MR. GREY:  To the extent he knows.
20      THE WITNESS:  I instruct to the president of
21  each entity to do so, and they do their own, so that
22  is beyond of what I know.
23  BY MR. GREY:
24      Q    And you instructed the president of each
25  entity never to terminate an employee?

---

KANG V.
U. LIM AMERICA

KI HWA YOON
01/12/00

1  Sik Yoon whether or not he observed Mr. Kang throw a
2  battery at Mr. Cho?
3       A    No.
4       Q    You never had that conversation?
5       A    Yes.
6       MR. BATTENFELD:  Yes, he did not?
7       THE INTERPRETER:  Yes.  But it's a linguistic
8  problem.
9  BY MR. GREY:
10      Q    Are you aware of any incident where
11 Mr. Kang threw any object at Mr. Cho?
12      A    No.
13      Q    Did you ever indicate to anyone that you
14 would spend $100,000 to defeat Mr. Kang?
15      A    No.
16      Q    Have you ever asked that anyone
17 investigate in your company Mr. Kang's allegations
18 against your son?
19      A    No, no.
20      Q    Now, you indicated that for the first
21 time here today you've learned of allegations that Tae
22 Jin Yoon struck people with objects, kicked them,
23 grabbed them and pulled them by the ear and yelled at
24 them excessively.  Having learned about those
25 allegations, are you concerned about the allegations?

73

1       MR. BATTENFELD:  Are you finished?  I object
2  that the question is both completely irrelevant of any
3  claim by Mr. Kang and ambiguous as to the phrase
4  "concerned about."
5       MR. GREY:  You can answer.
6       THE WITNESS:  No.
7  BY MR. GREY:
8       Q    You are not concerned?
9       THE INTERPRETER:  Let me -- would you -- the
10 word "concern" can be translated in two different ways
11 like concern, worrisome, or be bothered.  There is no
12 perfect word for me to translate "concern" into
13 Korean.
14      MR. GREY:  It sounds appropriate to translate
15 it with both words.
16      THE INTERPRETER:  All right.  I did that.
17      THE WITNESS:  I don't think that way since I
18 don't believe that he did.
19      MR. BATTENFELD:  I'm asking if he would like to
20 take a break.
21      THE WITNESS:  Yes.
22           (Recess taken from 2:50 p.m. to 3:02
23 p.m.)
24 BY MR. GREY:
25      Q    All the managers of U. Lim America were

74

1  Korean; correct?
2       A    I think almost.
3       Q    Are you aware of any U. Lim America
4  manager who was not Korean?
5       A    When you say non-Koreans, for instance,
6  like U.S. citizens.  There are some.
7       Q    In this context when I refer to Korean,
8  I'm referring to Korean race or national origin
9  regardless of citizenship.  So in that context were
10 all the managers of U. Lim America Korean?
11      A    It's different between America and
12 Mexico.
13      Q    I'm talking about U. Lim America.
14      A    I think U. Lim America is all -- I think
15 all of them are.
16      Q    Is there a reason why U. Lim America
17 hired only Koreans as managers?
18      A    Americans are reluctant to come.
19      Q    Americans are reluctant to come?
20      A    They more like not willing to sit for
21 employment.  I think so.
22      MR. BATTENFELD:  I would ask the witness not to
23 speculate, not to guess.
24 BY MR. GREY:
25      Q    I'm asking you what you know as to the

75

1  reasons why U. Lim America hired only Koreans.
2       A    I don't know.  I don't know.  The
3  president did.
4       Q    When you said Americans are reluctant to
5  come, are you referring to come to Mexico or come to
6  the United States, slash, Mexico?
7       A    Mexico side.  I think so.
8       Q    Why didn't you hire at U. Lim America any
9  Mexican managers?
10      A    There are -- there are in U. Lim Mexico.
11      Q    I know that, but we are talking about U.
12 Lim America now.  Why didn't you hire any Mexican
13 managers for U. Lim America?
14      MR. BATTENFELD:  I'm going to object to the
15 question as assuming a fact that is not in evidence,
16 i.e., that Mr. Yoon himself ever hired anyone to work
17 for U. Lim America.
18      MR. GREY:  I'll rephrase it.
19      Q    Why didn't U. Lim America ever hire any
20 Mexicans as managers for U. Lim America?
21      MR. BATTENFELD:  And I'll object to the
22 question as calling for speculation and lacking
23 foundation since the previous testimony was that
24 Mr. Yoon wasn't involved in any hiring decisions.
25      MR. GREY:  You can answer.

76

1    Q    Did you ever observe your son on any
2  occasion yelling at any of the U. Lim America
3  employees?
4    A    No.
5    Q    Did anyone ever tell you about your son
6  yelling at the U. Lim America employees?
7    A    No.
8    Q    Mr. Baek -- do you know who Mr. Baek is?
9    A    No.
10   Q    He was a former employee of U. Lim
11 America.
12   A    No.
13   Q    No, he wasn't, or no, you just don't
14 know?
15   A    I said I don't know.
16   Q    Okay.  He and Mr. Kang testified that Tae
17 Jin Yoon would hit Mr. Park on the head with a ruler.
18 Are you aware of Tae Jin Yoon doing such things?
19   A    Would you repeat it?
20   Q    Mr. Baek, a former employee of U. Lim,
21 and Mr. Kang testified that they frequently saw Tae
22 Jin Yoon hit Mr. Park on the head with a ruler, and
23 I'm asking you are you aware of this conduct by Tae
24 Jin Yoon?
25        THE INTERPRETER:  Which one is the other

65

1    A    No.  I don't think he did.
2    Q    The question was is this the first time
3  you've heard of any allegations that Tae Jin Yoon
4  struck Mr. Kang with a ruler?
5    A    Yes.
6    Q    Okay.  And then I believe you indicated
7  that you don't think he did; correct?
8    A    Yes.
9    Q    Why don't you think he did that?
10   A    I feel that he didn't do that because
11 they are, you know, co-workers together.  They are
12 similar ages, and I don't think he did, and they were
13 more like friends.
14   Q    Did anyone at U. Lim or U. Lim Korea ever
15 tell you that Tae Jin Yoon was physically striking any
16 of the employees at any time?
17   A    No.
18   Q    You would agree, would you not, that it
19 is improper for Tae Jin Yoon to strike employees with
20 rulers; correct?
21   A    Yes.
22   Q    Had you ever observed at any time Tae Jin
23 Yoon grabbing other men by the ear and pulling them,
24 grown men?
25   A    No.

67

1  person?
2        MR. GREY:  Baek.
3        THE WITNESS:  No.
4  BY MR. GREY:
5    Q    Does their testimony that he did this to
6  Mr. Park surprise you?
7    A    Yes, it is.
8    Q    Do you have any reason to believe it's
9  untrue?
10        MR. BATTENFELD:  I'll object that the question
11 is argumentative and calls for speculation.
12        MR. GREY:  You can answer.
13        THE WITNESS:  I don't know.
14 BY MR. GREY:
15   Q    Is it your testimony, then, that you
16 simply don't know whether or not Tae Jin Yoon struck
17 Mr. Park with a ruler at any time?
18   A    Of course I don't know.  This is first
19 time I am hearing.
20   Q    This is the first time you've heard of
21 any allegations that Tae Jin Yoon struck Mr. Park with
22 a ruler?
23   A    Yes.
24   Q    Have you ever heard of any allegations
25 that Tae Jin Yoon struck Mr. Kang with a ruler?

66

1    Q    Now, Mr. Park testified to an occasion
2  where Tae Jin Yoon grabbed him by the ear.  Are you
3  aware of that?
4        MR. BATTENFELD:  I'm going to object that the
5  question misstates Mr. Park's testimony.  Mr. Park's
6  testimony was that on one occasion Mr. Yoon playfully
7  pulled his ear.  I want to make sure that's
8  translated.
9        THE INTERPRETER:  Let me do Mr. Grey's and then
10 both.
11        MR. GREY:  And I'll clarify.
12   Q    Are you aware of Tae Jin Yoon ever
13 grabbing or pulling Mr. Park's ear?
14   A    No.
15   Q    Are you aware of Tae Jin Yoon having
16 daily meetings with the managers of U. Lim America?
17   A    I don't know.
18   Q    Mr. Kang alleges that Tae Jin Yoon would
19 frequently grab him and pull him by the ear.  Do you
20 have any information or knowledge as to those events?
21   A    No.
22   Q    Is the first time you've heard of those
23 allegations here today?
24   A    I don't know whether there was allegation
25 or not.  This is first time I'm hearing through the

68

1     Q     But did they tell you why he was suing?
2     A     Who?
3     Q     Either Cho or Mr. Yoon.
4     A     Not -- not too long ago.  Just recently
5   they told me.
6     Q     And what did they tell you about
7   Mr. Kang's lawsuit?
8     A     Like the lawsuit -- he sued.
9     Q     Did they tell you about his allegations
10  in the lawsuit?
11    A     I didn't ask.  I didn't ask.
12    Q     But did they tell you what his
13  allegations were whether or not you asked?
14    A     No.  It was not said anything.  I didn't
15  ask.  The only thing I heard is that lawsuit has been
16  filed.
17    Q     Now, you testified that Mr. Kang was your
18  favorite.  Weren't you concerned as to why Mr. Kang
19  filed a lawsuit against U. Lim?
20    A     I don't think I discussed anything since
21  I first asked.  The people who worked for the company
22  were handling since then.  It's a company matter.
23    Q     And who specifically did you think would
24  handle it?
25    A     Would you repeat it?

57

1     Q     Who specifically did you think would
2   handle it for the company?
3     A     I heard that the president of the
4   company, so, therefore, Tae Jin Yoon would handle it.
5   I don't even know why I am here.  I didn't even think
6   that I would be here.
7     Q     Did you ever -- other than this -- well,
8   strike that.
9           When you were first informed of
10  Mr. Kang's lawsuit, was that in person or over the
11  phone?
12    A     I don't know whether it was a telephone
13  or not.
14    Q     When is the next phone conversation or
15  meeting you had with anyone concerning Mr. Kang's
16  litigation?
17    A     I don't think I did.
18    Q     You obviously met with your attorney last
19  night; correct?
20    A     Yes.
21    Q     And it was regarding this litigation;
22  correct?
23    A     Yes.
24    Q     Okay.  So that's one instance.  I don't
25  want to know what your conversation with your attorney

58

1   is, but are there any other instances where you
2   physically -- and let me clarify something cause this
3   came up in the other deposition.  When I use the term
4   "meet," I use it both in a formal and in an informal
5   sense of just two people or more coming together.  Do
6   you understand that?
7     A     With whom?
8     Q     I'm just defining "meeting" right now to
9   be both formal meetings like business meetings and
10  informal meetings between people.  Do you understand
11  that?
12    A     I don't know what you are talking about.
13    Q     I'll assume, then, you have no problem
14  with the word "meeting."
15          Have you met -- or have you had any
16  conversations or communications with anyone concerning
17  Mr. Kang's litigation after you were first informed of
18  it by Mr. Cho or Mr. Yoon?
19    A     No.
20    Q     So let me just be clear.  So other than
21  the first meeting or conversation when you were
22  informed of the litigation and meeting with
23  Mr. Battenfeld yesterday for this deposition, you've
24  never met or discussed with anybody Mr. Kang's
25  litigation?

59

1     A     No.
2     MR. BATTENFELD:  Just for clarification, are
3   you including any discussions he may have had about
4   the scheduling of his deposition?
5     MR. GREY:  Well, I was including any
6   discussions he had with this -- about this litigation.
7     MR. BATTENFELD:  By that you mean about things
8   about the deposition or the substance of the
9   litigation?
10    MR. GREY:  Why don't we include scheduling,
11  too, just so we are comprehensive.
12    THE INTERPRETER:  Let me, then, repeat it.
13    THE WITNESS:  I was told by Jae -- Mr. Cho that
14  I have to come here today.  Then I was telling him
15  that why should I -- why should I be there.
16  BY MR. GREY:
17    Q     And did you have any discussions with
18  Mr. Cho as to why you should be here?
19    A     I only heard from him that he said that I
20  must be here.
21    Q     Other than the meeting or conversation
22  where you were informed of Mr. Kang's lawsuit, the
23  scheduling conversation over the deposition with
24  Mr. Cho, and meeting with your attorney last evening,
25  are there any other meetings or communications you've

60

KANG V.                                                                                    KI HWA YOON
U. LIM AMERICA                                                                              01/12/00

1   the company has to close down.
2        Q    I'm not talking about other companies
3   now. I'm talking specifically about U. Lim Mexico,
4   slash, U. Lim America. Do you know whether or not
5   that production at that facility increased from the
6   period of 1994 through the end of 1997?
7        A    Yes.
8        Q    Okay. What's your best estimate in terms
9   of multiples that production increased from 1994 to
10  the end of 1997?
11       A    That, I don't know.
12       Q    Do you have any estimate?
13  MR. BATTENFELD: Objection, asked and answered.
14  MR. GREY: You can answer.
15  THE WITNESS: Would you repeat?
16  BY MR. GREY:
17       Q    Do you have any estimate as to the
18  increase in production from 1994 to the end of 1997?
19       A    No. I don't know.
20       Q    Mr. Yoon, when did you first become aware
21  of the filing of the complaint by Mr. Kang against U.
22  Lim America?
23       MR. BATTENFELD: And I'll object to the
24  question as ambiguous as to what you mean by "the
25  complaint."

                              49

1        MR. GREY: I'll clarify.
2        Q    Did you ever become aware of Mr. Kang
3   filing a claim for unemployment benefits?
4        A    No. I didn't know.
5        Q    As we sit here today, are you aware of
6   whether or not Mr. Kang ever filed a claim of
7   unemployment benefits related to his employment at U.
8   Lim?
9        A    Would you repeat it?
10       Q    As we sit here today, your knowledge
11  today, are you aware of whether or not Mr. Kang ever
12  filed a claim for unemployment benefits relating to
13  his employment at U. Lim?
14       A    I don't know.
15       Q    Do you know whether or not Mr. Kang ever
16  received as we sit here today unemployment benefits
17  relating to his unemployment -- or his employment at
18  U. Lim?
19       A    No. Nothing to do with what I do.
20       Q    Does that mean you don't know?
21       A    No. I don't know.
22       Q    Okay. I'm going to represent to you that
23  Mr. Kang was hired by U. Lim in April of 1994. Are
24  you aware of when Mr. Kang ceased his employment at U.
25  Lim?

                              50

1        A    I don't know.
2        Q    Okay. Do you know whether or not he
3   currently works at U. Lim?
4        A    Yeah. I heard later on from Jae.
5        Q    When is your best estimate of when
6   Mr. Kang stopped working for U. Lim?
7        A    I cannot remember.
8        Q    But you indicated that the first time
9   that you heard that Mr. Kang was no longer working at
10  U. Lim, you were informed of this by Mr. Cho; correct?
11       A    I don't remember what that was from
12  Mr. Cho or Mr. Yoon. I think I may have heard.
13       Q    Heard from where?
14       A    I don't know. I don't remember.
15       Q    And when you were informed of Mr. Kang no
16  longer working at U. Lim, what were you informed of?
17       A    I think I was just told that he wasn't
18  working, but I heard that -- after a while he stopped
19  working, I heard about it.
20       Q    Were you told why he was not working?
21       A    I didn't pay attention too much about it.
22  I usually don't like to see an employee leave the
23  company. In my mind, I was thinking that I wished for
24  him to stay longer. He was my favorite. I liked him
25  very much. I liked him more than Jae.

                              51

1        MR. BATTENFELD: I want to remind the witness
2   to answer the question and not to go beyond answering
3   the question.
4        MR. GREY: Sorry, Jae.
5        MR. BATTENFELD: Jae's going to have his
6   feelings hurt.
7   BY MR. GREY:
8        Q    And you had substantial dealings with
9   Mr. Kang while he worked at U. Lim?
10       A    No, no.
11       Q    You indicated that Mr. Kang was your
12  favorite. Did you find out why Mr. Kang ceased his
13  employment with U. Lim?
14       A    I don't think I did.
15       Q    Well, at some point you received some
16  information, didn't you, with respect to why Mr. Kang
17  was no longer working at U. Lim?
18       A    I thought he left for a better place than
19  our company.
20       Q    Who told you that, if anyone?
21       A    What?
22       Q    You said, "I thought he left for a better
23  place than our company." I'm asking if anyone told
24  you that.
25       A    No. I don't know whether Yoon told me or

                              52

KANG V.
U. LIM AMERICA

KI HWA YOON
01/12/00

1    A    I have to look for.  I don't know.
2    Q    Do you know which facility they are kept
3 at?
4    A    I assume that they have to go to CPA's
5 office.
6    Q    You are talking about U. Lim America's
7 CPA?
8    A    Yes.
9    Q    And I believe it was your testimony that
10 for the period of 1994 through the end of 1997, you
11 don't know whether or not U. Lim made a profit or not;
12 is that correct?
13    A    I am assuming that when you have a
14 profit, the business maintain.  If you have loss, I
15 don't think a business can maintain.
16    Q    Didn't you say that you thought that the
17 business expenses were about equal to the profits?  I
18 thought you mentioned something to that effect.
19    MR. BATTENFELD:  I think you were asking about
20 1994.
21    THE WITNESS:  Yes, yes.
22    MR. GREY:  Can he define what he means by
23 "yes"?
24    THE WITNESS:  What are you saying?
25    MR. GREY:  Somehow I had a feeling we were

41

1 going to do this.
2    Q    I thought that earlier when I was asking
3 you about the business increasing at U. Lim, you
4 indicated that -- words to the effect that you thought
5 U. Lim broke even, the amount of money that it took in
6 to its expenses.  Is that true for that period of '94
7 through '97?
8    A    I don't know now.  I wouldn't know.
9         How do I know in 1994 or '95?
10    Q    So is it your testimony, then, for the
11 period of 1994 --
12    A    Let me do this.  From October of 1999, I
13 actually started to inquire or asking about the
14 business.  Prior to that, I was not able to get
15 involved at all.
16    Q    So, then, for the period of 1994 through,
17 we'll say, 1998, you are not aware of whether or not
18 U. Lim America or U. Lim Mexico were profitable
19 companies?
20    A    Yes.
21    Q    What specifically caused you to begin to
22 inquire about the business activities of U. Lim
23 America in October of '99?
24    MR. BATTENFELD:  I'll object to the question as
25 not having any relevance to this litigation wherein

42

1 Mr. Kang's employment ended in early February of 1998.
2 And absent an offer of proof as to the relevance of
3 that inquiry to Mr. Kang's case, I'll instruct the
4 witness not to answer the question.
5    THE WITNESS:  I'd like to make this statement.
6    MR. BATTENFELD:  No.  You are not going to make
7 any statement.  Hold on.
8    THE WITNESS:  The statement I made previously
9 was to try to help you by disclosing the information
10 to you which means I didn't have knowledge for the
11 period that you are asking.  It's not that I made that
12 statement to encourage you to ask me some other
13 additional questions.
14 BY MR. GREY:
15    Q    Well, the question was what caused you to
16 start to inquire into the business activities of U.
17 Lim America in October of 1999?
18    MR. BATTENFELD:  And there is an objection to
19 the question and an instruction not to answer.
20         If you can, translate to the witness when
21 I instruct him not to answer, that he doesn't say
22 anything.
23    MR. GREY:  As to my offer of proof, the
24 decision to begin inquiring into the business
25 activities in October of '99 may or may not be related

43

1 to Mr. Kang's litigation, may or may not be related to
2 Tae Jin Yoon's changing of duties at U. Lim America
3 which may or may not in part be related to the
4 allegations in the complaint and Tae Jin Yoon's
5 treatment of the employees.  That is why I am
6 inquiring, and I'm allowed to do that, so I would
7 expect an answer.
8    MR. BATTENFELD:  Go ahead and make your
9 statement, and then I'll make a statement.
10    MR. GREY:  Well, I just made it.
11    MR. BATTENFELD:  My response is that based on
12 your own admission that there is no relevance to the
13 inquiry depending on what the answer is, I would
14 permit the question as to whether or not Mr. Yoon's
15 decision to inquire into those business activities in
16 1999 was related to Mr. Kang's case or Mr. Kang's
17 allegations in some way.  But that would be the
18 question I would permit and not the open-ended
19 question as to why did the witness do that.
20    MR. GREY:  I would note that I do not have a
21 duty to ask Mr. Ki Hwa Yoon each and every question in
22 a point-blank fashion as to the very, very specific
23 allegations in the complaint.  I can ask those in
24 general terms.  I can discover information which may
25 be relevant to this litigation directly or indirectly,

44

**Page 33**

1   want to talk to the client -- have Mr. Cho talk to the
2   client so we can make sure that he's understanding
3   what it is exactly you are asking and then try to move
4   on without further confusion.
5       MR. GREY:  Okay.
6       (Recess taken from 10:50 a.m. to 11:03
7   a.m.)
8       MR. BATTENFELD:  The suggestion I would like to
9   make, to avoid any further confusion about using the
10  word "report," is I would suggest to propose that you
11  use the word "report" in a question where you are
12  actually asking about a corporate structure issue, and
13  if you want to know whether there were discussions
14  between person "A" and person "B," rather than use the
15  word "report," either use the word "discussion" or
16  "communication."
17      So, in other words, if the question is
18  did Jae Cho from a corporate perspective report to
19  Mr. Yoon, the question is did Jae Cho report to you.
20  If the question is did Jae Cho provide information or
21  discuss information with Mr. Yoon about the business,
22  that you use the word "discuss" or "communicate."
23  BY MR. GREY:
24      Q    Do you understand your attorney's
25  proposal here to try to make the translation issue as

**Page 34**

1   easy as possible?
2       A    Yes.
3       Q    Okay.  We will try to do that.  Right now
4   we are just waiting for Mr. Cho.
5       Okay.  It's my understanding, then, that
6   from 1994 to 1997 Mr. Cho never reported directly to
7   you; correct?
8       A    Which report you are talking about?
9       MR. BATTENFELD:  This is corporate structure.
10      THE WITNESS:  No.
11  BY MR. GREY:
12      Q    Okay.  During that period of time, '94
13  again through the end of '97, did he ever communicate
14  the business activities of U. Lim America or U. Lim
15  Mexico directly to you?
16      A    Like when you used the word
17  "communication" such as communication when we are in
18  the car together, I ask how it's going on about the
19  company, and he says, oh, it's going on like the
20  direction -- like big picture, yes.
21      Q    So would you characterize those as
22  informal communications?
23      A    Yes.
24      Q    And during the period of '94 through '97,
25  it was Tae Jin Yoon who reported directly to you;

**Page 35**

1   correct?
2       A    I think so.
3       Q    And he would formally communicate
4   business activities of U. Lim America, slash, Mexico
5   to you; correct?
6       A    No.  Just annually at the end of the year
7   during the workshop only once.  We call that as
8   workshop.
9       Q    And these were the only formal reports of
10  business activities of U. Lim America or U. Lim Mexico
11  that you received from Tae Jin Yoon during the period
12  of '94 through '97?
13      A    I feel that besides that, there should be
14  some reporting just between -- like brief report of
15  how it is, so and so, but I do not recall any of the
16  detailed information.
17      Q    Was there ever a point in time when
18  Mr. Cho in the corporate structure sense reported to
19  you directly?
20      A    No.
21      Q    And who presently reports to you directly
22  from U. Lim America or U. Lim Mexico?
23      A    Now?
24      Q    Now.
25      A    There was one step.  A director came from

**Page 36**

1   Korea.
2       Q    And who is that director?
3       A    Yoon, Y-o-o-n, one space, G-i-l, one
4   space, K-i-m is last name.
5       Q    And he's the person now in charge of
6   reporting to you -- strike that.
7       He's the person from U. Lim America and
8   U. Lim Mexico who reports directly to you; correct?
9       A    It's not reporting to me directly.  Just
10  they are doing their own work.  He comes to take care
11  of -- for Tae Jin Yoon's absence, like in and out to
12  Korea or over from Korea.
13      Q    Does Mr. Kim presently have a title at U.
14  Lim America or U. Lim Mexico?
15      A    He's the one who is the person who takes
16  transient position like somebody who goes --
17      Q    Transition?
18      THE INTERPRETER:  Yes.  Not like somebody that
19  doesn't have one station.  Somebody who fills in the
20  place where the person is absent.
21  BY MR. GREY:
22      Q    And just how long has he been in that
23  position at U. Lim America?
24      A    I think about two months.
25      Q    And immediately preceding that two

KANG V.
U. LIM AMERICA

KI HWA YOON
01/12/00

1     A   No.  I like to say here is -- what I like
2  to say is I didn't have time during that period
3  because I was -- I was placing a factory in China.  I
4  was quite busy, so I didn't have time to think about
5  or had time to do.
6     Q   I'm talking about a four-year period now.
7  In '94, '95, '96, and '97, were you busy throughout
8  that period placing a factory in China?
9     A   Yes, yes.
10    Q   What is your best estimate of how often
11  during that period, either on a weekly basis, a
12  monthly basis, or even a yearly basis, whatever range
13  you are comfortable with, that you would contact the
14  facility?
15    MR. BATTENFELD:  And I'll object that the
16  question is ambiguous as to time frame.
17    THE WITNESS:  I am 61 years old.  It's not
18  something I try not to answer.  I have so many places,
19  factories, and how can I remember all those details.
20  BY MR. GREY:
21    Q   This is one of those times, however, that
22  I'm entitled to your best estimate.  Certainly you
23  contacted the U. Lim America and Mexico facilities
24  before; correct?
25    A   I assume that I contacted, but I cannot

25

1  remember how many times I did.
2     Q   So is it your testimony, then, that for
3  the years of 1994, '95, '96, and '97, you have no
4  estimate of how often you would have contacted the U.
5  Lim facility?
6     A   Yes, yes.
7     Q   And you don't know whether you contacted
8  it once a month or once a year; is that correct?
9     A   Yes.
10    Q   Was it your understanding, therefore,
11  that Tae Jin Yoon was responsible for all operations
12  of U. Lim America and U. Lim Mexico during 1994, '95,
13  '96, and '97?
14    A   Yes.  Of course.  Of course.
15    MR. BATTENFELD:  You need to wait so I can make
16  an objection.
17    The objection is the question is
18  ambiguous with respect to the phrase "responsible
19  for," and I'll also object to the question to the
20  extent it calls for a legal conclusion.
21    MR. GREY:  You can answer.
22    MR. BATTENFELD:  I think he did answer before I
23  objected.
24    THE WITNESS:  What do you mean?
25  BY MR. GREY:

26

1     Q   You indicated you have no estimate as to
2  how often you contacted the U. Lim facility during
3  that four-year period, and that you were very busy
4  establishing a plant in China; correct?
5     A   What I said was is not four years I
6  placed a factory there.  I began in 1994; therefore, I
7  was so busy.  I was just all over doing the work, so I
8  don't remember anything.
9     Q   During that four-year period, 1994
10  through '97, was it your understanding that Tae Jin
11  Yoon was in charge of all the operations at U. Lim
12  America and U. Lim Mexico during that period?
13    A   Yes.
14    Q   And that you were not actively involved
15  in the operations of U. Lim America and U. Lim Mexico
16  during that period?
17    A   Yes.
18    Q   And that you were relying on Tae Jin Yoon
19  to operate those companies; correct?
20    A   Yes.
21    Q   Was there ever a point in 1994, 1995,
22  '96, '97 that Jae Cho reported any business activities
23  of U. Lim America or U. Lim Mexico directly to you?
24  Was there ever a point in 1994, '95, '96, or '97 that
25  Jae Cho reported business activities of U. Lim Mexico

27

1  or U. Lim America directly to you?
2     A   I believe that when -- maybe had been
3  reported by.
4     Q   I don't understand the answer.
5     A   When I was in Korea, no.  I didn't get
6  any report from him.  But, however, when I came here,
7  he was more like the -- was with me as if a secretary.
8  Therefore, he may have reported to me.
9     Q   Just so we understand the term "report,"
10  you testified that Mr. Kang and Mr. Park report
11  directly to Mr. Cho; correct?
12    A   Yes.
13    Q   And when you used the term "report," you
14  are talking about communicating the business
15  activities of their departments or jobs to Mr. Cho;
16  correct?
17    A   I don't understand your question.
18    Q   When you used the term Mr. Kang and
19  Mr. Park reported to Mr. Cho, what did you mean by the
20  term "report"?
21    THE INTERPRETER:  Let me -- I have to
22  explain -- I'd like to rather clarify before I do.  In
23  USA, I report to you.  It has the meaning of I am more
24  like submitting information to you.  All right?  But
25  in Korea, report can be different way like the report

28

1  operations.
2        THE INTERPRETER: C-h-a, j-a-n-g -- the
3  verbatim translation for me to be able to do that is
4  "Cha" means assistant.  "Jang" means head of
5  department.  Can be head of a section, head of a
6  company.  So those two words he gave to me.  I am not
7  able to -- each company has different naming.  For
8  instance, assistant director, assistant president,
9  assistant secretary.  I cannot translate the words
10  given to me except, I think, do assistant and head of
11  department.
12        MR. GREY:  Well, ask him this.
13        Q     Are you familiar with the term "manager"?
14        A     Yes.  They use manager as a manager in
15  Korea, and the companies do.
16        Q     Would the use of the word "assistant"
17  coupled with "manager" be a fairly accurate
18  description of Mr. Park?
19        A     I do not know.
20        THE INTERPRETER:  Assistant manager, I don't
21  know if it's equivalent to "cha jang" or not.
22  However, he is a manager.  I don't know whether it
23  translated as assistant or not, but "Cha" means
24  assistant.  That is my translation.
25  BY MR. GREY:

                            17

1        Q     Now, you are familiar with Mr. Kang;
2  correct?
3        A     Yes.  Of course.
4        Q     And what is your recollection of when he
5  first came to work for U. Lim America?
6        A     I don't know.
7        Q     Do you have a best estimate of when that
8  was?  A year for instance.
9        A     I don't know.  I don't remember.
10        Q     Was Mr. Kang ever an assistant head of
11  any of the departments?
12        A     No.  I think he was not "cha jang."  He
13  was under the "cha jang" -- the name "kwa jang."  More
14  like section head.
15        MR. BATTENFELD:  I believe that translation
16  would be manager.
17        THE INTERPRETER:  No.  Manager is different.
18  "Kwa jang," k-w-a, one space, j-a-n-g, is not a
19  manager.  It's a smaller head of a smaller section.
20  Manager means a department manager.  When he said
21  k-w-a, one space, j-a-n-g, it's usually -- they refer
22  underneath, smaller section of head.
23        MR. BATTENFELD:  According to Mr. Cho, the
24  translation of that word is manager.
25        THE INTERPRETER:  Some company use it that way.

                            19

1        Q     Do you know what departments he was an
2  assistant head of?
3        A     Production.
4        Q     Was he assistant head of any other
5  departments other than production?  And this is for
6  the term --
7        A     There are other managers.
8        Q     I'm just asking you for the term of
9  Mr. Park's employment.  Was he assistant head of any
10  other departments other than production?
11        A     I don't understand your question.
12        (Mr. Kang enters the deposition room.)
13  BY MR. GREY:
14        Q     Well, you said he was an assistant head
15  of production; correct?
16        A     Yes.
17        Q     Were there any other departments at U.
18  Lim America he was an assistant head of?
19        A     I believe that there are some other --
20  couple managers in the company.
21        Q     I'm not asking him about the other
22  managers now.  I'm just asking him if Mr. Park was an
23  assistant head of any other departments other than
24  production at any time.
25        A     No, no.

                            18

1  All right.
2  BY MR. GREY:
3        Q     Which department was he an assistant
4  in -- or departments, Mr. Kang?
5        MR. BATTENFELD:  The question is what
6  department he was a manager in?
7        MR. GREY:  We are going to get to that.  I
8  haven't defined it as manager.
9        MR. BATTENFELD:  According to Mr. Cho, he's
10  using the word "manager."
11        MR. GREY:  I know that.  I'm trying to get to
12  what is relative to Mr. Kang, what department.
13        MR. BATTENFELD:  Richard, I want to let you
14  know this is your chance to depose this witness.  If
15  you want to spend the entire morning on this topic,
16  you do so at your peril.
17        MR. GREY:  I'm going to take the deposition of
18  Mr. Ki Hwa Yoon until I'm done with the deposition of
19  Mr. Ki Hwa Yoon.  Now, he's properly noticed.  Okay?
20  He's an officer of the Defendant corporation, and I'm
21  entitled to his testimony.  Now, we spent the first 15
22  minutes of this deposition going through the courtesy
23  instructions for Mr. Ki Hwa Yoon, and I did so in a
24  very thorough and civil fashion for Mr. Ki Hwa Yoon's
25  benefit.  Now, 20 minutes later --

                            20

KANG V.
U. LIM AMERICA

KI HWA YOON
01/12/00

---

**Page 9**

1 knowledge of.
2          Do you understand?
3      A    Yes.
4      Q    Okay.  Did I ask him, do you have any
5 questions before we begin?
6      A    No.  I don't think I have any questions.
7 The purpose of my being here is you had questions for
8 me.  It's not that something -- I came here to ask you
9 something.
10     Q    I understand.
11     A    So I would just -- it's not something
12 that I volunteered to come here because I was told to
13 come.  That's why I am here.
14     Q    Mr. Yoon, what's your present address in
15 the United States?
16     A    605 Westview Court, Terra Nova, Chula
17 Vista, California, 91910.
18     Q    Is that the same address as Tae Jin
19 Yoon's home?
20     A    Yes.
21     Q    And presently and given in the last year,
22 how many months have you occupied that residence as
23 compared to your residence in Korea?
24     A    About one over two-fifths.  About three
25 months -- about three to four months.

9

---

**Page 10**

1      Q    And is the rest of the time spent in
2 Korea?
3      A    Yes.  In Korea, but, however, I have some
4 other locations of my companies, so sometimes I go
5 there, too.
6      Q    Are there any other U.S. locations that
7 you reside at?
8      A    This is it, the only address I have.
9      Q    For the U.S.?
10     A    Yes.
11     Q    Okay.  And you are an officer and
12 director of U. Lim Korea; correct?
13          MR. BATTENFELD:  For the record, I don't
14 believe that is the correct title.
15          THE WITNESS:  When you say the officer or
16 director --
17          THE INTERPRETER:  Let me get back with him
18 because when he gives a word --
19          THE WITNESS:  Chairman.
20 BY MR. GREY:
21     Q    Okay.  And just for clarification, what
22 is the full and actual name of U. Lim Korea that we've
23 come to refer to as?
24     A    Just wait a minute.  U. Lim Electronics
25 Industrial Co, comma, Ltd.

10

---

**Page 11**

1      Q    So U. Lim Electronics Company Limited?
2          MR. BATTENFELD:  No.  U. Lim Electronics
3 Industrial.
4          MR. GREY:  Oh, I'm sorry.
5      Q    And if we refer to that as U. Lim Korea,
6 would you understand what we mean?
7      A    Yes.
8      Q    Okay.  And you also hold a position or
9 title with what we've been referring to as U. Lim
10 America?
11     A    Yes.
12     Q    And what is your position or title with
13 U. Lim America?
14     A    Chair.
15     Q    And when you say chairman, you are
16 talking about chairman of the board?
17     A    Yes.
18     Q    And there is nobody higher than you in U.
19 Lim Korea or U. Lim America; correct?
20     A    No.
21     Q    Okay.  And do you hold a position in U.
22 Lim Mexico?
23     A    Yes.
24     Q    And what is your position at U. Lim
25 Mexico?

11

---

**Page 12**

1      A    Chair.
2      Q    And how long have you had your position
3 of chairman at U. Lim America?
4      A    About 23 years.  Could be 22 or 23.
5      Q    And how about for U. Lim Mexico?  Same
6 question.
7      A    Since December of 1992.
8      Q    And I take it that's when U. Lim Mexico
9 was founded or created?
10     A    Yes.
11     Q    And when was the first time that Tae Jin
12 Yoon had a position at U. Lim America?
13     A    I don't recall, but could be 1994 or
14 1995.
15     Q    And what was that position that he had in
16 '94 or '95?
17     A    President.
18          MR. BATTENFELD:  Were you asking about U. Lim
19 Mexico or U. Lim Korea or U. Lim America?
20          MR. GREY:  U. Lim America.
21          THE WITNESS:  Vice-president.
22 BY MR. GREY:
23     Q    And when did Tae Jin Yoon first have a
24 position with U. Lim Mexico?
25     A    Same year.

12

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4    SOO CHEOL KANG,                    )
                                         )
 5              Plaintiff,               )
                                         )
 6         vs.                           )   No. 99 CV659 JM
                                         )        (RBB)
 7    U. LIM AMERICA, INC.; TAE          )
      JIN YOON, an individual; and       )
 8    DOES 1 to 100,                     )
                                         )
 9              Defendants.              )
                                         )
10    _____
11
12
13
14              DEPOSITION OF KI HWA YOON
15              San Diego, California
16              Wednesday, January 12, 2000
17
18
19
20
21
22
      Reported by:
23    JESSICA E. MASSE
      CSR No. 9910
24    JOB No. 12066
25
                         1
```

**Page 2**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4    SOO CHEOL KANG,                    )
                                         )
 5              Plaintiff,               )
                                         )
 6         vs.                           )   No. 99 CV659 JM
                                         )        (RBB)
 7    U. LIM AMERICA, INC.; TAE          )
      JIN YOON, an individual; and       )
 8    DOES 1 to 100,                     )
                                         )
 9              Defendants.              )
                                         )
10    _____
11
12
13
14
15         Deposition of KI HWA YOON, taken
16    on behalf of Plaintiff, at 501 West
17    Broadway, Suite 1300, San Diego,
18    California, beginning at 9:43 a.m. and
19    ending at 5:40 p.m. on Wednesday,
20    January 12, 2000, before JESSICA E.
21    MASSE, Certified Shorthand Reporter No.
22    9910.
23
24
25
                         2
```

**Page 3**

```
 1    APPEARANCES:
 2    For the Plaintiff:
 3         LAW OFFICE OF RICHARD E. GREY
           BY:  RICHARD E. GREY
 4         Attorney at Law
           409 Camino Del Rio South, Suite 303
 5         San Diego, California 92108
           (619) 543-9300
 6
      For the Defendants:
 7
           MORGAN, LEWIS & BOCKIUS
 8         BY:  JOHN S. BATTENFELD
           Attorney at Law
 9         300 South Grand Avenue, 22nd Floor
           Los Angeles, California 90071
10         (213) 612-2500
11    Also Present:
12         JAE HO CHO
           SOO CHEOL KANG
13
      Interpreter:
14
           ANN McCORMICK
15         12212 Old Stone Road
           Poway, California 92064
16         (619) 486-6648
17
18
19
20
21
22
23
24
25
                         3
```

**Page 4**

```
 1                    INDEX
 2    WITNESS:                      EXAMINATION
 3    KI HWA YOON
 4
 5         BY MR. GREY                    5
 6
 7
 8
 9
10
                   EXHIBITS
11
                   (None)
12
13
14
15
16
                INSTRUCTION NOT TO ANSWER
17
               Page   Line
18
                42     24
19
                43     18
20
               101      6
21
               116     25
22
23
24
25
                         4
```

Recycled   Stock # DO 10-B

Excerpts from the Deposition of Soo Kang to Follow Tomorrow

Legal Tabs Co  1-800-322-3022

Recycled   Stock # DO-10-B

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

---

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,                    )
                                        )
 5            Plaintiff,                )
                                        )
 6        vs.                           )  No. 99 CV659 JM
                                        )      (RBB)
 7   U. LIM AMERICA, INC.; TAE          )
     JIN YOON, an individual; and       )
 8   DOES 1 to 100,                     )
                                        )
 9            Defendants.               )
                                        )
10   _____)
11
12
13
14         DEPOSITION OF SOON WAN PARK
15            San Diego, California
16          Tuesday, December 14, 1999
17                 Volume I
18
19
20
21
22
     Reported by:
23   JESSICA E. MASSE
     CSR No. 9910
24   JOB No. 11729
25
```

                          1

---

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3        LAW OFFICE OF RICHARD E. GREY
          BY:  RICHARD E. GREY
 4        Attorney at Law
          409 Camino Del Rio South, Suite 303
 5        San Diego, California 92108
          (619) 543-9300
 6
     For the Defendants:
 7
          MORGAN, LEWIS & BOCKIUS
 8        BY:  JOHN S. BATTENFELD
          Attorney at Law
 9        300 South Grand Avenue, 22nd Floor
          Los Angeles, California 90071
10        (213) 612-2500
11   Also Present:
12        JAE CHO
          SOO CHEOL KANG
13
     Interpreter:
14
          ANN McCORMICK
15        12212 Old Stone Road
          Poway, California 92064
16        (619) 486-6648
17
18
19
20
21
22
23
24
25
```

                          3

---

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,                    )
                                        )
 5            Plaintiff,                )
                                        )
 6        vs.                           )  No. 99 CV659 JM
                                        )      (RBB)
 7   U. LIM AMERICA, INC.; TAE          )
     JIN YOON, an individual; and       )
 8   DOES 1 to 100,                     )
                                        )
 9            Defendants.               )
                                        )
10   _____)
11
12
13
14
15         Deposition of SOON WAN PARK,
16   Volume I, taken on behalf of Plaintiff,
17   at 501 West Broadway, Suite 1300, San
18   Diego, California, beginning at 10:08
19   a.m. and ending at 5:38 p.m. on
20   Tuesday, December 14, 1999, before
21   JESSICA E. MASSE, Certified Shorthand
22   Reporter No. 9910.
23
24
25
```

                          2

---

```
 1                    INDEX
 2   WITNESS:                        EXAMINATION
 3   SOON WAN PARK
     Volume I
 4
 5     BY MR. GREY                        5
 6
 7
 8
 9
                     EXHIBITS
10
                     (None)
11
12
13
14
15       INSTRUCTION NOT TO ANSWER
16
17         Page  Line
18
19          10    18
20
21          35     1
22
23          48     3
24
25          85     2

           126     4
```

                          4

---

KANG V.                                                       SOON WAN PARK, VOL 1
U. LIM AMERICA, INC.                                                      12/14/99

| | |
|---|---|
| 1 give your best testimony today. | 1 BY MR. GREY: |
| 2    A    Yes. | 2    Q    This raises an issue -- I'll address it |
| 3    Q    If you need to take a break, please let | 3 now -- that there will be times when your attorney |
| 4 us know, and we will do that. | 4 will object in the deposition -- let me rephrase it -- |
| 5    A    Yes.  I understand. | 5 where U. Lim's attorney will object in today's |
| 6    Q    Okay.  Do you have any questions of me | 6 deposition.  He may object on various grounds. |
| 7 before we begin? | 7 Frequently, however, you can then proceed to answer. |
| 8    A    No. | 8         In this case, Mr. Battenfeld has |
| 9    Q    Now, you indicated you never had your | 9 instructed you not to answer.  I'll take up the issue |
| 10 deposition taken before; correct? | 10 with Mr. Battenfeld whether the attorney/client |
| 11    A    No.  It's correct. | 11 privilege is actually applicable to that situation, |
| 12    Q    Have you reviewed any documents in | 12 but in many cases you understand that Mr. Battenfeld |
| 13 preparation for today's deposition? | 13 will object, but it's still okay for you to answer? |
| 14    A    Yes, I do. | 14 Do you understand that? |
| 15    Q    Okay.  And what documents have you | 15    A    Yes.  I understand. |
| 16 reviewed? | 16         MR. GREY:  I'll just note for the record that I |
| 17    A    The event today with Director Cho.  I | 17 disagree with Mr. Battenfeld's assertion of the |
| 18 reviewed to prepare for today, the matter. | 18 attorney/client privilege in this context.  I believe |
| 19    Q    The question was what documents did you | 19 I'm entitled to that testimony, but I'll discuss this |
| 20 review? | 20 matter later with Mr. Battenfeld at the conclusion or |
| 21         MR. BATTENFELD:  If any. | 21 near the conclusion of the deposition. |
| 22         THE WITNESS:  I did not review the documents. | 22         MR. BATTENFELD:  I disagree completely.  I |
| 23 BY MR. GREY: | 23 invite Mr. Grey to read the Upjohn case. |
| 24    Q    So you are indicating you spoke with | 24 BY MR. GREY: |
| 25 Director Cho prior to coming to today's deposition | 25    Q    Were there ever any occasions where you |
| 9 | 11 |

| | |
|---|---|
| 1 about today's deposition? | 1 met with Mr. Cho or had discussions with Mr. Cho about |
| 2    A    Yes. | 2 this litigation or this deposition where |
| 3    Q    Okay.  When did you speak to Mr. Cho | 3 Mr. Battenfeld was not present? |
| 4 about today's deposition? | 4    A    Yes.  There were -- or there was a time |
| 5    A    This morning. | 5 or times that in the company, yes, we talked about it. |
| 6    Q    And where did this conversation take | 6    Q    Okay.  Do you have an estimate as to how |
| 7 place? | 7 many occasions you talked about it? |
| 8    A    At the breakfast.  We were having | 8    A    About two or three times. |
| 9 breakfast together. | 9    Q    And of these two or three times, when was |
| 10    Q    Was anybody else present at this | 10 the first occasion? |
| 11 breakfast? | 11    A    September. |
| 12    A    Yes.  Our attorney was there. | 12    Q    September of this year? |
| 13    Q    Was there anyone else other than you, | 13    A    Yes.  This year. |
| 14 Mr. Cho, and Mr. Battenfeld present at the breakfast? | 14    Q    Okay.  And when you had -- was this a |
| 15    A    No. | 15 meeting or a telephone conversation? |
| 16    Q    And what did Mr. Cho tell you about | 16    A    In person. |
| 17 today's deposition? | 17    Q    Okay.  And who else was present for this |
| 18         MR. BATTENFELD:  I'll object to the question to | 18 meeting? |
| 19 the extent it asks for any information provided by | 19    A    No.  There was no one. |
| 20 Mr. Cho during the meeting or any meetings that I was | 20    Q    And in September you were talking about |
| 21 present at on the grounds that that is protected by | 21 the litigation; is that correct? |
| 22 the attorney/client privilege and instruct the witness | 22    A    Yes. |
| 23 not to answer the question as to any discussions where | 23    Q    Okay.  And who initiated this meeting? |
| 24 I was present. | 24    A    Would you repeat that? |
| 25         THE WITNESS:  Yes. | 25    Q    Who initiated the meeting?  Who began the |
| 10 | 12 |

KANG V.                                                                                    SOON WAN PARK, VOL 1
U. LIM AMERICA, INC.                                                                                 12/14/99

1  he's not to guess.  He is to give his best testimony,
2  but he should not guess, and he should make clear if
3  he's giving an estimate.
4      THE WITNESS:  Yes.
5  BY MR. GREY:
6      Q    It's your best estimate that you became
7  aware of this lawsuit in January of this year; is that
8  correct?
9      A    Yes, it is.
10     Q    Okay.  When is the next conversation you
11 had with anyone after that initial conversation with
12 Mr. Cho about the lawsuit?
13     A    I think the first one was the first part
14 of the year.  I think the next one was maybe between
15 September and October.
16     Q    And between approximately January of this
17 year and September, you had no conversations with
18 anyone regarding this lawsuit?
19     MR. BATTENFELD:  Okay.  And the objection is
20 that it misstates the witness' prior testimony.  He
21 testified about conversations with Mr. Cho.  He's
22 also, based on a prior objection, testifying only as
23 to conversations where I was not present.  So there
24 may have been other conversations of that nature.
25     THE WITNESS:  Yes.

                              17

1  BY MR. GREY:
2      Q    And let's be clear so we understand
3  something.  If I ask you about a conversation you've
4  had about this lawsuit, whether or not Mr. Battenfeld
5  was present, you should indicate that the conversation
6  took place.  Mr. Battenfeld has asked and instructed
7  you not to answer as to the content of those
8  conversations based on the claim of attorney/client
9  privilege, but you are to indicate that his presence
10 existed at these conversations and not to delete that
11 conversation from your testimony.  Do you understand?
12     MR. BATTENFELD:  Let me just try to explain
13 this.  What he's saying is that if you are asked
14 whether there was a conversation, you can answer yes
15 as to a conversation that I was present at that may
16 have occurred here or in your facility or my offices
17 in Los Angeles, but you are not to discuss the
18 contents of that conversation.  But to merely
19 acknowledge that such a meeting took place, you are
20 allowed to say that.
21     THE WITNESS:  Yes, I have.
22 BY MR. GREY:
23     Q    And do you understand the instructions?
24     A    Yes.
25     Q    Okay.  Just due to the length of this

                              18

1  exchange, let me re-address the question, then.
2      Q    Between approximately January of this
3  year and September of this year, did you have a
4  conversation with anyone regarding this lawsuit?
5      A    Yes.
6      Q    Okay.  And who was that conversation
7  with?
8      A    The attorney -- our attorney and then
9  Tae, T-a-e, one space, Jin, J-i-n.  The last name is
10 Y-o-o-n.  We went to Los Angeles together and then
11 talked about it.
12     Q    And when did this meeting occur?
13     A    I don't recall.
14     Q    Okay.  It was sometime between January
15 and September of this year?
16     A    Yes.  I don't remember the month, but I
17 think it was this year.
18     Q    Can you give me your best estimate
19 whether or not it occurred in the summer, spring?
20     A    I don't -- I'm not for sure.  It could
21 have been springtime.
22     Q    And who was present at this meeting?
23     A    I and Tae Jin Yoon, the attorney and a
24 translator.
25     Q    Was Mr. Cho present?

                              19

1      A    No.
2      Q    Do you know why -- well, strike that.
3      Did Tae Jin Yoon request that you go to
4  this meeting?
5      A    Yes, yes.  Together.
6      Q    Do you know why he requested that you
7  attend this meeting?
8      A    I understood that I was going there
9  related to the lawsuit filed.
10     Q    I don't understand that answer.
11     A    I went there because the attorney told us
12 that he needs to question -- there are things to
13 question.  That's why I went there.
14     Q    The question I asked you was did Mr. Tae
15 Jin Yoon request that you attend, and you indicated
16 yes, and then I asked you why was it that Mr. Tae Jin
17 Yoon asked that you attend.
18     MR. BATTENFELD:  And I'll object.  I believe
19 the question has been asked and answered.  I believe
20 the witness testified that Mr. Yoon told him that the
21 attorney wanted to ask him a few questions.
22     MR. BATTENFELD:  You can answer.
23     THE WITNESS:  Yes, it was.
24 BY MR. GREY:
25     Q    It was Tae Jin Yoon who conveyed to you

                              20

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1  meeting?
2      A     No.
3      Q     Were you curious about the meeting?
4      A     Yes.
5      Q     And because of that curiosity, did you
6  ask Tae Jin Yoon anything about the meeting or the
7  lawsuit?
8      A     No.  I did not.
9      Q     Why not?
10     A     The reason was Mr. Cho is the one who was
11  more familiar about the case.
12     Q     Okay.  Well, had you asked Mr. Cho about
13  this meeting or what was going to take place at the
14  meeting?
15     A     Yes, I did.
16     Q     And what did you ask Mr. Cho about?
17     A     I was asking why kind of meeting today we
18  were having.
19     Q     And what did he tell you?
20     A     And he said there will be questions from
21  the attorney of Soo Cheol Kang, and myself was going
22  to be a witness.
23     Q     And what did you think you were going to
24  be a witness to?
25          MR. BATTENFELD:  I'll object to the question as

25

1  being ambiguous and unintelligible.
2          THE WITNESS:  I do not understand your
3  question.
4  BY MR. GREY:
5      Q     Okay.  You indicated that Mr. Cho told
6  you there would be questions, and that you would be a
7  witness; is that correct?
8      A     Yes.
9      Q     Did you have any understanding as to what
10  it was that you might have witnessed?
11          MR. BATTENFELD:  I'll object to the question as
12  being ambiguous as to what "might have" refers to.
13          THE WITNESS:  Would you repeat that again?
14          MR. GREY:  Sure.
15     Q     You testified that Mr. Cho told you that
16  you were going to be asked questions at this meeting,
17  and that you were a witness; is that correct?
18     A     Yes.
19     Q     Do you understand what the term "witness"
20  is?
21     A     Yes, I do.
22     Q     Okay.  My question to you is what did you
23  believe you were a witness to?
24     A     I understood that since I worked with
25  Mr. Kang at the company, the things that I have

26

1  witnessed or the information I have ought to be the
2  questions which I testify about it.
3      Q     Did Mr. Cho tell you anything about
4  Mr. Kang's accusations in the complaint?
5          MR. BATTENFELD:  Just for clarification, you
6  are asking about a discussion with Mr. Cho prior to
7  the meeting with the attorneys?
8          MR. GREY:  Right.  Right.
9          THE WITNESS:  You're asking me whether I have
10  discussed it?
11  BY MR. GREY:
12     Q     In this meeting that you had with Mr. Cho
13  where he told you you were going to go to the
14  attorney's office with Tae Jin Yoon, did he tell you
15  what the accusations Mr. Kang was making in the
16  complaint were?
17     A     Yes.
18     Q     Okay.  And what did he tell you those
19  accusations were?
20     A     Yes.  It was.
21          THE INTERPRETER:  I think there was a
22  linguistic problem.
23          MR. GREY:  I'll ask him again what were the
24  accusations he told him about.
25          THE WITNESS:  The lawsuit has been filed

27

1  against the company and Tae Jin Yoon.
2  BY MR. GREY:
3      Q     Did he tell you any of the details of
4  Mr. Kang's accusations against the company and Tae
5  Jin?
6      A     Yes.  More like -- more like briefly.
7      Q     Okay.  And what briefly did he tell you
8  about the specifics of those accusations?
9      A     I was told that he worked a lot such as
10  overtime and also including weekends.
11     Q     Did he tell you about any other
12  accusations?
13     A     No.  I think that's all I heard.
14     Q     When were you informed of this meeting
15  that you were going to go to with Tae Jin Yoon and the
16  attorney?
17     A     A few days prior to the actual event.
18     Q     In the time between when Mr. Cho informed
19  you of this meeting and the time you went to the
20  meeting, did you talk to any of your co-workers about
21  the meeting?
22     A     No.  I don't think there was anything I
23  talked to the -- with the co-workers.
24     Q     You indicated that you had a two-hour
25  drive with Mr. Yoon up to the attorney's office for

28

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1  was more like conversation about it.
2      Q    Okay.  Whether it's a meeting or a
3  conversation, approximately two to three meetings,
4  slash, conversations; correct?
5      A    We see each other at the company every
6  day.
7      THE INTERPRETER:  Let me make it clear.  In
8  Asia, Japan, Korea, meeting is a very formal meeting.
9  So if you say "meeting," I am not given other words.
10  I have to say "meeting."  So in Asia -- like in this
11  country, you and I meet, and we can say meeting.  In
12  Asia, I cannot do this.  Whenever when you say
13  "meeting," when I translate that word of "meeting," it
14  has a different connotation as an American way.
15  Conversation, yes.  But "meeting" is a very formal
16  meeting.
17      MR. GREY:  Is there an informal term for
18  "meeting" in Korean?
19      THE INTERPRETER:  You can say event or a
20  conversation or a gathering, but when you say
21  "meeting," I'm not given any choice except saying
22  "meeting" in Korean.  Sorry about it.  I just have to
23  make very clear so it doesn't create any confusion.
24      MR. GREY:  I'll try to keep that in mind.
25      Q    What I'm just trying to get to is you had

33

1      MR. BATTENFELD:  Again I will object that the
2  question invades the attorney/client privilege as well
3  as the attorney work product document, and I will
4  instruct the witness not to answer.
5      THE WITNESS:  So I won't answer.
6  BY MR. GREY:
7      Q    When was the next -- other than the
8  meeting with the attorney and Mr. Yoon, when was the
9  next time you talked to anyone about this litigation
10  or this deposition?
11      A    You are talking about meeting the
12  attorney again?
13      Q    No.
14      When was the next meeting, gathering, or
15  conversation you had regarding the lawsuit or this
16  deposition with anyone after the meeting -- your first
17  meeting with Mr. Battenfeld?
18      A    I believe that there was no meeting after
19  we talked with the attorney on the meeting we had.  I
20  think next one was like Director Cho was informing us
21  about --
22      THE INTERPRETER:  Let me ask him again cause
23  the last part --
24      THE WITNESS:  After the trip to the attorney's
25  office, after that, the only conversation I had was in

35

1  mentioned having a conversation or a gathering with
2  Mr. Cho in September of '99.  Do you recall that?
3      A    Yes.  We did.
4      Q    And when you mentioned that earlier, were
5  you referring to the conversation or gathering you had
6  with Mr. Cho where he instructed you that you'd be
7  going to this meeting with the attorney?
8      A    You mean coming here today?
9      Q    Either coming here to take the deposition
10  or talking about the lawsuit.  You mentioned having a
11  gathering or meeting with Mr. Cho in September of '99.
12      A    Yes.  I have.
13      Q    And when you referred to that gathering
14  or conversation, are you referring to the conversation
15  you had with Mr. Cho where he informed you that you
16  were going to be going to the attorney's office with
17  Mr. Tae Jin Yoon?
18      A    No.  The trip made to L.A. was prior to
19  that time.
20      Q    Okay.  I anticipate an objection, but
21  I'll ask the question, and I'll let the attorney
22  assert the objection.
23      You met with Mr. Battenfeld and Mr. Tae
24  Jin Yoon.  What did you discuss at that first meeting
25  in L.A.?

34

1  December.
2  BY MR. GREY:
3      Q    Of this year?
4      A    That's when we talked about it.
5      THE INTERPRETER:  Sorry.  September.
6      THE WITNESS:  Yes.  This year, September.
7  BY MR. GREY:
8      Q    That was with Mr. Cho; correct?
9      A    Yes.
10      Q    Was anybody else present at that meeting,
11  gathering, or conversation?
12      A    No.  It is not this kind of meeting.
13  Just -- I just when we were working in the office just
14  mentioned about it.
15      Q    Okay.  Let me -- just so you understand
16  when we use "meeting," we have a more informal sense.
17  It can mean meeting like this, but it can mean meeting
18  just one on one where I'm having a conversation with
19  you.  So that's why I keep saying meeting, gathering,
20  or conversation.
21      MR. BATTENFELD:  Can I suggest something?  Is
22  there a Korean word that would be broad enough to
23  cover all of the topics that Mr. Grey wants to cover
24  by that word?
25      THE INTERPRETER:  No.  Event, gathering.

36

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1   was.
2       Q       Was it before or after this first meeting
3   with Mr. Battenfeld?
4       A       I think prior to.
5       Q       Okay.  And when he went through these
6   allegations, did he comment on any of them?
7       A       No.
8       Q       So he just read them to you?
9       A       It was not that it was read to me from
10  the first to the end.  Just picked out a few of the
11  items.
12      Q       So Mr. Cho selected certain items of the
13  complaint to read to you; is that correct?
14      MR. BATTENFELD:  Just for clarification, you
15  mean read or translate?
16      THE WITNESS:  It was shown to me, and then I
17  skimmed through, and at the time Mr. Cho indicated
18  about those.
19  BY MR. GREY:
20      Q       Can you read English?
21      A       Very little.
22      Q       Okay.  So if Mr. Cho showed you the
23  complaint, would you need Mr. Cho to translate it for
24  you?
25      A       Yes, it is.

41

1       Q       So is it correct, then, that Mr. Cho
2   selected various portions of the complaint and
3   translated them for you?
4       A       Yes.  Just a few items.
5       Q       And these were portions that he selected,
6   not you; correct?
7       A       Yes, it is.
8       Q       Okay.  And what portions do you recall he
9   selected to read to you?
10      A       Like working a lot such as overtime and
11  then also discriminating among people.  I think that's
12  all.
13      Q       And when he read you the sections on
14  overtime, did he make any statement about that at all?
15      MR. BATTENFELD:  Do you mean other than
16  translating?
17  BY MR. GREY:
18      Q       Other than translating, did he comment on
19  it at all?
20      A       No.
21      Q       Did he ask you to comment?
22      A       No.
23      Q       Did he tell you whether or not he felt
24  that allegation was true or false?
25      A       No.

42

1       Q       Did he tell you why he was reading you
2   that portion of the complaint?
3       A       No.
4       Q       Did you ask him questions regarding that
5   portion of the complaint?
6       A       The thing I inquired was since I skimmed
7   through the English document, I asked him what do they
8   mean.
9       Q       Did he give you the document at this
10  meeting -- gathering?
11      A       No.  He was holding in his hand.  I just
12  saw.
13      Q       Who else was present at this meeting or
14  gathering or conversation?
15      A       No -- just us.
16      Q       How did this conversation or meeting or
17  gathering start?
18      A       I think it was the day that we were
19  supposed to meet Soo Cheol Kang.  That day in the
20  car -- I was shown the document in the car.
21      Q       And it's your testimony that this was
22  before the meeting you had with Mr. Kang; correct?
23      MR. BATTENFELD:  Mr. Kang?
24      THE WITNESS:  So prior to meeting Mr. Kang?
25      MR. GREY:  Right.

43

1       THE WITNESS:  I think after we met Kang.
2   BY MR. GREY:
3       Q       This meeting with Mr. Kang, where did it
4   take place?
5       A       I was not there.  Like I only just saw
6   them.  Mr. Cho and Mr. Kang, the two met.
7       Q       When was the date of this meeting?
8       A       I don't recall.
9       Q       Okay.  Where was this meeting or
10  gathering?
11      A       I do not know the place exactly, but it
12  was more like the area of Highway 8.
13      Q       Was it at a restaurant?
14      A       No.  It was not, but it was a building.
15      Q       Were you sitting down at a table at this
16  meeting or gathering?
17      A       I was there at the parking lot.  Mr. Cho
18  only went up there.
19      Q       And where did Mr. Cho go to to your
20  knowledge?
21      A       I think he told me that he was going to
22  see Mr. Kang.
23      Q       Okay.  Was anybody else in the car with
24  you before Mr. Cho left to go see Mr. Kang?
25      A       No.

44

KANG V.
U. LIM AMERICA, INC.

1        MR. GREY:  What is his answer?
2        THE INTERPRETER:  He said "no."
3    BY MR. GREY:
4        Q    What is your understanding of what
5    Mr. Kang's position was?
6        A    Manager.
7        Q    Manager of what?
8        A    Purchasing manager.
9        Q    Okay.  Was he also the warehouse manager?
10       A    Yes, yes.
11       Q    And when he left in February of '98, who
12   took over his duties as purchasing manager?
13       A    Yu Shin Yoon.
14       Q    And who took over Mr. Kang's duties as
15   warehouse manager?
16       A    Both together working.
17       Q    Yu Shin Yoon took over both positions?
18       A    Yes, it is.
19       Q    What was Yu Shin Yoon's position in the
20   company prior to the time he took over purchasing
21   manager and warehouse manager?
22       MR. BATTENFELD:  I'll object.
23           Could you read back the question in
24   English?
25           (Record read.)

49

1        MR. BATTENFELD:  I'll object to the question.
2    It assumes a fact that -- it hasn't been testified to
3    as to whether Mr. Yoon had a position prior to that
4    time.
5        MR. GREY:  I'll lay a foundation.
6        Q    Prior to Yu Shin Yoon taking over the
7    position of purchasing manager and warehouse manager
8    at Mr. Kang's termination -- was Mr. Yoon working for
9    the company prior to that?
10       MR. BATTENFELD:  For clarification, when you
11   say "the company" --
12       MR. GREY:  U. Lim America.
13       THE WITNESS:  Would you repeat it?
14       THE INTERPRETER:  Can I just repeat it?
15       MR. GREY:  Okay.
16       THE WITNESS:  He was starting.
17   BY MR. GREY:
18       Q    Was he employed in any capacity at U. Lim
19   America prior to February of '98?
20       MR. BATTENFELD:  And do you mean prior to
21   Mr. Kang's departure?
22       MR. GREY:  Yes.  In February of '98.
23       THE WITNESS:  Practically he didn't work.  He
24   sometimes worked.
25   BY MR. GREY:

50

1        Q    Okay.  When he sometimes worked, what did
2    he sometimes work at?
3        A    I don't think he was working for the
4    company actually.  I don't think so.  He sometimes
5    comes to do little errands in that way.
6        Q    Do you know whether or not he did any
7    accounting work for the company prior to Mr. Kang's
8    termination?
9        A    I don't remember.
10       Q    Did you ever have any conversations with
11   Bo Won Chung about the litigation or the deposition
12   here today?
13       A    No, not about this litigation.
14       Q    And do you understand when I refer to
15   "this litigation," I'm talking about Mr. Kang's
16   lawsuit against U. Lim America and Tae Jin Yoon?
17       A    Yes.  I understand.
18       Q    Is there another Mr. Kang that works for
19   U. Lim America or U. Lim Korea that you are familiar
20   with?
21       A    Yes.  There is one Mr. Kang who works in
22   Korea.
23       Q    And what's his full name?
24       A    Yu Hyung Kang.
25       Q    How do you spell the middle name?

51

1        A    Y-u, middle name H-y-u-n-g, last name
2    K-a-n-g.
3        Q    And have you ever talked to Mr. Yu Hyung
4    Kang about the lawsuit, litigation, or the deposition?
5        A    Not about the event today we are doing
6    this.
7        Q    Have you ever talked to him about
8    anything to do with the lawsuit, not just today's
9    deposition?
10       A    Yes, I have.
11       Q    And when did you talk to him about the
12   lawsuit or the events giving rise to the lawsuit?
13       A    I do not recall the date.
14       Q    Give me your best estimate.
15       A    I think this year.  It was this year.
16       Q    And did he initiate this conversation, or
17   did you?
18       A    I think Mr. Kang initiated it.
19       Q    And do you know why he initiated this
20   conversation?
21       MR. BATTENFELD:  I'll object to the question.
22   It calls for speculation.
23       MR. GREY:  You can answer.
24       THE WITNESS:  Should I say?
25       MR. BATTENFELD:  Only if you have personal

52

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

---

**Page 57**

```
 1   BY MR. GREY:
 2        Q    Did you give Mr. Kang any opinions about
 3   the lawsuit?
 4        A    No.  I don't think I told him about my
 5   opinion about it.
 6        Q    Did he ever ask you what you thought
 7   about the lawsuit?
 8        A    No.  He did not.
 9        Q    Was he upset at Mr. Kang for filing the
10   lawsuit?
11        MR. BATTENFELD:  I'll object to the question as
12   calling for speculation.
13        MR. GREY:  You can answer.
14        THE WITNESS:  Who was upset?
15   BY MR. GREY:
16        Q    Was Mr. Yu Kang upset about Mr. Soo Kang
17   filing the lawsuit?
18        A    No.
19        Q    Did Mr. Kang indicate to you why he -- if
20   he was, why he was involved in this lawsuit or in
21   getting the status of the lawsuit?
22        A    No, he didn't.
23        Q    It is true that you had a meeting with
24   Mr. Kang, yourself, Bo Won Chung, and then Soo Kang?
25   Is that correct?
```

---

**Page 58**

```
 1        A    Yes.  We have.
 2        Q    And didn't you speak to Mr. Bo Won Chung
 3   about this lawsuit?
 4        A    I think -- I think I have told him that
 5   the lawsuit has been filed.
 6        Q    And at that time, what was Mr. Chung's
 7   position with the company?
 8        A    Assistant manager.
 9        Q    Assistant manager to what department?
10        A    Quality control.
11        Q    Was he also assistant manager for
12   production?
13        A    No.
14        Q    Okay.  And he worked directly under you;
15   correct?
16        THE INTERPRETER:  Directly under you?
17        THE WITNESS:  Yes, it is.
18   BY MR. GREY:
19        Q    Who at U. Lim America, if anyone,
20   initiated the meeting with Soo Kang?
21        A    Yu Kang wondered how Soo Cheol Kang was
22   doing; therefore, I was the one who suggested to meet
23   and talk about it.
24        Q    I don't understand in your answer Mr. Yu
25   Kang's involvement.  Can you explain that to me?
```

---

**Page 59**

```
 1        A    He said he wondered about it, so,
 2   therefore, I then told him that I would contact
 3   Mr. Kang -- Soo Cheol Kang, and -- let's see --
 4   whether I could make just an occasion to meet each
 5   other.
 6        Q    When you say Yu Kang wondered about it,
 7   what did he wonder about?
 8        A    He said how we were doing first, and he
 9   was wondering why did the kind of issues or event
10   occur.
11        Q    Anything else?
12        A    No.  That's all.
13        Q    But is it your testimony that Mr. Yu Kang
14   told you to set up a meeting with Soo Kang?
15        A    That was mentioned, so I said I would do
16   that.
17        Q    Why did Mr. Yu Kang tell you to set up a
18   meeting with Soo Kang?
19        A    I don't know.  I think he knew -- he was
20   friends maybe.
21        THE INTERPRETER:  But the friendship English
22   word has a little different meaning than the Korean
23   friendship, so I'd rather translate it as
24   acquaintance.
25   BY MR. GREY:
```

---

**Page 60**

```
 1        Q    But Yu Kang mentioned to you that he
 2   wanted to speak to Soo Kang; is that correct?
 3        A    Yes.
 4        Q    Did he tell you what he wanted to speak
 5   to Soo Kang about?
 6        A    No.  He didn't say about what he wanted
 7   to talk about.
 8        Q    Okay.  At the time you set up this
 9   meeting, what did you think the purpose of the meeting
10   was for?
11        THE INTERPRETER:  I have to make it very clear
12   with him.  He said about three things, but without
13   subjects.  So without subjects, I cannot translate, so
14   let me --
15        MR. GREY:  Okay.
16        THE INTERPRETER:  So he would rephrase it.
17        MR. GREY:  Let's refresh him on what that
18   question was.  It's been a long time between the
19   question and the answer.
20        THE WITNESS:  Yes.  I'd like to hear the
21   question again.
22        THE INTERPRETER:  I can't translate it.  You'll
23   have to let her read the question.
24            (Record read.)
25        THE WITNESS:  There was no particular reason.
```

---

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

---

**Page 65**

```
 1   for this meeting?
 2        A    Are you talking about the purpose of that
 3   meeting at the time?
 4        Q    The meeting that you set up with Soo
 5   Kang.
 6        A    I don't understand.
 7             What is it about that meeting?
 8        Q    You set up a meeting with Soo Kang;
 9   correct?
10        A    Yes.
11        Q    Did anyone mention to you the purpose of
12   setting up that meeting with Soo Kang?
13        A    No.
14        Q    And it's correct, then, that Yu Kang, Bo
15   Won Chung, and yourself went to meet Soo Kang;
16   correct?
17        A    Yes.  It's correct.
18        Q    And where did you meet?
19        A    It was a Korean restaurant.
20        Q    Did you speak personally with Soo Kang
21   when you arranged this meeting?
22        A    Yes, I did.
23        Q    Okay.  And when you spoke with Soo Kang,
24   why did you tell him that you wanted to have this
25   meeting?
```

---

**Page 67**

```
 1   Kang where he set up -- or where you set up the
 2   meeting.
 3        Q    Do you understand that?
 4        A    Yes.
 5        Q    And you told Soo Kang that Yu Kang wanted
 6   to speak to him; correct?
 7        A    Yes.
 8        Q    Did you tell him what Yu Kang wanted to
 9   speak to him about?
10        A    No.  I didn't -- I didn't say anything
11   else except I told him that Yu Kang just wanted to see
12   him.
13        Q    Okay.  In response to that, what did Soo
14   Kang tell you in this telephone conversation?
15        A    Said it's fine.
16        Q    Is that all Soo Kang said?
17        A    That's all I remember.
18        Q    Okay.  Did you ever inform Tae Jin Yoon
19   that you had set up the meeting?
20        A    No.  I did not.
21        Q    Did you ever inform Yoon Suk Choi that
22   you had set up the meeting?
23        A    No.  I did not.
24        Q    When you went to this meeting, did you
25   drive to the meeting?
```

---

**Page 66**

```
 1        A    I stated to him that Yu Hyung Kang would
 2   like to see him -- meet him.
 3        Q    Did you say anything else to him?
 4        A    No.  I didn't say anything else.
 5        Q    Okay.  What did he say to you?
 6        A    Which one?
 7        Q    Soo Kang.  We are talking now about the
 8   conversation with Soo Kang where you set up the
 9   meeting.
10        A    He stated that a lawsuit has been filed,
11   and then the expense has already been incurred about
12   $5,000.
13        MR. BATTENFELD:  Could you read back the last
14   question and answer?
15             (Record read.)
16        MR. BATTENFELD:  Just so the witness
17   understands, if you could ask the witness whether he
18   understood the question what did he say to Mr. Kang or
19   what did Mr. Kang say to him during the phone
20   conversation as opposed to what Mr. Kang said during
21   the meeting at the restaurant.
22        THE WITNESS:  I understood that -- what has
23   been said when we met him.
24        MR. GREY:  We'll get to that.  Right now we are
25   just talking about the conversation you had with Soo
```

---

**Page 68**

```
 1        A    Yes, yes.  I went with my car, yes.
 2        Q    And did Yu Kang, yourself, and Bo Won
 3   Chung all go in the same vehicle?
 4        A    I don't remember about that.
 5        Q    Do you recall driving together?
 6        A    I don't recall.
 7        Q    Do you recall that at the point in time
 8   when this meeting occurred, you and Mr. Chung were
 9   car-pooling together?
10        A    Yes.
11        Q    Does that refresh your recollection as to
12   whether or not Mr. Yu Kang was also with you?
13        A    Yes.  I don't think he drove this side --
14   this side.  I think we went all together.
15        Q    Do you remember having any conversations
16   with Mr. Chung or Mr. Kang about the upcoming meeting
17   as you were traveling to that meeting?
18        A    I don't remember.
19        Q    When you got to the meeting place, was
20   Mr. Soo Kang there?
21        A    I think we were seated.  A little later
22   he came.
23        Q    And who initiated the conversation with
24   Mr. Soo Kang, or was it Mr. Soo Kang who initiated
25   with you?
```

---

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

---

**Page 73**

```
 1          THE WITNESS:  I don't know.
 2   BY MR. GREY:
 3      Q    Do you have any reason to know why
 4   Mr. Chung called you at that point in time to speak to
 5   Mr. Soo Kang?
 6      A    I do not know.
 7      Q    So is it your testimony this was just a
 8   coincidence?
 9          MR. BATTENFELD:  I'll object to the question as
10   misstating his testimony and calling for speculation.
11          THE WITNESS:  I do not know.
12   BY MR. GREY:
13      Q    Did you hand the phone to Mr. Soo Kang?
14      A    Yes, it was.
15      Q    Do you know whether or not Tae Jin Yoon
16   got on the phone at any time?
17      A    I do not know.
18      Q    Even after the conversation came to a
19   close, did you come to know by any knowledge that Tae
20   Jin Yoon had been on the phone at that point in time?
21      A    I don't know.
22      Q    Is it your testimony that Mr. Chung asked
23   to speak to Mr. Soo Kang?
24      A    Yes.
25      Q    Did he say why -- at that point in time
```

---

**Page 74**

```
 1   why he wished to speak to Soo Kang?
 2      A    No.  He didn't say that.
 3      Q    Did you receive any other phone calls, or
 4   did anyone else receive any phone calls during this
 5   meeting?
 6      A    No.
 7      Q    Did you ever tell Mr. Kang that he should
 8   drop the lawsuit?
 9      A    No.  I didn't do that.
10      Q    Did you ever ask him why he was bringing
11   the lawsuit?
12      A    No.  I didn't say about it.
13      Q    Did anyone ask him at that meeting why he
14   was bringing the lawsuit?
15      A    I don't recall.
16      Q    Approximately how long did the meeting
17   last?
18      A    It was just during the meal hour, so it
19   could have been about 30 to 40 minutes.
20      Q    Where did you go after the meeting?
21      A    Go back home.
22      Q    Home or to work?
23          THE INTERPRETER:  Pardon me?
24   BY MR. GREY:
25      Q    Home or to work?
```

---

**Page 75**

```
 1      A    I went back home.
 2      Q    I thought I heard you say something about
 3   it was approximately 30, 40 minutes because it was
 4   like lunchtime.
 5          THE INTERPRETER:  No.  Mealtime.
 6   BY MR. GREY:
 7      Q    So this meeting took place in the
 8   evening; correct?
 9      A    Yes, it was.
10      Q    And it took place after work; correct?
11      A    Yes, it was.
12      Q    Did you -- or Mr. Chung drop off
13   Mr. Kang -- Yu Kang?
14      A    Yes.
15      Q    And did Mr. Chung drop you off?
16      A    I don't remember whether I drove that day
17   or whether Yoon Suk drove that day.
18      Q    After the meeting and while you were all
19   in the car, did you have any conversations about your
20   meeting with Soo Kang?
21      A    No.
22      Q    You didn't talk about how the meeting
23   went?
24      A    No.  We didn't say.
25      Q    Did you talk about what you thought might
```

---

**Page 76**

```
 1   happen with respect to the lawsuit?
 2      A    Are you saying that how the lawsuit will
 3   end or since that day?
 4      Q    How it will end, how it will proceed,
 5   what course it will take.
 6      A    No.
 7      Q    So it's your testimony, then, that after
 8   this meeting, you didn't talk anything about what
 9   happened in this meeting at all while you were in the
10   car?
11      A    I don't think that we talked anything
12   about this lawsuit.
13      Q    And just to be correct on this, you then
14   dropped off Mr. Kang at his home; correct?
15      A    I don't recall about that.
16      Q    Do you recall having a meeting or a
17   gathering with either Mr. Chung or Mr. Kang after the
18   car trip?
19          THE INTERPRETER:  After the car trip?
20          MR. GREY:  After the car trip.  I'll back up.
21      Q    You testified that after the meeting you
22   dropped off Mr. Kang, and then either Mr. Chung
23   dropped you off, or you dropped off Mr. Chung; is that
24   correct?
25      A    Yeah.  I assume so.
```

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL I
12/14/99

1   this lawsuit?
2       A    I think I spoke to my wife.
3       Q    Did you speak to your wife about the
4   lawsuit when you first became aware of it?
5       A    No.
6       Q    When did you first speak to your wife
7   about the lawsuit?
8       A    I don't remember when it was.
9       Q    Do you remember the content of your
10  conversation with your wife about the lawsuit?
11      MR. BATTENFELD:  At this point I'm going to
12  raise an objection that the question invades the
13  spousal privilege and inform Mr. Park that he does not
14  have to testify about any conversations he had with
15  his wife.  If he chooses to, it's his choice to do so,
16  but he's not legally required to do so.  He can
17  decline to answer those questions if he chooses.
18      MR. GREY:  I disagree that there is any spousal
19  privilege to this situation.
20      MR. BATTENFELD:  Is that Grey in law?
21      MR. GREY:  It's almost as good as Battenfeld in
22  law.
23      MR. BATTENFELD:  The difference is I'm right.
24  BY MR. GREY:
25      Q    What was the content of your conversation

81

1   with your wife about the lawsuit?
2       MR. BATTENFELD:  And do you understand the
3   objection, and it's your choice whether you want to
4   reveal communications you had with your spouse?
5       THE WITNESS:  Yes.
6           There wasn't nothing -- particular
7   subject said.
8   BY MR. GREY:
9       Q    Well, you mentioned to your wife that
10  Mr. Kang had sued U. Lim; correct?
11      A    Yes.  She knew about it.
12      Q    Did she already know about it before you
13  spoke to her?
14      A    I don't know about that.
15      Q    Okay.  Did you tell her the things that
16  Mr. Soo Kang had sued U. Lim about?
17      A    No, I did not.
18      Q    Did you tell her you were surprised that
19  Mr. Kang had sued U. Lim?
20      A    No.
21      Q    What then did you tell her about the
22  lawsuit?
23      A    I only stated to her that a lawsuit has
24  been filed, and then it's now still on.
25      Q    Did you tell her you were attending today

82

1   for a deposition in this case?
2       A    Yes, yes.  She knows.
3       Q    Did you tell her you were concerned about
4   any testimony you might give today?
5       MR. BATTENFELD:  At this point I'm going to
6   take a break and talk to my client to make sure he
7   understands the spousal privilege, and I'll have
8   Mr. Cho translate fully what his rights are before we
9   proceed.
10      MR. GREY:  And that's fine.  But just before we
11  do that, it is my understanding that Mr. Cho is U.
12  Lim's representative in this matter; is that correct?
13      MR. BATTENFELD:  He's the company's
14  representative at this deposition.
15      MR. GREY:  And Mr. Park has not been designated
16  in that capacity as U. Lim's representative in this
17  deposition?
18      MR. BATTENFELD:  He is here as a witness.
19      MR. GREY:  But not as the representative of U.
20  Lim for the litigation?
21      MR. BATTENFELD:  He is a management
22  representative of U. Lim.  He is here today in his
23  capacity as a witness that you have noticed for
24  deposition.
25      MR. GREY:  But as I understand it, Mr. Cho has

83

1   been present for almost all the depositions.  He's
2   been present as the representative for U. Lim in this
3   litigation; correct?
4       MR. BATTENFELD:  As the representative
5   attending depositions on behalf of U. Lim.
6       MR. GREY:  I'm obviously going to contend --
7   and I'm sure you will object -- there is no
8   attorney/client privilege for this, but feel free to
9   take the break now.
10      MR. BATTENFELD:  I want to make sure through my
11  own -- Mr. Cho's translation that the witness
12  understands what the objection was that I was raising.
13          (Brief recess.)
14  BY MR. GREY:
15      Q    We have a disagreement on the scope of
16  the attorney/client privilege in this matter.
17  Mr. Battenfeld is contending that the attorney/client
18  privilege extends to you as a manager of U. Lim in
19  this matter.  I disagree with that.  I will,
20  therefore, ask you questions, and I assume
21  Mr. Battenfeld will interject his opposition to it,
22  but I just want to tell you in advance what's going
23  on.  Now, as we left this, I understood Mr. Battenfeld
24  was going to instruct -- or inform you as to some
25  privilege outside the presence of the court reporter.

84

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

<table>
<tr><td>

1  review a declaration of Raul Corio?
2      A   I do not understand what you are saying.
3      Q   A declaration is a statement given by a
4  person that's committed to written form.  Have you
5  ever seen any statement given by Raul Corio?
6      A   No.  I don't know.
7      Q   No, I don't know, or no --
8      A   I do not understand your question.  Still
9  I do not understand your question.
10     Q   Okay.  We are taking a deposition here
11  today.  Do you understand?
12     A   Yes.
13     Q   And it's going to be committed to a
14  written form.
15     A   Yes.
16     Q   So that your statements will now be in
17  writing.
18     A   Yes.
19     Q   Okay.  Have you ever seen a written
20  statement of Mr. Raul Corio concerning any aspects of
21  this litigation?
22     A   No.
23     Q   Okay.  Usually we do this part at the
24  beginning, but we got sidetracked, so now we are going
25  to go through just general background information on

89

</td><td>

1     Q   What's your date of birth?
2     A   December 24th, 1967.
3     Q   Okay.  And how long did you live in
4  Korea?
5     A   I lived until I came here, which means
6  April of 1994.
7     Q   And is April of '94 the first time you've
8  lived in the United States?
9     A   Yes.  It's correct.
10     Q   Okay.  And when did you first start
11  working for any U. Lim entity?
12     A   1992.  Yes.  1992.
13     Q   Okay.  And do they have high school in
14  Korea?
15     A   Yes.
16     Q   Okay.  And does high school continue up
17  until you are approximately 18 years of age?
18     A   Yes, it is.
19     Q   Did you graduate from high school?
20     A   Yes.
21     Q   Okay.  Did you go to college?
22     A   Yes.
23     Q   Okay.  And how long did you attend
24  college?
25     A   Two years.

91

</td></tr>
<tr><td>

1  you.  Where were you born?
2     A   Korea.
3     Q   And how old are you?
4     A   Korean age, I am 33 years old.
5     Q   Is that different from American age?
6     A   Yes, it is.
7     Q   How would that convert to an American
8  age?
9     A   Korean age, when after you are born after
10  a year, you become one year.  American age when you
11  are born, you become one year.
12     MR. BATTENFELD:  I believe the translation
13  reversed it.
14     THE INTERPRETER:  I reversed it.  In Korea as
15  soon as when you are born, you are one year.  Next
16  birthday you become more like every year.  It's not --
17  you don't have to wait your first date.  If I am born
18  on December 12, I am already one year old.  Next year
19  I become two years old.  But American age if I am born
20  on December 12, I will be one year when -- next year
21  December 12.  So that is the difference.
22     MR. BATTENFELD:  Next time ask for date of
23  birth.
24     MR. GREY:  I didn't know.  I didn't know.  Why
25  don't we do that?

90

</td><td>

1     Q   And did you receive any degree from
2  college after those two years?
3     A   Yes.  One diploma.
4     Q   What sort of degree did you receive or
5  diploma did you receive?
6     A   I believe that when you finish four years
7  of college, you get a degree.  I did two years, which
8  that is more like a professional junior college.  I
9  received a diploma.
10     Q   Do they have a term equivalent to
11  associate's degree in Korea?
12     THE INTERPRETER:  Let me -- it's not verbatim,
13  but it's equivalent.
14     THE WITNESS:  No.  I don't have a degree.  I
15  only received a diploma.
16  BY MR. GREY:
17     Q   And what did you study in junior college?
18  And correct me if that's an improper term.
19     THE INTERPRETER:  I need to ask him.
20     THE WITNESS:  Mechanic design.
21  BY MR. GREY:
22     Q   Mechanic design?
23     A   Mechanic design.
24     Q   And what was your first job after
25  graduating junior college?

92

</td></tr>
</table>

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1      Q      Did you leave your father's company
2  specifically to go work for U. Lim Korea?
3      A      Yes, it was.
4      Q      How did you come to know about a job
5  opening at U. Lim Korea?
6      A      That is Tae Jin Yoon told me.
7      Q      And it's true that Tae Jin Yoon is sort
8  of a life-long friend; correct?
9      MR. BATTENFELD:  I'll object to the question to
10 the extent the phrase "life-long friend" is ambiguous.
11 BY MR. GREY:
12     Q      Do you understand the question?
13     A      Yes.  I do understand.  Yes.  He is a
14 friend.
15     Q      How long have you known Tae Jin Yoon?
16     A      About 18 years.
17     Q      Did you go to school together?
18     A      Elementary school together only.
19     Q      I take it you went to different high
20 schools?
21     A      Yes.  All different.
22     Q      Did you stay in contact with Tae Jin Yoon
23 during high school?
24     A      Yes.
25     Q      So you continued your friendship even

97

1  Lim Korea?
2      A      Yes.
3      Q      Okay.  And what was the job opening at U.
4  Lim Korea that Tae Jin told you about?
5      A      He didn't say what position was -- can be
6  filled or anything like that.
7      Q      Well, did he tell you there was a job
8  opening at U. Lim Korea?
9      A      Yes.
10     Q      Okay.  Did he tell you what that job was?
11     A      No, he didn't.
12     Q      Did you ask him what that job was?
13     A      Only I was told that -- the area where I
14 had my educational background.
15     Q      So did you understand that the job had
16 something to do with mechanical design?
17     A      When I entered, I was not aware of what
18 department I will be placed or anything like that.
19     Q      But I believe the question was did he
20 tell you what the job was, and you indicated he told
21 you that it involved something to do with your
22 educational background; correct?
23     A      Yes.
24     Q      And your educational background was
25 mechanical design; correct?

99

1  when you weren't going to school together?
2      A      Yes.  We met sometimes.
3      Q      And it's your testimony, then, that Tae
4  Jin Yoon informed you of a job position at U. Lim
5  Korea?
6      A      Yes.
7      MR. BATTENFELD:  Just for the record, we are
8  using the term U. Lim Korea as a short term.  That's
9  not actually the legal name of the corporation.
10 BY MR. GREY:
11     Q      What is the legal name of U. Lim Korea?
12     A      U. Lim Industry Corporation.
13     Q      Do you know whether or not --
14     MR. BATTENFELD:  That isn't correct, but when
15 you ask a lay witness, that's what you get.
16     THE WITNESS:  U. Lim Electronic.
17     MR. GREY:  And we are getting a clarification
18 from Mr. Cho.
19     THE WITNESS:  U. Lim Electronic Industrial
20 Corporation.
21 BY MR. GREY:
22     Q      Does that refresh your recollection as
23 the name of U. Lim Korea?
24     A      Yes.
25     Q      Can we now refer to that company as U.

98

1      A      Yes.
2      Q      So did he tell you that it had something
3  to do with mechanical design?
4      A      Yes.
5      Q      Okay.  What else did he tell you about
6  the job or the job duties?
7      A      I don't think there was anything else
8  that he said.
9      Q      Okay.  Did you interview for this job?
10     A      When I entered the company?
11     Q      No.  Normally before people get a job,
12 they interview for a job in this country.
13            Did you interview for the job at U. Lim
14 Korea?
15     A      Yes, yes.  That's why -- when I entered,
16 yes.  Yes.
17            You were asking that -- whether I
18 received an interview when I entered the company?
19     Q      Not exactly.
20            Did you have to apply for the job before
21 you got the job?
22     A      Yes.
23     Q      Okay.  Did you fill out an application?
24     A      Yes.
25     Q      Okay.  Did you then after you filled out

100

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1  no relevance to any of these questions.  I will
2  strongly suggest, Mr. Grey, you move on, or I'm going
3  to inform Mr. Park to no longer answer these questions
4  which have no bearing on any issue in this case nor
5  are they reasonably calculated to lead to any
6  discoverable evidence relative to this case.
7      MR. GREY:  The objection is noted.
8      MR. BATTENFELD:  Well, I suggest we move on.
9  BY MR. GREY:
10     Q      Did Ki Hwa Yoon tell you what position
11 you've been hired for?
12     A      I don't recall about that.
13     Q      What position did you ultimately receive
14 when you were first hired?
15     A      Lever or --
16     THE INTERPRETER:  I will use the word
17 "position."
18     THE WITNESS:  You mean which department?
19     MR. BATTENFELD:  Job title is what you are
20 looking for?
21     MR. GREY:  Job title, position.
22     THE WITNESS:  I was a regular staff for QC
23 department, quality control department.
24 BY MR. GREY:
25     Q      A regular staff for quality control.  It

105

1  was not a management position; correct?
2      A      No.
3      Q      And how long did you work as a regular
4  staff person for quality control?
5      A      As a regular staff or with a particular
6  position?
7      Q      I thought you said as a regular staff for
8  quality control.
9      A      You are asking how many years have I
10 worked as a regular staff?
11     Q      How long did he work in the position as a
12 regular staff person for quality control?
13     A      About one year and a half.
14     Q      And after that what was your next
15 position or job tile at U. Lim Korea?
16     THE INTERPRETER:  I have to ask him the English
17 title.
18     THE WITNESS:  Still I was working for quality
19 control, but my position became a supervisor.
20 BY MR. GREY:
21     Q      And briefly summarize what were your
22 duties as a regular staff quality control person?
23     A      I was an inspector.
24     Q      So you'd inspect the products
25 manufactured by U. Lim Korea for defects; correct?

106

1      A      Yes.  It's correct.
2      Q      And then you were promoted to supervisor;
3  correct?
4      A      Yes, it is.
5      Q      And how long did you hold the position as
6  supervisor?
7      A      I don't remember how long I stayed there.
8      Q      Well, you indicated you went to the U.S.
9  in April of '94; correct?
10     A      Yes.
11     Q      So for the period of time after you
12 became a supervisor to the time you went to the U.S.,
13 was that -- were you always in a position of
14 supervisor?
15     THE INTERPRETER:  Let me make clear.
16     THE WITNESS:  What I did was when I was working
17 for U. Lim Korea, I began as regular staff.  Next
18 position I held was a section supervisor.  Next
19 position I held was -- I was section -- more like
20 department -- more like the small division director.
21 Next position I held was I became assistant manager
22 before I came to USA.
23 BY MR. GREY:
24     Q      Your job duties as you moved from section
25 supervisor to division director, did they change?

107

1      A      As regular staff my job duty was an
2  inspector.  When I got promoted to the section
3  supervisor until -- prior to the assistant manager
4  position I held, I was the inspector for the parts --
5  I was the inspector of the items coming into the
6  company -- our company until -- prior to the time that
7  I became an assistant manager.
8      MR. GREY:  He mentioned in there, however, that
9  he was a division director.  Did he have the same job
10 duties as section supervisor when he was division
11 director?
12     THE INTERPRETER:  What he's saying is when he
13 was regular staff, his job duties was an inspector.
14 Then he went to second, third, four steps before he
15 came here.  Those two -- in between two staff -- two
16 positions, he was the inspector for like -- try to
17 find out the defective items coming -- items coming
18 into the company.  Then his job duties changed when he
19 became assistant manager.  So two positions he was
20 doing same thing.  That's just my reading.  I am
21 reading what my notes are written down here when he
22 said.
23 BY MR. GREY:
24     Q      Did you become assistant manager while
25 you were still in Korea?

108

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

| | |
|---|---|
| 1   is production manager. | 1   I was familiar with the production manager's duties. |
| 2      Q   Who was the production manager when you | 2      Q   Was that a familiarity you got while |
| 3   came over from Korea? | 3   working at U. Lim America as opposed to U. Lim Korea? |
| 4      A   I'm not certain who it was. | 4      A   No. When I was working in Korea, I still |
| 5      Q   Do you know who performed the job duties | 5   obtained that kind of duties involved with that line |
| 6   of supervising production when you came over from | 6   of work. |
| 7   Korea? | 7      Q   So you are saying you had a familiarity |
| 8      A   I think Eduardo. I am not certain about | 8   through your quality control duties at U. Lim Korea |
| 9   it. | 9   with production? |
| 10      Q   Okay. At one point in time you became | 10      THE INTERPRETER: Would you give me a couple |
| 11   both quality control manager and production manager; | 11   minutes of break? I cannot contain words together. |
| 12   correct? | 12   Let me have -- then you will read it to me again. I |
| 13      A   Yes, it was. | 13   don't want to mistranslate. |
| 14      Q   When did you start receiving production | 14      (Recess taken.) |
| 15   duties? | 15   BY MR. GREY: |
| 16      MR. BATTENFELD: Do you mean production manager | 16      Q   When you arrived at U. Lim America other |
| 17   duties? | 17   than secretarial staff, who was employed at U. Lim |
| 18      MR. GREY: Production supervising duties. | 18   America? |
| 19      THE WITNESS: I don't remember exact years. | 19      A   Joo Hwan Kwak was there. |
| 20   BY MR. GREY: | 20      Q   And this is the same Kwak that |
| 21      Q   Give me your best estimate. | 21   interviewed you? |
| 22      A   About 1995 -- or 1995. | 22      A   Yes. It's correct. The next one is |
| 23      Q   Was it approximately the same time that | 23   Mr. Cho. Those two were there. |
| 24   you received your promotion to quality control | 24      Q   Is that it? |
| 25   manager? | 25      A   Yes, it was. |
| 113 | 115 |

| | |
|---|---|
| 1      A   Yes. | 1      Q   How about Tae Jin Yoon? |
| 2      Q   Okay. And is it correct that your duties | 2      A   Yes. He was there. |
| 3   were the same as assistant quality control manager as | 3      Q   And when we were using the term "there," |
| 4   they were as quality control manager? | 4   we are talking about employed by U. Lim America. Was |
| 5      THE INTERPRETER: Would you repeat that? | 5   Ki Hwa Yoon employed by U. Lim America when you |
| 6   BY MR. GREY: | 6   arrived? |
| 7      Q   Is it correct that your duties as | 7      A   No, he was not. |
| 8   assistant quality -- control manager were the same as | 8      Q   Ki Hwa Yoon didn't have any title with U. |
| 9   your duties as quality control manager? | 9   Lim America when you arrived? |
| 10      A   Yes, it was. | 10      A   He was the president. |
| 11      Q   Okay. So when you received your | 11      Q   Ki Hwa Yoon? |
| 12   promotion to quality control manager, it was really | 12      A   No. Ki Hwa Yoon was not the president in |
| 13   just a title you were receiving; correct? | 13   U. Lim America. He was the president of all U. Lim. |
| 14      A   Yes, it was. | 14      Q   When you say "He was the president of all |
| 15      Q   And at that same time is when you made | 15   U. Lim," are you saying that he was the president of |
| 16   production manager? | 16   U. Lim Korea, and U. Lim Korea owned U. Lim America? |
| 17      A   Yes. About same time. | 17      A   I do not know that relationship, how it |
| 18      Q   Had you ever had any experience in | 18   goes. |
| 19   supervising employees relative to production prior to | 19      Q   What do you understand Ki Hwa Yoon's |
| 20   being made production manager? | 20   relationship to U. Lim America was when you arrived? |
| 21      A   Are you talking about the production | 21      A   I understood he was the person who had |
| 22   line? | 22   the control of all those. |
| 23      Q   Yes. The production. | 23      Q   So by some means you understood that he |
| 24      A   Yes. When I was doing QC department work | 24   controlled U. Lim America, U. Lim Korea, and U. Lim |
| 25   because QC department work involves different areas. | 25   Mexico; is that correct? |
| 114 | 116 |

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

---

**Page 121**

1    Q    And then you testified that approximately
2  a week after you arrived Mr. Kang arrived; correct?
3    A    Yes.  It's correct.
4    Q    And what was Mr. Kang's job position at
5  the time that he first arrived?
6    A    At the company I think he started as
7  assistant manager.
8    Q    Of what department?
9    A    Purchase -- like purchase and then
10  warehouse.
11    Q    And other than secretarial employees, did
12  U. Lim America to your knowledge have any other
13  employees working for them when you arrived?
14    A    Yes.  Besides those I mentioned, no.
15    Q    All the production was carried out by U.
16  Lim Mexico; is that correct?
17    A    Yes.
18    Q    When you arrived, to your knowledge, was
19  there any Korean individuals working for U. Lim
20  Mexico?
21    A    Yes.
22         Koreans?
23    Q    Yes.
24    A    Yes.
25         MR. BATTENFELD:  Would you read back the

121

---

**Page 122**

1  question?
2         (Record read.)
3         THE WITNESS:  No.  I'm sorry about it.
4  BY MR. GREY:
5    Q    Were all the employees employed by U. Lim
6  Mexico Mexican to the best of your knowledge?
7    A    Yes.
8    Q    When you arrived, did you speak Spanish
9  at all?
10    A    No.
11    Q    Do you speak English at all?
12    A    Yes.  A little bit.
13    Q    Could you read English when you arrived?
14    A    I was not able to read well.  Not at all,
15  no.  I was not able to read well.
16    Q    When Mr. Kwak left, did anybody replace
17  him?
18    A    No.  Since he didn't have any position,
19  there was no need to replace his place.
20    Q    Did you report directly to Tae Jin Yoon
21  when you arrived?
22    A    Yes, it was.
23    Q    And to your knowledge, did Mr. Kang
24  report directly to Tae Jin Yoon?
25    A    Yes, it was.

122

---

**Page 123**

1    Q    And so did Mr. Cho; correct?
2    A    Yes.
3    Q    When you arrived at U. Lim America, do
4  you know the approximate total of U. Lim America's
5  sales?
6         MR. BATTENFELD:  I'll object to the question as
7  being vague and ambiguous as to what you mean by total
8  sales and also ambiguous as to a period you are
9  referring to.
10  BY MR. GREY:
11    Q    Do you understand the question?
12    A    Not -- I don't understand.
13    Q    Okay.  U. Lim America sold electronic
14  parts; correct?
15    A    Yes.
16    Q    Okay.  And at some point throughout the
17  year, U. Lim America would add up its total sales of
18  those parts; correct?
19    A    Yes.
20    Q    Okay.  And when during the year would it
21  tally its total sales?
22    A    End of the year, December.
23    Q    Okay.  In December of 1994, do you have
24  some estimate of what U. Lim's total sales were?
25         MR. BATTENFELD:  And you mean for the entire

123

---

**Page 124**

1  year 1994?
2         MR. GREY:  For the year 1994.
3         THE WITNESS:  I don't remember precisely.
4  BY MR. GREY:
5    Q    Give me your best estimate.
6         MR. BATTENFELD:  If you can give an estimate.
7  Again don't guess.
8         THE WITNESS:  I don't remember.
9  BY MR. GREY:
10    Q    Did that sales figure increase in 1995?
11    A    Yes.
12    Q    Do you know how much the total sales were
13  in 1995?
14    A    I don't remember now.
15    Q    As a percentage, what's your best
16  estimate of the percentage increase in sales from 1994
17  to 1995?
18    A    I have total year, but I do not remember
19  right now.
20    Q    What's your best estimate in a range that
21  you are comfortable with?
22    A    I don't remember.
23    Q    Let me give you a for instance and see if
24  that would help at all.  Did the sales from 1994 to
25  1995 double for instance?

124

---

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1   this deposition.
2       MR. BATTENFELD: Well, what the status was in
3   1994 does not go to that issue.
4       MR. GREY: It goes to his current status as far
5   as I know.
6       Q    Are you currently, Mr. Park, a citizen of
7   the United States?
8       A    No.
9       MR. GREY: Okay. So it goes.
10      MR. BATTENFELD: If you want to ask him his
11  current immigration status, I will allow that
12  question. I will not allow questions as to what his
13  immigration status was in 1994 because it's not
14  relevant.
15      MR. GREY: If he's not a U.S. citizen now, he
16  obviously was an immigrant in 1994. I don't
17  understand the need for the objection in the first
18  place.
19      MR. BATTENFELD: I've made the objection, and
20  I'm explaining to you I've heard nothing from you that
21  makes his status --
22      MR. GREY: There's no basis for this objection.
23      MR. BATTENFELD: Let me finish. I've heard
24  nothing from you that makes his immigration status in
25  1994 relevant. Therefore, I will instruct him not to

129

1   answer any questions about that status.
2       MR. GREY: You can instruct him with each and
3   every question.
4       Q    Were you ever promised by U. Lim Korea or
5   U. Lim America that when you came to the United
6   States, they would sponsor you for citizenship or
7   immigration status?
8       A    No.
9       Q    To work over here you had to have a visa;
10  correct?
11      A    Yes.
12      MR. BATTENFELD: Could you read the question
13  back?
14          (Record read.)
15  BY MR. GREY:
16      Q    And isn't it correct that you received a
17  three-year visa to work?
18      A    Yes. Three years' visa? Yes. Received
19  three years' visa first.
20      Q    Okay. And thereafter you had to seek an
21  extension to that visa; correct?
22      A    Yes. It's correct.
23      Q    And is it correct you received a two-year
24  extension?
25      A    It's correct.

130

1       Q    Did U. Lim America or U. Lim Korea ever
2   indicate at some point during the expiration of your
3   first visa and the expiration of your second visa that
4   they would seek to sponsor you for citizenship or a
5   green card?
6       A    No. There was no mention about it by the
7   company.
8       Q    Was there mention by anyone associated
9   with the company?
10      A    There was a time or event that I
11  mentioned about it.
12      Q    And who did you mention it to?
13      A    Yu Shik Yoon. I think I mentioned the
14  ones about it.
15      Q    You are talking about Yu Shik Yoon?
16      A    Yes.
17      Q    Did you request from Yu Shik Yoon that
18  the company sponsor you for either citizenship or a
19  green card?
20      A    Yes.
21      Q    Okay. And when did you request this of
22  Yu Shik Yoon?
23      A    I do not remember exactly what date.
24      Q    Just give me your best estimate.
25      A    I think it was about three or four months

131

1   ago.
2       Q    And what caused you to mention that to Yu
3   Shik Yoon?
4       A    Since it has been more than five years,
5   and then -- or so we have a child born here.
6   Therefore, I have in my mind to mention about it.
7       Q    Wasn't your child, in fact, born in
8   Korea?
9       A    No. First one was born in Korea, but the
10  second one was born in USA.
11      Q    Was it your understanding that your
12  extensions were running out?
13      A    I understand that I can have two more
14  years of extension in the future.
15      Q    Your understanding, then, is that you can
16  have extensions up to the year 2000 or 2001?
17      A    2002.
18      Q    And would that be April of 2002?
19      A    No. March.
20      Q    And at that point in time, it's your
21  understanding that you either have to get a green
22  card, or you'll have to go back to Korea; is that
23  correct?
24      A    You mean once I have -- my effective date
25  expires, I have to go back?

132

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1   months ago, did you ever speak to anyone at U. Lim
2   regarding your visa status?
3        A    No.  I didn't talk anything about green
4   card.
5        Q    I know I mentioned green card, but I'm
6   also talking about the visa status.
7        A    No.  There was nothing talked about the
8   green card, but the L-1 visa, first you get three
9   years, and then the extension is two years.  Another
10  extension is given only for two years.  That is the
11  way my understanding -- I understood.
12       Q    Did you have a conversation with someone
13  at U. Lim America about the L-1 visa and the
14  extensions?
15       A    Yes.
16       Q    Okay.  And who did you talk to about
17  that?
18       A    Mr. Cho.
19       Q    And in those conversations -- was it
20  multiple conversations or a single conversation?
21       A    I only talked about -- at the time about
22  extension.
23       Q    Okay.  And there was no mention of a
24  green card at that time?
25       A    No, not at the time.

137

1        Q    How did you become aware of the fact that
2   you needed an extension?
3        A    You are talking about L-1?
4        Q    Uh-huh.  Yes.
5        A    Mr. Cho informed me.  That's why I knew
6   about it.
7        Q    Now, you indicated when you came over to
8   U. Lim America, you thought of it as a temporary
9   assignment; is that correct?
10       A    Yes, it was.
11       Q    When did you, if ever, come to view it as
12  a permanent assignment?
13       A    About that, the company did not make any
14  decision about it.
15       Q    At any time?
16       A    Yes.
17       Q    Do you still consider yourself to be
18  temporarily assigned to U. Lim America?
19       A    Yes, it is.
20       Q    You are married; correct?
21       A    Yes.
22       Q    Is your wife of Korean ancestor?
23       A    Yes.
24       Q    Did you meet her in Korea?
25       A    Yes.

138

1        Q    Okay.  When did you get married?
2        A    1996.
3        Q    Do you know the month?
4        A    January.
5        Q    You indicated that approximately April of
6   '95 or thereabouts you became production manager and
7   quality control manager; correct?
8        A    I think -- I'm not certain exactly
9   whether it was in April or -- I think it was about
10  during that time.
11       Q    You said approximately one year after you
12  arrived; correct?
13       A    Yes.
14       Q    Okay.  And when you became production
15  manager, did you have any assistant managers working
16  for you?
17       A    Yes.  A Mexican.
18       Q    Who was that or those individuals who
19  worked for you?
20       A    Eduardo.
21       Q    Do you know his last name?
22       A    I do not know the last name.
23       Q    And would you characterize him as an
24  assistant manager?
25       A    Yes, he was.

139

1        Q    And did you have anybody working
2   underneath you as quality control manager as an
3   assistant manager or supervisor?
4        A    I did it.
5        Q    And you were in charge of the supervisory
6   line of production; correct?
7        A    Yes.
8        Q    And what hours were the production lines
9   in operation generally speaking?
10       A    From 7:30 to 5:35.
11       Q    You also frequently had the production
12  lines working overtime; correct?
13       MR. BATTENFELD:  I'll object to the question as
14  being ambiguous both as to time frame and with respect
15  to the word "frequently."
16       THE WITNESS:  If you let me know what period.
17  BY MR. GREY:
18       Q    Okay.  When you first took over as
19  production manager, the production lines -- their
20  normal hours of operation were 7:30 to 5:35; is that
21  correct?
22       A    Yes.  It's correct.
23       Q    And you indicated that from 1994 to 1995
24  approximately total sales nearly doubled or almost
25  doubled or close to doubled; correct?

140

KANG V.
U. LIM AMERICA, INC.

1  correct?
2      A    Yes.
3      Q    And do you ever set overtime in advance
4  on that monthly schedule?
5      THE INTERPRETER:  Would you repeat what you
6  just said?
7  BY MR. GREY:
8      Q    Do you ever set overtime in advance on
9  that monthly schedule?
10     A    Yes.  When we have lots of period, there
11 are times when we do that.
12     Q    And when you set overtime in advance on
13 your monthly schedule, do you set it for a particular
14 block of time each day?
15     A    The overtime changes according to the
16 status of a situation, therefore depends on the
17 situation.  Sometimes when we set overtime schedule.
18     Q    What's the latest your production line
19 ever stayed open working overtime?
20     MR. BATTENFELD:  I'll object that the question
21 is ambiguous as to time frame.  Do you have a time
22 frame?
23     MR. GREY:  I'm talking about while he is a
24 production manager the latest time.
25     MR. BATTENFELD:  Up to the present, or are you

145

1      Q    And the overtime that you scheduled would
2  vary depending on the production needs; correct?
3      A    Yes.
4      Q    Okay.  And the normal hours of operation
5  for the production lines were 7:30 to 5:35; correct?
6      A    Yes.
7      Q    Now, if you schedule overtime on a given
8  day, would you schedule overtime for all the
9  production lines, one of the production lines, a
10 specific number of production lines?
11     A    In Mexico there are not enough lines --
12 overtime production line.  What we do is we announce
13 to everybody -- everybody who wants to have overtime.
14 Then those who want to have overtime are remained
15 after their regular time.  Then we form overtime line.
16 We do those who want to have overtime separate lines,
17 not a particular line we designate for.  So we use the
18 people who want to have overtime, and then we form a
19 new production line for those who want overtime in
20 Mexico.
21     Q    Okay.  And when you form this overtime
22 production line, is there generally speaking a set
23 length of time that that production line is in
24 operation?  So, for instance, if you are going to have
25 overtime that day, is it usually done in a three-hour

147

1  talking --
2      MR. GREY:  Up to the termination of Mr. Kang's
3  employment.
4      THE INTERPRETER:  I don't understand your
5  question.
6      MR. BATTENFELD:  Let me try and see if you can
7  translate this.
8          Correct me if I don't have this right.
9          He's asking within the time frame of
10 Mr. Kang's employment, which would be April '94 to
11 February 2, '98, during that time frame the latest at
12 night that Mr. Park can recall that production was
13 running -- the production operations were running
14 until he stopped, what was the latest stop time.
15          Is that right?
16     MR. GREY:  Right.
17     THE WITNESS:  I think it was in 1996 to the
18 first part of 1997.
19 BY MR. GREY:
20     Q    Let me just try to clarify.  I'm just
21 trying to get to a simple answer so I'll understand
22 your job and I'll understand the overtime.  Okay?
23          You were in charge of scheduling
24 overtime; correct?
25     A    Yes.

146

1  block, a one-hour block, a five-hour block, or can it
2  vary anywhere in between?
3      A    No.  Overtime hours are already made
4  then.  It means two hours overtime.
5      Q    So when you have overtime, it's done in a
6  two-hour block; correct?
7      A    Yes.  A day.
8      Q    So the overtime line would be in
9  production from what hours on a given day?
10     A    6:00 to 8:00.
11     Q    Okay.  So when you have overtime, the
12 overtime production lines will operate between 6:00
13 and 9:00 p.m.; correct?
14     MR. BATTENFELD:  I believe his preface was
15 typically.
16     THE WITNESS:  Yes.
17 BY MR. GREY:
18     Q    Okay.  And when the overtime production
19 lines are in production, do all the U. Lim managers
20 have to be at the plant, U. Lim America?
21     MR. BATTENFELD:  I'll object to the question as
22 being ambiguous as to "all the U. Lim managers."  Who
23 are you referring to?
24     MR. GREY:  You can answer.
25     MR. BATTENFELD:  If you can since there has

148

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 1
12/14/99

1    Q    When a production line is running
2 overtime on a given day, what is the need for the
3 purchasing manager to be there while that production
4 line is running overtime?
5        MR. BATTENFELD:  And I'll object that the
6 question has been asked and answered.
7        MR. GREY:  You can answer.
8        THE WITNESS:  He was not just in charge of
9 purchase, but also was in charge of warehouse.
10 Therefore, it was not something I told him to stay.  I
11 think he volunteered to stay there.
12 BY MR. GREY:
13    Q    For your production line to be working
14 overtime, did you need Mr. Kang to be performing
15 purchasing duties during that overtime period?
16    A    No.
17        MR. BATTENFELD:  I'll object to the question as
18 being vague and ambiguous as to what you mean by
19 "purchasing duties" whether you are excluding
20 warehouse or inventory duties.
21        MR. GREY:  I am excluding warehouse and
22 inventory duties.
23    Q    And you understood I was just talking
24 about purchasing; correct?
25    A    Yes.

153

1 Tuesday.
2        MR. GREY:  What's the date of that; do you
3 know?
4        THE INTERPRETER:  Tuesday the 24th.
5        MR. GREY:  Tuesday the 24th?
6        MR. BATTENFELD:  21st.
7        MR. GREY:  And you are coming back when?
8        MR. BATTENFELD:  I'll be back the 31st.  But as
9 a practical matter in terms of working days --
10        MR. GREY:  January the 3rd, Monday.  Okay.  And
11 it's also my understanding based on other
12 conversations that Tae Jin Yoon is not presently in
13 the United States?
14        MR. BATTENFELD:  That's correct.
15        MR. GREY:  And you don't have any understanding
16 as to when he will be back in the United States?
17        MR. BATTENFELD:  Right.  He does not have a
18 date certain for his return to the United States.
19        MR. GREY:  So based on that, you are not
20 presently honoring the notice of taking deposition of
21 Tae Jin Yoon?
22        MR. BATTENFELD:  Correct.  At least not in the
23 United States.
24        MR. GREY:  Well, do you want to fly to Korea?
25 Is he in Korea?

155

1    Q    For your production line to run overtime
2 during the period of time -- that two-hour block that
3 is running overtime, did you consider it necessary for
4 Mr. Kang to be there due to his warehousing duties?
5    A    Yes, I did.
6        MR. BATTENFELD:  I'll let you know it is now
7 5:37 due to the translator -- her earlier statement
8 that she wanted to stop at 5:30.
9        THE INTERPRETER:  I am tired.
10        MR. GREY:  Okay.  Well, we'll suspend the
11 deposition to a set, convenient time once counsel gets
12 back to his office and can give us an available date
13 for the balance of the deposition and in accordance
14 with Mr. Park's scheduling duties at U. Lim America.
15        MR. BATTENFELD:  I already stated that I
16 believe next Monday is looking like an available day.
17        MR. GREY:  Okay.  Well, I'll get back with you.
18 I don't have my calendar.  I think that is okay cause
19 we scheduled, I believe, Tae Jin's for that day.
20 Right?
21        MR. BATTENFELD:  Just to give you a fair
22 warning, after Monday I won't be available until after
23 the holidays.
24        MR. GREY:  Okay.  Is that including Tuesday?
25        MR. BATTENFELD:  I'm leaving for vacation on

154

1        MR. BATTENFELD:  Currently he's in Hungary, but
2 his assignment is based in Korea right now.
3        MR. GREY:  Do you have any understanding of how
4 long he's going to be in Hungary?
5        MR. CHO:  Maybe about two weeks.
6        MR. GREY:  I think that concludes today's
7 deposition proceeding.  The stipulation -- this brings
8 up another point as to the correction of the
9 deposition transcript for multiple volumes.  Do we
10 wish to have each volume corrected separately, or do
11 you want to make a stipulation that the volumes will
12 be corrected when all the depositions are concluded?
13        MR. BATTENFELD:  We've been previously doing it
14 as a continuing obligation as each volume comes in.
15        MR. GREY:  I'm not sure I exactly understood
16 that, but okay.  With that in mind, we'll stipulate as
17 follows:  To relieve the court reporter of her duties
18 under the code; that the original deposition
19 transcript entitled volume I will be mailed to
20 Mr. Park directly.
21        MR. BATTENFELD:  Why don't we have it mailed to
22 me.
23        MR. GREY:  It will be mailed to counsel,
24 Mr. Battenfeld's office.
25        Mr. Park, you will have -- how many days

156

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF CALIFORNIA
3
4  SOO CHEOL KANG,                    )
                                       )
5           Plaintiff,                 )
                                       )
6      vs.                            ) No. 99 CV659 JM (RBB)
                                       )
7  U. LIM AMERICA, INC.; TAE          )
   JIN YOON, an individual; and       )
8  DOES 1 to 100,                     )
                                       )
9           Defendants.               )
   _____)
10
11
12
13
14
15           DEPOSITION OF SOON WAN PARK
16              San Diego, California
17            Monday, December 20, 1999
18                   Volume 2
19
20
21
22
23
   Reported by:
24 HEATHER M. COLLEY
   CSR No. 10693
25 JOB No. 11730

162

---

1  APPEARANCES:
2
3  For Plaintiff:
4      RICHARD E. GREY, ATTORNEY AT LAW
       BY:   RICHARD E. GREY
5      Attorney at Law
       409 Camino Del Rio South, Suite 303
6      San Diego, California 92108
       (619) 543-9300
7
   For Defendants:
8
       MORGAN, LEWIS & BOCKIUS LLP
9      BY:   JOHN S. BATTENFELD
       Attorney at Law
10     300 South Grand Avenue, 22nd Floor
       Los Angeles, California 90071
11     (213) 612-2500
12
13 Also Present:
14     SOO CHEOL KANG
       JAE CHO
15
   Interpreter:
16
       THOMAS YU
17     INTERPRETERS UNLIMITED
18
19
20
21
22
23
24
25

---

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF CALIFORNIA
3
4  SOO CHEOL KANG,                    )
                                       )
5           Plaintiff,                 )
                                       )
6      vs.                            ) No. 99 CV659 JM (RBB)
                                       )
7  U. LIM AMERICA, INC.; TAE          )
   JIN YOON, an individual; and       )
8  DOES 1 to 100,                     )
                                       )
9           Defendants.               )
   _____)
10
11
12
13
14
15        Deposition of SOON WAN PARK, Volume
16     2, taken on behalf of Plaintiff, at 501
17     West Broadway, Suite 1300, San Diego,
18     California, beginning at 9:45 a.m. and
19     ending at 5:40 p.m. on Monday, December
20     20, 1999, before HEATHER M. COLLEY,
21     Certified Shorthand Reporter No. 10693.
22
23
24
25

161

---

1                    INDEX
2  WITNESS                          EXAMINATION
3  SOON WAN PARK
   Volume 2
4
5        BY MR. GREY                     164
6
7
8
                        EXHIBITS
9
   DEPOSITION                            PAGE
10
   1     Declaration; 4 pages            254
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

163

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

1    A    The latest about 10 o'clock, 10:00 p.m.
2    Q    And on that occasion when it went to 10:00
3    p.m. or occasions, did you set the overtime for an
4    additional shift for 8:00 to 10 o'clock?
5    A    Only the person who wants to be put in
6    that schedule, yes.
7    Q    Okay.  I am not asking now whether or not
8    you are asking for volunteers or not.  I am just saying
9    that when you did schedule the overtime to go to 10:00
10   p.m. for whoever persons you chose for whatever reason,
11   did you set the schedule for 8:00 to 10:00?
12   A    Yeah.  For any person to be in that
13   schedule, they would be scheduled for overtime.
14   Q    On every -- strike that.
15        Was it true that on every occasion that
16   you scheduled overtime past 8:00 p.m. the overtime
17   would continue until 10:00 or not?
18   A    We seldom have this overtime scheduled
19   from 8:00 p.m. to 10:00 p.m. regularly.  Only that
20   occasion take place but once or twice a year when it is
21   most really needed to have that overtime scheduled.
22   Q    But I am asking you when you did schedule
23   the overtime, did it always go to 10:00 p.m.?  So, in
24   essence, did you always schedule it from 8:00 to 10:00
25   when you had overtime past 8:00 p.m.?

168

1        The question was:  In 1995, to your best
2    estimate, approximately how many times did you schedule
3    or have overtime until 10:00 p.m. in 1995?
4    A    I cannot remember exactly how many times
5    we had overtime past 10:00 p.m.
6    MR. BATTENFELD:  Could you hold on just a
7    second.
8    MR. GREY:  Sure.
9    MR. BATTENFELD:  I think the part of his last
10   answer was missed, but I don't think it's responsive to
11   his question, so I think it's a moot point.
12   MR. GREY:  You mean translation?
13   MR. BATTENFELD:  Right.
14   MR. GREY:  Off the record.
15        (Discussion off the record.)
16   MR. GREY:  Let's put this on the record.  I
17   don't know if it was noted before, but Mr. Cho is
18   present as a representative of U. Lim, the company, as
19   is Mr. Kang, the plaintiff.  Both Mr. Cho and Mr. Kang
20   speak Korean and will have an opportunity to listen to
21   the translation and to the answer.  So it's agreed,
22   just so that we can make this deposition as accurate as
23   possible, that if either party believes that
24   translation may have been inaccurate --
25   MR. BATTENFELD:  Or incomplete I think is more

170

1    MR. BATTENFELD:  Just to help, are you asking
2    did it sometimes go to 9:00 or 9:15 or 9:30?
3    MR. GREY:  Exactly.
4    THE WITNESS:  Yes, I scheduled for 8:00 p.m. to
5    10:00 p.m.
6    BY MR. GREY:
7    Q    Okay.  So you would schedule in a block if
8    you are going to schedule overtime?
9    A    Yes.
10   Q    And during 1994 approximately, how many
11   times did you schedule overtime up to 10:00 p.m.
12   A    I cannot recall exactly what happened.  It
13   did happen probably once or twice in 1994.
14   Q    How about in 1995 when you indicated that
15   the sales almost doubled?
16   MR. BATTENFELD:  I want to just remind the
17   witness if he can give an estimate, that's acceptable,
18   but he should not be guessing.
19   THE WITNESS:  I didn't have any set plan to have
20   overtime in 1995 after 8:00 p.m.; but if such occasion
21   took place, it was because the work site requires to
22   have overtime.
23   BY MR. GREY:
24   Q    Okay.  You have to listen to my question.
25   It doesn't directly answer the question asked.

169

1    likely the case.
2    MR. GREY:  -- or incomplete, that they will make
3    a notation and we will take a brief stop at that point
4    to see if it can be clarified to make sure Mr. Park's
5    answers are as correct as possible and the translation
6    is correct as possible.
7    MR. BATTENFELD:  I realize if the answer in
8    Korean, if it is lengthy, to get the entire question
9    translated, I could ask -- is it Mr. Yu?
10   THE INTERPRETER:  Yes.
11   MR. BATTENFELD:  Is it easier for you, if
12   there's a lengthy answer for the answer to be stopped
13   in stages so you can translate?
14   THE INTERPRETER:  It sometimes helps.
15   MR. BATTENFELD:  Let us know when you think that
16   would be helpful because I have -- I have noticed a
17   couple --
18   MR. GREY:  And you will have to sort of take
19   charge of that and speak with your witness and tell him
20   to stop at some point in time.
21   THE INTERPRETER:  Okay.
22   MR. GREY:  Make sure you can get it all, because
23   obviously we don't know how far you can go.
24   THE INTERPRETER:  All right.
25   MR. BATTENFELD:  Or just ask questions that

171

KANG V.
U. LIM AMERICA, INC.

1   there was no written weekly overtime schedule?
2       A    No, we didn't have that.
3       Q    Okay.  And was there no written daily
4   overtime schedule?
5       A    If there is any overtime, I usually notify
6   verbally and nothing in writing particularly.
7       Q    Okay.  So, then, is it correct to say that
8   the only written overtime schedule was the monthly
9   overtime schedule?
10      A    When I plan for the monthly work schedule,
11  I usually not including anticipated -- or overtime
12  schedule.  Just the figure is generated based on the
13  requirement from the salespeople how to carry out that
14  work load with existing personnel.  That's what I am
15  concerned with, but not overtime included within that
16  schedule.
17      Q    Would that monthly schedule ever include
18  overtime in advance?
19      A    I did not include overtime schedule into
20  that monthly schedule.
21      Q    So then it's correct to say that as you
22  progressed through a given month that you would then
23  verbally assign overtime either a week in advance or a
24  day in advance, but there would be no written record of
25  it; is that correct?

176

1       Q    Starting from January 1st of '98?
2       A    Yes, that is correct.
3       Q    Okay.  And you indicate in your testimony
4   that you kept records usually for two years; is that
5   correct?
6       A    Each document is different.  That is a
7   different period, but most of the time kept for two
8   years.
9       Q    Okay.  And what documents are you
10  referring to that are kept two years which would show
11  the overtime work?
12      A    That is indicated on the paperwork showing
13  the daily production record, report.
14      Q    Okay.  And the daily production report
15  actually has some space on it or column or some other
16  location on that report which indicates overtime worked
17  that day?
18      A    That record shows the time, time schedule
19  difference and certain portion is indicating the actual
20  number of the work performed and the overtime schedule.
21      Q    Okay.  And where would the daily
22  production records normally be kept?
23      A    Production people keep that.
24      Q    And are you referring to yourself?
25      A    Yes, that is correct.

178

1       A    That is a correct statement.
2       Q    Okay.  What records of any type would
3   exist which would show the employee's of U. Lim Mexico
4   working overtime during Mr. Kang's employment?
5       THE INTERPRETER:  You want me to repeat the
6   question one more time in Korean again?
7       MR. GREY:  Okay.
8       THE WITNESS:  Any kind of record showing that
9   overtime was scheduled and permitted, that sort of
10  thing?
11  BY MR. GREY:
12      Q    Any type of record that shows that the
13  overtime was worked period during Mr. Kang's
14  employment.
15      A    We are now maintaining the record for '98
16  and '99 for the overtime schedule.  But prior to those
17  years, we did not have any record showing a schedule at
18  all in our possession.
19      Q    Okay.  When did you start maintaining the
20  record in 1998?
21      A    Usually we keep the record for a period of
22  about two years and after that we do not keep the
23  record, but they are maybe stored in some other place.
24  But right now what we have is a schedule for '98 and
25  '99.

177

1       Q    Okay.  And after two years had passed,
2   what would you do with a daily production report that
3   was two years old?
4       A    Usually it's not required to keep certain
5   period.  After two years usually we discard from our
6   maintaining the document from my authority.
7       Q    Okay.  So would you personally discard or
8   destroy those documents?
9       A    That's right.
10      Q    I am not sure whether or not you indicated
11  this.  But do you presently have those documents for
12  January of '98?
13      A    Yes, I do keep that.
14      Q    When you say you would discard these
15  documents, do you have any particular time of the year
16  that you normally go through that process?  So for
17  instance do you discard the documents in January or do
18  you discard the documents throughout the year as they
19  become two years old?
20      A    For that question, I didn't have any
21  particular schedule to discard over period document,
22  but I told my personnel that anything reached over two
23  years period, they can either discard or use the
24  backside of that paper for a rough draft or a rough
25  writing.  So anything we keep right now is from January

179

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

1  amount of overtime that Mr. Kang worked; is that
2  correct?
3      A    Yes.
4      Q    Okay.  When did you become aware of that
5  to your best estimate?
6      A    I do not recall exactly.
7      Q    Well, you became aware of it at least at
8  the point when Mr. Cho read you portions of the
9  complaint; is that correct?
10     A    I do not recall exact date.  However, I
11 have been hearing about this complaint over the
12 overtime, yes.
13     Q    And did you hear about this complaint
14 approximately the spring of 1999?
15     A    Yeah.  I heard this year.  I don't know
16 exactly months, but I heard this year.
17     Q    But was it in the spring in the earlier
18 part of this year?
19     A    I believe so.
20     Q    Okay.  And knowing that there was an issue
21 with respect to overtime, did you take any action to
22 save the daily production records for 1997?
23     A    No, I was not particularly intending to do
24 anything about it.
25     Q    Okay.  So the answer is no?

184

1      A    No.
2      Q    Okay.  Did anybody instruct you that you
3  should try to save the 1997 daily production reports or
4  that you should destroy them, either one?
5      A    No, I have not heard either way.
6      Q    Do you know whether or not there would be
7  any payroll records with respect to the amount of
8  overtime worked at U. Lim Mexico?
9      A    I don't know exactly how the department
10 handling the payment, the employee payment, I don't
11 know.
12     Q    Do you know who handles the payroll for U.
13 Lim America and U. Lim Mexico?
14     A    There's a gentleman called Mr. Cho.
15     Q    When you are referring to Mr. Cho, are we
16 referring to the Mr. Cho --
17     A    Yes.
18     Q    -- who is here today?
19     A    Yes.
20     Q    Did you always work while overtime was
21 ongoing?
22     MR. BATTENFELD:  Just for clarification, you are
23 referring to some -- or when some of the production
24 workers were working overtime?
25     MR. GREY:  Yes, I am.

185

1      THE WITNESS:  Yes, I was.
2  BY MR. GREY:
3      Q    And when you had an assistant manager for
4  production, did they also always work while the
5  production line was working overtime?
6      MR. BATTENFELD:  Object to the question as being
7  ambiguous as to time frame and are you referring to the
8  time period of Mr. --
9      MR. GREY:  Yeah, Mr. Kang's employment period.
10     MR. BATTENFELD:  So the period is basically '94
11 until February 2, 1998.
12     THE WITNESS:  Sometime the person present;
13 sometime not present during the overtime period.
14 BY MR. GREY:
15     Q    Okay.  Was there any policy?
16     MR. BATTENFELD:  Can we just stop for a minute.
17 Mr. Cho is indicating that my objections or
18 clarifications are not necessarily being consistently
19 translated.  So if I could request that that --
20     MR. GREY:  We pay extra for that.
21     MR. BATTENFELD:  Do you understand, Mr. Yu --
22     THE WITNESS:  Yes, I try my best to do that.
23     MR. BATTENFELD:  If you haven't had an
24 opportunity to translate my objection or my
25 clarification, tell me and I will repeat it so it can

186

1  be translated.  But everything needs to be translated,
2  not just the questions.
3      MR. GREY:  Do you want to take a break here?
4      MR. BATTENFELD:  Yeah.
5          (Recess.)
6  BY MR. GREY:
7      Q    Mr. Park, you indicated that sometimes the
8  assistant managers would work during overtime and
9  sometimes not; correct?
10     A    Yes, that's correct.
11     Q    Okay.  Was there any policy either written
12 or verbal or understood with respect to those assistant
13 managers should be working during the overtime hours?
14     MR. BATTENFELD:  Object to the question as being
15 ambiguous with respect to the word "policy."
16     THE WITNESS:  No.
17 BY MR. GREY:
18     Q    Okay.  Do you -- you understand the term
19 "policy," do you not?
20     A    Yes.
21     Q    Raul Carillo was one of your assistant
22 managers; correct?
23     A    Several of them.
24     Q    But he was one of them?
25     A    Hispanic person, Mexican?

187

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

---

**Page 192**

1  instruct the witness to limit his response with respect
2  to Mr. Cheong to the time period until February 2,
3  1999.
4  BY MR. GREY:
5      Q    Do you understand the question?
6      A    Yes.  He understood the question.
7      I understand the question.
8      Q    And the answer?
9      A    I didn't instruct him to stay with the
10  production line at all including overtime.
11      Q    You did not instruct them?
12      A    No.
13      Q    Okay.  But you were their boss; correct?
14      A    Yes.
15      Q    Okay.  So you had some control or
16  influence over their working hours; correct?
17      A    That's correct.
18      Q    Okay.  So as their boss, did you expect
19  them as part of their job duties to be working at the
20  company while the production lines were running
21  including overtime production?
22      A    No.  It's not exactly mandatory that they
23  have to be with the work forces.
24      Q    I am not asking you whether or not it's
25  mandatory or whether or not there may be an occasion

---

**Page 193**

1  when they would not be there.  What I am asking you is
2  as their boss, as part of their regular duties, did you
3  expect them to be there?
4      A    Yes, I expect and I hope they do carry out
5  their duties.
6      Q    And that duty being to be supervising the
7  production lines during overtime operation; correct?
8      A    Yes, that's correct.
9      Q    Okay.  And it's correct that during 1994
10  you reported directly to Tae Jin Yoon; correct?
11      A    Yes.
12      Q    And during 1995 you reported to Tae Jin
13  Yoon directly; is that correct?
14      A    Yes.
15      Q    And the same question for 1996?
16      A    Yes.
17      Q    And the same question for 1997?
18      A    Yes.
19      Q    And is it true that from the first date of
20  your employment to the present you have always reported
21  directly to Tae Jin Yoon; correct?
22      A    From the -- from my employment or ever
23  since I arrived in Mexico?  Which one?
24      Q    Just to make it simpler for this
25  deposition so I don't have to make the questions

---

**Page 194**

1  longer -- translate that -- when I refer to you "U.
2  Lim," I will be referring to U. Lim Mexico and U. Lim
3  America.  If I am referring to U. Lim Korea, I will
4  specifically state that.  And if in giving your answer,
5  you feel the need to clarify between U. Lim Mexico and
6  U. Lim America, would you please do that.  Do you
7  understand?
8      A    Yes.
9      Q    Okay.  So from the time you were employed
10  by U. Lim, U. Lim America to the present, have you
11  reported directly to Tae Jin Yoon?
12      A    Yes, that's correct.
13      MR. BATTENFELD:  You are asking up to the
14  present?
15      MR. GREY:  Up to the present.
16      MR. BATTENFELD:  Did the witness understand
17  that, up to the present?
18      THE WITNESS:  Yes.
19  BY MR. GREY:
20      Q    So still presently you report to Tae Jin
21  Yoon; correct?
22      A    Right now different.
23      Q    Okay.  When did that change?
24      A    This year sometime, but I do not recall
25  the date.

---

**Page 195**

1      Q    What's your best estimate?
2      A    I do not recall, exactly.
3      Q    Was it in the spring, summer, fall?  Can
4  you give me some estimate?
5      A    Spring of this year.
6      Q    Were you still reporting to Tae Jin Yoon
7  when you first went to the attorney's office with Tae
8  Jin?
9      A    He was not my direct boss, no.
10      Q    Who was your direct boss?
11      A    Mr. Cho was my direct boss.
12      Q    When did Mr. Cho become your direct boss?
13      A    That happened ever since I came to Mexico
14  and it has been the same way ever since.
15      Q    So ever since you came to Mexico, you
16  reported directly to Mr. Cho?
17      A    Yes.
18      Q    Are you sure about that?
19      A    He was one grade higher than I was, so I
20  say he was my boss.
21      Q    When you say "one grade higher," what do
22  you mean?
23      A    Okay.  I don't know.  But when I came here
24  with the position, he was one position over me.  And
25  when I promoted one step higher, he is also, again, one

---

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

1    MR. GREY:  Read it back.
2         (Record read.)
3  BY MR. GREY:
4    Q    I will rephrase it.
5         In this meeting you each report
6  individually to Tae Jin Yoon; correct?
7    A    Yes.
8    Q    And then he would comment on each of your
9  own individual reports; correct?
10   A    Yes.
11   Q    Okay.  Before these daily meetings
12 occurred, did you meet with Mr. Kang or Mr. Cho or both
13 of them to go over your previous day's production
14 reports?
15        MR. BATTENFELD:  Object to the question as
16 vague, overbroad and ambiguous as to time frame.
17 BY MR. GREY:
18   Q    You can answer.
19   A    You are talking about we had to talk prior
20 to meeting?
21   Q    Yes.
22   A    No, we didn't have any particular meeting.
23   Q    Okay.  So normally your first meeting of
24 the day between any of the managers would normally
25 occur when you had that morning meeting with Tae Jin

200

1  authority from Tae Jin Yoon; correct?
2    A    Yes.
3    Q    And my question to you is basically to
4  clarify.  Does that mean assistant managers for both U.
5  Lim Mexico and U. Lim America?
6    A    Not up to assistant manager, no.
7    Q    Okay.  I am almost there.  So for U. Lim
8  Mexico, even an assistant manager you needed to get
9  authority to hire; correct?
10   A    Yeah, up to assistant manager, yes.
11   Q    Okay.  And, to the best of your knowledge,
12 was Mr. Kang under the same limitations with respect to
13 the ability to hire and fire?
14   A    It's in the purchasing department, perhaps
15 that's the way it was.
16   Q    Okay.  I am saying, to the best of your
17 knowledge, if you have knowledge, do you believe that
18 Mr. Kang also could not hire assistant manager level
19 and above persons without Tae Jin Yoon's approval?
20   A    I still don't quite clearly understand the
21 question.
22   Q    Why don't we do it this way.  Have you
23 ever known an occasion where Mr. Kang hired anyone who
24 was an assistant manager or above without first
25 obtaining Tae Jin Yoon's approval?

202

1  Yoon; is that correct?
2    A    That's right.  We didn't have any separate
3  meeting.
4    Q    Okay.
5    A    That's the meeting that we attend in the
6  morning.
7    Q    Did you have any authority to hire or fire
8  at U. Lim without Tae Jin Yoon's approval?
9    A    For the production employees, yes, I did
10 have authority, yes.
11   Q    Okay.  And so just to be clear, you are
12 saying that you had the authority to hire people for
13 the production line; is that correct?
14   A    That's right.
15   Q    Okay.  Did you have authority to hire or
16 fire people who were assistant manager level?
17   A    That's something I have to get approved --
18   Q    Okay.
19   A    -- prior to taking action.
20   Q    Okay.  Does that include having to get
21 approval prior to hiring a Mexican supervisor for U.
22 Lim Mexico?
23   A    Okay.  Say that again, please.
24   Q    Okay.  You indicated that to hire an
25 assistant manager level person you needed to get

201

1    A    As far as I know, he never had such
2  occasion.
3    Q    Okay.  To the best of your knowledge, did
4  Mr. Cho have to get authority from Tae Jin Yoon before
5  hiring anyone who was assistant manager or higher?
6    A    Yeah.
7         MR. BATTENFELD:  Object to the question as being
8  ambiguous as to time frame.
9  BY MR. GREY:
10   Q    So the answer is, to the best of your
11 knowledge, you believe Mr. Cho also had to seek Tae Jin
12 Yoon's approval for hiring or firing?
13   A    Yes, that's correct answer.
14   Q    Okay.  Do you, during Mr. Kang's
15 employment, believe that Mr. Cho had the ability to
16 fire you without Tae Jin Yoon's approval?
17        THE INTERPRETER:  I'm sorry.  I lost the
18 question.
19 BY MR. GREY:
20   Q    Okay.  During the period of Mr. Kang's
21 employment, were you ever of the belief that Mr. Cho
22 had the authority to fire you?
23   A    No.
24   Q    Okay.  You indicated that approximately in
25 the spring of this year you stopped reporting directly

203

1       A       Well, he had some confusion because --
2  there is an office space -- an office designated for
3  Tae Jin Yoon and while he is doing some other things,
4  there is another higher ranking officer from the
5  company someone that came from Korea and who is using
6  the office space, Tae Jin Yoon's office space.
7       Q       Who is occupying Tae Jin Yoon's office?
8       A       You know, probably Kim Youn Kil.  He is a
9  member of board of director.
10       Q       Do you know the title of Mr. Kim?
11       A       Known as board of director in English.
12       Q       Has he physically occupied that office
13  since you opened the new plant?
14       A       Yes.
15       MR. BATTENFELD:  Can we read back the question
16  again so we understand.  I don't want to have anymore
17  confusion.  The question is whether this other
18  individual has been in that office since approximately
19  April of 1999 when the new facility opened or whether
20  *he has been in that office since some later date.*
21       THE WITNESS:  It's just temporarily being used
22  by Yoon, the person that came from Korea, the board of
23  director members.
24  BY MR. GREY:
25       Q       Okay.  That almost answers the question.

208

1       But since the plant opened in
2  approximately April of 1999, has Mr. Kim physically
3  been in that office since the plant opened.
4       MR. BATTENFELD:  I don't think it's been
5  translated.  That's where there may be the confusion
6  here as to whether that means -- your question was
7  whether Mr. Kim --
8       MR. GREY:  Right.
9       MR. BATTENFELD:  I think it was when Mr. Yoon --
10       MR. GREY:  Let me do this -- and take your time
11  and you take your time.
12       Q       Since you moved into the new office in
13  approximately April of 1999 --
14       A       Yes.
15       Q       -- has Mr. Kim physically occupied Tae Jin
16  Yoon's office since that time?
17       MR. BATTENFELD:  You mean starting in April?
18       MR. GREY:  Right.
19       THE WITNESS:  Kim started using the office space
20  starting August of 1999.
21  BY MR. GREY:
22       Q       Okay.
23       A       That's the time he apparently came.
24       Q       Is Mr. Kim's name on the door or on just
25  outside the door?

209

1       A       No.
2       Q       Okay.  Is Tae Jin Yoon's name on the door
3  or outside of the door?
4       A       No.
5       Q       Okay.  Who occupied that office before
6  Mr. Kim, if anyone?  I am talking about physically
7  being in the office.
8       A       It mostly has been empty.  I mean,
9  unoccupied, rather.  Once in a while Mr. Yoon stop by.
10       Q       Okay.  When you started your employment in
11  1994, did Mr. Yoon come to the factory almost every
12  day?
13       MR. BATTENFELD:  Object to the question as being
14  ambiguous with respect to the phrase "almost every day"
15  as to what you are referring to.
16  BY MR. GREY:
17       Q       Do you understand the question?
18       A       Yes, I understand the question.
19       Q       Okay.  And was there almost every day?
20       A       Up to when?
21       Q       When you started your employment.
22       A       It was '94.
23       Q       Right.
24       A       Up to what period are you talking about?
25       Q       Just when you started your employment,

210

1  generally the period around the beginning of your
2  employment, was Mr. Yoon there on a daily basis?
3       MR. BATTENFELD:  Objection consistent with the
4  witness's request for clarification is that still
5  hasn't been given which is over what time frame the
6  question is referring to.
7       MR. GREY:  Okay.  In 1994.
8       THE WITNESS:  With the exception of the period
9  he was engaged in some trip abroad or trip to place, he
10  made a daily visit to the plant.
11  BY MR. GREY:
12       Q       Okay.  And as you understood, in 1994 he
13  was the person in charge of the plant; correct?
14       A       Yes.
15       Q       Okay.  I assume -- and tell me if I am
16  wrong -- that for 1995, '96 and 1997, Mr. Yoon, except
17  when he was away on a business trip, was there almost
18  every day?
19       MR. BATTENFELD:  Again, I will object to the
20  phrase "almost every day" as being ambiguous as to
21  whether you are referring to working days.
22       MR. GREY:  I will clarify it.
23       Q       For Monday through Friday.
24       A       Yes.
25       Q       Okay.  And during that period you

211

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

1  report to Mr. Cho.
2       Q      And would you just submit that report in
3  written form?
4       A      Yes, I did make a report.
5       Q      Okay.  Do you know whether or not Tae Jin
6  Yoon is presently employed by U. Lim America?
7       A      Yes, he is.
8       Q      Okay.  Is he employed also by U. Lim
9  Mexico, if you know, presently?
10      A      Yes.
11      Q      Okay.  And what's Mr. Cho's current title
12 at U. Lim America?
13      A      He is known as the general manager.
14      Q      Is there anybody above Mr. Cho presently
15 at U. Lim America who physically resides at U. Lim
16 America?
17      A      There is one called Mr. Yoon.
18      Q      Which Mr. Yoon?
19      A      Tae Jin Yoon.
20      Q      Is it not true that Tae Jin Yoon is not
21 really physically located anymore at the new plant?
22      A      Not on a daily basis, no.
23      Q      Is Mr. Cho in charge of the U. Lim plant
24 in Mexico on a daily basis?
25      A      Yes.

216

1  of?
2       MR. BATTENFELD:  Well --
3       THE WITNESS:  I don't know what method he is
4  using, but he does consult with Tae Jin Yoon.
5  BY MR. GREY:
6       Q      Do you know if he consults with him on a
7  daily basis?
8       MR. BATTENFELD:  Object to the question as
9  calling for speculation.
10      THE WITNESS:  I don't know.
11      MR. GREY:  Do you want to take a break here?
12      MR. BATTENFELD:  Yeah.
13          (Lunch recess taken from 12:40 p.m.
14      to 1:30 p.m.)
15 BY MR. GREY:
16      Q      You understand we are continuing your
17 deposition, so it's under oath?
18      A      Yeah.
19      Q      Okay.  You indicated that you were both
20 production manager and quality control manager;
21 correct?
22      A      Yes.
23      Q      And as production manager, what was
24 fundamentally your duties?
25      A      You are talking about what particular duty

218

1       Q      Is he doing basically the same job Tae Jin
2  Yoon used to do when Tae Jin Yoon was there on a daily
3  basis?
4       A      Yes, that's correct statement.
5       Q      Okay.  And do you understand that Mr. Cho
6  does have hiring and firing authority for people of a
7  managerial level?
8       A      He does have authority, I believe, but he
9  is also consulting with his boss and take action.
10      Q      Okay.  Who do you understand that he
11 consults with now as his boss?
12      A      Tae Jin Yoon.
13      Q      And does he consult with Tae Jin Yoon
14 telephonically?
15      A      I don't know how he does it.
16      Q      Well, Tae Jin Yoon is not at the plant;
17 correct?
18      A      Yes.
19      Q      Okay.  So does he meet Tae Jin Yoon at
20 another location or does he speak with him over the
21 telephone?
22      MR. BATTENFELD:  Or through some other means of
23 communication.  Those aren't the exclusive means of
24 communications.
25      MR. GREY:  Any other one that you are thinking

217

1  in production?
2       Q      Well, as production manager, how would you
3  describe your job duties overall?
4       A      I control and direct the productions which
5  was based on PO, purchasing order, I believe.
6       Q      And you are referring now to the
7  purchasing orders from the customers; correct?
8       A      Yeah, that's correct.
9       Q      Were all or most of your parts that went
10 into production supplied by U. Lim Korea?
11      A      That's correct.
12      Q      And what were your duties as quality
13 control manager?
14      A      I was supervising and controlling the
15 items shipping in and shipping out and production
16 around the production line.
17      MR. BATTENFELD:  Can you read that back.
18          (Record read.)
19 BY MR. GREY:
20      Q      As quality control manager, you would take
21 samples of the items you were producing to determine
22 whether or not they met specifications?
23      A      Yes.
24      Q      And generally speaking, what were the
25 major types of items produced by U. Lim America?

219

```
 1    work you have had to do for U. Lim?
 2         MR. BATTENFELD:  Object to the question as
 3    overbroad and ambiguous with respect to the time frame
 4    and ambiguous with respect to the phrase substantial
 5    increase.
 6         THE WITNESS:  He don't say that the work load
 7    has been increased during those periods.
 8    BY MR. GREY:
 9         Q    It has not?
10         A    Has not been.
11         Q    Is that correct?
12         A    Yes, that's right.  That's what I said.
13         Q    What time would you normally arrive at
14    work in 1994?
15         A    I usually report to work at 7 o'clock in
16    the morning.
17         Q    Okay.  And on a Monday through Friday when
18    would you normally leave in 1994?
19         MR. BATTENFELD:  You are asking about 1994?
20         MR. GREY:  Right.
21         THE WITNESS:  Most of the time I went home
22    7 o'clock p.m., but unless there is no overtime or
23    excess work.
24    BY MR. GREY:
25         Q    So your testimony is, then, that when
```

                                  224

```
 1    there was not overtime, you normally left at 7:00 p.m.;
 2    is that correct?
 3         A    That's right.
 4         Q    Okay.  Was there ever a second shift, not
 5    overtime, but an actual second shift for employees
 6    working the production lines?
 7         A    We did have a second shift, yes.
 8         Q    Okay.  And what were the hours of the
 9    second shift?
10         A    Normally started from 8:30 p.m. to 5:00
11    a.m. next morning.
12         Q    When did this second shift -- when did you
13    begin having this second shift?
14         A    The end of 1997, the later part I should
15    say.
16         Q    And who would supervise the production
17    line to 5:00 a.m. in the morning?
18         A    I believe the person under me was assigned
19    for that duty.
20         Q    When you use the word you believe, don't
21    you know who supervised the line during the second
22    shift?
23         A    One person named Chae, a Korean employee.
24         Q    What was the name?
25         A    C-h-a-e, maybe, was assigned for that
```

                                  225

```
 1    position, supervisorial duty in the morning.
 2         Q    Was he an assistant manager in production?
 3         A    We didn't give them a title like that, but
 4    acted as assistant manager.
 5         Q    And he was directly under you; correct?
 6         A    Yes.
 7         Q    And he was in charge of supervising the
 8    second shift?
 9         A    Yes.  Correct.
10         Q    What caused you to begin to operate a
11    second shift in the end of 1997?
12         A    We decided to start the second shift
13    because with the existing production rate, we are not
14    fully satisfied the buyer's request.
15         Q    So when you say you are not satisfying the
16    buyer's request, are you saying that you had more
17    orders than you could fill?
18         A    That is a correct statement.
19         Q    And prior to starting the second shift at
20    the end of '97, if you needed to fill those customer
21    orders, then you would use overtime to do that?
22         A    Say the question again, please.
23         Q    Okay.  Prior to beginning or starting up
24    the second shift, if you had orders that you could not
25    fill via the normal production hours, you would assign
```

                                  226

```
 1    overtime to try to fill those orders?
 2         A    That's correct.
 3         Q    And isn't it true that because you had a
 4    need for this second shift that prior to that you were
 5    regularly assigning people to overtime?
 6         MR. BATTENFELD:  Object to the question as being
 7    ambiguous as overbroad and ambiguous as to time frame
 8    and as to the word "regularly."
 9         THE WITNESS:  I didn't fully understand the
10    question.
11    BY MR. GREY:
12         Q    Okay.  You said you began the second shift
13    in 1997, the end of 1997?
14         A    Yes.
15         Q    And you made the decision to begin a
16    second shift because U. Lim was very busy; correct?
17         A    Yes.
18         Q    Okay.  And you were -- U. Lim was no
19    longer capable of meeting the customer orders with the
20    one shift; correct?
21         A    Well, if I have to explain in a little
22    more detail about why the second shift position came
23    about it was not overall production requirement by U.
24    Lim, but that there was a certain buyer who had a
25    little problem with U. Lim and in order to cope with
```

                                  227

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

```
 1  approximately 50 to 60 production workers; correct?
 2        A    Yes.
 3        Q    What were their regular work hours?
 4        MR. BATTENFELD:  By that, you mean excluding
 5  overtime?
 6        MR. GREY:  Excluding overtime.
 7        THE WITNESS:  48 hours per week.
 8  BY MR. GREY:
 9        Q    Was there a one-hour lunch break every
10  day?
11        A    Yes.
12        Q    Was that the regular work hours that those
13  employees maintained for '95, '96 and '97 excluding
14  second shift?
15        A    Yeah, we maintained the same time
16  schedule.
17        Q    Okay.  Now, you indicated that Monday
18  through Friday your regular works were 7:00 a.m. to
19  7:00 p.m.; correct?
20        A    From 7:30 to 5:30 Monday through Friday.
21        MR. BATTENFELD:  You are asking about the
22  production hours?
23        MR. GREY:  No.  I am asking him about his
24  hours.
25  BY MR. GREY:
```

232

```
 1        Q    I will ask it again.  I believe you
 2  previously stated that Monday through Friday the
 3  regular time you would be at work was between 7:00 a.m.
 4  and 7:00 p.m.; is that correct?
 5        A    Okay.  To be correct, I started work at 7
 6  o'clock and I usually go home at 6 o'clock unless there
 7  is any overtime.  And that time 7 o'clock I mentioned
 8  earlier p.m. was the time I reached home.
 9        Q    It 1994 you didn't have a driver's
10  license; correct?
11        A    Yes, that's correct.
12        Q    Okay.  You had to commute with someone;
13  correct?
14        A    Yes.
15        Q    Who did you normally commute with in 1994?
16        A    Mr. K-w-a-k, J-o H-w-a-n.
17        Q    He was only there for a short time in
18  1994; correct?
19        A    Not exact time period, but he was there a
20  few months.
21        Q    Okay.  Who did you commute with after Kwak
22  left?
23        A    Mr. Kang.
24        Q    How long did you commute with Soo Kang?
25        A    I don't recall exact period in time that I
```

233

```
 1  was riding with him.
 2        Q    Okay.  Who did you commute with after Soo
 3  Kang?
 4        A    I believe I obtained a driver's license
 5  after that.
 6        Q    Do you recall ever commuting with anybody
 7  other than Soo Kang?
 8        MR. BATTENFELD:  And Mr. Kwak?
 9        MR. GREY:  And Mr. Kwak.
10        THE WITNESS:  After -- besides those people, I
11  had some arrangement with Mr. Cheong for the car pool
12  with a certain date prearranged.
13  BY MR. GREY:
14        Q    And when there was overtime to 8:00 p.m.,
15  what time did you normally leave?
16        A    About 9 o'clock I went home.
17        Q    And when there was overtime to 10:00 p.m.,
18  what time would you normally leave?
19        A    About 11 o'clock.
20        Q    When you and Mr. Kang were commuting
21  together, that would mean that he would leave at the
22  same time as you; correct?
23        A    Yeah, we left the company together, same
24  time.
25        Q    Did you ever have an occasion where you
```

234

```
 1  had to stay overnight at the company?
 2        A    That happened when Sony audit.  I had to
 3  prepare for the audit.
 4        Q    When Sony did this audit, how many nights
 5  did you have to stay over at the company?
 6        A    Only one day.
 7        Q    By that we mean one night; correct?
 8        A    Yes.
 9        Q    When did this occur?
10        A    I believe either '96 or '97.  I am not
11  sure of the date.
12        Q    From the period of time of 1994 to
13  February of '98, did you ever have any other occasions
14  where you had to stay overnight at the facility?
15        A    No, there's none.
16        Q    Did you ever have to arrive at the
17  facility earlier than 7:00 a.m. during the period of
18  Mr. Kang's employment?
19        A    You said I report to company before
20  7 o'clock in the morning?
21        Q    Yes.
22        A    Well, I mainly kept the 7:00 time for the
23  reporting to work.
24        Q    Okay.  But my question to you was did you
25  ever have to report to work earlier than that?
```

235

KANG V.
U. LIM AMERICA, INC.

1    Q    Okay.  You indicated that in 1996 you
2  recall approximately 20 times where you assigned
3  overtime; is that correct?
4    A    I don't know exact number of the
5  overtimes, but that's something I stated, yes.
6    Q    We are talking about assigning overtime
7  for a 6:00 to 8 o'clock block?
8    A    How many people was assigned to that
9  block; is that what you mean?
10    Q    No.  I am just laying the foundation for
11  the next question.
12         When you would assign overtime for that
13  6:00 to 8:00 block, okay, approximately how many of the
14  people would you assign to overtime?
15    A    It's not a set number, but about 20 to 30
16  people.
17    Q    So a little less than half the total
18  number of people you had working for you in 1996; is
19  that correct?
20    A    Yes, slightly less than half.
21    Q    And when you assigned overtime during that
22  period same period 1996 for the 8:00 to 10:00 shift,
23  approximately how many people would you assign on
24  average for that shift?
25    A    About 20 to 30 people again.  Again, based

240

1  on personal approval or acknowledgment over assigning
2  to the overtime.
3    Q    Okay.  But approximately the same number;
4  is that correct?
5    A    Yes.
6    Q    And for 1997 is it approximately the same
7  number of people you assigned for overtime then too?
8    A    Yes, about the same.
9    Q    And that would apply to the 8:00 to 10:00
10  shift as well; correct?
11    A    Yes.
12    Q    Okay.  Did you ever have any set work that
13  you needed to accomplish at the end of the day when the
14  production line finally closed?
15    A    Set the new standard for deciding that.
16    Q    Let me reask the question.
17    Q    You indicated that you generally needed to
18  be there when production lines were running; correct?
19    A    Yes.
20    Q    And this included over time; correct?
21    A    Yes.
22    Q    Okay.  At the conclusion of the regular
23  shift or the overtime shift that you were staying for,
24  was there any particular work that you needed to do at
25  the end of that shift before you could leave the

241

1  facility?
2    A    You mean after the production lines
3  stopped?
4    Q    Yes.
5    A    No.  No such details.
6    MR. BATTENFELD:  Just a second.
7         (Recess.)
8  BY MR. GREY:
9    Q    Did U. Lim ever experience a gas leak at
10  the facility?
11    A    Gas leak?
12    Q    Yes.
13    A    Yes.
14    Q    Okay.  And how many times did U. Lim
15  experience that problem?
16    A    About twice, two times.
17    Q    And this gas leak, was it affecting the
18  workers in any way?
19    A    Yes.
20    Q    Did it in fact cause many workers to
21  faint?
22    A    Some people fainted as a matter of fact
23  and some of them went to hospital to get further
24  examination and treatment.
25    Q    And when did these gas leaks occur?

242

1    A    I do not recall the year of that incident.
2    Q    Can you give me your best estimate when
3  the first one occurred?
4    A    I cannot estimate.
5    Q    Okay.  Were the gas leaks close in time
6  together?
7    A    It was an interval between those two
8  incidents.
9    Q    Did you have the same problem for both
10  incidents where people were fainting and had to go to
11  the hospital?
12    A    The first one was the worst and the second
13  one was less worst than the first one.
14    Q    How did you first become aware of the gas
15  leak the first time?
16    A    One of the supervisors came to me and
17  reported that people were having trouble because of the
18  gas leak, the smell.
19    Q    Which supervisor was that?
20    A    I cannot recall the exact name.
21    Q    Did you convey this information to Tae Jin
22  Yoon?
23    A    I don't recall whether Tae Jin Yoon was in
24  the company in the plant or not.  I don't recall.
25    Q    When you were first told about this gas

243

```
 1   specifically who you are referring to in terms of being
 2   yelled at.
 3   BY MR. GREY:
 4        Q     It refers to the yelling and we are
 5   referring to the yelling at you.
 6        A     You mean yelling at -- yelling at him --
 7   yelling at me rather more than one hour?
 8        Q     Yes.
 9        A     That's what he said?
10        Q     Yes.
11        A     There have been no such incidents.
12        Q     No such occasions where you have been
13   yelled at for more than an hour by Tae Jin Yoon?
14        A     No, that's correct.
15        Q     Have there been any occasions where you
16   have been yelled at more than half an hour by Tae Jin
17   Yoon straight?
18        A     How long the yelling took place, I do not
19   recall at that incident.
20        Q     Okay.  So it could have been a half an
21   hour on occasion?
22        A     You mean doing nothing but the yelling for
23   30 minutes, that's what you are referring?
24        Q     Yes.
25        A     No, no such incident.
```

                              248

```
 1        Q     Well, just the longest period of time that
 2   you remember him continuously yelling at you during the
 3   period of Mr. Kang's employment.
 4        A     I don't recall Tae Jin Yoon continually
 5   yelling at me long period or I recall maybe it was a
 6   few minutes, yelling.  But after that he also tried to
 7   convince us, explained to us and teaching us what to do
 8   on our duty, performance of a duty.
 9        Q     How long did these daily meetings usually
10   last?
11        A     Unless there is something extra ordinary,
12   meeting was usually ended within an hour.
13        Q     That would be the normal length of the
14   meeting, one hour?
15        A     About one hour.
16        Q     Okay.  And the three of you would be
17   present during that time?
18        A     Yes.
19        Q     Do you ever recall Tae Jin Yoon yelling at
20   Mr. Kang for more than 15 minutes straight?
21        A     I don't recall.
22        Q     Okay.  Is that no or you don't have a
23   recollection?
24        A     I personally didn't notice or witness he
25   was yelling at Mr. Kang more than 15 minutes.
```

                              249

```
 1        Q     Okay.  Did Mr. Yoon ever throw your
 2   production report at you during any of these daily
 3   meetings?
 4        A     Yeah, I recall an occasion he threw the
 5   document toward me.  Well, I shouldn't say he threw the
 6   thing down on the floor or in front of him.  Not to me
 7   personally.
 8        Q     Did the production report ever hit you?
 9        A     No.
10        Q     Did he ever throw a file folder at you?
11        A     Yeah, occasionally he threw that thing to
12   the floor.
13        Q     Did he ever throw it at you?
14        A     No, that didn't happen.
15        Q     Was there ever an occasion where you saw
16   Mr. Yoon throw a report or other documents at Mr. Kang?
17        A     No, I personally didn't witness that.
18        Q     Okay.  Did you ever see an occasion where
19   he threw a file folder at Mr. Kang?
20        A     No.  No.
21        Q     Have you ever seen an occasion where
22   Mr. Kang through anything at Mr. Cho?
23        A     What time frame are we talking about?
24        Q     During Mr. Kang's employment.  At any
25   time.
```

                              250

```
 1        MR. BATTENFELD:  So you are including after his
 2   employment ended?
 3        MR. GREY:  Yeah.
 4        THE WITNESS:  I believe some occasion they were
 5   arcing and Mr. Kang threw something.
 6   BY MR. GREY:
 7        Q     Did you ever personally see him throw
 8   anything at Mr. Cho, you personally?
 9        A     Yes.  We were in the same office and I
10   noticed what was going on.
11        Q     Do you know what he threw?
12        A     A battery from -- a hand-form battery, he
13   threw that thing.
14        Q     Did that battery strike Mr. Cho?
15        A     I believe it was not a successful strike
16   or anything, but it bypassed him or something.
17        Q     And you personally saw it?
18        A     Yeah, that instant I observed myself.
19        Q     Were you ever told by Ki Huayooa to
20   testify that you had seen Mr. Kang throw that battery
21   at Mr. Cho?
22        A     No.
23        Q     Are you certain of that?
24        A     No, I didn't receive any suggestion or
25   instruction, no.
```

                              251

**Page 256**

1     A    Yeah.
2     Q    So you can see it in your mind's eye; is
3 that correct?
4     A    I recall he pulled my ear, but where that
5 took place, I don't recall.
6     Q    Do you know why he pulled your ear?
7     A    I recall that he did that and not as the
8 expression of his anger toward me, but kind of
9 playfully he pulled my ear or something, yes.
10     Q    I am asking why. Do you know why?
11     A    The reason why I don't know.
12     Q    Do you recall playing Tae Jin Yoon's ear
13 playfully during Mr. Kang's employment?
14     A    You mean, I pulled Mr. you know's ear?
15     Q    Yes.
16     A    Not in the facility.
17     Q    Have you pulled it someplace else during
18 the period of Mr. Kang's employment?
19     A    It could have happened. Because we had a
20 lot of gathering and things like that outside of the
21 facilities, so it might happen outside playfully
22 sometime.
23     Q    How old are you, Mr. Park?
24     A    I was born in 1967, 33.
25     Q    Do you consider it a normal event to have

**Page 257**

1 your ear pulled?
2     A    Well, unless a person is really angry or
3 mad at something and as an expression of his anger,
4 that is probably not just ordinary thing, but it could
5 happen to people who is just playfully playing with the
6 ears, pulling the ears.
7     Q    Has there been any other grown man during
8 Mr. Kang's employment that ever grabbed you by the ear?
9     A    You mean, grown up man like what?
10     Q    Grown up man.
11     A    You mean, I am a grown up person?
12     Q    Not children.
13     A    We do have such thing happening sometime
14 between friends playfully doing that.
15     Q    And you have had some friend who is a
16 grown man pulling your ear during the period of
17 Mr. Kang's employment?
18     A    In the facility?
19     Q    Just period. During the period of
20 Mr. Kang's employment.
21     A    No.
22     Q    Okay. So it is correct to say that during
23 the period of Mr. Kang's employment, Tae Jin Yoon is
24 the only grown man that has ever pulled you by the ear;
25 correct?

**Page 258**

1     THE INTERPRETER: I am sorry. Mr. Park pulling
2 Mr. Yoon's ear? Could you repeat that portion.
3 BY MR. GREY:
4     Q    During the period of Mr. Kang's
5 employment, it is true, is not, that Tae Jin Yoon is
6 the only person, grown man that has ever pulled your
7 ear?
8     A    He would like you to repeat the question
9 again. He didn't understand.
10     Q    During the period of Mr. Kang's
11 employment, is it true that Tae Jin Yoon has been the
12 only grown man who has pulled your ear?
13     A    While I was working there; right?
14     Q    At any time during the period of
15 Mr. Kang's employment.
16     A    I don't know whether someone else did that
17 or not, but I recall once or twice being pulled by the
18 ear.
19     Q    By anyone other than Tae Jin Yoon?
20     A    No, no other people. Tae Jin Yoon only.
21     Q    Thank you. Did you ever observe Tae Jin
22 Yoon grabbing Mr. Kang by the ear at any time?
23     A    No, I didn't observe that.
24     Q    Did you ever observe Tae Jin Yoon strike
25 Mr. Kang with a ruler?

**Page 259**

1     A    No, I did not observe that.
2     MR. BATTENFELD: I object the question has been
3 asked and answered. I guess it has been answered
4 again.
5 BY MR. GREY:
6     Q    Did you ever observe Mr. Kang instruct or
7 rather Mr. Yoon instruct Mr. Kang to do squats or
8 jumping up and down?
9     A    I didn't observe Mr. Yoon instructing
10 Mr. Kang to do such thing, but one time we were
11 gathering and we were supposed to be doing some
12 exercise and we did a similar thing.
13     Q    What gathering was this?
14     A    It was one or two weeks we decided to
15 promote such exercise time for the sake of health, so
16 we decided to do that for a week or two weeks. And
17 such occasion we did have such up and down jumping.
18     Q    When was this done? What time of day?
19     A    In the morning.
20     Q    Before or after 7:00 a.m.?
21     A    Around 7 o'clock when the people reported
22 into the work and we thought that maybe we would have
23 some exercise and people would go to work.
24     Q    Did all of the people that worked at both
25 U. Lim Mexico and U. Lim America do these exercises?

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

1    Q    Did you ever observe Tae Jin Yoon kick any
2  employee of U. Lim at any time?
3    A    No.
4    Q    Other than yourself, did you ever observe
5  Tae Jin Yoon grab the ear of any employee of U. Lim at
6  any time?
7    A    No, I didn't observe that.
8    Q    Have you ever had an occasion whereby Tae
9  Jin Yoon or any other employee of U. Lim -- why don't
10 you start -- ever requested you to smuggle American
11 currency to Korea?
12     MR. BATTENFELD:  Object to the question as
13 having absolutely no relevance to the issues raised by
14 Mr. Kang's lawsuit.  And I am going to -- given that
15 it's a question regarding possible criminal conduct and
16 that it has no bearing on any issue in this case, I am
17 going to instruct Mr. Park not to answer the question.
18     MR. GREY:  I would adamantly disagree to the
19 extent that U. Lim America has asked Mr. Park to commit
20 a criminal act and Mr. Park has engaged in it, it goes
21 both to his credibility, U. Lim's credibility.  And as
22 such, it's highly relevant.
23     Now, Mr. Park can take the Fifth
24 Amendment, but I believe instructing him not to answer
25 this question is not well taken and this would go right

264

1  to questions such as felony convictions and the like
2  which go to the credibility and reliability for the
3  truth.
4     MR. BATTENFELD:  A felony conviction is a valid
5  question.  If you want to ask Mr. Park if he has ever
6  been convicted of a felony, that's certainly a fair
7  question to ask.
8     MR. GREY:  It's a similar question.
9     MR. BATTENFELD:  It's not the question you are
10 asking.
11     MR. GREY:  The question goes to whether or not
12 he committed this act.  He can take the Fifth
13 Amendment, but if he is been instructed by U. Lim to
14 conduct the criminal act, it certainly entitles the
15 jury to know whether or not U. Lim instructed him in an
16 instance like this to lie under oath.  Because clearly
17 if he is smuggling cash for U. Lim, he is committing an
18 act of deception for U. Lim which he knows to be
19 unlawful.
20     MR. BATTENFELD:  My instruction is that the
21 witness will not answer the question.  There is no
22 issue raised by Mr. Kang's complaint of this
23 allegation.  Feel free to point it out to me if you
24 think I am wrong.  So in the absence of any showing
25 that the question relates to Mr. Kang's lawsuit -- as

265

1  to any fishing expedition you may think you are going
2  to engage in to get evidence, not of a felony
3  conviction but of some alleged criminal conduct not
4  resulting in a conviction, there's no relevance to this
5  case.  It's a highly improper question and I will stand
6  by the instruction to the witness that he not answer
7  the question.
8  BY MR. GREY:
9     Q    Mr. Park, are you going to answer that
10 question?
11    A    I will not answer.
12    Q    Okay.  Based on counsel's instruction?
13    A    My counsel mentioned a similar thing and I
14 feel the same way.
15    Q    So is the answer yes?
16     MR. BATTENFELD:  The answer is he is not going
17 to answer if that's what you are asking.
18     THE WITNESS:  Yeah, my answer is I will not
19 answer the question.
20 BY MR. GREY:
21    Q    Has Tae Jin Yoon ever threatened to fire
22 you at any time during your employment?
23    A    He didn't threaten me, no.
24    Q    Did he ever tell you he was going to fire
25 you?

266

1    A    He never spoke to me saying that he will
2  fire me from U. Lim, no.
3    Q    Has anyone at U. Lim ever told you that
4  you were fired or were going to be fired?
5    A    No, no one told me that.
6    Q    When you first came to the United States,
7  you were single; correct?
8    A    Yes.  True.
9    Q    And you had an apartment; correct?
10   A    Yes.
11   Q    How many bedrooms was that apartment?
12   A    First apartment had one bedroom.
13   Q    And the next apartment?
14     MR. BATTENFELD:  At this point I am going to
15 object to this line of questioning as getting into
16 issues relating to Mr. Park's privacy.  And in the
17 absence of an offer of proof as to why this line of
18 questioning is relevant to this case, I will instruct
19 Mr. Park not to answer this line of questioning any
20 further.
21     MR. GREY:  Well, in many ways it does go to
22 Mr. Park's privacy to the extent that U. Lim had
23 instructed him to maintain a room free at his residence
24 for U. Lim guests that U. Lim felt were necessary to
25 spend time here and that he was to make accommodations

267

1  married, the company would check with me, the company
2  would check with me whether or not it's feasible to
3  have a person boarding at my apartment, and if it is
4  possible -- then the company would provide the expenses
5  for the -- okay. About half of my rent will be paid
6  because of the persons boarding at my house.
7        Q    That wasn't the question asked. Who would
8  tell you that this person was going -- or persons were
9  going to be boarding at your house?
10       A    Sometimes Tae Jin Yoon or from the main
11 company.
12       Q    Are you referring to Ki Huayooa?
13       A    Yeah. Ki Huayooa sometimes ask me.
14 Mr. Kang sometimes ask me from Korea.
15       Q    Anyone else?
16       A    No. No other person.
17       Q    Was there ever an occasion where they
18 asked you to keep someone at your house where you
19 refused?
20       A    No, I didn't have an occasion to refuse
21 that because I am gaining some expenses, some money in
22 a pay. They pay for it, so --
23       Q    When you were single, did they pay for
24 your entire rent?
25       A    Yes.

272

1        Q    And you were here how long before you
2  became married?
3        A    About a year and a half I was still
4  unmarried.
5        Q    Married in January '96; right?
6        A    That's correct.
7        Q    So it's your testimony that up until
8  January of '96, they paid for your entire rent; is that
9  correct?
10       A    Yes.
11       Q    And after January of '96, did they
12 continue to pay your entire rent?
13       A    I don't recall, exactly, but I believe my
14 pay was adjusted after I got married.
15       Q    Just so I understand, did U. Lim America
16 specifically make a monthly payment for your rent on
17 your behalf or provide you with money specifically for
18 that rent on your behalf when you were single?
19       A    You mean how the company paid for the rent
20 for my apartment?
21       Q    Yes.
22       A    The company might give the money to me and
23 then I paid the rent.
24       Q    Did they give you a separate check for the
25 rent?

273

1        A    I believe I received a separate check.
2        Q    Was it just part of your salary or an
3  actual separate check?
4        A    It was a separate check exclusively for
5  the rent.
6        Q    How long did they continue to give you a
7  separate check for the rent?
8        A    I don't recall up to when.
9        Q    Are you still receiving a separate check
10 for the rent?
11       A    No.
12       Q    Do you know when it stopped?
13       MR. BATTENFELD: All right. At this point
14 unless, you have an awful good reason for continuing
15 this line of inquiry, I think you have heard enough
16 about this arrangement. So I think you are beating a
17 dead horse.
18       MR. GREY: Well --
19       MR. BATTENFELD: Let me finish my objection,
20 Mr. Grey. Unless you have an offer of proof why you
21 need to have the details of this arrangement, I will
22 instruct the witness not to answer any more questions
23 along this line and let's move on to something that's
24 relevant.
25       MR. GREY: I wish to know when this arrangement

274

1  ended whether he was getting separate reimbursement for
2  the rent and I am simply asking when that arrangement
3  stopped or when his reimbursement came in the form of
4  just his salary. I don't think that's much to ask.
5        THE WITNESS: I cannot recall when.
6        THE INTERPRETER: Mr. Park would like to ask you
7  how soon this hearing will last -- how soon it will
8  end.
9        MR. GREY: We will end at 5:30.
10       MR. BATTENFELD: Is that okay with you?
11       THE WITNESS: I am really tired and I wish that
12 the hearing would be terminated sooner than that.
13       MR. GREY: Well, we typically go to 5:30.
14 That's what we have done with all of our depositions.
15       Q    Are you capable of continuing the
16 deposition now?
17       A    Okay. I understand.
18       Q    Okay. During 1994 how many Saturdays
19 during that year did you work?
20       A    For the number of days I worked on a
21 Saturday in 1994 I cannot recall. But I know that I
22 did have ten days of Saturday work because of the --
23 you know, because to send some of the employees for the
24 Christmas vacation.
25       Q    Was it your understanding that there was a

275

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

1   that he is resigning.
2       Q    Do you have any understanding as to why
3   Mr. Kang resigned?
4       A    I don't know exact reason.
5       Q    Do you have any understanding as to any
6   reason?
7       A    No, I didn't hear anything.
8       Q    Did you ever ask Mr. Kang why he was
9   resigning or quitting?
10      A    Yes, I did ask him.
11      Q    What did he tell you?
12      A    I believe I heard from Mr. Kang that at
13  the time he was married and the fact that he has to
14  work Saturday is not preferred by Mr. Kang so he has to
15  resign.
16      Q    And what was your understanding of how
17  many Saturdays in that last year of Mr. Kang's
18  employment did he have to work?
19      A    1998; right?
20      Q    The last year, which would be February of
21  '97 to February of '98.
22      A    I cannot really come up with an exact
23  number of the days, but I believe maybe between eight
24  to slightly more than ten days.
25      Q    Well, it would have been at least ten,

280

1   his determination?
2       A    No, not from Tae Jin Yoon.
3       Q    Did Tae Jin Yoon during your employment at
4   U. Lim ever swear at you or use curse words?
5       THE WITNESS:  You said squatting at him?
6       MR. BATTENFELD:  Swearing.
7       MR. GREY:  Swearing.
8       THE WITNESS:  Occasionally when he was angry, he
9   was swearing at me.
10  BY MR. GREY:
11      Q    Did he ever use the term sip sae?
12      A    Yeah, when he was angry he uses that kind
13  of word.
14      Q    What is that in English?
15      A    I don't know how to translate that.
16      MR. BATTENFELD:  Did we have a translation for
17  the word you were asking?
18      MR. GREY:  No, we didn't.  He understands what
19  sip sae is.
20      Q    Correct?
21      A    I am Korean, but I can't fully understand
22  what that particular vocabulary is.  I think it's not a
23  good comment or --
24      Q    Sip sae ki?
25      A    I don't know how to describe the meaning

282

1   wouldn't it, to make up for Christmas vacation?
2       A    Well, maybe about 20 days altogether.
3       MR. BATTENFELD:  According to Mr. Cho, the
4   translation should have been eight to ten on top of the
5   ten.
6       THE INTERPRETER:  I didn't catch that.
7   BY MR. GREY:
8       Q    So we are talking approximately 18 to 20
9   Saturdays?
10      A    That's correct.
11      Q    Did Tae Jin Yoon ever tell you that he had
12  a conversation with Mr. Kang where he fired Mr. Kang or
13  Mr. Kang quit?
14      A    He didn't tell me any.
15      Q    Did you learn from anyone other than
16  Mr. Kang that he was either fired or resigned?
17      THE INTERPRETER:  He want me to repeat the
18  translation.
19      THE WITNESS:  I didn't hear any.
20  BY MR. GREY:
21      Q    So Mr. Cho didn't inform you that Mr. Kang
22  had quit or had been fired?
23      A    Mr. Cho I believe told me that Mr. Kang
24  resigned from his job.
25      Q    Did Tae Jin Yoon tell you anything about

281

1   of it, but I believe I understand what he is talking
2   about.
3       Q    Well, did he ever say that to you?
4       A    When he is angry and he is mad and he is
5   not controlling himself, he use that language.
6       Q    Specifically --
7       A    Like mumbling himself or something like
8   that.
9       Q    Particularly sip sae or sip sae ki?
10      A    Well, I understand that when a person get
11  mad, he can use that kind of a language whether he is
12  mumbling to himself or he can outrightly shout against
13  the person.
14      Q    Well, as I understand your testimony, Tae
15  Jin Yoon used that language on occasion; correct?
16      A    Yeah.  When he is angry or upset.
17      Q    And what was the language he was using?
18      A    I heard he is using sip sae ki.
19      Q    Okay.  And what does that mean?
20      A    I don't think he meant to say anything.
21  He just used that language.
22      Q    I am not talking about what he meant to
23  say.  What does that mean, what he actually said?
24      A    I don't know how to explain.
25      Q    Does it mean son of a bitch?

283

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

---

1      A      Yeah, he did say that to me.
2      Q      And how many times did he tell you he was
3  going to send you back to Korea?
4      A      For a couple of occasion I believe when I
5  was not performing my duty right or correctly, he was
6  saying that kind of thing to me a couple times.
7      Q      Were these occasions before or after you
8  were married?
9      A      I believe it was before my marriage.
10     Q      When he told you that he might send you
11 back to Korea, did he tell you what you would be doing
12 back in Korea?
13     A      I believe he -- well, he was not going
14 into that sort of a detail or what I am supposed to be
15 doing in Korea. He just commented that when he was
16 angry against he, he said that just to impress me.
17     MR. GREY:  Let's take a two-minute restroom
18 break here.
19     (Recess.)
20 BY MR. GREY:
21     Q      Did Mr. Yoon at work ever brag about being
22 a former gang member?
23     A      No, I haven't heard.
24     Q      At any time during your employment, were
25 you ever promised that U. Lim would provide health

288

---

1      Q      What is 100 percent bonus?
2      A      Bonus consists of 100 percent of
3  additional to my pay, regular paycheck. In other
4  words, if I am getting certain amount, the double of
5  that will be the 100 percent bonus.
6      Q      Let me clarify. Let's assume for a moment
7  you are making $3,000 a month. Would the bonus then be
8  $3,000?
9      A      That's correct.
10     Q      Okay. So if you got 100 percent of the
11 promised bonus, you would get 100 percent of your
12 monthly pay as a bonus; is that correct?
13     A      Yes. Correct.
14     Q      And you are saying that on one occasion
15 you were given that bonus; correct?
16     A      Yes.
17     Q      Okay. And these production targets, were
18 they production targets that you had for each month or
19 each year?
20     MR. BATTENFELD:  Just to clarify that, I think
21 there may have been an incorrect translation. I
22 believe the witness is referring to a sales goal rather
23 than a production goal. If I am wrong, we can clear it
24 up.
25     MR. GREY:  Let me clarify.

290

---

1  insurance or would provide health insurance in the
2  future?
3      THE INTERPRETER:  The insurance -- would you
4  repeat that, please.
5  BY MR. GREY:
6      Q      Did U. Lim ever promise to provide health
7  insurance at any time during your employment?
8      A      No, I didn't get any promise like that.
9      Q      Okay. Did Tae Jin Yoon or anyone else at
10 U. Lim ever promise to share any profits with the
11 managers at U. Lim?
12     A      They were talking about the possibility of
13 getting bonus for a certain project, but not sharing
14 any profit.
15     Q      What bonuses, if any, were promised to you
16 by Tae Jin Yoon or anyone else?
17     A      When we completed our targeted goal of a
18 production, he will be giving out some bonus to the
19 people.
20     Q      And did you ever meet that targeted goal
21 of production?
22     A      Targeted goal is higher, so we are not
23 able to reach that target. One occasion, I don't
24 recall exactly what year, but we had best production
25 record in Mexico, so we received 100 percent bonus.

289

---

1      THE WITNESS:  Okay. He is now saying that it
2  has been a sales goal.
3  BY MR. GREY:
4      Q      Okay. Were these monthly or yearly sales
5  goals?
6      A      Yearly.
7      Q      Okay. So each year if you met the sales
8  goal, then you understood you would receive a bonus
9  equivalent to one month's salary; is that correct?
10     A      Okay. Those -- the provision of the
11 bonus -- the promise for bonus is not any set rule,
12 any set promise. But that particular year, even though
13 we didn't meet the sales goal, we had the most highest
14 sale in Mexico area, that's why we received the bonus.
15     Q      Okay. But you understood that there was a
16 yearly sales goal; correct?
17     A      Yeah, that's correct.
18     Q      And you understood that if you were able
19 to meet that sales goal, you would be paid a sales
20 bonus; is that correct?
21     A      Yes.
22     Q      All right. But you testified that because
23 the sales goal was so high, you never met it; correct?
24     A      Yes.
25     Q      But on one occasion, you had done so well

291

---

KANG V.
U. LIM AMERICA, INC.

SOON WAN PARK, VOL 2
12/20/99

1  the second shift.  So he agreed.  The supervisor for
2  the night shift was the guy that used to be the first
3  shift supervisor in the morning.  And during the
4  daytime, I acted as a supervisor.
5      Q      So there was a vacancy -- where there used
6  to be a supervisor for the day shift, it became a
7  vacancy when you started the second shift; is that
8  true?
9      A      Yes, that's correct.
10     Q      Okay.  So you started working at U. Lim in
11  1994.  Have you ever had a female supervisor?
12     A      No, we never had a female supervisor.
13     Q      Okay.  Have you ever had a female
14  assistant manager or manager at U. Lim America since
15  you started working there?
16     THE INTERPRETER:  You said supervisor and
17  assistant manager; right?
18  BY MR. GREY:
19     Q      Have you ever had an assistant manager or
20  above who is a female at U. Lim America?
21     A      No.
22     Q      Okay.  Do you presently owe Tae Jin Yoon
23  any money?
24     THE WITNESS:  Owe money you said; right?
25     MR. GREY:  Right.

296

1  deems necessary to the deposition transcript;
2  Mr. Battenfeld will promptly inform me of those
3  changes; and if for any reason the original is lost,
4  misplaced or stolen, a certified copy can be used in
5  its place.  Anything else?
6      MR. BATTENFELD:  So stipulated.  The only other
7  thing is, just to confirm, I had a discussion with
8  Mr. Grey off the record about Mr. Yoon's deposition and
9  what I said was I am looking into the issue of the
10  location of the deposition or what might be the
11  requirements on or any costs for Mr. Yoon to travel
12  back here for the deposition.  I am also looking into
13  his schedule to see if we can make arrangements to have
14  him here before the discovery cutoff.  If not, we will
15  talk to Mr. Grey about what we might be able to do
16  about that.
17     We also have a settlement conference
18  coming up.  Was it in early February or mid February?
19     MR. GREY:  I think February 8th.  That's what I
20  want to say; either the settlement conference date or
21  when we have to have the briefs done.  I can't
22  remember.
23     MR. BATTENFELD:  We have that nuance as well.  I
24  am just trying to coordinate things so we can avoid
25  Mr. Yoon having to travel back here twice.  I am also

298

1      THE WITNESS:  Right now you mean?
2  BY MR. GREY:
3      Q      Yeah.
4      A      Right now I don't have any money owed to
5  him.
6      MR. GREY:  It's 5:35.  I am thinking I have
7  about 20 minutes.  So what do you want to do?
8      MR. BATTENFELD:  Let me --
9      MR. GREY:  We can maybe do it at the beginning
10  of, like, Mr. Cho's deposition; just set it for like an
11  hour.  That might work.  That's up to you.
12     MR. BATTENFELD:  Let me talk.  Off the record.
13     (Discussion off the record.)
14     MR. GREY:  We are close to the conclusion of
15  Mr. Park's deposition, but we are now past the time
16  that we said we were going to end at 5:30 and John also
17  has a flight at 6:00, so we will reconvene Mr. Park's
18  deposition for the next scheduled deposition date of
19  Mr. Cho and we will set aside approximately one hour
20  before beginning Mr. Cho's deposition to conclude
21  Mr. Park's deposition in this matter.
22     I will just have the same stipulation with
23  respect to volume two; that the original was sent to
24  Mr. Battenfeld's office and that the witness will have
25  30 days from receipt to review and make any changes he

297

1  trying to find out when he will be done with his
2  business in Hungry and inform you of that.
3  //
4  //
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

299

KANG V.
U. LIMAMERICA

SOON WAN PARK
01/06/00

---

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,                 )
                                     )
 5               Plaintiff,          )
                                     )
 6        vs.                        )  No. 99 CV659 JM
                                     )     (RBB)
 7   U. LIM AMERICA, INC.; TAE       )
     JIN YOON, an individual; and    )
 8   DOES 1 to 100,                  )
                                     )
 9               Defendants.         )
     _____)
10
11
12
13
14           DEPOSITION OF SOON WAN PARK
15               San Diego, California
16           Thursday, January 6, 2000
17                   Volume III
18
19
20
21
22
     Reported by:
23   JESSICA E. MASSE
     CSR No. 9910
24   JOB No. 11907A
25

                    302
```

---

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3        LAW OFFICE OF RICHARD E. GREY
          BY:  RICHARD E. GREY
 4        Attorney at Law
          409 Camino Del Rio South, Suite 303
 5        San Diego, California 92108
          (619) 543-9300
 6
     For the Defendants:
 7
          MORGAN, LEWIS & BOCKIUS
 8        BY:  JOHN S. BATTENFELD
          Attorney at Law
 9        300 South Grand Avenue, 22nd Floor
          Los Angeles, California 90071
10        (213) 612-2500
11   Also Present:
12        JAE CHO
          SOO CHEOL KANG
13
     Interpreter:
14
          ANN McCORMICK
15        12212 Old Stone Road
          Poway, California 92064
16        (619) 486-6648
17
18
19
20
21
22
23
24
25

                    304
```

---

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SOO CHEOL KANG,                 )
                                     )
 5               Plaintiff,          )
                                     )
 6        vs.                        )  No. 99 CV659 JM
                                     )     (RBB)
 7   U. LIM AMERICA, INC.; TAE       )
     JIN YOON, an individual; and    )
 8   DOES 1 to 100,                  )
                                     )
 9               Defendants.         )
     _____)
10
11
12
13
14
15        Deposition of SOON WAN PARK,
16   Volume III, taken on behalf of
17   Plaintiff, at 501 West Broadway, Suite
18   1300, San Diego, California, beginning
19   at 9:38 a.m. and ending at 11:22 a.m.
20   on Thursday, January 6, 2000, before
21   JESSICA E. MASSE, Certified Shorthand
22   Reporter No. 9910.
23
24
25

                    303
```

---

```
 1                   INDEX
 2   WITNESS:                        EXAMINATION
 3   SOON WAN PARK
     Volume III
 4
 5        BY MR. GREY                    306
 6
 7
 8
 9
10
11
12               EXHIBITS
13               (None)
14
15
16
17
18
19
20
21
22
23
24
25

                    305
```

---

1  BY MR. GREY:
2        Q      During Mr. Kang's employment?
3        A      I do not remember precisely, but,
4  however, I think maybe about once.
5        Q      And on this occasion, did you have to
6  stay both Saturday and Sunday to supervise or help in
7  the painting of the floors?
8        A      In any case, whether the facility is
9  running or not, whenever when the facility is open, I
10 was there.
11       MR. BATTENFELD:  I think there may have been a
12 mistranslation or misunderstanding.
13 BY MR. GREY:
14       Q      The question is during this occasion that
15 you recall the floors being painted, did you have to
16 supervise the painting of the floors or participate in
17 the painting of the floors for both Saturday and
18 Sunday?
19       A      Yes, I did.
20       THE INTERPRETER:  The word he used was
21 observed.
22 BY MR. GREY:
23       Q      Okay.  So it's your recollection that
24 this painting took approximately two days; correct?
25       A      I remember it took only one day.

310

1        Q      Okay.  I thought you just said that you
2  had observed this occurring on both Saturday and
3  Sunday.
4        A      I remember I think it took only one day,
5  the painting of the floor.
6        Q      And for the entire period of time that
7  you were employed at U. Lim, is it your testimony you
8  recall the floors being painted once?
9        A      During my employment, I think two times.
10       Q      Okay.  And when was the most recent time
11 you recall the floors being painted?
12       A      I don't remember.
13       Q      Okay.  So you don't know whether or not
14 this second time was during Mr. Kang's employment or
15 not?
16       A      No.  I don't remember.
17       Q      Okay.  During that, there had to be
18 cleaning -- frequent cleaning in relation to the duct
19 work at the facility?
20       A      No.  Rather cleaning the duct, I think
21 ducts or duct had been placed.
22       Q      And when was the placement of the ducts?
23       MR. BATTENFELD:  Replacement.
24       MR. GREY:  Did he say replacement or placement?
25       THE INTERPRETER:  He said placement, not

311

1  replacement.
2        MR. GREY:  Would you clarify if he means
3  placement or replacement?
4        THE WITNESS:  The placement, not replacement.
5        THE INTERPRETER:  There was no object, but it
6  was placed.
7  BY MR. GREY:
8        Q      So is it your testimony there was new
9  duct work put in into the facility?
10       A      Yes.
11       Q      And when was this duct work put in?
12       A      I do not remember.
13       Q      Okay.  But it was put in on a weekend.
14 Is that not correct?
15       A      I believe that since there was new
16 placement, I think during the working hour that was
17 placed.
18       Q      What do you mean "working hour"?  Do you
19 mean during the workweek or on a Saturday or on a
20 Sunday?
21       A      The weekdays.
22       Q      You didn't have to close any of the
23 production lines to install the duct work?
24       A      During the placement of the duct, you --
25 you just connect the things; therefore, it was not

312

1  necessary to stop the production line.
2        Q      Were the ducts used to clean out fumes or
3  remove exhaust or other gases from the production
4  facility?
5        A      Yes.  It's correct.
6        Q      So it was important that those ducts be
7  functioning correctly?
8        A      Yes.
9        Q      Did you ever have to have the ducts
10 cleaned or maintained?
11       A      Yes.  There were times it has to be
12 cleaned.
13       Q      How many times had it been cleaned?
14       A      I do not remember how many times.
15       Q      Can you give me your best estimate?
16       A      About twice a year maybe.
17       Q      And when the ducts were being cleaned,
18 were the production lines still in operation?
19       A      When partially it is cleaned, yes,
20 production line is still on.  However, when whole
21 thing was cleaned, you stop the production line.
22       Q      And because you would have to stop the
23 production line, did you do the cleaning of these
24 ducts on the weekends?
25       A      I do not recall or remember whether that

313

KANG V.
U. LIMAMERICA

SOON WAN PARK
01/06/00

---

**318**

1  various documents required.
2      Q       The quality assurance inspection
3  documents, what would those specifically be?
4      A       Quality control -- there are several
5  kinds.
6      Q       What are those?
7      A       You need quality manual work.  In manual
8  work there are many different instructions for that
9  and then also the inspection evaluation documents and
10  the inspection method, that sort of thing.  There are
11  various documents.
12     Q       The sampling inspection evaluation
13  documents, do those evidence what inspections of
14  product you specifically perform?
15     A       Yes.
16     Q       And they would show how many samples you
17  inspected; correct?
18     A       Yes.
19     Q       And it shows what types of samples you
20  inspected?
21     A       Yes.
22     Q       And they would show when you inspected
23  them; correct?
24     A       Yes.
25     Q       And you'd have both a time and a date for

---

**319**

1  those inspections; correct?
2      A       Yes, it is.
3      Q       And how long did you maintain those --
4  rather strike that.
5              What were the ISO 9000 requirements for
6  how long you'd have to maintain those sampling
7  inspection evaluations?
8      THE INTERPRETER:  I don't understand your
9  question.  Let me understand before I translate.  How
10  long do they have to maintain, or how long do they
11  have to inspect?
12     MR. GREY:  Pursuant to the ISO 9000
13  requirements, how long would he have to maintain those
14  records related specifically to the sampling of
15  inspection?
16     THE INTERPRETER:  All right.
17     THE WITNESS:  Yes.  There is indication of how
18  long you should maintain those documents.
19  BY MR. GREY:
20     Q       And what was that indication?
21     A       Each different item has a different time
22  period.
23     Q       When you say each item, what are you
24  referring to?
25     A       There are different specifications such

---

**320**

1  as some you can just inspect.  Some after you inspect
2  you have to maintain the record.  Things like that.
3      Q       Which items did you have to maintain
4  records for?
5      A       There are various items.  I do not recall
6  those.  I have to look at documents.
7      Q       Do you recall any of the types of the
8  items that you would have to maintain documents for?
9      A       I don't remember right now, but there are
10  the documents to be kept one year or two years or
11  three years.
12     Q       Is it your testimony that based on the
13  type of item that was being inspected, you would have
14  to maintain records either one, two, or three years?
15     A       Yes.  There are guidelines for those time
16  periods.
17     Q       Do you remember any of the items that you
18  had to maintain records for for three years?
19     A       Yes, I do.
20     Q       And what are those items?
21     A       You are asking me that -- what are those
22  documents that I have to maintain for three years?
23     Q       Why don't we do it that way.  Sure.
24     A       In our company, there is some standard --
25  some guidelines.  I have to look at those documents.

---

**321**

1  Unless I look at those documents, I don't remember
2  right now.
3      Q       Well, I go back to my original question.
4  You indicated that based on the type of item, you'd
5  have to --
6              (Telephonic interruption.)
7  BY MR. GREY:
8      Q       You indicated that based on the type of
9  item, you would have to maintain inspection records
10  for one, two, or three years; correct?
11     A       Yes.
12     Q       Okay.  Do you remember any of the items
13  that you had to maintain records for for three years?
14     A       You are repeating your question again.
15     Q       I want to make sure we are on the same
16  page so we understand each other.  There were
17  documents that were generated which showed a sampling
18  and inspections of items produced at U. Lim; correct?
19     A       Yes.
20     Q       And they would show the type of items
21  inspected.  They would show how many samples were
22  taken, and they would show the date and time that
23  those inspections were conducted; correct?
24     A       Yes.
25     Q       And you testified that depending on the

---

KANG V.                                                                    SOON WAN PARK
U. LIMAMERICA                                                                  01/06/00

1        MR. BATTENFELD:  You can sit here and say it's
2    relevant.  I'm not hearing any rationale for why it's
3    relevant.
4        MR. GREY:  I don't have to go through my whole
5    case, John.
6        MR. BATTENFELD:  There hasn't been a
7    demonstration why this line of inquiry has anything to
8    do with this case.  You are wasting more of our time
9    this morning.
10       MR. GREY:  Wasting more of our time?  You took
11   Mr. Kang's deposition for four days, and you still
12   want more deposition from Mr. Kang.  I'm going through
13   a translator on Mr. Park and not spending nearly as
14   much time as you spent on Mr. Kang, not even close.
15   So, please, don't talk to me about dragging things
16   out.
17       MR. BATTENFELD:  How long I take to depose the
18   Plaintiff in this case has nothing to do with how long
19   you are taking to --
20       MR. GREY:  John, this is a simple question with
21   respect to who occupies quality control now because
22   that person is relevant as to the maintenance of
23   records for quality control.
24       MR. BATTENFELD:  Why?  Why is that relevant?
25       MR. GREY:  Maintenance of documents.  I'm not

                              326

1    going to go through the case, and I don't have to.  It
2    goes to time and date that the plant was in operation.
3    For crying out loud, you should know the relevance of
4    that.
5        MR. BATTENFELD:  That is relevant in 1999 or
6    1998.
7        MR. GREY:  It goes to the maintenance of
8    documents, who is holding on to quality control, who
9    is maintaining it, why did he lose his position as
10   quality control manager.  All of these things are
11   relevant, John.
12       MR. BATTENFELD:  Let's move on.
13       MR. GREY:  Well, let's do that.
14       Q    Who took over after Bo Won Cheong left
15   quality control?
16       A    It's a Mexican.  Eduardo.
17       Q    Do you know his last name?
18       A    No.  I don't remember.
19       Q    Does he answer to you?
20       A    No.  I have not received anything from
21   this side.
22       Q    Who is now responsible for maintaining
23   the inspection documents to meet the ISO 9000
24   requirements?
25       A    QC maintains.

                              327

1        Q    But who specifically, the individual?
2        A    There are -- the documents should be
3    maintained by each department.  However, the QC
4    department also has to maintain some documents which
5    Repi is the one who has the documents.
6        Q    Repi?  Is that a first or last name?
7        A    I do not know.  We just call Repi.
8        MR. BATTENFELD:  Mr. Cho let me know he needs
9    to take a brief break, and he would like to be present
10   at the deposition.  So if we can, let's take a
11   five-minute break.
12       (Brief recess.)
13   BY MR. GREY:
14       Q    When Bo Won Cheong was hired, he was
15   hired as an assistant manager; is that right?
16       THE INTERPRETER:  Quality control assistant
17   manager?
18       MR. GREY:  Quality control assistant manager.
19       THE WITNESS:  Yes.
20   BY MR. GREY:
21       Q    And, therefore, as an assistant manager,
22   did he answer to one of the managers?
23       A    Yes, it was.
24       Q    Okay.  And he would have answered to you;
25   correct?

                              328

1        A    Yes.  At the beginning.
2        Q    Okay.  So when Bo Won Cheong was hired,
3    even if he took over the general duties of quality
4    control, you were still ultimately responsible for
5    quality control?
6        A    Yes.
7        Q    Okay.  When did you stop being
8    responsible for quality control?
9        A    In 1998.
10       Q    At the time you stopped being responsible
11   for quality control, how far back had you maintained
12   the inspection records?
13       MR. BATTENFELD:  And I'll object to the
14   question as being ambiguous as to quality control
15   records.
16       MR. GREY:  I'm referring now to those
17   inspection records.
18       THE WITNESS:  You are asking me that -- what
19   period documents were kept?
20   BY MR. GREY:
21       Q    In 1998 when you left your position as
22   quality control manager, up until that time you had
23   maintained some records relative to inspection;
24   correct?
25       A    Yes.  It's correct.

                              329

KANG V.
U. LIMAMERICA

SOON WAN PARK
01/06/00

1       A       The documents we are talking about, the
2   daily work report?
3       Q       Yes.
4       A       I had.
5       Q       And prior to April of '99, did you
6   maintain the inspection reports as well?
7       A       No.  It was not.
8       Q       Where were those maintained?
9       A       I assume that QC had.
10      Q       Now, you are referring to the period of
11  time after you were no longer in charge of QC;
12  correct?
13      A       Yes.
14      Q       When you were still in charge of QC,
15  where did you maintain those records?
16      A       At the QC.
17      Q       Where is QC as far as the physical
18  location?
19      A       You are -- you are asking where the QC
20  office was located?
21      Q       Yes.
22      A       In 1999?
23      Q       No.  I'll back up.
24              You indicated that prior to your leaving
25  the position in the middle of 1998, you maintained the

334

1   inspection reports; is that correct?
2       A       Yes.
3       Q       I just want to know where physically
4   those reports were maintained.
5       A       Yes.  It was maintained at the QC side.
6       Q       And is QC -- was that in the U. Lim
7   facility in Tijuana.
8       A       Yes.
9       Q       Was it a separate office?
10      A       Yes.  It was a separate office.
11      Q       During Mr. Kang's employment, how often
12  did you personally have to make deliveries?
13      MR. BATTENFELD:  I'm going to object to the
14  question as being ambiguous as to the word
15  "deliveries."
16      MR. GREY:  If you understand.
17      THE WITNESS:  I do not remember how many times
18  I did.
19  BY MR. GREY:
20      Q       Was it a frequent occurrence?
21      A       No, it's not.
22      Q       Now, you indicated that Tae Jin Yoon is
23  or was a friend of yours; is that correct?
24      A       You are saying not my friend?
25      Q       No.  Is a friend.

335

1       A       Yes.
2       Q       Do you recall Tae Jin Yoon having a
3   downtown apartment in 1996?
4       A       Yes.
5       Q       And was that located at the City Front
6   Terrace?
7       A       I knew it was downtown, but I didn't know
8   exactly where it was.
9       Q       And at the time he had this downtown
10  apartment, he also had a house; correct?
11      A       Yes, he had.
12      Q       Had you visited this downtown apartment?
13      A       Yes.
14      Q       On approximately how many occasions?
15      A       About two, three times.
16      Q       Do you know the address of this downtown
17  apartment?
18      A       No.  I don't know the address.
19      Q       Do you know generally where it's located
20  in downtown?
21      A       Yes.
22      Q       Whereabouts?
23      A       In front of Hyatt hotel.
24      Q       Do you know how long Tae Jin Yoon had
25  this apartment?

336

1       A       I do not remember.
2       Q       What's your best estimate?
3       A       I do not -- I cannot estimate.
4       Q       When did U. Lim promise to help or
5   sponsor you in getting a green card?
6       A       1999.
7       Q       And what's your best estimate as to the
8   month?
9       A       I do not remember the month.  I don't
10  know why.
11      Q       Beginning --
12      THE INTERPRETER:  I didn't hear him correctly.
13  I do not remember the months.
14  BY MR. GREY:
15      Q       Beginning, end, or middle of the year?
16      A       Mid.
17      Q       When you were transferred from U. Lim
18  Korea to U. Lim America, how much notice were you
19  provided about the transfer?
20      A       A month.  One month.
21      Q       Now, it's true that you would regularly
22  play poker with Tae Jin Yoon during Mr. Kang's
23  employment?
24      MR. BATTENFELD:  I'll object to the question in
25  that the question is ambiguous with respect to the

337

KANG V.
U. LIMAMERICA

SOON WAN PARK
01/06/00

---

1     A     No, it's not.
2     Q     How about 1995? What is your estimate of
3 the number of deliveries you made to customers?
4     A     I don't remember.
5     Q     How about 1996?
6     A     Same. I don't remember.
7     Q     And 1997?
8     A     I do not remember how many times I did.
9     Q     Do you remember any particular customer
10 that you would have to deliver to more frequently than
11 the others?
12     A     Once there was a time that there was a
13 problem again with production line; therefore, I don't
14 do those things.
15     Q     What was that answer again?
16     MR. BATTENFELD:  You might want to try to ask
17 the question again.  He didn't understand it, or the
18 translation may not have gotten through.
19 BY MR. GREY:
20     Q     When you were delivering merchandise to
21 customers, was there a particular customer that you
22 would deliver to more frequently than the others?
23     A     I personally?
24     Q     Yes.
25     A     Or company?

342

---

1 were gone and delivering working overtime?
2     A     I do not understand your question.
3     Q     Well, when you made a trip to Mexicali,
4 you'd be gone anywhere from four to six hours that
5 day; correct?
6     A     Yes.
7     Q     Okay.  And I assume that cut into the
8 amount of time you had for your other work; correct?
9     A     In order to do the urgent job, yes.
10     Q     And what would you do to make up for that
11 time lost from your normal duties?
12     A     I can orchestrate the work I have.  It's
13 not that when you go to work until you leave the work
14 you have every single minute of the work.  So I
15 orchestrate putting those work in the hours.
16     Q     Did the deliveries ever make you have to
17 work late into the evening to make up for your other
18 work?
19     A     No.
20     Q     We are just about done.
21     A     I have one thing I'd like to talk.  I was
22 told that you would require me just one hour, so I
23 have an appointment.  How long do you have to do?
24     Q     I think I'm almost done.  I mean I may
25 have no questions.  Just give me a minute.  That's it.

344

---

1     Q     Him.
2     A     I do not know.  I don't think that
3 applied to me.
4     Q     Well, you indicated that you did make
5 some deliveries for the company to customers; correct?
6     A     Yes.
7     Q     Do you recall any of the customers you
8 delivered to?
9     A     Yes.
10     Q     Okay.  And what were those customers you
11 recall making deliveries?
12     A     Sanyo and L.G.
13     Q     And where are those companies located?
14 In Mexico?
15     A     Sanyo is located in Otay.  L.G. is in
16 Mexicali.
17     Q     And when you would make a trip to Otay,
18 how long would it take you to make a delivery?
19     A     About 30 to 40 minutes.
20     Q     And how about to Mexicali?
21     A     About two, three hours.
22     Q     Is that one way or both ways?
23     A     Just one way.
24     Q     And when you made these trips to
25 Mexicali, did you have to make up the time that you

343

---

1               The same stipulation?
2     MR. BATTENFELD:  Yes.
3  /
4  /
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

345

---

Legal Tabs Co 1-800-322-3022

Recycled   Stock # DO-10-B

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOO CHEOL KANG,

            Plaintiff,

    vs.

U. LIM AMERICA, INC,; TAE
JIN YOON, an individual; and
DOES 1 to 100,

            Defendants.

Case No.
99 CV659 JM (RBB)


DEPOSITION OF TEDDY BAEK

VOLUME I

(Pages 1 through 175)

San Diego, California

November 10, 1999


Reported by Anita Worthington,
CSR No. 7356

Kang v. U. Lim America
Teddy Baek

Multi-Page™

---

**Page 2**

```
1    APPEARANCES:
2        FOR PLAINTIFF:
3            LAW OFFICES OF RICHARD E. GREY
             By:  Richard E. Grey
4            409 Camino Del Rio South, Suite 303
             San Diego, California 92108
5
6        FOR DEFENDANTS:
7            MORGAN, LEWIS & BOCKIUS LLP
             By:  John S. Battenfeld
8            300 South Grand Avenue, 22nd Floor
             Los Angeles, California 90071
9
10       Also present:
11           Ann McCormick (interpreter)
             Soo Kang
12
13
14
15           DEPOSITION OF TEDDY BAEK,
16   taken by plaintiff at 701 B Street, Suite 1925,
17   San Diego, California, on Wednesday, November 10,
18   1999, at 10:15 a.m., before Anita Worthington,
19   Certified Shorthand Reporter, in and for the State of
20   California.
21
22
23
24
25
```

---

**Page 166**

```
1                    I N D E X
2    WITNESS:  Teddy Baek
3
4    EXAMINATION                              PAGE
5    By Mr. Grey                               4
6
7    By Mr. Battenfeld                         73
8
9
10                INDEX TO EXHIBITS
11   EXHIBITS                               MARKED
12      1      Declaration of Teddy Baek, (4 pages)   66
13
14
15
16                   * * *
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1    San Diego, California; Wednesday, November 10, 1999
2                    10:15 a.m.
3
4
5             ANN McCORMICK,
6    being called as an interpreter, was first duly sworn
7    to translate truthfully from English to Korean and
8    Korean to English the testimony of the witness:
9
10            TEDDY BAEK,
11   having been first duly sworn, testified as follows:
12
13            EXAMINATION
14   BY MR. GREY:
15      Q  Mr. Baek, can you state your full name for
16   the record.
17      A  Teddy Baek.
18      THE INTERPRETER:  B-a-e-k.
19   BY MR. GREY:
20      Q  We're using an interpreter here today which
21   means that all of my questions need to go through the
22   interpreter and for her to translate them before you
23   respond.
24      Do you understand that?
25      A  Yes.
```

---

**Page 5**

```
1       Q  And I understand that you do speak English
2    but it's not your first language, so there will be
3    occasions when you understand perfectly well what I'm
4    asking, but we would still ask that you wait for the
5    interpreter to translate so that you are certain as to
6    the question.
7       A  Yes.
8       Q  Have you ever had your deposition taken
9    before?
10      A  No, it's the first time.
11      MR. BATTENFELD:  Before we go on, a couple
12   points.  First of all, I would request that the
13   witness not have what appears to be his statement in
14   front of him while he's testifying.
15      I also request that a copy of the statement
16   be made for me.
17      MR. GREY:  I'll provide a copy of the
18   statement, but I think the witness is entitled to
19   refer to his statement.
20      MR. BATTENFELD:  I would disagree strongly.
21   It's not appropriate for a witness to have a document
22   in front of him while he's testifying he can refer to
23   unless he's asked to look at it as an exhibit.  It
24   hasn't been marked as an exhibit, and there's no
25   question pending about the statement.
```

VERBATIM REPORTING SERVICE (619) 232-3376

Page 6

1  MR. GREY: Well, I would disagree. It is a
2  statement which he has reviewed, given sworn testimony
3  to, and he's reviewed it for today's deposition. I
4  believe he's entitled to look at it and reference it
5  whenever he feels fit to do so.
6      You've been provided a copy of that
7  deposition -- rather that statement. You can question
8  him regarding that statement, question him regarding
9  how that statement was entered into. I don't believe
10  it prejudices you in any way, and as it is his own
11  declaration, he's entitled to look at it.
12     MR. BATTENFELD: And my position is that
13  it's the equivalent of having a script in front of a
14  witness that the witness could refer to to answer
15  questions. I believe it is completely inappropriate,
16  and if you will not agree to have the witness testify
17  without the statement in front of him unless he is
18  asked to refer to it for purposes of a specific
19  question, I would suggest we take a break and get the
20  magistrate on the phone so that he can resolve this
21  dispute.
22     MR. GREY: If you want to call the
23  magistrate, that's fine with me.
24     MR. BATTENFELD: Okay. Then let's take a
25  break.

Page 7

1      THE REPORTER: Off the record?
2      MR. GREY: Off the record.
3      (Recess)
4  BY MR. GREY:
5      Q   We've worked out a compromise with respect
6  to your declaration. If you are asked specifically
7  about your declaration or the statements contained
8  therein, certainly you are free to look at it.
9      Other than that, if we are asking you
10  questions regarding your experiences that you learned,
11  you should answer those from your own memory as you
12  sit here today, and if you need to refresh that memory
13  by looking at the statement, then you should so state
14  that, and then you can look at the statement.
15     This way we will know on the record whether
16  or not you are refreshing your memory with the
17  statement or is it an independent recollection that
18  you have sitting here today.
19     Do you understand?
20     A   Yes.
21     Q   So we don't want you looking at the
22  statement unless you specifically state that you need
23  to to refresh your memory.
24     Do you understand?
25     A   Yes.

Page 8

1      Q   Okay.
2      MR. BATTENFELD: I don't at all question
3  the interpreter's qualifications, but if we can just
4  get, before we begin, a brief statement from the
5  interpreter of her --
6      THE INTERPRETER: Of my qualifications?
7  All right. My name is Ann McCormick,
8  M-c-C-o-r-m-i-c-k. I have been doing this for 26
9  years. Mainly about 95 percent of my work consist of
10  criminal work, federal court, immigration, Social
11  Security.
12     THE REPORTER: I'm sorry. What was the
13  last one?
14     THE INTERPRETER: Labor Commission. And
15  then San Diego superior and the municipal court. I
16  can give you about tens of judges that are my personal
17  references. Anything else you like to know?
18     MR. BATTENFELD: I assume you have
19  previously acted as an interpreter in a deposition.
20     THE INTERPRETER: 26 years, I have done
21  thousands of cases. More likely about three, four at
22  least a week. Sometimes about ten a week. I have
23  done in San Diego County including Orange County,
24  Imperial County. 99 percent of the work have been
25  done by my -- I have good references.

Page 9

1      MR. BATTENFELD: I don't doubt it. I'm
2  just asking for the record that we can have the
3  statement.
4      THE INTERPRETER: Yes. Yes.
5      MR. BATTENFELD: Thank you.
6      THE INTERPRETER: You're welcome.
7  BY MR. GREY:
8      Q   Mr. Baek, since we mentioned the statement,
9  I want to lay a foundation of where this statement
10  came from.
11     Do you remember reviewing and signing the
12  statement that is in front of you?
13     A   Yes.
14     Q   Did you read that statement carefully?
15     A   The statement which brought by -- to me by
16  a person who said he was delivering -- a special
17  delivery person. However, so at the time I have seen
18  the document. First prior to that I had written as
19  some notes.
20     Q   You said this document was brought to you
21  by messenger, correct?
22     A   Yes. Messenger.
23     Q   And did you review that document at that
24  time?
25     A   Yes, I did.

Kang v. U. Lim America                    Multi-Page™
Teddy Back

---

Page 10

1    Q  Okay.  And did you understand the document
2    when you reviewed it?
3    A  Yes.
4    Q  And do you recall meeting with me at my
5    office prior to signing this statement?
6    A  Yes.
7    Q  And did we discuss the things contained in
8    this statement?
9    A  Yes.
10    Q  And did you read -- when the messenger
11    brought this statement to you, did you read through
12    each paragraph carefully?
13       MR. BATTENFELD: Object to the question as
14    leading.
15       THE WITNESS: Yes.
16    BY MR. GREY:
17    Q  Okay.  I'd like you now to reference the
18    document, referring now to Paragraph 1.
19       At the time you signed this statement on
20    July 20th of '98, was that your correct address?
21    A  Yes.
22    Q  And looking now at Paragraph 2 of that
23    statement, are you able to read that statement?
24    A  Yes.
25    Q  Do you understand it in English?

---

Page 11

1    A  Yes.
2    Q  And would you now take a look at
3    Paragraph 2 of that statement, and would you tell me
4    if that information contained in Paragraph 2 is true
5    and correct to the best of your knowledge.
6    A  Yes.
7       MR. BATTENFELD: I'll object to the
8    question.  You need to pause -- I'm happy to make an
9    objection either before you interpret or after, but
10    whichever way it is, you need to pause to let me make
11    an objection.  So I'll request that the interpreter do
12    that.
13       THE INTERPRETER: Yes, I will.  I will try.
14    If it doesn't come in just automatically, I will start
15    to translate.  But, however, I will try my best.
16       MR. BATTENFELD: The objection to the
17    question is leading, argumentative and overbroad.
18    BY MR. GREY:
19    Q  Can you refer to Paragraph 3 of the
20    declaration.  Is the information contained in
21    Paragraph 3 of that declaration true and correct to
22    the best of your knowledge?
23       MR. BATTENFELD: And then again I'll object
24    that the question is leading, argumentative and
25    overbroad.

---

Page 12

1    BY MR. GREY:
2    Q  You can answer the question.
3    A  Yes.
4    Q  And taking a look at Paragraph 4 of the
5    declaration, is that true and correct to the best of
6    your knowledge?
7       MR. BATTENFELD: And again the objection to
8    the question is leading, argumentative and overbroad.
9       THE WITNESS: Yes.
10       MR. GREY: And can we just stipulate to a
11    continuing objection on that?
12       MR. BATTENFELD: Sure.  To the extent
13    that's the nature of your question.
14       MR. GREY: Okay.
15    BY MR. GREY:
16    Q  And Paragraph 5.  Is that true and correct
17    to the best of your knowledge?
18    A  Yes.
19    Q  And again take your time to read that now
20    as we sit here today, okay, to make sure it is.
21       And is Paragraph 6 true and correct to the
22    best of your knowledge?
23    A  Yes.
24    Q  And Paragraph 7.  Is that true and correct
25    to the best of your knowledge?

---

Page 13

1    A  Yes.
2    Q  And is Paragraph 8 true and correct to the
3    best of your knowledge?
4    A  Yes.
5    Q  And is Paragraph 9 true and correct to the
6    best of your knowledge?
7    A  Yes.
8    Q  And is Paragraph 9 true and correct to the
9    best of your knowledge?
10    A  Yes.
11    Q  And Paragraph 10.  Is that true and correct
12    to the best of your knowledge?
13    A  Yes.
14    Q  And Paragraph 11.  Is that true and correct
15    to the best of your knowledge?
16    A  Yes.
17    Q  And is Paragraph 12 true and correct to the
18    best of your knowledge?
19    A  Yes.
20    Q  And finally is Paragraph 13 true and
21    correct to the best of your knowledge?
22    A  Yes.
23    Q  And at the time you signed this
24    declaration, did you understand that was being signed
25    under penalty of perjury?

---

VERBATIM REPORTING SERVICE (619) 232-3376

Page 14

1    A  Yes.
2    Q  And was the information in this declaration
3  provided to my office by you prior to the signing of
4  the declaration?
5        MR. BATTENFELD: I'm sorry.  Could you
6  repeat the question, court reporter.
7        (Question read)
8        MR. BATTENFELD: I'll object to the
9  question as being leading, argumentative, ambiguous
10  and overbroad.
11       THE WITNESS: Yes.
12  BY MR. GREY:
13    Q  I'll ask you now to put the declaration to
14  the side and then refer to it only if you need to
15  refresh your recollection.  Understand?
16    A  (Witness nods)
17    Q  Some preliminary matters I should have
18  discussed earlier.  If you have any questions
19  regarding the question being asked you, feel free to
20  ask that.  We want to make sure that you understand
21  the question being asked as it is important here today
22  that you give your best testimony.
23    A  Okay.
24    Q  And for you to give your best testimony,
25  you have to understand thoroughly all the questions

Page 15

1  being asked.
2    A  Yes.
3    Q  That brings me to another point.  You need
4  to verbalize your answer in this situation so that the
5  interpreter can make sure she knows what you're
6  saying.  She's not supposed to be interpreting your
7  gestures.  She's supposed to be interpreting your
8  actual oral response.
9    A  Okay.
10    Q  There is going to be situations where I'm
11  going to ask you to give your best estimate, and I'm
12  entitled to that estimate, but in those situations we
13  want you to give estimates that you're comfortable
14  with.  So in situations, for instance, where I ask you
15  dates and times, you may not be able to give the
16  precise date and time but can give an estimate, maybe
17  a month, maybe a week, maybe a year that you're
18  comfortable with.
19    A  Yes.
20    Q  Do you understand that?
21    A  Yes.
22    Q  Okay.  If at any time you need to take a
23  break, stretch your legs, go to the restroom, please
24  let us know.  We'll go and do that.
25    A  Yes.

Page 16

1    Q  Okay.  Do you have any questions before we
2  really begin?
3    A  No.
4    Q  Mr. Baek, what's your present address?
5    A  2676 Torrey Pines Road, La Jolla,
6  California 92037.
7    Q  And where are you presently employed?
8    A  Low Air Ticket Travel Agency.
9    Q  And how long have you been employed there?
10    A  I am the owner.  I am not the employee.
11    Q  How long have you owned this business?
12    A  March 1999.
13    Q  Were you ever employed by U. Lim America?
14    A  Yes.
15    Q  When were you first employed by U. Lim
16  America?
17    A  October of 1995.
18    Q  And how long did you work at U. Lim
19  America?
20    A  Three months.
21    Q  Do you know what your final date of work at
22  U. Lim was?
23    A  I'm not sure, but I think it was January of
24  1996.  Middle of January.
25    Q  If I told you it was January 19th of '96,

Page 17

1  would that refresh your memory at all?
2        MR. BATTENFELD: I'll object to the
3  question as leading.
4        THE WITNESS: The time I came to you and
5  they provide information, my memory was quite accurate
6  because there was not too long after.  However, if you
7  ask me that question right now, when I just stated
8  earlier that it was middle of January, that's all I
9  can recall.
10  BY MR. GREY:
11    Q  And what was the position you were hired at
12  at U. Lim when you first started working there?
13    A  Purchase assistant manager.
14    Q  And who did you understand at the time you
15  were hired would be your immediate supervisor?
16    A  Tae Jin Yoon.
17    Q  At the time you were hired, what was Tae
18  Jin Yoon at the company?
19        THE INTERPRETER: Yoon, Y-o-o-n.  I like to
20  clear with him before I translate because when there
21  is one word that's given to me, especially position of
22  Korean ranking, it can be translated different way.
23  So let me make very clear.
24        The word he has given to me was CEO in
25  American way verbatim, but I don't think usually it

Page 14 - Page 17

VERBATIM REPORTING SERVICE (619) 232-3376

Kang v. U. Lim America
Teddy Back
Multi-Page™

Page 18

1  happens. It's correct. CEO.
2       MR. BATTENFELD: What was the answer again?
3       THE INTERPRETER: CEO.
4  BY MR. GREY:
5    Q  Was there any other person who supervised
6  you at the time of your hire?
7    A  My manager -- Soo Cheol Kang was my
8  manager. He's the one who interviewed me at the
9  initial interview. He did.
10   Q  Did you understand Soo Kang to be your
11 immediate supervisor?
12   A  No. During the interview, initial
13 interview, I had the Tae Jin Yoon, the CEO was in
14 Seoul for a business matter. Therefore, he giving me
15 a interview. After then I was informed by him that
16 when Tae Jin Yoon comes back, he will conduct the
17 final interview.
18   Q  Okay. When you say he gave you the
19 interview, who are you referring to?
20   A  Soo Cheol Kang.
21   Q  So it's correct to say Soo Kang interviewed
22 you first?
23   A  Yes, it's correct.
24   Q  And is it correct to say that you had a
25 second and final interview with Tae Jin Yoon?

Page 19

1    A  Yes. That person informed me that he was
2  not the authorized person to hire me or not.
3    Q  Are you referring to Soo Kang now?
4    A  It's correct.
5    Q  Did you have an interview with Tae Jin Yoon
6  after the first interview?
7    A  Yes.
8    Q  Okay. Did Tae Jin Yoon inform you that he
9  was intending to hire you?
10       MR. BATTENFELD: Objection. Question's
11 leading.
12       Is it easier if I make the objection before
13 or after you interpret the question?
14       THE INTERPRETER: It doesn't matter. That
15 is between -- my habit is I do just right after
16 anything I hear in -- with my ears. So it's just my
17 habit because of doing this so many years. So it's up
18 to you.
19       MR. BATTENFELD: Why don't we do this so
20 you don't lose track of the question. Why don't we
21 have an arrangement that you will interpret the
22 question --
23       THE WITNESS (Without interpreter): Can I
24 do something?
25       THE INTERPRETER: It's very hard for me to

Page 20

1  slow down because --
2       MR. BATTENFELD: I'll wait till the witness
3  gets back because this will pertain to his testimony
4  as well. What I would propose so that the interpreter
5  doesn't lose track of the question and can interpret
6  the question is that the interpreter will interpret
7  the question first, and then if I could request that
8  the witness pause before answering so that I have an
9  opportunity to make the objection at that time if I
10 have an objection before the witness answers the
11 question. Does that makes sense?
12       THE INTERPRETER: Yeah. Let me translate
13 that.
14       MR. BATTENFELD: Do you understand that,
15 Mr. Baek?
16       THE WITNESS (Without interpreter): Yes.
17 BY MR. GREY:
18   Q  Who did you understood -- understand had
19 the authority to hire you?
20       MR. BATTENFELD: Objection. Sorry about
21 that.
22       THE INTERPRETER: Anything I hear, I just
23 automatically translate.
24       MR. BATTENFELD: I stepped on my own
25 protocol.

Page 21

1       I'll object that the question is leading.
2       THE WITNESS: Mr. Yoon.
3  BY MR. GREY:
4    Q  When were you first told that you were
5  hired at U. Lim?
6    A  At the interview, the second interview I
7  had.
8    Q  And did Tae Jin Yoon tell you this?
9    A  Yes. Including informed me about the
10 salary information.
11   Q  And what did he inform you was going to be
12 your salary?
13   A  Which I didn't -- I don't wish to disclose
14 that information. However, during that interview he
15 informed me about the company regulations, our future
16 plan for the wage increase.
17       MR. BATTENFELD: The ways what?
18       THE INTERPRETER: Increase. Like increase.
19 I-n-c-r-e-a-s-e.
20 BY MR. GREY:
21   Q  Did he inform you what your salary would be
22 at that meeting?
23   A  Yes. Everything has been disclosed at the
24 time.
25   Q  Did he make any representations to you at

VERBATIM REPORTING SERVICE (619) 232-3376

**Page 22**

1  that time about any salary increases?
2      MR. BATTENFELD: And I'll object to the
3  question as leading, argumentative, calls for a legal
4  conclusion.
5      THE WITNESS: Yes. It's not something --
6  yes. He even informed me in detail of all that kind
7  information which I recall very clearly.
8  BY MR. GREY:
9      Q  What was the details of that information?
10     A  At the time that the wage salary was not
11 that large amount. Therefore, he stated to me that if
12 I stay some certain time, I will have a raise of my
13 salary. And then also he said in the future the
14 company will expand. Therefore, at the time there are
15 more additional benefits that will be given to me.
16     Q  Did he inform you as to any start date?
17     A  November 1st on 1995.
18     Q  Is that the date you first started working
19 for U. Lim?
20     A  No.
21     Q  Okay. When is the date you first started
22 working for U. Lim?
23     A  October 20th.
24     Q  Why did you start working for U. Lim on
25 October 20th when he informed you your start date

**Page 23**

1  would be November 1st?
2      A  Kang Soo called me -- Tae Jin Yoon
3  expressed to him that he wishes me to come to work as
4  an internship and before November 1st and then that
5  your work would begin from November 1st.
6      Q  Did you come to work on October 20th?
7      A  Yes.
8      Q  Were you paid during the period of
9  October 20th through November 1st?
10     A  No, I did not.
11     Q  When Tae Jin Yoon hired you, did he tell
12 you that you'd be working during this period for free?
13     A  No.
14     Q  When you were first hired, what did you
15 understand your work hours to be?
16     MR. BATTENFELD: I'll object to the
17 question as leading, lacking foundation.
18     THE WITNESS: What are you saying? What
19 you are saying leading?
20     MR. BATTENFELD: I'm objecting to the
21 question as being leading and lacking foundation.
22     THE WITNESS: The way you say lack of
23 foundation means when I said earlier that hours I
24 supposed to work -- I stated that earlier. How could
25 it be lack of foundation?

**Page 24**

1  BY MR. GREY:
2      Q  Okay. Let me inform you of something.
3  Defense counsel may object from time to time to the
4  questions I am asking. Defense counsel may be right
5  in his objections. He may not be right in his
6  objections. But he is putting them on the record so
7  he can challenge the question at some later date.
8  Okay? You do not need to concern yourself with those
9  objections or the legal reasons why he is objecting to
10 it.
11     Do you understand?
12     A  Yes.
13     Q  If you understand the question, then you
14 should answer it to the best of your ability.
15     A  Yes.
16     Q  When you were first hired, did anyone
17 inform you as to what your work hours would be?
18     A  Yes. I was given the company information,
19 and the company will begin 7:15, all the managers to
20 come to work by 7:00. The ending hour is 5:15, 5:30.
21     Q  And who informed you as to these working
22 hours?
23     A  Soo Kang, the manager, my manager, my boss.
24     Q  And after you came to work for U. Lim, were
25 these the normal hours that you worked?

**Page 25**

1      A  Not -- only few times only.
2      Q  What were the normal hours you would work
3  Monday through Friday at U. Lim after you were hired?
4      A  From 7:00 to 8:00 p.m. Yes.
5      Q  And would that be your normal work schedule
6  for Monday through Friday each week?
7      A  Yes.
8      Q  And that continued -- did that continue to
9  be the case for the approximate three months you
10 worked at U. Lim?
11     A  Yes. Including Saturdays and Sundays.
12     Q  When -- how often would you work Saturdays
13 in a given -- scratch that.
14     During the three -- approximate three
15 months that you worked at U. Lim, how many Saturdays
16 do you recall working?
17     A  I don't remember exactly, but if you ask me
18 to count, it should be more than five times.
19     Q  Do you recall on a monthly basis how many
20 Saturdays you'd have to work?
21     A  Twice, three times.
22     Q  So is it true that approximately two to
23 three Saturdays a month you'd be working at U. Lim?
24     A  Yes.
25     Q  And on Saturdays what was the normal work

Kang v. U. Lim America
Teddy Back

Multi-Page™

Page 26

1    hours that you kept?
2       A   About 7:30 to 3:30.
3       Q   And while you were employed at U. Lim, did
4    you ever work Sundays?
5       A   Yes.
6       Q   How many Sundays do you recall working at
7    U. Lim?
8       A   That I am very certain, twice.
9       Q   Do you recall what your hours were on those
10   Sundays that you worked?
11      A   I'm not certain about hours, but I went to
12   work in the morning and then after lunch before
13   sundown until then.
14      Q   Would you work into sundown or would you
15   simply leave before sundown?
16      A   Around the time sun goes down.
17      Q   Were you ever paid any overtime by U. Lim
18   for any work on Saturdays or Sundays?
19      A   No.
20      Q   Did you ever receive any additional
21   compensation from U. Lim of any type for working
22   Saturdays and Sundays?
23      A   No.
24      Q   You also indicated that Monday through
25   Friday you would normally work between 7:00 and

Page 27

1    8:00 p.m.; is that correct?
2       A   Yes.  It's correct.
3       Q   Did you ever receive any overtime pay or
4    additional compensation for working more than eight
5    hours on any given day?
6       A   No, it was not.
7       Q   You indicated that Soo Kang was your
8    immediate supervisor, correct?
9       A   Yes.
10      Q   Did you understand that he worked less, the
11   same or more hours than you on an average basis?
12         MR. BATTENFELD: I'll object to the
13   question as being leading and lacking foundation.
14         THE WITNESS: More than -- more than I did.
15   BY MR. GREY:
16      Q   When you would leave work at approximately
17   8:00 o'clock in the evening Monday through Friday, was
18   it usually the case or not that Soo Kang was still
19   there?
20      A   Usually -- usually, yes, and there are few
21   times that we left together too.
22      Q   And was Mr. Park usually there when you'd
23   leave work at 8:00 o'clock?
24         THE INTERPRETER: Mr. Park?  Am I right?
25         MR. GREY: Mr. Park.

Page 28

1          THE WITNESS: Mr. Park and Mr. Kang.
2    BY MR. GREY:
3       Q   At the time you worked for U. Lim, where
4    were you living?
5       A   Nobel Court in an apartment.
6       Q   And where is Nobel Court?  What part of
7    town?
8       A   UTC area.
9       Q   And how long would it take you to get from
10   your home in UTC to work?
11      A   About 35 to 40 minutes.
12      Q   And how long would it take to get back, to
13   leave work and get back to your home in the evening?
14      A   If you make it fast, it usually takes about
15   one hour, but normally about one hour and 30 minutes.
16      Q   And is that additional time because you
17   have to go through customs?
18      A   Yes.  Because when you depart, they don't
19   check.  But, however, when you enter at the border,
20   they inspect you.
21      Q   Was it your understanding that all of the
22   managers at U. Lim lived in the United States?
23      A   Yes, they did.
24         THE WITNESS (Without interpreter): Can I
25   take a break?

Page 29

1          MR. GREY: Sure.
2          (Recess)
3    BY MR. GREY:
4       Q   On the days that you were not working,
5    could you tell whether or not Soo Kang had been
6    working on those days?
7          MR. BATTENFELD: I'll object to the
8    question as being leading and lacking foundation.
9          THE WITNESS: Yes, I was able to know.
10   BY MR. GREY:
11      Q   And how were you able to know?
12      A   My position was a purchasing assistant
13   manager.  So whether he worked or not, if I see the --
14   after the fact that by looking at the invoices.
15      Q   You could tell that Soo Kang had worked?
16      A   Yes.
17      Q   And how frequently during your three months
18   did you observe documents that suggested to you that
19   Soo Kang had worked on days you had not?
20         MR. BATTENFELD: I'll object to the
21   question as being leading, argumentative, ambiguous
22   and lacking foundation.
23         THE WITNESS: The procedures of a warehouse
24   whenever when they send the materials from warehouse
25   to the production line, the people who work there --

Page 26 - Page 29

Page 30

1  they are Mexicans. They are supposed to get
2  authorization from me, but when -- during my absence
3  they should get from Mr. Kang. In that way I knew.
4     MR. BATTENFELD: And I'll move to strike
5  the answer as being nonresponsive.
6  BY MR. GREY:
7     Q  You indicated that you worked approximately
8  two to three Saturdays each month, correct?
9     A  Yes.
10    Q  Is it your recollection that each Saturday
11 you worked, Mr. Kang also worked?
12    A  Yes.
13    MR. BATTENFELD: And I'll object to the
14 question -- let me finish. I'll object to the
15 question as being leading.
16 BY MR. GREY:
17    Q  Based on your position as assistant
18 purchasing manager and your knowledge of the invoices,
19 do you have any estimate of how many Saturdays
20 Mr. Kang would work during the months that you were
21 employed at U. Lim?
22    MR. BATTENFELD: I'll object to the
23 question as being leading, argumentative, ambiguous
24 and lacking foundation.
25    THE WITNESS: I recollect that he did many

Page 31

1  times even though my recollection is not that precise.
2  BY MR. GREY:
3     Q  When you say he did many times, what are
4  you referring to?
5     A  As I stated earlier about invoices, I could
6  tell because if I see the invoices. My job whenever I
7  go to work in the morning -- what I do, I get invoices
8  and then also inventory, and then also I check the
9  completed products. I have to make the balance, how
10 many went out, how many was made. And so by doing so
11 I was able to tell he worked there during my absence
12 or not.
13    Q  And is that what you're referring to as
14 many times?
15    A  Yes.
16    Q  Okay. So it's your testimony that Soo Kang
17 worked many times when you were not working; is that
18 correct?
19    MR. BATTENFELD: And I'll object to the
20 question as being leading, argumentative, lacking
21 foundation.
22    THE WITNESS: During Saturdays, during my
23 employ there, most of times I worked more like most
24 Saturdays. Therefore, I knew he was there more than
25 even checking about documents.

Page 32

1     But Sundays when I was not there, I could
2  tell that he was working or he worked there by looking
3  at those documents because looking at those documents
4  were one of my duties.
5     MR. BATTENFELD: And I'll move to strike
6  the answer as being nonresponsive.
7  BY MR. GREY:
8     Q  Is it your testimony then that he worked
9  many Sundays when you were not there?
10    A  Yes.
11    MR. BATTENFELD: I'll object.
12    Please wait till I can make my objection.
13    I'll object to the question as being
14 leading, argumentative, ambiguous, overbroad, lacking
15 foundation.
16 BY MR. GREY:
17    Q  Do you have any estimate as to how many
18 Sundays Mr. Kang would work while you were at U. Lim
19 during any given month?
20    MR. BATTENFELD: And I'll object to the
21 question as being leading and lacking foundation.
22    THE WITNESS: About two, three times.
23 BY MR. GREY:
24    Q  Each month?
25    A  Total. Total.

Page 33

1     Q  Okay. So is that two or three times more
2  than the two Sundays you worked or including the two
3  Sundays you worked?
4     MR. BATTENFELD: And I'll object to the
5  question. It's been asked and answered. And I'll
6  also object to the question as leading.
7     THE WITNESS: Your question was during my
8  absence how many times he worked. Therefore, the time
9  or Sundays I worked were not included there.
10 BY MR. GREY:
11    Q  Okay. Thank you. During the normal day,
12 when would you have lunch?
13    A  There is no indicated lunchtime. Sometimes
14 3:00 o'clock, sometimes 2:00 o'clock, sometimes
15 1:00 o'clock.
16    Q  What would determine when you had lunch?
17    A  Tae Jin Yoon.
18    Q  And what do you mean Tae Jin Yoon?
19    A  He said, "Let's have lunch," then we should
20 have lunch.
21    Q  Is it your testimony then that you'd wait
22 for Tae Jin Yoon before you'd have lunch?
23    MR. BATTENFELD: And I'll object to the
24 question as being leading.
25    THE WITNESS: Yes.

Kang v. U. Lim America
Teddy Back

Multi-Page™

Page 34

1  BY MR. GREY:
2      Q  Why did you have to wait for Tae Jin Yoon
3  to have lunch?
4          MR. BATTENFELD:  I'll object to the
5  question as being argumentative and leading.
6          THE WITNESS:  That is more like you do in
7  the company.  That is what you are -- you get into.
8  BY MR. GREY:
9      Q  Did anyone ever tell you that you need to
10 wait for Tae Jin Yoon before you had lunch?
11         MR. BATTENFELD:  And I'll object to the
12 question as leading.
13         THE WITNESS:  What I meant is when Tae Jin
14 Yoon says, "Let's have lunch," we go upstairs.  Mainly
15 I had to go upstairs and I wash rice, and then we have
16 a rice cooker, and I made lunch for everybody.
17         It's not, you know, when somebody tells me
18 when to have lunch because when he said, "Let's have
19 lunch," I had to do that.
20 BY MR. GREY:
21     Q  Could you have lunch before Tae Jin Yoon
22 told you that you were going to have lunch?
23         MR. BATTENFELD:  I'll object to the
24 question as being argumentative, leading, and it's
25 misstating the witness' testimony.

Page 35

1          THE WITNESS:  You cannot even imagine doing
2  that.
3  BY MR. GREY:
4      Q  Did you ever observe Tae Jin Yoon yelling
5  at any of the managers?
6          MR. BATTENFELD:  And I'll object to the
7  question as being leading and argumentative.
8          THE WITNESS:  Daily events.
9      Q  And can you describe the yelling you
10 observed.
11         MR. BATTENFELD:  And I'll object to the
12 question as being ambiguous and overbroad.
13         THE WITNESS:  In the meeting room, daily
14 event is due to that he yells about the amount of
15 production prior to that day of the meeting.  So you
16 see that daily.
17 BY MR. GREY:
18     Q  Did you observe him yelling mostly at the
19 Korean employees or the Mexican employees or both?
20         MR. BATTENFELD:  And I'll object to the
21 question as being leading and argumentative and
22 ambiguous as to time.
23         THE WITNESS:  I have seen not even once
24 that he yelled to Mexicans.  He only yelled to

Page 36

1  Koreans.
2  BY MR. GREY:
3      Q  When you had lunch with Tae Jin Yoon, were
4  any Mexicans invited to that lunch?
5          THE INTERPRETER:  Would you repeat that?  I
6  didn't --
7  BY MR. GREY:
8      Q  When you had lunch with Tae Jin Yoon, were
9  any Mexicans invited to those lunches?
10     A  Not once.
11     Q  Did you ever engage in social activities
12 with Mr. Yoon?
13     A  Yes.
14     Q  What were the types of social activities
15 you engaged in with Mr. Yoon?
16     A  Bar or strip bar or poker game.  That's
17 all.
18     Q  And how often would you engage in poker
19 games with Tae Jin Yoon?
20     A  About once or twice every two weeks.
21     Q  Once or twice every two weeks?
22         THE INTERPRETER:  Every two weeks.
23         THE WITNESS:  Sometimes twice a week.
24 Sometimes once a week.
25 ///

Page 37

1  BY MR. GREY:
2      Q  And where were these poker games held?
3      A  Tae Jin's house.
4      Q  And what days of the week were these poker
5  games held on?
6      A  It doesn't matter.  Any day.
7      Q  There was no regular day?
8      A  No.  When Tae Jin wants to do that, you got
9  to do that.
10     Q  Did any of these poker games occur on
11 Sunday through Thursday night?
12     A  You mean from Thursday night continue to
13 Sunday night?
14     Q  No.  Did you hold these poker games after
15 work?
16     A  Yes.  Always after the work.
17     Q  Were any of these poker games held on
18 Sunday night, Monday night, Tuesday, Wednesday or
19 Thursday?
20     A  Yes.
21     Q  So they were held on days that you had work
22 the next day, correct?
23     A  Yes.
24     Q  Okay.  And was that frequently the case?
25     A  Yes.

Page 34 - Page 37

**Page 38**

```
1          MR. BATTENFELD: I'll object to the
2  question as vague, leading and argumentative and
3  ambiguous.
4  BY MR. GREY:
5       Q  How late would these poker games usually go
6  to?
7       A  The night I recall is it ended at
8  6:00 o'clock in the morning. So I went home to
9  shower, change clothes and went to work. But usually
10  it ends about 3:00, 4:00 o'clock in the morning.
11      Q  And would you be at work each day following
12  the poker game?
13      A  I did.
14      Q  Who would usually join you at these poker
15  games?
16      A  There are regular members. Tae Jin Yoon,
17  Mr. Park, Mr. Ko, Mr. Kang. And Cho attended, but,
18  however, he was not there all the time. He joined
19  several times.
20      Q  Who?
21      A  Cho, Mr. Cho.
22      Q  And would Tae Jin Yoon normally go to work
23  the following day after these poker games?
24      A  No. There are times that he didn't come.
25  Usually he shows up after 12:00 next day.
```

**Page 39**

```
1       Q  And how about Mr. Cho? Would he usually
2  work a day following when he was participating in the
3  program?
4       A  Mr. Cho didn't do that many times.
5  However, even if he did poker game, he left for home
6  early.
7          MR. BATTENFELD: And I'll move to strike
8  the answer as being nonresponsive.
9  BY MR. GREY:
10      Q  Just to clarify, would Mr. Cho normally
11  work following a poker game he attended?
12      A  Yes.
13      Q  Would he normally be at work the same time
14  that he usually was at work?
15      A  Yeah. There are times that he comes late,
16  but not always.
17      Q  Generally speaking, was Mr. Cho the only
18  one to leave the poker games early?
19      A  Yes.
20      Q  And did you observe Mr. Kang and Mr. Park
21  working their normal business hours following each of
22  these poker games?
23      A  Yes. Because we go to work together.
24      Q  Did you find it difficult to work -- to
25  play poker till 3:00 or 4:00 in the morning and then
```

**Page 40**

```
1  go to work the next day?
2          MR. BATTENFELD: I'll object --
3          THE WITNESS: Yes.
4          MR. BATTENFELD: -- as being argumentative
5  and leading.
6          THE WITNESS: Yes, it was difficult.
7  BY MR. GREY:
8       Q  Did you ever miss work the following day
9  because of the poker game?
10      A  No. I didn't miss any work, but only one
11  occasion that, because I was so tired, I went to work
12  late.
13      Q  Was there any repercussion to you for
14  showing up to work late that day?
15          MR. BATTENFELD: And I'll object to the
16  question as being leading and argumentative.
17          THE WITNESS: The person I recall about
18  that event is -- you think about Tae Jin Yoon. I
19  think happened to be that day. He didn't come to work
20  that day, but next day he didn't talk to me for all
21  day.
22  BY MR. GREY:
23      Q  How long was it before he started talking
24  to you again?
25      A  I don't remember exactly, but usually it
```

**Page 41**

```
1  last about three days or more than three days.
2       Q  What was your understanding of why he was
3  not talking to you?
4          MR. BATTENFELD: I'll object to the
5  question as lacking foundation.
6          THE INTERPRETER: Let me -- I want him
7  to --
8          THE WITNESS: Like there was mention by the
9  manager who was the bottom of the line, that it's like
10  military because when you miss one day of work or are
11  late, it's like have to be like the military camp.
12          MR. BATTENFELD: I'll move to strike the
13  answer as being nonresponsive.
14  BY MR. GREY:
15      Q  Was it your understanding that Tae Jin was
16  upset at you for arriving late to work that day?
17          MR. BATTENFELD: And I'll object to the
18  question as leading.
19          THE WITNESS: Yes, I felt that way.
20  BY MR. GREY:
21      Q  Did you feel that attending these poker
22  games was optional or mandatory?
23          MR. BATTENFELD: I'll object to the
24  question as being leading, argumentative and lacking
25  foundation.
```

Page 42

1      THE WITNESS: I felt it was mandatory.
2  BY MR. GREY:
3      Q  Why did you feel attending these poker
4  games was mandatory?
5      A  He always emphasized that we are a team
6  going for one goal. And then when we go to strip bar,
7  bars or poker game, that is something we only know.
8  We cannot tell our family members about it when we go.
9  This is more like as a team we do together.
10     Q  Did Tae Jin ever tell you that you must
11 attend any of these poker games or events at the bar?
12     MR. BATTENFELD: And I'll object to the
13 question as being leading and argumentative.
14     THE WITNESS: Yes.
15 BY MR. GREY:
16     Q  As part of your work schedule, were there
17 any regularly scheduled meetings with the managers?
18     A  Yes.
19     Q  And how often would you have these
20 meetings?
21     A  Almost daily.
22     Q  And who would generally be in attendance at
23 these meetings?
24     A  Mr. Park, Mr. Ko, Mr. Kang, me and Mr. Cho
25 and Tae Jin Yoon.

Page 43

1      Q  Was Raul Carillo ever at these meetings?
2      THE INTERPRETER: What was the first --
3      MR. GREY: Raul Carillo.
4      THE WITNESS: He couldn't attend for the
5  meeting, daily meeting. I think he attended for just
6  few minutes to explain about the parts he was in
7  charge.
8      MR. BATTENFELD: Who was the witness
9  referring to there?
10     THE WITNESS: Raul.
11 BY MR. GREY:
12     Q  Raul Carillo was assistant manager for
13 Mr. Park, correct?
14     A  Yes. Quality control.
15     Q  And just so I understand your testimony
16 correctly, he would not normally attend these morning
17 meetings?
18     A  No, he doesn't.
19     Q  Okay. And what was Tae Jin Yoon's role at
20 these daily meetings?
21     A  Usually what we talk about, the goals for
22 products for daily. He gets every department reports,
23 and then he signs. And then also he talks about the
24 assembly productions, about how much should be
25 produced, so and so.

Page 44

1      Q  Did Tae Jin Yoon ever yell at these
2  meetings?
3      A  Daily he yells.
4      Q  Were there any particular persons that he
5  would yell at more than others?
6      A  From beginning I was able to observe that
7  he was yelling mainly to Mr. Park and Mr. Soo Kang.
8      Q  He would not yell at frequently to Mr. Cho;
9  is that correct?
10     MR. BATTENFELD: I'll object to the
11 question as being leading and misstating the witness'
12 prior testimony.
13     THE WITNESS: Yes. I observed it that he
14 was yelling, but not that frequently.
15 BY MR. GREY:
16     Q  Did you have any understanding whether or
17 not Tae Jin Yoon had any personal relationship with
18 Mr. Cho?
19     MR. BATTENFELD: And I'll object to the
20 question as being leading and ambiguous with respect to the
21 phrase personal relationship.
22     THE WITNESS: Yes.
23 BY MR. GREY:
24     Q  And what was your understanding of that
25 relationship?

Page 45

1      A  Mr. Cho and Mr. Ko and Mr. Parker are
2  friends.
3      Q  Was Tae Jin Yoon friends with Mr. Cho?
4      A  Yes, they are friends.
5      Q  And was he friends with Mr. Ko?
6      A  Yes.
7      Q  Would you say that he was also friends with
8  Mr. Park?
9      A  In Korea they grew up together, Mr. Cho and
10 Mr. Ko and Mr. Yoon. Not Mr. Cho. Mr. Parker and
11 Mr. Ko.
12     Q  Did you observe that Mr. -- or Tae Jin Yoon
13 was a friend of Mr. Park?
14     MR. BATTENFELD: And I'll object to the
15 question as being leading and ambiguous.
16     THE WITNESS: Yes.
17 BY MR. GREY:
18     Q  Did you observe that friendship to be as
19 close as the friendship he had with Mr. Cho?
20     MR. BATTENFELD: I'll object to the
21 question as being leading, argumentative, lacking
22 foundation.
23     THE WITNESS: No, he was not.
24 BY MR. GREY:
25     Q  Is it your testimony then that he was

Page 46

1  closer friends with Mr. Cho?
2      A  Yes.
3      Q  Did you consider that he was friends with
4  Mr. Kang -- I'm referring now to Tae Jin. I'm
5  referring to Tae Jin. Tae Jin being friends with
6  Mr. Kang.
7      A  No.
8      Q  When you indicated that Tae Jin would
9  frequently yell at these meetings, how often -- rather
10  how long would this yelling occur?
11          MR. BATTENFELD: I'll object to the
12  question as being ambiguous as to time.
13          THE WITNESS: Yelling begins from the
14  beginning of the meeting, and it ends when meeting
15  ends.
16  BY MR. GREY:
17      Q  Is it your testimony that Tae Jin Yoon
18  would normally yell at these meetings at the managers?
19      A  Yes.
20          MR. BATTENFELD: I'm sorry. Could you read
21  the question and answer back. Yes, the question. I
22  don't need the translation.
23          (Record read)
24  BY MR. GREY:
25      Q  Did you ever observe Tae Jin Yoon yelling

Page 47

1  at any of the managers for more than one hour?
2      A  Yes.
3      Q  Did you ever observe Tae Jin Yoon yelling
4  at any of the managers for more than two hours?
5      A  Yes. I said there were times that he did
6  for two hours. I said two hours are proper way to
7  say.
8      Q  And who -- which manager specifically did
9  you observe him yelling at for up to two hours?
10          MR. BATTENFELD: And I'll object to the
11  question as being ambiguous with respect to the phrase
12  up to two hours.
13          THE WITNESS: Each day to different
14  individual, Mr. Ko, Mr. Park, and Mr. Kang.
15  BY MR. GREY:
16      Q  And when he was yelling at Mr. Ko, Mr. Park
17  or Mr. Kang, were they normally sitting or standing
18  when this occurred?
19          MR. BATTENFELD: And I'll object to the
20  question.
21          THE WITNESS: Sitting.
22          MR. BATTENFELD: I'll object to the
23  question as being overbroad and ambiguous as to which
24  individual or which incident is being referred to.
25          THE WITNESS: Usually when we attend

Page 48

1  meeting, we never stood. However, we were sitting.
2  But, however, when he does stand, we have to place the
3  head down.
4  BY MR. GREY:
5      Q  Did you ever observe him throw anything at
6  any of the managers at these meetings?
7          MR. BATTENFELD: I'll object to the
8  question as being leading.
9          THE WITNESS: Yes. I observe frequently,
10  and also he did that to me too.
11  BY MR. GREY:
12      Q  What objects, if any, did you observe him
13  throwing at any of the managers including yourself?
14      A  As I stated earlier, that each department
15  submit to him for each production line report. Then
16  when -- when he was yelling, he threw, which was
17  something to him in this manner. Then he throw that
18  back to us and then anything just around him such as
19  rulers, lighters and then pens. He threw at the
20  managers.
21      Q  Did you ever observe him throw an ashtray
22  at any time?
23          MR. BATTENFELD: Object to the question as
24  being leading.
25          THE WITNESS: Yes. To Mr. Park.

Page 49

1  BY MR. GREY:
2      Q  Did it hit Mr. Park?
3      A  Yes, it did.
4      Q  Do you remember what the ashtray was made
5  out of?
6      A  Crystal.
7      Q  Did you ever observe Mr. Yoon physically
8  strike any of the managers?
9          MR. BATTENFELD: I'll object to the
10  question as being leading.
11          THE WITNESS: Yes, I did.
12  BY MR. GREY:
13      Q  What did you observe?
14      A  Like with a ruler he hit our cheeks or our
15  face. He kicked the managers' bottom portion of the
16  body.
17      Q  Who did you observe him hit with a ruler?
18      A  Mr. Park, Mr. Kang.
19      Q  And approximately how many times did you
20  observe him strike Mr. Park with a ruler?
21      A  It was so quick, you cannot count. But if
22  you want me to state, at least more than ten times.
23      Q  And when he would hit Mr. Park, would he
24  hit him with the flat edge of the ruler or the narrow
25  edge of the ruler?

Page 50

1       MR. BATTENFELD: I'll object to the
2   question -- I'll object to the question as being
3   leading and ambiguous as to time.
4       THE WITNESS: When he hit face and cheek,
5   the flat portion he was hitting. When he was hitting
6   the person with a ruler, head and body, he did the
7   narrow edge portion.
8   BY MR. GREY:
9       Q   You said you observed Mr. Yoon kick or
10  strike the lower portion of the assistant -- one of
11  the assistant manager's bodies; is that correct?
12      A   Yes. Leg portion.
13      Q   This is the portion below the knee,
14  correct?
15      A   Yes. It's correct.
16      Q   And he would strike this portion with what
17  part of his body?
18      A   Like his foot, with his shoe.
19      Q   So it would be correct to say you observed
20  him kick assistant managers in the portion of the leg
21  below the knee?
22      A   Yes. If you want to be precise, yes.
23      Q   And who did you observe him kick in this
24  manner?
25      A   Mr. Park and Mr. Kang.

Page 51

1       Q   And approximately how many times did you
2   observe this conduct?
3       MR. BATTENFELD: Object to the question as
4   being vague and ambiguous as to which conduct is being
5   referred to.
6       MR. GREY: Conduct referring to the
7   kicking.
8       MR. BATTENFELD: It's still same objection
9   as to who specifically he's referring to being kicked.
10  BY MR. GREY:
11      Q   You can answer.
12      A   Mr. Kang about three or four times I
13  observed, and Mr. Park more than five times I saw.
14      Q   Did these events occur, the kicking occur,
15  at those daily meetings?
16      A   No, not always. However, he did that at
17  the meeting too.
18      MR. GREY: Let's take a two-minute break
19  here.
20      (Recess)
21      (Record read)
22  BY MR. GREY:
23      Q   When you observed Tae Jin yelling at any of
24  the managers, did you observe him insult them in any
25  way?

Page 52

1       MR. BATTENFELD: I'll object to the
2   question as leading and ambiguous.
3       THE WITNESS: Yes.
4   BY MR. GREY:
5       Q   What were the sort of insults you recall
6   occurring?
7       MR. BATTENFELD: Object to the question as
8   being ambiguous as to time and individual.
9       THE WITNESS: He -- the questions -- some
10  issues that he only knows which not managers start.
11      THE REPORTER: I'm not understanding that.
12  I apologize.
13      THE WITNESS: He ask questions that only he
14  knows the answer, not the managers have the
15  information. So when manager do not have the
16  information, he said, "How come you don't know?"
17  Treats them like very stupid and then tell them
18  that -- "Go to study about it."
19  BY MR. GREY:
20      Q   I don't know if this translates into
21  Korean, but did he ever call them any names?
22      MR. BATTENFELD: Object to the question as
23  being ambiguous as to who is being referred to by
24  "they" and as to time as to incident.
25      THE WITNESS: Such as slangs?

Page 53

1   BY MR. GREY:
2       Q   Potentially.
3       A   Of course.
4       Q   What sort of slangs?
5       A   Like such as slangs if it is --
6       MR. BATTENFELD: Is that slangs?
7       THE WITNESS: Slangs.
8       THE INTERPRETER: I could translate it like
9   colloquial words.
10  BY MR. GREY:
11      Q   Like what?
12      A   Such as Mr. Ko and Mr. Park they grew up
13  together, so he was using different name to them. And
14  I made -- that's all I remember.
15      THE INTERPRETER: I may have translated
16  though your question -- I have feeling which I don't
17  feel comfortable when I do make mistakes. I like to
18  make -- it's my statement. When I don't make precise
19  correct verb in translation, there are times that if
20  one word is given to me, I can pick about two, three
21  choices. I don't think I have translated your
22  question correctly. So would you repeat it?
23  BY MR. GREY:
24      Q   When he was yelling at the managers,
25  whether that be Mr. Park or Mr. Kang or one of the

Multi-Page™

Page 54

1   other managers, did he ever call them a name which the
2   name itself was insulting?
3         MR. BATTENFELD: And I'll object to the
4   question as being ambiguous as to time, as to a
5   particular incident and as to a particular individual.
6         THE WITNESS: Like when he does that there
7   are titles, like Park or some kind of titles were
8   given to them, but, however, he always --
9         THE REPORTER: I don't understand.
10        THE WITNESS: Ignores titles of individual
11  except those titles, for instance, like Park and so
12  and so. He curse at them by using the words like,
13  "You stupid" or "You" -- like "Jerk."
14        THE WITNESS (without interpreter): Jerk.
15        THE WITNESS: Like that way.
16  BY MR. GREY:
17    Q  What were all the curses?
18        THE WITNESS (without interpreter): Excuse
19  me.
20        THE REPORTER: Off the record?
21        MR. GREY: Uh-huh.
22        (Discussion off the record)
23        THE WITNESS: As I stated earlier, stupid,
24  jerk.
25  ///

Page 55

1   BY MR. GREY:
2     Q  Do you remember him ever calling them
3   assholes or sons of a bitch?
4         MR. BATTENFELD: I'll object to the
5   question as being leading and ambiguous as to who
6   "they" are.
7         THE WITNESS: I didn't hear he said those
8   words to Soo Kang, but I heard that quite worse words
9   on Mr. Park.
10        MR. BATTENFELD: I didn't understand the
11  translation that you just gave.
12        THE INTERPRETER: I didn't hear he was
13  saying those words, bad words, on Mr. Kang, but -- Soo
14  Kang, but I heard that he was using those bad, bad
15  words on Mr. Park.
16        MR. BATTENFELD: Which bad words?
17        THE INTERPRETER: Bad words like cursing
18  words.
19        MR. GREY: Like specifically asshole or son
20  of a bitch.
21        THE WITNESS: Both words he used.
22  BY MR. GREY:
23    Q  On Mr. Park?
24    A  Yes.
25    Q  How often do you recall Tae Jin Yoon

Page 56

1   cursing at Mr. Park?
2     A  I can't count since he did so frequently.
3     Q  Give me your best estimate of how
4   frequently he would curse at Mr. Park.
5     A  It's not that many times a day, just that
6   once you have meeting, just the same day, next day,
7   always. I couldn't understand why he was working
8   there.
9     Q  Is it your testimony that he would normally
10  curse at Mr. Park every day?
11    A  Mostly, yes.
12    Q  And how often would he curse at Mr. Kang?
13        MR. BATTENFELD: And I'll object to the
14  question as being leading and as misstating the
15  witness' testimony which I understood to be that he
16  did not call Mr. Kang curse words.
17  BY MR. GREY:
18    Q  Do you understand the question?
19    A  I don't believe that he cursed at Mr. Kang,
20  but, however, I observed that he threw objects at
21  Mr. Kang.
22    Q  Are you defining curse to be simply asshole
23  and son of a bitch, those two words?
24        MR. BATTENFELD: And I'll object to the
25  question as being leading.

Page 57

1   BY MR. GREY:
2     Q  You can answer.
3     A  He used both son of a bitch and asshole.
4     Q  Okay. When you refer to cursing, are you
5   referring to the words stupid and jerk as well?
6     A  He does both.
7     Q  Did you ever hear Tae Jin Yoon call
8   Mr. Kang stupid or call him a jerk?
9     A  Yes.
10    Q  Okay. And is this something you would hear
11  on a daily basis?
12        MR. BATTENFELD: And I'll object to the
13  question as being leading and ambiguous.
14        THE WITNESS: Very clear the recollection I
15  have, one occasion he did that to Mr. Kang.
16  BY MR. GREY:
17    Q  Did you ever observe Mr. Yoon grab either
18  Mr. Park or Mr. Kang in any manner?
19        MR. BATTENFELD: I'll object to the
20  question as being leading, argumentative and
21  ambiguous.
22        THE WITNESS: No, I have not.
23  BY MR. GREY:
24    Q  Did you ever observe Mr. Park or Mr. Kang
25  or -- strike that.

Kang v. U. Lim America                          Multi-Page™
Teddy Baek

---

Page 58

1　　　　Did you ever observe Mr. Yoon grab Mr. Park
2　or Mr. Kang by the ear?
3　　　　THE INTERPRETER:  By the ear?
4　　　　MR. GREY:  By the ear.
5　　　　MR. BATTENFELD:  I'll object to the
6　question as being leading, ambiguous and that the
7　question has been asked and answered.
8　　　　THE WITNESS:  Yes, I did.
9　BY MR. GREY:
10　　Q　How many times did you observe Mr. Park
11　being grabbed by the ear?
12　　A　Many times.
13　　Q　And how many times did you observe Mr. Kang
14　being grabbed by the ear?
15　　A　I think Mr. Kang's ear got grabbed by
16　Mr. Yoon quite frequently, so I can say more than ten
17　times.
18　　Q　And when you observed this, how would it
19　occur?
20　　A　He didn't do that to me, but whenever I
21　observed that, I felt that he tried to show off his
22　power.  "I have power on you."  Or he had to act like
23　he was quite an arrogant showman, like I have power
24　over you in that manner.  It's --
25　　　　THE REPORTER:  I'm sorry.  It's what?

---

Page 59

1　　　　THE INTERPRETER:  "I felt that it was an
2　over action."
3　　　　It was not my translation.
4　BY MR. GREY:
5　　Q　Did you ever observe an occasion when
6　Mr. Kang was ordered by Tae Jin Yoon to grab his own
7　ears?
8　　A　Yes, I did.
9　　　　MR. BATTENFELD:  I'll object to the
10　question as being leading and argumentative.
11　BY MR. GREY:
12　　Q　And what did you observe?
13　　A　Can I explain what I saw?
14　　　　MR. GREY:  For the record he is --
15　　　　THE WITNESS (without interpreter):  No.  He
16　talking to Soo.
17　　　　MR. GREY:  Okay.  For the record, the
18　deponent is grabbing both of his ears with his hands.
19　　　　THE WITNESS:  And he told him, "Grab your
20　two ears and sit down in that way and sing."
21　BY MR. GREY:
22　　Q　And what do you mean by sit down?
23　　A　Sit like this and jumping up and down.  And
24　at the same time jump up and down and sing a song.
25　　Q　Do you know why Tae Jin Yoon told Mr. Kang

---

Page 60

1　to do this?
2　　　　MR. BATTENFELD:  I'll object to the
3　question as being leading and calling for speculation.
4　　　　THE WITNESS:  I saw him exercising his
5　power on him.  And then also the behavior -- like the
6　acting he demanded him to do was more like the
7　kindergarten-like play in Korea.  So him demanding
8　this grown man to do that kindergarten acting, I felt
9　that he was insulting a grown man.  And then also I
10　saw him clearly that he was enjoying by watching the
11　acting in front of him.
12　　　　MR. BATTENFELD:  I'll move to strike the
13　answer as being nonresponsive to the question.
14　BY MR. GREY:
15　　Q　Did you ever go on any trips with Tae Jin
16　Yoon or any of the other managers of U. Lim while you
17　were employed at U. Lim?
18　　A　When you say trip, what trips are you
19　talking?
20　　Q　Either work-related trips outside --
21　　A　Like a bar or strip bar, that's not a trip,
22　right, that one?
23　　Q　Let me clarify.  I'm not referring now to a
24　simple evening out to the strip bar or poker, but
25　trips which would be extended more than one evening.

---

Page 61

1　　A　Yes, we did a ski trip like one night, two
2　days.
3　　Q　And where was this trip to?
4　　A　Big Bear, Snow Summit.
5　　Q　Was this a trip that only the Korean
6　managers were invited to?
7　　　　MR. BATTENFELD:  I'll object to the
8　question as being leading.
9　　　　THE WITNESS:  Yes.  Managers and the
10　families.
11　BY MR. GREY:
12　　Q　Were any Mexican employees of U. Lim
13　invited on this trip?
14　　A　No.
15　　Q　You indicated that the families were
16　invited -- of those Korean managers who were invited,
17　the families were invited as well?
18　　A　It's correct.
19　　Q　Did the managers stay in the same place as
20　the family members at Big Bear?
21　　A　Yes, we did.  One cabin, and we stayed
22　together.  I'm sorry.  We rented two cabins.  The
23　unmarried people stayed in one separate cabin, married
24　people stayed in one cabin.
25　　Q　Which cabin were you in?

---

Page 62

1    A  Married cabin.
2    Q  And where did you ski?
3    A  Snow Summit.
4    Q  Did you and all the family members ski
5  together?
6    A  First years we did.
7    Q  The first what?
8    A  Yes, we did together.
9    Q  Was there ever a time when the managers
10  were separated from the family?
11    A  I went with my wife. No. I was not
12  separated. But others, yes, they did.
13    Q  Why were the others separated?
14    A  The first reason was there were beginner
15  skiers and there was children. Because of children,
16  we could not go to the higher area ski place. After
17  lunch they were separated. We had lunch. Tae Jin
18  Yoon saw three Korean girls. Tae Jin Yoon said he
19  liked those girls. He told us that we should follow
20  those girls because -- when they were going up to the
21  slope, he told us, "Let's leave our wives down here
22  and let's go to with those girls."
23       That's why we were separated.
24    Q  Did you go with Tae Jin Yoon to meet those
25  girls?

Page 63

1    A  No. No. I went up there, but I did with
2  my wife.
3    Q  And had Tae Jin Yoon told you to leave your
4  wife below?
5    A  Yes, he did.
6       MR. BATTENFELD: Object to the question --
7  object to the question as leading.
8  BY MR. GREY:
9    Q  Was Tae Jin Yoon upset at you in any way
10  for not leaving your wife?
11       MR. BATTENFELD: I'll object to the
12  question as leading.
13       THE WITNESS: Yes, he was upset.
14  BY MR. GREY:
15    Q  How did he express that he was upset?
16    A  As I stated earlier repeatedly, that he
17  didn't curse at me. However, the only one way he did
18  express his anger at me was when he was upset, he
19  didn't talk to me.
20    Q  Did he stop talking to you after you
21  indicated you were going to bring your wife along?
22    A  He didn't talk to me.
23    Q  When you got back to U. Lim after the trip,
24  was Mr. Yoon still upset at you?
25       MR. BATTENFELD: I'll object to the

Page 64

1  question as being leading and argumentative.
2       THE WITNESS: Yes. The first day when we
3  came back.
4  BY MR. GREY:
5    Q  Did he say anything to you that day about
6  the trip?
7    A  Yes, he did.
8    Q  What did he say?
9    A  He said, "What kind company is this? The
10  manager who is on bottom line did not obey me, and the
11  bottom of the line manager did things as he wishes to
12  do."
13    Q  Do you recall him threatening you in any
14  way as a result of this perceived disobedience?
15       MR. BATTENFELD: Object to the question as
16  being leading and argumentative.
17       THE WITNESS: When you say threatening,
18  would you define what it is?
19  BY MR. GREY:
20    Q  Threatening you in any way, whether it
21  related to your work, physically or anything that you
22  took as a threat to your well-being or your
23  employment.
24    A  Not physically I was threatened, but he
25  stated that, "If you want to do that, go ahead and

Page 65

1  quit the work."
2    Q  When he told you you should quit, did this
3  upset you in any way?
4       MR. BATTENFELD: Object to the question as
5  leading.
6       THE WITNESS: Yes, very much so.
7  BY MR. GREY:
8    Q  Why did it upset you?
9    A  I felt that I was insulted. I felt that I
10  was treated like a sub human being, not exactly like
11  human like, and I felt that there was no hope to stay
12  in the company, that there is no vision at all.
13    Q  Did this cause you to quit?
14    A  Yes.
15       MR. BATTENFELD: I'll object to the
16  question as being leading.
17  BY MR. GREY:
18    Q  Did you quit your employment at U. Lim?
19    A  Yes.
20    Q  What were your reasons for quitting your
21  employment at U. Lim?
22    A  First reason is -- first I left home about
23  6:00 o'clock. I had to wake about at least
24  6:00 o'clock in the morning to leave the house
25  7:00 o'clock. No. To go to work at 7:00 o'clock.

Page 62 - Page 65

**Page 66**

1   And I stayed until about usually 9:00 o'clock. I felt
2   that I was abandoning my own family.
3          I worked very hard all day there. For the
4   price, I was insulted. And then also I got scared
5   when I was thinking about I want to be in the place
6   like Kang, Cho, Park, Ko if I stayed here longer.
7   Like, for instance, like the insulting them, abusing
8   them in that way. In future I would be exactly like
9   the place -- I would be placed like those people. So
10  there was no future. My wife objected.
11         In addition to that, I started having some
12  physical problems.
13     Q   What sort of physical problems were you
14  having?
15     A   I had -- I didn't consume any food, but I
16  had full stomach like with gas, and I started to have
17  diarrhea, and I didn't have even to go see doctor.
18     Q   Did you ever see a doctor for these
19  problems?
20     A   Yes. I went to see doctors continuously as
21  soon as I quit the job.
22     Q   Did they ever tell you what they thought
23  the cause of this problem was?
24     A   Close stitching [sic]. If I explain that
25  what the symptoms I had was if you have the stomach,

**Page 67**

1   like the small intestine and large one, then the small
2   intestine was starting rot.
3      Q   Did you have an operation for this?
4      A   Yes. I had surgery.
5      Q   Did the doctor tell you what caused this
6   problem?
7      A   The name of the symptom is not that known
8   to public. That was closed stitching [sic], which was
9   the way I was told by the doctor.
10         THE REPORTER: I don't understand.
11         MR. BATTENFELD: Crone's disease?
12         THE WITNESS (without interpreter): Yeah.
13         (Discussion off the record)
14         THE WITNESS: My doctor stated to me that
15  that symptom was caused by whether genetic or stress.
16  I have evidences, such as doctors visit, reports,
17  surgery record, which it would show that that was
18  right after quitting the job, and the surgery required
19  about five stitches, five places, and I feel that that
20  was due to the stress I had.
21  BY MR. GREY:
22     Q   Did you find working at U. Lim stressful?
23         MR. BATTENFELD: Object to the question as
24  being leading.
25         THE WITNESS: Yes.

**Page 68**

1   BY MR. GREY:
2      Q   How stressful did you find the work at
3   U. Lim?
4          MR. BATTENFELD: Objection. Leading.
5          (Interruption)
6          (Question read)
7          MR. BATTENFELD: The same objection.
8          THE WITNESS: If you look at Mr. Park and
9   Mr. Cho and Mr. Kang, they were working as if they're
10  not exactly human being. They were working like
11  robot.
12  BY MR. GREY:
13     Q   Robots?
14     A   Robot or military, special military, and
15  6:00 to 9:00 daily. Think about it. If you cannot --
16  can you imagine that? I didn't think I should do
17  that.
18     Q   How would you describe the way Tae Jin Yoon
19  treated his managers, his Korean managers?
20         MR. BATTENFELD: Object to the question as
21  being leading, ambiguous, overbroad.
22         THE WITNESS: The state of the behaviors of
23  Mr. Yoon still confuses me. He has two -- totally two
24  different sides. When you go into the company, it's
25  not a company. It's more like his kingdom. It's a

**Page 69**

1   special military camp. The thing got confused me is
2   he kicks, he abuses, he curse at these people, yet
3   after work he wants to be with them doing some social
4   activities. And then especially he brought Mr. Cho
5   from Denver. They said they knew each other.
6          Another thing is he grew up together with
7   Mr. Ko and Mr. Park. They are friends. How could a
8   person treat them in totally two different ways?
9   Therefore, when you think about it still, it just --
10  emotionally it confuses me. How could you do that?
11  BY MR. GREY:
12     Q   Where did you start working after U. Lim?
13     A   Travel Land. It's a travel agency.
14     Q   Who did you interview with for that job?
15     A   The owner name is Kimberly.
16     Q   Do you have any knowledge of Tae Jin
17  speaking with Kimberly prior to getting that job?
18         MR. BATTENFELD: I'll object to the
19  question as being leading.
20         THE WITNESS: Yes.
21  BY MR. GREY:
22     Q   And what is your knowledge of any
23  conversations Tae Jin Yoon had with Kimberly?
24         THE INTERPRETER: Kimberly, you said?
25         MR. GREY: Kimberly.

Page 70

```
1        THE WITNESS: He told her to not hire me.
2  BY MR. GREY:
3      Q  Despite this fact you were in fact hired by
4  Kimberly, correct?
5      A  Yes.
6      Q  I may have covered this, but did you
7  observe Tae Jin Yoon kick Soo Kang at any time?
8      A  Yes, I did.
9        MR. GREY: Why don't we go off the record
10 for a second.
11       (Discussion off the record)
12
13            * * *
14
15       (LUNCHEON RECESS)
16
17            * * *
18
19       MR. BATTENFELD: Mr. Baek --
20       THE WITNESS (without interpreter): Baek,
21 yeah.
22       MR. BATTENFELD: Have you been able to
23 understand the questions that you've been asked so far
24 in the deposition, generally speaking?  In other
25 words, in English?
```

Page 71

```
1        THE INTERPRETER: Do you want me to
2  translate this?
3        MR. BATTENFELD: No, not at this point.
4        THE WITNESS (without interpreter): Okay.
5        MR. GREY: Well, I think you have to
6  translate it as we start off, the Korean interpreter.
7  She has to at least tell him the question in English,
8  and he can answer you.
9        So you have to translate.
10       THE WITNESS (without interpreter): Mostly.
11       MR. BATTENFELD: What I'd like to propose
12 to you, because I've listened to your English
13 including when you were conducting business on the
14 phone in English -- what I'd like to propose is that
15 we conduct this deposition in English; that if at any
16 point I ask a question that you feel you don't
17 understand, that at that point you let me know and ask
18 the interpreter for assistance.  Or similarly if
19 you're not able to answer the question in English, if
20 you're unsure of what the proper words should be, to
21 also ask for the interpreter's assistance.
22       It strikes me from my observation of you
23 that you would be able to conduct a good portion of
24 the deposition in terms of responding to my questions
25 in English, and that way we'll try to move this along
```

Page 72

```
1  faster.
2        Are you comfortable with attempting that?
3        (Gesturing to interpreter)  Translate.
4        MR. GREY: Let me add this.  You should
5  only agree to that if you are comfortable, okay,
6  listening to his questions in English and answering in
7  English.
8        THE WITNESS (without interpreter): This is
9  not comfortable or uncomfortable.  I want to correct
10 answer.  I don't want to miss anything.  I don't want
11 to make lying or if not I answer to not correct
12 answer.  I don't want to.
13       MR. GREY: Do you feel that you need the
14 interpreter?
15       THE WITNESS (without interpreter): Yes,
16 please.
17       MR. GREY: Okay.
18       THE WITNESS (without interpreter): That's
19 better.  I know also I don't want to spend more time
20 here.
21       MR. BATTENFELD: It will take more time.  I
22 sense that you don't need the interpreter except for
23 perhaps on occasion there may be a phrase --
24       THE WITNESS (without interpreter): More
25 important is another person need a correct answer.  So
```

Page 73

```
1  I want to do it that way.
2        MR. GREY: Okay.
3        MR. BATTENFELD: Recognizing that's going
4  to take longer.
5
6            EXAMINATION
7  BY MR. BATTENFELD:
8      Q  Mr. Baek, how long have you lived in the
9  United States?
10     A  About seven years.
11     Q  What year did you arrive in the United
12 States?
13     A  I not wish to disclose my personal
14 information if the question doesn't have any relevance
15 with the lawsuit, with all this going on here.
16       MR. GREY: Okay.
17 BY MR. BATTENFELD:
18     Q  Well, you're here to testify under oath.
19 I'm entitled to ask some background questions about
20 you including when you came to the United States, and
21 there's no reason, legitimate reason, for you to not
22 answer that question.  So I'm entitled to an answer.
23       And just to let you know the process, if
24 you refuse to answer a question, I can go to the court
25 and seek an order compelling you to answer the
```

Page 70 - Page 73

Kang v. U. Lim America
Teddy Baek

Multi-Page™

**Page 74**

1   question. If the court agrees with me and orders you
2   to answer a question, I may be able to recover, in
3   addition to having an order that you will be required
4   to answer the question, recover from you personally my
5   attorney's fees in having to make such a motion.
6        I would like to avoid that process and,
7   therefore, I'll ask you again.
8        What year did you first come to the United
9   States?
10       MR. GREY: And I'll just object to the
11  question as not reasonably calculated to lead to the
12  discovery of admissible evidence.
13       THE WITNESS: I'd like to disclose an
14  answer for the questions which have direct
15  relationship or involvement with U. Lim. If you like
16  to have my personal questions which do not have
17  anything to do with that employment I had, I think I
18  don't mind that you go to the court to get approval
19  from the judge that you can ask me then.
20  BY MR. BATTENFELD:
21       Q   You have to understand that as part of the
22  process, I am entitled to inquire into your background
23  as part of the discovery process. In other words, I'm
24  not limited to only asking you questions about U. Lim
25  specifically if there are questions that may be

**Page 75**

1   calculated to lead to the discovery of admissible
2   evidence in this case, and general background
3   questions, similar to the ones that I asked Mr. Kang
4   at his deposition and similar to the ones that I'm
5   sure Mr. Grey will ask when he takes some other
6   depositions in this case, are entirely appropriate.
7        So I'm going to give you another chance to
8   answer this question and similar questions of this
9   nature. And I will tell you if you don't, I will go
10  to court and I will seek an order, and I will seek my
11  costs from you, and I will collect those costs.
12       THE WITNESS (without interpreter): From
13  me?
14       MR. BATTENFELD: Yes.
15       THE WITNESS (without interpreter): You
16  collect me?
17       MR. BATTENFELD: If I get an order from the
18  court compelling you to answer questions you have
19  refused to answer without a legitimate reason, I will
20  be entitled to ask for my costs as a penalty against
21  you, not Mr. Kang, not Mr. Grey. You.
22       THE WITNESS (without interpreter): Okay.
23  That's my question, Gary [sic]. That's me personally?
24  Personally I have to pay -- owe him?
25       MR. GREY: What is the question?

**Page 76**

1        THE WITNESS (without interpreter): He say
2   penalty I do not answer.
3        MR. GREY: It is possible that if the court
4   views --
5        THE WITNESS (without interpreter): Let me
6   know.
7        MR. GREY: It's possible that if the court
8   views that you unreasonably refuse to testify while
9   under subpoena, the court could order your testimony,
10  compel your testimony.
11       THE WITNESS (without interpreter): Okay.
12       MR. GREY: And it is possible that the
13  court could award sanctions relative to the costs that
14  were incurred because of your failure to testify.
15       Why don't we, just to avoid --
16       THE WITNESS (without interpreter): Okay.
17       I don't know exactly when I came to the
18  United States. I don't know exactly.
19  BY MR. BATTENFELD:
20       Q   Approximately.
21       A   (Without interpreter) I think '92 or '93.
22  I'm sorry. '91 or '92. I'm sorry. Because I was
23  married '93. Confused a little bit.
24       Q   And are you a U.S. citizen?
25       A   (Without interpreter) Yes, sir.

**Page 77**

1        Q   When did you become a U.S. citizen?
2        A   (Without interpreter) I got last year
3   April.
4        THE REPORTER: Off the record, please.
5        (Discussion off the record)
6   BY MR. BATTENFELD:
7        Q   So you became a U.S. citizen last year?
8        A   Yes.
9        Q   And at the time you were hired by U. Lim,
10  were you performing some other job at that time?
11       MR. GREY: Object to the question as vague
12  and ambiguous.
13       THE WITNESS: No, I did not.
14  BY MR. BATTENFELD:
15       Q   Had you had any sort of employment in the
16  United States before you were hired by U. Lim?
17       A   Yes, I have.
18       Q   What job or jobs had you had in the United
19  States before you were hired by U. Lim?
20       A   Should I disclose that too?
21       MR. GREY: I can't advise you to give your
22  testimony or not give your testimony. He's entitled
23  to reasonably investigate basic background information
24  as a general rule.
25       THE WITNESS: U-N-I Hosiery.

VERBATIM REPORTING SERVICE (619) 232-3376

## Page 78

1   H-o-s-i-e-r-y. I worked there two years.
2         MR. GREY: Let me interject here. Do you
3   have any concerns about this information that you're
4   giving being used in some inappropriate fashion not
5   connected with this litigation?
6         THE WITNESS: I feel that I have certain
7   rights of my privacy, and I feel that I am here as
8   witness for U. Lim case. Therefore, I like to have
9   some respect for my privacy. That's all.
10        MR. GREY: I would just inform you that as
11  a general matter then he's entitled to some basic
12  background information.
13  BY MR. BATTENFELD:
14     Q   So you worked for Uni Hosiery for
15  approximately two years before you were hired by
16  U. Lim; is that correct?
17     A   Yes.
18     Q   And what position or positions did you hold
19  with Uni Hosiery?
20     A   Sales.
21     Q   Did you have any other jobs in the United
22  States before you started working for U. Lim?
23     A   Let me think about it. No, I don't think
24  so.
25     Q   Did you have any formal education in the

## Page 79

1   United States or was all of your education in Korea?
2      A   Yes. I went to -- mostly my education in
3   Korea, but, however, in this country I went to
4   language school.
5      Q   And where did you go to language school?
6      A   I do not recall the exact name of the
7   school. However, it used to be located in Orange
8   County. I believe that it's not there any longer.
9      Q   Was this a college of some sort --
10     A   It's correct.
11     Q   And what course work did you take at this
12  language school?
13     A   I didn't think that I was studying really.
14  I just went to school.
15     Q   Did you take courses at this school?
16     A   It was not a semester so much as quarter
17  system, such as three months at a time, so and so. It
18  was not that even though if you finish the courses,
19  you don't get any degree or credit.
20     Q   But the question I'm asking is what courses
21  did you take at this school.
22     A   Conversation.
23     Q   In English?
24     A   Yes.
25     Q   Did you graduate from the equivalent of

## Page 80

1   high school in Korea?
2      A   Yes.
3      Q   And do you remember what year that was?
4      A   '85.
5      Q   What is your date of birth?
6      A   May 12, 1967.
7      Q   Did you attend any college in Korea?
8      A   Yes.
9      Q   What college or colleges?
10        THE INTERPRETER: I have to ask a name.
11  There is one word that it's named and also what sort
12  of college, which I am verifying with him. What do
13  they use in English which -- I don't want to
14  mistranslate the word.
15        An Yang, A-n, one space -- no. A-n, one
16  space, Y-a-n-g, Mechanical University.
17  BY MR. BATTENFELD:
18     Q   And where is that located?
19     A   City of An Yang, A-n, one space, Y-a-n-g.
20     Q   And how many years did you attend that
21  school?
22     A   Two years. Yes.
23     Q   Did you have any -- get any sort of degree
24  from that school?
25     A   Yes. You could say when you complete two

## Page 81

1   years, you get a degree. That is my degree.
2      Q   And what did you get a degree in? Any
3   particular area?
4      A   Electronic telecommunication degree.
5      Q   Now, you say you were married in 1993; is
6   that correct?
7      A   Yes. '93.
8      Q   And is the woman you married in 1993 -- is
9   she still your wife?
10     A   Yes.
11     Q   And what is her name?
12     A   I do not wish to involve my wife here.
13        MR. GREY: I'll just object to not
14  reasonably calculated to lead to the discovery of
15  admissible evidence.
16  BY MR. BATTENFELD:
17     Q   Let me ask you this question. Were you
18  living with your wife during the period of time that
19  you worked for U. Lim?
20     A   Yes.
21     Q   Okay. That makes it relevant. So what is
22  your wife's name?
23     A   Gloria Baek, last name.
24     Q   Same as your name? Same as your last name?
25     A   Yes.

Kang v. U. Lim America                    Multi-Page™
Teddy Back

---

Page 82

1    Q  And she lives at the same home address that
2  you live at?
3    A  Yes.
4    Q  And does she work?
5    A  Yes.
6    Q  Where does she work?
7    A  Intek Technology, I-n-t-e-k Technology.
8        MR. GREY: I'm going to object to not
9  reasonably calculated to lead to the discovery of
10  admissible evidence.
11  BY MR. BATTENFELD:
12    Q  Intek Technology?
13    A  Yes.
14    Q  And where is that located?
15    A  Fashion Valley. I don't know official
16  address of the place.
17    Q  During the period that you worked for
18  U. Lim, was anyone else living with you besides your
19  wife?
20    A  No.
21    Q  Mr. Baek, have you ever been convicted of a
22  crime?
23        MR. GREY: I'm going to object to not
24  reasonably calculated to lead to the discovery of
25  admissible evidence. Crime's overbroad.

---

Page 83

1        THE WITNESS: Yes, I have.
2  BY MR. BATTENFELD:
3    Q  What crime or crimes have you been
4  convicted of?
5    A  Traffic school.
6    Q  Some sort of traffic offense?
7    A  Yes.
8    Q  Anything else?
9    A  No.
10    Q  Was the traffic offense a felony, if you
11  know?
12        MR. GREY: Same objection.
13        THE WITNESS: Just a regular ticket.
14  BY MR. BATTENFELD:
15    Q  Okay. So it wasn't driving under the
16  influence or anything like that?
17    A  No.
18    Q  Now, before your deposition today -- and
19  I'm asking you specifically about today -- did you
20  meet or talk with Mr. Kang?
21    A  Yes.
22    Q  And where did that meeting take place?
23    A  Gary office.
24        MR. GREY: Grey.
25        THE WITNESS: Grey. I'm sorry.

---

Page 84

1  BY MR. BATTENFELD:
2    Q  And was that this morning?
3    A  When I went to there that was a new office
4  that he was. The office I think was -- used to be
5  UTC. That is the office I saw him.
6    Q  So you met at Mr. Grey's office?
7    A  Yes.
8    Q  And how long did you meet this morning at
9  Mr. Grey's office?
10    A  I was there from 8:30 to 9:30.
11    Q  And who did you meet with?
12    A  Mr. Kang and the attorney.
13    Q  And before yesterday when was the last time
14  you had spoken to either Mr. Kang or Mr. Grey?
15  Before -- I'm sorry. Before this morning.
16        MR. GREY: I'm going to just object to the
17  question as vague and ambiguous as to Mr. Grey because
18  he may be confused about speaking to me personally or
19  speaking to my office, like such as my secretary.
20  BY MR. BATTENFELD:
21    Q  My question is specifically referring to
22  Mr. Grey or Mr. Kang.
23    A  The time when I had this information, that
24  is the day, first day, I saw him, and that was the
25  last time I saw him until this morning.

---

Page 85

1        Mr. Kang -- I saw him in a Chinese
2  restaurant once. It was a coincidence bumping into
3  him. We did not talk anything about this. I was
4  leaving the restaurant. He was coming into the
5  restaurant. He called me yesterday, and he asked me
6  about today's -- like I supposed to come.
7    Q  So you had a meeting in connection with
8  your statement before; is that correct?
9    A  I was informed about -- it's not like
10  specific information, just general I would be asked
11  about this sort of questions and also was asked that
12  this is your signature, therefore, would you review
13  this document to find out whether the information here
14  is correct or not.
15    Q  Between the meeting that you had to look at
16  and/or sign your statement and the meeting you had
17  this morning, had you had any phone conversations
18  specifically with Mr. Grey?
19    A  I have not spoken with Mr. Grey, but,
20  however -- I don't know how many times, but I spoke a
21  couple times with Mr. Grey's secretary.
22    Q  I was asking specifically about Mr. Grey.
23  So if I understand correctly, you had no conversations
24  with Mr. Grey between the time that you signed the
25  statement and this morning; is that correct?

---

**VERBATIM REPORTING SERVICE** (619) 232-3376

Page 86

1   A  It's correct.
2       THE INTERPRETER: Would you just --
3   (Interruption)
4   (Exhibit No. 1 marked)
5   BY MR. BATTENFELD:
6   Q  Mr. Baek, I've marked as Exhibit 1 to your
7   deposition a document entitled Declaration of
8   Teddy Baek, four-page document dated 7/20/98. I just
9   want to confirm that when you were answering questions
10  this morning and to the extent we've talked about that
11  document today, that that's the document that you've
12  been referring to; is that correct?
13  A  It's correct.
14  Q  Now, between the time that you signed the
15  declaration that's been marked as Exhibit 1 and the
16  meeting you had this morning, did you have any
17  telephone conversations or written communications with
18  Mr. Kang? Or I guess I need to include E mail
19  communications.
20  A  Yes.
21  Q  And what has been the nature of the
22  communications that you've had? Have they all been by
23  telephone? Have some of them been face to face, some
24  by E mail, by letter?
25  A  There was no occasion that I did E mail.

Page 87

1   It was a telephonic conversation. Because of my
2   business, I don't have much time. Very hard for me to
3   get away from my business. Therefore, he expressed
4   that I have to be here as witness. So more like
5   talking back and forth about my schedule.
6   Q  How many telephone conversations have you
7   had with Mr. Kang between the time you signed your
8   statement and the meeting you had this morning?
9   A  I think about three telephone calls with
10  Mr. Grey secretary regarding scheduling, which it
11  didn't work out because there was too much conflict of
12  scheduling.
13  Q  Okay. I'm going to -- let me interrupt you
14  because I think the answer is not responsive. I was
15  asking about how many communications with Mr. Baek
16  had -- telephone conversations Mr. Baek had with
17  Mr. Kang between the time he signed his declaration
18  and --
19      THE INTERPRETER: He responded already,
20  which you didn't give me enough chance to translate
21  that. I didn't finish my translation what he said.
22  So should I finish?
23      MR. GREY: Why don't you finish the
24  translation.
25      THE INTERPRETER: Let me finish.

Page 88

1       Then so it didn't work out. So Mr. Kang
2   called me about three times and then to somehow try to
3   work out the schedule. So we talked about that. And
4   then this morning he called me. He said -- or I
5   called him being late, little late. That's all.
6   BY MR. BATTENFELD:
7   Q  During any of the conversations you had
8   with Mr. Kang prior to this morning and after the time
9   that you signed your declaration, did you talk about
10  either your experiences at U. Lim or Mr. Kang's
11  experiences at U. Lim?
12  A  No.
13  Q  During any of those conversations did
14  Mr. Kang talk to you about his lawsuit against U. Lim
15  and Mr. Yoon?
16      MR. GREY: I'm going to object to --
17      THE WITNESS: I stated to you that I didn't
18  talk about anything else.
19      MR. GREY: I'm just going to object to the
20  question as vague and ambiguous to the extent he's
21  referring to litigation. It could be interpreted as
22  referring to scheduling, which he's already testified
23  to.
24  BY MR. BATTENFELD:
25  Q  Do you understand that Mr. Kang has a

Page 89

1   lawsuit that he has filed against U. Lim and Mr. Yoon?
2   A  Before I met Mr. Grey in his office, I had
3   telephone call from Mr. Kang, and he stated that he
4   was going to file a lawsuit against U. Lim. And also
5   he state that, "I like to meet you," which I didn't
6   have time so we were not able to meet. However, he
7   only stated to me that he still wanted to have the
8   information about my experience at U. Lim.
9   Q  Do you have any understanding as to the
10  type of claim or claims that Mr. Kang is bringing
11  against U. Lim and Mr. Yoon?
12      MR. GREY: I'm going to just object to the
13  use of the term claim as vague and ambiguous and
14  requires legal expertise.
15      THE WITNESS: Even -- no. Even at this
16  moment I do not know.
17  BY MR. BATTENFELD:
18  Q  Has anyone ever told you that Mr. Kang is
19  claiming that he was discriminated against when he
20  worked for U. Lim?
21  A  Are you saying after he filed lawsuit or
22  what are you saying, that is the content of the
23  lawsuit?
24  Q  I'm asking you if you've ever been informed
25  by anyone that that's at least one of the claims that

Kang v. U. Lim America
Teddy Back

Multi-Page™

Page 90

```
1   Mr. Kang is bringing against U. Lim.
2         MR. GREY:  Same objection.
3         THE WITNESS:  No.
4   BY MR. BATTENFELD:
5      Q  When Mr. Kang worked for U. Lim, did he
6   ever say to you or say in your presence that he
7   believed he was being discriminated against by U. Lim
8   or Mr. Yoon?
9      A  There was no time that I have a
10  communication with anybody to do with U. Lim or there
11  was no time that I conversed about U. Lim.
12        When I was leaving U. Lim, actually I was
13  very disappointed about the people in U. Lim,
14  including Mr. Kang.  Mr. Kang was my boss, but I felt
15  with that kind of circumstance with the situation, he
16  even did not or was not able to protect me, somebody
17  who works for the company under him.
18        MR. BATTENFELD:  Let me ask my question
19  again, and if we need to have the court reporter read
20  it back and have it retranslated -- I'd like to ask my
21  question again and get an answer to my question.
22        So could you read my question back.  It's a
23  yes or no question.
24        (Question read)
25        THE WITNESS:  No.
```

Page 91

```
1   BY MR. BATTENFELD:
2      Q  Now, the meeting you had this morning, what
3   did you talk about?
4      A  That is also yes and no?
5      Q  No.  This is what did you talk about.
6      A  As I stated earlier, that at the meeting I
7   was asked, "Is that your signature?"  And then also
8   the content of the information would you review and
9   then also just to make for sure that is true and then
10  also correct information.  That's all.
11     Q  Did Mr. Grey ask you any other questions at
12  the meeting this morning?
13     A  No.  There was no other conversation except
14  I asked him questions such as where we will have, how
15  long it will take because of my tight schedule.
16     Q  Did Mr. Kang ask you any questions at the
17  meeting this morning?
18     A  Yes.  Let me think about it.  I don't think
19  so.  I don't think there was any except I think -- I
20  think I was told that it would take quite time.
21        THE REPORTER:  Quite time?
22        THE INTERPRETER:  Like long time or quite.
23  BY MR. BATTENFELD:
24     Q  Did either Mr. Kang or Mr. Grey tell you
25  anything during your meeting this morning?
```

Page 92

```
1      A  No.
2      Q  Now, you say you met for about an hour; is
3   that correct?
4      A  Yes, it's correct.
5      Q  What else did you talk about during this
6   hour after you had gone over your statement?
7         MR. GREY:  Objection.  Lacks foundation and
8   misstates the witness' testimony in that there was
9   anything else that they talked about.
10        THE WITNESS:  I went there, I spend my time
11  going to bathroom and drinking coffee and I reviewed
12  this document.  That's all.
13  BY MR. BATTENFELD:
14     Q  Other than the declaration in front of you,
15  have you reviewed any other documents in preparation
16  for your deposition today?
17     A  No.
18     Q  Have you ever seen any complaint or written
19  complaint or claim made by Mr. Kang?
20        MR. GREY:  I'm just going to object to the
21  use of the term complaint insofar as it's a very
22  specific document submitted to the court, and he may
23  or may not know what that is.
24        THE WITNESS:  As I stated earlier that
25  except this document, I have not seen any other
```

Page 93

```
1   documents.  I have not met these people.
2   BY MR. BATTENFELD:
3      Q  So you haven't seen any other documents
4   either prepared by Mr. Kang or prepared by Mr. Grey?
5      A  Yes, I am certain about it.
6         MR. GREY:  I assume, Counsel, that's not
7   referring to the deposition subpoena.
8         MR. BATTENFELD:  No.  I'm not referring to
9   that.
10  BY MR. BATTENFELD:
11     Q  By yes, you mean no, you have not?
12     A  It's correct.
13     Q  Now, you said the first interview you had
14  relating your being hired by U. Lim was with Mr. Kang.
15        How did that meeting come about?
16     A  That was a very short time.  It was in a
17  conference room.  Then just about went over about my
18  experience there.  That's all.  It was a very short
19  time.
20     Q  I guess I didn't ask the question clearly
21  enough.
22        How did you come to have the meeting with
23  Mr. Kang?  How did you hear about working or become
24  aware of him?
25        THE INTERPRETER:  There are two questions?
```

**VERBATIM REPORTING SERVICE** (619) 232-3376

| Page 94 | Page 95 |
|---|---|
| 1 Would you repeat it? I have a little hard time to<br>2 translate.<br>3     MR. BATTENFELD: Yeah.<br>4 BY MR. BATTENFELD:<br>5   Q  The question is how did you come to learn<br>6 about possibility of working for U. Lim?<br>7   A  U. Lim advertised in Korean newspaper by<br>8 saying that they want to hire staff and then also in<br>9 that advertising contact Mr. Soo Cheol Kang. So I<br>10 contacted Mr. Soo Cheol Kang. And also in that<br>11 advertising it said send resume, which I contacted<br>12 him. So I was met by him.<br>13   Q  So there was an ad in the Korean newspaper?<br>14   A  Yes.<br>15   Q  And where were you living at that time?<br>16   A  Nobel Court at UTC area.<br>17   Q  And at that time did you have some sort of<br>18 a visa that allowed you to be living in the United<br>19 States?<br>20   A  Yes. I had a green card. Otherwise, I<br>21 wouldn't be able to apply for the job since the<br>22 location was in Tijuana, which requires visa to go in<br>23 there.<br>24   Q  And do you know -- do you recall what kind<br>25 of visa you had? | 1   A  No, it was not visa. I had a green card.<br>2   Q  Has Mr. Kang ever spoken to you about where<br>3 he has worked since his employment with U. Lim ended?<br>4     THE INTERPRETER: Since his employment with<br>5 U. Lim?<br>6     MR. BATTENFELD: Since his employment with<br>7 U. Lim ended.<br>8     THE WITNESS: I think earlier that I bumped<br>9 into him in a Chinese restaurant. At the time I was<br>10 holding a baby. Therefore, we actually didn't have<br>11 time at all. I was asking just, "Hi. What are you<br>12 doing?"<br>13     Then he said -- I think he was with his<br>14 brother, something like this. So just we just passed<br>15 by each other at the time. That's all we had.<br>16 BY MR. BATTENFELD:<br>17   Q  Did Mr. Kang tell you that he was working<br>18 either with or for his brother?<br>19   A  Yes.<br>20   Q  Did he tell you what type of work he was<br>21 doing?<br>22   A  No. We didn't have chance to do that.<br>23   Q  Have you ever learned from any source of<br>24 what the nature of the work is that Mr. Kang is doing<br>25 either with or for his brother? |

| Page 96 | Page 97 |
|---|---|
| 1     THE INTERPRETER: Last word I didn't hear.<br>2     MR. BATTENFELD: Either with or for his<br>3 brother.<br>4     THE WITNESS: I was not interested in Kang.<br>5 I didn't have anything to do with him so I didn't know<br>6 anything about him.<br>7 BY MR. BATTENFELD:<br>8   Q  Have you ever heard from anyone that<br>9 Mr. Kang worked for a company called Vision Printing<br>10 or Vision Imaging?<br>11   A  I think since you mentioned Vision<br>12 Printing, which I totally forgot about it -- I think I<br>13 met -- bumped into his cousin in the Korean grocery<br>14 market. When I bump into, I was asking what Mr. Kang<br>15 does. Then I think he may said that he's working for<br>16 Vision Printing.<br>17   Q  You remember the name of this cousin who<br>18 you bumped into?<br>19   A  I do not know name. I know the face.<br>20   Q  Did you ever hear from anyone why Mr. Kang<br>21 stopped working for Vision Printing?<br>22   A  No.<br>23   Q  Now, during the period of time that you<br>24 worked for U. Lim, if you could identify for me by<br>25 name all of the non-Mexican workers that you ever | 1 worked with or for while you worked for U. Lim.<br>2     MR. GREY: I'm going to object to the<br>3 question as overbroad.<br>4     THE WITNESS: Are you talking about the<br>5 Korean?<br>6 BY MR. BATTENFELD:<br>7   Q  I'm asking about anybody who worked at the<br>8 facility in Tijuana who was not Mexican.<br>9     MR. GREY: Same objection.<br>10     THE WITNESS: I remember all Koreans.<br>11 BY MR. BATTENFELD:<br>12   Q  I'm asking you the names.<br>13   A  Sales manager Hae Ho, J-a-e, H-o. Last<br>14 name is C-h-o. He was sales manager. The next one is<br>15 Suk Ho Ko, S-u-k, H-o. Last name is K-o. He was the<br>16 production manager. Mr. Park, which -- who was<br>17 quality control department. Tae Jin Yoon. That's<br>18 all.<br>19   Q  And during the period of time that you<br>20 worked for U. Lim, was Mr. Cho ever, to your<br>21 knowledge, away from the United States for any reason?<br>22 Strike that.<br>23     Let me ask you was he in Korea -- did he go<br>24 to Korea for any period of time that you worked for<br>25 U. Lim? |

Kang v. U. Lim America
Teddy Back

Multi-Page™

---

**Page 98**

1  A  Once, yes.
2  Q  And how long was Mr. Cho away from work
3  when he was in Korea?
4  A  I'm not certain. I think it was about
5  fourteen days.
6  Q  And how about Mr. Ko? Was he ever -- did
7  he ever go to Korea or was he ever in Korea?
8  A  I think at time they were together.
9  Q  Mr. Ko and Mr. Cho?
10  A  Yes, it's correct.
11  Q  So Mr. Ko was also away for approximately
12  two weeks?
13  A  Yes, it's correct.
14  Q  How about Mr. Park? Was he ever in Korea?
15  A  Yes. Mr. Kang, Mr. Park and Tae Jin Yoon
16  all -- they went together. I think when I was there
17  they went to only one trip together.
18  Q  And how long was Mr. Park away from the
19  Tijuana facility?
20  A  Mr. Park was there to get married. His
21  wedding ceremony. That's why they went there.
22  Q  And how long was Mr. Park gone from the
23  Tijuana facility?
24  A  Same time. Almost same time. And it's
25  very hard for me to remember all those.

---

**Page 99**

1  Q  Are you able to estimate how long Mr. Park
2  was away?
3  A  Yes. At the same time, on the same time
4  they went together. Mr. Park -- because it was his
5  wedding. He came a little later, but I think they
6  gone almost the same time.
7  Q  Again can you estimate for me how long
8  Mr. Park was away when he left to go to Korea?
9  MR. GREY: I'm going to object to the
10  question as nonsensical. I think you misstated. How
11  far he was away?
12  MR. BATTENFELD: How long.
13  MR. GREY: Same objection.
14  THE WITNESS: I only remember that, even
15  though I forgot about it until you mention all this.
16  I lucky that I remember that he went there to get
17  married. Besides that, if you tell me to estimate, I
18  could say that they went there during the same time,
19  came back same time. Maybe about fourteen days.
20  That's all I can say.
21  BY MR. BATTENFELD:
22  Q  Do you recall that they all left at the
23  same time, Mr. Cho -- Mr. Cho, Mr. Ko, Mr. Park,
24  Mr. Kang and Mr. Yoon?
25  A  I don't know whether when they left they

---

**Page 100**

1  told me that they were leaving.
2  Q  So you don't recall whether they all left
3  at the same time?
4  A  I wouldn't know. I knew they had a show
5  there so they went there. Maybe when they went there
6  they met there. I am not the one who give them ride
7  to airport. I didn't make reservation for their
8  ticket. So when they came back, they said they were
9  there. So I assumed that they were there during same
10  time.
11  Q  And how long do you estimate that Mr. Kang
12  was away on this trip to Korea?
13  A  I think they went there about same time.
14  Q  How long would you say that Mr. Kang was
15  away when he went on this trip, away from work in
16  Tijuana?
17  A  I don't know. In Tijuana during Christmas,
18  about 18th or 20th, the factory shuts down because
19  Christmas season. So I assume that they left during
20  that time. And then when we opened up on January 5th
21  or 6th, they all showed up. Except me, not being in
22  Korea, I felt that I was only one who didn't go to
23  Korea. So I assumed that they went there about same
24  time, they came back about same time. I didn't give
25  them ride. I don't know exactly. That is all I can

---

**Page 101**

1  say.
2  Q  Is it your recollection that this trip to
3  Korea coincided with the shutdown of the factory
4  between approximately December 20 and January 5?
5  A  Plus that reason Mr. Park went there
6  because of his wedding, and our reason was U. Lim's
7  headquarter office in Korea in In Chun. So during
8  that time I think they had a workshop. And the
9  workshop, I assume, that was there the plan for coming
10  here since like that. So that's all I know.
11  Q  Again let me ask my question. Please
12  listen to my question.
13  My question was, is it your recollection
14  that this trip to Korea happened during the period of
15  time that the Tijuana factory was shut down during the
16  Christmas season?
17  A  And that plus Mr. Parker wedding plan. So
18  he went there, and then also workshop was there. So,
19  therefore, they preplanned to go there. That's why
20  they went there during that time, I think.
21  Q  So it was during that time?
22  A  Yes.
23  Q  Did you work at the facility during this
24  period when the factory was shut down from
25  approximately December 20 to January 5?

## Page 102

1    A  No. I suppose not to work, but I worked
2  one day.
3    Q  The ski trip that you mentioned, you
4  testified this morning, did that happen before or
5  after these other individuals went to Korea?
6    A  After.
7    Q  The ski trip was after?
8    A  It's correct.
9    Q  And how many days was the ski trip?
10      MR. GREY: Objection. Asked and answered.
11      THE WITNESS: One night, two days.
12  BY MR. BATTENFELD:
13    Q  And what days of the week was it?
14    A  I don't remember.
15    Q  Was it during the week?
16    A  I do not remember.
17    Q  So it could have been Monday, could have
18  been Tuesday, could have been Wednesday?
19    A  I do not remember.
20      THE WITNESS (without interpreter): Can I
21  take break?
22      MR. GREY: Sure. Anytime you need a break,
23  say so.
24      (Recess)
25  ///

## Page 103

1  BY MR. BATTENFELD:
2    Q  Mr. Baek, during the period of time that
3  you worked for U. Lim, did you ever car pool with
4  anyone either to work or from work?
5    A  No.
6    Q  Now, other than the trip you referred to
7  that Mr. Cho, Mr. Ko, Mr. Park, Mr. Kang and Mr. Yoon
8  went on where they all were in Korea, do you recall
9  whether any of those gentlemen took any other trips to
10  Korea while you worked for U. Lim?
11    A  No, I do not remember.
12    Q  Was there an area in the factory where you
13  typically worked when you worked for U. Lim?
14    A  I didn't know where I was. I don't know
15  where I was.
16    Q  Well, did you have a work station where you
17  typically were seated during the day?
18    A  Yes. My desk.
19    Q  And where was your desk located?
20    A  We all were in one office. If you --
21  precisely I can tell you that my desk was placed in
22  front of Mr. Kang.
23    Q  When you say we all worked in one office,
24  you mean there was one office area where people
25  worked?

## Page 104

1    A  Yes. We all were in office, but at the
2  same time Mr. Yoon had his own separate office, and
3  then also outside in front of Mr. Yoon's there was a
4  production quality control area. So Mr. Park was
5  placed right in front of there. I cannot say he had
6  his own office, but in that area.
7    Q  So Mr. Park was in the same area where
8  Mr. Yoon's office was?
9    A  Not that same area but from opposite from
10  Mr. Yoon's.
11    Q  Was Mr. Yoon's office located on another
12  floor?
13    A  No. Same floor.
14    Q  So all the offices were on the same floor?
15    A  Yes.
16    Q  And Mr. Kang worked closest to you in terms
17  of where his work location was?
18    A  Yes. As I stated earlier, that I was just
19  in front of him.
20    Q  Who else worked in that general vicinity of
21  where you worked?
22    A  Mr. Jae Ho Cho and Suk Ko, Mr. Kang.
23    Q  Now, you testified that you started to work
24  for U. Lim on approximately October 20; is that
25  correct?

## Page 105

1    A  Yes.
2    Q  And you continued to work until
3  approximately middle of January?
4    A  Yes.
5    Q  How long was it between the time of the ski
6  trip and the time that you quit?
7    A  Three months.
8      MR. GREY: Do you understand the question?
9      THE WITNESS: Yes.
10      MR. GREY: You only worked three months,
11  correct?
12      THE WITNESS: Yes.
13  BY MR. BATTENFELD:
14    Q  So the ski trip was at the beginning of
15  your employment?
16    A  What I stated was they went to Korea. As
17  soon as they came back, we had a ski trip, and after
18  we had a ski trip, the next day I quit the job.
19    Q  What did you mean when you said it was
20  three months between the ski trip and the time you
21  quit?
22    A  I thought you were asking how long you
23  worked, so I said three months, and then after -- then
24  when it was, which I understood that way. So,
25  therefore, I said after ski trip. I went to ski trip.

Page 102 - Page 105

Kang v. U. Lim America
Teddy Back

Page 106

1  I worked. That's why I said that.
2      Q   So you quit the day after the ski trip?
3      A   If we came back or went to ski trip on
4  Saturday, I know we didn't open on Sunday in our
5  office. So, therefore, if it was a Monday -- I don't
6  know exactly when I quit the job, which means when I
7  came back, the first day I went back to work I quit
8  the job.
9      Q   The first day you went to work after the
10 ski trip?
11     A   Yes. As I like to state that again. I
12 didn't know the day we came back was Saturday, Sunday.
13 I don't know.
14     Q   Is it your recollection that you quit on a
15 Monday?
16     MR. GREY: I'm going to object. Misstates
17 his testimony. He indicated he doesn't know whether
18 or not -- what day the ski trip was so he doesn't know
19 which day he quit.
20     THE WITNESS: I don't remember. Maybe the
21 day when we went was a Sunday or the next day was
22 Sunday or holiday. I don't remember.
23     MR. GREY: Is it correct to say that the
24 first business day after the ski trip you quit?
25     THE WITNESS (without interpreter): Yes.

Page 107

1  BY MR. BATTENFELD:
2      Q   Now, you testified that there were some
3  times during the week, that is, Monday through Friday,
4  that you left at about 5:15 or 5:30; is that correct?
5      A   Yes.
6      Q   Can you estimate how many times during your
7  employment with U. Lim on a Monday, Tuesday,
8  Wednesday, Thursday or Friday you left work at
9  approximately 5:15 or 5:30?
10     A   I certainly remember that December, no. I
11 didn't even do that. I was not able to do that, not
12 one day. November, yes. Yes, I was able to do that.
13 I do not remember exactly how many times. If you tell
14 me I have to estimate, could be about ten times.
15     Q   And how about during the period of time
16 from October 20 until November 1? During that period
17 how many times did you leave work around 5:15 or 5:30
18 during the week?
19     A   I say during that time I think I left work
20 about 5:30. I didn't even plan to stay longer. I
21 thought I couldn't do that. When it's 5:30, I just
22 said I'm going home. I could have maybe said ten
23 times. That is included the period that I just told
24 you.
25     Q   Just so your testimony is clear, during the

Page 108

1  period that you worked in October, which was
2  approximately October 20 until the end of October,
3  your testimony is that during that period you left at
4  5:30 every day more or less; is that correct?
5      A   I think when I stated ten times, I think
6  that was the period total ten times that I was able to
7  leave work. I think October is included there.
8      Q   Right now I'm asking you about October.
9  That's all I'm asking you about is October.
10     A   I think I just went home 5:30, I think.
11     Q   Okay. How about in November?
12     A   As I stated earlier, the total about ten
13 times I was able to leave at the time. So in November
14 if you ask me, I do not know how many times. I may
15 have, but I think total about ten times I was able to
16 leave about 5:30.
17     Q   You aren't able to estimate how many times
18 you left by approximately 5:30 in November?
19     A   No, I can't.
20     Q   And your recollection is that in December
21 you never left during the week as early as 5:30?
22     A   Yes, I am certain about it.
23     Q   Now, in November were you more often than
24 not during the month of November leaving U. Lim's
25 facility by 7:00 o'clock at night?

Page 109

1      MR. GREY: I'm going to object to that
2  question as asked and answered.
3      THE WITNESS: I cannot say how many times
4  because if I wasn't able to leave around 7:00 o'clock,
5  which means the factory was running as overtime.
6  Overtime ends at 8:00 o'clock.
7      So when you ask 7:00 o'clock, I don't think
8  it makes sense at all. I don't think I was able to do
9  that.
10 BY MR. BATTENFELD:
11     Q   So factory overtime ended at 8:00?
12     A   Yes.
13     Q   And during the month of November is it
14 correct that the factory did not go until 8:00 o'clock
15 every workday in November?
16     MR. GREY: Object. Objection. Lacks
17 foundation.
18     THE WITNESS: As I stated earlier, that if
19 you ask me how many times I was able to go back home,
20 which I leave the company about 5:30, about
21 7:00 o'clock total period of my employment with the
22 company. I said could be between from October 20th,
23 November 30th about ten times. That's all I was able
24 to leave the company around 5:30.
25     ///

Page 106 - Page 109

Case 3:99-cv-00659-JM-RBB   Document 20  Filed 02/16/00   PageID.1016   Page 211 of 332

Multi-Page™                                    Kang vs. U. Lim America
                                                          Teddy Back

| Page 110 | Page 111 |
|---|---|
| 1 BY MR. BATTENFELD:<br>2   Q   And am I correct that all the times that<br>3 you left at 8:00 o'clock the factory was on overtime<br>4 running until 8:00 o'clock?<br>5   A   When the factory runs, managers cannot go<br>6 home. You have to just wait until they close down.<br>7 So, therefore, if they close down at 8:00 o'clock, we<br>8 are not able to leave the place until about 8:15 or<br>9 8:30. So if you ask me correct answers, I do not<br>10 have.<br>11   Q   So when the factory was running, the<br>12 managers had to be there as well; is that correct?<br>13   A   Yes, it's correct.<br>14   Q   And why was that?<br>15   A   That is the way I understood as soon as I<br>16 entered the company, that nobody was leaving.<br>17   Q   Nobody was what?<br>18   THE INTERPRETER: Leaving the place.<br>19 L-e-a-v-i-n-g.<br>20   THE WITNESS: I am end of the line. My<br>21 position was the bottom of the totem pole. So,<br>22 therefore, when there is overtime, nobody blames,<br>23 nobody complains. So when everybody else stays, I<br>24 didn't have any choice. I had to stay.<br>25 /// | 1 BY MR. BATTENFELD:<br>2   Q   And were the Mexican workers also staying<br>3 working until 8:00 o'clock?<br>4   MR. GREY: Object to vague and ambiguous as<br>5 to Mexican workers and what position they held.<br>6   Go ahead and answer.<br>7   THE WITNESS: They send all Mexican<br>8 supervisors back home except only one supervisor.<br>9 Always they leave them -- leave one supervisor there.<br>10 BY MR. BATTENFELD:<br>11   Q   One Mexican supervisor?<br>12   A   (Witness nods)<br>13   Q   Was that any particular person?<br>14   A   Yes.<br>15   Q   Who was that?<br>16   A   Depend. There was a Mexican man which I<br>17 don't remember the name. They not leave him there<br>18 because then you will end up paying lots of money for<br>19 him. So mainly I think Sergio is the one who is left<br>20 there.<br>21   Q   And who was Sergio? What was his position?<br>22   A   Was a supervisor, production supervisor.<br>23   Q   And did Sergio typically work the same<br>24 hours that you worked?<br>25   A   When I stated Sergio, I didn't say Sergio |

| Page 112 | Page 113 |
|---|---|
| 1 was only person who was left there. It's very hard to<br>2 remember all those events what happened. You told me<br>3 that you expected me to have a very sincere answers<br>4 with the best knowledge, which I try my best to<br>5 respond. Therefore, I just remember Sergio name alone<br>6 at this moment. You keep asking same question. It's<br>7 really hard. It's getting -- I'm getting very tired.<br>8   Q   Do you need to take a break?<br>9   A   I like to finish it up as soon as possible.<br>10   Q   Well, we're not finished, but the question<br>11 is are you feeling capable of continuing with the<br>12 deposition?<br>13   A   Yes.<br>14   Q   Okay. The question is are you able to<br>15 recall, either yes or no, as to whether Sergio<br>16 typically worked the same hours that you worked?<br>17   A   There's many Mexican supervisors. Happen<br>18 to be I remember the name of Sergio. It's not that<br>19 Sergio was only there. I just remember his name<br>20 alone. Therefore, I said Sergio. It doesn't mean<br>21 that he was the only one who was there whenever I was<br>22 there.<br>23   Q   Okay. Let me ask my question again because<br>24 I still haven't gotten an answer to my question.<br>25   The question is, yes or no, did Sergio | 1 typically work the same hours that you worked?<br>2   A   It's not Sergio worked whenever I worked<br>3 there, and I know when I was there, there were times<br>4 that Sergio was there. It's not that all the time<br>5 that I was there Sergio was there, which I stated<br>6 earlier same thing.<br>7   Q   Was Sergio usually there when you were<br>8 working?<br>9   A   I never said usually Sergio was there. I<br>10 said there were times when he was there when I was<br>11 working.<br>12   Q   When you worked until 8:00 o'clock<br>13 approximately, did the majority of the time that you<br>14 worked until 8:00 o'clock Sergio also worked until<br>15 8:00 o'clock?<br>16   A   There were times that when I was there he<br>17 was there, I think. It's not that when I was there he<br>18 was always there. I never said usually he was there.<br>19 There were times that he was there.<br>20   Q   Were there times when you left before<br>21 Sergio?<br>22   A   No.<br>23   Q   You're positive about that?<br>24   A   100 percent.<br>25   Q   Did Raul Carillo work for U. Lim when you |

**VERBATIM REPORTING SERVICE (619) 232-3376**

## Page 114

1 worked for U. Lim?
2   A  Yes.
3   Q  Did Raul Carillo ever work until
4 8:00 o'clock at night on a work night?
5   A  Yes.
6   Q  And did he work more often until
7 8:00 o'clock compared to Sergio or less often or was
8 it about the same?
9   A  I cannot compare at this moment. There are
10 times that Sergio was there. There were times that
11 Raul was there. They took rotation. Therefore,
12 whenever I was there, I cannot say who was there at
13 the same time.
14   Q  And were there any times that you left work
15 before Raul Carillo?
16   A  Yes. I do not know Raul's -- the last name
17 Carillo or something. So, therefore, I will refer as
18 Raul. That is the way we knew Raul. I never knew his
19 last name.
20   Q  Okay. Could I have an answer then to my
21 question with respect to Raul? The question is were
22 there times that Raul -- that you left work before
23 Raul?
24   A  No.
25   Q  Did you work in the same area as Raul?

## Page 115

1         THE INTERPRETER: The last word?
2 BY MR. BATTENFELD:
3   Q  Did you work in the same area of the
4 factory that Raul worked in?
5   A  Different department.
6   Q  Were you always aware of where Raul was
7 when you were working?
8   A  Yes.
9         MR. GREY: Objection. Overbroad.
10 BY MR. BATTENFELD:
11   Q  So no matter what you were doing, you
12 always knew where Raul was?
13   A  Yes.
14   Q  And if you were working at your desk, how
15 would you know where Raul was?
16   A  As a quality control supervisor, he was
17 always in front of Mr. Park.
18   Q  Always?
19   A  Yes, always.
20   Q  He never moved from there?
21         THE WITNESS (without interpreter): Always.
22 BY MR. BATTENFELD:
23   Q  The entire day?
24         MR. GREY: Do you understand the question?
25 Take your time. Okay? I know it's been a long day.

## Page 116

1         THE WITNESS: I have to go.
2         MR. GREY: I know it's been a long day, but
3 don't rush through. Okay? And listen to the question
4 that's being asked. He's asking you if Raul was
5 always right there in front of Mr. Park's desk at his
6 desk, including going to the bathroom and everything
7 else. He's asking you always.
8         THE WITNESS: Well, the restroom was a
9 different place. How can he sit there all day? And
10 he went for lunch.
11 BY MR. BATTENFELD:
12   Q  And didn't he sometimes go out on the
13 factory floor to perform his job?
14   A  It's the same area. As I said earlier,
15 production -- it's not a room. It's not separate.
16 They're next to the production line. There is a
17 quality control line. Control area.
18   Q  And there was also a warehouse; is that
19 correct?
20   A  No. It's not same. Warehouse only had the
21 materials.
22   Q  Did Mr. Carillo ever go to the warehouse to
23 perform any of his duties?
24   A  I don't think he has things to do, but I
25 don't know who is Mr. Carillo.

## Page 117

1   Q  Did Raul ever go to the warehouse, as far
2 as you know?
3   A  I cannot say never, but his position didn't
4 have anything to do with that area.
5   Q  Did your position ever require you to go to
6 the warehouse?
7   A  Yes. That's my job to go there to do the
8 inventory checkout.
9         THE INTERPRETER: Can I have just a couple
10 minutes?
11         MR. GREY: Sure.
12         (Recess)
13 BY MR. BATTENFELD:
14   Q  Mr. Baek, you testified that there were
15 some times that you and Mr. Kang left together at the
16 end of a workday.
17         Do you recall that testimony?
18   A  Yes.
19   Q  Can you estimate how many times Mr. Kang
20 and you left at about the same time during the
21 approximately three months that you worked for U. Lim?
22   A  As I stated earlier, that except about ten
23 times, I left earlier. Besides those ten times, all
24 other times I left at the same time as he left.
25   Q  Okay. And that was at approximately

| Page 118 | Page 119 |
|---|---|
| 1  8:00 o'clock or 8:15? | 1  8:00 p.m.? |
| 2     A  I think usually the company closed about | 2     A  As I stated earlier, that even though |
| 3  8:15, so the time we left the place should be out at | 3  U. Lim closed at 8:00 o'clock as stated here, the time |
| 4  8:30. | 4  actually physically leaving the place, company, is |
| 5     Q  Okay.  So other than the times that you | 5  about as I stated earlier, about 8:30, because you |
| 6  left early, you testified there were times you left | 6  have to check the doors whether they are locked or not |
| 7  approximately 5:30 -- other than that, you typically | 7  and everything. |
| 8  left at about 8:30 and Mr. Kang also typically left at | 8     Q  So where your statement says, "My hours |
| 9  8:30? | 9  were normally from 6:45 a.m. to 8:00 p.m.," is that an |
| 10     A  Yes. | 10  accurate statement or is that not an accurate |
| 11     Q  And were there times that you left -- this | 11  statement? |
| 12  is on a Monday through Friday -- after 5:30 but before | 12        MR. GREY:  I'm going to object to the |
| 13  approximately 8:30? | 13  question as argumentative.  The witness has explained |
| 14     A  No. | 14  the discrepancy. |
| 15     Q  Now, if you could look at your statement | 15        THE WITNESS:  During this time when I was |
| 16  and look specifically at Page 2, Paragraph 9. | 16  writing this information, yes, normally the company |
| 17        Do you see that? | 17  closed at 8:00, but physically the time that I leave |
| 18     A  Yeah. | 18  the building after you check everything is about 8:15 |
| 19     Q  The second sentence it says, "During the | 19  or 8:30.  I am repeating same thing again. |
| 20  last year I was employed by U. Lim, my hours were | 20  BY MR. BATTENFELD: |
| 21  normally from 6:45 until 8:00 p.m." | 21     Q  And did you usually arrive at 6:45 or 7:00? |
| 22        Do you see that? | 22     A  I stated here at about 6:45.  I think I |
| 23     A  Yes. | 23  like to maybe say that around 7:00 o'clock. |
| 24     Q  So is your statement accurate or inaccurate | 24     Q  Now, you testified that there was some type |
| 25  when it says that your normal hours were until | 25  of record that you would see that told you that |

| Page 120 | Page 121 |
|---|---|
| 1  Mr. Kang had been working during a time when you had | 1        MR. GREY:  Do you understand the term |
| 2  not been working. | 2  never? |
| 3        Do you recall that testimony? | 3        THE WITNESS:  I think when I do the daily |
| 4     A  Yes. | 4  total report, I can tell that he has done some.  I |
| 5     Q  And what type of record were you referring | 5  think there are except few occasions when I was busy |
| 6  to? | 6  he recorded for me.  Otherwise, I record. |
| 7     A  The purchasing department -- every morning | 7  BY MR. BATTENFELD: |
| 8  we have meeting.  Then at the meeting the purchasing | 8     Q  And did the information that was recorded |
| 9  department report documents to Mr. Yoon, and when I | 9  on this purchasing department daily report -- did it |
| 10  find out there are some items that which I was not | 10  have any times listed on anything that was recorded? |
| 11  involved with, that means I knew that Mr. Kang was | 11     A  Usually the next morning we get the order |
| 12  working when I was not there. | 12  report.  So the next morning when we gather all those |
| 13     Q  And what type of report was this again? | 13  things we do, including inventory, we try to balance |
| 14     A  The report done by purchasing department. | 14  those two different items. |
| 15  Daily report. | 15     Q  Please listen to my question and answer my |
| 16     Q  And there were -- who typically recorded | 16  question. |
| 17  items on that report? | 17        My question was, the purchasing department |
| 18     A  When I am there, I record.  When I am not | 18  daily report that you completed and that sometimes |
| 19  there, Mr. Kang records. | 19  Mr. Kang completed -- did either what you put on the |
| 20     Q  And were there times that you were there | 20  report or what Mr. Kang put on the report include any |
| 21  and Mr. Kang was there and Mr. Kang recorded items on | 21  times?  Times.  8:00 o'clock, 9:00 o'clock, |
| 22  that report? | 22  12:00 o'clock. |
| 23     A  I record. | 23     A  As I stated earlier that -- I mean if I had |
| 24     Q  So Mr. Kang never recorded anything on that | 24  time recorded, I would say yes, a time was recorded. |
| 25  report except when you were not there? | 25  But I didn't say that.  I said date is recorded.  And |

Page 118 - Page 121

Kang v. U. Lim America
Teddy Back

Multi-Page™

Page 122

1  then also in the morning we do so. That is whenever
2  when we see the date in the morning, it was recorded.
3  Q. Okay. The process will go a lot faster if
4  you listen to my question and simply answer my
5  question when it calls for a yes or no, yes or no.
6  Am I correct that your answer to my
7  question is no times, as in time of a day,
8  8:00 o'clock, 9:00 o'clock, 7:52 -- that information
9  was not recorded on the purchasing department daily
10  report?
11  A. No time.
12  Q. Thank you. And if you saw any entries by
13  Mr. Kang on the report, you wouldn't know when
14  Mr. Kang had recorded those entries, would you?
15  MR. GREY: I'm going to object to vague and
16  ambiguous as to the use of the term "when."
17  THE WITNESS: Didn't I say twice already
18  the report we do indicates the date? So when you
19  record, don't you think there is a date written there?
20  BY MR. BATTENFELD:
21  Q. Was there a date written?
22  A. Yes.
23  Q. And where was the date written?
24  A. Yes. As I stated earlier, that the record
25  has date. In the record there is how much production

Page 123

1  was made, which means material came out from the
2  warehouse. So the amount of the material came out
3  from warehouse plus and minus makes production. So if
4  you don't have that daily balance -- if you don't have
5  the date written on the daily balance, it just
6  wouldn't make any sense.
7  Q. Again I asked a simple question, and I'd
8  appreciate an answer.
9  The question is where was the date recorded
10  on the purchasing department daily report?
11  MR. GREY: Objection. Vague and ambiguous.
12  I mean is he asking for a specific column? Are you
13  asking for a specific area of the report?
14  THE WITNESS: The date is recorded in the
15  daily report. I don't know whether left side, bottom
16  right side or bottom. I'm not for sure.
17  BY MR. BATTENFELD:
18  Q. So if you looked at a report and saw
19  something that Mr. Kang had completed, that would tell
20  you that he had completed some portion of the report.
21  Would it tell you how long Mr. Kang had
22  been working on a particular day?
23  A. No.
24  Q. And when you testified about looking at the
25  report and by that report concluding that Mr. Kang had

Page 124

1  not been working, were you referring to weekend work
2  or nighttime work, during the week or both?
3  A. As I stated earlier, that except times I
4  left earlier, I stayed always with him at the same
5  time. And I also stated to you that I worked about
6  twice on Sundays. That means if he worked when I was
7  not there, I think I assume that should be Sundays.
8  Q. Did you ever spend the night at the factory
9  during your employment with U. Lim?
10  A. No.
11  Q. Did anyone ever tell you that they had
12  spent the night at the factory while you worked for
13  U. Lim?
14  A. Yes. I think I heard. But, however, I
15  don't know exactly who told me or who stayed there. I
16  do not remember.
17  Q. Do you remember Mr. Kang or anyone else
18  ever telling you that Mr. Kang had stayed at the
19  factory all night?
20  A. No.
21  Q. Now, you testified that there were social
22  events that you attended with Mr. Yoon that occurred
23  either at a regular bar or at what you called a strip
24  bar; is that correct?
25  A. Yes.

Page 125

1  Q. And where were these bars or strip bars
2  located? Were they in Mexico or in the United States?
3  A. Sport Arena.
4  Q. In San Diego?
5  A. San Diego.
6  Q. And approximately how many times did you go
7  to a bar or a strip bar with other U. Lim employees,
8  including but not limited to Mr. Yoon, during the
9  period of time that you worked for U. Lim?
10  A. I only went once. However, they went
11  frequently. They told me frequently that they went
12  there.
13  Q. So you went one time?
14  A. I went one time.
15  Q. And was that a bar or a strip bar?
16  A. Strip bar.
17  Q. And do you recall if this was on a work
18  night?
19  A. Yes. Yes, after the work.
20  Q. Okay. And how many hours did you spend at
21  the strip bar?
22  A. About two hours.
23  Q. And what time was it that you left?
24  A. 11:00.
25  Q. So you were there from approximately 9:00

**Page 126**

1  to 11:00?
2      A  I think so.
3      Q  And how long did it take to go from the
4  factory to this strip bar?
5      A  If you do straight, it will take about
6  40 minutes.
7      Q  And as best as you can recall, did you go
8  straight from work to the strip bar?
9      A  No.
10     Q  Did you go home first?
11     A  No. All together. I had dinner.
12     Q  So you went to dinner first?
13     A  Yes.
14     Q  Okay. And where did you go to dinner?
15     A  I do not remember.
16     Q  And how long were you at dinner before you
17  went to the strip bar?  So you went from work to
18  dinner and then to the strip bar.
19     A  Yes.
20     Q  And who else went to dinner?
21     A  We all went together.
22     Q  By we all, who are you referring to?
23     A  Mr. Yoon, Mr. Cho, Mr. Ko, Mr. Park, Soo
24  and me.
25     Q  By Soo, you mean Mr. Kang?

**Page 127**

1      A  Soo Kang.
2      Q  And the same individuals also went to the
3  strip bar?
4      A  Yes.
5      Q  Okay. You say you only did that once, but
6  you heard that other people went to bars or strip bars
7  on other times that you didn't go?
8      A  How do you call room, salon?
9          MR. GREY:  Hotels?
10         THE WITNESS:  Just with a hostess in the
11  room.
12         MR. GREY:  Brothel.
13         THE WITNESS:  When they had lunch together
14  during lunchtime, they say they always went there,
15  like Orange County someplace. There are -- in a room
16  you stay with hostess.
17  BY MR. BATTENFELD:
18     Q  And who told you about that?
19     A  Mr. Yoon -- whenever when the subject comes
20  out, Mr. Yoon is the one who talks everything.
21     Q  Just asking about bars. Did you ever hear
22  that any of the other managers in a group had gone to
23  a bar together?
24     A  Not from the managers.
25     Q  Who did you hear it from?

**Page 128**

1      A  Mr. Yoon.
2      Q  And did he tell you that a group of
3  managers, including himself, had gone to a bar
4  sometime?
5      A  Yes.
6      Q  And no one other than Mr. Yoon ever told
7  you that?
8      A  No.
9      Q  Did anyone you work with ever complain
10  about having to go to a bar?
11     A  No, I did not.
12     Q  Did anyone you worked with at U. Lim ever
13  complain about going to a strip bar?
14     A  No.
15     Q  And did you ever hear anyone talk about
16  going to a strip bar?
17     A  Yes.
18     Q  Who?
19     A  Mr. Yoon.
20     Q  Anyone else?
21     A  No. They don't talk about it.
22     Q  Were you ever invited to go to a bar or a
23  strip bar other than the time you testified about
24  going to the strip bar near the Sports Center --
25  Sports Arena?

**Page 129**

1      A  No.
2      Q  Now, you testified that there were poker
3  games that happened, you estimated, one to two times
4  every two weeks.
5          Do you recall that testimony?
6      A  Yes.
7      Q  Now, did those poker games always take
8  place at Mr. Yoon's house or did they sometimes take
9  place somewhere else?
10     A  Mr. Yoon's.
11     Q  And was that a house or an apartment?
12     A  A house.
13     Q  And when -- was there a typical starting
14  time for the poker games at Mr. Yoon's house?
15     A  No. There is no particular time, but it is
16  always after the work.
17     Q  Do you have an estimate as to the range of
18  times that the poker games would begin?
19     A  Whenever when he is in the mood. Sometimes
20  in the morning, "Oh, let's have poker game tonight."
21  Or sometimes at the end of the work days he said, "Oh,
22  we are going to have poker game. Come to my house."
23     Q  The question is can you give me an estimate
24  as to the range of times, in other words, the earliest
25  time that the poker game would begin or the latest

Kang v. U. Lim America
Teddy Back

Multi-Page™

**Page 130**

1  time that the poker game would begin?
2  A  I cannot recall exactly.  Usually 9:00 or
3  10:00.
4  Q  And would you typically drive straight from
5  work to Mr. Noon's house when you went to a poker
6  game?
7  A  Yes.
8  Q  Did you sometimes stop at your home or your
9  apartment before going to the poker game?
10  A  No.
11  Q  And how long did it take you to drive from
12  work to Mr. Yoon's house or apartment?
13  A  About 25 minutes.
14  Q  So did he live closer to the factory than
15  you did?
16  A  Yes.
17  Q  And how much closer was he to the factory
18  than you?
19  A  About 20 minutes.
20  Q  So it usually took you about 45 minutes to
21  get home from work?
22  A  Yes.
23  Q  And were there times that you were invited
24  to play poker but you did not go play poker?
25  A  No.

**Page 131**

1  Q  As far as you know, anytime there was a
2  poker game at Mr. Yoon's house, you were there?
3  A  (Witness nods)
4  Q  And who else was always at the poker game
5  at Mr. Yoon's house?
6  A  Mr. Yoon, Soo Kang, Mr. Ko, Mr. Park, me --
7  and me.
8  Q  Was Mr. Cho sometimes there and sometimes
9  not there?
10  A  Yes.
11  Q  And did Mr. Cho ever talk to you about the
12  fact that he was not going to be at a poker game on a
13  particular night?
14  A  Yes.
15  Q  And what do you recall him saying?
16  THE INTERPRETER:  I didn't hear.
17  BY MR. BATTENFELD:
18  Q  What do you recall Mr. Cho saying?
19  A  Mr. Cho -- I felt that it was quite unusual
20  because there were times -- Mr. Yoon always make
21  sometimes excuse, like I have something to do at home.
22  Then Mr. Yoon allowed him to do that.
23  Q  You mean Mr. Cho would have an excuse?
24  A  Yes.
25  Q  And Mr. Yoon would allow him to not attend?

**Page 132**

1  A  Yes.
2  Q  Okay.  And you said also there were times
3  that Mr. Cho played poker but he left before others
4  left; is that correct?
5  A  Yes.
6  Q  What was the earliest that you ever left a
7  poker game at Mr. Yoon's house?
8  A  I think it was between about -- between
9  2:00 and 3:00 in the morning, but I'm not certain
10  exact amount, exact time.
11  Q  That was the earliest?
12  A  Yes.
13  Q  Were the poker games usually on a Friday
14  night?
15  A  No.  It was not.  Depends on Mr. Yoon's
16  mood.
17  Q  Was there any night that was a more likely
18  night to be a poker night than any other night?
19  A  No.  You cannot predict what would happen.
20  Q  So it could be a Sunday, a Monday, a
21  Tuesday, Wednesday, Thursday, Friday, Saturday?
22  (Interruption)
23  BY MR. BATTENFELD:
24  Q  Did you ever observe Tae Jin Yoon drinking
25  alcohol?

**Page 133**

1  A  No, I did not.
2  Q  Did you ever go out drinking with Mr. Yoon?
3  A  No.
4  Q  Did you feel that Mr. Kang favored certain
5  of the managers over other managers?  Mr. Yoon.  I may
6  have misspoken.
7  Did you feel Mr. Yoon favored certain
8  managers over other managers?
9  A  Yes.
10  Q  And who did you feel that he favored?
11  A  Mr. Ko and Mr. Cho.
12  Q  And what caused you to form the belief that
13  Mr. Yoon favored Mr. Cho and Mr. Ko?
14  A  As I stated earlier, that except about ten
15  days I did overtime, Mr. -- we are not production
16  managers.  We are more like purchasing or sales
17  manager.  So as quality control manager or the other
18  jobs we had -- whenever when we did overtime, almost
19  no time that Mr. Ko or Mr. Cho did overtime.  Whenever
20  when Mr. Yoon left, most times that Mr. Ko and Mr. Cho
21  left with him too.
22  Q  And when did Mr. Yoon usually leave?
23  A  At -- depends on what he wanted.
24  Q  But your testimony is Mr. Yoon did not
25  always stay until 8:00 o'clock?

Page 134

1   A  Not even once he stayed until 8:00 o'clock.
2   Q  Okay.  What was the latest that he stayed
3  while you were working there?
4   A  6:00 o'clock.
5   Q  And so during your employment he was always
6  gone no later than 6:00?
7   A  No.  He was not.  Not even once.
8   Q  And your testimony is that Mr. Cho and
9  Mr. Ko also often left by 6:00 o'clock?
10   A  Usually they leave about 3:00 or
11  4:00 o'clock together.
12   Q  Mr. Yoon, Mr. Cho and Mr. Ko?
13   A  Mr. Cho was production manager -- Mr. Ko
14  was.  Sorry.  Mr. Ko was production manager.  He never
15  stayed there until late hours.  And don't you see
16  that?  He is the production manager.  He never stayed
17  there.  So he chose that.
18   Q  So Mr. Ko would sometimes leave as early as
19  3:00 or 4:00 on a workday?
20   A  Yes.
21   Q  And would Mr. Cho sometimes leave as early
22  as 3:00 or 4:00?
23   A  Yes.
24   Q  Did Mr. Ko ever work later than 6:00 p.m.
25  during your employment?

Page 135

1   A  No.  Not even once.
2   Q  Did Mr. Cho ever work later than 6:00 p.m.
3  during your employment?
4   A  Yes.  Maximum about five times.
5   Q  And how about Saturday work?  Did you
6  observe any difference in terms of the amount of
7  Saturdays worked by Mr. Cho and Mr. Ko versus yourself
8  or Mr. Kang or Mr. Park?
9   A  I saw Mr. Cho on a few occasions.  Never
10  Mr. Ko or Mr. Yoon.
11   Q  And did Mr. Cho work fewer Saturdays than
12  Mr. Kang?
13   A  It is.
14   Q  Are you able to estimate how many Saturdays
15  Mr. Cho worked during the period that you worked for
16  U. Lim?
17   A  Yes.  About three times.
18   Q  Three times?
19   A  Yes.
20   Q  And how about Sundays?  Did you ever
21  observe Mr. Ko or Mr. Yoon work on a Sunday?
22   A  No.
23   Q  How about Mr. Cho?
24   A  No.
25   Q  So the Sundays that you work -- you worked

Page 136

1  you never worked with either Mr. Ko or Mr. Yoon or
2  Mr. Cho?
3   A  No.
4   Q  Other than the difference in the working
5  hours that you've described, were there any other
6  reasons why you concluded or believed that Mr. Yoon
7  favored Mr. Cho and Mr. Ko over Mr. Park and Mr. Kang
8  and, I guess, yourself?
9   A  Those three, they had their own secrets.
10   Q  Their own what?
11   A  Secrets.
12   Q  Secrets.  What do you mean by that?
13   THE INTERPRETER:  I have to make clear what
14  I hear from him.
15   THE WITNESS:  They didn't tell other
16  people, but among those three, they had some secrets,
17  I think, involving female.
18  BY MR. BATTENFELD:
19   Q  Now, you previously testified that
20  Mr. Yoon's abuses, I think you called it, or maybe
21  Mr. Grey called it was primarily directed at Mr. Park
22  and Mr. Kang; is that correct?
23   A  Yes.
24   Q  And was that also a reason why you believe
25  that Mr. Yoon favored Mr. Ko and Mr. Cho?

Page 137

1   A  Yes, it is possible.
2   Q  Did you ever see Mr. Yoon throw anything at
3  Mr. Ko or Mr. Cho?
4   A  No.
5   Q  Did you ever see Mr. Yoon kick Mr. Ko or
6  Mr. Cho?
7   A  No, I did not.
8   Q  Did you ever see Mr. Yoon kick Mr. Ko or
9  Mr. Cho?
10   A  No.
11   Q  And did you ever see Mr. Yoon yell at
12  Mr. Ko?
13   A  Yes, many times.
14   Q  So he yelled at Mr. Ko?
15   A  Yes.
16   Q  Did you ever see Mr. Yoon yell at Mr. Cho?
17   A  Yes.
18   Q  And was that frequently or infrequently?
19   A  Frequently.
20   Q  Did Mr. Yoon yell at Mr. Ko more frequently
21  or less frequently or about the same as he yelled at
22  Mr. Kang?
23   A  About same.
24   Q  And how about Mr. Cho?
25   A  Mr. Cho I think is lesser.

Page 138

1 Q And did Mr. Yoon yell at Mr. Park more than
2 he yelled at others or was it about the same as he
3 yelled at Mr. Ko and Mr. Kang?
4 A Compared to Mr. Cho and Mr. Ko, I think he
5 yelled at Mr. Park the most.
6 Q And how about yourself? Did Mr. Yoon yell
7 at you about the same as he yelled at Mr. Ko and
8 Mr. Kang or less or more?
9 A He didn't yell almost to me. Less maybe.
10 He did yell at me about twice.
11 Q So he yelled at you only twice?
12 A Yes.
13 Q Do you recall what he yelled at you about?
14 A Once when I came to work late because of a
15 late poker game he did. And second time when I went
16 to ski, I took my wife to the higher place, and when
17 he told me not to bring, then he was yelling at me
18 that I was the bottom of the totem pole, that how
19 could you do that. If you want to do that, quit it.
20 In that way.
21 Q Did you ever see Mr. Yoon yell at Raul?
22 A I have not.
23 Q Did you ever see Mr. Yoon yell at Sergio?
24 A He didn't do to Mexicans.
25 Q Now, while you were employed by U. Lim, did

Page 139

1 you ever talk to Mr. Kang or Mr. Park about your
2 feeling that Mr. Yoon favored Mr. Ko and Mr. Cho?
3 A No.
4 Q Why not?
5 A You don't talk everything as you feel.
6 There are times that even you feel you don't like talk
7 about it.
8 Q Now, as I understand your testimony, most
9 nights you would watch Mr. Cho and Mr. Yoon and Mr. Ko
10 leave, and you and Mr. Park and Mr. Kang would
11 continue to work for several hours; is that correct?
12 A Yes.
13 Q And did you ever -- when that happened did
14 you or Mr. Kang or Mr. Park, you know, turn and, you
15 know, say to someone else, you know, "That's not fair.
16 Why are we always working here late?"
17 A (No audible response)
18 MR. BATTENFELD: I don't think the witness
19 has answered my question.
20 THE WITNESS: You stated that as -- that
21 much difference treatment were received. If somebody
22 cannot feel it's absolutely stupid -- I mean everybody
23 knew that, and also my wife knew that. I talked to my
24 wife. If you want to bring my wife, she will testify
25 because I told her about it to her.

Page 140

1 BY MR. BATTENFELD:
2 Q If you could listen to my question and
3 answer my question, which is was there ever a time
4 during all of these nights that you and Mr. Kang and
5 Mr. Park were working late and Mr. Yoon and Mr. Cho
6 and Mr. Ko had left and it's just the three of you,
7 whoever other else was working there from the Mexican
8 work force -- you're working late.
9 Was there ever a time when you had a
10 conversation with Mr. Kang or Mr. Park or both of them
11 where one of you made a comment about, you know, "This
12 isn't fair" or "This isn't right" or "How come they
13 get to leave early," something like that?
14 A No.
15 Q Why not?
16 A A difference I and myself. Other people
17 file lawsuit or another person file lawsuit. I did
18 not. Even although I was suffering physically and
19 then also the evidence shows that I had operation
20 right after I quit the job, but yet I didn't raise my
21 voice. I did not say anything. That is the way I am.
22 Q So you just -- you're not a complainer?
23 MR. GREY: I'm going to object as
24 argumentative.
25 THE WITNESS: As I stated earlier, that the

Page 141

1 environment, the workplace was not a normal place.
2 It's more like army camp. It was more like I was in
3 his kingdom. The environment was quite scary to me.
4 I was the bottom of the totem pole there. Yes, I
5 complain, yet it was quite scary place for me to
6 complain. How could I complain?
7 And if -- I want to add I felt that the
8 people who joined army, if they don't like the place,
9 whether they should retire or they should quit, they
10 should take their uniform off instead of complaining.
11 I felt that if I cannot stay there or if I didn't like
12 it, instead of complaining, I should quit the job.
13 That is the way I felt there.
14 BY MR. BATTENFELD:
15 Q Did Mr. Kang ever complain in your presence
16 while you were working at U. Lim about the hours he
17 was working?
18 A I question to myself those people. They
19 work unfairly those many hours, never complained. And
20 I felt that I was the last one, the bottom one. When
21 they don't complain, that was always to me very
22 questionable about it.
23 Q Again we all want this process to move
24 quickly. The question was yes or no, and I believe
25 your answer is no.

**Page 142**

1  A  Yes.
2  Q  Thank you. If you could just please try to
3  answer my question.
4      Other than what you've testified now about,
5  were there any other things that happened that caused
6  you to feel that Mr. Yoon favored Mr. Ko and Mr. Cho
7  over Mr. Kang and Mr. Park?
8  A  No.
9  Q  Did Mr. Yoon ever tell you why either
10 yourself or Mr. Park or Mr. Kang had to stay to work
11 while he left early and Mr. Cho and Mr. Ko left early?
12 A  No. He didn't explain anything. He said,
13 "You, you, you do the overtime today."
14 Q  And did you ever form an opinion as to why
15 Mr. Yoon favored Mr. Ko and Mr. Cho over Mr. Park and
16 Mr. Kang and yourself?
17 A  I just -- instead of forming my opinion, I
18 felt that Mr. Yoon was going out to meet a female, and
19 then -- and Mr. Cho and Mr. Ko maybe had partners too.
20 Therefore, they are more like each pairs going out
21 like as a pair or as a group going out. I felt that
22 way.
23 Q  Any other reasons why you felt that
24 Mr. Yoon favored Mr. Ko and Mr. Cho?
25 A  Mr. Cho is a friend from long time ago.

**Page 143**

1  Mr. Cho came to -- Mr. Ko came to this country through
2  U. Lim, that is, through Mr. Yoon. Mr. Cho had a
3  relationship with Mr. Yoon from Denver, and then from
4  Denver because of Mr. Yoon moved to San Diego, so
5  they -- I thought they were just good friends.
6  Q  And I believe you testified that you felt
7  that Mr. Kang and Mr. Yoon were not friends; is that
8  correct?
9  A  No, they were not friends.
10 Q  Did you form any opinion as to why Mr. Kang
11 and Mr. Yoon were not friends?
12 A  Mr. Kang was picked up locally here when he
13 opened up his business. Mr. Cho, from the
14 relationship he had in Denver, was brought by him.
15 Mr. Ko was brought by Mr. Yoon from Korea even before
16 even he opened up business here in Tijuana. So make
17 me think that they are friends.
18     The main thing is Mr. Ko has visitor's
19 visa. He doesn't have work visa. How could he hire
20 him to work here?
21 Q  Again the question I was asking is what
22 opinion -- what was the basis of any opinion you had
23 that Mr. -- as to why Mr. Yoon and Mr. Kang were not
24 friends.
25     Have you now fully answered that question?

**Page 144**

1  A  I had my opinion about Mr. Kang being
2  locally picked up so didn't have any previous
3  relationship or friendship with him, and the others
4  had a previous friendship or relationship with him.
5  Q  Now, I know you talked about this on direct
6  examination, but this is now cross-examination, so the
7  question I want to ask you is as best as you can
8  recall, what were all of the insulting or bad or
9  negative things that Mr. Yoon said to Mr. Kang while
10 you worked there?
11 A  Yeah. During my stay I witnessed all
12 those.
13 Q  What? What specifically?
14 A  I stated -- I told you all those earlier.
15 It has been so many hours here. I have my headache.
16 I cannot -- I don't have a clear head. I cannot say
17 what I said before.
18 Q  Again I'm not asking you what you said
19 before. I'm asking you what you recall right now.
20     MR. GREY: Objection. Asked and answered.
21     MR. BATTENFELD: Asked and answered is not
22 an appropriate objection on cross-examination.
23     MR. GREY: Well, I'm going to object
24 anyhow. I mean he's already answered the thing.
25     THE WITNESS: No. I don't remember. I'm

**Page 145**

1  feeling a little tired.
2      MR. BATTENFELD: Here's the problem I have.
3  I think we're getting close to getting done, but I
4  think -- the witness is saying he is not able to give
5  his best testimony.
6      MR. GREY: Can't you cut to the quick? You
7  already got the answers on that. We went over that at
8  great length.
9      MR. BATTENFELD: Well, to me it was
10 garbled, and that's why I'm just trying to get
11 clarified.
12     MR. GREY: I thought we did clarify. We
13 went through the exact words. We went through the
14 definitions he thought were curses. We went through
15 stupid, jerk, asshole, son of a bitch and which ones
16 he called who to. You got to help the witness out a
17 little bit and help to conclude this thing.
18 BY MR. BATTENFELD:
19 Q  Do you feel able to continue answering my
20 questions?
21 A  Yeah, I will do. But at same time I only
22 can answer what I can think right now. There are
23 things that because of these long hours I think I
24 cannot say. I cannot make up the information for you.
25 Q  During your employment with U. Lim, did you

Page 142 - Page 145

Kang v. U. Lim America
Teddy Back

Multi-Page™

Page 146

1  ever hear Mr. Kang say anything that was of a negative
2  tone directed at Koreans?
3         THE INTERPRETER: Mr. Kang?
4         MR. BATTENFELD: Mr. Yoon. I'm sorry.
5  Mr. Yoon.
6         THE WITNESS: You mean Korean community
7  here or --
8  BY MR. BATTENFELD:
9     Q  Koreans or about or a race or people who were
10 of Korean origin, something negative.
11    A  I don't remember now.
12    Q  Not that you can remember?
13    A  Not right now I cannot remember.
14    Q  Now, earlier -- and it wasn't clear to me
15 what the translation was or what the statement was.
16 Earlier today there was some reference, and I couldn't
17 tell if it was to slangs or slants.
18        Which word were you referring to?
19    A  Slang.
20    Q  Slang. Okay. And by slang, you were
21 referring to the words you were describing at that
22 time?
23    A  I can't say anything right now.
24    Q  But it was slang, s-l-a-n-g?
25        THE INTERPRETER: I think my recollection

Page 147

1  is when Mr. Grey questioned slang --
2         MR. BATTENFELD: Well, again I'm asking for
3  the witness' testimony, not yours.
4         THE INTERPRETER: All right.
5         THE WITNESS: Right now I can't recall what
6  I said today.
7  BY MR. BATTENFELD:
8     Q  But as you sit here today right now, slang
9  is what you were referring to?
10    A  I don't remember what I said even today.
11    Q  Do you ever recall Mr. Yoon using the word
12 slants when you worked for U. Lim?
13    A  Yes, he did.
14    Q  And how often do you recall him using that
15 word?
16        THE INTERPRETER: I have to understand you.
17 When you say slant, would you explain it to me? It
18 can be about two, three different things. What do you
19 mean?
20        MR. BATTENFELD: Well, what are you
21 referring to?
22        THE INTERPRETER: I --
23        MR. BATTENFELD: No. The witness.
24        THE INTERPRETER: No. I didn't translate.
25        MR. BATTENFELD: I'm sorry.

Page 148

1         THE INTERPRETER: I have to understand to
2  be able to translate --
3         MR. BATTENFELD: Sure.
4         THE INTERPRETER: -- in Korean.
5         MR. BATTENFELD: In English slant could
6  simply mean what is your slant on this issue.
7         THE INTERPRETER: All right.
8         MR. BATTENFELD: And slant can also be a
9  derogatory term directed at some categories of Asian.
10        THE INTERPRETER: That's why I want to know
11 which one you want me to use.
12        MR. BATTENFELD: Well, I'm just trying to
13 get clarified from earlier because I wasn't sure I
14 understood the testimony this morning. So I don't
15 know if he used either of those words.
16        THE INTERPRETER: I only translate slang,
17 if you are asking me. I ask you question because I
18 didn't want to translate. Slant can be two, three
19 different things.
20        MR. BATTENFELD: If you could translate it
21 if there's an equivalent word in Korean as the
22 derogatory term.
23        THE INTERPRETER: The slant?
24 Linguistically the slant word isn't used by
25 non-Asians. To Asians that word of slant doesn't mean

Page 149

1  the way non-Asians understand.
2         MR. BATTENFELD: Okay.
3         MR. GREY: They probably use round eyes.
4         THE INTERPRETER: No, we don't. No, we
5  don't. But what I'm saying is when you say slant,
6  what you meant now is understood in Asian community
7  different way. We don't talk about it because
8  everybody has slant eyes. We don't talk about that.
9         So the meaning of slant is very different
10 than you are saying slant. So I cannot -- I have
11 to -- if I do verbatim translation -- although slant
12 has totally different meaning in Korean. So you want
13 me to do that? That's why before when we were saying
14 slang -- slang -- the verbatim translation in Korean
15 is different than what you are saying slang.
16        MR. BATTENFELD: I'm just trying to simply
17 as I can find out if the witness is or is not claiming
18 that Mr. Yoon used a term that would have been the
19 equivalent of slant.
20        THE INTERPRETER: No. A Korean does not
21 use the word the meaning of a slant to another Korean.
22        MR. BATTENFELD: Well, if you could ask the
23 witness that.
24        THE INTERPRETER: All right. Let me
25 first -- I need to explain --

Page 150

1    MR. BATTENFELD: Before --
2         THE INTERPRETER: -- slant, meaning of what
3    you said.
4         MR. BATTENFELD: Before you try to
5    translate, perhaps if we could just get over this in
6    English, we can move on.
7         Do you understand what I'm asking from
8    English?
9         THE WITNESS (without interpreter): No.
10        THE INTERPRETER: Let me explain about what
11   I said to you between you and I.
12        MR. BATTENFELD: Right.
13        THE INTERPRETER: Now he understand what
14   you are saying slant.
15   BY MR. BATTENFELD:
16   Q   I guess the question is did Mr. Yoon ever
17   use that type of a word.
18   A   No. They don't talk about it.
19   Q   Did Mr. Kang ever tell you that he was
20   worried about being fired?
21   A   No.
22   Q   Were you ever present when Mr. Yoon made
23   any sort of a promise of some sort to Mr. Kang, a
24   work-related promise?
25        MR. GREY: Objection. Overbroad, vague and

Page 151

1    ambiguous.
2         THE WITNESS: No.
3    BY MR. BATTENFELD:
4    Q   Were you ever present when Mr. Yoon
5    threatened to fire Mr. Kang?
6    A   He did to everybody.
7    Q   Who did he threaten to fire?
8    A   Mr. Cho, Mr. Park, Mr. Ko and Mr. Kang,
9    even to me. So I quit the job.
10   Q   And what was the nature of any threat he
11   made to Mr. Kang about firing Mr. Kang? What do you
12   recall? What words did he use?
13   A   He threw the reports, and, "You, jerk. If
14   you want to do it, quit it like that way."
15   Q   Anything other than that, other than
16   telling Mr. Kang to quit?
17   A   It's very similar manners. Just very
18   casual just to everybody. Casually he says that to
19   everybody what he did to Mr. Kang.
20   Q   Words to the effect of if you don't do
21   something or if you don't like something, you can
22   quit?
23   A   Yeah.
24   Q   Did Mr. Kang ever complain about anything
25   work-related in your presence while you were working

Page 152

1    for U. Lim?
2    A   No, he didn't.
3    Q   Now, when you were talking about your
4    statement earlier, you made some reference to notes.
5         What notes were you referring to?
6    A   If you remind me, I will say I don't
7    remember what I said today.
8    Q   Do you recall as you sit here now that
9    there were any notes that either you prepared or
10   somebody else prepared in addition to the statement
11   that's been marked as Exhibit 1?
12   A   Are you talking about the report, daily
13   report we prepared in the morning?
14   Q   No, no, no. I thought you made reference
15   to notes when you talked about the preparation of your
16   statement.
17   A   No. I don't think there was a time that I
18   prepared a note. I think I may refer this note that
19   information I have, but nothing to even make a note
20   about it. Just I think I may referred this.
21   Q   And you did not type that statement; is
22   that correct?
23   A   No, I did not.
24   Q   It was mailed to you?
25   A   I think, yes, came by mail.

Page 153

1    Q   Now, on Page 3 of your statement there's
2    handwritten "Mr. Cho" near the bottom.
3         Do you see that?
4    A   Yes.
5    Q   Is that your handwriting?
6    A   This is not mine.
7    Q   Was that handwritten on the document when
8    you received it in the mail?
9    A   Yes.
10   Q   Did you make any changes to your statement,
11   either an earlier draft or this statement, before you
12   signed it?
13   A   No. Once this was written, no time that it
14   has been corrected. No.
15   Q   Okay. Did you ever tell Mr. Kang at any
16   time either while you were working for U. Lim or after
17   up to the present that you felt that Mr. Yoon was a
18   coward?
19        THE INTERPRETER: Would you repeat that?
20   BY MR. BATTENFELD:
21   Q   The question is did you ever tell
22   Mr. Kang -- and this is at any time, meaning while you
23   were working for U. Lim or after -- that you felt
24   Mr. Yoon was a coward?
25   A   No, I have not.

Kang v. U. Lim America      Multi-Page™
Teddy Baek

---

Page 154

1    Q  And did you ever tell Mr. Kang -- again
2 this is at any time including after you left U. Lim up
3 to the present -- that you believe Mr. Yoon had
4 embezzled or stolen money from U. Lim?
5    A  I made that statement?
6    Q  To Mr. Kang.
7    A  I think I may have.
8    Q  And when was that?
9    A  I do not remember.
10    Q  Do you remember if it was while you were
11 working for U. Lim or after?
12    A  I think when I was working.
13    Q  And what do you recall telling Mr. Kang?
14    A  I think maybe I said it seems to me that he
15 has about $400,000 in cash from the company which is
16 behind his father's back.
17    Q  And that's what you told Mr. Kang?
18    A  I think so I did.
19    Q  And what was Mr. Kang's response?
20    A  He didn't say anything.
21    Q  And what was the basis of the belief that
22 you expressed to Mr. Kang about Mr. Yoon's conduct?
23    A  Mr. Yoon bragged about it.
24    Q  Who did he brag about it to?
25    A  I think he was talking maybe to Mr. Cho or

---

Page 155

1 Ko, but happen to be I was there. So I heard,
2 overheard, then they knew that when I overheard, they
3 immediately changed the subject. But I wasn't stupid.
4 I mean I heard everything. I got it.
5      I now remember. When we were having meal,
6 he said he was planning to do some different business
7 behind his father. He was asking that, giving me some
8 idea, if you have some idea to do some different
9 business. The subject of our conversation became like
10 business between us, how much you would need to have
11 that kind of business, so and so.
12      At the time Mr. Yoon said -- he bragged
13 that he had $400,000 in cash which was behind his
14 father's back from which he received that from
15 Sam Sung. S-a-m, one space, S-u-n-g. It's name of
16 company.
17    Q  And you overheard this?
18    A  Yes.  And then also said that the money
19 came from the payment of molding, like molding. You
20 can produce same thing over and over through molding.
21    Q  Anything else you can recall that you based
22 your statement to Mr. Kang about your belief that
23 Mr. Yoon had embezzled or stolen money?
24    A  No.  That's all what Mr. Yoon said.  That's
25 all I had.

---

Page 156

1    Q  Now, the meetings that you talked about in
2 the meeting room, where was the meeting room?
3    A  Mr. Yoon's office is the meeting room.
4    Q  And who attended these daily meetings?
5    A  As I stated earlier, that all Korean
6 managers attended.
7    Q  And you mentioned that Raul attended for a
8 few minutes?
9    A  Yes, I did.
10    Q  And was that every time or just sometimes?
11    A  Whenever when Mr. Yoon calls him specially.
12    Q  Did you ever see Mr. Yoon strike Mr. Kang
13 with a ruler?
14      MR. GREY:  Objection.  Asked and answered.
15      THE WITNESS:  Yes.
16 BY MR. BATTENFELD:
17    Q  How many times?
18    A  More than ten times.
19    Q  He struck Mr. Kang more than ten times?
20    A  Yes.
21    Q  Because earlier you testified that he
22 struck Mr. Park more than ten times.
23      Is it also your testimony that he struck
24 Mr. Kang more than ten times?
25    A  Mr. Yoon harassed those two different from

---

Page 157

1 one another and the other one.  Mr. Park and Mr. Kang.
2 He harassed and abused those two.
3    Q  Question I'm asking is just to confirm is
4 it your testimony that you observed Mr. Yoon striking
5 Mr. Kang with a ruler more than ten times.
6    A  Yes.  Definitely more than ten times.
7    Q  Okay.
8      MR. GREY:  Before we go any further, how
9 much longer, John?
10      MR. BATTENFELD:  I've only got a few more
11 questions.  I will represent you did not get into this
12 issue.  You asked about Mr. Park but not Mr. Kang, so
13 that's why I'm asking.
14      MR. GREY:  Go ahead.  Just a couple more
15 questions?
16      MR. BATTENFELD:  Yeah.  I'm very close to
17 being done.
18 BY MR. BATTENFELD:
19    Q  When you observed Mr. Yoon striking
20 Mr. Kang with a ruler, was anyone else ever present
21 besides yourself, Mr. Yoon and Mr. Kang?
22    A  Mostly I only like to state what I saw.
23 Mostly the event or events have been taken in the
24 meeting room.
25    Q  Was Mr. Park ever present when Mr. -- when

| Page 158 | Page 159 |
|---|---|

**Page 158**

1  you observed Mr. Yoon strike Mr. Kang with a ruler?
2      A   Yes.
3      Q   Was Mr. Cho ever present when you observed
4  Mr. Yoon strike Mr. Kang with a ruler?
5      A   Yes.
6      Q   Was Mr. Ko ever present when you observed
7  Mr. Kang strike Mr. Cho -- sorry -- Mr. Yoon strike
8  Mr. Kang with a ruler?
9      A   Yes.
10     Q   And did you ever observe Mr. Yoon strike
11 anyone with a ruler other than Mr. Park and Mr. Kang?
12     A   Yes.  Of course, but I see Mr. Ko also
13 receive that too.
14     Q   And do you recall any of the -- of any of
15 the times that you saw Mr. Yoon strike Mr. Kang with a
16 ruler, do you recall anything that caused him to
17 strike Mr. Kang with a ruler?
18     A   No.
19     Q   Was Mr. Yoon angry at Mr. Kang for some
20 reason?
21     A   I do not know whether he had a reason or
22 not, but in that company whether you have a reason or
23 not I don't think anybody striking somebody else can
24 be justified.  I don't think so.
25     Q   Again my question is whether you recall any

**Page 159**

1  of the incidents where you can recall what caused
2  Mr. Yoon to strike Mr. Kang.  For example, was he
3  upset about production?  Was he upset about a work
4  error that Mr. Kang had made?  Was he upset about some
5  personal issue?  Do you remember any of the reasons
6  that led Mr. Yoon to strike Mr. Kang with a ruler?
7      A   You cannot define whether he has some
8  reason or not.  He may have some personal reasons, but
9  whether he has personal reasons or not, he brings
10 everything to work all day.  His mood has been up and
11 down, up and down.  You even cannot even reason what
12 is the reason behind his behaviors.
13     Q   He was a mystery to you?
14         THE INTERPRETER:  I didn't hear you.
15 BY MR. BATTENFELD:
16     Q   Mr. Yoon was a mystery to you, his
17 behavior?
18         MR. GREY:  Object.  Misstates his
19 testimony.
20         THE WITNESS:  Yes.
21 BY MR. BATTENFELD:
22     Q   And where did you observe Mr. Kang being
23 struck with the ruler by Mr. Yoon?  Not where as in
24 the office, but where on Mr. Kang's body?
25     A   Shoulder, neck, head, arm area.  I think

| Page 160 | Page 161 |
|---|---|

**Page 160**

1  those.
2      Q   And sometimes with the flat part of the
3  ruler and sometimes with the edge of the ruler?
4      A   Yes.
5      Q   And did Mr. Kang ever act in a manner where
6  you believe he was hurt physically by what Mr. Yoon
7  was doing with the ruler?
8          MR. GREY:  Objection.  Calls for
9  speculation.
10         THE WITNESS:  I never got hit by other
11 people.  I cannot relate my feeling, that kind feeling
12 to me.
13 BY MR. BATTENFELD:
14     Q   Okay.  So you don't know?
15     A   If you get hit, wouldn't you get hurt?
16     Q   Well, the question I'm asking is from your
17 observation of Mr. Kang, did you observe anything that
18 caused you to believe that it physically hurt Mr. Kang
19 when he was hit with the ruler?
20     A   I don't think it's reasonable for me to
21 tell you whether physically when Mr. Yoon struck
22 Mr. Kang hurt or not because he didn't do that to me.
23 So when you are telling me to describe whether
24 Mr. Kang got hurt or not, I don't think it's feasible
25 for me to answer for your question because I don't

**Page 161**

1  know physically how much it hurt him or not.
2          THE REPORTER:  I need a break.
3          (Recess)
4  BY MR. BATTENFELD:
5      Q   Now, you previously estimated that Mr. Yoon
6  had kicked Mr. Kang three to four times.
7          Did you ever observe anything that --
8  either Mr. Kang's reaction or anything else that
9  caused you to believe that it hurt Mr. Kang when he
10 was kicked by Mr. Yoon?
11     A   Yes.
12     Q   What?
13     A   He had had expression when he got hit by --
14 kicked by Mr. Yoon.  He was holding his legs or leg
15 got struck by Mr. Yoon and holding it, rubbing it, and
16 then also he expressed that it was hurting.
17     Q   And how many of the three or four times
18 that you saw Mr. Yoon kick Mr. Kang did he react in
19 that manner?
20     A   Every time when he kicked Mr. Kang.  I
21 think every time.
22     Q   And am I correct that the only people
23 Mr. Yoon ever kicked that you observed being kicked
24 were Mr. Park and Mr. Kang?
25     A   Mr. Ko got too.

Page 158 - Page 161

Page 162

```
 1       Q  And how many times did you observe Mr. Ko
 2  being kicked?
 3       THE WITNESS (without interpreter):  Mr. Ko?
 4       MR. BATTENFELD:  Yes.
 5       THE WITNESS:  Couple times, I think.
 6  BY MR. BATTENFELD:
 7       Q  And how many times did you see Mr. Ko
 8  struck with a ruler?
 9       A  About three times.  Three times.  About
10  three times.
11       MR. GREY:  What was the last question?
12       (Question read)
13  BY MR. BATTENFELD:
14       Q  Now, if you could look at your declaration
15  and look at Paragraph 6 on Page 2, do you see that?
16       A  Yes.
17       Q  Your declaration says, "Once I saw Mr. Yoon
18  throw a crystal ashtray at Mr. Park which struck him
19  on the forehead.  I was told by a secretary thereafter
20  that he bled because of it."
21       Who was the secretary who told you that?
22       A  Laura.
23       Q  How do you spell that?
24       A  We call Laura.
25       Q  Was she one of the Mexican workers?
```

Page 163

```
 1       A  Yes.
 2       Q  Whose secretary was she?
 3       A  I think she was working for accounting
 4  department, but she also covered as a secretary role
 5  too.  There was one more lady, which I don't remember
 6  her name.
 7       Q  And this incident with the ashtray, what
 8  month did this incident occur?
 9       A  That event was not during my employment
10  there.  Therefore, when I heard that, I assumed that
11  that event was there before I went to work there.
12       Q  Okay.  So the incident when Mr. Yoon threw
13  a crystal ashtray at Mr. Park where you were told by a
14  secretary that he bled because of it, that did not
15  occur while you were working for U. Lim?
16       A  That's correct.
17       Q  When did it occur?
18       A  I state earlier that I assume that it
19  didn't happen when I was there, so it could have been
20  before.
21       Q  When were you told about the incident?
22       A  No idea.
23       Q  Sometime after you had left U. Lim's
24  employment you were told by Laura about the incident?
25       A  No.  When I was working there after I got
```

Page 164

```
 1  acquainted with the Mexican staff there, then they
 2  told me about it.
 3       Q  Okay.  So they told you about it while you
 4  were working, but it had happened -- you believe it
 5  happened before you started working for U. Lim?
 6       A  Yes.
 7       Q  So just to be clear, you did not personally
 8  observe Mr. Yoon throw an ashtray at Mr. Park which
 9  struck him on the forehead?
10       A  It's correct.
11       Q  Did you ever tell anyone who worked for
12  U. Lim that the -- you had gotten sick, you were
13  having stomach problems because of some food you had
14  eaten?
15       A  You mean some food I got ill I ate?
16       Q  The question is did you tell anyone who
17  worked at U. Lim that you had gotten sick, that you
18  were having stomach problems because of food you had
19  eaten?
20       A  I may have so.  The reason is the symptoms
21  I have I find out after I quit U. Lim, and then also I
22  found out when they open up my stomach, they find out
23  what went wrong.
24       So when I was working there, I didn't know
25  whether that was caused by food that I ate.  I didn't
```

Page 165

```
 1  know anything.  So I may have.  I don't remember
 2  whether I said that or not.  I don't recall right now
 3  at all about it.  Just logically if you eat something
 4  wrong, you maybe have a few days of stomach sick.  So
 5  I may have so, but I don't recall right now at all.
 6       Q  Do you currently have Crone's disease?
 7       A  I am still taking medication so -- but you
 8  want me to say yes or no, so I would say yes, even
 9  sitting here I still have pain here.  I can even hear
10  what is going on there.  I'm sure the people sitting
11  both sides, they may have heard.
12       Q  Has any doctor ever told you that your
13  Crone's disease was a genetic condition?
14       A  Yes.
15       Q  And what doctor or doctors told you that?
16       A  Dr. Simay.
17       Q  How do you spell that?
18       A  Can I see?
19       Q  Sure.  Do you have a business card for him?
20       A  Before they open my stomach, nobody ever
21  told me that I had Crone's disease.  This is not --
22  this is my family doctor.  This is like my family
23  doctor.  Simay.
24       Q  How do you spell that?
25       A  S-i-m-a-y.
```

**Page 166**

```
 1      Q   S-i-m-a-y?
 2      A   I am reading. He is not the one who did
 3   operate me. He is my family doctor. He has custody
 4   of my -- the surgery record. Telephone number is 619
 5   454-6141.
 6          MR. GREY:  We're taking one break?
 7          (Recess)
 8   BY MR. BATTENFELD:
 9      Q   Mr. Baek, has any doctor ever told you that
10   your Crone's disease was caused by your working
11   conditions at U. Lim?
12      A   No.
13          MR. BATTENFELD:  I have nothing further.
14
15          FURTHER EXAMINATION
16   BY MR. GREY:
17      Q   Mr. Baek, I understand we've been going at
18   it now since 10:00 o'clock.  So that's nearly nine
19   hours of deposition.
20          What time did you go to bed last night?
21      A   3:30 a.m.
22      Q   What time did you get up this morning?
23      A   7:00 o'clock.
24      Q   Is it fair to say you're very tired right
25   now?
```

**Page 167**

```
 1      A   Yes.
 2      Q   I want to try to clarify a couple of points
 3   because I think you were tired by the end of this
 4   deposition.
 5          In your declaration you indicated that you
 6   observed Mr. Yoon throw objects at Mr. Park including
 7   an ashtray?  Do you see that?
 8      A   (Witness nods)
 9      Q   And in your deposition earlier today you
10   indicated again that you observed Mr. Yoon throw an
11   ashtray at Mr. Park.
12          As you sit here today, do you remember
13   seeing that?
14      A   Yes, he did.  Yes, I am certain about it.
15      Q   And this wasn't just something somebody
16   told you, correct?
17      A   The reason I am laughing right now is when
18   he was asking me question, I got confused with a few
19   things.
20      Q   What did you get confused about?
21      A   When I saw that the ashtray was thrown to
22   Mr. Park, I got quite scared.  Therefore, when I was
23   talking about it, Laura stated that it happened before
24   too.
25      Q   Okay.  So when you referred to something
```

**Page 168**

```
 1   happening before, that was another event; is that
 2   correct?
 3          MR. BATTENFELD:  I'll object to the
 4   question as leading.
 5   BY MR. GREY:
 6      Q   You can answer.
 7      A   Yes.  It's very clear, yes.
 8      Q   And that was an event you did not see?
 9      A   Yes.  When he was asking me about the event
10   that I did not see.
11      Q   Now, defense counsel asked you a whole
12   bunch of questions about who was kicked, who Mr. Yoon
13   threw things at and who did Mr. Yoon hit.  Okay.
14          Do you remember that?
15      A   I will try to recall.
16      Q   Okay.  And I believe at one point in the
17   deposition he asked you a string of questions, did
18   Mr. Yoon ever kick Mr. Ko, did Mr. Yoon ever kick
19   Mr. Cho, did Mr. Yoon ever throw something at Mr. Cho,
20   did Mr. Yoon ever throw something at Mr. Ko.
21          Do you remember that line of questioning?
22          MR. BATTENFELD:  I'll object to the
23   question as being compound and leading.
24          THE WITNESS:  Yes.
25   ///
```

**Page 169**

```
 1   BY MR. GREY:
 2      Q   And I believe at that time you indicated
 3   that you had never seen Mr. Ko hit by Mr. Yoon, and
 4   later in the deposition you indicated that you saw
 5   Mr. Ko struck with a ruler three times.
 6          As you sit here today, do you have a
 7   personal recollection of ever having seen Mr. Yoon
 8   strike Mr. Ko with a ruler?
 9      A   I don't think so.  He confused me a lot.
10      Q   Okay.
11      A   I had a certain memory in my head.  When he
12   ask me question, he jumps one to the other one to the
13   other way.  Then you get very natural way of
14   confusion.
15      Q   We just want to get the truth out, whatever
16   that is.  Okay?
17          And as you sit here today, is it your
18   belief or do you have any recollection of whether or
19   not Mr. Yoon struck Mr. Ko with a ruler in your
20   presence?
21      A   Now I think that Mr. Yoon -- I don't think
22   I witnessed hitting Mr. Cho.  Mr. Ko -- my head is not
23   very clear right now.
24      Q   Now, we just confused Cho and Ko.  Right
25   now we're talking about Ko.  If you don't remember,
```

Page 170

1  you can say, "I don't remember."
2      A  If you sleep only three hours, I don't
3  think you can have straight answers. I just like to
4  finish it up and go back home and sleep.
5      Q  Okay. Is it your testimony then you're too
6  tired now to think clearly?
7      A  Yes. And then also the memories got all
8  blurry now because the reason so many questions, so
9  long questions. I have been drilled by the other
10  attorney.
11      MR. GREY: Well, we can suspend your
12  deposition then. Okay? I warn you there is a chance
13  that we may have to come back to get your best
14  testimony on some of these matters. Now, that's not
15  guaranteed to happen because you're going to get a
16  copy of the transcript and you're going to have an
17  opportunity to go through that transcript and to make
18  corrections that you deem necessary. But there is a
19  chance because we won't -- we'll be suspending the
20  deposition that if the attorneys are not satisfied
21  that they have all the information necessary to
22  conclude the deposition, you may have to come back.
23      Do you understand that?
24      (No audible response)
25      THE REPORTER: I didn't hear an answer.

Page 171

1  I'm sorry.
2      THE WITNESS: Yes.
3      MR. GREY: Then I propose we suspend the
4  deposition. We'll issue the transcript as Volume I.
5  We relieve the court reporter of her duty under the
6  code and forward the deposition transcript directly to
7  Mr. Baek to have him read and sign the deposition
8  transcript.
9      You will have 30 days from the date of
10  receipt to read and sign the transcript, to make any
11  corrections which you deem are necessary and then to
12  notify us of those changes.
13      And I would propose that the original be
14  forwarded to my office to remain in my custody and to
15  be produced at the time of trial or any other judicial
16  proceeding or so required or requested. And if for
17  any reason the original is lost, stolen, misplaced, a
18  certified copy can be used in its stead. And I will
19  notify defense counsel of any changes received within
20  three days of receipt.
21      MR. BATTENFELD: Couple things. I think
22  your proposed stipulation was a little confusing. You
23  originally said the original would be forwarded to
24  Mr. Baek, and later I think you said the original
25  would be forwarded to you. Which is it you're

Page 172

1  proposing?
2      MR. GREY: After he reads and signs it,
3  he'll mail it to me.
4      MR. BATTENFELD: Your proposal is the
5  transcript will be initially sent to Mr. Baek?
6      MR. GREY: Right.
7      MR. BATTENFELD: After he's reviewed it and
8  signed it, he'll forward it to you; is that correct?
9      MR. GREY: Right.
10      MR. BATTENFELD: I just want to make
11  sure -- since the witness is going to be part of this,
12  he needs to make a representation that he will both,
13  you know, accept the original transcript and then he
14  will commit to forwarding it to Mr. Grey after he's
15  had an opportunity within the 30 days to correct and
16  sign it.
17      MR. GREY: Do you understand the
18  stipulation?
19      THE WITNESS: Yes.
20      MR. GREY: And do you accept the
21  responsibility to read and sign your transcript and
22  forward it to my office after you've done so?
23      And please forward to him a stamped,
24  addressed envelope to my office with the original.
25      MR. BATTENFELD: The only other stipulation

Page 173

1  I propose is that if Mr. -- for some reason Mr. Baek
2  does not sign and forward the original transcript to
3  you, that an unsigned copy, certified copy of the
4  transcript may be used for all purposes.
5      MR. GREY: So stipulated.
6      THE REPORTER: Off the record?
7      MR. GREY: I think so.
8      (Whereupon Volume I proceedings concluded
9  at 7:15 p.m.)

10
11          *  *  *

| Page 174 | Page 175 |
|---|---|
| 1  DECLARATION UNDER PENALTY OF PERJURY<br>2<br>3    I, TEDDY BAEK, do hereby certify under<br>4  penalty of perjury that I have read the foregoing<br>5  transcript of my deposition taken November 10, 1999;<br>6  that I have made such corrections as appear noted<br>7  herein, in ink, initialed by me; that my testimony as<br>8  contained herein, as corrected, is true and correct.<br>9    Dated this _____ day of _____,<br>10  19 ___, at _____, California.<br>11<br>12<br>13<br>14<br>15    _____<br>16    TEDDY BAEK<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2    I, Anita Worthington, a Certified Shorthand<br>3  Reporter in the State of California, do hereby<br>4  certify:<br>5<br>6    That the foregoing witness was by me duly<br>7  sworn; that the deposition was then taken before me at<br>8  the time and place herein set forth; that the<br>9  testimony and proceedings were reported<br>10  stenographically by me and later transcribed into<br>11  typewriting under my direction; that the foregoing is<br>12  a true record of the testimony and proceedings taken<br>13  at that time.<br>14<br>15    IN WITNESS WHEREOF, I have subscribed my name<br>16  this _____ day of _____, 1999.<br>17<br>18<br>19<br>20    _____, CSR No. 7356<br>21    Anita Worthington<br>22<br>23<br>24<br>25 |

Page 174 - Page 175

Legal Tabs Co. 1-800-322-3022

Recycled   Stock # DO-10-B

## DECLARATION OF RAUL CARILLO

I, Raul Carillo, declare as follows:

1.     I reside at Calle Ignacio Ramirez, #33, Modulo 1, Mesa De Otay, Tijuana, B.C.  CP 22500.

2.     From $\underline{July\ 95}$ to $\underline{April\ 97}$* I worked at ULIM Corporation, located at Carlos Salinas De Gortari No. 3 Parque industrial presidentes, Tijuana, Mexico.

3.     I was employed as an assistant manager to Soo Wan Park who was the production manager for ULIM.

4.     During my employment at ULIM I observed a continuous pattern of abusive conduct, physical and mental, engaged in by the president of the company, Tai Jin Yoon, toward his employees.  His behavior was particularly abusive toward the Korean managers and in particular, Mr. Park (my supervisor) and Soo Kang (the purchasing manager).

5.     I observed on numerous occasions Mr. Park being hit by Mr. Yoon with the edge of a ruler. He would hit Mr. Park with the ruler all over his body, including his head.  I also observed Mr. Yoon strike Mr. Kang and Mr. Suhko Ko (who was employed by ULIM as a production manager for a short time) in a similar fashion.

6.     I observed Mr. Yoon throw objects at Mr. Park including telephones and ashtrays.  Twice Mr. Yoon broke the telephone by hitting Mr. Park with it.  I also observed on one occasion Mr. Yoon throw a crystal ashtray at Mr. Park which struck him on the forehead and caused him to bleed.  I observed Mr. Yoon throw files and reports at Mr. Kang which would sometimes strike him in the face.

7.     When Mr. Ko was fired, I observed Mr. Yoon approach him and hit him hard on the head because Mr. Ko had fallen asleep at his desk due to the long hours he was working.  Mr. Ko was then

called into Mr. Yoon's office and was either fired or quit. I never saw him again.

8.      I would frequently observe Mr. Yoon yelling at Mr. Park and Mr. Kang for hours on end. Sometimes he would yell at Mr. Park and Mr. Kang for 2-3 hours at a time. On these occasions, Mr. Park and Mr. Kang would be forced to stand at attention, put their hands behind their back and were forbidden to look Mr. Yoon in the eye. I am also aware of the fact that Mr. Yoon would frequently refer to Mr. Park and Mr. Kang in derogatory terms when he was yelling at them, specifically including telling them they were "assholes" and/or "sons of bitches".

9.      I frequently observed Mr. Yoon, while he was yelling at Mr. Park or Mr. Kang, grab them by the ear and forcibly pull them into his office. This happened many times.

10.     Mr. Park, Mr. Kang and Mr. Ko were forced to work usually 7 days a week. I usually worked 6 days a week due to both the work load and the fact that all the employees were required to work Saturdays to make up for the two weeks of vacation ULIM provided us at Christmas. During the last year, I was employed by ULIM, my hours were normally from 6:45 a.m. until 8:00 p.m. I was never paid overtime. When I would leave the office, Mr. Park, Mr. Ko and Mr. Kang would still be working. Additionally, I am aware that Mr. Park, Mr. Kang and Mr. Ko would normally work Sundays as well.

11.     I also observed that Mr. Yoon would not allow the other Korean managers to eat lunch until he ate lunch as he did not like to eat alone. This frequently created problems for the managers because Mr. Yoon would frequently not come to work until 10:00 or 11:00 in the morning and so he would not be hungry until frequently 3:00 or 4:00 in the afternoon. However, as the other managers had been at work since 6:45 in the morning this would result in a substantial hardship.

12.     The only Korean manager excluded from this abuse was the General Manager, Jae Ho Cho,

who was a personal friend of Mr. Yoon.

13.     Although Mr. Yoon was not as abusive to the non-Korean employees, he was still verbally abusive.  He would yell at me for hours at a time frequently using the same derogatory terms he would use when he was yelling and the Korean managers.  The environment this created was one of extreme stress.

14.     As a general manager, Mr. Yoon would use the office staff for any use he saw fit.  Their was no dividing line between Mr. Yoon's business concerns and his personal needs.  On numerous occasions, I was asked as a Mexican, and therefore as a person who knew the area, to try to find prostitutes to consort with Mr. Yoon.  Additionally, I was asked where medicines such as penicillin could be procured after such encounters.  I also observed that Mr. Yoon would typically hire only attractive women with large breasts to be the office secretaries regardless of their qualifications.  On one occasion, he hired a particular attractive woman with large breasts who did not even know how to type.  On this occasion, he made us move her desk into his private office which had never been done before.  Ultimately, I was terminated from ULIM after Mr. Yoon's father came into the shop and had grabbed two womens' breasts who worked in the plant.  When I informed Mr. Yoon that his father could not act that way I was told that I was never to tell him or his father what they could do.  I shortly thereafter was told to wash his father's car in front of all the employees.  When I refused I was terminated.  I then made a complaint to the Mexican Labor Board, which ultimately was resolved in my favor.

15.     I never observed Mr. Park, Mr. Kang or Mr. Ko take any action to instigate or provoke the physical and verbal abusive directed at them by Mr. Yoon.

        I declare under penalty of perjury under the laws of the State of California that the foregoing

Page 3 of 4

declaration is true and correct.

Dated: _9 - 15 - 98_

Raul Carillo

* Represented to Richard Grey after signature.

Legal Tabs Co  1-800-322-3022

Recycled   Stock # DO-10-B

1 | **LAW OFFICE OF RICHARD E. GREY**
RICHARD E. GREY,  Bar No. 157406

2 | 409 Camino Del Rio South, Suite 303
San Diego, California  92108

3 | (619) 543-9300

4 | **Attorney for Plaintiff SOO CHEOL KANG**

```
                              ┌─────────────────────────────┐
                              │          FILED              │
                              │                             │
                              │       FEB  -  2000          │
                              │                             │
                              │  CLERK, U.S. DISTRICT COURT │
                              │ SOUTHERN DISTRICT OF        │
                              │ CALIFORNIA                  │
                              │ BY                  DEPUTY  │
                              └─────────────────────────────┘
```

7 | UNITED STATES DISTRICT COURT

8 | SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 9 | SOO CHEOL KANG | )    CASE NO.  99CV659JM (RBB) |
| 10 |       PLAINTIFF, | ) |
| 11 | | )    **EX PARTE APPLICATION FOR DISCOVERY** |
| | | )    **SANCTION ADMITTING DECLARATION** |
| | | )    **INTO EVIDENCE, OR IN THE** |
| 12 | v. | )    **ALTERNATIVE, FOR MODIFICATION** |
| | | )    **OF CASE MANAGEMENT CONFERENCE** |
| 13 | U.LIM AMERICA, INC.  a California | )    **ORDER REGULATING DISCOVERY** |
| 14 | corporation; TAE JIN YOON, | )    **RE: EXTENDING DISCOVERY** |
| | and DOES 1 to 100 | )    **CUTOFF AND STAYING PROCEEDINGS** |
| 15 | | )    **PENDING TAKING OF DEPOSITION OF** |
| | | )    **MATERIAL WITNESS RAUL CARILLO** |
| 16 |       DEFENDANTS. | )    **and MOTION FOR SANCTIONS** |
| | | )    **AGAINST DEFENDANT U.LIM AMERICA** |
| 17 | | )    **FOR OBSTRUCTING DISCOVERY** |
| 18 | | ) |
| 19 | | ) |
| 20 | | ) |

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2  I.    CASE SUMMARY ............................................. 1

3  II.   PROCEDURAL BACKGROUND .................................. 1

4  III.  ARGUMENT ................................................. 2

5        A.    DEFENDANTS' HAVE ILLEGALLY INTIMIDATED A KEY
              MATERIAL WITNESS IN THESE PROCEEDINGS .................. 2
6
7              1.   RAUL CARILLO is a Critical Material Witness in
                   these Proceedings ..................................... 2

8              2.   Mr. CARILLO had Previously Agreed to Voluntarily
                   Submit to Examination by Oral Deposition ............ 3
9
                3.   Mr. CARILLO Failed to Attend his Deposition. ........ 3
10
11             4.   Mr. CARILLO told Plaintiff that he did not Appear
                   For The Deposition because he was told he would be
12                 Fired ................................................ 4

13             5.   Plaintiff attempted to find alternate employment for Mr. Carillo so that
                   he would be free to testify. ........................... 4

14             6.   Based on the Testimony of Defendants' General
                   Manager, JAE H. CHO, and the other Deponents in
15                 this Action, U.LIM has Engaged in Illegal Witness
                   Intimidation by Threatening Mr. CARILLO with
16                 Termination Should he Testify in this Matter. ........ 5

17                  a.   CHO Admits he Spoke with CARILLO
                        Prior to his Scheduled Deposition and
18                      Asked Him Not to Testify ......................... 5

19                  b.   CHO's   Claim   that   CARILLO
                        Contacted Him Only Because Plaintiff
20                      had tried to Bribe Him Is a Clear Lie ............ 6

21                  c.   CHO Admits that he Called CARILLO
                        to "Thank Him" for not Testifying
22                      After the Scheduled Deposition ................... 8

23                  d.   CHO   Admits   that   CARILLO
                        Specifically told CHO that he "Liked
24                      His   Job"   and   Testifying   Would
                        Jeopardize His Job ............................... 9
25
                    e.   CHO's Responses as to his Meeting
26                      with CARILLO are Inconsistent and
                        Evasive. ......................................... 9
27
                        i.    What Was Said at the
28                            Meeting .................................... 9

                        ii.   Who was at the Meeting ..................... 10

f.   CHO's Testimony as to CARILLO's "Friendship" with CHO and PARK is Particularly Dubious Given that CARILLO was Fired by U.LIM after Complaining About Sexual Harassment at U.LIM .................................... 11

7.   U.LIM's Witness Tampering is Further Established by the Testimony of Plaintiff's Other Witnesses ...................... 12

a.   Plaintiff's Other Witness, Mr. BAEK and Mr. CHEONG, Appeared for Deposition and Substantiated Allegations Similar to Those Made by Mr. CARILLO ........................................ 12

b.   Plaintiff's Witness BOWON CHEONG has Testified that U.LIM has Instructed Witnesses to Lie In Discovery ........................................ 13

8.   Defense Counsel has Shown no Concern over his clients Admitted Interference with the Deposition of Mr. Carillo. .................. 13

B.   DEFENDANT'S TAMPERING WITH THIS WITNESS WARRANTS THE IMPOSITION OF DISCOVERY ISSUE SANCTIONS OR A STAY IN PROCEEDINGS TO ALLOW FOR THE ISSUANCE OF LETTERS ROGATORY COMPELLING CARILLO'S DEPOSITION ....... 14

1.   Plaintiff Should Be Entitled to Submit the Declaration as the Sworn Testimony of Carillo, Without Objection by Defendants ............................................... 14

a.   The Court has the Inherent Authority to Issue a Discovery Sanction Order Admitting CARILLO's Declaration into Evidence ........................................ 15

b.   Admitting CARILLO's Declaration into Evidence is the Most Economical Means to Remedy Defendants' Abuse of Discovery ........................................ 16

c.   Defendants' Own Conduct Has Forestalled Their Opportunity To Cross-Examine CARILLO re: his Declaration, Which Could Otherwise Considered Hearsay ........................................ 16

2.   In The Alternative, Plaintiff Is Entitled to an Order For Issuance of Letters Rogatory And Sanctions For The Costs Thereof ........................................ 16

ii

a.   Mr. CARILLO will not Submit to
     Deposition Absent Compulsion Subsequent
     to Defendants' Having Threatened his Job  . . . . . . . . . . . . . . . . . 16

b.   A Stay of Proceedings is Warranted to
     Permit the Taking of CARILLO's
     Deposition.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.   PLAINTIFF IS ALSO ENTITLED TO MONETARY SANCTIONS
     AGAINST   U.LIM   UNDER   THE   COURT'S   INHERENT
     AUTHORITY TO SANCTION DISCOVERY MISCONDUCT  . . . . . . . . . . . . . 17

IV.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

**TABLE OF AUTHORITIES**

**FEDERAL STATUTES**

Federal Rule of Evidence §801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**FEDERAL CASES**

*Campbell Industries v. M/V Gemini* (9th Cir.SD Cal 1980) 619 F.2d 24, 27 . . . . . . . . . . . . . . . . . 16

*Chambers v. NASCO, Inc.* 501 U.S. 32, 43 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Link v. Wabash R. Co.*, 370 U.S. 626, 632 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Roadway Express, Inc. v. Piper* 447 U.S. 752, 765 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**CALIFORNIA CASES**

*Windigo Mills v. California Unemployment Appeals Board* (1979) 92 Cal.App.3d 586, 598 . . . . . . . . 16

## I. CASE SUMMARY

This case is based upon Plaintiff's wrongful termination from employment by his employer, U.LIM AMERICA, INC. on or about February 2, 1998.  Plaintiff worked at U.LIM AMERICA's Tijuana, Mexico facility from 1994 until his termination.  During that time, Plaintiff was verbally abused and repeatedly physically struck by his supervisor, defendant TAE JIN YOON, vice-president of defendant U.LIM AMERICA.  Plaintiff was also subjected to working oppressive hours (often in excess of 60 hours per week) without just compensation.  Plaintiff suffered further abuses as detailed fully in the Complaint in this action.  All of these acts against Plaintiff were motivated by the fact that Plaintiff is of Korean descent, and accordingly was expected to work harder and endure harsher conditions, physically and emotionally, then the non-Korean workers at U.LIM were not subjected to these oppressive schedules and physical violence.

Defendant U.LIM AMERICA asserts that Plaintiff's work hours were not excessive or oppressive, that Plaintiff was not verbally or physically assaulted in the course of his employment, and most importantly for the issues under consideration herein, that Plaintiff was not treated discriminatorily because of his national origins.

## II. PROCEDURAL BACKGROUND

This court issued its case management conference order regulating discovery on May 12, 1999.  Therein, it was specified that all discovery proceedings must be concluded by January 17, 2000.  Plaintiff moves herein for:

    a)    A discovery sanction order under the inherent authority of this Court permitting the previously obtained Declaration of material witness RAUL CARILLO to be admitted into evidence as his direct testimony, or, in the alternative;

    b)    An order extending the time for discovery to permit the deposition of CARILLO to be compelled via letters rogatory submitted to the central judicial authority of the Republic of Mexico, of which he is a citizen and resident, and for a stay in proceedings until this deposition may be taken. Plaintiff further requests sanctions against Defendant U.LIM AMERICA, INC. for the costs of this proceeding and the issuance of letters rogatory.

This request is based upon defendants' admission that they suborned the testimony of this key material witness, as detailed below.

- 1 -

# III. ARGUMENT

## A.   DEFENDANTS' HAVE ILLEGALLY INTIMIDATED A KEY MATERIAL WITNESS IN THESE PROCEEDINGS

### 1.   RAUL CARILLO is a Critical Material Witness in these Proceedings

Mr. Carillo was an employee of U.LIM Mexico from July of 1995 through April of 1997. U.LIM Mexico was and is wholly owned by U.LIM America and during the period of plaintiff's employment both companies shared the same facility. Virtually all of the employees of U.LIM Mexico were of Mexican origin whereas all the employees of U.LIM America were of Korean descent.[1] Mr. Carillo was an assistant manager of production and accordingly worked in the main office with Mr. Kang.

On or about September 15, 1998 Raul Carillo executed a declaration sworn under penalty of perjury which stated, in summary, that:

a)   He worked at U.LIM AMERICA, INC. from July of 1995 through April of 1997 and during that time;

b)   he had personally observed on numerous occasions TAE JIN YOON physically striking Plaintiff and other Korean employees with his hands and with various objects including metal rulers and ashtrays;

c)   he saw TAE JIN YOON strike one Korean manager, Mr. Park, with an ashtray on one occasion with such force that his forehead bled;

d)   he had frequently observed TAE JIN YOON screaming profanities and other derogatory comments at Korean employees, including Plaintiff, for long periods of time, sometimes 2-3 hours at a time;

e)   he saw Plaintiff working six and seven day workweeks, often past 8:00 p.m. in the evening;

f)   U.LIM required its employees to work Saturdays to make up for the two weeks of vacation U.LIM provided at Christmas;[2] and

g)   While TAE JIN YOON and his father, U.LIM's President KI HWA YOON, were not as abusive toward non-Korean employees, they were

---

[1]     U.LIM Mexico produced all the products sold by U.LIM America. Accordingly, all the production employees were employed by U.LIM Mexico. All managers, excluding assistant managers, were employed by U.LIM America which supervised all operations of both U.LIM Mexico and U.LIM America.

[2]     Mexican labor law required U.Lim Mexico to provide its employees with two weeks vacation at Christmas [See, Excerpts from Deposition of U.Lim President KI HWA YOON (hereinafter YOON), attached hereto as EXHIBIT 1, at 120 and Excerpts from Deposition of U.Lim manager SOON WAN PARK (hereinafter PARK), attached hereto as EXHIBIT 2, at 275-276]

1

> often verbally abusive to CARILLO and other Mexican employees, and
> were sexually abusive toward Mexican female employees.

See, Declaration of Raul Carillo, attached hereto as EXHIBIT 3

Accordingly, Mr. Carillo is a key witness in this litigation as he was in a position to observe the defendants' conduct towards the plaintiff and did indeed observe that conduct. His observations clearly support the plaintiff's allegations and contradict the defendants' denials of wrongdoing. Furthermore, as a non-Korean, he is in a more impartial position to have judged whether the Koreans were treated more unfairly than non-Korean employees. He admits that even non-Koreans were abused, but concedes that the Koreans were treated worse than non-Koreans. As such, his testimony is crucial to establishing Plaintiff's case.

> 2.     Mr. CARILLO had Previously Agreed to Voluntarily Submit to
>         Examination by Oral Deposition

At the time Mr. Carillo executed his declaration on September 15, 1998, he agreed to testify for the plaintiff on these matters and reassured both plaintiff and plaintiff's counsel that if a deposition was required that not only was he willing to testify as to the matters set forth in his declaration but that he felt that he had a moral duty to do so. [Declaration of Richard E. Grey at Paragraph 12] Accordingly, after the case was filed and preliminary discovery was conducted, CARILLO's deposition was scheduled for Saturday, October 23, 1999 at 10:00 a.m. at the Holiday Inn Caliente in Tijuana, Mexico.   On October 18, 1999, Plaintiff's counsel gave notice of this voluntary deposition to defendant's counsel, John Battenfeld. [Declaration of Richard E. Grey at Paragraph 13 and correspondence attached thereto as EXHIBIT 4]   Plaintiff's counsel's office confirmed with Mr. Carillo on several occasions his agreement to appear at the deposition. [See, Declaration of Dawn M. Souder at Paragraphs 3-8]

Notably, in the absence of this voluntary agreement, Plaintiff would have been required to issue letters rogatory to the Mexican judicial authorities which, as the Court knows, often take months of time to issue and cost hundreds of dollars (e.g. $445.00 is required just for the application to the State Department, etc.).

> 3.     Mr. CARILLO Failed to Attend his Deposition

On Saturday, October 23, 1999 at 10:00 a.m., both Mr. Grey, Mr. Battenfeld and their respective clients appeared for the deposition. However, Mr. Carillo failed to attend.

- 3 -

1    **4.      Mr. CARILLO told Plaintiff that he did not Appear For The Deposition because he was told he would be Fired**

2
     On or about Monday, October 25, 1999, Plaintiff spoke with Mr. Carillo regarding his non-
3
attendance.
4
          A.    He [Carillo] says that — first he said he has his family to think about.
5                Then he said one of the managers in his company threatened to fire if he
                 goes to the deposition.
6
          Q.    And did he tell you who the manager was?
7         A.    He wouldn't say who the manager's name or who it was.

8         Q.    What else did he say, if anything?
          A.    So I asked him, did — why would he say something like this to him?
9
          Q.    And what did Mr. Carillo say?
10        A.    Carillo says someone from U.Lim had called to the company, influencing
                 that person sl — in essence, if you are kind of person who goes against the
11               company, who testifies against the company, he is not a good employee
                 to keep, or something like that.
12
Deposition Excerpts from KANG Deposition (hereinafter KANG), attached as EXHIBIT 5, at 488, lines
13   1-17.

14        Q.    Did Mr. Carillo tell you what caused him to believe that someone from
                 U.Lim had called the company?
15
          A.    He did not exactly explain the relationship between his manager or
16               U.Lim.  Simply stated that he influenced the manager, so the manager
                 directly — I mean, I asked him twice the same question.  And the answer
17               was manager specifically said not to go to the depositions.  Otherwise, he
                 said he will fire Raul Carillo if he did.
18
KANG at 489, lines 12-21
19
     Notably, CARILLO's present employer, J.V.C., INC., was a subsidiary of one of U.LIM's
20
customers, PANASONIC, INC. as admitted in the deposition testimony of U.LIM's General Manager, JAE
21
H. CHO.  [See, Deposition Excerpts from CHO Deposition (hereinafter CHO) attached hereto as EXHIBIT
22
6, at 111, lines 5-15].  Additionally, KI HWA YOON admitted in his deposition that he personally knew
23
the officers and directors of PANASONIC, INC.  [See, YOON at 97, lines 11-16].
24
     **5.      Plaintiff attempted to find alternate employment for Mr. Carillo so that he would be free to testify.**
25
26   Mr. Kang later inquired with Mr. Carillo that if he helped him find another job would he be able

27  to testify.  Mr. Carillo indicated "yes".  Thereafter, Mr. Kang attempted to locate a position for Mr.

28  Carillo and did attempt to secure a potential position for Mr. Carillo at a number of Mexican companies.

However, Mr. Carillo was not interested in the position as it was with a much smaller company than JVC and accordingly no alternate employment could be secured for Mr. Carillo. These facts were freely admitted by Mr. Kang in his deposition. (See, KANG at 490-499, and 502-506)

6.  **Based on the Testimony of Defendants' General Manager, JAE H. CHO, and the other Deponents in this Action, U.LIM has Engaged in Illegal Witness Intimidation by Threatening Mr. CARILLO with Termination Should he Testify in this Matter.**

Under 18 U.S.C. §1512, the intimidation or harassment of a witness to prevent his giving deposition testimony is a federal felony punishable by ten or more years in prison. Nevertheless, U.LIM has used its influence with Mr. CARILLO's present employer, JVC, Inc., to have him threatened with termination should he testify in this matter. As a result, Mr. CARILLO refused to appear for his deposition.

On January 6, 2000, Plaintiff took the deposition of U.LIM's general manager, JAE H. CHO.[3] In a line of questioning seeking U.LIM's communications with Mr. Carillo, CHO, admitted speaking to Mr. Carillo shortly before his scheduled deposition (approximately 2 weeks). The following are excerpts from his testimony, which taken in conjunction with the testimony of the other witnesses, clearly shows a pattern of deceit and witness tampering.

a.  **CHO Admits he Spoke with CARILLO Prior to his Scheduled Deposition and Asked Him Not to Testify**

Q.   And what caused you to speak with him [Carillo] before the deposition?
A.   I think I got a call from him. He was telling me about the [instant] case.
Q.   Why would he call you to tell you about the case?
A.   He called me to — I guess he was concerned. I don't know. Cause Raul and I didn't have any bad relations when we were working together.

     Maybe he was concerned, and he called me up and told me what was going on.
Q.   And what did he tell you?
A.   That he was — he talked to Mr. Kang and something about Kang was supposed — Kang asked Raul to help him. Kang had offered him a job or money, I think. I can't remember exactly what he said, but something like that.
Q.   Is this before his deposition?
A.   Before, yes.

_____

[3]   Plaintiff has been unable to submit this ex parte application until this date because Plaintiff did not receive the transcript of Mr. CHO's deposition until Friday, January 21, 2000.

- 5 -

1      Q.    Did you talk about the upcoming deposition?
    A.    Yes, I met with him.

2

CHO, at 108, line 16 - 109, line 12.

3

    Q.    How many approximate days before the deposition?
4     A.    Maybe two weeks.  Two to three weeks.

5  CHO, at 110, lines 2-4.

6      Q.    <u>Did he tell you whether or not he was planning to testify for Mr. Kang?</u>
    A.    <u>He had mentioned that.</u>

7

CHO, at 111, line 9-11.

8

    Q.    <u>Did you ever ask Mr. Carillo not to testify?</u>
9     A.    Not to testify?
    Q.    Not to testify?
10     A.    <u>I think I said as a friend -- I would like as a friend -- as a friend if you are not</u>
           <u>involved. I would appreciate it, or something like that I said.</u>
11     Q.    If you would not testify?
    A.    I did not say testify?  I said if you are not involved.
12     Q.    <u>So as a friend you would appreciate it if he would not be involved?</u>
    A.    <u>Yeah.</u>

13

CHO, at 114, line 1-14.

14

    In fact, however, the later inconsistencies and illogical claims of his testimony make it quite clear

15

that Mr. Carillo refused to appear for fear of losing his job, not from "friendship."

16

         **b.**    **CHO's Claim that CARILLO Contacted Him Only**
17                       **Because Plaintiff had tried to Bribe Him Is a Clear Lie**

18     CHO claims that CARILLO initiated the contact with CHO some two weeks before his deposition,

19 because "maybe" CARILLO was concerned that Plaintiff was trying to offer him a "job or money":

20     Q.    Why would he call you to tell you about the case?
    A.    He called me to — I guess he was concerned.  I don't know.  Cause Raul
21            and I didn't have any bad relations when we were working together.
           <u>Maybe he was concerned</u>, and he called me up and told me what was going
22            on.

23     Q.    And what did he tell you?
    A.    That he was — he talked to Mr. Kang and something about Kang was
24            supposed — Kang asked Raul to help him.  <u>Kang had offered him a job or</u>
           <u>money, I think.  I can't remember exactly what he said but something like</u>
25            <u>that.</u>

26     Q.    Is this before his deposition?
    A.    <u>Before, yes.</u>

27

CHO at 109, lines 2-7

28

- 6 -

1       **If Mr. CARILLO had really stated that Plaintiff had attempted to bribe his testimony via a**

2  **job offer or money, why didn't U.LIM immediately seek Mr. Carillo's testimony rather them ask him**

3  **not to testify at all?  It flies in the face of all reason to believe that any litigant would willingly pass**

4  **up the opportunity to prove that their opponent had attempted to bribe a witness.  If proven, *the case***

5  ***is effectively over*, yet U.Lim asked Mr. Carillo *not* to testify.**

6       The so-called reasons for this call are clearly untrue.  Plaintiff's counsel had already obtained a

7  declaration from Mr. Carillo 12 months before.  As such, there was no reason to bribe him prior to his

8  deposition since the witness was already committed to the key testimony set forth in the declaration.

9  Additionally, there was no reason to obtain alternate employment for Mr. Carillo prior to the deposition

10  since the plaintiff did not become aware of the threat to fire Mr. Carillo until after he spoke with Mr.

11  Carillo and asked him why he did not appear.  Notably, Mr. Kang revealed these facts in his deposition,

12  as stated above.  CHO was present during this testimony and accordingly was aware of this issue prior to

13  CHO's own deposition.

14       What is evident from CHO's testimony is that he is attempting to manufacture a reason for Mr.

15  Carillo contacting him which will place the plaintiff in a bad light.  However, Mr. Carillo could not have

16  mentioned Mr. Kang finding him a job before the deposition as these efforts did not take place until *after*

17  the scheduled deposition and *after* Mr. Carillo told Mr. Kang that he did not appear for his deposition

18  because his supervisor told him he would be fired.[4]  Additionally, if the plaintiff was bribing Mr. Carillo,

19  as CHO infers, the time for that was before plaintiff's counsel obtained his declaration some 12 months

20  before.  Obviously, there is no reason to bribe a witness who has was already committed to the key

21  testimony via his declaration.

22       The falseness of this testimony is further supported by what CHO does not say.  If plaintiff was

23  bribing Mr. Carillo where is CHO's outrage?  He is the general manager of U.LIM America and U.LIM's

24  designated representative in this action.  He would be hanging on every word.  Like the plaintiff, he would

25

26       [4]     As the plaintiff noticed the deposition, he obviously anticipated he would appear for it.
This is self-evident and emphasized by the significant expense incurred in hiring the court reporter and

27  leasing a hotel room in Tijuana.  Obviously, Mr. Kang's efforts to secure alternate employment only make
sense if they occurred after the deposition when he spoke with Mr. Carillo as to why he did not attend.

28

1   immediately be seeking to secure Mr. Carillo's testimony.  Despite this fact, CHO's memory about this

2   bribery allegation is extremely hazy.

3           "Maybe he was concerned" and
        "I can't remember exactly what he said but something like that."

4

5   CHO at 109, lines 2-7

6           There is only one reasonable explanation for CHO's testimony, and that is that CHO was trying

7   to cover up for the real purpose of the call (i.e. to suborn Mr. Carillo's testimony) by incorporating Mr.

8   Kang's testimony regarding subsequent events.  However, CHO neglected to consider the chronology and

9   impossibility of his statements in the heat of the moment.  This manufactured testimony also explains

10  CHO's hazy recollection of statements, which due to their import, would have been clearly etched into his

11  memory if they were in fact uttered by Mr. Carillo.  They were not.

12              c.      CHO Admits that he Called CARILLO to "Thank
                        Him" for not Testifying After the Scheduled
                        Deposition

13      Q.      You did talk to him after the deposition?
14      A.      Yes.

15      Q.      When was that?
        A.      Maybe two days after that.  Something like that.

16

17  CHO at 115, lines 4-8

18      Q.      And why did you call him?
        A.      Why did I call him?  I was curious.  I'm pretty sure you guys were
                curious why he didn't show up.  I was curious why he didn't show up

19              either.

20      Q.      Well, you asked him not to be involved.
        A.      Excuse me?

21

22      Q.      You had asked him as a friend not to be involved.
        A.      I did say that, yes.[5]

23                      * * * * *

24      Q.      Did you call Mr. Raul (Carillo) after the deposition to thank him for not appearing at the

25      [5]     This entire exchange is questionable.  Why would CHO be curious as to why CARILLO
26  did not show up when he had asked him not to some two to three weeks prior?  In addition, "I did say that"
    is an odd way of stating that something actually happened, particularly when this follows the prior
27  statement as to his "curiosity"  What is clear from this testimony is that CHO is reluctantly testifying to
    these events.

28

                                    - 8 -

1      deposition?
   A.   I guess you could say that.

2

3      Mr. Battenfeld: No. Only adopt that if that's what you said. If you didn't say that, then that's not your testimony.

4      Q.   Did you or didn't you, Mr. Cho, call him to say thank you for not appearing?
   A.   Yes, I did.

5

6   CHO at 116, lines 1-24 (in pertinent part)

7         d.    CHO Admits that CARILLO Specifically told CHO that he "Liked His Job" and Testifying Would Jeopardize His Job

8

9      Despite CHO's attempts to infer that the plaintiff is suborning a witness, CHO gives credibility to

10  Mr. Kang's statement that Mr. Carillo was threatened with being fired if he attended the deposition.

11     Q.   And in this conversation did he indicate why he had not shown up to the deposition?
   A.   He had indicated to me that he doesn't want to be involved and he likes his job. I don't know why he would tell me that he likes his job. He doesn't want to be

12         involved. He doesn't like to get in problems with his manager. Things like that. He said that to me.

13

14  CHO, at 115, line 18-25.

15     Why would Mr. CARILLO mention that "he likes his job" in the context of that conversation if

16  his job had not been threatened? Why would giving testimony result in "problems with his manager"? How

17  did his manager even know he was testifying at all?

18     Notably, as previously stated, in the deposition of U.LIM's president, KI HWA YOON, YOON

19  admitted that he personally knows the directors of JVC's parent corporation, PANASONIC, and that

20  PANASONIC is a customer of U.LIM.

21        e.    CHO's Responses as to his Meeting with CARILLO are Inconsistent and Evasive.

22           i.    What Was Said at the Meeting

23     Q.   So what did Mr. Carillo tell you specifically at this meeting?
   A.   The same thing he told me over the phone about Kang offering him a job

24         and things like that.

25     Q.   He didn't talk at all about Kang's allegation?
   A.   Well, first we talked about how he was doing, how I was doing. We

26         talked about our past, and we hardly went into the case. He didn't want

27         to — he was — he was too busy with his work, and he didn't want to be bothered by Mr. Kang.

28     Q.   Did he tell you he had signed a declaration?

1     A.    No, he did not.

2     Q.    Did he talk to you about any specific allegation about whether or not Tae Jin Yoon had struck Mr. Kang at any time?

3     A.    No.

4     Q.    Did you ask him whether or not he had seen any of that?

     A.    No, I did not.

5

6     Q.    You weren't curious if he testified that he had seen such action?

     A.    No.   Cause I don't think that was mentioned, no.  <u>I don't know what the — what his deposition was about, you know</u>.

7

8     Q.    So it is your testimony, then, the only thing you can recall from that conversation is he talked to you about the fact Mr. Kang supposedly was offering him money and/or a job to testify?

9     A.    Well, he said he was going to take care of it after the trial, something like that.

10

11     Q.    And no other specifics about what he was going to testify to?

     A.    Something about why he quit the company, things like that.

12  CHO at 112, line 13 - 113, line 25 (emphasis added)

13     Q.    How long did this meeting last?

     A.    Maybe a total of an hour.  We ate and talked.

14

  CHO at 130, lines 1-3

15

16      It is ridiculous to assume that CHO would meet with CARILLO for an hour to discuss his not

17 appearing for deposition without having discussed what it was he was to testify to.  According to CHO,

he did not even discuss CARILLO's testimony with him to the point where CHO could determine whether

18 the testimony would actually be advantageous for U.LIM or not.  This simply does not make sense.

19             ii.    **Who was at the Meeting**

20      Furthermore, the testimony of CHO and that of U.Lim manager SOON WAN PARK are

21 inconsistent as to who was present at this meeting.  CHO first says that no one else went with him to the

22 meeting (CHO at 111, lines 7-8) and then, <u>after consulting with his attorney</u> (CHO at 120, line 19 - 121,

23 line 6), he states that SOON WAN PARK was present at the meeting (CHO at 121, lines 24-25).  <u>Notably,</u>

24 <u>after having conferred with counsel, CHO suddenly developed a very detailed recollection of PARK's</u>

25 <u>attendance</u>:

26

27     Q.    What did Mr. Park ask Mr. Carillo at this meeting?

     A.    He didn't say much because he doesn't speak English that well, so I did most of the talking.

28

Q.   Why did Mr. Park go down with you to Mexico?
A.   Well, he is in Mexico.  We work there.  And why did he go to the dinner?

Q.   Why did you go to this meeting together with Mr. Park?
A.   Mr. Park wanted to attend because, like I said, we are all friends — not friends, but associates.  We work together.  So Mr. Park wanted to see Raul, so he tagged along.

However, SOON WAN PARK was extensively questioned by Plaintiff's counsel as to every person with whom he had met with regarding this case and made no mention of this meeting, despite the fact that they had specifically asked this witness not to testify in this litigation.[6]

### f.   CHO's Testimony as to CARILLO's "Friendship" with CHO and PARK is Particularly Dubious Given that CARILLO was Fired by U.LIM after Complaining About Sexual Harassment at U.LIM

As previously stated, CHO makes much of the ostensible friendship between himself, PARK and CARILLO, using this supposed friendship to explain the motives of all three persons in his implausible scenario.  This is rather hard to believe considering that, after CARILLO had complained to U.LIM President KI HWA YOON about KI HWA YOON's sexual harassment of Mexican workers, he was constructively terminated from U.LIM and successfully brought a Mexican labor board action against U.LIM:

> Ultimately, I was terminated from ULIM after Mr. Yoon's father came into the shop and had grabbed two womens' breasts who worked in the plant.  When I informed Mr. Yoon that his father could not act that way I was told that I was never to tell him or his father what they could do.  I shortly thereafter was told to wash his father's car in front of all the employees.  When I refused I was terminated.  I then made a complaint to the Mexican Labor Board, which ultimately was resolved in my favor.

Declaration of CARILLO [EXHIBIT 3] at Page 3, Paragraph 14.

We are supposed to believe that a man who had been constructively terminated from a company after observing the sexual harassment and other abusive actions of U.LIM's officers and managers alleged in his declaration is still "friends" with CHO and PARK?  Is it plausible that a man who successfully took U.LIM to the Labor Board would still be considered a "friend" by U.LIM's managers?  It is simply unbelievable that these persons would be "friends" to the extent where they would go out of their way to socialize with each other.

---

6 28   See, PARK at Page 88, lines 1-22

1    One must also ask why CARILLO would have sworn to this declaration and agreed to voluntarily

2    testify against his "friends", if in fact that is what they were?

3    Furthermore, CHO admitted earlier in his deposition that he didn't even know CARILLO well:

4    Q    Do you know how long he [Carillo] worked for U. Lim?
     A    Approximately a year I guess. No guessing.

5    MR. BATTENFELD: Don't guess.

6    BY MR. GREY:

7    Q    Did you know him well?
8    A    Yes. I mean not well. We were working associates.

9    CHO 106, lines 9-17

10   Yet, despite the fact that they did not know each other well, CHO would have us believe that,

11   despite having given highly damaging sworn testimony against U.LIM, CARILLO would fail to attend his

12   deposition because of their "friendship."   Moreover, Mr. Carillo's curious words to CHO after the

13   deposition, "I like my job" and "I don't like getting in problems with my manager", are hardly the words

14   of a friend agreeing not to testify to help them out.[7]  Obviously, this supposed "friendship" is nothing more

15   than a smokescreen to cover the fact that U.LIM intimidated, threatened and harassed this witness

16       **7.    U.LIM's Witness Tampering is Further Established by the Testimony
                 of Plaintiff's Other Witnesses**

17
18           **a.    Plaintiff's Other Witness, Mr. BAEK and Mr.
                     CHEONG, Appeared for Deposition and Substantiated
                     Allegations Similar to Those Made by Mr. CARILLO**
19

20   The allegations made by CARILLO in his declaration have been substantiated by other witnesses,

21   including TEDDY BAEK, a Korean former co-worker of Plaintiff, whose testimony was likewise secured

22   by a declaration signed under penalty of perjury and who willingly gave his deposition testimony pursuant

23   to subpoena on November 10, 1999, fully substantiating under cross-examination the contentions set forth

24   in his declaration. [See, Declaration of Teddy Baek - EXHIBIT 7]  Given that Mr. Baek held a position

25   with a company with which defendants apparently had no influence, they were unable to suborn his

26   testimony.

27

28       [7]     Edited for "first person" phrasing. Cho at 115, ln 18-25.

| | |
|---|---|
| 1 | **b.** **Plaintiff's Witness BOWON CHEONG has Testified** |
| 2 | **that U.LIM has Instructed Witnesses to Lie In** **Discovery** |

3    BOWON CHEONG, another former co-worker of Plaintiff, who has brought his own suit against

4 U.LIM has testified in deposition that, subsequent to Plaintiff's filing suit, U.LIM held a strategy session

5 wherein U.LIM"s president instructed a witness to lie in discovery:

6    A.    Initially, we had a meeting regarding the lawsuit filed with Cho, Park,
        Y.S. Yoon, and Ki Hwa Yoon. That's the boss.
7
8    Q.    Okay
     A.    So we all got together in the meeting room to find out what happened. So
        we talked about it.
9
     Q.    Do you remember what was discussed?
10   A.    I don't remember all the discussion, but I remember one thing. Ki Hwa
        Yoon asked a question regarding an incident where Mr. Kang threw a
11      battery to Mr. Cho. He said "Who had seen that?" After Mr. Kang left,
        Y.S.Yoon, the second son [of Ki Hwa Yoon], started working there. And
12      Ki Hwa Yoon asked his second son, Y.S. Youn, whether or not his
        second son had seen Mr. Kang throw a battery to Mr. Cho. Y.S. Youn
13      could not have seen it, because at that time Y.S. Youn was not working
        at the company. Then Y.S. Youn replied "Sir, I did not see." And Ki
14      Hwa Yoon told his son, "Listen, tell you saw it. Regardless of amount of
        lawsuit, whether $100,000 or a million dollars, do not leave Mr. Kang
15      alone." With an exception of that, "He is a U.S. citizen, he's not nothing
        to brag about. That guy has nothing to show other people."
16
    *Deposition of BOWON CHEONG (hereinafter CHEONG), attached hereto as EXHIBIT 8, at 56, line 12*
17  *through 57, line 8 [emphasis added]*

18    Thus it is established that U.LIM has indeed instructed its employees to lie in discovery. This

19 strongly suggests that they have indeed indulged in other forms of evidence tampering, including the

20 conduct complained of herein.

21    **8.    Defense Counsel has Shown no Concern over his clients Admitted Interference with**
          **the Deposition of Mr. Carillo.**
22
23    At the scheduled deposition of Mr. Carillo, Mr. Grey met Mr. Battenfeld and Mr. Cho in the lobby

     of the Hotel and informed them that Mr. Carillo had told us, via his mother, that he would not be attending
24
     the deposition. Mr. Battenfeld chuckled and said that he and Mr. Cho were betting on the way down whether
25
     or not Mr. Carillo would attend. He then informed Plaintiff's counsel that he would be sending him a letter
26
     requesting reimbursement of his expenses associated with the deposition for Mr. Carillo's non-attendance.
27
    [See, Declaration of Richard Grey at Paragraph 16]
28

1    On December 14, 1999 at the conclusion of Mr. Park's deposition, Mr. Battenfeld inquired whether

2   or not the Plaintiff would pay his fees associated with Mr. Carillo's deposition. He noted that if he was

3   forced to bring a motion, the fees would be substantially greater. Plaintiff's counsel informed him that

4   Plaintiff did not intend to pay his fees because we believed that U.LIM was behind his failure to appear. At

5   that time, Plaintiff's counsel cautioned Mr. Battenfeld about bringing such a motion by saying that "I would

6   not want to be you if you bring that motion and we are able to prove that it is true." Mr. Battenfeld

7   responded that *"that has nothing to do with me and my fees."* Plaintiff's counsel told him that he strongly

8   disagreed and left the conference room. [See, Declaration of Richard Grey at Paragraph 18].

9    At Mr. Cho's deposition, when it became apparent that his client had obtained Mr. Carillo's non-

10   attendance, Mr. Battenfeld indicated that his client did nothing wrong, that his actions did not in any way

11   effect his right to sanctions for Mr. Carillo's non-appearance, and that it was still plaintiff's counsel's fault

12   that he did not appear for not subpoenaing him. CHO at 119, line 18 through 120, line 5

13 **B.    DEFENDANT'S TAMPERING WITH THIS WITNESS WARRANTS THE IMPOSITION OF DISCOVERY ISSUE SANCTIONS OR A STAY IN PROCEEDINGS TO ALLOW FOR THE ISSUANCE OF LETTERS ROGATORY COMPELLING CARILLO'S DEPOSITION**

14

15    The aforementioned deposition testimony and declarations clearly show that U.LIM has illegally

16   intimidated CARILLO into avoiding testimony for fear of being fired from his job. Mr. CARILLO is a

17   key material witness herein. Accordingly, Plaintiff has two basic alternatives to avoid further prejudice

18   to his case:

19

20        a)    The Court may order that the Declaration of Raul Carillo be submitted as his deposition testimony, without objection by Defendants; or

21

22        b)    That the Court modify its pretrial scheduling order to allow for the issuance of letters rogatory and stay these proceedings pending the taking of CARILLO's deposition.

23

24    1.   **Plaintiff Should Be Entitled to Submit the Declaration as the Sworn Testimony of Carillo, Without Objection by Defendants**

25

26    Notably, given his duressed state of mind, it is hardly guaranteed that Mr. CARILLO will be brave

27   enough to substantiate the sworn statements of his declaration in deposition even should it be compelled.

28   Furthermore, as noted above, deposition through letters rogatory will place this Court somewhat at the

- 14 -

1  mercy of the schedule of the courts of the Republic of Mexico, which may result in substantial delay in

2  these proceedings.

3      Accordingly, Plaintiff proposes that the most economical solution in terms of both time and money

4  is that the Declaration of Raul Carillo be admitted into evidence as the sworn deposition testimony of Mr.

5  CARILLO as the Defendants deprived themselves of the right to cross examination.  Notably, they were

6  wholly unconcerned about there right to cross-examine the witness but rather sought to deprive the

7  plaintiff, the court and the jury of his testimony completely.  Admitting the declaration would allow the

8  defendants to reap what they have sown and correct the injustice they are attempting to perpetrate on the

9  plaintiff and the court.

10          a.      The Court has the Inherent Authority to Issue a
                    Discovery Sanction Order Admitting CARILLO's
11                  Declaration into Evidence

12      The Federal Courts possess the implied authority to issue such orders as are necessary to sanction

13  the abuse of the discovery process, in recognition of the necessity of these powers to the orderly

14  administration of justice:

15          It has long been understood that "[c]ertain implied powers must necessarily result to our
            Courts of justice from the nature of their institution," powers "which cannot be dispensed
16          with in a Court, because they are necessary to the exercise of all others." [citation]. For this
            reason, "Courts of justice are universally acknowledged to be vested, by their very creation,
17          with power to impose silence, respect, and decorum, in their presence, and submission to
            their lawful mandates." [citation].  These powers are "governed not by rule or statute but by
18          the control necessarily vested in courts to manage their own affairs so as to achieve the
            orderly and expeditious disposition of cases."
19
    *Chambers v. NASCO, Inc.* 501 U.S. 32, 43 (1991).
20
        This power extends to the outright dismissal of an action should the Court find that severe sanction
21
    to be warranted.
22
            "The authority of a federal trial court to dismiss a plaintiff's action with prejudice because
23          of his failure to prosecute cannot seriously be doubted.  The power to invoke this sanction
            is necessary in order to prevent undue delays in the disposition of pending cases and to
24          avoid congestion in the calendars of the District Courts.  The power is of ancient origin,
            having its roots in judgments of nonsuit and non prosequitur entered at common law,
25          [citation], and dismissals for want of prosecution of bills in equity [citation].

26  *Link v. Wabash R. Co.*, 370 U.S. 626, 632 (1962)

27      Accordingly, the Supreme Court and, subsequently, the Courts of Appeal have noted that this near-

28  absolute inherent authority impliedly grants the Courts the authority to issue a broad range of lesser

- 15 -

1   sanctions, including the imposition of attorney's fee sanctions (*Roadway Express, Inc. v. Piper* 447 U.S.

2   752, 765 (1980)) or the exclusion of percipient or expert witness testimony (*Campbell Industries v. M/V*

3   *Gemini* (9th Cir. SD Cal. 1980) 619 F.2d 24, 27).

        **b.   Admitting CARILLO's Declaration into Evidence is**
            **the Most Economical Means to Remedy Defendants'**
            **Abuse of Discovery**

6       Given the impending trial date in this action and the considerable delay which issuance of letters

7   rogatory would create, the simplest means to remedy the defendants' wrongful conduct is to admit the

8   declaration into evidence as CARILLO's sworn deposition testimony, without objection from defendants.

        **c.   Defendants' Own Conduct Has Forestalled Their**
            **Opportunity To Cross-Examine CARILLO re: his**
            **Declaration, Which Could Otherwise Be Considered**
            **Hearsay**

11      Declarations are typically inadmissible as direct evidence due to Federal Rule of Evidence §801

12  regarding hearsay.  Notably, however, that Rule states:

13      (d) Statements which are not hearsay. **A statement is not hearsay if--**

15          (1) Prior statement by witness. **The declarant testifies at the trial or**
        **hearing and is subject to cross-examination concerning the statement,**
16          and the statement is (A) inconsistent with the declarant's testimony, and
        was given under oath subject to the penalty of perjury at a trial, hearing, or
        other proceeding, or in a deposition, or (B) consistent with the declarant's
17          testimony and is offered to rebut an express or implied charge against the
        declarant of recent fabrication or improper influence or motive, or (C) one
18          of identification of a person made after perceiving the person;

19  Federal Rule of Evidence §801 [emphasis added]

20      The general rule in civil actions is that absent statutory authorization, stipulation of the
    parties, or a waiver by failure to object, an affidavit [citation] or a declaration under penalty
21      of perjury [citation] is not competent evidence; it is hearsay because it is prepared without
    the opportunity to cross-examine the affiant.

22  *Windigo Mills v. California Unemployment Appeals Board* (1979) 92 Cal.App.3d 586, 598

23      Defendants herein have deliberately prevented their own opportunity to obtain direct testimony and

24  cross-examine this witness.  Therefore, their own conduct warrants the admission of the declaration as direct

25  testimony.

    **2.   In The Alternative, Plaintiff Is Entitled to an Order For Issuance of**
27        **Letters Rogatory And Sanctions For The Costs Thereof**

28      Given the clearly illicit conduct of defendants in suborning the testimony of Mr. CARILLO and

1    its understandably chilling effect on Mr. CARILLO's willingness to testify in this case, Plaintiff has no

2    choice but to compel Mr. CARILLO's appearance for deposition.  This will necessitate the issuance of

3    letters rogatory to the central judicial authority of the Republic of Mexico.  The U.S. State Department's

4    processing fees to simply issue such letters alone currently totals $445.00 (See Schedule of Fees, EXHIBIT

5    9).  As Plaintiff had attempted to avoid incurring such costs and was forced to do so only by Defendant's

6    subornation, equity demands that those costs be transferred to Defendants by way of discovery sanctions

7    under the Court's aforementioned authority for Defendant's role in obstructing discovery proceedings in

8    bad faith.

9                    **a.    Mr. CARILLO will not Submit to Deposition Absent**
                    **Compulsion  Subsequent  to  Defendants'  Having**
10                   **Threatened his Job**

11        As noted above, CARILLO indicated he would not appear for the depositions because he was

12   afraid he would be fired.  Accordingly, absent being compelled by Mexican authorities, Plaintiff is

13   informed and believes that there is now no chance that Mr. CARILLO will attend his deposition absent

14   such an order.

15                   **b.    A Stay of Proceedings is Warranted to Permit the**
                    **Taking of CARILLO's Deposition.**
16

17        As Mr. CARILLO is a key material witness for the prosecution of Plaintiff's claims, the case

     cannot proceed to trial absent securing his testimony without considerably prejudicing the case.  As it may
18
     take some weeks to secure the issuance and service of the letters rogatory by the Mexican authorities,
19
     Plaintiff respectfully submits that a stay in proceedings is warranted until this deposition may be taken, in
20
     light of the defendants conduct.  The Defendants showed not be allowed to suborn the testimony of a
21
     witness and then hide behind discovery and pre-trial deadlines.
22
     **C.    PLAINTIFF IS ALSO ENTITLED TO MONETARY SANCTIONS AGAINST U.LIM**
23          **UNDER THE COURT'S INHERENT AUTHORITY TO SANCTION DISCOVERY**
            **MISCONDUCT**
24
         The issuance of letters rogatory is an expensive and time-consuming process, with fees running into
25
     the multiple hundreds of dollars.  Accordingly, as it is only due to the conduct of defendants that Plaintiff
26
     has been forced to seek this remedy, Plaintiff requests that sanctions in an amount appropriate to
27
     compensate Plaintiff for the attorneys' fees and costs incurred in securing this testimony be awarded against
28

1 U.LIM and that sanctions also be awarded plaintiff for the time and expense of bringing the instant motion

2 and for plaintiff's expenses associated with the failed deposition of Mr. Carillo, due to the intentional and

3 serious wrongful conduct of the defendants.

4     The Plaintiff has incurred the following costs due to CARILLO's non-attendance and U.Lim's

5 efforts to suborn his testimony.

6 Costs Associated with CARILLO's non-attendance

7       1.  Hotel Room for Deposition                      $  115.00

      2.  Mileage and Mexican Car Insurance           $    55.10

8       3.  Court Reporter No Show fee                   $  200.00

      4.  Attorney's time in attending the deposition

9           and seeking to locate CARILLO on the

          day of the deposition. (6.2 Hours)

10           Attorney's normal hourly rate is $185.00.       $ 1,147.00

11                     Sub-Total              $ 1,517.10

12 Costs Associated with Bringing this Motion

13       1.  Attorney's time in preparing the instant

          motion. (8.0 Hours)                     $ 1,480.00

14

15       2.  Paralegal time in preparing the instant motion.

          (22.6 Hours) Paralegal hourly rate is $45.00     $ 1,017.00

16                     Sub-Total              $ 2,497.00

17

18     Notably, Mr. Battenfeld was seeking that Plaintiff reimburse his clients $1,320.00 in attorney fees

19 at the rate of $300.00 per hour for CARILLO's non-attendance. [Correspondence of John Battenfeld dated

20 December 2, 1999 - EXHIBIT 10] Needless to say, due to his client's admitted interference with the

21 deposition, Mr. Battenfeld did not bring his threatened motion. For all the aforementioned reasons, Plaintiff

22 seeks an award of sanctions in the amount of $4,014.10 and an order of the court that Defendants reimburse

23 Plaintiff for those expenses incurred in relation to issuing the Letters Rogatory.

24                           **IV.   CONCLUSION**

25     Based upon U.LIM's clearly established intimidation of a key material witness to this action,

26 Plaintiff respectfully requests that this Court issue either:

27       a)    A discovery sanction order under the inherent authority of this Court

            permitting the previously obtained Declaration of material witness RAUL

28

1    CARILLO to be admitted into evidence as his direct testimony; or, in
     the alternative;

2

3    b)   An order extending the time for discovery to permit the deposition of
          CARILLO to be compelled via letters rogatory submitted to the central
          judicial authority of the Republic of Mexico, of which he is a citizen and
4         resident, and for a stay in proceedings until this deposition may be taken.

5    c)   Plaintiff further requests sanctions against Defendant U.LIM AMERICA,
          INC. for the costs of CARILLO's non-attendance, the costs of this
6         proceeding and all costs incurred in compelling CARILLO's testimony
          including those for the issuance of letters rogatory; or

7

8    d)   Such other order as the Court finds reasonable and appropriate under the
          circumstances.

9                                              LAW OFFICE OF RICHARD E. GREY

10

11   Dated:_____2/3/00_____              _____
                                               By:  Richard E. Grey, Attorney for Plaintiff
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Legal Tabs Co  1-800-322-3022

Recycled   Stock # DO-10-B

ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


SOO CHEOL KANG,                    )
                                   )
                    Plaintiff,     )
                                   )
         vs.                       )No. 99CV659JM (RBB)
                                   )
U. LIM AMERICA, INC., et al.,      )
                                   )
                    Defendants.    )
_____)


DEPOSITION OF BO WON CHEONG

January 10, 2000


INGRID J. VILLA
CSR 11960
62011



1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4

5   SOO CHEOL KANG,                )
                                   )
6              Plaintiff,          )
                                   )
7        v.                        )    No. 99CV659JM (RBB)
                                   )
8   U. LIM AMERICA, INC., TAE      )
    JIN YOON, an individual; and   )
9   DOES 1 to 100,                 )
                                   )
10             Defendants.         )
    - - - - - - - - - - - - - - - - - - - - - -

11

12

13

14

15          Deposition of BO WON CHEONG, taken on

16          behalf of the Defendants, at 300 South

17          Grand Avenue, 22nd Floor, Los Angeles,

18          California 90071, commencing at 10:00 a.m.,

19          Monday, January 10, 2000, before Ingrid J.

20          Villa, Certified Shorthand Reporter No.

21          11960.

22

23

24

25


                          2

BARKLEY

1                    A P P E A R A N C E S:

2

3   For Plaintiff:

4           RICHARD E. GREY, ESQ.
            ATTORNEY AT LAW
5           409 Camino Del Rio South
            Suite 303
6           San Diego, California 92108
            (619) 543-9307

7

8   For Defendants:

9           MELISSA M. MULKEY, ESQ.
            ATTORNEY AT LAW
10          MORGAN, LEWIS & BOCKIUS
            COUNSELORS AT LAW
11          300 South Grand Avenue
            22nd Floor
12          Los Angeles, California 90071
            (213) 612-1082

13

14  ALSO PRESENT:

15          DANIEL B. KIM, J.D., INTERPRETER

16          SOO CHEOL KANG

17

18

19

20

21

22

23

24

25

                           3

```
1                        I N D E X

2

3    DEPONENT            EXAMINED BY              PAGE

4    BO WON CHEONG       MRS. MULKEY                 6

5

6

7

8

9

10

11

12              EXHIBITS FOR IDENTIFICATION

13                      NONE

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    LOS ANGELES, CALIFORNIA

 2            MONDAY, JANUARY 10, 2000; 10:00 A.M.

 3

 4                (Prior to going on the record, the parties

 5            stipulated to waive the provisions of Rule

 6            30(b)(4), except for the swearing of the witness.)

 7                    DANIEL B. KIM, J.D.,

 8

 9            interpreter, was sworn as follows:

10                 .

11            DEPOSITION OFFICER:  Do you solemnly swear that

12    you will accurately translate English into Korean and

13    Korean into English, to the best of your ability in this

14    matter, so help you God?

15            MR. KIM:  I do.

16

17                    BO WON CHEONG,

18            deponent, was sworn and examined and

19            testified through the interpreter as follows:

20

21            DEPOSITION OFFICER:  Do you solemnly swear that

22    the testimony that you are about to give in this matter

23    pending shall be the truth, the whole truth, and nothing

24    but the truth, so help you God?

25            MR. CHEONG:  Yes.
```

5

BARKLEY

EXAMINATION

BY MRS. MULKEY:

     Q    Okay.  Hi, Mr. Cheong.  My name is
Melissa Mulkey.  I'm an attorney representing U. Lim
Corporation in the lawsuit that was filed by Mr. Kang
against U. Lim.

          To start out the deposition, we're going to
go through some of the interpreter's qualifications for
the record, just so that we can have that established on
the record.'

     INTERPRETER:  This is highly unusual.

     MR. GREY:  Well, we've done this on every
deposition.

     INTERPRETER:  I think my card speaks for itself,
Counsel.

     MRS. MULKEY:  Can you go through, basically, how
long you've been doing the interpreting, and who you have
been doing that for?

     INTERPRETER:  This is highly unusual, Counsel,
because I'm not a party to this case; I'm not for this
case or to this case.  As my business card indicates, I'm
certified with the State of California.  I've
been -- never been asked this question by any counsel.

     MR. GREY:  We've had several depositions in this
case and with the exclusion of two of them, we've always

BARKLEY
Court Reporters & Transcription

1   had an interpreter present, and John has made a point of

2   wanting to have the qualifications of the interpreters on

3   the record.  So to be consistent with that practice that

4   we've established, that's why I'm asking you to.

5           INTERPRETER:  With that understanding, I'll be

6   happy to.

7               My name is Daniel Kim, State of California

8   certified.  I'm a law graduate.  I don't practice in the

9   State of California.  I went to the University of Houston,

10  and I've been interpreting in this business more than 27

11  years.  And I'm an official interpreter of the Federal

12  Courts.  I'm also translating interpretation in Federal

13  and Municipal Court.  I think I have abundant experience

14  in these areas.  If you have any questions, I'll be happy

15  to --

16          MRS. MULKEY:  Thank you.  I think that will be

17  fine for the record, thank you.

18      Q       Mr. Cheong, the purpose of the deposition

19  here is to gather some information for what we call the

20  discovery phase of the litigation.

21      A       Okay.

22      Q       So because we're trying to get as much

23  information as we can, it's important to be as open and

24  forthright as possible in terms of the information

25  responsive to the questions that I'm going to ask you.

7

BARKLEY

1          A      Okay.

2          Q      As evidenced by the oath that you took at

3     the beginning of this deposition, the testimony you are

4     about to give here today is under oath and can be used

5     against you in a court cf law.

6          A      Yes.

7          Q      Particularly because of the need to use an

8     interpreter, it's important that we listen to the

9     questions carefully and wait until the question is

10    completed for you to answer the question; do you

11    understand?

12         A      Yes.

13         Q      Okay.  If you don't understand, or didn't

14    hear the question, please ask me and the interpreter to

15    repeat the question for you.  And particularly if you

16    don't understand it, to rephrase it, and we will do so.

17         A      Okay.

18         Q      If you do not ask us to repeat the question

19    or rephrase it, we will assume, and the record will

20    reflect, that you understood the question and answered the

21    question that was asked; do you understand?

22         A      Okay.

23         Q      It's also important for purposes of the

24    court reporter that you verbalize your responses, a yes,

25    or a no, and don't shake your head, or do a nod, or any

8

BARKLEY
Court Reporters & Transcription

1    other gesture that can't be taken down; do you understand?

2         A    Okay.

3         Q    Are you under the influence of any

4    medication, alcohol or any other drugs that might

5    influence your ability to testify here today?

6         A    No.

7         Q    Okay.  Just as a preparatory note, we're

8    here today because of the lawsuit that Mr. Kang has filed

9    against U. Lim, not for the purposes of the lawsuit that

10   you have filed against U. Lim.

11        A    Yes.

12        Q    So my questions today will focus on that

13   brief period of time which you and Mr. Kang were employed

14   and working at U. Lim together.

15        A    Yes.

16        Q    Mr. Checng, when did you first start

17   working for U. Lim?

18        A    I started in America September 5, 1997, in

19   America.  But in Korea, I began August 14, 1997, in Korea.

20        Q    And when you say that you started on

21   September 5th, 1997, were you working in U. Lim's facility

22   in Tijuana, Mexico?

23        A    Yes, ma'am.

24        Q    Okay.  What was your position when you

25   began at U. Lim's facilities in Tijuana, Mexico?

9

1          A       I was in charge of the quality control

2     because my major was industry -- industrial engineering.

3          Q       Okay.  What types of things would you do on

4     a daily basis for the quality control?

5          A       My major in charge was No. 1.  Since we are

6     manufactoring the parts internally, I was in charge of the

7     quality control.  Externally, I also was in charge of

8     receiving the complaints from the customer regarding

9     component parts.

10         Q       Were you in charge of quality control from

11    the beginning of your employment of September 5th, 1997?

12         A       Initially, No. 1, I did not know what was

13    going on in their company and also the company was very

14    busy doing its own business.  And in the area of the

15    Tijuana, Mexico -- since the business is very busy like

16    the LG in Mexicali, initial emphasis was on the quality

17    control.  I was spending more time, for example,

18    presenting the products to the customers at that time.

19         Q       So the Tijuana facility was very busy with

20    work at the time you started in September of 1997?

21         A       Yes, ma'am.

22         Q       What were your hours, your average hours,

23    like during that first time that you started in September

24    1997?

25              A       Are you talking about on a weekly basis?

10

BARKLEY
Court Reporters & Transcription

1      Q      Let's begin with September 1997.  What time

2  would you typically arrive at the facility?

3      A      You mean the time that I arrived at the

4  company?

5      Q      When you would go to work in the morning.

6  Let's start with Monday through Friday.  What time would

7  you typically arrive?

8      A      I'm supposed to be at 7:30 a.m.  However,

9  because I was in charge of the opening of the company

10  doors, I have to be there at least between 7:10 and 7:15

11  a.m.  I'm talking about Tijuana, Mexico.

12      Q      And that was Monday through Friday that you

13  would arrive between 7:10 and 7:15?

14      A      Yes, ma'am.

15      Q      And did you arrive Monday through Friday

16  7:10 to 7:15 through September 1997 to February 1998?

17      A      Yes, continuously.  And at that time, I

18  also worked on Saturdays including, like, continuously the

19  next Sunday morning, very early morning.

20      Q      Okay.  Let's focus on the Monday through

21  Friday for now, and what time would you typically leave

22  Monday through Friday?

23      A      For example, like, Monday, Friday overtime,

24  there was no overtime allowed at all.  So my quitting time

25  is 6:00 p.m.  And Tuesdays, Wednesdays, and Thursdays, I

11

1    work overtime.  My quitting time is 7:40 p.m.  However, by

2    the time I turn off all the electric lights in the

3    company, it's about 8:00 p.m. that I leave the company.

4    That is generally speaking, ma'am.  For example, at the

5    time because of the demand for the demand of new items for

6    LG, we call it second shift.  Sometimes you are required

7    to work up until 10:00 p.m.  The second shift, normally it

8    last from November, December, and January.  I'm talking

9    about next year, 1998.  And also, in order to present the

10   manufactured items in time for the customer --

11           INTERPRETER:  With your permission, Counsel, can I

12   clarify one word with the deponent?

13           MRS. MULKEY:  Yes.

14           INTERPRETER:  Since the witness simply said 2:00

15   o'clock, I needed to clarify whether it was to p.m. or

16   a.m.

17           MRS. MULKEY:  Okay.

18           THE WITNESS:  Sometimes when the demand is high to

19   present items -- manufactured goods to the customers, we

20   let the employees go home.  However, the Korean employees

21   stay around like until 2:00 a.m. to meet the demands.  For

22   example, after 2:00 a.m., which is the following

23   morning -- for your information, LG was located in

24   Mexicali and the distance between Mexicali and Tijuana

25   takes about two hours.  So in order to be back on the work

12



1    schedule that we have to deliver, which starts 4:00 a.m.

2    the same morning with gentleman by the name of Park, it's

3    normally spelled P-a-r-k --

4         Q    BY MRS. MULKEY:  Can I interrupt for a

5    second?  I'm sorry.  Can you please tell me who was

6    working for U. Lim America at the time that you were

7    employed there from September 1997 through February 1998?

8         A    That's T.J. Yoon, Y-o-o-n.  J-a-e

9    H-o-c-h-o.  S.W. Park.  S-o-o K-a-n-g.  M-y-u-n-g-h-o-o-n

10   C-h-o-i.

11        Q    I'm sorry.  What was the last name?

12        A    M-y-u-n-g-h-o-o-n.  Last name C-h-o-i.  The

13   president's name who was the boss at the time, K-i-h-w-a,

14   last name Y-o-o-n.  For as far as Mr. Yoon is concerned,

15   he spent more time in Korea than in Mexico.

16        Q    I'm sorry.  And when he was talking about

17   Kihwa Yoon at the time?

18        A    The president.

19        Q    Okay.

20        A    For T.J. Yoon, who happens to be the first

21   son of the boss.  K.Y. Youn worked there and was paid.

22   However, second son, capital Y.S., this fellow spelled

23   Y-o-u-n, was paid but is not working there.  For the

24   Y.S. Youn, he attended Southwestern college since he had a

25   family, and he got paid even though he did not work

13

1    there.

2        Q    Okay.  So if I can summarize for you, the

3    people who were actually employed and working there were

4    Kihwa Yoon, T.J. Yoon, Jae Hocho, S.W. Park, Mr. Kang, and

5    then Myunghoon Choi, and this is from September 1997 to

6    February 1998?

7        A    Yes, ma'am.

8        Q    Okay.  Was T.J. Yoon at the facility very

9    often during the time frame from September 1997 to

10    February 1998?

11        A    Since he was the fourth son of the boss, I

12    would say more than 50 percent he spent time in Korea

13    rather than working at the work site.

14        Q    Back to the hours, can you estimate for me

15    the times that you would stay until 2:00 a.m. Monday

16    through Friday?

17        A    You said Monday through Friday, but I'm

18    talking about only Fridays.

19        Q    Okay.  So you would only stay until 2:00

20    a.m. on Fridays during this time frame September 1997 to

21    February 1998?

22        A    Yes, I'm saying Mondays and Fridays.

23        Q    Okay.  So, I'm sorry.  Both Mondays and

24    Fridays you could potentially have to stay as late as

25    2:00 a.m.?



1      A      What I'm saying is that the statement that
2  I made, I worked until 2:00 a.m., was not a continuing
3  situation; only once.

4      Q      So only one time did you have to work until
5  2:00 a.m. during this time frame September '97 to February
6  '98?

7      A      That's right; until 2:00 a.m. once.  Again,
8  there was only one occasion that I worked until 2:00 a.m.;
9  however, there are at least between five to ten occasions
10 where I worked up until 10:00 to 12:00 midnight.

11     Q      You also mentioned that there were times
12 you would leave at about 8:00 p.m. after closing up the
13 facility.  Would Mr. Kang or others still be there when
14 you left?

15     A      You mean when I closed my company's door
16 with him?

17     Q      Whether -- if he left at the same time that
18 you did or earlier?

19     A      At that time as far as Mr. Kang was
20 concerned, he didn't work overtime.

21     Q      So from September 1997 through February
22 1998, Mr. Kang was not working overtime?

23     A      When I said 2:00 a.m. situation, I want you
24 to include Mr. Kang also.

25     Q      Okay.  But on the days that he would leave

15

1    at 8:00 p.m., which he said was his regular

2    schedule -- I'm sorry.  I shouldn't refer to him as third

3    person.

4              On the days that you would leave at

5    8:00 p.m., which was your regular schedule and you weren't

6    working overtime, would anybody else stay in the facility

7    after you left?

8        A    Yes.  For example, in the case of Mr. Park,

9    since I stayed at his home, since I didn't have any

10   transportation, he and myself always worked together.  So

11   the worst part is when he's late, I have to be late too.

12       Q    Okay.  Do you recall approximately when

13   Mr. Kang was leaving Monday through Friday?  During this

14   time frame, what time he would leave?

15       A    At that time, during the weekdays his

16   working schedule was 7:30 a.m. to 5:30 p.m.  That was

17   regular working time.  Now I refreshed my recollection,

18   is that from September 1997 up until February 1998, there

19   was not many overtime for Mr. Kang.

20       Q    What about for any of the other individuals

21   that you've discussed; were any of those individuals

22   working overtime during September 1997 through February

23   1998?

24       A    I told you that Mr. Park was always with

25   me.

16

BARKLEY

1        Q      Okay.

2        A      The gentleman by the name of Cho, C-h-o,

3    who was the general manager man, he goes home under any

4    circumstances with any excuses.  As far as Mr. Cho is

5    concerned, who was a United States citizen and, for

6    example, even though in a situation we are supposed to

7    work on Saturdays and Sundays to meet with the buyer, like

8    playing golf, he didn't work that much.  For example, I'm

9    still talking about Mr. Cho, general manager, this fellow,

10   if he happened to be -- I mean, if he happened to be

11   working on Saturday, he only picking up the phone from

12   boss and from Korea.  And, for example, if he got a

13   telephone call from boss 1:00 p.m., he logs his time at

14   3:00 p.m.

15       Q      Okay.  How many Saturdays do you estimate

16   that you worked from September 1997 through February 1998?

17       A      Let's assume we have four Saturdays.  Out

18   of four Saturdays, I work three Saturdays.  And at the

19   time even Sundays employees were called in to work.

20       Q      Okay.  When you say that you are assuming

21   four Saturdays, are you talking about each month, because

22   obviously there would be more than four Saturdays in that

23   time period?

24       A      Yes, ma'am.  One month.

25       Q      So every month, September, October, et

17

BARKLEY
Court Reporters & Transcription

1   cetera, you worked three out of the four Saturdays?

2        A     Exactly.  Let me put it this way:  It was a

3   situation where the excessive work schedule was imposed on

4   at that time.  And that wasn't right.  For example, the

5   Mexican employees would not -- I mean, never want to go to

6   deliver at night because it's mountainous country.  Once

7   you go astray, they are doomed to death.  I mean death.

8   Therefore, the Mexican employees would not drive at all.

9   However, being a Korean employee, being a newcomer into

10  the company; even if it was a rainy day, I was supposed to

11  delivery like at 9:00 p.m., one-way drive taking about two

12  hours and back home takes about two hours; therefore, I

13  get home at approximately 12:00 or 1:00 a.m.

14       Q     And this is on a Saturday or Sunday?

15       A     It applies even week days.

16       Q     About how many times do you think you were

17  sent out to make these deliveries from September 1997

18  through February 1998?

19       A     At that time, I logged those information

20  into my diary, memory, and like I traveled at least two to

21  Mexicali or three times a week.

22       Q     A week?

23       A     Back in January 1998, I was in Korea at

24  that time and I also heard Mr. Kang and Mr. Park go to LG

25  at least two times a week.

18



1          INTERPRETER:  I'm sorry.  Correction stands.
2   Witness said, "on day, daily basis."
3          THE WITNESS:  That shows how we were on the
4   excessive busy schedule.
5          Q     BY MRS. MULKEY:  And all of these
6   deliveries and the driving that he had to do, all of this
7   was because of the orders for LG Electronics?
8          A     Yes, ma'am.
9          Q     What were you having to deliver to LG
10  Electronics?
11         A     CDT Earth.  It's a little component.  It is
12  the television component parts attached to the tube.
13         Q     And why were you having to make so many
14  deliveries?
15         A     Partially, it was due to the poor
16  communication with the procurement person in charge at LG,
17  and without giving too much thought in the "capability" --
18         INTERPRETER:  That is the word used by the
19  witness.
20         THE WITNESS:  -- capability, equipments,
21  employees, and the materials, and T.J. Yoon was vice
22  president, which means he was our boss at that time, but
23  we didn't have any option because that was order from T.J.
24  Yoon.  Only in the hope or anticipation that LG would give
25  more order when we meet their demand on time.

19



1      Q      BY MRS. MULKEY:  Okay.  You had mentioned

2   that you were in Korea in January 1998.  When did you go

3   to Korea?

4      A      Since during the time of the vacation,

5   Christmas vacation, in Mexico, I left Mexico around 19th

6   or 20th of December 1997.  And also, as an assigned --

7   because of the short notice delivery to LG, when we

8   boarded a plane, we didn't have enough sleep at all,

9   because of the delivery.  Then, since we are not familiar

10  with the driving, Mr. Kang gave a ride from there to Los

11  Angeles area.

12     Q      Okay.  Did you go -- how long were you in

13  Korea?

14     A      You mean when I returned?

15     Q      When did you return?  You left for the trip

16  on the 19th or 20th of December.  When did you return from

17  Korea?

18     A      January 11, 1998.

19     Q      Was that for personal reasons, a vacation,

20  or was it for business?

21     A      At that time, for marriage.

22     Q      Had you already been engaged to be married

23  when you left Korea in September 1997?

24     A      Yes, it was a time of my engagement.

25     Q      And did your wife come back to the United

20



1    States with you when you returned?

2          A      Well, as for my personal situation, it will

3    take many days to explain what happened to my wife.  To

4    make a long story short, because no visa was issued, I

5    came home by myself.

6          Q      Okay.  Did you get married?

7          A      Yes, ma'am.

8          Q      Does she still live in Korea?

9          A      You mean my wife?

10         Q      Yes.

11         A      No, she lives in America.

12         Q      When did she come to the United States?

13         A      5/31/1998.

14         Q      Okay.

15         A      Once I get my personal load between the

16   time of September 1997 up to the time of May of 1998, when

17   my wife comes, because of that and other business

18   situations, I had to undergo so many hardships and

19   everything.

20         Q      Okay.  During the time September 1997

21   through February 1998, do you recall whether Mr. Kang

22   worked on any Saturday or Sundays when you were there?

23         A      I already stated -- testify to that.

24         Q      I'm sorry.  I don't recall -- I know you

25   said that he didn't work any overtime.  I just want to



1   make sure.

2          A       Well, yes, I said so. However, at that

3   time because Mr. Kang was not recording what the company

4   should have, according to him, he was going to leave the

5   company; therefore, like Saturday and Sundays he did not

6   work that many times. And that's why Mr. Park, my

7   roommate and I said I don't know why Mr. Kang is doing

8   something that goes against the will of T.J. Yoon at that

9   time.

10         Q       Did Mr. Kang ever talk to you about why he

11  was not working the overtime?

12         A       Yes. I remember now. Yes, he said that

13  his working hours are only 7:30 to 5:30. And since he was

14  going to wrap up his employment at the company and

15  transfer to another company, he needed his own personal

16  time.

17         Q       Approximately when did Mr. Kang tell you he

18  was going to wrap up his employment and go to another

19  company?

20         A       I don't recall exactly. My best estimation

21  is either between November or December of 1997, ma'am.

22         Q       Did Mr. Kang tell you that he had another

23  job waiting for him at that time?

24         A       No, I never heard that he found a job

25  waiting for him, but I believe he need some preparation

22

1    time to find his own new employment business.  He work

2    already there for the past three to four years.  And also,

3    my observation and my opinion was that because of the

4    excessive physical and mental exertion at the company, he

5    wanted to rest for a while.

6        Q    And when you say, "physical and mental

7    exertion," you mean because of the long hours necessitated

8    by LG Electronic's orders?

9        A    No.  The physical or mental exertion after

10   work.  For example, you mentioned LG; it was at the lowest

11   bottom, almost nothing, peanuts.  However, I'm talking

12   about the physical and mental stress suffered from

13   T.J. Yoon.

14       Q    Okay.  During this time frame from

15   September 1997 through really the end of January 1998, do

16   you recall seeing Mr. Yoon yell at Mr. Kang?

17       A    I didn't hear any yelling, that kind of

18   thing directly; however, for example, generally, he -- I

19   would say he was yelling to all of us.  One of the

20   examples is that he would not let us sit down for the next

21   two hours.  No sitting down for two hours while he is

22   freely talking to others.  There was one eyewitness

23   experience where T.J. Yoon grabbed Mr. Kang's -- one of

24   the ear and almost grabbed him to the office.

25       Q    When --

23

1          INTERPRETER:  Can I clarify one word?

2          MRS. MULKEY:  Yes.

3          THE WITNESS:  Left ear, Mr. Kang's left ear with

4   T.J. Yoon's right hand.

5          Q      And approximately when did that happen?

6          A      I believe winter of 1997.

7          Q      Can you be any more specific in terms of

8   the month, if it was either September, October, November,

9   or December?

10         A      I believe it's either September or October

11  because when I observed or eyewitnessed Mr. T.J. Yoon

12  grabbing Mr. Kang's left ear -- for your information,

13  Mr. Kang is two years older than T.J. Yoon, and any

14  ordinary man of a sense -- I couldn't believe what I was

15  watching.  On top of that, Mr. Kang was married.  How

16  could -- how in the world could T.J. Yoon do such a

17  conduct at the company in front of other people?  That

18  instant led me to believe that that is not one instant at

19  all.  What I'm saying is that there must have been more

20  incidents previously.

21         Q      Did you personally witness any other times

22  that T.J. Yoon grabbed Mr. Kang by the ears?

23         A      By me?

24         Q      Yes.

25         INTERPRETER:  The interpreter clarified with the

                              24



1    witness how many times did you witness.

2          MRS. MULKEY:  Witness, yes.

3          INTERPRETER:  And the witness said, "Only once."

4    The witness said, "Mean me or others?"

5          Q    BY MRS. MULKEY:  No.  How many times did

6    you see Mr. Yoon, T.J. Yoon, grab Mr. Kang by the ear?

7          A    Only once.

8          Q    And you believe it was either September or

9    October 1997?

10         A    Yes, ma'am.  The reason I remember it was

11   September or October was because that's when I came to

12   Tijuana, Mexico, and I was new to the company, U. Lim in

13   Tijuana, Mexico.  I'm almost like an outsider, stranger.

14   When I witnessed that incident, I was almost shocked to

15   death.

16         Q    So would you put it within the first month

17   of your coming to Tijuana, Mexico?

18         A    Yes, ma'am.  Yes, ma'am.

19         Q    If you don't know, you don't have to guess,

20   but would you estimate it was within the first two weeks?

21         A    I don't know.

22         Q    Okay.  Did you personally ever observe

23   Mr. Yoon hit Mr. Kang?

24         A    I have never seen even once.  However, I

25   never witnessed, eyewitnessed, myself, personally.

25

BARKLEY
Court Reporters & Transcription

1    However, I was told by Mr. Park and Cho -- let's go to

2    Mr. Park first.  For example, in the occasion of Mr. Park

3    was hit with an ashtray which caused a nosebleed; and

4    therefore, Mr. Park was going to quitting (sic) and they

5    had disputes frequently.  Also, in a public meeting

6    T.J. Yoon officially said that before you came here,

7    meaning you as me, the conditions is terrible.  However,

8    since you came here, I have been rather calm down or

9    control myself, because so many people were disciplined

10   before.  At that time, he asked a question to

11   Mr. Kang -- and then he asked Mr. Kang a question:  "How

12   was different then and now?"  Mr. Kang said, "Yes, there's

13   a difference now and the past."  Well, for T.J. Yoon and

14   myself, we were kind of old buddies more than ten years

15   extending back to elementary school, like almost ten

16   years, and Jae Hocho is the one T.J. Yoon acquired in

17   America and Mr. Park is the older friend with T.J. Yoon;

18   in fact, older than my friendship.  And when Mr. Park did

19   not use a respectful form of calling Mr. Yoon, then

20   Mr. Park is in trouble.

21          Q      Okay.  Did you actually see Mr. Park get

22   hit with the ashtray?

23          A      No.  I already testified that I only heard.

24          Q      Okay.  So putting aside what Mr. Park may

25   have told you or what you may have heard from others, did

26

BARKLEY

1    you ever see Mr. Yoon hit Mr. Kang or anyone else either

2    with his fist or with items during this time frame

3    September 1997 to February 1998?

4            A       Never seen Mr. Yoon hit Mr. Kang, no.

5            Q       What about others during this time frame,

6    only September 1997 to February 1998; did he ever see

7    Mr. Yoon hit anyone else who worked at the facility?

8            A       I don't know whether you classify that,

9    quote, unquote, "hitting."  During his regular course of

10   conversation, he hits with one of his foot while he is

11   talking to the person to whom he is speaking.  For

12   example, when he's not satisfied, he's kind of kicking

13   with his foot.

14           Q       Okay.  Did you see Mr. Yoon kick Mr. Kang

15   during this time frame?

16           A       I did not see him hit Mr. Kang.  But I saw

17   Mr. Park, yes.

18           Q       Okay.  Let me -- I was asking about

19   kicking.  Did you actually see him kick?

20           A       It's not severe kicking; kind of like, you

21   know, tapping.  Kicking would not make you happy at all,

22   that kind of kicking.

23           Q       Did you see him do that tapping or kicking

24   to Mr. Kang during this time frame?

25           A       No, not to Mr. Kang.  Well, let me put it

27

BARKLEY

1   this way.  I may have seen it, but due to the passage of

2   time and since it was the usual or ordinary things that

3   always happening, that's why I don't remember.  For

4   example, grab by somebody's neck and then hitting with a

5   fist to one of the shoulders, you know.  To me, what he

6   was doing was a part of daily ritual, sort of.  See,

7   especially remembering now still is that his grabbing

8   Mr. Kang's ear because grabbing by ear, it still lingers

9   in my memory after long passage of time.

10          Q       So do you have any specific memory of

11  either Mr. Yoon grabbing Mr. Kang by the neck, or hitting

12  him with a fist, or kicking him during that five months

13  where you worked together?

14          A       For the example of Mr. Cho, who was a U.S.

15  citizen, since he was speaking the English language rather

16  freely and was in charge of the management, and plus me,

17  myself, who was new to the company, T.J. Yoon did not

18  treat him and me bad, no.  However, for Mr. Kang and Park,

19  it was almost like a little play thing for him to do

20  whatever he wanted to, even though I don't have a specific

21  recollection to remember.

22          Q       So you don't have a specific recollection

23  of Mr. Yoon either grabbing Mr. Kang by the neck, hitting

24  him with a fist, or kicking him during this time frame?

25          A       I don't have a specific recollection.  But

BARKLEY

1    since it happened, it is kind of ritual, I'd say, every

2    day.

3            Q      Do you ever recall an incident where

4    Mr. Yoon forced Mr. Kang or others to do jumping jacks or

5    some sort of exercise in the form of jumping jacks during

6    this time frame?

7            A      In Korea, we call it rabbit jumping jack.

8                   I don't recall specifically, but let me

9    see.  I know Cho was telling -- oh, now I remember

10   something.  During the lunch hour, while we were getting a

11   lunch table during the lunch hour, when something happened

12   that made T.J. Yoon unhappy, and T.J. Yoon instructed

13   Mr. Kang, let me see, stand up or kneel down or something.

14   And lo and behold, Mr. Kang complied with his demand.

15   That, I could not understand at that time.  You know, if

16   T.J. Yoon demanded me to do so, I would have objected.

17   However, Mr. Kang did it.  And I also did not understand

18   why -- both Mr. Kang and Mr. Cho were U.S. citizens, and I

19   didn't understand why Mr. Kang alone was treated like

20   that.  Back in October of '97, there was a computer show

21   in Las Vegas; all went to Las Vegas show with an exception

22   of Mr. Kang.  He did not invite Mr. Kang.  And T.J. Yoon

23   told us that -- correction, not T.J. Yoon but Mr. Cho told

24   me, "Hey, don't tell this to Mr. Kang."  Original plan

25   only called for T.J. Yoon, Mr. Cho, and Mr. -- the other

29

1    fellow, Park.  However, since -- well, original plan did

2    not even include myself.  What Mr. Park thought was that

3    if I was not invited, I would have -- spend time with the

4    baby and Mrs. Park, so that is why I was invited.

5         Q    Okay.

6         A    And also, at that time, Mr. Kang here,

7    Mr. T.J. Yoon in Korea.  And I heard inside the company

8    that, "Whether or not Mr. Kang quit or not?"  And when

9    Mr. Cho, "He did not."  And Mr. T.J. Yoon from Korea

10    called the company and said, "Will that guy quit or not?"

11    That kind of conversation I heard.

12         MRS. MULKEY:  Do you need a moment?

13         MR. GREY:  We've -- as we go through this, we've

14    always had Mr. Cho present and Mr. Kang present, who speak

15    Korean as well, so if there's ever been a situation where

16    there's concern about the translation, they have spoken up

17    and just clarified the translation.

18           Let me just confer with him for one

19    moment.

20         MRS. MULKEY:  Off the record.

21         (Discussion held off the record.)

22         MR. GREY:  Back on the record.

23           Specifically, with respect to the last

24    translation, Mr. Kang informed me that he believes that

25    Mr. Cheong mentioned the word "fired" as well as "quit,"

30

1   and that the word "fired" wasn't translated.  If we can

2   have a clarification with respect to the last conversation

3   that Mr. Cheong was relating, it would be appreciated.

4           INTERPRETER:  I appreciate it, Counsel.  I'm open

5   to any questions or comments regarding the translation.

6   In a normal situation when there is any -- and for your

7   information, translation is not an exact science.  So what

8   happens is that when there is any questions or disputes,

9   I'm very open-minded.  And for the question of firing or

10  quitting, keep in mind -- I don't know who is reading

11  this -- Mr. Cheong speaks rather abundantly, so I have to

12  quit once in awhile because -- as a limit for the

13  interpreter.  In fact, I was going to ask Mr. Cheong

14  during the break to make a short statement, to move on.

15  Otherwise, I can't remember all of it.  And for the firing

16  or quitting --

17          MRS. MULKEY:  Maybe we can just -- I know it

18  wasn't necessarily responsive to the question that I asked

19  but maybe what we can do is just have him --

20          INTERPRETER:  He wants to take a short break.

21          MRS. MULKEY:  Sure.  Please feel free.  If you

22  need to use the rest room --

23          MR. GREY:  And I'm going to talk to him about

24  being more responsive.

25                  (Brief recess taken.)

31

1      MRS. MULKEY:  Back on the record.  We took a break

2  just a few moments ago and there were some issues about

3  clarifying an answer that he had given, some potential

4  problems with translation.

5      Q    Let's do that now, Mr. Cheong.

6      INTERPRETER:  For the record, if there's any good

7  faith dispute for the translation of this interpreter,

8  once again as a professional I'm open-minded.  In that

9  situation, I will ask the witness to restate the statement

10  so that I deliver it precise and correct, the translation.

11      THE WITNESS:  A couple of matters I know of.

12  No. 1, some statements that I testified to should be

13  corrected, No. 1.  No. 2, for the issue of Mr. Kang's

14  quitting company, it was only an inference on the part of

15  myself and Mr. Park.  My recollection goes that Mr. Kang,

16  yes, he worked overtime 50 percent, five-zero.  And, in

17  fact, Mr. Kang worked overtime September and October;

18  however, none in November.  What I'm saying is never

19  overtime.  What I'm saying is not compared to September

20  and October.  There was -- he was not working overtime as

21  much; that's what I'm saying.  So it was only our

22  inference or presumption between Mr. Park and myself.  And

23  I don't know why Mr. Kang did not work overtime unlike he

24  did in September and October, so it was only our

25  inference.  Then Mr. Park and I conclude that Mr. Kang is

32

1  going to quit.  As far as overtime is concerned, there is

2  no exemption for the -- exemption to anybody.  Once you

3  are required to make a delivery, you have to.  So when

4  Mr. Kang was supposed to deliver, Mr. Kang had no

5  exception; he had to go.

6         Q       Do you recall whether or not he was

7  required to make deliveries, and therefore, work overtime

8  in November, or December, or January?

9         A       For example, in the month of January,

10  Mr. Kang made several deliveries to Mexicali.  Yes, I do

11  remember.

12        Q       Was this during the time that you were

13  gone, in Korea?

14        A       That's right.

15        Q       So did you personally observe him making

16  those deliveries or is this something you heard about

17  through others.

18        A       Mr. Park told me so.

19        Q       Okay.

20        A       Even on Sunday, Mr. Kang went to Mexicali

21  with his wife for delivery.

22        Q       Did you see Mr. Kang go to Mexicali with

23  his wife?

24        A       I did not see; I only heard.

25        Q       Who did you hear that from?

33

BARKLEY

1          A       Either Mr. Park or Mr. Cho.

2          Q       Okay.  I think what we were talking about,

3   what led up to this portion that we got a little bit far

4   afield, was the actual incidents involving Mr. Yoon and

5   Mr. Kang, specifically.  If I recall correctly, you were

6   saying that you didn't see Mr. Yoon hit or kick Mr. Kang

7   during this time frame; is that correct?

8          A       I did not testify that Mr. Yoon did not.

9   What I was testifying was since it was a daily ritual that

10  I observed everyday, I do not specifically remember.

11         Q       In this daily ritual that you saw everyday,

12  do you remember whether he would hit or kick Mr. Kang?

13         A       What I'm saying is that since it was a

14  daily ritual and what I observed was not necessarily any

15  violent hitting or kicking, but in a manner of -- as an

16  advising manner to hitting or kicking.  It happens

17  everyday to Mr. Park -- I mean Mr. Kang, correction.

18         Q       Every day.  So every day you would see some

19  sort of hitting or kicking but it wasn't violent; is that

20  what you are saying?

21         A       Correct.  Not so violent that he remembers

22  in my memory bank, correct.

23         Q       I'm sorry to keep repeating the question,

24  I'm just not sure that I'm understanding the answer.

25                 Do you have a specific recollection of

34

1   Mr. Yoon connecting with his fist or with his foot to
2   Mr. Kang?
3          A       Yes, he did.
4          Q       And can you recall about when you saw a
5   specific instance of Mr. Yoon connecting with a punch or a
6   kick?
7          A       Like I said, there was no specific time.
8   He was always doing particularly to Mr. Kang and Park.
9          Q       Did he ever hit or kick you during this
10  time frame?·
11         A       Not during the time I was employed there,
12  but after I quit, I left the company, and he kind of hit
13  me and grabbed by the neck, kind of pushed, and then
14  cursed or humiliated, like, "You rat," you know, "your
15  conduct is kind of that of a rat," or some kind of
16  humiliation.
17         Q       Okay.  But during the time frame that you
18  were working with Mr. Kang, that is, September 1997, or
19  February 1998, he did not kick or hit you?
20         A       He didn't.
21         Q       And do you have a recollection of what led
22  up to the incidents and -- you are calling them daily
23  incidents -- where Mr. Yoon in some form hit or kick
24  Mr. Park or Mr. Kang?
25         A       One of the many examples -- this is the

35

BARKLEY

1   situation.  For example, when we drafted some letters or

2   when some errands were not done the way he wanted, i.e.,

3   when he was not satisfied, he does so, kicking, hitting.

4         Q      So would you say that for the most part

5   these incidents were the product of Mr. Yoon being upset

6   at something related to work?

7         A      Yes.  What boils down is this:  Even though

8   we are employees of that company, we were not treated as

9   decent human beings.  That's what I'm saying.

10        Q      Okay.

11        A      Like your servant.

12        Q      Okay.  In your opinion, did he treat

13  Mr. Kang and Mr. Park differently than, for example, he

14  treated you and Mr. Cho?

15        A      Absolutely.

16        Q      Why do you think he treated Mr. Kang and

17  Mr. Park differently than he treated you and Mr. Cho?

18        A      First of all, he treated Mr. Park with no

19  minimum courtesy whatsoever, for the reason that

20  Mr. Park was a friend from childhood, because there was no

21  complaint.  And in the case of Mr. Kang, I was told that

22  Mr. Kang was not treated that bad in all the stage of his

23  employment at U. Lim.  Like, he didn't work overtime and

24  he complied with all the demands of the company.  And

25  later when Mr. Kang was not a favorite to the eyes of

36

1    T.J. Yoon, that's why T.J. Yoon said that, "Oh, he didn't

2    quit yet? He should have been fired." Something like

3    that.

4         Q    And was he not a favorite with Mr. Yoon

5    because he was no longer working the amount of overtime

6    that the others were working?

7         MR. GREY:  I'm going to object.  Calls for

8    speculation, but he can answer.

9         THE WITNESS:  Could you repeat the question?

10        Q  BY MRS. MULKEY:  Question was -- and maybe

11    this would help it -- if you know, was Mr. Yoon -- strike

12    that.

13         If you know, did Mr. Kang fall out of favor

14    with Mr. Yoon because he was no longer working the same

15    overtime as others?

16         MR. GREY:  Same objection.  And object, lacks

17    foundation, but he can answer.

18         THE WITNESS:  I don't have a specific answer to

19    your question, but I believe not necessarily work related,

20    but if you don't like a person --

21         Q    BY MRS. MULKEY:  So do you believe that

22    Mr. Yoon did not like Mr. Kang?

23         A    I believe so.  Let me add one more thing

24    for you, Counsel.  This is what he said.  "Like woman, his

25    character is unpredictable."

37

1          Q      I'll go with that.

2          A      "His character is unpredictable, like a

3    woman."  Some of the time he likes Mr. Cho.  Certain

4    period of time, Mr. Park.  Or certain period of time he

5    also likes Mr. Kang.  I believe the reason is as follows:

6    For example, any employee will be branded no good

7    employee.  For example, when Mr. T.J. Yoon invites the

8    employee for a kind of drinking party outside of the scope

9    of employment, if any one of the employees dare to decline

10   or reject it, that's the end; out of favorite.  For

11   example, when your parents are sick, or when your wife is

12   sick, because of a personal appointment you cannot be

13   there, but he doesn't care.

14         Q      So people would fall out of favor with

15   Mr. Yoon if they did not accompany him in the social

16   events?

17         MR. GREY:  I'm going to object to the question as

18   it infers that would have been the only explanation for

19   falling out of favor.  I think that mischaracterizes the

20   testimony.

21         Q      BY MRS. MULKEY:  Let me restate that that

22   is one of the reasons that Mr. Yoon would -- excuse me.

23                Is one of the reasons that people would

24   fall out of favor with Mr. Yoon the fact that they would

25   not attend these social events?

38

1        A        That's only one of the easy examples for me

2   to remember.

3        Q        What other kinds of things would make you

4   fall out of favor with Mr. Yoon?

5        A        For example, when he invite me to play

6   golf, I don't play golf.  Or the playing of pool, or

7   playing card games, or fishing; there are many situations.

8   Or a picnic, for example.

9        Q        Aside from the social events, were there

10  other reasons why a person might fall out of favor with

11  Mr. Yoon?

12       A        This is my personal opinion, and that is

13  that he cannot stand someone who is superior to him.

14       Q        Okay.  Were any of the employees that he

15  treated disfavorably (sic) -- did any of them hold a

16  superior position to Mr. Yoon?

17       A        In other words, his vision of employment is

18  that no one is above him.  He's on the top of that

19  employment and he's what I say tyrant.

20       Q        Okay.  So then this other factor, the other

21  explanation for him disliking one of the employees that is

22  someone who is superior to him, how would that work given

23  his, Mr  Yoon's, belief that he was basically the "top

24  dog"?

25            MR. GREY:  May I just add, we're looking here for

39

1   clarification, what he means by the use of the term

2   "superior."

3           MRS. MULKEY:  Yeah, I think that may be it.

4           THE WITNESS:  For example, he had a complex that

5   his height is short.  Even though he's short, he's

6   bragging that his height is 170 centimeters.  For example,

7   in the command of the English language he gets by, not

8   fluent, not bad; and in the example of Mr. Park and

9   myself, which we have very poor English language, he

10  humiliates.  For example, the playing pool, or playing

11  card games, if he is a loser, he will never end the game.

12  For example, until he recovers all what he had lost, or

13  until his physical condition cannot stand him, then that's

14  the end of the game; otherwise, he continues.

15          Q       Okay.  So generally, would you describe

16  Mr. Yoon as not a very likable person?

17          A       Of course.

18          Q       Was he generally mean to everybody at the

19  work place?

20          A       Yes, generally.

21          Q       Did you have occasion to watch Mr. Yoon

22  interact with any of the Mexican workers for U. Lim de

23  Mexico?

24          A       Well, he couldn't do that because of the

25  language barrier.  The Mexican nationals could not

40

BARKLEY

1   understand this guy's language.  So for example, if T.J.

2   yells at the female employees there, and since female

3   employee's know the character of T.J. Yoon, they are kind

4   of used to it.

5        Q    So would Mr. Yoon, T.J. Yoon, yell at the

6   Mexican workers despite the language barrier?

7        A    Yes, including female employees.

8        Q    What kinds of things would he get angry

9   about with respect to the Mexican workers?

10       A  ·   When there's noncompliance.

11       Q    And when you say "noncompliance" --

12       A    When he was not satisfied.

13       Q    Not satisfied with their work performance?

14       A    Yes.  And another reason is, for example,

15   if an add-on was requested and the female employee simply

16   forgot as she was doing another companies duties.  And,

17   for example, one of the employee was kind of fat, plump

18   lady, he called her, "The big fucking lady did not do the

19   job right."  And he never speaks for those words in their

20   language, Spanish, or English; he only spoke in Korean so

21   the other party would not understand.  However, these

22   Mexican workers understand those Korean curses used by

23   T.J. Yoon and Mr. Cho.  They understood Korean curses.

24       Q    So Mr. Yoon and Mr. Cho would curse at the

25   workers?

41

1          A      Yes.

2          Q      What kinds of curse words would they use?

3     I don't know if there's a way to translate them exactly or

4     not.  We've tried before in some of the other

5     depositions.

6          A      It can be "translated son of a bitch" or

7     "motherfucker," you know.

8          INTERPRETER:  That's not bilingual; that was said

9     by the witness.

10         Q   ·   BY MRS. MULKEY:  But that's the Korean

11    words would be the equivalent to the American "son of a

12    bitch" or "motherfucker"?

13         A      That kind of language should not be

14    condoned at the company environment.

15         Q      Okay.  Did he use that kind of language

16    towards the Korean employees as well?

17         A      Oh, yes.

18         Q      Did you ever see Mr. Yoon throw objects or

19    hit any of the Mexican workers?

20         A      He would not do that; otherwise, he would

21    be sued instantly.

22         Q      Did you ever hear Mr. Yoon make any

23    derogatory or disparaging remarks to Koreans in general

24    during this time frame September of 1997 and February

25    1998?

1        A      Yes.  To me, as well.

2        Q      Okay.  What did he say that was either

3   negative or disparaging about Koreans?

4        A      For example, "You must obey the rules from

5   the company; otherwise, you may be sent back to Korea."

6   Also, "If you fall out of favor of the president, boss,

7   you have no choice but to return to Korea.  So work hard

8   to earn the favor of the president."  When I was in Korea,

9   my philosophy was only to work hard for the sake of the

10  company.  But over here, I had to not only work hard for

11  the company, but also to run a personal favor of the

12  boss.  It was really a worse situation for me because I

13  already quit my job in Korea and my status is not fixed

14  here in America, and I just didn't have any choice what to

15  do over here.

16       Q      Okay.  Going back to my question, which

17  was, did he make any derogatory comments about Koreans --

18              Can we go off the record for a second?

19              (Discussion held off the record.)

20       MRS. MULKEY:  Back on the record.

21       Q      Going back to my question, which was, did

22  Mr. Yoon make any derogatory comments?  I don't recall you

23  saying anything concerning Koreans in general.  Do you

24  remember him saying anything that insulted Koreans?

25       A      Yes.

43

BARKLEY

1          Q          What types of insults would he make about

2     Koreans?

3          A          One example is when Mr. Cho is not present,

4     for example, and when Mr. T.J. Yoon does not like Mr. Cho,

5     he said, you know, "I picked up that guy from auto shop

6     and then I trained him to be working for this company and

7     he does not obey me."

8          Q          Okay.   I think perhaps maybe you don't

9     understand my question.   I'm not talking specifically if

10    he insulted the Korean employees.   I'm asking whether he

11    made comments insulting Koreans as a national origin?

12         A          Can I compare ethnically with the Mexicans?

13         Q          If Mr. Yoon made comparisons then, please.

14         A          He did.

15         Q          Okay.   Please.

16         A          For example, "Koreans must work hard

17    because Mexicans unreliable and you have to watch out for

18    them."   I don't know whether it has any relevance, but he

19    only talks about the person who was not present.

20         Q          Did he make any other -- did Mr. Yoon,

21    T.J. Yoon, make any other statements comparing Mexicans

22    and Koreans, if you recall?

23         A          Since the Mexicans would not work overtime,

24    and since we pay them and they are paid, we have let them

25    work.   For example, Koreans are diligent in saving from

44



1    what they earn or made.  However, Mexicans do not -- are

2    not, and therefore, if you have any chance let them work

3    hard.

4         Q     Do you remember Mr. Yoon comparing Koreans

5    to Americans?

6         A     No, but I could feel what he said.  I

7    believe if Mr. Park and I were United States citizens, he

8    would not have discriminated like that.

9         Q     What did you mean that, "he would not have

10   discriminated like that"?

11        A     Because he believes himself -- he's the

12   final ruler of my employment, because I don't have any job

13   in Korea and my status is not set here; that is his

14   mindset.

15        Q     Earlier you indicated that Mr. Yoon treated

16   you better than Mr. Kang; is that correct during that time

17   frame?

18        A     Yes.

19        Q     Okay.  Aside from comparing Koreans to

20   Mexicans, do you remember Mr. Yoon making any insulting

21   remarks about Koreans in general?

22        MR. GREY:  I'm going to object as asked and

23   answered, but go ahead.

24        THE WITNESS:  He made a comparison with Samsung

25   employ, S-a-m-s-u-n-g, which happened to be our company,

BARKLEY

1   and they were less paid but they good colleagues, and what

2   about you we pay you well and you are not working well.

3         Q    Okay.  As you sit here now, do you remember

4   anything from September 1997 through February 1998, that

5   Mr. Yoon said in terms of an insult specifically related

6   to Korean national origin?

7         A    Yes.

8         MR. GREY:  Same objection.

9         THE WITNESS:  You are talking about the Korean

10  origin?

11        Q    BY MRS. MULKEY:  Yes.

12        A    Yes.  For example, he said, you know,

13  "Koreans are lazy when the boss is not around."  That kind

14  of insulting comment.

15        Q    Do you remember when he said -- when

16  Mr. Yoon said to you, "Koreans are lazy when the boss is

17  not around"?

18        A    For example, from Korea he calls over to

19  Mexico in the morning, working time, whether or not we are

20  at the work site or not.  Then when he returns, he checks

21  up on us.  "Uh-huh, since I'm not around you are lazy.

22  You didn't come to work on time."  Things like that.  What

23  he is saying is that when he's around productivity is up,

24  and when he's not around, you are lazy and you do not work

25  hard.  You must feel the vacuum that I was away from work.

46

**BARKLEY**

1    Q    Was Mr. Yoon making this comment about you
2  and the other employees specifically, or about Koreans in
3  general?
4    A    Well, initially, Mr. Cho and me, and then
5  later, he said all the Koreans -- I mean, Mr. Park.
6    Q    And when he said, "all the Koreans," did he
7  mean -- strike that.
8         When he said, "all the Koreans," did you
9  understand him to be referencing the Koreans who worked
10  for U. Lim America, or Koreans in general?
11    A    You mean in my opinion?
12    Q    Yes, in your opinion.
13    A    Well, to me, honestly, whether he is here
14  or not, when he's not here it's less stressful.  However,
15  we work according to the schedule.  Whatever he believed
16  was his personal opinion and not ours.
17    MR. GREY:  Can we just take a two-minute break?
18    MRS. MULKEY:  Sure.
19         (Brief recess taken.)
20    MRS. MULKEY:  Back on the record.
21    Q    During this time frame from September 1997
22  through February 1998, did you ever personally hear
23  Mr. Yoon call Mr. Kang any insulting names?
24    A    Yes.  For example, in the disparaging
25  manner, Mr. Kang's shape is something like this

BARKLEY

1   (indicating).

2          INTERPRETER:  Well, Counsel, you witnessed what he

3   did.

4          MRS. MULKEY:  For the record, he was making a

5   circle type of shape with his hands, the witness.

6          Q     So he would indicate -- I'm sorry.

7   Mr. Yoon would indicate that Mr. Kang had some sort of

8   circled shape to him?

9          A     Not necessarily face shape, but I hate to

10  mention that comment in front of Mr. Kang.  What T.J. Yoon

11  described insultingly was comparing Mr. Kang's bulging

12  belly and, "He's just like his wife," you know.

13         Q     Other than describing his physical

14  appearance, did he make any insulting comments about

15  Mr. Kang to you?

16         A     Nothing off the top of my head right now.

17        MR. GREY:  And can we clarify when you use the

18  word "insulting," are you also including swearing and

19  curses?

20        MRS. MULKEY:  I was going to get to that part.

21  Why don't I ask the question.  You can translate that.

22         INTERPRETER:  I translated the Korean words for

23  insulting, swearing, and curses.

24         Q     BY MRS. MULKEY:  So, do you recall during

25  this time frame from September 1997 through February 1998,

BARKLEY

1    Mr. Yoon insulting, or swearing, or cursing at Mr. Kang?

2         A     To answer your question, yes.  However,

3    since that kind of stuff is a daily ritual, nothing worthy

4    of my recollection now.  Just like when you are hit

5    everyday, you are kind of used to it.

6         Q     Do you remember what types of words

7    Mr. Yoon would use when he would either insult, or curse,

8    or swear at Mr. Kang?

9         A     Yes, I do.  For example, "Soo Cheol Kang,

10   that son of a bitch; he doesn't work overtime and he does

11   not do full company's work well.  That guy should have

12   been fired.  He did not quit yet?"

13        INTERPRETER:  One more additional translation.

14   Sometimes "fired" is translated in Korean language,

15   "cutoff."

16        Q     BY MRS. MULKEY:  Okay.  Putting aside the

17   other comments about Mr. Kang not working overtime or not

18   working well, did Mr. Yoon use any other phrases besides

19   "son of a bitch"?

20        A     He said he's lazy.  Lazy worm.  Well, the

21   fact of the matter is that guy is lazy worm since he's the

22   boss of the company.  He's lazy, lazier than anybody.

23        Q     Okay.  Do you remember at what point in

24   time Mr. Kang either stopped working overtime or

25   significantly reduced his overtime?

49

BARKLEY

1          MR. GREY:  I'm going to object as asked and

2     answered.

3          THE WITNESS:  My recollection is that he did

4     approximately 50 percent in the month of September and

5     October.  And in the month of November, he was rather

6     working less compared to the month of September and

7     October.  That's the extent of my recollection.

8          Q     In November and, if you remember, December

9     or January, was he working less overtime than you,

10    Mr. Cho or Mr. Park?

11         MR. GREY:  Object to the question as compound.

12         THE WITNESS:  You are talking about overtime;

13    right?

14         Q     BY MRS. MULKEY:   Yes.

15         A     Mr. Cho, in fact, worked far less overtime,

16     so he shouldn't be there.

17         Q     So did he work -- did Mr. Kang work less

18    overtime than you during the months November, December of

19    1997, and January of 1998?

20         A     Yes, that's right.

21         Q     And what about Mr. Park?  Did he work less

22    overtime than Mr. Park?

23         A     Keep in mind that Mr. Park and I are always

24    together because of the car.

25         Q     Okay.  Because you are sharing the car, you

50

1  would say that Mr. Kang worked less overtime than both you

2  and Mr. Park during that time frame?

3       A     Correct.

4       Q     Okay.  Did -- during this time frame from

5  September 1997 through February 1998, did anyone ever

6  comment to you about the fact that Mr. Kang was working

7  less than at least you or Mr. Park?

8       A     For example, "I don't know why, Soo Cheol

9  Kang does not work overtime.  Why does he not listen to

10  us?  If that's the case, cut him off."

11       Q     Who was saying that?

12       A     T.J. Yoon commanded to Mr. Cho to say so.

13       Q     Okay.  Did you ever observe any

14  conversations between Mr. Cho or Mr. Yoon and Mr. Kang,

15  concerning his hours?

16       MR. GREY:  I'm going to object as to vague and

17  ambiguous as to whether or not only certain of those

18  parties had to be in those conversations or all of those

19  parties together had to be in the conversation.

20       THE WITNESS:  Yes, on the basis of two reasons:

21  No. 1, since we shared one big office with just one glass

22  door open, we can hear all the conversations.  So I heard

23  it as well as Mr. Cho told me so.

24       Q     BY MRS. MULKEY:  What was the substance of

25  the conversation that you heard concerning Kang's hours?

51

1      A      For example, Mr. Cho told me that, "You two

2  guys," meaning myself and Mr. Park, "you come to work at

3  darkness, and then you leave the company also at darkness,

4  but what about Kang?  That guy, why does -- did he not

5  work overtime?"  Then I assume that from what Mr. Cho

6  said, I think Mr. Cho heard from T.J. Yoon.

7      Q      What is your understanding about the

8  reasons that Mr. Kang ultimately left employment at U.

9  Lim?

10      MR. GREY:  Objection.  Calls for speculation, but

11  he can answer.

12      THE WITNESS:  First of all, over the past three

13  years, he sacrificed his youth for the sake of the

14  company's benefit and what he suffered was the physical as

15  well as the emotional stress everyday, everyday.  And he

16  has been an asset to the company and to him; however, he's

17  seen no changes whatsoever.  No decent treatment as a

18  human being.  Make a note that that's my personal

19  speculation.  I don't know what the other parties felt.

20      Q      BY MRS. MULKEY:  Okay.  Do you know whether

21  or not -- strike that.

22          Did Mr. Kang ever discuss with you around

23  the beginning of February 1998, why he was leaving the

24  company?

25      MR. GREY:  Objection.  Lacks foundation.  Assumes

52

BARKLEY

1    that was his decision to leave.

2         THE WITNESS:  Do you want me to go ahead?

3         Q    BY MRS. MULKEY:   I'll ask a follow-up,

4    actually.

5              Did Mr. Kang ever relate to you a

6    conversation that he had with Mr. Yoon concerning his

7    hours in February 1998?

8         A    Not that I recall.

9         Q    Did you discuss with anyone in February

10   1998, the reasons why Mr. Kang was no longer going to be

11   employed by U. Lim?

12        A    With me?

13        Q    Yeah.  Did anyone discuss it with you?

14        A    Mr. Park and I discussed our friendly

15   concern that, "I don't know why Mr. Kang is doing that.  I

16   don't know why he's trying to make himself out of favor of

17   Mr. T.J. Yoon.  If he keeps doing so, he'll be fired or

18   cut off sooner or later unless he quit."  On top of that,

19   let me see, second generation -- I mean, the baby was

20   supposed to be born or something.  So once again, that was

21   the out of our friendly concern for Mr. Kang with

22   Mr. Park.

23        Q    And do you have any understanding that you

24   gained at the time, in February 1998, as to the reasons

25   why Mr. Kang was no longer going to be employed with U.

53

BARKLEY

1  Lim?

2  A    From Mr. Kang or from any other source?

3  Q    From Mr. Kang or any other source that you

4  learned of at the time, in February 1998?

5  A    Yes.

6  Q    And what was your understanding of the

7  reasons that he was no longer going to be employed?

8  A    My understanding was there was a dispute,

9  problems between Mr. Kang and the company.

10  Q    Do you have an understanding as to the

11  nature of the dispute or problems?

12  A    Not precisely, but we thought Mr. Kang fell

13  out of the favor of T.J. Yoon.  T.J. Yoon did not like

14  Mr. Kang, and Mr. Kang could not stand T.J. Yoon.

15  Q    I don't know how it's going to work on the

16  translation but I'll go for it anyway.

17       Was it your understanding at that time that

18  Mr. Yoon terminated Mr. Kang's employment or that Mr. Kang

19  quit his employment?

20  A    I don't know exactly because T.J. kept

21  saying, "That thing" -- or "That guy must be cut off," and

22  "Mr. Kang may have intention of quitting."  I don't know

23  exact terms, because inside of the office it was almost

24  officially, publicly, that that guy should be cut off,

25  terminated.  Probably that's what happened.

54

BARKLEY

1      Q      When you and Mr. Park talked about Mr. Kang
2  not obeying orders and falling out of favor of Mr. Yoon,
3  were you referencing his working hours?
4      A      No, I'm talking about overtime.  Overtime,
5  but generally disfavored.
6      Q      Okay.  So, one of the reasons which you and
7  Mr. Park believed Kang had fallen out of favor was the
8  fact that he was not working overtime; is that correct?
9      A      Initially, in my opinion, yes.  And
10 secondly, what happened is that Cho, Park, myself and
11 T.J., were longtime friends, but not Mr. Kang.  And,
12 therefore, there was a discrimination against him.
13     Q      The discrimination was because he was not
14 friends with Mr. Yoon?
15     A      Yes.  The fact that he was not a longtime
16 friend.
17     Q      At any time after Mr. Kang was no longer
18 employed by U. Lim -- so, in other words, after February
19 1998 -- did you have discussions with anyone at U. Lim
20 concerning Mr. Kang's employment?
21     MR. GREY:  I'm going to object.  That question is
22 overbroad?
23     THE WITNESS:  Yes, but nothing in particular.
24 Like the future of his employment, no.
25     Q      BY MRS. MULKEY:  Did you ever have

55

BARKLEY

1    discussions with anyone at U. Lim concerning Mr. Kang's

2    lawsuit against the company?

3           A      Me?

4           Q      Yes.

5           A      No.

6           Q      Were you ever present during conversations

7    between individuals at U. Lim concerning Mr. Kang's

8    lawsuit?

9           A      Yes.

10          Q      Could you tell me what you recall from that

11   discussion?

12          A      Initially, we had a meeting regarding the

13   lawsuit filed with Cho, Park, Y.S. Youn, and Kihwa Yoon.

14   That's the boss.

15          Q      Okay.

16          A      So we all got together in the meeting room

17   to find out what happened.  So we talked about it.

18          Q      Do you remember what you discussed?

19          A      I don't recall all the discussion, but I

20   remember one thing.  Kihwa Yoon asked a question regarding

21   an incident where Mr. Kang threw a battery to Mr. Cho.  He

22   said, "Who had seen that?"  After Mr. Kang left,

23   Y.S. Youn, the second son, started working there.  And

24   Kihwa Yoon asked his second son, Y.S. Youn, whether or not

25   his second son had seen Mr. Kang throw a battery to Mr.

BARKLEY

1   Cho.  Y.S. Youn could not have seen it, because at that

2   time Y.S. Youn was not working at the company.  Then Y.S.

3   Youn replied, "Sir, I did not see."  And Kihwa Yoon told

4   his son, "Listen, tell you saw it.  Regardless of amount

5   of lawsuit, whether $100,000 or a million dollars, do not

6   leave Mr. Kang alone."  With an exception of that, "He is

7   a U.S. citizen; he's not nothing to brag about.  That guy

8   has nothing to show other people."

9          Q      Okay.  Is there anything else that you

10  recall from that discussion?

11         A      That was when the notice of lawsuit was

12  received.  And then subsequently we had another meeting.

13  I'm talking about the meeting was subsequent to the

14  receipt of the letter of law office.

15         Q      Okay.

16         A      It was a general discussion for the

17  defense, how U. Lim company will defend for the lawsuit

18  filed.  That was the meeting No. 1, where specific

19  discussion were made for the defense of the matter.

20  Subsequently, no formal meetings were called; however,

21  just casual conversation concerning the lawsuit.

22         Q      If you can recall, do you remember what you

23  discussed in either the formal meeting or any of the

24  casual meetings regarding this lawsuit?

25         MR. GREY:  Other than what he's already indicated.

57

1          MRS. MULKEY:  Sure.

2          THE WITNESS:  At that time, another Mr. Kang, by

3     the name Y-o-o H-y-u-n-g K-a-n-g was on a business trip

4     there.  And the meeting was called to utilize Y.H. Kang,

5     who was on a business trip, to meet Mr. Kang, the

6     plaintiff, to --

7          INTERPRETER:  Witness used the word "cancel,"

8     unquote.

9          THE WITNESS:  -- the lawsuit.  I think the meeting

10    was materialized.

11         Q     BY MRS. MULKEY:   I meant to ask this in

12    the beginning.  Are you currently a U.S. citizen?

13         A     No.

14         MRS. MULKEY:  Okay.  That's all I have.

15         MR. GREY:  Okay.  Good.  I'll do the stipulation.

16         Relieve the court reporter of her duty under the

17    Code.  The original transcript will be forwarded to my

18    office.  Mr. Cheong will have 30 days to read and sign,

19    making corrections that he deems necessary.  We will

20    notify you of those changes within five business days. If

21    for any reason the original is lost, misplaced, or stolen,

22    a certified copy can be used instead.

23         DEPOSITION OFFICER:  Would you like him to sign

24    under penalty of perjury?

25         MR. GREY:  Yes.  So stipulated.

58

Recycled   Stock # DO 10-B

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICE.    .NCY                                                                    PETE WILSON, Governor

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
110 West 'C' Street, Suite 1702, San Diego, CA 92101-3901
(619) 645-2681  TTY (800) 700-2320  Fax (619) 645-2683



October 20, 1998


Director
Human Resources/Personnel
U. LIM AMERICA, INC.
605 Westview Court
Chula Vista, CA  91910

RE:  E9899D0453-00-c
     KANG/U. LIM AMERICA, INC.

Dear Director:

## NOTICE OF FILING OF DISCRIMINATION COMPLAINT

Enclosed is a copy of a complaint that has been filed with the Department of Fair
Employment and Housing (DFEH) in accordance with California Government Code
section 12960.  This constitutes service of the complaint pursuant to Government
Code section 12962.

Complainant has requested an authorization to file a lawsuit.  As it is unlikely that
DFEH would complete an investigation prior to 150 days from the date of this
complaint filing, at which time an authorization to file a lawsuit could be requested,
this complaint is being closed immediately based on the complainant's 'Election of
Court Action.'  A copy of the closing letter is enclosed for your records.

NO RESPONSE FROM YOU TO THE DFEH IS REQUIRED.

Sincerely,

Myonia Gibbs
District Administrator

CERTIFIED MAIL: RETURN RECEIPT REQUESTED


DFEH-200-06 (06/98)

* EMPLOYMENT * *

COMPLAINT OF DISCRIMINATION UNDER
THE PROVISIONS OF THE CALIFORNIA
FAIR EMPLOYMENT AND HOUSING ACT

DFEH # E9899-D-0453-01C

DFEH USE ONLY

## CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

YOUR NAME (indicate Mr. or Ms.)
Mr. Soo Cheol Kang

ADDRESS
910 South Euclid Avenue, #98

TELEPHONE NUMBER (Include Area Code)
(619) 475-8797

CITY/STATE/ZIP
National City, California 91950

COUNTY
San Diego County

COUNTY CODE

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP
COMMITTEE, OR STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

NAME
Tae Jin Yoon

TELEPHONE NUMBER (Include Area Code)
(619) 476-7071

ADDRESS
605 Westview Court

DFEH USE ONLY

CITY/STATE/ZIP
Chula Vista, California 91910

COUNTY
San Diego County

COUNTY CODE

NO. OF EMPLOYEES/MEMBERS (if known)

DATE MOST RECENT OR CONTINUING DISCRIMINATION
TOOK PLACE (month, day, and year) February 2, 1998

RESPONDENT CODE

THE PARTICULARS ARE:

On _____ 2/2/98 _____. I was   X fired
      (date of harm)             ___ laid off
                                 ___ demoted
                                 ___ harassed
                                 ___ forced to quit

___ denied employment       ___ denied family or medical leave
___ denied promotion        ___ denied pregnancy leave
___ denied transfer         ___ denied equal pay
___ denied accommodation    ___ denied right to wear pants
___ other (specify) _____

by   Tae Jin Yoon
    Name of Person                    Job Title (supervisor/manager/personnel director/etc.)

Because of my:   ___ sex          ___ race/color                ___ physical disability   ___ (Circle one) filing;
                 ___ age          X national origin/ancestry    ___ mental disability     protesting; participating in
                 ___ family       ___ marital status            ___ medical condition     investigation (retaliation for)
                 ___ religion     ___ association               ___ other (specify) _____

The reason given by _____ Tae Jin Yoon _____
                              Name of Person and Job Title

was because of _____ refusal to work in excess of 100 hours every week.  The aforesa
[please state
what you believe   as well as refusal to work in hostile environment of physical and
to be reason(s)]   verbal abuse which employer expected me to tolerate because of
                   our shared South Korean heritage.

I wish to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right-to-sue notice. I understand that if I want a federal notice of right-to-sue, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the DFEH "Notice of Case Closure", or within 300 days of the alleged discriminatory act, whichever is earlier.

I have not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair Employment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action".

I declare under penalty perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to matters stated on my information and belief, and as to those matters I believe it to be true.

Dated _____ 9-23-99 _____

_____ City

COMPLAINANT'S SIGNATURE

DATE FILED:

DFEH-300-03 (04/97)
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

Legal Tabs Co. 1-800-322-3022

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                                    PETE WILSON, Governor

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING
110 West "C" Street, Suite 1702, San Diego, CA  92101-3901
(619) 645-2681  TTY (800) 700-2320  Fax (619) 645-2653



October 20, 1998


SOO CHEOL KANG
910 South Euclid Ave. #98
National City, CA  91950

RE:   E9899D0453-00-c
      KANG/U. LIM AMERICA. INC.


Dear Mr. KANG:

## NOTICE OF CASE CLOSURE

This letter informs you that the above-referenced complaint that you filed with the Department of Fair Employment and Housing (DFEH) has been closed effective October 15, 1998 because you requested an immediate right-to-sue notice.  DFEH will take no further action on your complaint.

This letter is also your Right-To-Sue Notice.  According to Government Code section 12965, subdivision (b), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint.  The civil action must be filed within one year from the date of this letter.

If you want a federal notice of Right-To-Sue, you must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged discriminatory act, whichever is earlier.

Notice of Case Closure
Page Two


The Department of Fair Employment and Housing does not retain case files beyond
three years after a complaint is filed, unless the case is still open at the end of the
three-year period.

Sincerely,

Myonia Gibbs
District Administrator

cc:    Case File


Director
Human Resources/Personnel
U. LIM AMERICA, INC.
605 Westview Court
Chula Vista, CA  91910

DFEH-201-43 (05/92)

Recycled   Stock # R-DO-10-B14

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

| | |
|---|---|
| | FILING CHARGE |
| | Kang, Soo Cheol |

Mr. Ki Hwa Yoon
Owner
U. Lim America, Inc.
605 Westview Court
Chula Vista, CA 91910

**THIS PERSON** (check one)
[X] CLAIMS TO BE AGGRIEVED
[ ] IS FILING ON BEHALF OF ANOTHER

**DATE OF ALLEGED VIOLATION**

| *Earliest* | *Most Recent* |
|---|---|
| 04/15/1994 | 02/03/1998 |

**PLACE OF ALLEGED VIOLATION**
Chula Vista, CA

**CHARGE NUMBER**
345990110

## NOTICE OF CHARGE OF DISCRIMINATION
*(See EEOC "Rules and Regulations" before completing this Form)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] **TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

[ ] **THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967**

[ ] **THE AMERICANS WITH DISABILITIES ACT**

[ ] **THE EQUAL PAY ACT (29 U.S.C. SECT. 206(d))** investigation will be conducted concurrently with our investigation of this charge.

The boxes checked below apply to your organization:

1.[X] No action is required on your part at this time.

2.[ ] Please submit by _____ a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3.[ ] Please respond fully by _____ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

San Diego Area Office
401 B Street, Suite 1550
San Diego, CA  92101

[X] Enclosure:  Copy of Charge

_Steven E. Aronberg_
*(Commission Representative)*

_(619) 557-7235_
*(Telephone Number)*

**BASIS OF DISCRIMINATION**

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [X] NAT. ORIGIN  [ ] AGE  [ ] DISABILITY  [ ] RETALIATION  [ ] OTHER

**CIRCUMSTANCES OF ALLEGED VIOLATION**

See enclosed Form 5, Charge of Discrimination.

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 11/13/1998 | Patrick Matarazzo | |

EEOC  FORM 131  (Rev. 06/92)

**RESPONDENT'S COPY**

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA ☒ EEOC | 345990110 |

CA DEPT OF FAIR EMPLOYMENT/HOUSING _____ and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Soo Cheol Kang | (619) 475-8797 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 910 S. Euclid Avenue, #98, National City, CA 91950 | | 10/29/1966 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| U. Lim America, Inc. | Cat A (15-100) | (619) 476-7071 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 605 Westview Court, Chula Vista, CA 91910 | | 073 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 04/15/1994 | 02/03/1998 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

Ia.    I was initially employed by U. Lim America, Inc. on or about April 15, 1994, and I was last employed as a Purchasing Manager. Throughout my employment, I was subjected to both physical and verbal harassment from Tae Jin Yoon, Vice President. Although I complained to Jae Ho Cho, General Manager, about the harassment, no action was taken and that harassment persisted.

b.    On February 2, 1998, I was informed by Mr. Yoon that I was being discharged from my position because I had failed to follow the company rules about working mandatory overtime.

II.    I believe I have been discriminated against, harassed, and discharged because of my national origin, Korean, in violation of Title VII of the Civil Rights Act of 1964, as amended.

---

☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

NOTARY - *(When necessary for State and Local Requirements)*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)*

Recycled   Stock # R DO 10 B14

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# NOTICE OF RIGHT TO SUE

*(Issued on request)*

| To: Soo Cheol Kang | From: Equal Employment |
|---|---|
| 910 S. Euclid Avenue, #98 | Opportunity Commission |
| National City, CA 91950 | San Diego Area Office |
| | 401 "B" Street, Suite 1550 |
| | San Diego, CA 92101 |
| ☐ *On behalf of a person aggrieved whose identity is CONFIDENTIAL (29 C.F.R. 1601.7(a))* | |

| Charge Number | EEOC Representative | Telephone Number |
|---|---|---|
| 34E990110 | Legal Officer of the Day | (213) 894-1000 |

( See the additional information attached to this form )

**TO THE PERSON AGGRIEVED:** This is your NOTICE OF RIGHT TO SUE. It is issued at your request. If you intend to sue the respondent(s) named in your charge, YOU MUST DO SO WITHIN NINETY (90) DAYS OF YOUR RECEIPT OF THIS NOTICE; OTHERWISE YOUR RIGHT TO SUE IS LOST.

☐ More than 180 days have expired since the filing of this charge.

☒ Less than 180 days have expired since the filing of this charge, but I have determined that the Commission will be unable to complete its process within 180 days from the filing of the charge.

☒ With the issuance of this NOTICE OF RIGHT TO SUE, the Commission is terminating its process with respect to this charge.

☐ It has been determined that the Commission will continue to investigate your charge.

☐ ADEA: While Title VII and the ADA require EEOC to issue this notice of right to sue before you can bring a lawsuit, lawsuit you may sue under the Age Discrimination in Employment Act (ADEA) any time 60 days after your charge

☐ Because EEOC is closing your case, your lawsuit under the ADEA must be brought within 90 days of your receipt of this notice. Otherwise, your right to sue is lost.

☐ EEOC is continuing its investigation. You will be notified when we have completed action and, if appropriate, our notice will include notice of right to sue under the ADEA.

☐ EPA: While Title VII and the ADA require EEOC to issue this Notice of Right to Sue before you can bring a lawsuit, lawsuit you already have the right to sue under the Equal Pay Act (EPA) (You are not required to complain to any enforcement agency before bringing an EPA suit in court). EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

I certify that this notice was mailed on the date set out below.

11/26/97

(Date Mailed)

On behalf of the Commission

Patrick Matarezzo, Director

Enclosures
Information Sheet
Copy of Charge

cc: Respondents

EEOC Form 161-B (Test 10-94)

Ex. 7

Recycled Stock # R DD-10-B14

# * * EMPLOYMENT * *

COMPLAINT OF DISCRIMINATION UNDER
THE PROVISIONS OF THE CALIFORNIA
FAIR EMPLOYMENT AND HOUSING ACT

DFEH # _E9899-D-0453-01c_

DFEH USE ONLY

## CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

YOUR NAME (indicate Mr. or Ms.)
**Mr. Soo Cheol Kang**

ADDRESS
910 South Euclid Avenue, #98

TELEPHONE NUMBER (include Area Code)
(619) 475-8797

CITY/STATE/ZIP
National City, California 91950

COUNTY
San Diego County

COUNTY CODE

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP
COMMITTEE, OR STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

NAME
Tae Jin Yoon

TELEPHONE NUMBER (include Area Code)
(619) 476-7071

ADDRESS
605 Westview Court

DFEH USE ONLY

CITY/STATE/ZIP
Chula Vista, California 91910

COUNTY
San Diego County

COUNTY CODE

NO. OF EMPLOYEES/MEMBERS (if known)

DATE MOST RECENT OR CONTINUING DISCRIMINATION
TOOK PLACE (month, day, and year) February 2, 1998

RESPONDENT CODE

THE PARTICULARS ARE:

On    2/2/98    . I was  X fired          ___ denied employment        ___ denied family or medical leave
      (date of harm)        ___ laid off        ___ denied promotion         ___ denied pregnancy leave
                            ___ demoted         ___ denied transfer          ___ denied equal pay
                            ___ harassed        ___ denied accommodation     ___ denied right to wear pants
                            ___ forced to quit  ___ other (specify) _____

by   Tae Jin Yoon
     Name of Person              Job Title (supervisor/manager/personnel director/etc.)

because of my:  ___ sex      ___ race/color              ___ physical disability   (Circle one) filing;
                ___ age       X  national origin/ancestry ___ mental disability     protesting; participating in
                ___ family   ___ marital status          ___ medical condition      investigation (retaliation for)
                ___ religion ___ association              ___ other (specify)

the reason given by _____ Tae Jin Yoon
                               Name of Person and Job Title

[es because of]    refusal to work in excess of 100 hours every week.  The aforese
[please state]
[that you believe  as well as refusal to work in hostile environment of physical and
to be reason(s)]   verbal abuse which employer expected me to tolerate because of
                   our shared South Korean heritage.

I wish to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right-to-sue notice. I understand that if I want a federal notice of right-to-sue, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the DFEH "Notice of Case Closure", or within 300 days of the alleged discriminatory act, whichever is earlier.

I have not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair Employment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action".

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to matters stated on my information and belief, and as to those matters I believe it to be true.

Dated  9-23-9?                          Soo Cheol Kang
                                        COMPLAINANT'S SIGNATURE

_____
City

DATE FILED:

DFEH-300-03 (04/97)
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

STATE OF CALIFORNIA

Legal Tabs Co.  1-800-322-3022

Recycled    Stock # R-DO-10-B

10/18/1999  20:53    6195439307

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA  ☒ EEOC | 345990110 |

CA DEPT OF FAIR EMPLOYMENT/HOUSING    and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr., Mrs., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Soo Cheol Kang | (619) 475-8797 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 910 S. Euclid Avenue, #98, National City, CA 91950 | | 10/29/1966 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| U. Lim America, Inc. | Cat A (15-100) | (619) 476-7071 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 605 Westview Court, Chula Vista, CA 91910 | | 073 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER *(specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 04/15/1994 | 02/03/1998 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s))*:

Ia.   I was initially employed by U. Lim America, Inc. on or about April 15, 1994, and I was last employed as a Purchasing Manager. Throughout my employment, I was subjected to both physical and verbal harassment from Tae Jin Yoon, Vice President.  Although I complained to Jae Ho Cho, General Manager, about the harassment, no action was taken and that harassment persisted.

b.   On February 2, 1998, I was informed by Mr. Yoon that I was being discharged from my position because I had failed to follow the company rules about working mandatory overtime.

II.   I believe I have been discriminated against, harassed, and discharged because of my national origin, Korean, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 11-13-98 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |
| Date    Charging Party *(Signature)* | |

EEOC FORM 5 (Rev. 06/92)

CHARGING PARTY COPY

**SENDER:**
- Complete items 1 and/or 2 for additional services
- Complete items 3, 4a, and 4b
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

Juliet Peluso
U.S. Army America, Ground
605 Westview Court
Chula Vista, CA 91910

(1) 04532 (lang) 18 May

4a. Article Number
Z 454 748 303

4b. Service Type
☐ Registered          ☐ Certified
☐ Express Mail        ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

5. Received By: (Print Name)

6. Signature: (Addressee or Agent)
X

8. Addressee's Address (Only if requested and fee is paid)

PS Form 3811, December 1994          Domestic Return Receipt

Thank you for using Return Receipt Service.

---

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

Z 454 748  303

| | | |
|---|---|---|
| Sent to | | |
| Street & Number | | |
| Post Office, State, & ZIP Code | | |
| Postage | $ | |
| Certified Fee | | |
| Special Delivery Fee | | |
| Restricted Delivery Fee | | |
| Return Receipt Showing to Whom & Date Delivered | | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | | |
| TOTAL Postage & Fees | $ | |
| Postmark or Date | | |

D- 04532
11-3-5V

PS Form 3800, April 1995